# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DISTRICT OF COLUMBIA**, <br> 400 6th Street NW <br> Washington, D.C. 20001 <br><br>        Plaintiff, <br><br>    v. <br><br> **DONALD J. TRUMP**, *in his official capacity as President of the United States*, <br>    1600 Pennsylvania Ave. NW <br>    Washington, D.C. 20500 <br><br> **UNITED STATES DEPARTMENT OF DEFENSE**, <br>    1000 Defense Pentagon <br>    Washington, D.C. 20301-1400 <br><br> **PETER HEGSETH**, *in his Official Capacity as Secretary of Defense*, <br>    1000 Defense Pentagon <br>    Washington, D.C. 20301-1400 <br><br> **UNITED STATES ARMY**, <br>    101 Army Pentagon <br>    Washington, D.C. 20310-0101 <br><br> **DANIEL P. DRISCOLL**, *in his Official Capacity as Secretary of the Army*, <br>    101 Army Pentagon <br>    Washington, D.C. 20310-0101 <br><br> **UNITED STATES DEPARTMENT OF JUSTICE**, <br>    950 Pennsylvania Avenue NW <br>    Washington, D.C. 20530 | Case No.: 1:25-cv- <br><br><br> **COMPLAINT** |

**PAMELA J. BONDI**, *in her official capacity as United States Attorney General,*
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

**UNITED STATES MARSHALS SERVICE,**
    1215 South Clark Street
    Arlington, VA 22202

**GADYACES S. SERRALTA**, *in his official capacity as Director of the United States Marshals Service,*
    1215 South Clark Street
    Arlington, VA 22202

            Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Over 2,200 National Guard troops from seven states and the District of Columbia are currently patrolling the streets of the District dressed in military fatigues, carrying rifles, and driving armored vehicles. The U.S. Department of Defense has directed these troops to conduct core law enforcement activities, including "presence patrols" and "community patrols." The U.S. Department of Justice has also deputized these troops to engage in additional law enforcement activities, including searches, seizures, and arrests. And despite the fact that these troops are in state militia status—and thus are legally required to be under the sole command of their governors—the President has placed them under the control of the nation's military leadership, which exercises day-to-day supervision over the law enforcement operations they have been designated to conduct.

2.      The residents and leaders of the District of Columbia have not requested any of this. But the President has determined that the District, which he has called a "filthy and crime ridden embarrassment," should be "federalize[d]," so that his Administration can "run it the way

it's supposed to be run." He has therefore disregarded Congress's decision, half a century ago, to afford the residents of the District "the powers of local self-government," including the authority to police the District as they see fit. In so doing, he has run roughshod over a fundamental tenet of American democracy—that the military should not be involved in domestic law enforcement.

3.     None of this is lawful. For one thing, Defendants' deployment of National Guard units to police District streets without the Mayor's consent violates both the Home Rule Act and a congressionally approved compact governing the interstate mobilization of state National Guard troops. More than fifty years ago, Congress exercised its constitutional authority "[t]o exercise exclusive Legislation, in all Cases whatsoever, over [the] District," U.S. Const. Art. I, § 8, cl. 17, to vest the residents of the District with control over "local District matters." Congress gave the President no role in policing the District. What is more, the interstate compact that Congress approved entitles the District alone to determine when to "request" emergency assistance, including "National Guard forces," from other states. Neither the President nor the military he controls may supplant these judgments by deciding for themselves how to police the District or by unilaterally inviting other states to send National Guard forces to "assist" the District.

4.     Furthermore, Defendants' command and control of out-of-state National Guard units when they are in state militia status violates the Constitution and federal law. That is because the Constitution and federal law reserve to the states the authority to command National Guard forces unless and until they have been placed into active federal service. The President has not federalized any of the out-of-state forces he has foisted on the District. The federal government therefore may not lawfully command them or control their day-to-day operations, as it is doing here.

5.      And Defendants' actions flout the Posse Comitatus Act and its counterpart, 10 U.S.C. § 275, which enshrine the nation's foundational prohibition on the participation of military forces in domestic law enforcement absent the most extreme exigencies, such as an invasion or rebellion. Defendants have established a massive, seemingly indefinite law enforcement operation in the District subject to direct military command. The danger that such an operation poses to individual liberty and democratic rule is self-evident.

6.      These unprecedented, unlawful actions have subjected the District to serious and irreparable harm. The deployment of National Guard troops to police District streets without the District's consent infringes on its sovereignty and right to self-governance. The deployment also risks inflaming tensions and fueling distrust toward local law enforcement. And it inflicts economic injuries, depressing business activities and tourism that form the backbone of the local economy and tax base.

7.      No American jurisdiction should be involuntarily subjected to military occupation. The District of Columbia brings this lawsuit to obtain declaratory and injunctive relief that will stop Defendants' violations of law, remedy the harms Defendants are inflicting on the District, and preserve the District's sovereignty.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331.

9.      There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706, and the Court's equitable powers.

10.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The District of

Columbia is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in the District.

## PARTIES

11.    Plaintiff the District of Columbia (the District) is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest. D.C. Code § 1-301.81.

12.    Defendant Donald J. Trump is the President of the United States. He is the Commander-in-Chief of the United States' armed forces, including the District of Columbia National Guard and state National Guard units when under federal control. He is sued in his official capacity.

13.    Defendant United States Department of Defense (DOD) is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). DOD is responsible for coordinating the activities of the United States' armed forces, including the National Guard when under federal control. DOD also directs the activities of the District of Columbia National Guard pursuant to a delegation from the President. DOD is headquartered in Washington, D.C.

14.    Defendant Peter Hegseth is the Secretary of Defense. As Secretary, Defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

15.    Defendant United States Army (Army) is the primary land service branch of the United States military. The Army is a component of DOD, which is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

16.    Defendant Daniel P. Driscoll is the Secretary of the Army. He is the leader of the Army and is responsible for all actions taken by the Army. He is sued in his official capacity.

17.    Defendant United States Department of Justice (DOJ) is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). DOJ is headquartered in Washington, D.C.

18.    Defendant Pamela J. Bondi is the Attorney General of the United States. Attorney General Bondi is responsible for all aspects of the operation and management of DOJ, including implementing and fulfilling DOJ's duties under the Constitution and statutory law. She is sued in her official capacity.

19.    Defendant U.S. Marshals Service (USMS) is a federal law enforcement agency within DOJ responsible for enforcing federal laws and providing support for the federal justice system. It operates under the authority and direction of the Attorney General. 28 U.S.C. § 561. The United States Marshals Service is an agency within the meaning of 5 U.S.C. § 552(f).

20.    Defendant Gadyaces S. Serralta is the Director of the USMS. He is responsible for all aspects of the operation and management of the U.S. Marshals Service. He is sued in his official capacity.

21.    Defendants Department of Defense, Secretary of Defense Peter Hegseth, Department of the Army, and Secretary of the Army Daniel P. Driscoll are collectively referred to in this complaint as "DOD Defendants."

22.    Defendants United States Department of Justice, Attorney General Pamela J. Bondi, U.S. Marshals Service, and USMS Director Gadyaces S. Serralta are collectively referred to in this complaint as "DOJ Defendants."

## LEGAL FRAMEWORK

### A.    The National Guard

23.    At the nation's founding, the Framers divided control over state militias in order to protect "individual liberty" and "the sovereignty of the separate States." *Perpich v. Dep't of Defense*, 496 U.S. 334, 340 (1990). The Founding generation "strongly disfavored standing armies" and believed that "adequate defense of country and laws could be secured through the Militia"—a force composed of "civilians primarily, soldiers on occasion." *United States v. Miller*, 307 U.S. 174, 179 (1939). At the same time, the experience of the Revolutionary War and the Articles of Confederation taught the Founding generation that "[t]he steady operations of war" required "a regular and disciplined army" under centralized federal command. The Federalist No. 25 (Alexander Hamilton).

24.    The Constitution therefore reflects a compromise. It "reserv[es] to the States" the principal power over the "Militia," including the authority to appoint its officers, train its members, and "govern[] such Part of them" as are not in federal service. U.S. Const. art. I, § 8, cl. 16. At the same time, the Constitution vests Congress with authority "[t]o raise and support Armies" for terms of no longer than "two years." *Id.* art. I, § 8 cl. 12. It also grants Congress the powers necessary to ensure that the Militia is a professional force available for national emergencies: it states that Congress may provide for "organizing, arming, and disciplining, the Militia," *id.* art. I, § 8, cl. 16,

and for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions," *id.* art. I, § 8, cl. 15.

25.    The National Guard is the modern Militia. It is governed by a statutory framework that embodies the careful balance struck in the Constitution. In general, National Guard units are under the command of the states.

26.    A state National Guard unit may be activated by its governor to perform state law duties under state command and control, funded by the state, and with pay and benefits determined by state law. This is known as "state active duty status."

27.    National Guard units are also subject to general rules of organization, training, and discipline set forth in Title 32 of the U.S. Code. At the request of the President or Secretary of Defense, a state National Guard unit may be activated by its state governor to perform training or duty under state command and control, funded by the federal government, with pay and benefits determined by federal law. This is known as "Title 32 status." *See* 32 U.S.C. § 502(f).

28.    In rare circumstances, set forth in Title 10 of the U.S. Code, the President may activate the National Guard, thereby making it part of the federal military subject to his direct control. This is known as "Title 10 status." But these circumstances are limited to the most severe exigencies. They include cases in which a state "request[s]" federal aid to suppress an "insurrection . . . against its government," 10 U.S.C. § 251, or when the United States "is invaded or is in danger of invasion by a foreign nation," *id*. § 12406(1).

29.    The District of Columbia National Guard (DCNG) is unique because, regardless of duty status, the President of the United States is always its Commander-in-Chief. D.C. Code § 49-409.

30.    The circumstances in which the President may call out the D.C. National Guard in its state-equivalent militia status are circumscribed by statute.  For instance, the President may activate the DCNG to "aid the civil authorities in the execution of the laws," D.C. Code § 49-404, only when there is a "tumult, riot, mob," or similar disturbance, and the Mayor, the U.S. Marshal for the District, or the National Capital Service Director requests aid. *Id.* § 49-103.

31.    One of the DCNG's elements is the Joint Task Force – District of Columbia (Joint Task Force-DC), a mission-specific entity that typically operates as an organizational umbrella for larger local or federal efforts.[1] The command structure of the Joint Task Force-DC falls completely under the DCNG and, therefore, under the President as Commander-in-Chief of the DCNG.

## B.    Home Rule in the District of Columbia

32.    The Constitution vests Congress with the authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. art. I, § 8, cl. 17. The Framers granted Congress this "exclusive" authority to make clear that other states—including but not limited to those that ceded land to create the capital—would not interfere with or attempt to regulate the nation's seat of government. *See* The Federalist No. 43 (James Madison).

33.    For much of the nation's history, Congress chose to govern the District directly, with little input or control from its residents.

---

[1] DOD, District of Columbia National Guard: Fact Sheet (Aug. 6, 2019), https://media.defense.gov/2019/Aug/06/2002167361/-1/-1/1/DISTRICT%20OF%20COLUMBIA%20NATIONAL%20GUARD%20FACT%20SHEET%2008.06.2019.PDF.

34.     During that period, Congress established a District of Columbia militia, which it later renamed the DC National Guard. *See* Act of Mar. 1, 1889, 25 Stat. 773, ch. 328 (codified as amended at D.C. Code §§ 49-101 *et seq.*).

35.     Congress made the President "Commander-in-Chief" of the DCNG, D.C. Code § 49-404, and gave him control over its operations: he directly appoints and commissions a Commanding General, who prescribes "such drills, inspections, parades, escort, or other duties, as he may deem proper," *id.* §§ 49-102, 49-301; approves "regulations for the government of the militia," *id.* § 49-805; and appoints all of its officers, *id.* § -49-305. During a "tumult, riot, mob," or similar civil disturbance, he may also grant requests by local leadership to "order out so much and such portion of the militia as he may deem necessary to suppress the same." *Id.* § 49-103.

36.     In 1973, after decades of struggle, Congress enacted the District of Columbia Home Rule Act (HRA), Pub. L. No 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code §§ 1-201.01 *et seq.*), which grants the residents of the District "powers of local self-government" and authority over "local District matters," D.C. Code § 1-201.02(a).

37.     To that end, Congress "delegate[d]" to the District government authority over "all rightful subjects of legislation within the District." *Id.* §§ 1-201.02(a), 1-203.02. It authorized the residents to elect a Mayor vested with "[t]he executive power of the District," *id.* § 1-204.22(a), and a Council vested with all of Congress's delegated "legislative power[s]," *id.* § 1-204.04(a).

38.     Pursuant to a statute enacted by Congress, the Mayor's responsibilities include the duty to "preserve the public peace," "prevent crime and arrest offenders," and otherwise "enforce and obey all laws and ordinances in force in the District." D.C. Code § 5-101.03(1), (2), (10). It also includes the power to appoint "all officers and members of [the] Metropolitan Police force," *id.* § 5-105.01, determine the "[c]omposition of [the] force," *id.* § 5-105.05, and to set the rules

10

governing the Metropolitan Police Department (MPD), subject to any legislation enacted by the Council or by Congress.

39.     Congress reserved for itself control over certain matters it deemed of federal concern—for instance, the authority to enact legislation "that concerns the functions of property of the United States" or that is "not restricted in its application exclusively in or to the District." *Id.* § 1-206.02(a)(3). But it otherwise gave the people of the District the right to govern themselves.

40.     By contrast, Congress gave the President an extremely limited role in District affairs. Under the HRA, the President may nominate a small set of District officials. *E.g.*, *id.* §§ 1-204.33, 1-204.34. In "special conditions of an emergency nature," he also may request that the Mayor provide "the services of the Metropolitan police force" for "federal purposes," for a period of no more than 30 days. *Id.* § 1-207.40(a).

41.     The Home Rule Act also states that the District government may not exercise "any greater authority over . . . the National Guard of the District of Columbia" than it did prior to Home Rule—indicating that the President must retain his command role in that organization. *Id.* § 1-206.02(b). But apart from these limited powers, Congress gave the President essentially no authority to oversee the District or control its governance.

## C.    Emergency Management Assistance Compact

42.     All 50 states, four U.S. territories, and the District of Columbia have entered into an interstate compact, known as the Emergency Management Assistance Compact (Assistance Compact), that governs the deployment of non-federalized National Guard units between jurisdictions. *See* H.J. Res. 193, 104th Cong. (1996).

43.     The Assistance Compact provides that "states"—defined to include the District of Columbia—may deploy emergency assistance to another state upon "request." *Id.* arts. I, III.B.

44.    Once sent into another state, "emergency forces" come under "the operational control . . . of the state receiving assistance" and "shall be considered agents of the requesting state." *Id.* arts. IV, VI.

45.    The Assistance Compact specifies that "[m]utual assistance in this compact may include the use of states' National Guard forces, either in accordance with" an interstate compact "or by mutual agreement between states." *Id.* art. I.

46.    Congress and the President assented to the Assistance Compact in 1996, giving it the status of federal law. Emergency Management Assistance Compact, Pub. L. No. 104-321, 110 Stat. 3877 (1996); *see Cuyler v. Adams*, 449 U.S. 433, 438 (1981).

47.    The Council of the District of Columbia subsequently authorized the Mayor to "execute" the compact. D.C. Code § 7-2332. Accordingly, since 2002, the Mayor has been responsible for determining when to "request" the deployment of other states' National Guard forces into the District. *Id.* art. III.B.

**D.    The Posse Comitatus Act**

48.    Even when the President assumes or exercises control of the National Guard, Congress has sharply limited his authority to use the National Guard for domestic law enforcement purposes.

49.    During the nineteenth century, United States Marshals increasingly used the common law power of "posse comitatus"—a Latin phrase that translates roughly to "the power of the county" or "the power of the sheriff"—to deputize citizens, including members of militias and the military, to aid in the enforcement of federal laws. In 1878, Congress rejected this practice and enacted the Posse Comitatus Act (PCA), 18 U.S.C. § 1385, codifying a fundamental principle of

American democracy: military forces are, as a general matter, strictly prohibited from engaging in domestic law enforcement.

50.    The PCA provides that no person may "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except where "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

51.    Because the federalization of National Guard troops makes them part of the federal military, this Act applies to any part of the National Guard that is under federal command and control. When National Guard units are brought into federal service, the PCA applies to them, absent an express statutory exception.

52.    Congress has also enacted a statute that extends PCA-like limits to military establishments not initially covered by the PCA.  In 10 U.S.C. § 275, it required the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter does not include or permit direct participation by any member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity," unless "otherwise authorized by law."  10 U.S.C. § 275.  The Secretary has implemented this requirement by issuing a policy directive that generally bars nearly all "DoD personnel" from providing "direct civilian law enforcement assistance," including but not limited to "a search or seizure," an "arrest" or "apprehension," and "security functions" or "crowd and traffic control." Dep't of Defense Instruction No. 3025.21, at 18-19 (updated Feb. 8, 2019).

## FACTUAL ALLEGATIONS

**A.    The President Has Launched an Unprecedented Assault on the District's Sovereignty.**

53.    Despite more than 50 years of local self-governance in the District, President Trump has repeatedly threatened to infringe on the District's home rule, falsely asserting that the District is lawless and disparaging its appearance.

54.    In March 2023, then-candidate Trump declared that "the federal government should take over control and management of Washington, DC," which he claimed was "littered with trash."[2] Similarly, in August 2023, Trump remarked on social media that he was "calling for a federal takeover of this filthy and crime ridden embarrassment to our nation."[3]

55.    In a November 2023 campaign speech, he promised that the District would "become the most beautiful capital anywhere in the world. We're going to take over the capital and we're going to make it beautiful, we are going to make it safe, we're going to make it great."[4]

56.    In January 2024, then-candidate Trump reiterated, "We're . . . going to federalize Washington DC. It's become hell on earth . . . . . [Y]ou can't even walk through the best areas without being molested or shot, beat up by thugs. We're going to take over Washington DC, and we're going to make it great again."[5]

---

[2] Video posted by Aaron Rupar (@atrupar), X (Mar. 4, 2023, at 6:59 ET) https://x.com/atrupar/status/1632168980130455553?lang=ms.

[3] Shawna Mizelle & Katelyn Polantz, *Trump claims he can't get a fair trial in DC as latest indictment dominates GOP* primary, CNN (Aug. 7, 2023), https://www.cnn.com/2023/08/06/politics/trump-fair-trial-court-case-dc-venue-change/index.html.

[4] Oliver Browning, *Trump vows to 'take over' Washington DC: 'We are going to make it beautiful'*, Independent (Nov. 20, 2023), https://www.the-independent.com/tv/news/trump-iowa-speech-washington-election-b2450354.html.

[5] *Speech: Donald Trump Holds a Campaign Rally in Mason City, Iowa – January 5, 2024*, Factbase, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-mason-city-iowa-january-5-2024/ (01:19:01-01:19:33 timestamp).

57.    Similarly, in July 2024, after making assertions about crime in the District, then-candidate Trump declared, "[W]e're going to take it away from the mayor. . . . [T]hat doesn't make me popular there, but I have to say it."[6]

58.    President Trump's attacks on the District's independence and local autonomy have continued since he re-entered office. On February 19, 2025, President Trump told reporters, "I think that we should govern the District of Columbia . . . I think that we should run it strong, run it with law and order, make it absolutely flawless . . . And I think we should take over Washington, DC . . . We should govern DC. The federal government should take over the governance of DC . . . [T]hey're not doing the job—too much crime, too much graffiti, too many tents on the lawn."[7]

59.    On March 14, 2025, in remarks at DOJ headquarters, President Trump declared, "we're gonna have to take [DC] back and run it through the federal government."[8]

60.    On March 27, 2025, President Trump promulgated Executive Order 14252, "Making the District of Columbia Safe and Beautiful" (the March 27 Executive Order). 90 Fed. Reg. 14559 (Apr. 3, 2025).  The March 27 Executive Order directed federal agencies to coordinate on tasks including "directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area" and increasing enforcement of a variety of local criminal laws, including "those prohibiting assault, battery, larceny, graffiti and other vandalism,

---

[6] Mark Segraves, *Here's what a second Trump presidency could mean for DC*, NBCWashington, https://www.nbcwashington.com/news/local/heres-what-a-second-trump-presidency-could-mean-for-dc/3762595/.

[7] Screenshot of White House Press Pool posted by Jake Sherman (@JakeSherman), X (Feb. 19, 2025, at 9:55 ET), https://x.com/JakeSherman/status/1892407773603778589/photo/1.

[8] Julia Mueller, *Trump suggests federal government take over DC if local leaders 'can't do the job'*, The Hill (Mar. 14, 2025), https://thehill.com/homenews/administration/5195711-trump-dc-federal-government-takeover/.

unpermitted disturbances and demonstrations, noise, trespassing, public intoxication, drug possession, sale, and use, and traffic violations." 90 Fed. Reg. at 14560.

61.    In early August, President Trump's threats accelerated following a highly publicized incident involving a former staff member of the Department of Government Efficiency (DOGE). Around 3:00 a.m. on August 3, the former DOGE staffer was reportedly assaulted by a group of teenagers. The District's MPD quickly responded to the incident and apprehended two suspects.

62.    Two days later, President Trump posted to his social media platform, Truth Social, a photo of a young man—identified by others as the former DOGE staffer—bloodied and with wounds to his face. In this post, the President claimed that "[c]rime in Washington, D.C., is totally out of control," and he renewed threats to "federalize" the District in light of the attack.[9]

63.    Over the following days, President Trump continued to threaten to take control of the District, purportedly for the purpose of addressing local crime:

- On August 5, 2025, the President told reporters, "[s]omebody from DOGE was very badly hurt last night. You saw that. A young man that was beat up by a bunch of thugs in D.C. And either they're going to have to straighten out their act in the terms of government and in the terms of protection or we're going to have to federalize it, run it the way it's supposed to be run."[10]

- On August 6, 2025, President Trump stated, "We're considering [taking federal control over law enforcement] because the crime is ridiculous . . . Now we want to

---

[9] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 05, 2025, at 4:13 ET), https://truthsocial.com/@realDonaldTrump/posts/114977985620971126.

[10] TIME, *Trump Threatens to Federalize D.C. After Beating of 'Big Balls'*, at 0:05-0:24 (YouTube, Aug. 5, 2025), https://www.youtube.com/watch?v=Fb7yKvOQE_c.

have a great, safe capital, and we're gonna have it, and that includes cleanliness and it includes other things. . . . We're going to do something about it, so whether you call it federalize or what—and that also includes the graffiti that you see, the papers all over the place, the roads that are in bad shape, the medians that are falling down . . . And what a shame—the rate of crimes, the rate of muggings, killings, and everything else. And that includes bringing in the National Guard, maybe, very quickly."[11]

64.    On August 9, 2025, the President announced in a social media post that he would soon hold a press conference that "will, essentially, stop violent crime in Washington, D.C." In the post, he claimed the District is "one of the most dangerous cities anywhere in the World," and that it would "soon be one of the safest!!!"[12]

65.    The President's statements, including his statements that crime in the District is rising, are hyperbolic and inconsistent with the facts. Publicly available data from both federal and local sources demonstrate that violent crime in the District has been and is trending significantly downward.

66.    According to the U.S. Department of Justice, "[t]otal violent crime for 2024 in the District of Columbia [was] down 35% from 2023 and [was] the lowest it [had] been in over 30 years."[13]

---

[11] News18, *Trump Teases Takeover of* DC (Facebook, Aug.7, 2025 at 4:55 a.m.), https://www.facebook.com/cnnnews18/videos/787799723585929/.
[12] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug.9, 2025, at 9:40 a.m.), https://truthsocial.com/@realDonaldTrump/posts/114999087271735961.
[13] Press Release, U.S. Att'y's Off. for D.C., Violent Crime in D.C. Hits 30 Year Low (Jan. 3, 2025), https://www.justice.gov/usao-dc/pr/violent-crime-dc-hits-30-year-low.

67.    That downward trend has continued. In 2025, violent crime is down 26% from this time in 2024, 51% from this time in 2023, and 35% from 2019, prior to the pandemic.

68.    Both President Trump and the U.S. Attorney's Office for the District of Columbia have acknowledged that in 2025, prior to the attempted takeover of MPD or deployment of any National Guard troops in the District, violent crime in D.C. was declining.

69.    In an April 28, 2025 press release, former interim U.S. Attorney Ed Martin, Jr. marked the first 100 days of President Trump's second term "by highlighting a 25 percent drop year-to-date in violent crime across the District, credited in part to the 'Make D.C. Safe Again' initiative and the U.S. Attorney's partnership with the Bureau of Alcohol, Tobacco, Firearms, and Explosives and [the] Metropolitan Police Department."[14]

70.    Shortly thereafter, on May 7, 2025, President Trump praised Mr. Martin, stating that on his watch, "[c]rime is down in Washington, D.C.—street crime, violent crime—by 25%. And it's . . . people have seen . . . they've noticed a big difference."[15]

**B.    The President Ordered the Secretary of Defense to Deploy National Guard Troops.**

71.    On August 11, 2025, flanked by Defendant Hegseth, Defendant Driscoll, Defendant Serralta, Defendant Bondi, and other officials, the President carried through on the threats he had been making for more than two years.[16] In a press conference in the White House briefing room, he "announc[ed] a historic action to rescue our nation's capital from crime, bloodshed, bedlam,

---

[14] Press Release, U.S. Att'y's Off. for D.C., U.S. Attorney Ed Martin, Jr. Credits President Trump's First 100 Days with 25% Drop in D.C. Violent Crime (Apr. 28, 2025), https://www.justice.gov/usao-dc/pr/us-attorney-ed-martin-jr-credits-president-trumps-first-100-days-25-drop-dc-violent.

[15] The White House, *President Trump Swears in the Ambassador to the People's Republic of China*, at 13:24-13:39 (YouTube, May 7, 2025), https://www.youtube.com/watch?v=MydfT0rCkZ8.

[16] Video posted by The White House (@WhiteHouse), X, *President Trump Holds a Press Conference* (Aug. 11, 2025, at 10:36 a.m.), https://x.com/WhiteHouse/status/1954914776527589534.

and squalor, and worse." He continued, "[t]his is liberation day in DC and we're gonna take our capital back. We're taking it back."[17]

72.    In addition to invoking Section 740 of the Home Rule Act to purportedly "place[] the D.C. Metropolitan Police Department under direct federal control,"[18] the President announced that he was "deploying the National Guard to help reestablish law, order, and public safety in Washington, D.C." "[W]e will bring in the military if needed," he added. The President also signaled that his appetite for military intervention extended far beyond his initial deployment of 800 DCNG troops, confirming his administration would deploy "much more, if necessary, much more. You remember, I said I offered 10,000 once."[19]

73.    The same day as the press conference, the President issued a memorandum (the August 11 Memorandum) to the Secretary of Defense titled "Restoring Law and Order in the District of Columbia."[20]

74.    Section One of the August 11 Memorandum repeats the claim that the District is "under siege from violent crime" and asserts that the President has a "solemn duty to protect law-abiding citizens from the destructive forces of criminal activity."

---

[17] *Id.* at 54:52-55:12.
[18] The Administration's efforts to seize direct control of the District's police department were quickly rebuffed in federal court. *See* Zach Montague, *D.C. Police Chief Retains Control of City Police After Court Hearing*, N.Y. Times (Aug. 15, 2025), https://www.nytimes.com/2025/08/15/us/politics/judge-hearing-dc-home-rule.html; *District of Columbia v. Trump*, No. 1:25-cv-02678 (D.D.C. filed Aug. 15, 2025).
[19] Video posted by The White House (@WhiteHouse), X, *President Trump Holds a Press Conference* (Aug. 11, 2025, at 10:36 a.m.), https://x.com/WhiteHouse/status/1954914776527589534.
[20] *Presidential Memoranda: Restoring Law and Order in the District of Columbia*, White House (Aug. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/.

75.     In Section Two of the August 11 Memorandum, the President directed the Secretary of Defense to deploy the DCNG "in such numbers as [the Secretary of Defense] deems necessary."

76.     In Section Two, the President further directs "the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission."

77.     After the President issued the August 11 Memorandum, Secretary of Defense Hegseth said that the mobilization would be "operationalized" by Secretary of the Army Driscoll and that National Guard members would be deployed in the streets of Washington, D.C. in the coming week.[21]

78.     Two weeks later, on August 25, 2025, President Trump issued an additional Executive Order (the August 25 Executive Order) that required the Secretary of Defense to "immediately create and begin training, manning, hiring, and equipping a specialized unit within the District of Columbia National Guard, subject to activation under Title 32 of the United States Code, that is dedicated to ensuring public safety and order in the Nation's capital." Additional Measures to Address the Crime Emergency in the District of Columbia, 90 Fed. Reg. 42121, 42121 (Aug. 28, 2025). Members of this unit are to be "deputize[d]. . . to enforce Federal law." *Id.*

**C.     Defendants Deployed National Guard Troops from Seven States in the District.**

79.     As directed by the President, Secretary of Defense Hegseth mobilized thousands of troops from across the country into the District.

---

[21] C. Todd Lopez, *National Guard Task Force Mobilizes to Restore Safety in Nation's Capital*, DOD News (Aug. 11, 2025),  https://www.defense.gov/News/News-Stories/Article/Article/4271502/national-guard-task-force-mobilizes-to-restore-safety-in-nations-capital/.

80.    In an interview on Fox News on the night of August 11, Defendant Hegseth said he was deploying troops to the District to act as "force multipliers" for local and federal law enforcement.[22]

81.    Comparing the law enforcement actions to come in D.C. with those that had recently taken place in Los Angeles, Defendant Hegseth stated, "[i]n 2025, there was a summer of law enforcement. And we quelled the protests [in Los Angeles] of the attacks on ICE officers. We're going to help get D.C. under control . . . . The D.C. [National] Guard's proud to be a part of it; other states will contribute. . . ."[23]

82.    In defending the President's decision to use the National Guard and the military for domestic law enforcement purposes, Hegseth continued: "He's got the guts to say, 'I'm gonna federalize the police that don't work; I'm gonna bring in the National Guard; I'm gonna bring in federal marshals; I'm gonna bring in the Park Police.'"[24]

83.    "They will be standing right alongside our federal agents, like they were in Los Angeles. They're going to be proactive. If you take an action or a shot at them, there will be a consequence," Hegseth told the host.[25]

84.    When the host then asked what the National Guard would do if law enforcement was not on the scene, Hegseth stated, "I will have their back to make sure they can take the necessary action to protect the citizens of D.C. and protect themselves. . . . You can help somebody, interdict, temporarily detain like we did in Los Angeles, and hand over to law enforcement."[26]

---

[22] Ingraham Angle, *Trump's 'got the guts' to do this: Pete Hegseth*, at 00:26-00:32 (FoxNews Live, Aug. 11, 2025), https://www.foxnews.com/video/6376809414112.
[23] *Id.* at 01:05-01:25.
[24] *Id.* at 2:25-2:37.
[25] *Id.* at 3:35-3:46.
[26] *Id.* at 3:49-4:19.

85.     According to Pentagon Press Secretary Kingsley Wilson, at the time of their original deployment, the DCNG troops were unarmed and following the DCNG rules for the use of force. While claiming that the DCNG troops would not conduct any arrests, Press Secretary Wilson also confirmed that this would be "very similar to the LA mission, where we could temporarily [detain] someone and then turn them over to the proper law enforcement authorities."[27]

86.     Then, between August 16 and August 31, 2025, at the request of the President and Defendant Driscoll, the states of Ohio, South Carolina, West Virginia, Mississippi, Tennessee, Louisiana, and South Dakota sent more than 1,300 National Guard troops from their own states into the District of Columbia.

87.     On August 16, 2025, Ohio Governor Mike DeWine deployed 150 National Guard Military Police Officers to the District.[28] Governor DeWine explained that the deployment request came from Defendant Driscoll and that the troops would "support the District of Columbia National Guard . . . [to] carry out presence patrols and serve as added security" in the District.[29]

88.     On August 16, 2025, South Carolina Governor Henry McMasters deployed 200 members of the South Carolina National Guard to the District, in order to "support federal law enforcement activities under President Donald J. Trump's executive order to Restore Law and

---

[27] C. Todd Lopez, *National Guard Mobilizes 800 Troops in D.C. to Support Federal, Local Law Enforcement,* DOD News (Aug. 14, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4275149/national-guard-mobilizes-800-troops-in-dc-to-support-federal-local-law-enforcem/ (brackets in original).
[28] Press Release, Off. of the Governor of Ohio, Governor DeWine Issues Statement on Ohio National Guard (Aug. 16, 2025), https://governor.ohio.gov/media/news-and-media/governor-dewine-issues-statement-on-ohio-national-guard.
[29] *Id.*

Order in the District of Columbia," and "restore law and order to our nation's capital and ensure safety for all who live, work, and visit there." [30]

89.     On August 16, 2025, West Virginia Governor Patrick Morrisey deployed "approximately 300-400" members of the West Virginia National Guard, "to support the President's initiative to restore cleanliness and safety to Washington, D.C. . . . [and] as a show of commitment to public safety and regional cooperation." [31]

90.     On August 18, 2025, Louisiana Governor Jeff Landry deployed 135 members of the Louisiana National Guard "to assist President Donald J. Trump's mission of restoring safety and peace in our nation's capital . . . [and] to return safety and sanity to Washington DC and cities all across our country, including right here in Louisiana." [32] The Louisiana National Guard announced in a press release that, "as directed by the president of the United States," it was "federalizing and activating to Washington, D.C., to support the Metropolitan Police Department, the District of Columbia National Guard and D.C. local law enforcement beginning August 16, 2025." [33]

---

[30] Press Release, Off. of the Governor of South Carolina, Governor Henry McMaster Authorizes Deployment of National Guard to Washington, D.C. (Aug. 16, 2025), https://governor.sc.gov/news/2025-08/gov-henry-mcmaster-authorizes-deployment-national-guard-washington-dc.

[31] Press Release, Off. of the Governor of W. Virginia, West Virginia National Guard to Support President Trump's Initiative to Make D.C. Safe and Beautiful (Aug. 16, 2025) https://governor.wv.gov/article/west-virginia-national-guard-support-president-trumps-initiative-make-dc-safe-and-beautiful.

[32] Governor Jeff Landry (@LAGovJeffLandry), X (Aug. 18, 2025, at 5:04 p.m.), https://x.com/LAGovJeffLandry/status/1957549092562956743.

[33] Press Release, La. Nat'l Guard, La. National Guard Military Police to assist in Washington, D.C. (Aug. 18, 2025), https://geauxguard.la.gov/2025/08/18/la-national-guard-military-police-to-assist-in-washington-d-c/.

91.     On August 18, 2025, Mississippi Governor Tate Reeves deployed 200 members of the Mississippi National Guard to the District.[34] According to Governor Reeves, he approved deployment of the Mississippi National Guard "to support President Trump's effort to return law and order to our nation's capital."

92.     On or about August 18, 2025, Tennessee Governor Bill Lee deployed 160 members of the Tennessee National Guard to the District[35] "to assist with monument security, community safety patrols, protecting federal facilities, and traffic control" for "as long as needed."[36]

93.     On or about August 31, 2025, South Dakota Governor Larry Rhoden announced the deployment of 12 South Dakota National Guard troops to the District "at the request of President Donald J. Trump." The Governor stated that "[w]ith the National Guard's help, President Trump has restored law and order to our nation's capital—and our guardsmen will help keep it that way. We will not sit on the sidelines while crime threatens the safety of our families."[37]

94.     While it is not clear how many other governors received the President's request to deploy National Guard troops to the District, at least one more did. Governor Phil Scott of Vermont publicly declined the request because, "in the absence of an immediate emergency or disaster that

---

[34] Press Release, Off. of Governor of Mississippi, Governor Reeves Statement on Mississippi National Guard Deployment to Washington, D.C. (Aug. 18, 2025), https://governorreeves.ms.gov/governor-reeves-statement-on-mississippi-national-guard-deployment-to-washington-d-c/.

[35] Katie Glueck & Anushka Patil, *Tennessee Becomes Latest Republican-Led State to Send National Guard to D.C.*, N.Y. Times (Aug. 19, 2025), https://www.nytimes.com/2025/08/19/us/politics/tennessee-national-guard-dc-trump.html.

[36] Associated Press, *National Guard troops from Tennessee authorized by governor to patrol D.C. streets*, NewsChannel9 (Aug. 19, 2025), https://newschannel9.com/news/local/national-guard-troops-from-tennessee-authorized-by-governor-to-patrol-dc-streets.

[37] Press Release, Off. of Governor of South Dakota, Gov. Rhoden Mobilizes SDNG to DC at the Request of President Trump (Aug. 31, 2025), https://news.sd.gov/news?id=news_kb_article_view&sys_id=62fdcf1f47e7aa10701588ff336d43ea.

local and regional first responders are unable to handle," he did "not support utilizing the guard for this purpose, and [did] not view the enforcement of domestic law as a proper use of the National Guard."[38]

95.    Notably, most of the states that sent their troops into the District are home to cities presently reporting comparable or higher rates of violent crime than the District, including: Cleveland, Dayton, and Toledo, Ohio; Memphis and Nashville, Tennessee; Shreveport, Louisiana;[39] Jackson, Mississippi;[40] North Charleston, South Carolina;.[41] and Sioux Falls, South Dakota.[42]

**D.    The District Did Not Request Assistance from the Out-of-State National Guard Troops.**

96.    District Mayor Muriel Bowser, who under D.C. Code § 1-204.22 is "responsible for the proper execution of laws relating to the District, and for the proper administration of the affairs of the District," has repeatedly made it clear that she does not support the influx of National Guard troops in the District. Even before the deployment, the Mayor rejected the notion that the

---

[38] Peter Hirschfeld, *Phil Scott rejects second request to deploy Vermont National Guard, this time to Washington, D.C.*, Vermont Public (Aug. 15, 2025), https://www.vermontpublic.org/local-news/2025-08-15/phil-scott-rejects-request-deploy-vermont-national-guard-washington-d-c.

[39] David W. Chen, *Crime Festers in Republican States While Their Troops Patrol Washington*, N.Y. Times (Sept. 1, 2025), https://www.nytimes.com/2025/09/01/us/politics/crime-republican-states.html.

[40] The homicide rate in Jackson, Mississippi is more than four times that in the District. Shamira Muhammad, *Mississippi sent troops to back Trump's D.C. takeover despite its own high crime rates*, NPR (Aug. 20, 2025), https://www.npr.org/2025/08/20/nx-s1-5508089/mississippi-sent-troops-to-back-trumps-d-c-takeover-despite-its-own-high-crime-rates.

[41] *See Crime Statistics (Year-to-Date Comparison)*, City of N. Charleston, https://police.northcharleston.org/services/crime_stats_online_mapping.php.

[42] Cooper Seamer, *Violent crime rates slightly dip, property crime rates steady in Sioux Falls*, DakotaNewsNow (Oct. 1, 2024), https://www.dakotanewsnow.com/2024/10/01/violent-crime-rates-slightly-dip-property-crime-rates-steady-sioux-falls/.

National Guard was a proper tool for law enforcement, correctly noting that National Guard troops are "not law enforcement officials."[43]

97.    On August 11, Mayor Bowser called the deployment of the D.C. National Guard "unsettling and unprecedented."[44] On August 16, following the first announcements that other states were sending their National Guard units to the District, Mayor Bowser posted on social media that "American soldiers and airmen policing American citizens on American soil is #UnAmerican."[45] On August 25, Mayor Bowser reiterated that she "[does not] believe that troops should be policing American cities." [46]

98.    On August 27, as part of a presentation to the public relating to the federal surge of law enforcement in the District, the Mayor noted that "National Guard from other states" was part of "what's not working."[47]

99.    At no time did the Mayor or any other District official request the presence of National Guard troops in the District, under the Emergency Management Assistance Compact or by any other means, and the states that sent out-of-state National Guard troops did not seek the consent of the Mayor prior to sending their National Guard units to the District.

---

[43] Luke Garrett, *D.C. mayor defends capital's crime rates after Trump threatens to take over police*, NPR (Aug. 10, 2025), https://www.npr.org/2025/08/10/g-s1-81933/d-c-mayor-defends-capitals-crime-rates-after-trump-threatens-to-take-over-police.

[44] Aaron Pellish, *Washington mayor calls Trump's police order 'unsettling and unprecedented'*, POLITICO (Aug. 11, 2025), https://www.politico.com/news/2025/08/11/dc-mayor-trump-police-order-unsettling-unprecedented-00504209.

[45] Muriel Bowser (@MurielBowser), X (Aug. 16, 2025, at 9:31 p.m.), https://x.com/MurielBowser/status/1956891644076154962.

[46] Mark Sherman et al., 'Leave Our Kids Alone': *Schools Reopen in DC With Parents on Edge over Trump's Armed Patrols*, Military.com (Aug. 25, 2025), https://www.military.com/daily-news/2025/08/25/leave-our-kids-alone-schools-reopen-dc-parents-edge-over-trumps-armed-patrols.html.

[47] First slide image posted by Mayor Muriel Bowser (@MayorBowser), X (Aug. 27, 2025, at 2:52 pm), https://x.com/MayorBowser/status/1960777484510880111.

100.    The states that sent National Guard troops into the District have also provided virtually no information to the District regarding the deployments.

101.    On or around August 20 and 21, 2025, the Office of the Attorney General for the District of Columbia sent letters to Defendant Driscoll and to the Governors and Attorneys General of Ohio, South Carolina, West Virginia, Mississippi, Tennessee, and Louisiana, requesting information regarding the factual and legal basis for the states' decisions to deploy troops to the District as well as the operational details of their deployment.

102.    Specifically, the District's letters to these states requested information regarding (i) the source of the request for National Guard support, (ii) the legal authority offered by federal officials for the deployment, (iii) their stated mission, (iv) the scope of any law enforcement authority the units would exercise, (v) the command structure the units would follow, (vi) whether the units would be armed, (vii) the rules of force the units would follow, (viii) whether the units had been deputized by any federal law enforcement agencies, and (ix) the length of deployment.

103.    As of the date of this Complaint, only Tennessee has responded to the District's request, and it provided only limited information. On August 22, 2025, Tennessee informed the District that "upon orders from President Trump, Governor Lee granted the Administration's request to provide Tennessee National Guardsmen under Title 32 Status to assist the District of Columbia National Guard on a security mission in our nation's capital." Tennessee stated it had sent "[a]pproximately 160 service members" to "join the D.C. Joint Task Force and work alongside local and federal law enforcement agencies to assist with monument security, community safety patrols, protecting federal facilities, and traffic control." It noted that "the service members are ready to assist as long as needed."

104.    Tennessee did not respond to the District's question about the scope of the Tennessee National Guard's law enforcement authority while in the District, nor did it confirm the nature of their command structure, armed status, rules of force, or deputization status.[48]

**E.    All of the National Guard Units Deployed in the District Are Under Federal Command and Control.**

105.    The National Guard units in the District have purportedly been activated in the District of Columbia in a Title 32 status. Accordingly, the out-of-state National Guard units should be under the command and control of their respective Governors, and not the federal government.

106.    But the reality is that Defendants have seized command and control of the out-of-state National Guard troops. Like the DCNG, they are here at the request of the President and federal military officials, and they have been integrated into the command structure of the Joint Task Force-DC.

107.    Consistent with the President's August 11 Memorandum, the Secretary of Defense activated the Joint Task Force-DC and 800 DCNG troops. The current mission of the troops assigned to the Joint Task Force-DC is "to support local and federal law enforcement efforts aimed at restoring order in the District of Columbia" in accordance with "the President's [March 28 Executive Order] declaring a crime emergency."[49]

---

[48] This Complaint uses the term "deputization" to refer to the process of deputizing or the status of having been deputized. Some DOD and USMS policy documents use the synonymous term "deputation."

[49] *Joint Task Force (JTF)-DC*, D.C. Nat'l Guard, https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/.

108.    With the arrival of out-of-state troops, the Secretary of Defense consolidated all National Guard units present in the District under the command of the Joint Task Force-DC.[50] Now, 2,290 Guardsmen are supporting the Joint Task Force-DC, of which 952 troops are from the DCNG and 1,338 troops are from other states' guards.[51]

109.    Army Col. Larry Doane of the DCNG is the commander of the Joint Task Force-DC.[52] His chain of command leads through the Army Secretary and Secretary of Defense to the President. Accordingly, any units under the command of Joint Task Force-DC are now also under federal command and control.

110.    Demonstrating this federal command structure, the Secretary of Defense, at the behest of the President, has issued crucial orders through Joint Task Force-DC to the out-of-state troops. Most notably, on August 22, 2025, Defendant Hegseth directed Brigadier General Leland D. Blanchard II, the interim Commanding General of the DCNG, to authorize all National Guard members supporting the Joint Task Force-DC to carry their service-issued weapons—M17 pistols or M4 semiautomatic rifles.[53]

---

[50] *See* Jon Soucy, *Guard members from six states, D.C. on duty in Washington in support of local, fed authorities*, D.C. Nat'l Guard (Aug. 29, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4290553/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/ ("More than 2,000 National Guard Soldiers and Airmen from six states and the District of Columbia are on duty in Washington as part of Joint Task Force – District of Columbia").

[51] *Joint Task Force (JTF)-DC*, D.C. Nat'l Guard, https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/.

[52] *Joint Task Force D.C. commander discusses D.C. Safe and Beautiful mission*, Defense Visual Information Distribution Service (Aug. 13, 2025), https://www.dvidshub.net/video/973731/joint-task-force-dc-commander-discusses-dc-safe-and-beautiful-mission.

[53] *National Guard authorized to carry weapons in support of law enforcement*, D.C. Nat'l Guard (Aug. 23, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4284293/national-guard-authorized-to-carry-weapons-in-support-of-law-enforcement/.

111.    That National Guard troops are carrying M17 pistols on District streets is particularly troubling. The M17 is a version of the Sig Sauer P320 handgun, which numerous reports indicate can fire without a trigger pull and cause unintentional injuries. In July 2025, U.S. Immigration and Customs Enforcement (ICE) banned the use of all models of the P320 by agents, and the U.S. Air Force Global Strike Command suspended the use of the pistols pending further investigation.[54]

**F.    The President Has Authorized National Guard Troops Under Federal Command and Control to Engage in Law Enforcement in Violation of the Posse Comitatus Act.**

112.    On August 15, U.S. Marshal Jeryl Isaac, Chief Deputy of the USMS, deputized the leaders of the DCNG that are in command of the Joint Task Force-DC.



*(U.S. Marshal for the District of Columbia Deputizing National Guard Troops in D.C.)*[55]

---

[54] Zita Ballinger Fletcher, *Air Force suspends use of M18 pistols after airman's death*, DefenseNews (Jul. 24, 2025), https://www.defensenews.com/air/2025/07/24/air-force-suspends-use-of-m18-pistols-after-airmans-death/.
[55] U.S. Marshals Service (@USMarshalsHQ), X (Aug. 18, 2025, at 11:33 AM), https://x.com/USMarshalsHQ/status/1957466011742961851.

113.    On August 25, Col. Doane, the commander of the Joint Task Force-DC, addressed the decision to arm National Guard units in the District and stated they would "receive training on the rules of use of force and then be deputized by our partners at the U.S. Marshals Service to work with them as deputy U.S. Marshals."[56]

114.    On information and belief, most or all District of Columbia and out-of-state National Guard units have been deputized as U.S. Marshals.

115.    The USMS is a federal law enforcement agency. Those deputized by the USMS are authorized by the agency to perform federal law enforcement functions. Specifically, they:

> have Title 18 authority . . . to perform any of the following federal law enforcement functions: a. Seek and execute arrest warrants and search warrants; b. Make arrests without a warrant if there are reasonable grounds to believe that the suspect has violated or is violating federal law; c. Serve subpoenas and other legal writs; d. Monitor Title III Intercepts (electronic surveillance); and e. Carry firearms for personal protection or the protection of those covered under the federal assault statutes.

USMS Policy Directive 17.11.D.4 (10/07/2020).

116.    Furthermore, Special USMS Deputies are "appointed, under authority delegated by the Attorney General, to perform the duties of the Office of Special Deputy United States Marshal as directed by an appropriate official of the United States Marshals Service or some other appropriate Federal Official as so designated." Form USM-3B, Special Deputation Oath of Office, Authorization, and Appointment.

---

[56] Master Sgt. Whitney Hughes, *Security Posture Interview with JTF-DC Commander*, 189TH INFANTRY BRIGADE (Aug. 25, 2025), https://www.first.army.mil/Units/Divisions/Division-West/189th-Infantry-Brigade/videoid/974996/, at 0:22.

117.    The USMS also approved the authorization for National Guard units under Joint Task Force-DC to be armed.[57]



*(National Guard Troops Armed With Rifles on the National Mall)[58]*

118.    As a result of these deputizations, the National Guard troops in the District are authorized and expected to detain individuals. On several occasions, Defendants and their representatives have reiterated that they expect National Guard units to "interdict" and "temporarily detain" individuals if they determine that a crime is in progress.[59] And press reports indicate that these detentions are, in fact, occurring.[60]

---

[57] Mosheh Gains & Daniel Arkin, *Hegseth Authorizes National Guard Troops in D.C. to Carry Weapons*, NBC NEWS (Aug. 22, 2025), https://www.nbcnews.com/news/us-news/hegseth-authorizes-national-guard-troops-dc-carry-weapons-rcna226536.

[58] AP Photo, Nikhinson, Julia Demaree (Aug. 26, 2025) https://apnews.com/photo-gallery/trump-national-guard-police-washington-dc-photos-170363ba069f7e52a66f1e7056c24dc5#.

[59] Diana Nerozzi & Steven Nelson, *Trump Takes Control of DC Police, Deploying National Guard in Historica Capital Crime Crackdown – And Warns NYC Could Be Next*, NEW YORK POST (Aug. 11, 2025), https://nypost.com/2025/08/11/us-news/trump-federalizing-dc-police-deploying-national-guard-in-capital-crime-crackdown/.

[60] Eric Schmitt & Campbell Robertson, *National Guard Detained Man Who Assaulted a Park Police Officer, Authorities Say*, THE NEW YORK TIMES (Aug. 16, 2025), https://www.nytimes.com/2025/08/16/us/politics/national-guard-detained-man.html.

119.    In addition, under federal command and control, these units are engaged in armed "presence patrols" across the District. On August 25, 2025, the Commander of the Joint Task Force-DC confirmed that the Task Force had "been ordered by the Secretary of Defense and at the request of the U.S. Marshals Service to go begin armed patrols."[61] These are law enforcement activities.

120.    District residents and visitors have seen this play out in their daily lives. For more than two weeks, members of the National Guard—uniformed, armed, and deputized as law enforcement officers—have been seen carrying out these patrols, bearing handcuffs, across D.C.



*(Photos of National Guard Troops Patrolling D.C. Streets)[62]*

---

[61] Master Sgt. Whitney Hughes, *Security Posture Interview with JTF-DC Commander*, 189TH INFANTRY BRIGADE (Aug. 25, 2025), https://www.first.army.mil/Units/Divisions/Division-West/189th-Infantry-Brigade/videoid/974996/ at 0:09.

[62] District of Columbia National Guard (@DCGuard1802), X (Aug. 26, 2025 at 8:40 PM), https://x.com/DCGuard1802/status/1960502754540970464/photo/1; and National Guard (@USNationalGuard), X (Sept. 3, 2025 at 1:00 PM), https://t.co/ekbe76uqGY.

121.    The troops have been regularly seen patrolling in groups, sometimes accompanying MPD or federal law enforcement officers, and sometimes on their own.

122.    Metro stations—which are not federally owned or controlled—have been frequently patrolled and surveilled by the National Guard.



*(National Guard Troops Patrolling at a D.C. Metro Station and on a Red Line Train)*[63]

123.    The patrols have extended even further into local District neighborhoods and around routine, local District events, where Defendants have sought to establish a militarized presence.

124.    As recently as August 29, 2025, the National Guard publicized that "[f]uture plans include presence patrols in residential neighborhoods and other locations throughout the District."[64]

---

[63] South Carolina National Guard
https://www.flickr.com/photos/thenationalguard/54751381932/in/photostream/; South Carolina National Guard (@TheNationalGuard), Flickr (Aug. 29, 2025),
https://www.flickr.com/photos/thenationalguard/54751381932/in/photostream/.
[64] Sgt. 1st Class Jon Soucy, *Guard Members From Six States, D.C. on Duty in Washington in Support of Local, Fed Authorities*, NATIONAL GUARD (Aug. 29, 2025),
https://www.nationalguard.mil/News/Article-View/Article/4290072/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/.

**K.    The District is Harmed by Defendants' Unlawful Deployment of National Guard Troops to Police the District.**

125.    The District has suffered a severe and irreparable sovereign injury from the deployment of National Guard units to perform law enforcement activities throughout the District. In particular, the deployments have infringed on the District's sovereign authority, granted by the Home Rule Act, to determine how best to police the District and protect public safety. The deployment has also impaired the District's sovereign right to determine when to permit out-of-state National Guard troops to enter the District and furnish assistance to local law enforcement.

126.    The presence of armed military units purporting to exercise law enforcement authority that they are not lawfully permitted to exercise also creates confusion among the public and threatens to undermine the work of the District in combating local crime. These National Guard units are operating without lawful authority and without law enforcement training or expertise, both of which threaten to complicate the District's public safety efforts.

127.    Defendants' unwanted deployment of National Guard troops to conduct law enforcement on District streets also threatens to harm the crucial relationship between police and the communities they serve, eroding trust and inflaming tensions.[65]

128.    Defendants' order that the National Guard troops patrolling District communities carry service weapons only exacerbates the harm to residents. History carries somber reminders of the risks involved when armed National Guardsmen are deployed among civilians. In 1970, for

---

[65] *Opinion: A joint letter from ANCs opposing President Trump's takeover of D.C.*, The 51st (Aug. 29, 2025), https://51st.news/opinion-a-joint-letter-from-ancs-opposing-president-trumps-takeover-of-d-c/.

instance, Ohio National Guard troops opened fire on students protesting at Kent State University, killing four and wounding nine.[66]

129.    The encroachment of National Guard troops in the District has also already caused harm to public safety in the District. On August 20, 2025, a National Guard Member driving a Mine-Resistant Ambush Protected All-Terrain Vehicle (MATV) rammed into the side of an SUV, injuring the civilian driver.[67]



*(Photo of National Guard MATV That Crashed Into Civilian Via Fox5DC)*[68]

130.    MATVs are "military vehicle[s] that weigh[] up to 16 tons and [are] meant to withstand explosive attacks."[69] MATVs are equipped with smaller military-grade windshields that

---

[66] Jennifer Mascia, *With Troops in Los Angeles, Echoes of the Kent State Massacre*, OHIO CAPITAL JOURNAL (June 13, 2025), https://ohiocapitaljournal.com/2025/06/13/with-troops-in-los-angeles-echoes-of-the-kent-state-massacre/.

[67] Luke Garrett, *One Civilian Injured in Crash With D.C. National Guard Military Vehicle*, NPR WAMU (Aug. 20, 2025), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash.

[68] Sam Kosmas & Stephanie Ramirez, *1 Injured in Crash Involving National Guard Vehicle*, FOX 5 DC (Aug. 20, 2025), https://www.fox5dc.com/news/1-injured-crash-involving-military-vehicle-dc.

[69] Luke Garrett, *One Civilian Injured in Crash With D.C. National Guard Military Vehicle*, NPR WAMU (Aug. 20, 2025), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash.

are suited for bullet-proof windowpanes, but which limit visibility.[70] The guardsman was later ticketed for running the red light in D.C.'s Capitol Hill neighborhood where the crash occurred.[71]

131.    A video circulated on social media shows the sunken angle of the SUV's driver's side door where it collapsed after impact.[72] The civilian driver, reported to live in Capitol Hill, was trapped inside their vehicle until freed by firefighters using the Jaws of Life.[73] The civilian driver suffered lacerations.[74] But the next collision involving these massive armored vehicles on residential streets could lead to worse injury or death.

132.    Concerningly, DCNG officials have not addressed "whether Guard members are receiving training on D.C. traffic, whether leaders issued a risk assessment on pedestrian and driver safety when using these vehicles, or whether Guard members are going to continue to operate [MATVs] in the city."[75] As expressed by D.C. Councilmember and Transportation Committee Chair Charles Allen, "[t]hese are vehicles designed for warfare. They have no business on our city streets."[76]

---

[70] Dan Lamothe, Rachel Weiner & Alex Horton, *Armored National Guard Vehicle Collides With SUV on Capitol Hill*, THE WASHINGTON POST (Aug. 20, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-national-guard-crash-suv/.

[71] District of Columbia National Guard, *D.C. National Guard Activated to Support Law Enforcement in District of Columbia*, DISTRICT OF COLUMBIA NATIONAL GUARD (Aug. 23, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/.

[72] Washingtonian Problems (@WashProbs), X (Aug. 20, 2025, at 10:30 AM), https://x.com/WashProbs/status/1958174783041884639.

[73] Mitchell Miller, *National Guard Vehicle Collides With Car, Trapping Driver on Capitol Hill*, WTOP NEWS (Aug. 20, 2025), https://wtop.com/liveblog-today-on-the-hill/2025/08/national-guard-vehicle-collides-with-car-trapping-driver-on-capitol-hill/.

[74] Carla Babb, *DC Driver Trapped, Then Freed From SUV After Crash With Guard Vehicle*, ARMYTIMES (Aug. 21, 2025), https://www.armytimes.com/news/pentagon-congress/2025/08/21/dc-driver-trapped-then-freed-from-suv-after-crash-with-guard-vehicle/.

[75] Dan Lamothe, Rachel Weiner & Alex Horton*, Armored National Guard Vehicle Collides With SUV on Capitol Hill*, THE WASHINGTON POST (Aug. 20, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-national-guard-crash-suv/.

[76] *Id.*

133.    Despite these risks, National Guard troops continue driving oversized MATVs that are heavier and wider than District law permits. *See* Chapter 25 of Title 18 of the District of Columbia Municipal Regulations. On information and belief, the MATVs that National Guard troops are driving around the District exceed these limits and no permit has been sought or obtained for their lawful operation. Their continued use within District limits impairs the District's ability to regulate the safe and proper use of its streets and places District residents in harm's way.

134.    The inrush of National Guard troops has also caused financial strain for the District's economy because it has depressed key industries, including tourism, restaurants, and hospitality services. For example, a recent report from the Washington Post indicates that "the week federal forces dispersed across the capital, foot traffic in D.C. dropped 7 percent on average," and that "[r]estaurant reservations saw an even steeper drop."[77] The report continues: "marketing forecasts, street-level foot traffic, [and] hotel occupancy" all demonstrate that "Washington's tourism economy is sliding . . . [and t]he sight of National Guard troops, now authorized to carry weapons, could further chill demand at a time when the industry can least afford it."

135.    Because the majority of transactions at District retail businesses, hotels, and restaurants are subject to gross sales taxes, the reduction in business activity in the District since August 11, 2025, is resulting in the loss of a proportional amount of sales tax revenue to the District government. It is also resulting in a reduction in work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government.

---

[77] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, THE WASHINGTON POST (Aug. 29, 2025), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

136.    The continued presence of armed National Guard troops also impinges on the District's right to self-governance by suspending certain District laws. District law criminalizes, among other firearms offenses, the possession of unregistered firearms, D.C. Code § 7-2502.01; the possession of assault weapons, *id.* § 7-2502.02; and the transportation of firearms under certain conditions, *id.* § 22-4504.02. Many National Guard members would be in violation of all of these statutes if they were not lawfully "on duty and duly authorized to carry a firearm." *See, e.g.*, *id.* § 7-2502.01(b)(1)(C). The Secretary of Defense's order authorizing and directing National Guard members to carry these weapons—including semi-automatic M17 pistols and M4 carbine assault rifles—thus purports to relieve these members of criminal liability and exempt them from the District's generally applicable firearms regulations. In addition, if National Guard troops are involved in searches, seizures, and arrests without lawful authority, that could complicate and undermine criminal prosecution efforts and put public safety at risk.

137.    The President has made clear his intention to continue to inflict these harms on the District for an extended period. In the August 25 Executive Order, the President memorialized an intent to continue to use the National Guard to police D.C.'s streets, directing the Secretary of Defense to create a unit within the DCNG in which the members will be deputized to "enforce Federal law." *See* Section 2(d)(i). In doing so, the President memorializes his intent to again violate the PCA and repeat the present injuries to the District's authority.

138.    Defendants claim that their conduct is intended to make D.C. safer; however, recent reporting indicates that "about two-thirds of D.C. residents say Trump's recent actions will not help combat violent crime."[78] News reports confirm that the deployment of National Guard troops

---

[78] Joe Heim, Scott Clement & Emily Guskin, *We Asked 604 D.C. Residents About Trump's Takeover. Here's What They Said*, THE WASHINGTON POST (Aug. 20, 2025),

has given District residents a "palpable sense of fear" and rendered them "afraid to go grocery shopping, show up to work and go about their daily lives." One restaurant owner said that "[i]t's not working. It's an attack on the community. That's the way we're seeing it. We're the ones feeling the effects, everyone, the business owners, the community."[79] At a news conference, Mayor Bowser noted that the National Guard presence has caused some parents to keep their children out of school out of concern for their safety.[80]

## CAUSES OF ACTION

### COUNT I
### Violation of the Administrative Procedure Act
### Contrary to Law
### (DOD and DOJ Defendants)

139.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

140.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority. Under the Administrative Procedure Act (APA) a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

---

https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-poll-trump-crime-police/
https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-poll-trump-crime-police/.
[79] Daniella Silva & Megan Lebowitz, *Trump Vowed to Make Washington Streets Safer. In One Neighborhood, People Feel Less Safe Than Ever*, NBC NEWS (Aug. 26, 2025), https://www.nbcnews.com/news/us-news/national-guard-trump-washington-dc-immigration-fears-ice-deportation-rcna226943.
[80] Konstantin Toropin & Will Weissert, *DC School Year Starts With Parents on Edge Over Trump's Armed Patrols*, PBS NEWS (Aug. 25, 2025), https://www.pbs.org/newshour/education/dc-school-year-starts-with-parents-on-edge-over-trumps-armed-patrols.

141.    Defendants DOD, DOJ, and USMS are all agencies subject to the APA. 5 U.S.C. § 701.

142.    The DOD Defendants took final agency actions that are subject to judicial review when they:

    a.    ordered the mobilization of the DCNG for the purpose of supporting local and federal law enforcement in the District;

    b.    ordered or requested deployment of out-of-state National Guard units under 32 U.S.C. § 502(f) from Louisiana, Mississippi, Ohio, South Carolina, South Dakota, Tennessee, and West Virginia for the purpose of supporting local and federal law enforcement in the District (the Deployment); and

    c.    placed the DCNG and the out-of-state troops under the command and control of the Joint Task Force-DC, which is in turn under the command and control of the Army, DOD, and the President.

143.    The DOJ Defendants took final agency action that is subject to judicial review when they deputized the National Guard units from the District of Columbia, Louisiana, Mississippi, Ohio, South Carolina, Tennessee, and West Virginia as Special Deputy U.S. Marshals to perform law enforcement functions in the District (the Deputization).

144.    The DOD and DOJ Defendants have collectively engaged in final agency action that is subject to judicial review by:

    a.    ordering the troops in the DCNG and from the Deployment to be armed with M17 pistols and M4 rifles; and

b.  implementing the President's August 25 Executive Order, including by establishing a unit in the DCNG dedicated to "ensuring public safety and order" in the District and by deputizing the members of that unit to "enforce Federal law."

145.   The DOD and DOJ Defendants' actions are contrary to the Constitution and federal law in numerous respects, including the following.

146.   *First*, the DOD and DOJ Defendants have violated the Home Rule Act and the Assistance Compact by deploying the DCNG and out-of-state National Guard troops to "support" and "assist" District law enforcement without the consent of the Mayor.

147.   In the Home Rule Act, Congress vested the Mayor with "the executive power of the District," which it has elsewhere made clear includes the power to determine how best to police "the boundaries of" the District to "preserve the public peace." By contrast, the Act grants the President no authority to direct or control law enforcement in the District. The President may not supplant the Mayor's authority by directing National Guard units to police the District as he sees fit.

148.   The Assistance Compact further provides that states may send "mutual assistance" to one another upon the "request" of the receiving state. Mutual assistance under this Compact "may include the use of the states' National Guard forces" only pursuant to an interstate compact or "by mutual agreement between states." Congress has designated the District of Columbia a "state" under this Compact, and the Council has authorized the Mayor to "execute[]" it on the District's behalf. The President may not lawfully evade this scheme by authorizing other states to introduce National Guard units into the District without the "request" or "agreement" of the Mayor.

149.   Section 502(f) of Title 32 of the U.S. Code does not alter this framework. It permits National Guard units to perform "training or other duty," including "support of operations or

missions undertaken by the . . . unit at the request of the President or Secretary of Defense." By its terms, this provision only allows the President or the Secretary to "request" support, not to order or authorize the provision of aid over the receiving jurisdiction's objection. And, in context, the provision plainly permits forms of aid similar to "training" or "drills," not a massive, independent power that would gut limits Congress imposed elsewhere in the statute.

150.    *Second*, the DOD and DOJ Defendants have acted contrary to the Constitution and federal law by assuming command and control over out-of-state National Guard units in Title 32 status.

151.    Under the Militia Clauses of the Constitution, the President may only "govern[] such part of [the Militia] as may be employed in the service of the United States." And under the statutes governing the National Guard—the modern-day militia—he may only assume command of National Guard units that have been called into federal service under Title 10. Until then, both the Constitution and statute require that they remain under state command.

152.    The DOD and DOJ Defendants have unlawfully assumed command and control of out-of-state National Guard units in state militia status under Title 32. Through Joint Task Force-DC, the DOD Defendants have exercised pervasive control over the operations of these units in the District, including by issuing "order[s]" and assigning them missions. And the DOJ Defendants have deputized them as U.S. Marshals, subjecting them to the direction and authority of the President and DOJ.

153.    *Third*, the DOD Defendants have violated the Posse Comitatus Act and 10 U.S.C. § 275 by giving DOD and the Army direct command and control of Joint Task Force-DC—a law enforcement operation in the District conducted by National Guard troops vested with the powers to arrest, conduct seizures, and otherwise engage in core law enforcement activities.

154.    In the PCA, Congress prohibited the use of "any part of the Army" to engage in "law enforcement." Congress extended the scope of that prohibition in Section 275, which requires the Secretary of Defense to promulgate regulations ensuring that "member[s] of the Army" do not have "direct participation . . . in a search, seizure, arrest, or other similar activity." The DOD has implemented that command by issuing a policy that prohibits most "DoD personnel" from providing "direct civilian law enforcement assistance."

155.    The DOD Defendants are subject to the Posse Comitatus Act and Section 275. Nonetheless, they are in direct command of Joint Task Force-DC, an operation expressly designed to engage in law enforcement. The DOD Defendants have asserted pervasive control over and active involvement in the law enforcement work of this Task Force, including by issuing "order[s]" to its members and identifying the forms of law enforcement assistance they should provide, including "community safety patrols," "traffic control," and "presence patrols." And the DOJ Defendants have augmented the law enforcement powers of the Task Force by deputizing its participants as U.S. Marshals—empowering them to conduct searches, seizures, and arrests.

156.    Both the Posse Comitatus Act and Section 275 flatly prohibit the establishment of a law enforcement operation in the District that is helmed and controlled by the DOD Defendants.

157.    In sum, the DOD and DOJ Defendants have acted contrary to law, in violation of 5 U.S.C. § 706, by deploying the DCNG and out-of-state National Guard units to police the District without the consent of the District's Mayor, assuming command and control of out-of-state National Guard units that are in Title 32 status, and exercising command and control of Joint Task Force-DC, a law enforcement operation.

158.    The District is entitled to vacatur of the final agency actions of the DOJ and DOD Defendants, and a preliminary and permanent injunction prohibiting the DOD and DOJ Defendants from engaging in such actions.

### COUNT II
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious
### (DOD and DOJ Defendants)

159.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

160.    Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

161.    An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

162.    When an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternatives that are within the ambit of the existing policy," "consider [] important aspect[s] of the problem," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33, 38 (2020) (citations and internal quotation marks omitted).

163.    A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

164.    The DOJ and DOD Defendants' actions are arbitrary and capricious for several reasons, including the following:

     a.    The DOD and DOJ Defendants failed to offer any explanation for deviating from longstanding principles and prior practice of not using National Guard units for law enforcement in the District.

     b.    The DOD and DOJ Defendants failed to consider the risks associated with deploying National Guard troops to support law enforcement and deputizing them as Special Deputy U.S. Marshals when they lack adequate training and expertise in law enforcement.

     c.    The DOD and DOJ Defendants failed to weigh the purported benefits of implementing the Deployment against the costs, including creating confusion among District residents and visitors to the District about what entities are actually policing the District, what powers and duties they may lawfully exercise, and the corresponding threat that the exercise of such powers and duties will cause to public safety in the District. They similarly failed to weigh the risks of authorizing thousands of National Guard troops to carry semi-automatic weapons in the District, including the M17 pistol, a version of the Sig Sauer P320 series pistol that is capable of firing without the trigger being pulled, or the costs and risks of deploying large, armored vehicles on District streets.

d.   The DOD and DOJ Defendants also failed to consider other relevant factors, such as the threat to the independence of state National Guard units, the harm their actions would cause to military readiness, and the extent to which the Deployment and the Deputization would render units unable to perform other important state- or District-level functions.

165.    For all these reasons, the DOD and DOJ Defendants have acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706.

166.    Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the District is entitled to a declaration that the DOD and DOJ Defendants' final agency actions are arbitrary and capricious, violate the APA, and are invalid.

167.    The District is entitled to vacatur of the DOJ and DOD Defendants' final agency actions, and a preliminary and permanent injunction prohibiting the DOD and DOJ Defendants from continuing such actions.

## COUNT III
### Violation of the Constitution
### Separation of Powers, Take Care Clause, and District Clause
### (All Defendants)

168.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

169.    The Constitution's separation of powers doctrine, Take Care Clause, and District Clause all place limitations on the exercise of executive authority.

170.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637-38 (2024).

171.    The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

172.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

173.    Further, the Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted).

174.    The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

175.    Finally, the District Clause vests Congress with authority "[t]o exercise exclusive Legislation, in all Cases whatsoever, over such District (not exceeding ten Miles square) as may  .

. . become the Seat of the Government of the United States . . . ."  U.S. Const. art. I, § 8, cl. 17. This Clause affords Congress "plenary power" over the Nation's capital.  *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434 (1932).  It has exercised that authority by enacting the Home Rule Act, which grants the residents of the District "powers of local self-government" and authority over "local District matters."  D.C. Code § 1-201.02(a). The Executive may not exercise authority over local District governance except to the limited extent authorized by Congress.

176.     Defendants have violated each of these constitutional doctrines.

177.     In violation of the separation of powers, the Take Care Clause, and the District Clause, Defendants have: asserted authority over state Militias that the Constitution and federal law expressly assign to the States; disregarded the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement; and attempted to supplant the Mayor's authority over law enforcement in the District.

178.     This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). The District is entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

179.     Pursuant to 28 U.S.C. § 2201, the District is also entitled to a declaration that the actions challenged herein violate the constitutional separation of powers doctrine, the Take Care Clause, and the District Clause, and impermissibly arrogate to the Executive power that is reserved to Congress, the states, or the District.

## COUNT IV
## Equitable *Ultra Vires*
## (All Defendants)

180.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

181.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional or statutory authority.

182.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

183.    Defendants have taken actions in the absence of any plausible constitutional or statutory authority, and in plain violation of the limits imposed by Congress. They have impermissibly asserted control over the National Guard units in state militia status, directed DOD to supervise and actively participate in domestic law enforcement activities, and ordered troops to police the District without the Mayor's consent.

184.    The District will continue to suffer irreparable injury if Defendants' actions are not declared unlawful and enjoined, and the District has no adequate remedy at law.

185.    The public interest favors issuance of a judicial declaration that Defendants' actions are unlawful and issuance of an injunction requiring Defendants to cease such actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff District of Columbia respectfully requests that the Court:

186.    Declare that Defendants have acted contrary to the Constitution and federal law by:

   a.    deploying National Guard troops to conduct law enforcement in the District of Columbia without the express consent of the Mayor;

   b.    exercising command and control of out-of-state National Guard troops in Title 32 status in the District of Columbia, including by issuing operational orders to such troops or dictating their day-to-day operations;

   c.    deputizing members of National Guard units deployed in or to the District of Columbia as Special Deputy U.S. Marshals;

   d.    ordering that National Guard troops in the District of Columbia carry service weapons while conducting operations pursuant to the President's August 11 order; and

   e.    placing DOD officials, including the Secretary of the Army, in operational command or control of Joint Task Force-DC, and otherwise permitting DOD officials to directly supervise or participate in law enforcement activities conducted by National Guard Units in the District of Columbia.

187.    Permanently and preliminarily enjoin such actions;

188.    Stay such actions pursuant to 5 U.S.C. § 705;

189.    Vacate such actions pursuant to 5 U.S.C. § 706; and

190.    Award such additional relief as the interests of justice may require.

Dated: September 4, 2025                 Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (D.C. Bar No. 1026153)
ELIZA H. SIMON (D.C. Bar No. 90035651)
MITCHELL P. REICH (D.C. Bar No. 1044671)
Senior Counsels to the Attorney General

BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
Assistant Deputy Attorney General
Legal Counsel Division

*/s/ Alicia M. Lendon*
ALICIA M. LENDON (D.C. Bar No. 1765057)
Chief, Civil Rights and Elder Justice Section
Public Advocacy Division

*/s/ Pamela Disney*
PAMELA DISNEY (D.C. Bar No. 1601225)
ANDREW MENDRALA (D.C. Bar No. 1009841)
CHRISTOPHER PEÑA (D.C. Bar No. 888324806)
CHARLES SINKS (D.C. Bar No. 888273315)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel: (202) 807-0371
pamela.disney@dc.gov

*Attorneys for the District of Columbia*