**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>             Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>             Defendants. | Case No.: 1:25-cv-03005 (JMC)<br><br>Judge Jia M. Cobb |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION AND SECTION 705 STAY**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................................. iii

**INTRODUCTION** .............................................................................................................. 1

**BACKGROUND** ................................................................................................................ 4

   A.   Legal Background ..................................................................................................... 4

      1.   The National Guard................................................................................................ 4

      2.   The Posse Comitatus Act ..................................................................................... 5

      3.   Home Rule in the District of Columbia .............................................................. 6

      4.   The Emergency Management Assistance Compact ........................................ 9

   B.   Factual Background ................................................................................................. 9

      1.   President Trump has long threatened to "take over" the District.................... 9

      2.   The President attempts to assume control of law enforcement in the District............. 10

      3.   Defendants deploy the National Guard to conduct law enforcement in the District. ... 12

**ARGUMENT** .................................................................................................................... 16

     I.     THE DISTRICT IS LIKELY TO SUCCEED ON THE MERITS............................ 17

      A. Defendants' Deployment of National Guard Troops to Police the District Over
        the District's Objection Is Unlawful.................................................................... 18

        1.   Defendants may not direct DCNG to engage in law enforcement outside
           of narrow circumstances not present here..................................................... 18

        2.   Defendants may not direct out-of-state National Guard troops in state
           militia status to engage in law enforcement in the District without
           obtaining the District's consent.................................................................... 22

      B. Defendants Have Unlawfully Assumed Command and Control Over Out-of-
        State National Guard Troops in State Militia Status. ......................................... 27

      C. Defendants Have Violated the Posse Comitatus Act and 10 U.S.C. § 275 by
        Deploying National Guard Troops Under the Command of the Army to
        Engage in Law Enforcement. .............................................................................. 31

        1.   The PCA bars the Army from exercising command and control over
           National Guard troops engaged in law enforcement. ................................. 31

        2.   The Army is unlawfully exercising command and control over National
           Guard troops engaged in core law enforcement activities.......................... 34

i

D.  Defendants' Actions Are Arbitrary and Capricious ............................................... 39

II.    THE DISTRICT IS SUFFERING SEVERE AND IRREPARABLE INJURY. ....... 41

III.   THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES FAVOR
       AN INJUNCTION. ................................................................................................. 44

**CONCLUSION** ........................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023)............................................................................. 28, 31

*Alaska v. U.S. Dep't of Transp.*,
868 F.2d 441 (D.C. Cir. 1989) .................................................................................. 42

*Ass'n of Civilian Technicians v. United States*,
603 F.3d 989 (D.C. Cir. 2010) ............................................................... 2, 5, 29, 31

*Atl. Cleaners & Dyers, Inc. v. United States*,
286 U.S. 427 (1932) .................................................................................................... 6

*Aviles-Wynkoop v. Neal*,
978 F. Supp. 2d 15 (D.D.C. 2013) ........................................................................... 17

*Banks v. Booth*,
468 F. Supp. 3d 101 (D.D.C. 2020) ......................................................................... 45

*Bilski v. Kappos*,
561 U.S. 593 (2010) .................................................................................................. 21

*Bond v. United States*,
572 U.S. 844 (2014) .................................................................................................. 28

*Carcieri v. Salazar*,
555 U.S. 379 (2009) .................................................................................................. 26

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ................................................................................. 17

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) .................................................................................................. 26

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) ................................................................................. 17

*Cuyler v. Adams*,
449 U.S. 433 (1981) ............................................................................................. 9, 24

*District of Columbia v. Exxon Mobil Oil Corp.*,
172 A.3d 412 (D.C. 2017) ........................................................................................ 42

*District of Columbia v. John R. Thompson Co.*,
346 U.S. 100 (1953) ............................................................................................. 6, 27

*District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020).............................................................................. 17

*Dorsey v. United States*,
567 U.S. 260 (2012) .................................................................................................. 37

*Dubin v. United States*,
    599 U.S. 110 (2023) .................................................................................................... 26

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................................................... 40

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ................................................................................... 17

*Fischer v. United States*,
    603 U.S. 480 (2024) .................................................................................................... 21

*Fraternal Ord. of Police v. District of Columbia*,
    290 A.3d 29 (D.C. 2023) .............................................................................. 8, 19, 22

*Fuld v. Pal. Liberation Org.*,
    606 U.S. 1 (2025) ....................................................................................................... 23

*Gilbert v. United States*,
    165 F.3d 470 (6th Cir. 1999) ............................................................................... 34, 36

*Glob. Health Council v. Trump*,
    No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025) .................................. 17

*Gnagy v. United States*,
    634 F.2d 574 (Ct. Cl. 1980) ...................................................................................... 29

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) ............................................................................ 44, 45

*Helling v. McKinney*,
    509 U.S. 25 (1993) ..................................................................................................... 43

*In re Sealed Case*,
    551 F.3d 1047 (D.C. Cir. 2009) ............................................................................ 5, 29

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................................................ 2, 5, 39

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................................................. 44, 45

*Maracich v. Spears*,
    570 U.S. 48 (2013) ..................................................................................................... 26

*Maryland ex rel. Levin v. United States*,
    381 U.S. 41 (1965) .................................................................................................. 5, 29

*Mashpee Wampanoag Tribe v. Benhardt*,
    2020 WL 3034854 (D.D.C. June 5, 2020) ............................................................... 42

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .................................................................................................... 27

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) .................................................................................................... 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................... 39, 40

*Newsom v. Trump*,
   ---F. Supp. 3d ---, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025) ...................... 3, 35, 37, 38,  41

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................................... 17

*Initiative v. Trump*,
   510 F. Supp. 3d 198 (S.D.N.Y. 2021) ........................................................ 45

*Perpich v. Dep't of Defense*,
   496 U.S. 334 (1990) ................................................................................ 4, 28

*R.I.L.-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................ 45

*Stoutenburgh v. Hennick*,
   129 U.S. 141 (1889) ..................................................................................... 6

*Texas v. Yellen*,
   105 F.4th 755 (5th Cir. 2024) .................................................................... 42

*United States ex rel. Gillett v. Dern*,
   74 F.2d 485 (D.C. Cir. 1934) .................................................................. 4, 28

*United States v. Al-Talib*,
   55 F.3d 923 (4th Cir. 1995) ....................................................................... 38

*United States v. Baker*,
   438 F.3d 749 (7th Cir. 2006) ................................................................ 15, 30

*United States v. Chon*,
   210 F.3d 990 (9th Cir. 2000) ........................................................... 33, 34, 36

*United States v. Dreyer*,
   804 F.3d 1266 (9th Cir. 2015) ............................................................... 33, 34

*United States v. Garrett*,
   172 F. App'x 295 (11th Cir. 2006) ............................................................ 29

*United States v. Lampkin*,
   No. 3:15-cr-5-05, 2016 WL 11680671 (D. Alaska Apr. 21, 2016) ....................... 30

*United States v. Miller*,
   307 U.S. 174 (1939) ...................................................................................... 4

*United States v. Moraga*,
   No. CR 01-964, 2002 WL 35649965 (D.N.M. June 25, 2002) ............................ 34

*United States v. Red Feather*,
   392 F. Supp. 916 (D.S.D. 1975) ......................................................... 5, 32, 36

*United States v. Weiland*,
   420 F.3d 1062 (9th Cir. 2005) .................................................................... 30

*United States v. Yunis,*
    681 F. Supp. 891 (D.D.C. 1988) ......................................................... 32, 34

*United States v. Yunis,*
    924 F.2d 1086 (D.C. Cir. 1991) .............................................. 6, 32, 33, 37

*W. Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury,*
    59 F.4th 1124 (11th Cir. 2023) .......................................................... 45

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................ 27

*Winter v. Nat. Resources Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................... 41

## Constitution, Statutes, and Regulations

U.S. Const. art. I, § 8, cl. 15 ................................................................. 28

U.S. Const. art. I, § 8, cl. 16 ............................................................ 2, 4, 28

U.S. Const. art. I, § 8, cl. 17 ............................................................ 1, 6, 18

5 U.S.C. § 706 ................................................................... 17, 18,  39

10 U.S.C. § 7013 .............................................................................. 35

10 U.S.C. § 251 .................................................................. 5, 22, 26, 29

10 U.S.C. § 275 ............................................. 31, 32, 33, 34, 35, 36, 37, 38

10 U.S.C. § 12406 ......................................................................... 5, 29

18 U.S.C. § 1385 ................................................................ 2, 6, 32, 35, 37

28 U.S.C. § 561 .............................................................................. 38

32 U.S.C. § 502 .............................................................. 5, 13, 25, 38

D.C. Code § 1-201.01 ......................................................................... 7

D.C. Code § 1-201.02 ................................................................... 1, 7, 18,

D.C. Code § 1-204.22 .................................................................... 23, 24

D.C. Code § 1-206.02 ......................................................................... 8

D.C. Code § 1-207.40 ........................................................................ 19

D.C. Code § 5-101.03 .................................................................. 8, 9, 22, 23

D.C. Code § 5-105.03 ........................................................................ 20

D.C. Code § 5-105.05 ........................................................................ 20

D.C. Code § 7-2332 ....................................................................... 9, 24

D.C. Code § 22-4502.01 ..................................................................... 42

D.C. Code § 22-4505 ........................................................................ 42

D.C. Code § 49-101 ............................................................................................. 7, 20, 21

D.C. Code § 49-102 ............................................................................................. 7, 21, 38

D.C. Code § 49-103 ........................................................................................ 7, 20, 21,  22

D.C. Code § 49-107 ..................................................................................................... 21

D.C. Code § 49-404 ................................................................................................ 20, 22

D.C. Code § 49-409 ....................................................................................................... 7

Act of June 18, 1878, Pub. L. No. 45-263, 20 Stat. 145 (1878) ................................ 6, 22

District of Columbia Self-Government and Governmental Reorganization Act,
    Pub. L. No 93-198 (1973) ........................................................................................ 7

Emergency Management Assistance Compact, Pub. L. No. 104-321 (1996) ........ 9, 23, 24

John Warner National Defense Authorization Act for Fiscal Year 2007,
    Pub. L. No. 109-364 (2006) ................................................................................... 27

Homeland Security Act of 2002, Pub. L. No. 107-296 ................................... 5, 32, 36

National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328 (2016) ............. 34

## Executive Orders

Additional Measures to Address the Crime Emergency in the District of Columbia,
    Exec. Order No. 14,339, 90 Fed. Reg. 42121 (Aug. 25, 2025) ................................ 16

Declaring a Crime Emergency in the District of Columbia,
    Exec. Order No. 14,333, 90 Fed. Reg. 39301 (Aug. 11, 2025) ............................... 11

Supervision and Control of the National Guard of the District of Columbia,
    Exec. Order No. 11,485, 34 Fed. Reg. 15411 (Oct. 3, 1969) ............................... 7, 14

## Other Authorities

*Authority to Use Troops to Prevent Interference With Federal Employees by Mayday
    Demonstrations and Consequent Impairment of Government Functions*,
    1 Supp. Op. O.L.C. 343 (1971) ........................................................................ 5, 32, 36

Dep't of Defense, Instruction No. 3025.21, Defense Support of Civilian Law
    Enforcement Agencies (2019) .......................................................................... 33, 35, 37

H.R. Rep. No. 50-809 (1888) ................................................................................... 22

*Mil. Support for Customs & Border Prot. Along the S. Border Under the Posse
    Comitatus Act*,
    2021 WL 298369 (O.L.C. Jan. 19, 2021) ...................................................... 35, 37, 38

Staff of H. Comm. on the District of Columbia, 93d Cong., Home Rule for the District of
    Columbia 1973-1974: Background and Legislative History of H.R. 9056, H.R. 9682, and
    Related Bills (Comm. Print 1974) ......................................................................... 19

*Posse Comitatus Act of Detail of Defense Department Civilian Employee to the National Infrastructure Protection Center*,
22 Op. O.L.C. 103 (1998)..........................................................................................35

*Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*,
13 Op. O.L.C. 91 (1989)............................................................................................36

## INTRODUCTION

More than 2,300 National Guard troops from eight states and the District of Columbia are currently patrolling the District's streets for the stated purpose of combating "crime" and maintaining "law and order" in the District. They operate under the command of the Secretary of the Army, who issues them orders and governs their deployment. They have been vested with core law enforcement powers, including the authority to make arrests, execute search warrants, and conduct seizures. And they have used those powers to exercise the functions of a local police force: patrolling neighborhoods while armed, detaining criminal suspects, and otherwise enforcing public order as the federal military sees fit.

The District's elected leaders did not invite these troops and do not believe their presence is in the best interests of the District. But the President—who has derided the District as a "filthy and crime ridden embarrassment"—has determined that the District should be "federalize[d]" so that his Administration can "run it the way it's supposed to be run." He has therefore installed the Department of Defense as the overseer of a parallel local police force over the District's objection. He has made clear, moreover, that this incursion will not be short-lived: he has directed the Secretary of Defense to create a specialized force within the D.C. National Guard that is "dedicated to ensuring public safety and order" and deputized to "enforce" the law.

The Constitution and our most foundational statutes prohibit this military takeover of the District and its law enforcement functions. In the Home Rule Act, Congress invoked its authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the] District," U.S. Const. art. I, § 8, cl. 17, to grant the people of the District "powers of local self-government," D.C. Code § 1-201.02(a). In that Act, Congress gave the Mayor and Council of the District of Columbia authority over policing in the District, and it specifically denied such powers to the

1

President outside of time-limited, narrowly circumscribed emergencies.  The President's actions disregard those congressional judgments and wrest control of local policing away from local leaders.  Further, by summoning out-of-state militia troops over the Mayor's objection, the President and his subordinates have flouted the Emergency Management Assistance Compact, which provides that the District—not the President or the Army—may determine when to "request" and "agree[]" to the aid of other states' National Guard troops.

Defendants have also violated the laws governing the National Guard itself by placing the out-of-state troops under federal military control.  The Constitution reserves to the states the power to "govern[]" the "Militia" except where it has been called into "the Service of the United States."  U.S. Const. art. I, § 8, cl. 16.  Congress has effectuated that command by providing that the National Guard—the modern-day Militia—must remain "under the command of the state Governor" except in those extreme cases, such as insurrections and invasions, in which Congress has permitted the National Guard to be federalized for domestic purposes.  *Ass'n of Civilian Technicians v. United States*, 603 F.3d 989, 993 (D.C. Cir. 2010).  The President has not federalized the National Guard units he has called into the District—nor could he, given that the extraordinary conditions for such an act are not present.  But he has placed them under pervasive military command anyway, and the Secretary of the Army and Secretary of Defense have overtly exercised control over their operations in the District.

Finally, the President's takeover flouts the Posse Comitatus Act, our Nation's bedrock prohibition on "any military intrusion into civilian affairs."  *Laird v. Tatum*, 408 U.S. 1, 15 (1972).  The Act prohibits "any part of the Army" from involving itself in "executi[ng] the Laws."  18 U.S.C. § 1385.  Here, despite that prohibition, the Secretary of the Army, the Secretary of Defense, and their subordinates have directly involved themselves in law

2

enforcement by commanding a sweeping operation, the very purpose of which is to combat "crime" and restore "law and order" in the District.  Memorandum for the Secretary of Defense, "Restoring Law and Order in the District of Columbia," § 1 (Aug. 11, 2025) (National Guard Memorandum), Haynes Decl. Ex. 8.

For these and other reasons, Defendants' actions are *ultra vires*, unconstitutional, and in violation of the Administrative Procedure Act.  And preliminary injunctive relief is warranted to halt the irreparable harms these actions are inflicting on the District.  Every day that this lawless incursion continues, the District suffers harm to its sovereign authority to conduct local law enforcement as it chooses. Moreover, the use of heavily armed National Guard troops, untrained in basic law enforcement techniques, to patrol residential neighborhoods and combat crimes threatens to undermine the work of District police and creates a dangerous situation rife with the possibility of tragic encounters.  The deployment is also causing economic harm, including to restaurants and hotels, that will foreseeably diminish the District's tax revenues—imposing financial costs that the District cannot later recover as a result of the federal government's sovereign immunity.

Few acts pose as great a threat to democratic self-government as the unlawful introduction of military power into civilian affairs.  In June, it was Los Angeles that suffered such an incursion.  *See Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL 2501619, at *1 (N.D. Cal. Sept. 2, 2025) (holding that Defendants violated the Posse Comitatus Act by "systematically us[ing] armed soldiers" to engage in law enforcement).  Today, it is the District of Columbia. Tomorrow, it may be Baltimore, Chicago, Seattle, New Orleans, or Boston.  Our constitutional democracy will never be the same if these occupations are permitted to stand.  The Motion should be granted.

3

## BACKGROUND

### A.  Legal Background

####     1.   The National Guard

The Framers divided control over state militias in order to protect "individual liberty" and "the sovereignty of the States."  *Perpich v. Dep't of Defense*, 496 U.S. 334, 340 (1990).  The Founding generation "strongly disfavored standing armies" and believed that "adequate defense of country and laws could be secured through the Militia"—a force composed of "civilians primarily, soldiers on occasion."  *United States v. Miller*, 307 U.S. 174, 179 (1939).  At the same time, the experience of the Revolutionary War and the Articles of Confederation taught the Framers that "[t]he steady operations of war" required "a regular and disciplined army" under centralized federal command.  The Federalist No. 25 (Alexander Hamilton).

The Constitution therefore reflects a "compromise."  *Perpich*, 496 U.S. at 340.  It "reserv[es] to the States" the principal power over the "Militia," including the authority to appoint its officers, train its members, and command its forces when under state control.  U.S. Const. art. I, § 8, cl. 16; *see United States ex rel. Gillett v. Dern*, 74 F.2d 485, 487 (D.C. Cir. 1934).  But it also grants Congress the powers necessary to ensure that state militias are a professional force available for national emergencies.  It states that Congress may provide for "organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States."  U.S. Const. art. I, § 8, cl. 16.  And it vests Congress with authority to provide for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," *id.* art. I, § 8, cl. 15.

The National Guard is "the modern Militia reserved to the States by . . . the Constitution." *Maryland ex rel. Levin v. United States*, 381 U.S. 41, 46, *vacated on other grounds*, 382 U.S. 159

(1965). It is governed by a statutory framework that embodies the careful balance struck in the Constitution. In general, National Guard units are "under the command of the state Governor," subject to general rules of organization, training, and discipline set forth in Title 32 of the U.S. Code. *Ass'n of Civilian Technicians*, 603 F.3d at 993; *see, e.g.*, 32 U.S.C. § 502 (prescribing "[r]equired drills and field exercises" for National Guard units). In "rare circumstances" set forth in Title 10 of the U.S. Code, the President may "call[] forth" the National Guard "for domestic purposes," and thereby make it part of the federal military subject to his direct "control [and] supervision." *In re Sealed Case*, 551 F.3d 1047, 1054 (D.C. Cir. 2009) (Kavanaugh, J., concurring). But these circumstances are limited to the most severe exigencies: they include, for example, cases in which a state "request[s]" federal aid to suppress an "insurrection . . . against its government," 10 U.S.C. § 251, or when the United States "is invaded or is in danger of invasion by a foreign nation," *id.* § 12406(1).

        *2.   The Posse Comitatus Act*

      The United States has a "traditional and strong resistance . . . to any military intrusion into civilian affairs." *Laird*, 408 U.S. at 15. As then-Assistant Attorney General Rehnquist explained, Congress particularly objected to the Reconstruction-era practice of "United States Marshals . . . calling upon troops to assist them in performing their duties." *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Supp. Op. O.L.C. 343, 344 (1971); *see* Homeland Security Act of 2002, Pub. L. No. 107-296, § 886(a)(2) (2002); *United States v. Red Feather*, 392 F. Supp. 916, 922 (D.S.D. 1975). Marshals would often achieve this blending of military and civilian power by assembling troops as a "posse comitatus," a phrase that translates roughly to "power of the county." *Posse Comitatus*, Black's Law Dictionary (12th ed. 2024).

In 1878, Congress enacted the Posse Comitatus Act (PCA) to prevent these abuses. Pub. L. No. 45-263, § 15, 20 Stat. 145, 152 (1878). As currently codified, that Act provides that no person may "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except where "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. This prohibition bars such personnel from "direct active involvement in the execution of the laws"—such as commanding or conducting arrests, searches, seizures, patrols, or similar activities—or engaging in conduct that "pervade[s] the activities of civilian authorities" or entails "the exercise of regulatory, proscriptive, or compulsory military power." *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (internal quotation marks omitted).

### 3.   Home Rule in the District of Columbia

The Constitution vests Congress with authority "[t]o exercise exclusive Legislation, in all Cases whatsoever, over such District (not exceeding ten Miles square) as may . . . become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17. This Clause affords Congress "plenary power" over the Nation's capital. *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932). It may govern the District directly, with all "the combined powers of a general and of a state government." *Stoutenburgh v. Hennick*, 129 U.S. 141, 147 (1889). Or it may delegate "full legislative power" to the people of the District, enabling them to exercise "powers of self-government and home rule." *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953).

For much of the nation's history, Congress chose to govern the District directly, with little input or control from its residents. During that period, Congress established a D.C. militia, which it later renamed the D.C. National Guard (DCNG). *See* Act of Mar. 1, 1889, ch. 328, 25

Stat. 772 (codified as amended at D.C. Code § 49-101 *et seq.*). Congress made the President "Commander-in-Chief" of DCNG, D.C. Code § 49-409, and gave him control over its operations: he commissions its officers, *id.* § 49-305; approves "regulations for the government of the militia," *id.* § 49-805; and appoints the Commanding General, *id.* § 49-301, who in turn may prescribe "such drills, inspections, parades, escort, or other duties, as he may deem proper," *id.* § 49-102. During a "tumult, riot, mob," or similar disturbance, the President may grant requests by local leadership to "order out so much and such portion of the militia as he may deem necessary to suppress the same." *Id.* § 49-103. The President has provided that when DCNG is "in militia status," the Secretary of Defense "shall command" it "[t]hrough the Commanding General" of DCNG. Exec. Order No. 11485, § 1 (Oct. 3, 1969). The Secretary has in turn delegated that authority to the Secretaries of the Army and the Air Force. Mem., "Supervision and Control of the National Guard of the District of Columbia" (Oct. 10, 1969) (DCNG Delegation Mem.), Haynes Decl. Ex. 2.

In 1973, after decades of struggle, Congress enacted the District of Columbia Home Rule Act, Pub. L. No 93-198 (1973) (codified as amended at D.C. Code §§ 1-201.01 *et seq.*). This Act grants the residents of the District "powers of local self-government" and authority over "local District matters." D.C. Code § 1-201.02(a). To that end, it "delegate[s]" to the District government authority over "all rightful subjects of legislation within the District." *Id.* §§ 1-201.02(a), 1-203.02. It authorizes the residents to elect a Council vested with Congress's delegated "legislative power[s]," *id.* § 1-204.04(a), and a Mayor vested with "[t]he executive power of the District" and the responsibility for "the proper administration of the affairs of the District coming under [her] jurisdiction or control," *id.* § 1-204.22(a). By statute, the Mayor's responsibilities include the duty, "at all times of the day and night within the boundaries of [the]

Police District," to "preserve the public peace," "prevent crime and arrest offenders," and otherwise "enforce and obey all laws and ordinances in force in the District . . . properly applicable to police or health." D.C. Code § 5-101.03(1), (2), (10); *see id.* § 5-101.02 (defining the Police District as "coextensive with the District of Columbia"). It also includes the power to appoint the Chief of Police and "all officers and members of said Metropolitan Police force," *id.* § 5-105.01, determine the "[c]omposition of [the] force," *id.* § 5-105.05, and set the rules governing the Metropolitan Police Department (MPD), subject to legislation enacted by the Council. *See Fraternal Ord. of Police v. District of Columbia*, 290 A.3d 29, 42-43 (D.C. 2023).

Congress reserved for itself control over certain matters it deemed of federal concern—for instance, the authority to enact legislation "that concerns the functions of property of the United States" or that is "not restricted in its application exclusively in or to the District." D.C. Code § 1-206.02(a)(3). It also retained the authority to review District legislation and reassert its constitutional powers at any time. *Id.* § 1-206.02(c). But it otherwise gave the people of the District the right to govern themselves.

By contrast, Congress gave the President an extremely limited role in District affairs. The President has the responsibility for nominating a small set of District officials. *Id.* §§ 1-204.33, 1-204.34. In "special conditions of an emergency nature," he may request that the Mayor provide "the services of the Metropolitan police force" for "federal purposes," for a period of no more than 30 days. *Id.* § 1-207.40(a). The Home Rule Act also states that the District government may not exercise "any greater authority over" DCNG than it did prior to Home Rule. *Id.* § 1-206.02(b). Apart from these limited powers, Congress gave the President essentially no authority to oversee the District or control its governance.

#### 4. *The Emergency Management Assistance Compact*

All 50 States and the District have entered an interstate compact, known as the Emergency Management Assistance Compact (Assistance Compact), that governs the deployment of non-federalized National Guard units between jurisdictions. *See* Pub. L. No. 104-321 (1996). The Assistance Compact provides that "states"—defined to include the "District of Columbia"—may deploy emergency assistance to another state upon "request." *Id.* arts. I, III.B. Once sent into another state, the "organizational units" of the sending state come under "the operational control . . . of the state receiving assistance," and any personnel rendering aid "shall be considered agents of the requesting state." *Id.* arts. IV, VI. The Compact specifies that "[m]utual assistance in this compact may include the use of states' National Guard forces, either in accordance with" an interstate compact "or by mutual agreement between states." *Id.* art. I.

Congress assented to the Assistance Compact in 1996, giving it the status of federal law. Pub. L. No. 104-321; *see Cuyler v. Adams*, 449 U.S. 433, 438 (1981). In 2002, the Council of the District authorized the Mayor to "execute" the compact. D.C. Code § 7-2332. Since that date, the Mayor has been responsible for determining when to "request" the deployment of National Guard forces into the District. *Id.* art. III.B.

### B. Factual Background

#### 1. *President Trump has long threatened to "take over" the District.*

Despite its more than 50-year history of local self-governance, President Trump has repeatedly threatened to eliminate the District's home rule. As a candidate, he asserted time and again that "the federal government should take over control and management of Washington, D.C," and vowed: "[w]e're going to take it away from the Mayor."[1] Since reassuming office, he

---

[1] Video posted by Aaron Rupar (@atrupar), X (Mar. 4, 2023, at 6:59 PTG), https://x.com/atrupar/status/1632168980130455553?lang=ms ("Rupar Video"); Mark Segraves, *Here's what a*

has made a litany of similar threats, announcing that his Administration was "gonna have to take [the District] back and run it through the federal government," and that he would "federalize [the District] and run it the way it's supposed to be run."[2]

Many of President Trump's threats have centered on complaints about the District's cleanliness and crime rate. He has said that the District has too much "trash" and "graffiti" and is "filthy."[3] He has also made false and exaggerated claims about crime in the District, claiming that the District is "one of the most dangerous cities anywhere in the World" and in a state of "complete and total lawlessness."[4] In fact, the Department of Justice stated in January that violent crime in the District is "the lowest it has been in over 30 years." Dep't of Justice, "Violent Crime in D.C. Hits 30 Year Low" (Jan. 3, 2025).[5] And the President acknowledged in May that "crime is down in Washington, D.C.—street crime, violent crime—by 25%."[6]

   2. *The President attempts to assume control of law enforcement in the District.*

Around 3:00 a.m. on August 3, a former employee of the Department of Government Efficiency was assaulted by a group of teenagers in connection with an attempted carjacking.

---

second *Trump presidency could mean for DC*, NBC Washington, https://www.nbcwashington.com/news/local/heres-what-a-second-trump-presidency-couldmean-for-dc/3762595/.

[2] Screenshot of White House Press Pool posted by Jake Sherman (@JakeSherman), X (Feb. 19, 2025, at 9:55 ET), https://x.com/JakeSherman/status/1892407773603778589/photo/1; Julia Mueller, *Trump suggests federal government take over DC if local leaders 'can't do the job'*, The Hill (Mar. 14, 2025), https://thehill.com/homenews/administration/5195711-trump-dcfederal-government-takeover/; Time, *Trump Threatens to Federalize D.C. After Beating of 'Big Balls'*, at 0:05-0:24 (YouTube, Aug. 5, 2025), https://time.com/7307798/trump-washington-dc-federalize-takeover-big-balls-edward-coristine-assault/.

[3] Rupar Video; News18, *Trump Teases Takeover of DC* (Facebook, Aug.7, 2025 at 4:55 a.m.), https://www.facebook.com/cnnnews18/videos/787799723585929/; Shawna Mizelle & Katelyn Polantz, *Trump claims he can't get a fair trial in DC as latest indictment dominates GOP primary*, CNN (Aug. 7, 2023), https://www.cnn.com/2023/08/06/politics/trump-fair-trial-court-case-dc-venuechange/index.html.

[4] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug.9, 2025, at 9:40 a.m.), https://truthsocial.com/@realDonaldTrump/posts/114999087271735961; Gabrielle Lazor et al., *How Trump exaggerates DC crime in taking over its police department and deploying the National Guard,* PBS (Aug. 12, 2025), https://www.pbs.org/newshour/politics/how-trump-exaggerates-d-c-crime-in-taking-over-its-police-department-and-deploying-the-national-guard.

[5] https://www.justice.gov/usao-dc/pr/violent-crime-dc-hits-30-year-low.

[6] The White House, *President Trump Swears in the Ambassador to the People's Republic of China*, at 13:24-13:39 (YouTube, May 7, 2025), https://www.youtube.com/watch?v=MydfT0rCkZ8.

MPD quickly responded to the incident and apprehended two suspects.  But President Trump pointed to this incident as proof that "[c]rime in Washington, D.C., is totally out of control" and renewed his threats to "federalize" the District.[7]

On August 11, President Trump made good on those threats.  Flanked by the Secretary of Defense, the Secretary of the Army, and other federal military and law enforcement officials, the President announced at a press conference that it was "liberation day" for the District.[8]  He stated that he was "placing the D.C. Metropolitan Police Department under direct federal control."  *Id.* at 55:00-55:30.  And he announced that he was "deploying the National Guard to help reestablish law, order, and public safety in Washington, D.C."  *Id.* at 55:42-55:50.  He made clear this was just the beginning, adding: "We will bring in the military if needed."  *Id.* at 1:12:30 to 1:12:40.

The President effectuated his attempted takeover of the District through two presidential directives.  First, he signed an executive order, entitled "Declaring a Crime Emergency in the District of Columbia," that purported to invoke Section 740 of the Home Rule Act to give the Attorney General "[o]perational control of the Metropolitan Police Department."  Exec. Order No. 14333, § 3 (Aug. 11, 2025), Haynes Decl. Ex. 3.  On the evening of August 14, the Attorney General attempted to exercise that authority by installing her own appointee as "Emergency Police Commissioner."  Attorney General Order No. 6370-2025 (Aug. 14, 2025), Haynes Decl. Ex. 5.  Within less than 24 hours, a judge concluded that action was "plainly contrary to statute," Tr. of Motions Hearing 56:12-13, *District of Columbia v. Trump*, No. 25-2678 (D.D.C. Aug. 15, 2025), Haynes Decl. Ex. 7, and the Attorney General revoked that order, Attorney General Order No. 6372-2025 (Aug. 15, 2025), Haynes Decl. Ex. 6.

---

[7] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 05, 2025, at 4:13 ET), https://truthsocial.com/@realDonaldTrump/posts/114977985620971126.
[8] Video posted by The White House (@WhiteHouse), X, *President Trump Holds a Press Conference*, at 54:52-55:12 (Aug. 11, 2025, at 10:36 a.m.), https://x.com/WhiteHouse/status/1954914776527589534.

Second, President Trump issued a memorandum, entitled "Restoring Law and Order in the District of Columbia," that directed the deployment of the National Guard to conduct law enforcement in the District. *See* National Guard Memorandum. That order claims that the "violent crime rate" in the capital is too high and that "[t]he local government of the District of Columbia has lost control of public order and safety in the city." *Id.* § 1. It then directs the Secretary of Defense to "mobilize the District of Columbia National Guard and order members to active service, in such numbers as he deems necessary, to address the epidemic of crime in our Nation's capital." *Id.* § 2. It also directs the Secretary of Defense to "coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission." *Id.* The memorandum states that these operations will continue until the President "determine[s] that conditions of law and order have been restored in the District of Columbia." *Id.*

### 3. *Defendants deploy the National Guard to conduct law enforcement in the District.*

The Secretary of Defense, the Secretary of the Army, the Attorney General, the Director of the U.S. Marshals Service, and their respective agencies (collectively, the "Agency Defendants") have implemented the President's memorandum by deploying over 2,300 National Guard troops from the District and eight states onto District streets, placing them under the control of the Secretary of the Army and the Secretary of Defense, and directing them to engage in law enforcement activities.

Agency Defendants started by mobilizing DCNG. On August 11, the Commanding General of DCNG, under the direction of the Secretary of the Army, issued an order calling 800 members of DCNG to active duty. DCNG Permanent Order 25-223 (Aug. 11, 2025), Haynes Decl. Ex. 9; *see* Haynes Decl. Ex. 50 (Secretary of Defense explaining that the mobilization

"would be operationalized by [the] Secretary of the Army"). The order stated the purpose of this mobilization is to enable DCNG troops to "respond to short or no-notice direction from the Secretary of Defense or the President of the United States to protect federal property and functions in the District of Columbia and to support federal and District law enforcement." DCNG Permanent Order 25-223.

Between August 16 and September 5, the Secretary of Defense and the Secretary of the Army issued formal requests to at least nine States, pursuant to 32 U.S.C. § 502(f), that they deploy state National Guard units to "support law enforcement and deter crime" in the District. "D.C. National Guard Activated," (Aug. 23, 2025), Haynes Decl. Ex. 10. In response to those requests, eight States—Ohio, South Carolina, West Virginia, Mississippi, Tennessee, Louisiana, South Dakota, and Georgia—sent more than 1,350 National Guard troops into the District. Haynes Decl. Exs. 11-20, 45-46. (The governor of the ninth State, Vermont, declined the request, explaining that he did not "view the enforcement of domestic law as a proper use of the National Guard." *Phil Scott rejects second request to deploy Vermont National Guard* (Aug. 15, 2025), Haynes Decl. Ex. 47.) The states variously described the purpose of these deployments as "restor[ing] law and order" in the District and "support[ing] . . . D.C. local law enforcement," and stated that their forces would engage in activities such as "community safety patrols." Haynes Decl. Exs. 11-18. The Army itself recently echoed these statements, explaining that these troops provide "critical support to the D.C. Metropolitan Police Department," which enforces local law in the District.[9]

---

[9] U.S. Army(@USArmy), X (Sept. 8, 2025, at 2:00 PM), https://x.com/USArmy/status/1965112966195359836; *Tennessee National Guard Sustains DC Safe and Beautiful Mission*, U.S. Army (Sept. 8, 2025), Haynes Decl. Ex. 53.

Once these troops were deployed to the District, Defendants placed all of them under the control of DCNG. Defendants established a task force, called Joint Task Force District of Columbia (JTF-DC), that is headed by U.S. Army Colonel Larry Doane, a commander from DCNG who reports to the Secretary of the Army. *See* Haynes Decl. Ex. 10.[10] All of the state National Guard units in the District are members of JTF-DC and operate as a single integrated force "under the command of the D.C. National Guard." "Gov. Rhoden mobilizes SDNG to DC at the Request of President Trump" (Aug. 31, 2025), Haynes Decl. Ex. 18. The commander of JTF-DC has made clear that he determines where troops will be deployed and how they will serve their mission, explaining that National Guard units "are here to serve the task force." "Guard Members from six states, D.C. on duty," Haynes Decl. Ex. 19.

As a result of this arrangement, all of the National Guard units in the District are also subject to the command of the Secretary of Defense and the Secretary of the Army. *See* Buchanan Decl. ¶ 23 ("when troops from other States serve in the District, they become subject to the operational control of the DCNG and fall under the same command and control of the Secretary of the Army"). These officers "command," "supervis[e]," and "control" DCNG and JTF-DC, just as they do National Guard troops that formally have been federalized. Exec. Order No. 11485, § 1; DCNG Delegation Memorandum. Indeed, DCNG itself has stated that the purpose of its deployment is to enable it to respond to "direction" from the President and the Secretary of Defense, DCNG Permanent Order 25-223, and that it operates "under the command and control of the President . . . or the Secretary of Defense," Haynes Decl. Ex. 49. Consistent with that command authority, on August 23, the Secretary of Defense "direct[ed]" the

---

[10] *See also Joint Task Force (JTF) -DC*, D.C. Nat'l Guard, https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/ (last visited Sept. 7, 2025)(describing the Task Force and its members); Haynes Decl. Ex. 49.

Commanding General of DCNG to "order" all National Guard units in the District "to carry their service-issued weapons" while patrolling the District.  "National Guard authorized to carry weapons in support of law enforcement" (Aug. 23, 2025), Haynes Decl. Ex. 20.   Similarly, on September 3, the Secretary of the Army personally "extend[ed]" the mobilization of DCNG through November 30 so it could "continue supporting the President's ongoing efforts to restore law and order in the District of Columbia."  Mem., "Extension of 11 August 2025, Mobilization of D.C. National Guard" (Sept. 3, 2025), Haynes Decl. Ex. 21.  The Secretary further stated that he would continue to "assess conditions on the ground in conjunction with the [Secretary of Defense] and the White House, to ensure our forces remain appropriately postured."  *Id.*

Furthermore, the U.S. Marshals have deputized most or all National Guard troops in the District as Special Deputy U.S. Marshals.  *See* Haynes Decl. ¶¶ 24-29 & Exs. 22-27.  These deputations grant the troops authority to perform core "law enforcement functions," including making arrests and executing search warrants.  USMS Policy Directive 17.11.D.4 (Oct. 7, 2020), Haynes Decl. Ex. 28.  And the deputations require troops to act "as directed by an appropriate official of the United States Marshals Service or some other appropriate Federal Official as so designated" in furtherance of the mission for which they have been deployed.  Form USM-3B, Special Deputation Oath of Office, Authorization, and Appointment, Haynes Decl. Ex. 29; *see United States v. Baker*, 438 F.3d 749, 755 (7th Cir. 2006).

Since their deployment, National Guard troops have been engaged in law enforcement and policing tasks throughout the District.  *See* "D.C. National Guard Activated," Haynes Decl. Ex. 10; Haynes Decl. Ex. 49.  Wearing military uniforms, carrying visible firearms, and sometimes bearing handcuffs, they have repeatedly conducted "presence patrols in residential neighborhoods and other locations throughout the District." "Guard members from six states,

15

D.C. on duty in Washington in support of local, fed authorities," Haynes Decl. Ex. 19; Compl. ¶ 120; Haynes Decl. Ex. 49. They have "detained" individuals whom they suspect of crimes in order to turn them over to MPD.[11] They have patrolled and surveilled public transit stations and established a militarized presence outside local events. Haynes Decl. Ex. 49; Compl. ¶¶ 122-23. They have physically intervened in fights.[12] And thanks to their deputation by the U.S. Marshals Service, they have authority to do even more. USMS Policy Directive 17.11.D.4 (Oct. 7, 2020).

The leadership of the District has repeatedly stated that it did not request and does not want National Guard units to police the District. *See* Haynes Decl. ¶¶ 37, 39 & Exs. 35, 37. Nonetheless, the President has made clear that he intends the National Guard to continue policing the District indefinitely. On August 25, the President issued an executive order directing the Secretary of Defense to "immediately create and begin training, manning, hiring and equipping a specialized unit within the District of Columbia National Guard" that would be "dedicated to ensuring public safety and order in the Nation's capital." Exec. Order No. 14,339, § 2(d)(i) (Aug. 25, 2025), Haynes Decl. Ex. 4. He instructed the Attorney General, the Secretary of the Interior, and the Secretary of Homeland Security to "deputize the members of this unit to enforce Federal law." *Id.*

## ARGUMENT

A preliminary injunction is warranted when the movant demonstrates: "(1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if

---

[11] *See, e.g.*, District of Columbia National Guard (@DCGuard1802), X (Sept. 7, 2025), https://x.com/DCGuard1802/status/1964650073528418732, Haynes Decl. Ex. 54; Diana Nerozzi & Steven Nelson, *Trump Takes Control of DC Police, Deploying National Guard in Historical Capital Crime Crackdown – And Warns NYC Could Be Next*, New York Post (Aug. 11, 2025), https://nypost.com/2025/08/11/us-news/trump-federalizing-dc-policedeploying-
national-guard-in-capital-crime-crackdown/; Eric Schmitt & Campbell Robertson, *National Guard Detained Man Who Assaulted a Park Police Officer, Authorities Say*, The New York Times (Aug. 16, 2025), https://www.nytimes.com/2025/08/16/us/politics/national-guard-detained-man.html.
[12] *Joint Task Force DC patrols at Union Station*, DVIDS, https://www.dvidshub.net/video/975780/joint-task-force-dc-patrols-union-station

the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The factors governing issuance of a preliminary injunction also govern issuance of a §705 stay." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). All of these factors strongly favor the District.

## I.    THE DISTRICT IS LIKELY TO SUCCEED ON THE MERITS.

The District is highly likely to succeed on each of its claims. Defendants have supplanted the Mayor's authority to police the District and directed both DCNG and out-of-state National Guard troops to engage in law enforcement without statutory authorization. They have violated the Constitution and the statutes governing the National Guard by exercising command and control over National Guard troops in state militia status. And they have flouted the PCA by placing the Army in command of personnel engaged in core law enforcement functions.

These acts are plainly unlawful. They are contrary to law and in excess of statutory authority, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2). Further, they are "so plainly beyond the bounds of . . . . statutory authority," and "so clearly in defiance of it," that they constitute *ultra vires* action. *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up); *see Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *12 (D.C. Cir. Aug. 13, 2025). And they are unconstitutional: Defendants have violated the Militia Clauses of the Constitution by asserting command authority that the

17

Constitution vests in the states; the District Clause by usurping authority that Congress vested in the Mayor; and the Constitution's separation of powers and the Take Care Clause by disregarding the foundational statutes Congress enacted to bar the Executive from blending military and civilian power.  Defendants have also taken actions that are arbitrary and capricious under the APA.  5 U.S.C. § 706(2)(A).  For all of these reasons, the District is likely to prevail.

### A. Defendants' Deployment of National Guard Troops to Police the District Over the District's Objection Is Unlawful.

Defendants have exceeded the statutory limits on their authority and acted in disregard of Congress's "exclusive" power under the District Clause, U.S. Const. art. I, § 8, cl. 17, by directing National Guard units to police the District over the District's objection.  Congress made clear in the Home Rule Act and the statutes governing DCNG that the President may employ DCNG to conduct law enforcement only in narrow circumstances not present here.  And the Home Rule Act, the Assistance Compact, and basic limits on sovereign authority in our federal system make clear that other states may not invade the District and police its residents without the District's consent.

> 1. *Defendants may not direct DCNG to engage in law enforcement outside of narrow circumstances not present here.*

The Home Rule Act vests the District with "powers of local self-government" and authority over "local District matters."  D.C. Code § 1-201.02(a).  One central component of that authority is the power to determine how to conduct law enforcement in the District.  The Home Rule Act gives the Mayor the "executive power of the District," and the responsibility for "the proper administration of the affairs of the District coming under [her] jurisdiction or control."  *Id.* § 1-204.22.  Pursuant to statute, those responsibilities include the duty to "preserve the public peace," "prevent crime and arrest offenders," and "enforce and obey all laws and ordinances . . . properly applicable to police or health."  *Id.* § 5-101.03(1), (2), (10).  It also includes the power

to determine the leadership and composition of the police force and set rules governing its conduct. *Id.* §§ 5-105.01, 5-105.05; *see Fraternal Order of Police*, 290 A.3d at 42-43.

By contrast, the Home Rule Act gives the President virtually no authority over law enforcement in the District. Indeed, when considering the Home Rule Act, Congress overwhelmingly rejected a proposed amendment that would have given the President authority to appoint the Chief of Police and control MPD. *See* Staff of H. Comm. on the District of Columbia, 93d Cong., Home Rule for the District of Columbia 1973-1974: Background and Legislative History of H.R. 9056, H.R. 9682, and Related Bills 2406 (Comm. Print 1974) (Nelson Amendment); *see id.* (statement of Rep. Nelson) (explaining that, under the rejected amendment "we would have a line of authority coming down from the President to the law enforcement facility of the District of Columbia"). Opponents of this measure objected that local police should be "responsive to the interests of those in the community," *id.* at 2408 (statement of Rep. Adams), and that vesting control in the President "strikes very deeply at the entire heart of the subject of home rule" by conveying that Congress "does not feel that the people of the District of Columbia are fit to govern themselves," *id.* at 2409 (statement of Rep. McKinney).

Instead of this amendment, Congress granted the President a narrow, time-limited authority, which he could invoke only in "special conditions of an emergency nature," to require that the Mayor "provide . . . services of the Metropolitan Police force" for "federal purposes" for a period of no longer than "30 days." D.C. Code § 1-207.40(a)-(b). Even that narrow exception requires that requests be directed through "the Mayor." *Id.* § 1-207.40(a); *see* Tr. 56:12-13, *Trump*, No. 1:25-cv-02678 (stating that the President's attempt to assume operational control of the police force was "plainly contrary to statute"). The existence of this carefully drawn

emergency provision confirms that, in ordinary circumstances, the President has no authority to direct the conduct of District law enforcement at all.

Defendants' directive that National Guard troops be activated to address "crime" and restore "law in order" over the District's objections flatly contradicts this scheme. The choice of which personnel or resources will participate in policing the District is plainly a component of the Mayor's authority to supervise MPD and execute the laws. *See* D.C. Code §§ 5-105.03, 5-105.05. And nothing in the Home Rule Act permits the President to supplant the Mayor's authority and decide for himself how best to police the District.

The provisions governing DCNG do not grant the President that authority either. In Title 49 of the D.C. Code, Congress delineated in detail when and how the President or the Commanding General may deploy DCNG. *See* D.C. Code § 49-101 *et seq.* This title lists only one circumstance in which the President may call out the National Guard to "aid the civil authorities in the execution of the laws." D.C. Code § 49-404. In section 49-103, it provides that, where there is a "tumult, riot, mob," or similar disturbance, and the Mayor, the U.S. Marshal for the District, or the National Capital Service Director requests "aid in suppressing such violence and enforcing the laws," the President shall call out such portion of DCNG "as he may deem necessary to suppress the same." *Id.* § 49-103. Defendants, however, have not invoked section 49-103, and none of the circumstances necessary to invoke that authority are present in this case: Defendants have not identified conditions comparable to a "tumult, riot, [or] mob"; neither the Mayor nor any other civil leader has requested the President's aid; and the deployments they have authorized are not limited to "suppress[ing] the same."

Defendants claim that three provisions of the D.C. Code authorize them to use DCNG to police the District, but none does so. *See* DCNG Permanent Order 25-223 (invoking D.C. Code

§§ 49-101, 49-102, and 49-107).  Section 49-102 authorizes the Commanding General to use

DCNG for "such drills, inspections, parades, escort, or other duties, as he may deem proper."

The term "other duties" appears after a list of ceremonial and training-related duties in a

provision entitled "Prescribing drills," and so should be read to refer to duties of a similar kind to

the "specific items that precede it."  *Fischer v. United States*, 603 U.S. 480, 487 (2024) (cleaned

up).  Section 49-101 reinforces that reading, specifying that "[a]ny drill, encampment, or duty

that is required, ordered, or authorized to be performed under the provisions of this title, shall be

deemed to be a *military* duty"—a characterization fundamentally incompatible with an

authorization to engage in ordinary domestic law enforcement.  *See infra* pp. 31-32 (explaining

that the PCA bars the military from engaging in law enforcement).  And section 49-107

authorizes the Commanding General to require the National Guard to "perform not less than 6

consecutive days of camp duty in each year," allowing him merely to "encamp[] . . . the militia"

on a "suitable campground."  D.C. Code § 49-107.

Moreover, reading these provisions as a blanket authorization to engage in law

enforcement would make little sense in light of the surrounding statutes.  It would render largely

superfluous section 49-103, which authorizes the President to call out the National Guard to

"enforc[e] the laws" in a far narrower set of circumstances.  *See, e.g.*, *Bilski v. Kappos*, 561 U.S.

593, 607-08 (2010) (cautioning against "interpreting any statutory provision in a manner that

would render another provision superfluous").  In addition, prior to enacting the laws governing

the D.C. militia in 1889, Congress had enacted a statute specifically vesting in the

Commissioners of the District the responsibility to "preserve the public peace," "prevent crimes

and arrest offenders," and "enforce and obey all laws and ordinances . . . properly applicable to

police or health."  D.C. Code § 5-101.03; *see* Act of June 11, 1878, ch. 180 § 6.  In the Home

Rule Act, Congress transferred that authority to the Mayor and gave the Council authority to pass laws governing local District affairs, which it used to enact a comprehensive police code.  *See Fraternal Order of Police*, 290 A.3d at 42-43; D.C. Code tit. 5.  Reading Title 49 to permit DCNG to engage in law enforcement absent special exigencies would contravene the specific grant of authority to the Mayor to "preserve the public peace" and would allow the operation of a police force free from any constraints imposed by the Council.  It is highly improbable that Congress meant to confer such sweeping and unusual authority when it enacted a militia statute that its drafters described as "contain[ing] only the usual and necessary provisions that are included in the militia codes of nearly all the States."  H.R. Rep. No. 50-809, at 1-2 (1888).

In short, Congress carefully limited the circumstances in which the President may use DCNG for law enforcement purposes.  It permitted him to call out DCNG to "aid the civil authorities in the execution of the laws" in cases of a "tumult, riot, mob," or similar disturbance.  D.C. Code §§ 49-103, 49-404.  And, under Title 10, it gave him the authority to call up DCNG (like any National Guard unit) to enforce the laws in the exceptional circumstances in which those authorities may be invoked, such as an insurrection or invasion.  *See, e.g.*, 10 U.S.C. § 251.  Those circumstances are not present here—and Defendants have not even attempted to claim otherwise—so the deployment of DCNG for law enforcement purposes is unlawful.

> 2.  *Defendants may not direct out-of-state National Guard troops in state militia status to engage in law enforcement in the District without obtaining the District's consent.*

Defendants have similarly acted unlawfully by directing out-of-state National Guard troops in state militia status to engage in law enforcement in the District absent the Mayor's consent.  The starting place for this analysis is, again, the Home Rule Act.  That statute grants the Mayor the "executive power" and the authority to prevent "crime" and maintain "public order"

in the District.  D.C. Code §§ 1-204.22, 5-101.03(1), (2), (10).  Just as Defendants cannot supplant the Mayor's authority by using DCNG as a substitute police force in the District, they surely cannot use *out-of-state* troops to do so.  Nothing in the Home Rule Act gives other states the authority to engage in law enforcement in the District.  And it is a basic  precept of our federal system that states may not exert their sovereign authority beyond their borders without the receiving jurisdiction's consent.  *See, e.g.*, *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders.").

The Assistance Compact confirms that Defendants may not lawfully use out-of-state National Guard troops to police the District over the District's objection.  In this interstate compact, Congress specifically approved the terms under which "states"—which it defined to include "the District of Columbia"—could request and furnish "mutual assistance" to each other during any "emergency disaster," including "community disorders."  Pub. L. No. 104-321, art. I. Under that scheme, states and the District may provide such services only after they receive a "request."  *Id.* arts. III.B, IV.  The Compact explains that, once emergency aid is provided, the "organizational units" of the sending state come under the "operational control" of the receiving state, that any personnel "rendering aid" become the "agents" of "the requesting state," and that emergency forces may not make arrests "unless specifically authorized by the receiving state." *Id.* arts. IV, VI.  The Compact specifically states that "[m]utual assistance" subject to the Compact "may include the use of the states' National Guard forces, either" pursuant to an interstate compact or "by *mutual agreement between states*."  *Id.* art. I (emphasis added).

The reference to the "District" in this Compact makes plain that it is the Mayor—not the President or his subordinates—who must "request" and "agree" to the sending of National Guard troops or other assistance to the District, and who exercises the authorities granted to receiving

jurisdictions under the Compact.  The Mayor's "executive power" includes the duty to enforce federal law such as interstate compacts.  D.C. Code § 1-204.22; *see Cuyler*, 449 U.S. at 440 ("the consent of Congress transforms [an interstate compact] into federal law").  And when the Council agreed to join the Compact in 2002, it made that Compact part of District law and provided that it would be "executed" by the Mayor.  D.C. Code § 7-2332.

Defendants' attempt to unilaterally foist out-of-state National Guard troops on the District for law enforcement purposes is irreconcilable with this Compact.  Those forces have been asked to render "aid" to the District without the necessary triggering "request" or "mutual agreement" from the Mayor.  Pub. L. No. 104-321, arts. I, III, IV.  And they have been permitted to operate independently of MPD, even though their organizational units are not subject to the District's "operational control," their personnel have not been made its "agents," and the District has not "specifically authorized" them to make arrests.  *Id.* arts. IV, VI.  It is inconceivable that the states that entered this Compact or the Congress that consented to it would have believed that the federal government could evade all of the Compact's careful constraints by fiat.  On the contrary, when it ratified the agreement, Congress added a narrow provision specifying that the Compact did not affect "the authority of the President" to send *federalized* National Guard troops into a state under "the Constitution and Title 10."  Pub. L. No. 104-321, art. XIII, § 2(6).  That exception would make no sense if the President could mandate the sending of non-federalized National Guard troops whenever or wherever he wished.  And, indeed, no other President has attempted to deploy non-federalized National Guard troops to a jurisdiction absent "coordination with or [a] request from the supported State."  Buchanan Decl. ¶ 21.

Defendants invoke 32 U.S.C. § 502 as a basis for their deployments, but nothing in that provision can be read to authorize the President to send National Guard troops into a non-

consenting jurisdiction for law enforcement purposes.  Section 502, located in a chapter on

"Training" and entitled "Required drills and field exercises," details the frequency with which

National Guard units must assemble for training and instruction. 32 U.S.C. § 502; *see generally*

*id.* ch. 5.  Subsection (a) provides that National Guard units must "assemble for drill and

instruction . . . at least 48 times each year" and must "participate in training at encampments,

maneuvers, outdoor target practice, or other exercises, at least 15 days each year." 32 U.S.C. §

502(a). Subsections (b), (c), (d), and (e) address when assemblies may count towards the

required number.  Last, subsection (f)—the provision Defendants specifically rely on—provides

that troops may be "ordered to perform training or other duty in addition to that prescribed under

subsection (a)," and that such training or other duty may include "[s]upport of operations or

missions undertaken by the member's unit at the request of the President or Secretary of

Defense." *Id.* § 502(f).

        Defendants appear to take the position that subsection (f) permits them to deploy

National Guard troops into *any* jurisdiction for *any* operation or mission, including a law

enforcement mission, as long as there is a state governor *somewhere* willing to offer up their

troops for that purpose.  In other words, in Defendants' view, subsection (f) permits them to

request that Texas send National Guard troops into Louisiana to enforce the law in state militia

status, even if Louisiana objects. This cannot be right.

        To start, there is no basis for reading subsection (f)'s reference to "other duties" to

authorize law enforcement missions. Section 502's title references "drills and field exercises,"

every other subsection in the statute is focused exclusively on "drills" and "training," and the

operative phrase in section 502(f) is "training or other duty."  A battery of interpretive canons—

the title canon, *nosciturs a sociis*, *ejusdem generis*—dictates that the residual term "other duties"

should be construed to convey an ancillary authority to perform duties *similar to* "drills" or "training," not to create a substantial and independent power unlike everything in the surrounding statute.  *See Dubin v. United States*, 599 U.S. 110, 120-22 (2023) ("indeterminate" text should be construed in light of its title); *Maracich v. Spears*, 570 U.S. 48, 63 (2013) ("a word is given more precise content by the neighboring words" (internal quotation marks omitted)); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (residual clause introduced by "other" should be construed similarly to "the preceding specific words" (internal quotation marks omitted)).

Defendants' interpretation is also at odds with the broader statutory scheme.  If section 502(f) were read to allow the President to send National Guard troops into a state *without* consent of the state's legislature or governor, it would gut the limitations in Title 10, which carefully detail the circumstances in which the President may send National Guard troops into a state without the consent of the governor. *See, e.g.*, 10 U.S.C. §§ 251-253.  It would also conflict with the Assistance Compact, which provides that states may send National Guard units to another state by "request" and "mutual agreement."  The generic language of section 502(f) contains no suggestion that Congress intended these startling results.  *See Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (describing strong presumption against implied repeals).

Section 502(f)'s history further bolsters the point.  Until 2006, subsection (f) simply provided that members of the National Guard could be "ordered to perform training or other duty in addition to that prescribed under subsection (a)."  Then, in a 2006 omnibus defense bill, in a section entitled "National Guard Title 32 Training Duty," Congress provided that this "training or other duty" may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense."  Pub. L. No. 109-364, § 525(c) (2006).

There was almost no discussion of this provision—and certainly nothing to suggest that Congress intended to fundamentally alter the circumstances in which National Guard troops can be authorized to conduct law enforcement or deployed into non-consenting states.  It is improbable in the extreme that Congress altered the "fundamental details" of the Title 32 and Title 10 scheme through the "vague terms" of Section 502(f).  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 469 (2001) (Congress does not "hide elephants in mouseholes").

Finally, reading the statute to allow the President to send troops into a non-consenting state for law enforcement purposes would raise serious constitutional concerns.  In our federal system, it is a bedrock principle that one state may not "invade" another without its consent.  *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).  That limit applies with particular force to the District, which the Framers placed under Congress's "exclusive" authority precisely so that other states could not exert sovereign power over the nation's capital as they pleased.  *See John R. Thompson Co.*, 346 U.S. at 109 (the District Clause "eliminate[s] any possibility" that Congress's powers are "concurrent with that of the . . . states"); The Federalist No. 43 (James Madison) (Congress was vested with "complete authority" over the District so that the District would not have a "dependence" on any "state").  Section 502(f) lacks the clear statement necessary to conclude that Congress sought to work such a significant and constitutionally dubious alteration of our federal structure.  *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 858 (2014).  And this consideration provides yet further reason to reject Defendants' attempt to justify the deployment of National Guard troops into the District over its objection.

### B. Defendants Have Unlawfully Assumed Command and Control Over Out-of-State National Guard Troops in State Militia Status.

Defendants have also violated the Constitution and federal law by exercising command and control over National Guard units in state militia status.

27

The Constitution reflects a delicate "compromise" concerning control of the Militia. *Perpich*, 496 U.S. at 340. It generally reserves to states the authority over "the Appointment of the Officers," the "training," and the command of state militias. U.S. Const. art. I, § 8, cl. 16. At the same time, it permits the federal government to provide for "organizing, arming, and disciplining, the Militia, and for governing such Part of [the Militia] as may be employed in the service of the United States." *Id.* And it vests the federal government with authority to call forth the Militia to "execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Together, these clauses mean that "the government of the militia is committed to the states" until "the militia [is] called into national service." *Dern*, 74 F.2d at 487; *see Abbott v. Biden*, 70 F.4th 817, 827 (5th Cir. 2023). Indeed, Madison stated that "[n]othing can be more certain and positive than this": that "state governments are to govern the militia when not called forth for general national purposes; and Congress is to govern such part only as may be in the actual service of the Union." 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 424 (Jonathan Elliot ed., 1836) (James Madison).

The statutes governing the National Guard—the "modern Militia reserved to the States by . . . the Constitution," *Maryland*, 381 U.S. at 46—reflect the same compromise. It is well-settled that, when National Guard forces are in state militia status under Title 32, they must be "under the command of the state Governor" and subject to the governor's "day-to-day" control. *Ass'n of Civilian Technicians*, 603 F.3d at 993; *see Gnagy v. United States*, 634 F.2d 574, 578-79 (Ct. Cl. 1980). The federal government may assume command of National Guard forces only when called into federal status under Title 10. *In re Sealed Case*, 551 F.3d at 1054 (Kavanaugh, J., concurring); *see Maryland*, 381 U.S. at 48. And the law limits those circumstances to particular exigencies, such as an insurrection or invasion. *See* 10 U.S.C. §§ 251, 12406.

The out-of-state National Guard units called into the District are all in state militia status under Title 32.  *See* Haynes Decl. Exs. 11-19.  Both the states themselves and the federal government have acknowledged as much.  *See* Haynes Decl. Ex. 20.  Yet it is plain that the federal government is commanding these units directly.  Defendants have placed all of the National Guard units in the District "under the command" of DCNG, which is directed and controlled by the U.S. Army.  *See supra* pp. 14-15; Buchanan Decl. ¶¶ 23-24.  The leadership of DCNG has made clear that members of JTF-DC operate as an integrated command, with each National Guard unit "here to serve the task force."  *See* Haynes Decl. Ex. 19.  And the Secretary of Defense has issued "order[s]" to the National Guard units in the District, including by requiring them to carry "their service-issued weapons" while on mission.  Haynes Decl. Ex. 20.

The deputation of the National Guard troops as U.S. Marshals reinforces that they are subject to federal command and control.  In accepting deputation, National Guard troops must agree to carry out their duties "as directed by an appropriate official of the United States Marshals Service *or some other appropriate Federal Official as so designated*."  Haynes Decl. Ex. 29 (emphasis added).  Further, deputation obligates these troops to carry out their duties only in "furtherance of the mission for which" they have "been specially deputized."  *Baker*, 438 F.3d at 755 (internal quotation marks omitted).  Because the National Guard troops have been deputized specifically for the purpose of furthering the work of JTF-DC, deputation subjects them to the direction of the "Federal Official[s]" leading that mission—that is, the leadership of the U.S. Army and Department of Defense.  *See, e.g.*, *Untied States v. Lampkin*, No. 3:15-cr-5-05, 2016 WL 11680671, at *2 (D. Alaska Apr. 21, 2016) (where U.S. Marshal deputized as member of the FBI Safe Streets Task Force, the "Federal Bureau of Investigation" was "the federal sponsoring agency"); *United States v. Garrett*, 172 F. App'x 295, 299 n.2 (11th Cir. 2006)

(Special Deputy Marshals on a joint task force required "authoriz[ation] by the Drug
Enforcement Agency or the FBI" to engage in certain conduct); *United States v. Weiland*, 420
F.3d 1062, 1067 (9th Cir. 2005) (similar).  And, regardless, deputation allows the President to
direct and control how they carry out JTF-DC work through the U.S. Marshals Service.

The states themselves have made clear the deployed National Guard units operate
pursuant to federal direction.  The Louisiana National Guard stated that, "as directed by the
president of the United States," it was "federalizing and activating to Washington, D.C." to
"augment the [D.C. National Guard] in a joint effort," and that the Department of the Army and
the Secretary of the Army had "directed multiple states' National Guard forces" to do the same.
Haynes Decl. Ex. 15.  The Tennessee Attorney General similarly stated, in response to a specific
request from the District of Columbia Attorney General to identify the legal basis for the
deployment, that the Guard was deploying "[u]pon orders from President Trump."  Mase
Response, Haynes Decl. Ex. 45.  And the South Dakota governor stated that "[the] mobilization
is under the command of the D.C. National Guard," which is in turn commanded by the
Secretary of the Army, the Secretary of Defense, and the President.  Haynes Decl. Ex. 18.

The Constitution and federal law bar the federal government from controlling state
National Guard units in this way without federalizing them.  At the nation's founding, the power
to "govern" included, at minimum, "the power to command and control."  *Abbott*, 70 F.4th at 831
(surveying Founding-era sources).  And the federal government has previously argued—and the
D.C. Circuit has agreed—that Title 32 only authorizes it to issue "regulations and orders that
apply generally to all the states' National Guard while leaving control of the day-to-day
operations to the states."  *Ass'n of Civilian Technicians*, 603 F.3d at 992.  Yet, by any measure,
Defendants have assumed "command and control" of the National Guard units in the District and

exercised "control" of their "day-to-day operations": they have placed the troops under the integrated command of the Army, issued orders concerning their carrying and use of firearms, and directed their operations in the District.  Both the Constitution and federal statutes prohibit the federal government from exercising this degree of control over National Guard troops in state militia status.

**C. Defendants Have Violated the Posse Comitatus Act and 10 U.S.C. § 275 by Deploying National Guard Troops Under the Command of the Army to Engage in Law Enforcement.**

Defendants have also violated the Posse Comitatus Act (PCA) and 10 U.S.C. § 275. These statutes forbid any part of the Army from active involvement in the execution of the law, including by assuming command or control of law enforcement operations, absent express statutory authorization.  The Secretary of the Army and his subordinates are plainly subject to the PCA and section 275.  And by commanding a 2,300-strong force of National Guard troops vested with core law enforcement powers, they are involved in "execut[ing] the laws" in precisely the manner those foundational statutes forbid.

1. *The PCA bars the Army from exercising command and control over National Guard troops engaged in law enforcement.*

The PCA provides that no person may "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except where "expressly authorized by the Constitution or Act of Congress."  18 U.S.C. § 1385.  Congress enacted this statute specifically to end the practice of "United States Marshals . . . calling upon troops to assist them in performing their duties."  *Authority to Use Troops to Prevent Interference With Federal Employees*, 1 Supp. Op. O.L.C. at 344; *see also* Pub. L. No. 107-296, § 886(a)(2), (b); *Red Feather*, 392 F. Supp. at 922.  To that end, the statute forbids "any part of the Army" or another branch of the military from "active involvement in the execution of

31

the law," "the exercise of regulatory, proscriptive, or compulsory military power," or conduct

that "pervade[s] the activities of civilian authorities." *United States v. Yunis*, 924 F.2d 1086,

1094 (D.C. Cir. 1991) (quoting *United States v. Yunis*, 681 F. Supp. 891, 895-96 (D.D.C. 1988)).

In 10 U.S.C. § 275, Congress directed DoD to extend the constraints of the PCA to

entities not initially covered by the PCA itself. That statute requires the Secretary to Defense to

"prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter

does not include or permit direct participation by any member of the Army, Navy, Air Force, or

Marine Corps in a search, seizure, arrest, or other similar activity," unless "otherwise authorized

by law." 10 U.S.C. § 275. The Secretary has implemented this requirement by issuing a policy

directive that bars most "DoD personnel," including officials in the Army, from providing "direct

civilian law enforcement assistance," including "a search or seizure," an "arrest" or

"apprehension," and "security functions" or "crowd and traffic control." DoDI 3025.21, at 18-

19; Buchanan Decl. ¶ 28. The D.C. Circuit has explained that this directive uses the same

standard as the PCA to "identify violations." *Yunis*, 924 F.2d at 1094. And courts have

repeatedly found its prohibitions to be judicially enforceable. *See United States v. Dreyer*, 804

F.3d 1266 (9th Cir. 2015) (en banc); *United States v. Chon*, 210 F.3d 990, 993-94 (9th Cir. 2000).

Accordingly, under these statutes, officials in the Army may not have "active

involvement in the execution of the law" or provide "direct civilian law enforcement assistance."

*See Yunis*, 924 F.2d at 1094; DoDI 3025.21, at 18. Military officials plainly violate those

restrictions by *personally* conducting law enforcement activities like arrests, searches, seizures,

security functions, and traffic control. *See* DoDI 3025.21, at 18-19. And they also violate the

PCA and section 275 by *commanding* or *directing* personnel who engage in such conduct. The

command and control of law enforcement activities is a form of "active involve[ment] in the

32

execution of the law." No one would doubt, for instance, that the Attorney General, the FBI Director, and the Chief of Police are "actively involved in the execution of the law," even if they do not themselves handcuff suspects or execute warrants—nor that the government would violate the PCA by turning those offices over to military command. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985) (describing the Attorney General as "the Nation's chief law enforcement officer"). Similarly, DoDI 3025.21 expressly states that its restrictions apply to personnel acting "under the direct control of a military officer" or "under the direction or control of DoD authorities." DoDI 3025.21, at 23-24.

Precedent confirms that officials subject to the PCA and section 275 cannot command or supervise personnel engaged in law enforcement. In *Chon*, the Ninth Circuit held that civilian law enforcement personnel were subject to section 275[13] because they had a "direct reporting relationship to . . . a military officer" and were "a unit of, and accountable to, the Navy." 210 F.3d at 994. As the court explained, "the PCA and PCA-like restrictions [in section 275] function to proscribe use of the strength and authority of the military rather than the use of the private force of the individuals who make up the institution." *Id.* at 993. Those restrictions therefore apply to any actions taken "under the auspices of the military," including by civilian personnel acting under military command. *Id.*

Similarly, in *Gilbert v. United States*, 165 F.3d 470 (6th Cir. 1999), the Sixth Circuit held that National Guard troops are subject to the PCA where they are under the "command and control" of the federal military. *Id.* at 473 (quoting Steven B. Rich, *The National Guard, Drug Interdiction and Counterdrug Activities and Posse Comitatus: The Meaning and Implications of "in Federal Service,"* Army Law. 40(1994)). The court explained that it does not matter whether

---

[13] At the time this case was decided, this provision was codified at 10 U.S.C. § 375 (2012). It was renumbered without change as 10 U.S.C. § 275 in 2016. *See* Pub. L. No. 114-328, div A, tit. XII, §1241(a)(2) (2016).

"the authority for the duty lies in state or federal law," "state or federal benefits apply" "state or federal funds are being used," or "any combination thereof." *Id.* (quoting Rich, *supra*, at 40). What matters is whether National Guard troops are "acting in response to directives issued by their . . . Governor" or are, instead, under "federal control." *Id.*

Numerous other courts have echoed the view that the application of the PCA and section 275 turn on the existence of military direction and control. *See, e.g.*, *United States v. Moraga*, No. CR 01-964, 2002 WL 35649965, at *10 (D.N.M. June 25, 2002) (no PCA violation because "[t]he Air Force did not permeate or direct the civilian investigation"); *Dreyer*, 804 F.3d at 1276 (PCA violation where military personnel "spearheaded a law enforcement investigation"); *United States v. Yunis*, 681 F. Supp. at 895 (no violation of section 275 because "[t]he FBI was in charge of the operation at all times" and the military did not exert "authority or control").

So too has the Department of Justice. It has indicated that, to avoid a violation of the PCA, a DoD official detailed to a law enforcement agency should be "separated from the oversight, control, and conduct of" law enforcement investigations. *Permissibility Under Posse Comitatus Act of Detail of Defense Department Civilian Employee to the National Infrastructure Protection Center*, 22 Op. O.L.C. 103, 107 (1998). And, like the Sixth Circuit, it has said that National Guard troops are "subject to the Posse Comitatus Act" where they are "operating under federal command and control." *Mil. Support for Customs & Border Prot. Along the S. Border Under the Posse Comitatus Act*, 2021 WL 298369, at *5 & n.3 (O.L.C. Jan. 19, 2021).

> 2.  *The Army is unlawfully exercising command and control over National Guard troops engaged in core law enforcement activities.*

Defendants have flouted this prohibition. They have placed senior Army officials in command and control of National Guard troops that are engaged in core law enforcement

activities.  No statute "expressly authorize[s]" this conduct.  18 U.S.C. § 1385.  It is therefore a

brazen violation of the PCA and section 275.  *Cf. Newsom*, 2025 WL 2501619, at *1.

*First*, Defendants have placed in charge of JTF-DC Army officials who are plainly

subject to both the PCA and section 275.  The Secretary of the Army and his subordinates are

within the scope of the PCA because they are "part of the Army."  18 U.S.C. § 1385; *see* 10

U.S.C. § 7013(a)-(b) (making the Secretary of the Army "the head of the Department of the

Army" and authorizing him to conduct "all affairs" of the Department); *id.* §§ 7031(a), 7033(c)

(making the Army Staff subject to the Secretary's "authority, direction, and control").  They also

fall within the broad terms of DoDI 3025.21, which applies the limitations of section 275 to "the

Military Departments," including the Army.  DoDI 3025.21, at 1; *see* 10 U.S.C. § 275 (requiring

the Secretary of Defense to issue regulations prohibiting any "member of the Army" from direct

participation in law enforcement activities).  These officials are accordingly barred from

involvement in law enforcement activities.

*Second*, these individuals exercise "command and control" over the more than 2,300

National Guard troops in the District.  As noted above, all of these troops have been placed under

the control of DCNG and JTF-DC.  *See supra* pp. 14-15.  The Secretary of the Army commands

DCNG pursuant to a delegation of authority dating back to 1969.  *See* DCNG Delegation

Memorandum.  Secretary Hegseth ordered Secretary Driscoll to "operationalize" the President's

order by overseeing JTF-DC.  *See* Haynes Decl. Ex. 50.  And both Secretary Hegseth and

Secretary Driscoll have in fact issued "orders" to those troops.  *See* Haynes Decl. Exs. 20-21.

The National Guard troops thus have a "direct reporting relationship to" the Army, *Chon*, 210

F.3d at 994, and are subject to its "command and control," *Gilbert*, 165 F.3d at 473. Nothing

more is necessary to subject their conduct to the requirements of the PCA and section 275.[14]

> *Third*, the National Guard troops are engaged in the "execution of law" prohibited by the

PCA. Most obviously, they have been designated as Special Deputy U.S. Marshals. The

deputation of military-led forces as U.S. Marshals was the very evil the PCA was enacted to

prevent. *See Authority to Use Troops to Prevent Interference With Federal Employees*, 1 Supp.

Op. O.L.C. at 344; Pub. L. No. 107-296, § 886(a)(2); *Red Feather*, 392 F. Supp. at 922. And by

being deputized as Marshals, the troops have been given authority to make arrests, conduct

searches and seizures, serve subpoenas, monitor electronic surveillance, and otherwise enforce

federal criminal law. *See* USMS Policy Directive 17.11.D.4 (Oct. 7, 2020). These law

enforcement tasks are expressly forbidden by section 275 and lie at the core of the PCA's

prohibition. *See* 10 U.S.C. § 275; DoDI 3025.21, at 18; *Yunis*, 924 F.2d at 1094.

> Furthermore, these troops in fact engage in law enforcement activities. They temporarily

"detain" individuals so that they can turn them over to MPD; they conduct armed "presence

patrols" of residential neighborhoods, transit stations, and public events to prevent and deter

crimes; and they have physically intervened to stop altercations. *See supra* pp. 15-16. These law

enforcement activities entail the application of "regulatory, proscriptive and compulsory military

power" and "pervade" the conduct of law enforcement in the District. *Yunis*, 924 F.2d 1086

(internal quotation marks omitted); *see Newsom*, 2025 WL 2501619, at *24-25 (concluding that

---

[14] In a 1989 opinion, the Department of Justice Office of Legal Counsel asserted that the PCA does not apply to DCNG except when it has been formally called into federal service. *Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 92 (1989). That sparsely reasoned opinion did not grapple with (or even acknowledge) the fact that DCNG is subject to the command and control of the Army. It is also irreconcilable with the Office's subsequent opinions (and a wealth of judicial precedent) making clear that the relevant question for PCA purposes is whether the unit is "operating under federal command and control." *Mil. Support for Customs*, 2021 WL 298369, at *5 & n.3. And, here, there is direct evidence that the Army is in fact directing and supervising the work of the National Guard troops in JTF-DC.

the use of the National Guard to engage in similar conduct violated the PCA).  And they are

forms of "direct civilian law enforcement assistance" expressly covered by the policy

implementing section 275.  DoDI 3025.21, at 18-19; *see* Buchanan Decl. ¶¶ 25-30 (explaining

that the PCA and section 275 prohibit such activities).

*Finally*, no statute "expressly authorize[s]" this conduct, as would be required to avoid

the PCA's restrictions.  18 U.S.C. § 1385; *see* 10 U.S.C. § 275 (section 275 applies unless

conduct is "otherwise authorized by law").  A later statute provides "express" authorization to

override an earlier one only if "ordinary interpretive considerations point clearly in that

direction," such that the "plain import of [the] later statute directly conflicts with [the] earlier

statute." *Dorsey v. United States*, 567 U.S. 260, 274-75 (2012).  This stringent standard applies

to the PCA, as the Department of Justice has recognized.  *See* 2021 WL 298369, at *7.  It ensures

that the "American tradition of restricting military intrusions into civilian affairs" is upheld,

"except where Congress has recognized a special need for military assistance in law

enforcement." *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995); *Newsom*, 2025 WL

2501619, at *19 n.17 (explaining that the word "expressly" was added as part of a legislative

compromise and must be given "full effect").

None of the vague statutes Defendants have invoked comes close to providing express

authorization to disregard the PCA.  The principal statutes Defendants rely on provide that

DCNG may engage in "drills, inspections, parades, escort, or other duties," D.C. Code § 49-102,

and that the President and the Secretary of Defense may request that National Guard units

perform "training or other duties" that include "support of operations or missions," 32 U.S.C.

§ 502(f)(2).  *See* Haynes Decl. Ex. 49 (claiming that section 49-102 is an "exception to the

PCA").  These statutes are best read not to authorize law enforcement at all.  *See supra* pp. 20-

22, 24-27. And they plainly do not do so with the sort of explicit language necessary to make "clear that Congress has approved that activity without regard to the restrictions on using the military 'as a posse comitatus or otherwise to execute the laws.'" 2021 WL 298369, at *7 (quoting 18 U.S.C. § 1385); *see id.* at *7-8 (concluding that a "generic authorization" to grant "assistance" was not sufficiently clear because it was susceptible to "two plausible interpretations").[15]

Accordingly, by commanding National Guard troops conducting quintessential law enforcement operations, the Army Secretary and his subordinates are "actively involved in the execution of the law" in violation of the PCA and section 275. Indeed, any other conclusion would rend an intolerable gap in these statutes. Defendants have effectively established for themselves a parallel and pervasive domestic police force in the District of Columbia—almost three quarters the size of the entire Metropolitan Police Department itself —and placed it under direct military command. If Defendants could achieve this blending of military and civilian power through the expedient of formally keeping the troops in Title 32 status and requesting their services under section 502(f), they could impose involuntary military occupation on any city in the country whenever they wished. Our Nation's "traditional and strong resistance . . . to any military intrusion into civilian affairs," *Laird*, 408 U.S. at 15, cannot be so easily cast aside. Defendants' actions are unlawful.

---

[15] Nor can Defendants plausibly contend that any statute pertaining to deputation by the U.S. Marshals contains such authorization. *See, e.g.*, 28 U.S.C. § 561(f) (authorizing Director of the U.S. Marshals Service to appoint "such employees as are necessary to carry out the powers and duties of the Service"). These statutes contain no reference to National Guard or military personnel at all. And the central purpose of the PCA was to prevent the deputation of military personnel as U.S. Marshals. *See supra* p. 31.

### D.  Defendants' Actions Are Arbitrary and Capricious

Agency Defendants' actions to deputize National Guard troops as Special Deputy U.S. Marshals and to direct them to carry firearms should also be set aside as arbitrary and capricious under the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).  In each instance, Defendants failed to consider key aspects of their decisions or to adequately explain them.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*First*, Defendants have failed to adequately explain their decision to deputize thousands of troops who do not have any law enforcement training as Special Deputy U.S. Marshals.  Ordinarily, before being deputized, candidates are expected to have completed a basic law enforcement training program and to possess at least one year of law enforcement experience with an agency that has general arrest authority.  *See* USMS Policy Directive 17.11.D.5 (Oct. 7, 2020). Defendants, however, carried out their deputations without regard for these usual requirements. Although all enlistees undergo basic training and learn various military skills before becoming members of the National Guard, most do not learn law enforcement.  *See Basic Combat Training*, Army Nat'l Guard, https://nationalguard.com/basic-combat-training/basic-training-phases (last visited Sept. 9, 2025).  Law enforcement training typically is reserved for Guard members who become military police, who specifically learn how to do law enforcement patrols, arrest and detain suspects, and perform traffic and crowd control.  *See Military Police*, Army Nat'l Guard, https://nationalguard.com/31b-military-police (last visited Sept. 9, 2025).

While some of the deployed National Guard troops are Military Police, many or most are conducting law enforcement as Special Deputy U.S. Marshals without the qualifications or experience that the U.S. Marshals Service typically requires.  Defendants have not acknowledged or attempted to explain why they have deviated from their usual practice of requiring this training

and experience. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency must both "display awareness that it *is* changing position" and "show that there are good reasons for the new policy"). Moreover, Agency Defendants have failed to grapple with the obvious dangers posed to the public by granting arrest, search, and seizure powers to thousands of armed troops who have no specific knowledge of, or experience with, those skills. *See* Hall Decl. ¶¶ 62-65; Buchanan Decl. ¶¶ 34-47. That is arbitrary and capricious. *State Farm*, 463 U.S. at 43 (action is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem").[16]

*Second*, Defendants have authorized and ordered troops patrolling the District to carry their service weapons, including M17 pistols and assault weapons like the M4 rifle, without considering the self-evident risks associated with carrying such arms during domestic law enforcement activities. The M17 pistol, a military version of the Sig Sauer P320 series pistol, is of particular concern because reports have shown that models in that series are capable of firing without the trigger being pulled. Article, "Sig Sauer guns," Haynes Decl. Ex. 48. The P320 is so dangerous that Immigrations and Customs Enforcement has stopped using it entirely, and the U.S. Air Force Global Strike Command paused its use of a military version following a fatal discharge in July. Article, "Air Force Suspends use of M18 Pistols," Haynes Decl. Ex. 31. An inspection during the pause "identified discrepancies with 191 weapons across the command's M18 inventory," including "problems with the safety lever, striker assembly and sear." Press Release, "AFGSC Completes M18 Handgun Inspection, Returns to Service," Haynes Decl. Ex.

---

[16] This failure is all the more troubling in light of last year's finding by the Department of Justice Office of the Inspector General that the U.S. Marshals Service has repeatedly approved special deputations for "questionable purposes" and "ineligible applicants." Off. of the Inspector Gen., Dep't of Just., Audit of the U.S. Marshals Service's Special Deputation Authority i, 4, 6, 9 (Sept. 2024), https://oig.justice.gov/sites/default/files/reports/24-116.pdf.

51. Defendants have not indicated that they have conducted any similar inspections. Despite the extreme risk these weapons pose, even in the hands of trained professionals, Defendants have directed that troops carry them on armed patrols and while interacting with members of the public. Furthermore, although USMS policy contemplates that Special Deputies may "[c]arry firearms for personal protection or the protection of those covered under the federal assault statutes," USMS Policy Directive 17.11.D.4 (Oct. 7, 2020), Defendants have not explained why Special Deputies would need to carry assault weapons like the M4 rather than pistols typically carried as service weapons by law enforcement. Defendant's failure to weigh these risks or explain the justification for the order is arbitrary and capricious.

## II.      THE DISTRICT IS SUFFERING SEVERE AND IRREPARABLE INJURY.

The District is suffering severe and irreparable injury from the unconsented-to deployment of National Guard units that are now engaged in unlawful law enforcement activities throughout the District. *See Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This intrusion has inflicted a substantial sovereign injury, by depriving the District of one of the core rights of self-government afforded in the Home Rule Act: the authority to control law enforcement operations in the District. *See supra* pp. 18-20. Further, it has divested the District of its authority under the Assistance Compact. *See supra* pp. 23-24. This loss of sovereign authority and control is itself irreparable. *See Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024) ("The States' injuries are irreparable because [the challenged federal statute] impacts their sovereign authority"); *Mashpee Wampanoag Tribe v. Benhardt*, No. 18-2242, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (finding "loss of sovereignty to constitute an irreparable harm"); *cf. Newsom*, 2025 WL 2501619, at *13 (finding injury-in-fact based on the federal government's intrusion on state's "police power").

The unlawful deployment of National Guard troops has also impaired the District's ability to enforce its laws. Several District laws create exceptions for authorized National Guard troops lawfully operating in the District, including traffic laws and limitations on carrying unregistered firearms. *See, e.g.*, D.C. Code § 22-4502.01(c) (specifying that a gun-free-zone provision "shall not apply . . . to members of . . . the National Guard . . . when on duty"); D.C. Code § 22-4505(b)(3) (specifying that certain firearm provisions "shall not apply to . . . [m]embers . . . of the National Guard . . . when on duty and duly authorized to carry a firearm"). But, because the National Guard troops have been deployed unlawfully, the presence of the National Guard troops has impermissibly suspended the operation of these laws. The inability to enforce these laws has created an ongoing sovereign injury to the District. *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443-44 (D.C. Cir. 1989) (finding sovereign injury where action has "preemptive effect"); *District of Columbia v. Exxon Mobil Oil Corp.*, 172 A.3d 412, 422 (D.C. 2017) (the District has a "sovereign interest in enforcing statutory prohibitions its legislature has enacted").

Further, the unwanted deployment of National Guard troops poses a high risk of undermining the District's own law enforcement work. Because these troops lack adequate law enforcement training, they present a great risk of making unlawful stops and seizures, failing to document interactions or preserve evidence appropriately, and otherwise undermining the District's ability to bring prosecutions for criminal conduct they identify. Buchanan Decl. ¶¶ 34-46; Hall Decl. ¶ 63. Absent appropriate training or coordination with MPD, they are likely to engage in conduct that "could easily result in harm to both civilians and officers." Buchanan Decl ¶¶ 32, 47; Hall Decl. ¶¶ 62-65. And the deployment of these armed troops, unfamiliar with

42

the District's communities, to police the District's neighborhoods is likely to undermine trust in District law enforcement generally.  Hall Decl. ¶¶ 51-57.[17]

Defendants' deployments also pose an immediate risk of serious public safety harms. Armed National Guard troops patrolling the District without adequate training present a serious risk of engaging in unlawful and potential deadly uses of force and violations of the laws governing arrests, searches, and seizures.  *Id.* ¶¶ 62-65; Buchanan Decl. ¶¶ 34-48.  These troops have given District residents a "palpable sense of fear" and rendered them "afraid to go grocery shopping, show up to work and go about their daily lives."[18]  *See* Hall Decl. ¶ 56.  DCNG even posted a video of an out-of-state servicemember admitting he "can understand how we could come across as threatening," because "[w]e are wearing firearms and protective armor."[19]  As the Mayor has said, the presence of National Guard troops in the District is "not working."  Haynes Decl. Ex 37.  The court "need not await a tragic event" before providing "[a] remedy for" these "unsafe conditions."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

Finally, because of the fear and tension caused by the unlawful deployment of National Guard, the District is losing out on substantial revenues it would otherwise gain from the tourism and entertainment industries.  *See, e.g.*, *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) ("expected loss of tax revenue" can constitute cognizable injury).  The unfamiliar presence of armed military patrols has frightened away customers and led to a significant reduction in tourism, foot traffic, and associated revenue at restaurants and hotels throughout the District.  Schwalb Decl. ¶¶ 5-7. A recent report indicates that "the week federal forces dispersed

---

[17] *Opinion: A joint letter from ANCs opposing President Trump's takeover of D.C.*, The 51st (Aug. 29, 2025), https://51st.news/opinion-a-joint-letter-from-ancs-opposing-president-trumps-takeover-of-d-c/.
[18] Daniella Silva & Megan Lebowitz, *Trump Vowed to Make Washington Streets Safer. In One Neighborhood, People Feel Less Safe Than Ever*, NBC NEWS (Aug. 26, 2025), https://www.nbcnews.com/news/us-news/national-guard-trump-washington-dc-immigration-fears-ice-deportation-rcna226943.
[19] https://www.facebook.com/reel/1761335358592445.

across the capital, foot traffic in D.C. dropped 7 percent on average," and that "[t]he sight of National Guard troops . . . authorized to carry weapons" is likely to further "chill demand."[20] Because most transactions at District retail businesses, hotels, and restaurants are subject to gross sales taxes, the reduction in business activity in the District will foreseeably result in the loss of a proportional amount of tax revenue to the District government.  *See* D.C. Code § 47–2202; *see also* Schwalb Decl. ¶ 8.  And that injury is likely irreparable due to the federal government's sovereign immunity.

## III.    THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES FAVOR AN INJUNCTION.

The balance of the equities and public interest tip sharply in the District's favor.  The District's "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  Also "[o]n the District's side of the balance is the governmental interest in enforcing [the] duly enacted law[s]" governing the District.  *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024).   The District has a strong public interest in preserving the autonomy and self-government that Congress gave District residents in the Home Rule Act.  *See W. Virginia ex rel. Morrisey*, 59 F.4th at 1149 (finding that the public interest is served by "preserv[ing] state sovereignty").  And there is a public interest in preserving the District's control of law enforcement.  *See Banks v. Booth,* 468 F. Supp. 3d 101, 124 (D.D.C. 2020) (noting "public interest in permitting the government discretion to carry out

---

[20]  Andrea Sachs & Federica Cocco, D.C. Tourism Was Already Struggling. Then the National Guard Arrived, THE WASHINGTON POST (Aug. 29, 2025), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

its authorized functions"); *Hanson*, 120 F.4th 246 (weighing "likelihood of concrete harm to the District's law enforcement and public safety interests" (cleaned up)).

More broadly, the public has an overriding interest in ensuring that the military "abide[s] by the federal laws that govern [its] existence and operations." *League of Women Voters*, 838 F.3d at 12. Our country's foundational principles caution against martial law, military rule, and a nationalized military police force. The PCA erects critical safeguards that prevent the deployment of military units for domestic law enforcement. Permitting the federal government to erode those safeguards in the District will foreseeably lead it to do so elsewhere and pose grave harm to our democratic institutions.

Finally, the public interests favoring a preliminary injunction far outweigh any harm Defendants would face from being prohibited from illegally deploying military units to conduct civil law enforcement. Defendants are not harmed by "an injunction that merely ends an unlawful practice." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Given the considerable harms the deployment presents to the District and the public, preventing an unprecedented intrusion on District affairs during the pendency of litigation outweighs any asserted federal interest. *See Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 217 (S.D.N.Y. 2021). And Defendants cannot show that the requested injunction will harm public safety in the District, given that MPD and federal civilian officers actually trained in and legally permitted to engage in law enforcement will remain on duty.

## CONCLUSION

For the foregoing reasons, the Motion for a Preliminary Injunction and Section 705 Stay should be granted.

Dated: September 9, 2025            Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (D.C. Bar No. 1026153)
ELIZA H. SIMON (D.C. Bar No. 90035651)
Senior Counsels to the Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH (D.C. Bar No. 1044671)
Senior Counsel to the Attorney General

BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
Assistant Deputy Attorney General
Legal Counsel Division

ALICIA M. LENDON (D.C. Bar No. 1765057)
Chief, Civil Rights and Elder Justice Section
Public Advocacy Division

PAMELA DISNEY (D.C. Bar No. 1601225)
ANDREW MENDRALA (D.C. Bar No. 1009841)
CHRISTOPHER PEÑA (D.C. Bar No. 888324806)
CHARLES SINKS (D.C. Bar No. 888273315)
HANNAH COLE-CHU (D.C. Bar No. 1613497)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel: (202) 807-0371
pamela.disney@dc.gov

*Attorneys for the District of Columbia*