# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>            Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>            Defendants. | Case No.: 1:25-cv-03005 (JMC)<br><br>Judge Jia M. Cobb |

**<u>DECLARATION OF LIEUTENANT GENERAL JEFFREY S. BUCHANAN, (RETIRED)</u>**

I, Lieutenant General Jeffrey S. Buchanan, (Retired), pursuant to 28 U.S.C. § 1746, declare that the following facts are true and correct to the best of my knowledge, based on my experience described herein:

1. I am a retired Lieutenant General of the United States Army with extensive experience commanding active component and National Guard troops.

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

BACKGROUND AND QUALIFICATIONS

3. As a Lieutenant General of the United States Army, I commanded U.S. Army North (Fifth Army). U.S Army North conducts Multi-Domain Operations in support of U.S. Northern Command in order to detect, deter and defeat threats to the Homeland and conducts defense support of civil authorities and theater security cooperation initiatives to defend the United States and its interests.

1

4. I was commissioned as a Lieutenant in the Infantry in May 1982 after graduating from the University of Arizona with a Bachelor of Science in Wildlife Ecology. I hold a Master of Arts in Leadership Development from the United States Military Academy.

5. My duty assignments in the United States Army included command and staff positions within the 82nd Airborne Division, 25th Infantry Division, 101st Airborne Division, and 10th Mountain Division. I served as a Company and Battalion Tactical Officer at the U.S. Military Academy, the Director for Operations (J3) of Joint Task Force Full Accounting, and the Senior Light Infantry Task Force Trainer at the National Training Center.

6. I served four combat tours in Iraq and one tour in Afghanistan.

7. I have extensive experience commanding Soldiers in domestic missions. For example, I led the military response in support of FEMA for five major hurricanes (Matthew, Harvey, Irma, Maria, and Florence). I also led more than 6,000 Soldiers and Marines supporting the Department of Homeland Security for security of the southwest border of the United States. Furthermore, I served as commanding general U.S. Army Military District of Washington/Joint Force Headquarters-National Capitol Region from 2013–2015. In that role I led military forces in support of a number of law enforcement agencies, including direct support of the U.S. Capitol Police during National Special Security Events, such as the annual State of the Union Address.

8. Many of the Soldiers under my command, both abroad and within the United States, were members of the National Guard.

9. After a 37-year career in the Army, I retired from active duty in September 2019. In my retirement, I serve as a volunteer deputy (and ranch liaison) at the Santa Cruz County Sheriff's Office in Arizona. To serve in this position, I completed over 100 hours of hands-on and classroom training, including firearms and taser qualifications, drug identification, public

assistance, community policing, securing a crime scene, liability, preserving evidence, and more. I also completed more than 100 hours of ride-along (FTO) training with sworn officers before patrolling the remote areas of the county on my own.

10. I have been asked by the Office of the Attorney General for the District of Columbia to provide expert testimony regarding the deployment of the District of Columbia National Guard and National Guard units from other states to the District and the use of the National Guard troops for domestic law enforcement.

## OPINIONS

### I. Federalized National Guard members are generally not authorized to engage in domestic law enforcement tasks.

11. Before members of the National Guard can serve a mission, they must be activated. Typically, there are three active statuses for National Guard forces.

12. First, the National Guard could be activated by the State or Commonwealth in which the National Guard unit is based. This is commonly referred to as "State Active Duty." The governor of the State or Commonwealth activates the guard unit, often in response to an emergency or in anticipation of a particular need. When the members of the National Guard serve in this capacity, they fall under the governor's chain of command. The costs of using the National Guard in State Active Duty are borne by the State or Commonwealth.

13. Second, the National Guard could be activated pursuant to Title 32 of the United States Code. Under Title 32, the governor of a State or Commonwealth makes a request for the federal government to bring troops into active duty for a particular mission. Under this authority, the troops fall under the command of the governor, but the costs of using the National Guard are borne by the federal government.

14. Third, the National Guard could be activated pursuant to Title 10 of the United States Code. Under Title 10, the National Guard is considered federal military, subject to the command of the U.S. President. National Guard serving under Title 10 are commonly called "federalized" National Guard troops.

15. The District of Columbia National Guard (DCNG) is unique because the President of the United States is at all times the Commander in Chief of the DCNG. Based on my experience and understanding, the President has delegated command of the DCNG to the Secretary of Defense, who has further delegated command to the Secretary of the Army.

18. In my experience commanding troops serving in post-hurricane emergency response missions, I have also developed extensive understanding of the authority governing out-of-state National Guard troops serving in another State.

19. Under the Emergency Management Assistance Compact (EMAC), States and Commonwealths can share resources from all disciplines, including members of the National Guard.

20. Unless activated under Title 10 (federalized), when National Guard troops from one State serve in another State, they are generally subject to the operational control of the supported State.

21. EMAC provides that States may use other States' National Guard forces pursuant to either EMAC itself or "by mutual agreement between states." I am not familiar with any scenario in which members of the National Guard from one State (in a State Active Duty or Title 32 status) were sent to support a mission in another State without coordination with or request from the supported State.

22. Except for the District, the governors of the States executed EMAC to receive the authority to issue a request for assistance from another State. While the President of the United States is the Commander in Chief of the DCNG, it is the Mayor of the District, to my knowledge, that executed EMAC and can request assistance for the District.

23. Further, based on my experience and understanding, when troops from other States serve in the District, they become subject to the operational control of the DCNG and fall under the same command and control of the Secretary of the Army through to the President of the United States.

24. Regarding the current deployment of out-of-state troops in the District, the DCNG reports that all Guardsmen deployed in the District are supporting the Joint Task Force-District of Columbia. My understanding is that the Joint Task Force-District of Columbia is an element of the DCNG.

25. While National Guard troops serving under State Active Duty or under Title 32 may engage in domestic law enforcement tasks (subject to restrictions under state law), federalized National Guard troops may not engage in domestic law enforcement activities, subject to specific exceptions.

26. By domestic law enforcement activity, I mean the day-to-tasks police officers perform. The tasks include, but are not limited to, patrolling neighborhoods, conducting traffic stops, interviewing witnesses, performing security functions, arresting, apprehending, or detaining individuals, issuing citations, executing search warrants, and conducting criminal investigations.

27. These domestic law enforcement tasks are distinct from the tasks of infantry Soldiers, which include attacking enemy positions, conducting raids, capturing prisoners, and seizing and defending key terrain. Though there are many different occupational specialties in the

military (such as infantry, engineers, artillery, and aviation), only military police (or security police in the Air Force) are trained in law enforcement tasks.

28. While in command of military forces serving in support of civilian law enforcement agencies, I relied on instruction from the Department of Defense regarding what tasks such forces could or could not perform. The most recent version of such instruction is Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21 (Feb. 27, 2013) (Incorporating Change 1, Eff. Feb. 8, 2019). That guidance document provides that federal troops may not perform direct civilian law enforcement assistance tasks, including: "A search or seizure . . . An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity . . . Using force or physical violence, brandishing a weapon, discharging or using a weapon [except in self-defense or defense of others] . . . Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints . . . Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators." DODI 3025.21, Enclosure 3 ¶ 1.c.(1). I commanded my troops in accord with the principles described in DODI 3025.21.

29. As of September 8, 2025, the official website for the Joint Task Force-DC (https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/) includes a description of the "Duties and Tasks" undertaken by the approximately 2,330 Guardsmen activated in the District. According to this site, the Guardsmen are "directly support[ing] specific federal and civil partners needs, such as *presence patrols*, *crowd control*, and helping *prevent and deter crime* in the District." The site also states that the Guardsmen are patrolling and supporting the Metropolitan Police Department in high-traffic areas and assisting

U.S. Park Police with *traffic control*. These are all law enforcement activities that federal military units would be prohibited from performing.

30. In the District, it is particularly concerning to learn that the United States Marshals Service has deputized National Guard troops as Special Deputy U.S. Marshals. Special USMS Deputies have Title 18 authority to perform law enforcement functions, including executing arrest warrants and search warrants, or making arrests without warrants. These are law enforcement activities.

**II.  For federal troops to support local law enforcement, extensive coordination and training are necessary.**

31. I have extensive experience commanding troops who have served in a supporting role to law enforcement. For example, I have commanded troops who supported U.S. Capitol Police for major events such as the annual State of the Union address. I have also commanded troops who supported the United States Customs and Border Protection at the southwest border of the United States in 2018 and 2019. In both contexts, the troops I commanded did not engage in domestic law enforcement tasks. They did not perform any of the tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.c.(1). Instead, the troops were engaged in well-defined, discrete military tasks.

32. Extensive coordination is required for the effective use of active-duty military troops to support local law enforcement. For example, for active-duty military to support U.S. Capitol police to secure the State of the Union address, the military and local law enforcement cooperate at every level. This cooperation includes meetings, rehearsals, and information sharing. The coordination process begins more than six months before the event. Without such coordination, activity duty military would not be able to effectively support local law enforcement.

33. Similarly, extensive training is required for the effective use of active-duty military troops to support law enforcement. When I commanded active-duty troops who supported federal

7

law enforcement at the southwest border, those troops received specific scenario-based training based on the specific tasks that were required of them at the border. Without such training, activity duty military would not be able to effectively support law enforcement.

### III. U.S. military troops, including members of the National Guard, do not receive the training necessary to engage in domestic law enforcement.

34. I have had the unique experience of serving as both a member of the military and as a local law enforcement officer.

35. For me to effectively serve in local law enforcement, I required extensive training regarding skills that I did not need in the military.

36. First, I needed to learn de-escalation techniques. Infantry members are trained to effectively destroy enemies in combat scenarios. As a result, they do not learn how to take the temperature out of a confrontation. This skill, however, is part of daily life as a local law enforcement officer.

37. Second, I needed to learn how to make a traffic stop. As a member of the military, I was never trained in making traffic stops, nor was such training necessary to effectively serve. I learned how to manage the many risks involved in making traffic stops, as well as the extensive regulations governing such interactions. None of this was part of my military training.

38. Third, I needed to learn how to effectively clear a room or a structure. While military members learn to clear rooms, the task is completely different in a domestic civilian context.

39. Fourth, I needed to learn how to use nonlethal force. Law enforcement officers often carry a taser and/or pepper spray and must be trained on the use of such tools. Both tasers and pepper spray are used by law enforcement as part of a graduated response. Both are intended to incapacitate a subject without having to resort to lethal force such as a firearm. With the

exception of military police, members of the military do not carry tasers nor pepper spray, nor do they receive training regarding those tools.

40. Fifth, I needed to learn the rules governing the use of force in a domestic scenario. Law enforcement officers are subject to local policies, state law, and federal law governing when the use of force is appropriate against a civilian. None of these policies or laws apply to military officers in combat. As a result, members of the military are not trained on such policies. When I commanded military forces on the Southwest border in 2018 and 2019, I mandated extensive scenario-based training so that our troops (mostly Soldiers and Marines) could apply the Rules for Use of Force (RUF) without consulting a card or asking the opinion of a lawyer. Those rules are intended to enable military forces to accomplish their mission in a domestic context, and protect both our troops and the civilians they encounter. As a result of that training, I am confident that our troops were prepared for the challenges of operating on the southwest border. It is critical to note, however, that they were not performing any of the law enforcement tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.b.(5).

41. Sixth, I needed to learn how to properly engage in defensive tactics for close quarters combat. In the military, I was trained in the use of mixed martial arts tactics, including the use of chokeholds, to engage with enemy combatants at close range. In the law enforcement context, however, many such tactics are both prohibited and disfavored, as the goal of a close quarters confrontation is to neutralize the potential threat and apply handcuffs.

42. Seventh, I needed to learn how to properly conduct a criminal investigation. Law enforcement officers must know how to build a case by securing a crime scene, preserving evidence, and conducting witness interviews and interrogations. Generally, members of the military are not required to perform such detective work. Absent specific training regarding the

9

criminal investigation process, a member of the military would be unable to successfully solve crime through investigations and prosecutions.

43. Eighth, I needed to learn how to use discretion appropriately as a law enforcement officer. For example, if a law enforcement officer observes a car driving over 100 miles per hour, an officer must make a series of split-second decisions regarding the appropriateness of vehicle chase. The officer needs to immediately consider factors such as the ongoing risk to life created by the speeding vehicle, the probability of successfully stopping the speeding vehicle through a chase, the capabilities of the officer, and the rules and laws governing such a decision. Officers must make that decision in a matter of seconds, and they cannot do so without extensive training. While military members make countless split-second decisions, weighing the risk and rewards of certain courses of action, I have learned that the context of those decisions is drastically different in the domestic law enforcement context.

44. Finally, and perhaps most importantly, a different mindset is necessary for local law enforcement. The mission of the infantry (which was my branch in the Army) is to close with and destroy the enemy. This tends to produce an aggressive mindset, and that mindset is what we need in our infantry troops in combat. I have learned that it is not the mindset of an effective police officer, who must always try to prevent confrontation and reduce the use of lethal force.

45. I had to receive over a month of training to serve as a local law enforcement officer, notwithstanding my extensive experience in the military.

46. It is my opinion that members of the military are ill-suited to engage in domestic law enforcement tasks unless they receive extensive scenario-based training on the particular tasks required by the mission.

**IV.     The uncoordinated use of untrained U.S. military troops in American cities to engage in civilian law enforcement would result in tremendous harm.**

47.     Policing is a risky activity. It could easily result in harm to both civilians and officers if done incorrectly. Routine activities such as traffic stops, searches, or arrests could turn into tragedies if they are not conducted by trained individuals in coordination with one another. Sending troops untrained in domestic law enforcement into a city, without local coordination, creates a substantial risk that someone innocent will be hurt.

48.     Furthermore, I am gravely concerned that the use of the military for domestic law enforcement would lead to a loss of trust in the military among the American people. The Army is older than our country and for the entirety of our nation's history, the perception of most Americans is that our military is non-partisan. After all, we swear an oath to the Constitution, not a political leader or a political party. To my knowledge, in every poll conducted over the last 40 years (the entirety of my active duty time), the military has been at or near the top of all institutions that people of our country have confidence in. I am concerned about creating the perception among the American people that the military is or will be used for political means. The confidence that our citizens have in our military is based on trust.  Rebuilding trust once it has been lost is a difficult task.

*[Signature on Next Page]*

11

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___9 SEP 2025___ at ___PATAGONIA, AZ___

_____
Lieutenant General Jeffrey S. Buchanan (Retired)