# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DISTRICT OF COLUMBIA,**<br><br>Plaintiff,<br><br>v.<br><br>**DONALD J. TRUMP,** *et al.*,<br><br>Defendants. | Case No.: 1:25-cv-03005 (JMC) |

## DECLARATION OF RENEÉ HALL

I, U. Reneé Hall, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge, based on my experience described herein:

1. My name is U. Reneé Hall. I am over the age of 18 and able to provide true and accurate testimony under oath.

2. This declaration is based on my own personal knowledge and experience. If I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

3. I earned a Bachelor of Science degree in Criminal Justice from Grambling State University, as well as two Masters of Science degrees from the University of Detroit Mercy in Security Administration and Intelligence Analysis, respectively. I am also a graduate of the FBI National Academy (Session 262) and the Major Cities Chiefs Association's Police Executive Leadership Institute. I was a 2022 Harvard Advanced Leadership Initiative Fellow and former Senior Editor of the Harvard Social Impact Review.

1

4.      In my more than twenty-year law enforcement career, I held positions at every level, culminating as the Deputy Chief of Police in Detroit, Michigan from 2014-2017, and as the Chief of Police in Dallas, Texas from 2017-2020.

**(1) Service in Detroit**

5.      I enrolled in the Police Academy in Detroit, Michigan in 1999. I served at the rank of police officer in the Detroit Police Department culminating as the Deputy Chief of Police.

6.      From 1999 through 2017, I advanced through a series of increasingly complex leadership assignments within the Detroit Police Department, acquiring the operational expertise, administrative skill, and community-focused vision that ultimately positioned me to serve as Chief of Police in Dallas. My career began with foundational service as a patrol officer, where I engaged directly with Detroit's neighborhoods, conducted dignitary protection for the mayor and international visitors, and cultivated trust through community affairs initiatives.

7.      Promoted to sergeant in 2006, I assumed supervisory responsibilities across internal affairs, patrol, and tactical operations. My work in internal affairs exemplified my dedication to accountability and integrity, as I investigated allegations of misconduct while ensuring compliance with federal consent decree mandates. Concurrently, I coordinated covert operations targeting violent offenders and narcotics activity, sharpening my command of investigative and tactical protocols. This supervisory stage marked a critical turning point in my development as a leader capable of balancing enforcement with reform and accountability.

8.      My promotion to lieutenant in 2010 expanded my responsibilities to tactical operations at a citywide scale. In this role, I directed incident command for large-scale civil disturbances, special events, and dignitary visits, overseeing logistics for major sporting events and international gatherings. My leadership during the World Series, the Detroit Grand Prix, and

presidential visits showcased the capacity to coordinate multi-agency operations under high-pressure conditions. The scope of these assignments required both operational precision and strategic foresight, qualities that became hallmarks of my executive leadership style.

9.      By 2013, I had advanced to the rank of inspector and then commander, taking charge of patrol operations in some of Detroit's most complex precincts, including downtown and entertainment districts. Managing multimillion-dollar budgets and supervising critical infrastructure security, I fostered intergovernmental collaborations with local, state, and federal agencies.

10.      In 2014, I was appointed Deputy Chief of Police, a role in which I oversaw more than one-third of the department, including 12 precincts, specialized divisions, and citywide initiatives. Managing a $137 million budget, I implemented crime reduction strategies that yielded year-end decreases of 20–30 percent in violent crime. I directed Operation Ceasefire, which mobilized law enforcement, clergy, and community leaders to address gang violence, and provided oversight of the department's compliance with use-of-force requirements under federal monitoring. I also spearheaded the pilot implementation of body-worn cameras, establishing policy frameworks that would later serve as national models. My collaborative initiatives, such as Community COMPSTAT and the Spirit of Service program, strengthened police-community relations by engaging residents as partners in crime reduction and cultural understanding.

11.      My experience managing budgets, overseeing specialized units, implementing federal consent decree requirements, and directing large-scale operations established me as a leader uniquely equipped to navigate the complex challenges of urban policing. By the time of my retirement from the Detroit Police Department in 2017, I had amassed nearly two decades of executive-level and operational experience, laying a robust foundation for appointment as Chief

of Police in Dallas, where I would continue to advance a vision of accountability, transparency, and community partnership.

**(2) Service in Dallas**

12.    In 2017, I was hired as the Chief of Police in Dallas, Texas. I was the first woman to serve in that role in Dallas.

13.    As Chief, I was the chief executive officer of the Department. In that role, I had full power and authority over the Dallas Police Department, and all functions, resources, officials, and other personnel assigned thereto. I was also responsible for the proper and efficient conduct, control, and discipline of all officers in the Department. I led 4,000 personnel and managed a $500 million budget.

14.    While I was Chief, the Dallas Police Department coordinated extensively with federal partners.

15.    As a Dallas Chief I had operational oversight, MOU authority and executive coordination with several task forces that brought together FBI, ATF, DEA, U.S. Marshals, and Homeland Security resources. These included, for example:

a.    FBI Joint Terrorism Task Force (JTTF) — Oversight of departmental participation in counterterrorism operations, intelligence sharing, and prevention strategies;

b.    FBI Violent Crimes Task Force — Coordination on serial robberies, kidnappings, and multijurisdictional violent offenders;

c.    FBI/DOJ Project Safe Neighborhoods (PSN) — Executive oversight and strategy alignment to reduce gun crime and gang violence;

d.    DEA Task Force — Coordination on large-scale narcotics investigations, including opioids, heroin, and synthetic drugs (like K2 in Dallas);

4

e.    ATF Violent Crime and Firearms Trafficking Task Force — Collaboration on illegal firearms possession, straw purchasing, and trafficking cases;

f.    U.S. Marshals North Texas Fugitive Task Force — Oversight of DPD officers assigned to high-risk fugitive apprehension operations;

g.    Homeland Security Investigations (HSI) Task Force — Coordination on human trafficking, cybercrimes, and transnational organized crime; and

h.    Secret Service Financial Crimes Task Force (where applicable) — Participation in investigations of large-scale fraud, identity theft, and counterfeiting.

16.    I had executive oversight of all departmental participation in these task forces, ensuring that DPD's resources were aligned with federal partners while safeguarding community priorities and constitutional policing.

17.    In my years as Chief, Dallas saw a 5.7 percent reduction in overall crime in 2017, and a 5.97 percent reduction in violent crime in 2018.

18.    As Chief, I prioritized community engagement and outreach. I regularly connected with officers in the field and met often with Dallas community groups, professional leaders, and local organizations. I spearheaded the City of Dallas' restructuring of the Community Police Oversight Board, as well as the police department's first Youth Summer Jobs program, which allowed business leaders and community stakeholders to mentor at-risk youth through workforce development.

19.    In moments of crisis, I also coordinated directly with the Texas National Guard to support local efforts while ensuring that community rights and constitutional freedoms remained protected. These collaborations allowed the Dallas Police Department to leverage federal resources while keeping community trust at the center of every operation.

5

20.     The test of leadership came most visibly in 2020 following the murder of George Floyd, when Dallas, like the rest of the nation, was gripped by civil unrest. I worked tirelessly to strike the balance between ensuring public safety and protecting the right to peaceful protest. My leadership approach focused on engagement, transparency, and restraint. We implemented command protocols that limited the use of force to only when absolutely necessary, and I personally met with community leaders, clergy, and activists to listen to concerns and to create space for dialogue. These actions helped Dallas avoid some of the more destructive outcomes seen in other major cities and positioned the Police Department as one willing to face its challenges directly while leaning into reform.

**21.**     My efforts in Dallas were always rooted in building trust—bridging the gap between police and community through dialogue, visibility, and accountability. From federal coordination to protest management, my experiences reinforced a principle that guided my leadership: true public safety is only possible when the community believes that their police department exists to serve them with fairness, equity, and respect.

**(3) Current Service**

22.     Currently, I serve as President of the National Organization of Black Law Enforcement Executives (NOBLE), an organization of more than 4,800 members with 60 chapters in the United States, Canada, the Caribbean, and Africa. NOBLE's mission is to ensure equity in the administration of justice in the provision of public service to all communities, and to serve as the conscience of law enforcement by being committed to justice by action.

23.     I am also currently the Executive Director of the Community Solidarity and Safety Coalition, where I work with nonpartisan leaders and government partners to address public safety challenges.

6

24.     Since retiring from the Dallas Police Department in December 2020, I have continued to advance the profession of policing through training, consultation, and leadership development. I have been invited to conduct executive-level trainings for law enforcement agencies across the country, with a focus on 21st Century Policing, organizational change management, crisis leadership, and building community trust. I have consulted with major city police departments, smaller municipal agencies, and community-based organizations seeking to strengthen their partnerships with law enforcement.

25.     In addition to direct consultation, I have participated in national conferences, panel discussions, and academic forums where I share insights on modern policing strategies, cultural competency, and police-community relations. I have also partnered with universities, leadership institutes, and professional organizations to design and deliver curriculum for current and aspiring police leaders. These engagements have allowed me to leverage my experiences in Detroit and Dallas while contributing to the next generation of law enforcement leadership.

26.     My post-retirement work has been guided by the same principles that shaped my career: a commitment to fairness, accountability, and service. Whether through training, consultation, or public speaking, I continue to advocate for reforms that build trust and ensure that public safety evolves in a way that reflects both community needs and professional standards.

## OPINIONS

### A.     Community Trust is Essential to Public Safety.

27.     My two-decade-long career in policing has taught me that public safety is built on trust, consistent enforcement, and community-based strategies.

28.     Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement.

7

29.    Trust is built in a number of different ways: a transparent command structure, being able to identify individual officers and the law enforcement agencies they work for, systems of accountability, and carefully building community relationships.

30.    Policing is not simply about responding to crime; it is about creating an environment where residents feel both safe and respected. That foundation cannot exist without authentic trust between law enforcement and the communities we serve.

31.    Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement, and it requires intentionality. Trust determines whether residents call the police when they need help, whether witnesses are willing to come forward, and whether neighborhoods see officers as guardians or as outsiders.

32.    Trust is built in a number of different ways. One way is through a transparent command structure. Communities need to know how decisions are made, who is accountable, and how information flows. By ensuring that our chain of command is clear and that our actions are communicated openly, we reinforce that policing is done with—not to—the community.

33.    A second way trust is built is by ensuring that residents can identify individual officers and the agencies they represent. This level of visibility is a safeguard against anonymity, which can erode accountability. When officers wear clearly marked uniforms and nameplates, and when agencies ensure consistent identification, it strengthens both responsibility and professionalism.

34.    A third method for ensuring community trust is creating systems of accountability. Oversight mechanisms, internal affairs processes, body-worn cameras, and civilian review boards all serve to ensure that misconduct is addressed transparently and fairly. Accountability is not a

punitive measure alone—it is also a way to build credibility by showing the community that law enforcement holds itself to the same standards of justice it enforces.

35.     Another essential way trust is built is through carefully cultivated community relationships. These are not achieved through occasional outreach but through sustained engagement. Whether by creating advisory boards, hosting neighborhood dialogues, or involving youth in summer jobs programs, community relationships signal that law enforcement is invested in the success and well-being of residents beyond the moment of crisis.

36.     In my experience as Chief in Dallas, one salient example came during the protests of 2020. In the midst of national tension, I met directly with clergy, activists, and community leaders. By listening before acting, by explaining command decisions in real time, and by maintaining open channels of communication, we were able to reduce the temperature of the moment and preserve space for peaceful demonstration. That experience reinforced what I had learned throughout my career: when law enforcement embraces transparency, accountability, and genuine relationship-building, it not only strengthens trust but also enhances public safety in ways enforcement alone never could.

**B.      Law Enforcement Officers, Including in the District of Columbia, Receive Extensive Policing Training.**

37.     In my experience in Detroit and Dallas, along with what I have observed in other police departments nationwide, typical training for new recruit police officers, such as those entering service with MPD, includes training on the law relevant to policing. This would typically include law interpreting the Fourth Amendment and standards for lawful stops and arrests; the proper use of force; and the chain of custody and preservation of evidence.

38.     I have reviewed MPD training materials that are publicly available.

39.     According to these materials, prior to being assigned to police the District, new MPD recruit officers receive approximately 37 weeks of police academy training to prepare them for policing in the District, which includes a full program of classroom, scenario, physical, and tactical training.

40.     This is consistent with the training that officers receive in both the Detroit and Dallas police departments, and it is consistent with my knowledge of other police departments' training procedures across the country.

41.     Based on my review of publicly available training materials, MPD police academy training includes training on District case law interpreting the Fourth Amendment and the standards for lawful stops and arrests. A true and correct copy of the MPD Academy Curriculum Block 4.1 on the Introduction to Criminal Law is attached hereto as Exhibit A.

42.     MPD's police academy training also includes training on the appropriate use of force. A true and correct copy of the MPD Academy Curriculum Block 5.1 on the Use of Force is attached hereto as Exhibit B. MPD's use of force training emphasizes that officers should attempt to defuse any situation by using de-escalation techniques whenever possible and that any use of force should be proportionate to the circumstances. See Ex. B at 6. This training also includes training on MPD's General Order on the Use of Force, which emphasizes that MPD officers must exercise "the utmost restraint" in using force and that "Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others." A true and correct copy of MPD's General Order on the Use of Force is attached hereto as Exhibit C.

10

43.     Finally, MPD's police academy training also includes training on basic investigative techniques, report writing, chain of custody, and the preservation of evidence. A true and correct copy of the MPD Academy Curriculum Blocks 3.2 through 3.4, which cover Basic Investigative Incident Reports, Crime Scene Awareness and Management, and Property, is attached hereto as Exhibit D.

## C.     National Guard Troops Deployed to the District of Columbia Will Undermine Basic Principles of Effective Local Law Enforcement and Risk Public Safety.

44.     Based on public reporting, and my own personal observations as a resident of the greater Metro-Washington area, I understand that the President declared a "crime emergency" in the District of Columbia on or about August 11, 2025.

45.     As part of that "emergency," it is my understanding that the President ordered the activation of the D.C. National Guard and deployment of National Guard units from other states to the District. Based on public reporting and public statements I have reviewed from various federal and military officials, it is my understanding that more than 2,300 National Guard troops have been deployed in the District, and been authorized to carry service weapons and engage in law enforcement activities.

46.     In my experience, the presence of armed military personnel in an American city is highly unusual. Never in my 20 years as a law enforcement professional have I encountered a deployment of National Guard troops like the one in the District of Columbia right now.

47.     In the context of my role as Chief of Police in Dallas, I had the responsibility of working closely with the Texas Department of Public Safety (DPS) in conjunction with the National Guard when their support was requested by the Governor and Mayor during periods of heightened civil unrest (for example, the 2020 George Floyd protests). The National Guard's

11

presence was not initiated unilaterally, but rather came as part of a coordinated, lawful invitation to assist local law enforcement in maintaining order and ensuring community safety.

48.     From the outset, we established a collaborative working relationship that respected both DPS, the Guard's military command structure, and the operational authority of the Dallas Police Department. The National Guard did not act independently; they served in a support capacity under civil authority, reinforcing perimeters, protecting infrastructure, and allowing sworn officers to focus on direct engagement with the public. Importantly, in Dallas their deployment was designed to be non-confrontational and many were unarmed or assigned strictly to static posts, ensuring that their presence communicated stability without escalating tension.

49.     This deliberate approach stands in contrast to what has unfolded in Washington, D.C., where the deployment of federal troops and militarized responses at times blurred the lines between civil law enforcement and military intervention. In Dallas, we were intentional about preserving the distinction, maintaining civilian control, and keeping community trust at the forefront. By doing so, we were able to benefit from the Guard's resources and manpower while ensuring that our policing efforts remained grounded in the principles of accountability, proportionality, and constitutional policing.

50.     In my opinion, based on years of expertise in community-law enforcement relations, the presence of armed National Guard patrols in the District of Columbia poses significant, immediate risks to public safety for three primary reasons: it undermines community trust; it creates confusion and lack of coordination; and it introduces new risks associated with lack of law enforcement training.

**(1)    Undermining Community Trust**

51.     The deployment of uniformed and heavily armed military, as well as armored military vehicles, risks destroying carefully-constructed community relationships that, in my experience, local police departments spend decades fostering.

52.     Even when federal law enforcement assists local law enforcement, which in my experience is much more common than a military deployment but still relatively rare, federal law enforcement is not immediately introduced into communities without extensive preparation and coordination at every level. And those federal agents typically come from field offices in or near those communities and are trained law enforcement officers.

53.     The deployment of National Guard troops in the District carries significantly greater risks to public safety.

54.     Deploying uniformed, armed National Guard troops, including more than 1,000 from outside the District who are not familiar with the District's communities, to police the District's neighborhoods risks undermining trust and confidence in law enforcement, generally.

55.     In my experience, if the community does not trust law enforcement, crimes go unreported. If crimes are unreported, communities are less safe.

56.     Additionally, the sight of armed military troops on District streets is intimidating and creates an atmosphere of fear. Americans are not accustomed to armed soldiers in full uniform and armored trucks on city streets. It indicates that residents live in a police state patrolled by an occupying force; it replicates war.

57.     In my extensive law enforcement experience—especially in senior leadership positions in major metropolitan police departments—an atmosphere of fear does not enhance public safety – it undermines it.

13

### (2) Lack of Coordination

58.    In addition, effective local policing requires all officers conducting law enforcement activities to have a clear understanding of the command-and-control structures under which they are operating. To the extent that multiple entities or agencies are engaged in law enforcement activities in a single jurisdiction, there must be an infrastructure in place to coordinate the command and control of all law enforcement officers.

59.    Based on my experience leading the police departments in two large, urban cities, it is not possible for thousands of National Guard troops to be integrated or become familiarized with the command structure, deployments, or directives of local law enforcement in a mere matter of days or weeks.  Attempting to do so on a short timeframe in the District is highly likely to pose problems for local police officers and other law enforcement entities operating in the District.

60.    The lack of a coordinated command-and-control structure also poses problems for the residents of the District. When a proper command-and-control structure is in place, there is a structure for accountability for officers' conduct. Based on my understanding of the command-and-control structure governing the National Guard troops deployed in the District of Columbia, there does not appear to be a proper framework for accountability for troops' law enforcement activity.

61.    For example, if National Guard troops participate in searches, seizures, arrests, or detentions for crimes in the District, District residents are unlikely to know where to seek accountability for potentially unlawful activity. Moreover, any uncertainty about the lawfulness of troops' involvement in those activities would complicate the prosecution of those crimes, which undermines public safety.

14

### (3)    Lack of Training

62.    Finally, it is my understanding that National Guard troops largely do not have experience in policing but instead have other "day jobs" that are unrelated to law enforcement.

63.    Law enforcement training is different than military training. When people act as law enforcement officers without proper training, including untrained National Guard troops, it can create several risks to the public and local governments, including potential violations of the law governing important areas of policing, such as stops, seizures, and arrests; the proper use of force; and the chain of custody and preservation of evidence. Violations of these rules can endanger the public, including by subjecting them to unlawful detentions and excessive or deadly uses of force. And it can lead to negative consequences for local governments, including by exposing them to civil liability and undermining prosecution efforts.

64.    Additionally, it is unclear whether the National Guard units conducting armed patrols have been trained on the safe handling of firearms in a densely populated, domestic urban setting, or on de-escalation techniques required to operate safely in an urban environment within the United States, creating a possibility of accidental discharge or other incident involving harm to the public.

\* \* \*

65.    As a long-time law enforcement officer and retired Chief and Deputy Chief of Police in Dallas and Detroit, respectively, it is my professional opinion that the current deployment of National Guard troops in the District of Columbia risks significantly damaging the District's public safety efforts. Without effective coordination and training, the use of National Guard troops in law enforcement activities poses a danger to the community, as it erodes community trust in law enforcement, sows confusion, and places armed military personnel in positions for which they are ill-trained.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___ day of September 2025, in Oxon Hill, MD.

U. Reneé Hall

# Exhibit A

# Metropolitan Police Academy



# 4.1 Introduction to Criminal Law

*May 29, 2025*

## Introduction

As a law enforcement officer, you are entrusted with a significant amount of authority, including the legal authority to stop, detain, search, arrest, and ultimately limit or revoke the freedoms of your fellow community members. This authority is not to be taken lightly and must be respected by all police officers. Furthermore, the scope, reach, and limitations of this authority must be thoroughly understood and never abused.

In this lesson, you will learn how serious these rights and freedoms are, how they came to be, and what precedents and standards of proof are in place to guide you in police procedures and functions. You will learn about and discuss historic cases involving decisions made by the Supreme Court that affect how police officers perform their duties and how their actions are weighed in court using standards of proof. You will learn the basics of criminal law needed by police officers, precedent, the categories of crimes, criminal procedures in Washington, DC, and the laws of arrest.

The concepts discussed in this lesson will be used and practiced in the field, and it is imperative that all patrol officers understand them in order to be effective while also respecting the rights of American citizens protected by the US Constitution and the Bill of Rights.

## 4.1.1    Appreciate the limitations on law enforcement placed in the Bill of Rights

**Writ of Assistance**

Limitations on government authority and its associated concepts have been popular topics for political theorists since the ancient Greeks. The American Revolution was inspired by such topics after challenges to powerful court orders enforced upon colonists by the British Empire. These court orders, known as writs of assistance, allowed British officers to conduct searches of premises for contraband without justifiable reason or a description of the contraband being sought. The royal authorities in the thirteen colonies used such writs to enforce massively unpopular taxes imposed by British laws, such as the Stamp Act and Navigation Acts. Unreasonable searches and seizures became a major source of tension in pre-revolutionary America.

In Boston, James Otis represented merchants challenging the writs by arguing that they violated the colonists' natural rights. When legal and political pleadings did not end the unpopular taxes nor the unpopular searches to enforce them, the colonists began to resist by force. There were many incidents where mobs of angry colonists violently resisted the Royal officials as they searched for contraband goods or where the mobs targeted the homes and persons of these officials after particularly unpopular seizures occurred. The cycle of mob violence followed by royal crackdowns to restore order contributed to the outbreak of the American Revolution.

After the American colonists won the Revolutionary War and while they were setting up their new government and legal system, they were determined to prevent the injustices they had suffered under British rule. The abuses associated with the writs of assistance and many of the arguments made by colonists like James Otis figured prominently in the writing of the Constitution and the Bill of Rights. These documents contain several explicit limitations on the powers and authority of law enforcement personnel.

**Fourth Amendment**

As a preventative measure resulting from the writs of assistance, James Madison introduced the Fourth Amendment to the Constitution. It states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This amendment protects all Americans from unreasonable searches and seizures by the government. Furthermore, any evidence seized in an unreasonable search is inadmissible in court under the **exclusionary rule**, which prohibits the introduction of fruits (unlawfully seized items) of the poisonous tree (the unlawful search). Police officers must understand and strictly adhere to this and all rights granted to Americans while also performing their duties, which will often require conducting reasonable searches and seizures.

The text of the Fourth Amendment also establishes the strong preference for searches and seizures to be conducted with a warrant and what the general requirements for such warrants are.

**Fifth Amendment**

This amendment states, in relevant part, that "…nor shall any person be compelled in any criminal case to be a witness against himself…" Thus, one constitutional right provided by the Fifth Amendment that affects police procedure is that officers cannot compel an individual to engage in self-incrimination, meaning compelling a person to make a statement against him or herself. Invoking this Constitutional protection is commonly called "pleading the Fifth" or "taking the Fifth." More importantly, particularly for the patrol officer, it affects the procedures for questioning, interviewing, and interrogating suspects and arrestees. The well-known requirement to "read suspects their rights" is based on the Fifth Amendment. Doing so ensures that suspects know their right to have an attorney present during questioning, that an attorney can be provided if they cannot afford one, and that anything they say can be used against them in a court of law.

**Sixth Amendment**

The Sixth Amendment states:

> In all criminal prosecutions, the accused shall enjoy the right to a public and speedy trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

Although much of the protection provided to arrestees by the Sixth Amendment applies to the due process procedures of the court system in the handling of their cases, it is important for police officers to understand much of this system relies upon officers' work and that their actions and inactions can affect the efficiency of the criminal justice system. All procedures for processing an arrest, following through with the collection of evidence, completing all requisite paperwork and court forms in a timely manner, arriving at all scheduled court appearances, and providing all applicable items of evidence to the prosecutor must be diligently observed so as not to deny the defendant's right to due process. Ensuring

that these tasks are all completed prevents Sixth Amendment violations, which would lead to, among other things, the dismissal of a case.

**Eighth Amendment**

This amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." The protections provided by the Eighth Amendment apply both to the procedures of the court system as well as police officers in their handling of prisoners and arrestees.

Cruel and unusual punishment refers not only to court-ordered sentencing or punishment, but to the treatment received while in our custody. Prisoners must be treated and housed humanely. Officers are to use the minimum amount of force necessary to bring an incident under control (GO-RAR-901.07 – Use of Force). Excessive force and abusive/degrading treatment is an Eighth Amendment violation. Prisoners must not be deprived of medical attention, food, or shelter while in your custody. Remember that, regardless of the crime committed, once a person is arrested and, in your custody, you are responsible for their welfare.

## 4.1.2        Define the components of a crime

There are numerous definitions of the term **crime**, nearly all of which involve an act or omission which violates a law of a state and is punishable by that state. The definition used by MPD is "A positive or negative act in violation of penal law; an offense against the state (District of Columbia or United States); Any social harm defined and made punishable by law."

The commission of a crime involves a criminal act along with some level of criminal intent.

**Criminal Act**

For a crime to be committed, a criminal act must occur. The concept of criminal act stems from the Latin phrase "*actus reus,*" meaning "guilty act," in the English common law system, which was adopted and modified by the United States. There are two types of criminal acts:

- **Positive Act:** Positive criminal acts are the most common type encountered by patrol officers. They involve voluntary behavior and physical action which violates the law or laws of the state. An example of a positive act is physically removing merchandise from a store aisle, placing items in one's pocket, passing registers, and exiting the store without paying. In this case, a theft, numerous positive acts were carried out in the commission of the crime.

- **Negative Act:** This type of criminal act is just as much a crime as a positive act; however, it involves a voluntary omission or failure by the offender to physically act. These cases involve situations where, by law, certain actions are required to be taken by the offender. The omission of such action is considered a criminal act despite the fact that no physical action occurred. A simple example of this is the US tax laws. Filing one's taxes is an action which, by law, must be done. Failing to do so (doing nothing) is a criminal act. Police officers, firefighters, medical professionals, and others are required to take action in various situations where the failure or omission of such actions can lead to the injury or death of others. As such, failure to take action in such cases may constitute a criminal act. For example, consider a police officer who witnesses an armed robbery but chooses not to take any form of police action and the armed robber later shoots another

individual at a bus stop. The police officer's failure to act (to include calling 911) is a negative criminal act.

**Criminal Intent**

As described above, the commission of a crime involves a criminal act (positive or negative) accompanied by some form of intent. Without some level of intent, the criminal act does not always constitute a crime. Criminal intent is defined as "an intent to commit an act without any justification, excuse, or other defense."

Just as English common law required the criminal act (*actus reus*), intent must also accompany that act in order to hold someone culpable (guilty). "*Mens rea,*" meaning "the guilty mind," is another Latin phrase used to gauge criminal liability. The English common law system stated, "The act is not culpable unless the mind is guilty."  This gauge is in place to ensure that the courts and law enforcement officers take steps to determine if a criminal act was committed purposefully or by accident.

**Tort**

Separate from the types of crime described thus far, a tort refers to a civil matter that MPD defines as "a civil wrong for which a remedy can be obtained in the form of damages." The most important element in the definition of tort is the word "civil", as it refers to the concerns of, or between, private individuals. This is different than a criminal act, which refers to the concerns between individuals and government. Tort law enables the filing of lawsuits, such as suing a person or entity by another, for various reasons including negligence, personal injury, or defamation. Tort cases normally result in some form of relief to the plaintiff (the one bringing the lawsuit), such as a court order that the defendant (the one against whom the lawsuit is brought) must do or cease doing some action or the provision of monetary compensation or reimbursement.

Although patrol officers respond to cases involving criminal law far more often than torts, many calls for service handled by MPD are actually civil in nature and may result in tort cases. MPD does not take direct action in these cases and advises parties to pursue resolution in civil court on their own.

## 4.1.3    Distinguish Principals from Accessories

**Principals**

The principal in a criminal offense is the person or persons participating in the criminal act or actively participating in the commission of a crime.

According to D.C. Code § 22-1805, in prosecutions for any criminal offense:
- All persons advising, inciting, or conniving at the offense
- Or aiding or abetting the principal offender
- Shall be charged as principals and not as accessories

**Examples**:

Suspects A and B plan a bank robbery in which Suspect A enters the bank and demands money from the teller at gunpoint while Suspect B waits outside in a vehicle, acting as a lookout and getaway driver. Both A and B can be charged with the robbery offense even though Suspect A carried out the act inside of the bank alone.

Suspects A and B plan a bank robbery in which Suspect A enters the bank and demands money from the teller at gunpoint. This time, Suspect B helps plan the offense, provides a floor plan of the bank to Suspect A, and lends him the firearm to use in the offense, but stays home instead of assisting in the commission of the act. Again, both are charged with the robbery, even though Suspect B was at home at the time of the offense.

Suspect A plans a bank robbery in which he enters a bank and demands money from the teller at gunpoint without any assistance from Suspect B. After completing the criminal act, Suspect A drives to Suspect B's house, tells him about the offense and asks to stay a few days to avoid being caught. Suspect B allows him to stay and hide. Suspect A is the principal and charged with the Robbery. In this case, Suspect B cannot be charged as a principal with the offense of Robbery but instead as an accessory after the fact.

**Accessory After the Fact**

According to D.C. Code § 22-1806**,** accessory after the fact is a separate and distinct offense in which:

- A felony or misdemeanor occurred
- A particular person, other than the accused, has committed the offense
- The accused must have knowledge that that person committed the offense
- The accused received, relieves, comforts, or assists that person
- And the accused does so with the intent to hinder or prevent that person's apprehension, trial, or punishment

The penalties for Accessory After the Fact depend upon the seriousness of the offense committed by the principal. If that crime has a maximum sentence of life in prison, the accessory faces up to 20 years imprisonment. In all other cases, the accessory offense carries a maximum of one-half the maximum penalty faced by the principal.

## 4.1.4        Categorize the Crimes recognized by the DC Code

**Misdemeanor**: These offenses are punishable by imprisonment for a period of no more than one year.

**Felony**: These are more serious offenses that are punishable by imprisonment for a period of over one year.

**Sentencing**

Felony offenses are described as punishable by a period of imprisonment. The period of imprisonment corresponds to a length of time that varies greatly depending upon the type of offense. Recall that the minimum sentence is 1 year unless otherwise designated in the DC Code. For example:

- When written as "not more than 5 years," it should be taken to mean "at least 1 year in prison or up to and including 5 years in prison."
- When written as "not less than 2 two years nor more than 15 years," a person may be sentenced to at least 2 years or at most 15 years in prison, or some period of years in between.

Always look at maximum sentences first: "not less than 2 years nor more than 15 years" is a less severe penalty than "up to 20 years." In contrast, "not less than 2 years nor more than 15 years" is more severe than "not more than 15 years" because of the minimum requirement involved. "Not more than 15 years"

can result in a sentence of 1 year, whereas "not less than 2 years nor more than 15 years" cannot result in a sentence of less than 2 years.

**While Armed:** As defined in D.C. Code § 22-4502, if, during any felony offense, the defendant uses or is in possession of a weapon, the crime is charged with the addition of "while armed." For example, if a defendant is arrested for burglary II and is found to have a firearm in his waistband, they should be charged with "burglary II while armed." Penalties are enhanced when a crime is committed by an armed suspect, whether the weapon was used in the offense or not

Crimes can also be enhanced due to the nature of the crime or who the crime was made against. For example:

**Department of Parks and Recreation:** A **crime of violence** against person at Department of Parks and Recreation property may be punished by a fine of up to 1 1/2 times the maximum fine otherwise authorized for the offense and may be imprisoned for a term of up to 1 1/2 times the maximum term of imprisonment otherwise authorized by the offense, or both.

**Vulnerable Adults**: A **crime of violence** against vulnerable adults may be punished by a fine of up to 1 1/2 times the maximum fine otherwise authorized for the offense and may be imprisoned for a term of up to 1 1/2 times the maximum term of imprisonment otherwise authorized by the offense, or both.

A **vulnerable adult** is person who is 18 years of age or older and has one or more physical or mental limitations that substantially impairs the person's ability to independently provide for their daily needs or safeguard their person, property, or legal interests.

**Crime of Violence Transportation:** Any person who commits a **crime of violence** against a transportation provider (a private vehicle-for-hire or a public vehicle-for-hire); Metro manager, employee, or passenger, may be punished by a fine of up to 1 1/2 times the maximum fine otherwise authorized for the offense and may be imprisoned for a term of up to 1 1/2 times the maximum term of imprisonment otherwise authorized for the offense, or both.

A **crime of violence** means:
- Aggravated assault;
- Act of terrorism;
- Arson;
- Assault on a police officer (felony);
- Assault with a dangerous weapon;
- Assault with intent to kill, commit first degree sexual abuse, commit second degree sexual abuse, or commit child sexual abuse;
- Assault with significant bodily injury;
- Assault with intent to commit any other offense;
- Burglary;
- Carjacking;
- Armed carjacking;

- Child sexual abuse;
- Cruelty to children in the first degree;
- Extortion or blackmail accompanied by threats of violence;
- Gang recruitment, participation, or retention by the use or threatened use of force, coercion, or intimidation;
- Kidnapping;
- Malicious disfigurement;
- Manslaughter;
- Manufacture or possession of a weapon of mass destruction;
- Mayhem;
- Murder;
- Robbery;
- Sexual abuse in the first, second, or third degrees;
- Use, dissemination, or detonation of a weapon of mass destruction; or
- An attempt, solicitation, or conspiracy to commit any of the foregoing offenses.

## 4.1.5        Distinguish General Intent from Specific Intent

As previously described, all crimes require not just the criminal act but also criminal intent. There are two types of intent that can apply to different offenses based on the terminology used to describe the nature of the particular offense. The types of intent are *general* and *specific*:

**General Intent**
- The person did the act of their own choice or free will
- The person does not need to have the intent to or even be aware of the fact that they are breaking the law
- All crimes must have at least general intent

For example, simple assault is a general intent crime. As such, if John pushes Michael in the chest and then punches Michael in the face, he must only do so willingly to commit the offense of simple assault. The only required level of intent is that John willfully pushes and punches Michael. It is not necessary that John intended to hurt or cause injury to Michael, and Michael does not have to suffer any injuries to constitute the offense.

**Specific Intent**
- The person must have a particular wrongful state of mind
- Not only must the defendant do the act with free will, but the defendant must intend a certain outcome, regardless of whether the act results in that outcome or not.

For Example, malicious disfiguring is a specific intent crime in which an assault occurs with not just a general intent to commit the assault but with a specific intent to cause a certain type of injury which leaves the victim less complete, perfect, or beautiful. If John pushes Michael in the chest, punches Michael to the ground, then holds Michael down and pours sulfuric acid on his face in an effort to

cause permanent chemical burns, which would leave Michael's appearance less perfect and beautiful, John has committed malicious disfiguring. In this case, committing the assault alone does not constitute the offense. Rather, specific intent to cause permanent injury must be articulated.

General intent is always present before specific intent can be developed. For a crime to occur, general intent must be present. Some crimes require that the accused not only had the general intent to commit the act but specific intent as well to produce a certain outcome of that criminal act.

## 4.1.6        Identify the factors that absolve someone of criminal responsibility

**Self-Defense**
Self-defense is defined as "a use of force to protect oneself from an attempted injury by another. If justified, self-defense is a defense to a number of crimes." This defense demonstrates good reason to conduct a thorough preliminary investigation to determine what exactly happened. What may appear to be a crime or assault may be self-defense, and an officer must be able to determine what, if any, action is to be taken. Although self-defense can be determined on the scene of an offense, it is also determined through court proceedings to absolve someone of criminal responsibility when applicable.

**Insanity**
This defense "reflects society's belief that the law should not punish defendants who are mentally incapable of controlling their conduct." This defense is determined through court procedures and does not affect the way MPD enforces the law.

Although these are the only factors that absolve someone of criminal responsibility, officers should thoroughly evaluate situations and circumstances to determine whether criminal intent is present and whether an arrest should be made. For example, it is generally accepted that children under the age of seven are unable to develop criminal intent. When dealing with offenders of this age or younger, officers should consult with an MPD official and an MPD Youth Investigations Branch official to decide what action should be taken.

## 4.1.7        Differentiate the standards of proof

**Mere Suspicion**
Often described as a gut feeling or a hunch, mere suspicion is just that: a feeling which is not articulable by the officer that someone or something is suspicious, out of place, or potentially dangerous. Mere suspicion does not meet the standard of proof required for a stop, search, or arrest but often can lead to a higher level of proof after investigation. Mere suspicion is enough to make an officer take notice of something happening without any objective facts to base the suspicion on.

For example, while walking your beat, a person walking by gives you a very strange look and fails to respond when you say hello. This behavior may be considered out of the ordinary depending on the circumstances, and an officer may become suspicious of that person. In this circumstance, there are no objective facts to prove anything more about the person or what they are doing.

**Reasonable Suspicion**

This is a standard of proof in which the officer can articulate facts about the person or situation that leads the officer to act and is the standard required to conduct a stop and/or a protective pat down. Reasonable suspicion is more than mere suspicion but still does not provide enough information to make an arrest or conduct a search. Reasonable suspicion is a minimal level of justification based on articulable facts. At this level, the officer can explain and justify the action that was taken.

For example, while canvassing your beat for a robbery suspect, in which a detailed lookout (description) for the suspect has been provided, reasonable suspicion can be articulated by an officer who sees someone matching that lookout running from the area or hiding in an alley. Reasonable suspicion justifies the stop of that suspect.

**Probable Cause**

This standard of proof is required for all arrests, searches, seizures, and warrants. It relies upon the objective facts of the situation that an officer can articulate and is defined as a set of facts, circumstances, or reliable information that would lead a reasonable, prudent, and cautious police officer to believe that a crime has been committed, is being committed, or is about to be committed and that a certain person is responsible.

There are no rigid rules for establishing probable cause. You must gather and evaluate all of the information available to you and weigh it against the DC Code definition. Probable cause, meaning it is more likely than not, is one of the most commonly used terms in law enforcement. It has been reviewed and defined by the US Supreme Court in countless decisions interpreting the scope of the Fourth Amendment.

**Beyond a reasonable doubt**

The standard for conviction in a criminal trial is proof beyond a reasonable doubt. Officers in the field do not use this standard of proof; it applies to triers of fact, judges, and juries in court. In other words, a judge or jury must believe beyond a reasonable doubt that the defendant committed the offense.

***NOTE***: These levels of proof do not have to develop in sequence. If probable cause exists, there is no need for an officer to develop some other level of proof to justify an arrest, search, or warrant. If reasonable articulable suspicion exists that the individual is armed and dangerous, there is no need for an officer to develop some other level of proof to justify a stop and pat-down. If an officer witnesses a crime being committed, probable cause exists to make an immediate arrest.

# 4.1.8     Distinguish the standards of proof and understand totality of the circumstances

The different standards of proof described above are required for different procedures used by police officers in the field. Without meeting certain criteria, the actions we take may or may not be legally justified, so we must always be cognizant and respectful of the rights of all people regardless of the severity of circumstances or nature of the offenses involved. The standards required for a field contact, stop, search, and arrest all need to be known and understood for a police officer to be effective in the field. These standards are measured in court and must be viewed in the context of what is reasonable by an objective police officer under the same circumstances.

**Reasonable Suspicion vs. Probable Cause**

The US Supreme Court describes the difference between reasonable suspicion and probable cause as follows:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity and content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Reasonable suspicion must be supported by specific and articulable facts and is considered a minimal level of justification for suspecting a person of engaging in criminal activity.

The specific and articulable facts to support probable cause must be more reliable. It is a set of facts, circumstances, or reliable information that would lead a reasonable, prudent, and cautious police officer to believe a crime has been committed, is being committed, or is about to be committed and that a certain person is responsible. This is a far more demanding standard in which the officer must evaluate the information cautiously, eliminate unreliable information, and reach a determination based on all of the facts, given all of the circumstances. A number of factors surrounding each case's circumstances will strengthen or weaken the level of proof at issue, and understanding and evaluating them constitutes a totality of the circumstances analysis.

**Totality of the Circumstances**

The totality of the circumstances is a legal concept involving the examination of all evidence and information available to the officer to make a decision, to the best of their ability, as to what exactly happened, who is involved, and whether there is enough proof (probable cause) to make an arrest, conduct a search, or obtain a warrant, or enough proof (reasonable suspicion) to conduct a stop or protective pat down. This includes examining and evaluating the sources of the information and the credibility of the sources when acting on a tip. Information should be corroborated as much as possible, especially when you do not have enough information about the source to evaluate its veracity or reliability, such as with the use of an informant. The totality of the circumstances is the product of an analysis of all the information obtained during the preliminary investigation. It involves the credibility of witnesses, complainants, and suspects, and dictates the decisions ultimately made by the officer handling a scene.

**Example:** An officer receives an anonymous call describing that a young black male wearing a plain blue shirt is at a particular bus stop with a handgun in his waistband. The officer arrives and sees a person specifically matching that description. What level of proof exists, and what action can be taken? Since the information in this lookout is general in nature, contains information anyone could discover, and the caller is anonymous, there is not enough information available to establish reasonable suspicion. The officer should look for additional facts that may corroborate the anonymous call and observe the suspect without confronting him to see if he exhibits any indicators of someone who is armed or if he commits any other offense for which the officer can conduct a stop or arrest. This example is based on an actual case where the officer immediately approached the suspect, frisked him, and recovered a handgun without taking any steps to corroborate the tip. The U.S. Supreme Court ruled that the handgun was illegally seized and could not be used as evidence. (Florida v. J.L.)

**Example:** An officer receives an anonymous tip that Vanessa White will, at a certain time, be leaving a certain address and heading towards a certain motel. It is also relayed that she will be driving a brown

Plymouth station wagon and have some cocaine in a brown attaché case. Based on the tip, officers responded to the address and observed Ms. White leaving in the brown Plymouth. She drives a direct route toward the motel described in the call and is stopped a few blocks from the motel. After being informed that she was stopped for suspicion of transporting cocaine, Ms. White consented to a search of her vehicle, and the officers recovered marijuana from it. She is placed under arrest, and a search of her purse uncovers a small quantity of cocaine. Were the officers' actions reasonable based on the anonymous tip? Did the officers establish the standards of proof necessary to justify the vehicle stop, search, and arrest? Yes, although the information came from an anonymous tip, the level of knowledge displayed by the caller was in much greater detail than in the previous scenario. Here, the caller not only knew easily observable facts like the type of car and location but also knew the time of departure and the driver's destination. The U.S. Supreme Court ruled that although it was a close call, based on the totality of the circumstances, the information provided by the caller qualified as reasonable suspicion to justify a stop of Ms. White. (Alabama v. White)

*NOTE*: When relying on anonymous tips, officers must ensure the information is corroborated or based on detailed knowledge about the suspect and incident. Without the additional specific details provided in the second example, the anonymous tip involving information anyone could observe would not be enough to justify the vehicle stop, arrest, and search.

## Evaluating Information

The main issue in using information from a third party is determining its accuracy and validity. Officers must vet and corroborate the information as much as possible in order to make a practical, common-sense decision, given all the circumstances, including the veracity, reliability, and basis for how the person acquired the information to determine whether it is valid. (Illinois v. Gates) According to the US Supreme Court, the following terms are all highly relevant elements. They are not entirely separate but rather intertwined issues.

- **Veracity** means determining how truthful the person providing the information is.
- **Reliability** is determined by examining how accurate the information provided is.
- **Basis of knowledge:** This is how the person came to acquire the information provided. Did they learn of it while witnessing the offense? Did they hear about it from someone else? Is the information detailed or vague?

Similar to developing standards of proof, determining the validity of the information cannot be done by applying any rigid set of rules or examining any single factor. Rather, the officer must look at the entire situation and all of the information received—the totality of the circumstances—to make a practical, common-sense determination.

There is no single deciding factor in establishing levels of proof, and the totality of the circumstances will dictate your decisions, which is why it is important to conduct thorough preliminary investigations and gather as much information as possible. The following factors comprise the totality of the circumstances analysis that courts take into consideration when determining the legality of an officer's actions:

- **Officer's own knowledge, training, and experience**
  Throughout your career with MPD, you will have opportunities to receive training on several different topics and become familiar with the people and trends in your patrol service area. Experience and expertise give each officer a unique skill set to utilize while policing. Some officers may have training and experience in investigating certain types of offenses and recognizing when

a person's behavior is consistent with that type of offense. For example, an officer may witness people engaging in behavior consistent with that of drug sales or witness a person walking on the sidewalk, pausing at each parked car to look inside, which is consistent with someone who might be planning a theft from automobiles.

An officer's experience with certain individuals and knowledge of their criminal history may also be considered, though their criminal history alone does not justify a stop. For example, an officer observes a person recently convicted of theft from an automobile walking on the sidewalk past vehicles. This alone does not justify a stop, but if the person is observed to be viewing the interior compartments and checking door handles on the vehicles, this behavior, combined with the officer's knowledge, would justify a stop of the person.

- **Person's Appearance**
  A person's appearance alone does not justify a stop, but a stop might be justified when coupled with circumstances surrounding an offense. Examples of this include a person's appearance matching the description of a suspect wanted for an offense, a person appearing to be under the influence of drugs or alcohol, a person suffering from an injury that may have been received in an assault, a person appearing to be winded from running, and a person appearing to be exceptionally nervous.

  For example, if a lookout is broadcast for a white male, 18-25 years of age, wearing blue jeans and a white shirt, you may see numerous individuals fitting the description. As such, an officer should also look for other factors, such as proximity to the offense location, whether the person appears nervous or winded, or whether the person is reasonably involved in some lawful activity. In this case, a stop near the time and place of the offense, could be justified. A stop solely based on the person's clothing an hour later would most likely not be justified.

- **Actions and Demeanor**
  A person may be actively fleeing, hiding, or trying to conceal or destroy evidence. Or, a person may respond to questions with evasive, suspicious, incriminating, or contradictory answers. People may appear exceptionally nervous or display other signs that they may have been involved in unlawful behavior. These actions alone may or may not justify a stop but should always be considered within the totality of the circumstances.

  Remember that, except in specific circumstances, community members are not required to answer any questions posed by a police officer. As such, silence alone does not justify a stop or arrest (remember the protection against self-incrimination and right to remain silent covered above). For example, on the scene of a call involving a drug complaint, you observe a group of men in front of the location of the call that may or may not be dealing drugs. You approach the group, identify yourself, and ask one of the men what they are doing and if they are selling drugs. He looks at you, says nothing, and walks away. Absent some other factor, such as seeing a suspected drug sale or discarding contraband, there is no justification to conduct a stop of the man who walked away. If, instead, the man drops a clear zip-lock bag (potential drugs or paraphernalia) to the ground and begins walking away, a stop would be reasonable because you have articulable facts on which to build the standard of proof and conduct the stop.

- **Time and place**
  The time and place as it relates to a criminal offense is applicable to the justification of police action. A stop of a community member is more reasonable the closer in time and place it occurs to the associated offense. Furthermore, certain types of crimes are more likely to occur at certain times of day or night and in certain locations that officers become familiar with in their respective patrol districts.

  For example, around closing time in the early morning, a higher than usual rate of robberies may be experienced in areas with a high volume of nightclubs. Knowing this trend, you can apply it to the totality of the circumstances when building the standard of proof necessary to conduct stops in that area. If prior early morning robberies involved a group of two or three males 18-25 years old wearing black hooded sweatshirts and blue jeans working together, conducting a stop of one person wearing those items of clothing during the daytime would not be reasonable. However, at closing time, in the vicinity of the night clubs, along with other factors, reasonable suspicion can more easily be developed with this knowledge of the crime trend.

- **Information or information plus corroboration provided by a reliable third party**
  The information used in developing the standards of proof does not have to be gathered by just one officer conducting the investigation or the stop. Information from various sources is also applicable but needs to be measured for accuracy, veracity, and corroborated whenever it is possible. For instance, information from a third party is often used in developing the standards of proof. The third party can be another police officer, officers from other jurisdictions, community members, or paid informants.

  Information from other law enforcement agencies is shared regularly with MPD. MPD officers can make arrests and stops based on this information when valid warrants are issued and thorough lookouts are provided. Lookouts, teletypes, and wanted posters can justify the stop of a community member when a description of the suspect, the underlying offense, and the type of police action requested are included in the message.

  For example, the sergeant conducting roll call distributes wanted posters from the Alexandria Police Department containing a picture of John Smith along with a physical description and indicates that he is wanted on an outstanding warrant for failing to register as a violent sexual offender. If you observe someone who resembles Smith, can you conduct a stop based on the wanted poster? Yes, as long as that person objectively matches the description, the wanted poster indicating the existence of a warrant can justify a stop. Furthermore, if the person is identified during the stop as Smith, he will be arrested after the officer confirms that the warrant is valid and active. A copy of the wanted poster should be attached to the arrest paperwork submitted to the US Attorney's Office.

## 4.1.9    Identify the importance of precedent in criminal law

The Latin legal concept "*stare decisis,*" meaning "to stand by things decided," is the process of looking to prior court decisions to guide present decisions. Issues previously brought to court and the resultant legal decisions that have been made set a precedent for the courts to use in future cases. Precedent is generally adhered to by the courts to provide predictability and consistency. The concept of precedent also ensures equality to all persons under the law, in that persons involved in similar situations will be treated alike.

A great deal of officers' decision-making in the performance of their duties will be dictated by policies in place that limit or restrict an officer's authority in light of precedent, those court decisions that affect how law enforcement officers conduct their investigations. Most MPD policies are a result of court rulings and must be adhered to by members to avoid violating the rights of community members, which have been guaranteed by the US Constitution and determined by courts. A good example of a precedent that affects the everyday thought process of a patrol officer is *Brinegar v. US*, which established the standard of proof needed to establish probable cause for an arrest.

## 4.1.10    Apply the legal brief of court cases to police practices

***Brinegar v. United States*, 338 U.S. 160 (1949)**
In class, we will review and discuss the U.S. Supreme Court ruling in this case. We will discuss how the decision affects the everyday practices of police officers and police policies in terms of the following:
- Did probable cause exist to arrest Brinegar?
- Did probable cause exist to search the vehicle and seize the liquor?
- If so, at what point was the standard of proof for probable cause met?
- What was the Supreme Court's reasoning that supports its ruling about probable cause?
- What does the Supreme Court decision mean for police officers and the need to establish probable cause in the future?

***T.W. v. United States,* 292 A.3d 790, (April 20, 2023) (Review TB 23-08)**
In class, we will review and discuss the court ruling in this case. We will discuss how the decision affects the everyday practices of police officers and police policies in terms of the following:
- Was T.W. seized under the 4th amendment?
- Was there reasonable articulable suspicion (RAS) to stop T.W.?
- What is the difference between a "stop" and a "contact"?

## 4.1.11    Justify different police-community member interactions and the categories of police powers

**Investigative Powers**
Officers in the field conduct investigations into a wide variety of incidents and offenses. As such, their authority, although strictly limited and defined, allows different measures to be taken based on the level of proof that is present. While conducting an investigation, officers often conduct field **contacts, stops, protective pat downs, and questioning** of persons involved.

**Field Contact**
Conduct by a member which places the member in face-to-face communication with an individual under circumstances in which the individual is free not to respond and to leave.

**Conduct during Field Contacts**

- Persons contacted may not be detained in any manner against their will, nor patted down. An officer may not use force or coercion to require a community member to stop or respond.
- Persons cannot be required to answer the officer's questions or to respond in any way to the officer if they choose not to do so. Any information received during the field contact must be voluntarily provided. Officers should avoid asking questions or making a request which could be misunderstood as commands. Requests should be made with language that communicates that the person has an option, such as "may you" or "would you mind," to make it clear that the person is not receiving a lawful order.
- Officers must constantly keep in mind that the distinction between a field contact and a stop depends on whether, under particular circumstances, a community member could reasonably perceive that they are not free to leave the officer's presence. Therefore, since the individual may be, and is presumed to be innocent of wrongdoing of any kind, officers should take special care to act as restrained and courteously as possible.
- The duration of a field contact should be as brief as possible unless such ease and rapport exists that the community member wishes to continue interacting.
- When asked, officers during a field contact must advise community members of their right to refuse the interaction as well as their right to leave. If community members refuse to interact or cease to cooperate during a field contact, they must be permitted to leave. Refusal to cooperate does not justify a stop or arrest.
- Generally, individuals are not required to possess or carry with them any form of identification or be required to account for their presence on public space. No demands for identification should be made.

**Stop**

While conducting investigations, officers have the authority to conduct stops of community members when reasonable suspicion exists to believe that the suspect is involved in criminal activity. Stops are defined as "the temporary detention of a person for the purpose of determining whether probable cause exists to arrest that person." As noted above, an officer must have reasonable suspicion and articulable facts about the suspect and the circumstances to justify the stop, as it does involve the detention of a person for investigative purposes. Unlike a field contact, when a stop is conducted, the suspect is not free to leave, and officers are authorized to use force, when necessary, to conduct the stop.

**Conduct during Stops**

- An individual may be stopped at or near the origination of the stop for a reasonable period of time. When a stop occurs over an extended period of time, officers shall articulate the justification for the length of the stop in a records management system (RMS) report.
- Officers conducting a stop should only detain the person for the length of time necessary to obtain or verify the person's identity, to question the person's presence or conduct, and to determine if the person is to be arrested or not. The length of a stop must be reasonable, and caution dictates that it should not last any longer than necessary to avoid it becoming an arrest.
- Although justified in briefly detaining an individual and compelling them to perform certain actions, officers must act with restraint and courtesy while conducting all stops, and must identify themselves as police officers.
- Officers are required, at some point during every stop, to provide an explanation to the person as to the reason and purpose of the stop. Being the subject of a stop can be very unsettling.

Providing an explanation can potentially de-escalate the situation, gain cooperation, and reinforce the legitimacy of our actions as police officers. However, while all stopped individuals must be provided with a general explanation of the purpose of the stop before they are released, officers are not required to provide specific details, such as detailed lookout information, as that may jeopardize an investigation.

- Officers may question persons during a stop, to include obtaining the person's identity. Persons being detained, however, shall not be compelled to answer questions or produce identification for the officer. Refusal to answer questions and/or identify oneself does not meet the standard of proof for probable cause to arrest. However, such refusal does contribute to the totality of the circumstances and should be taken into consideration by officers conducting the investigation.
- Officers shall use the least coercive means necessary to effect a stop. This includes verbal requests, lawful orders, and the use of physical force when necessary.
- Officers who reasonably believe that a person in the vicinity of a crime of violence has knowledge of value to the investigation, such as an eyewitness, may order the person to stop. The very brief stop is only to obtain identification and information about the current situation. As already noted, however, witnesses shall not be compelled to answer any questions or produce identification for an officer.
- All stops must be documented on an incident report.


**Protective Pat Down**

During a justified and reasonable stop, a protective pat down, also known as a frisk, of the suspect may be conducted if the officer has reasonable articulable suspicion to believe that the subject is armed and dangerous. This is done specifically to detect weapons and other dangerous instruments and to neutralize the threat of physical harm. Pat downs are not meant to discover any other evidence or incriminating material. Reasonable suspicion to conduct a stop does not automatically justify reasonable suspicion to conduct a protective pat down.

Some common factors that are considered in determining if reasonable suspicion exists to conduct a protective pat down include:

- **The individual's physical characteristics**: A stopped person's clothing may bulge in a manner suggesting the presence of a weapon, such as a firearm tucked into a waistband. Physical demeanor, like how a person is standing or slouching, may also suggest that the person may be carrying a weapon.
- **The individual's actions**: A stopped person may have made a movement as if to hide a weapon when approached, may appear nervous, may make threats, or may blade their body in such a way that leads you to believe the person is armed.
- **Prior knowledge about the individual**: The officer may be familiar with an individual and know that the person has been arrested for possessing weapons in the past, is known to carry a weapon, or is known to be violent.

Protective pat downs shall be conducted in the following manner:

- The pat down should begin at the area of a person's body or clothing, which the officer believes is most likely to contain a concealed weapon, such as a waistband or coat pocket.

- Officers should not reach into pockets or clothing. Rather, the officer should touch the outside of pockets or clothing to feel for what may be a weapon concealed beneath or inside. If such an instrument is detected, reaching into the pocket to remove it is then justified.
- Outer clothing such as overcoats and jackets may be opened to allow a pat down of shirts or trousers, when necessary.
- Bags that may contain weapons can be separated from the persons carrying them. In these cases, taking possession of the bag so that it is not accessible to the stopped person is sufficient to eliminate the danger, and a search of its contents is not necessary.
- Other items of property detected during a pat down that are not weapons are not to be removed or seized.
- If, during a pat down, the officer feels an object and believes that it might be a weapon that could be used to harm him or her or others, the officer is authorized to take whatever action is necessary to examine the object and secure it for the duration of the stop.
- If, while retrieving an object that the officer believes might be a weapon, the officer discovers contraband, paraphernalia, or evidence of a crime, the officer may seize it and use it as evidence.

All stops shall be documented in an incident report per the NEAR ACT, as covered later in this lesson. Members shall be mindful of these reporting requirements when conducting stops so they are able to document all required information during the completion of their RMS reports. (GO 304.10 and 3.1 – Report Writing).

The term "stop and frisk" is commonly used to describe a protective pat down encounter. Still, it is important to remember that not all stops involve a frisk (protective pat down). As a reminder, the pat down requires its own justification through articulable facts that give the officer a reason to believe that the suspect may be armed and dangerous. Pat downs of suspects are also called "Terry Stops" after the legal case that defined them. (*Terry v Ohio*).

### *Terry v. Ohio,* 392 U.S. 1 (1968)
Language from the US Supreme Court's decision indicates that:

- "When an officer is justified in believing that an individual whose suspicious behavior, he is investigating at close range is armed and presently dangerous to the officer or others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is, in fact, carrying a weapon and to neutralize the threat of physical harm."
- The officer "confined his search to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find.
- "At the time he seized petitioner and searched him for weapons, Officer McFadden had reasonable grounds to believe that petitioner was armed and dangerous, and it was necessary for the protection of himself and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized.
- "Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing

with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."

An officer must have reasonable articulable suspicion to believe a person has engaged in, is engaged in, or is about to engage in criminal activity, *and* reasonable articulable suspicion to believe the person is armed and potentially dangerous to perform a Terry pat-down.

**Questioning**
While conducting your investigation and handling calls for service, incorporating a thorough line of questioning is very effective. Questioning is a crucial skill for officers in the field. Building rapport with persons during a field contact or stop is valuable for effective questioning, but remember that persons in both forms of interaction do not have to answer your questions. General questioning of everyone present at a crime scene to determine what has happened and who the suspect may be is reasonable. Questioning is conducted for a number of reasons but is primarily done to obtain and corroborate information from people with different forms of involvement in the offense including complainants, witnesses, and suspects.

**Arrest Powers**
As a result of police investigations, when probable cause exists, officers make arrests of suspects and obtain arrest warrants so suspects can be prosecuted in the court system.

**Use of force**
When necessary, officers are authorized to use physical force in affecting the arrest of suspects. The force used is to be the minimal and reasonable amount necessary based on the suspect's level of resistance.

**Search**
Probable cause is the same standard of proof required to conduct a search and apply for a search warrant. Searches differ from pat downs in many ways and are not only conducted to detect weapons. Searches of suspects and their surroundings can be conducted when consent is voluntarily granted to the officer by the suspect. Searches of suspects can also be conducted when it is incident to a lawful arrest. Arrestees are always searched incident to arrest and prior to being transported to an MPD facility for processing. This practice is in place for the safety of officers and prisoners, as arrestees become our responsibility once in our custody. No prisoner is allowed to keep any weapons or illegal devices or substances on their person after being arrested. (More training and information will be provided in Blocks 8 and 10 when case law and searches are discussed.)

**Exercise seizure and restraint**
All arrests involve some level of restraint, whether you are required to use force to take the person into custody or the person submits to the arrest without you having to employ force. Furthermore, an arrest is the seizure and detention of a person. When the person becomes restrained in such a way that they are no longer free to leave, move, or act as one is normally and freely able to do, he or she has been seized by the arresting officer. For example, handcuffing an arrestee and moving the arrestee to a transport vehicle and police facility involves restraint and a seizure of that person. A reasonable person would understand that they are under arrest under these conditions regardless of what the officer does or does not say regarding an arrest.

### 4.1.12        Define Arrest

There are four elements that need to be present for an arrest to occur. Note that these elements do not address the legality of the arrest, just whether an arrest has factually occurred.

1. **Authority to Arrest:** For an arrest to be lawful, the officer must have the legal authority to make an arrest, and the arrest must be based on legal authority, such as a warrant or when an offense is committed in the officer's presence.
2. **Intention to Arrest:** There must be intent on the part of the officer to arrest a person. This element and how that intent is demonstrated is gauged by how a reasonable person would feel based on the totality of the circumstances. Words alone do not constitute an arrest. The officer's intent must be communicated in such a way that a reasonable person under the circumstances would believe that they are not free to go and that they are under arrest.
3. **Seizure and Detention:** The physical taking of someone into custody; a seizing and detention of a person that effectively deprives him or her of their liberty, with or without force, must occur. Words alone do not constitute an arrest, rather the physical restraint and custody convey the officer's intent to arrest.
4. **The Individual Understands:** Persons being arrested must have some understanding that they are under arrest. This can be as simple as saying "You are under arrest," but that does not necessarily have to be the case, and those words are not required to be said for an arrest to occur.

Actions strongly imply that a person is being arrested, with or without an explicit statement to the arrestee about his or her custodial status. For example, if an officer handcuffs a person, conducts a pat down, and places the individual in the back seat of a transport vehicle, a reasonable person would presume that he or she is under arrest with or without being told by an officer. In this situation, the person is not free to leave and has been significantly limited in his or her ordinary freedom. Under other circumstances, the same actions may be taken without an arrest occurring, such as with an overly aggressive or violent person who may be under the influence of drugs. Such a person is handcuffed for safety purposes or placed in a vehicle to keep the person out of extreme cold, heat, or otherwise dangerous weather. These actions would be reasonable without constituting an arrest, but it should always be clearly explained to the person who may otherwise feel that he or she has been arrested.

The element of understanding is not required for arrests involving the following circumstances:
- If the suspect/arrestee is under the influence of drugs or alcohol and is unable to understand what is happening.
- If the suspect/arrestee is mentally unstable.
- If the suspect/arrestee is unconscious.

### 4.1.13        Identify the four elements of a lawful arrest

Once an arrest has been determined to have actually occurred, there are four factors that need to be examined to determine if the arrest was lawful.

1. **Lawful Authority:** The arrest was made by a sworn police officer with arrest powers, which is the statutory authority to make arrests. The officer should identify him or herself so that the arrestee is aware of this lawful authority, and the officer should display a badge, name tag, ID card, or police uniform.

2. **Lawful Place:** The arrest must be made in the geographic jurisdiction of the arresting officer. MPD has the authority to make arrests nearly everywhere in the city. The exceptions to this are:
   - Arrests generally should not be made in a courtroom. In the case of an offense occurring in a courtroom, the officer is required to receive advance permission from the judge to make the arrest.
   - Foreign embassies are technically foreign territories where MPD officers lack jurisdiction so officers are not to make arrests on those properties unless such action is requested by an official from the embassy.
   - Officers have no authority to make arrests or continue pursuit onto a military installation. If a pursuit must continue, proper authority to do so should be requested at the entry gate of the military installation. Serving warrants and summons on military bases should be done with the assistance of military police officers from that base.
   - In public buildings and military bases, members should notify the special police officers or military police assigned to the area of any intent to arrest someone on the property, request their assistance as they are familiar with the property and access to different areas of the building/base which minimizes the chance of escape and confrontation.

3. **Lawful Time:** MPD is authorized to make arrests at any time of the day or night, but officers are prohibited from deliberately serving misdemeanor arrest warrants during early morning or late-night hours. However, if at any time an officer encounters a wanted person, the officer is required to make the arrest. For example, officers shall not respond to the last known addresses of persons wanted for misdemeanor arrest warrants at 2:00 AM for the purpose of serving warrants. On the other hand, if you were dispatched for a radio run at 2:00 AM and one of the involved persons is found to have an outstanding misdemeanor warrant, the arrest shall be made.

4. **Lawful Reason:** The standard of proof for arrests is probable cause. However, in some cases, even when probable cause exists, an officer is required to apply for and obtain an arrest warrant in lieu of making a field arrest. The Department has clearly defined the circumstances in which arrests can be made without a warrant, and those in which a warrant must be obtained. With knowledge of an outstanding arrest warrant for the suspect, an arrest is always authorized, and officers do not need a physical warrant in their possession to make an arrest based on a warrant.

## 4.1.14    Identify the circumstances when an arrest may be made without a warrant

When probable cause exists, officers shall apply for and obtain an arrest warrant for the suspect in all cases except the following. Under these circumstances, officers may make a field arrest on the scene:

- Any crime which was committed in the officer's presence and witnessed by the officer.

- Any felony case in which probable cause exists to believe the offense occurred and the suspect committed it.
- Any offense in which probable cause exists and a domestic relationship between the victim and suspect is present.
- At the request of any Washington Humane Society Officer who has witnessed a violation of laws for the prevention of animal cruelty.
- Any of the designated **probable cause misdemeanors**.


## 4.1.15       Define probable cause misdemeanors

Probable cause misdemeanors are separated into three different categories and have a set requirement for each. The requirements for each category will be discussed in the following section.

**Category 1 Probable Cause Misdemeanors**

- Assault § 22-404
- Unlawful entry § 22-3302
- Malicious burning, destruction or injury of another's property § 22-303
- Voyeurism § 22-3531
- Theft of property valued less than $1000 §22-3211
- Receiving stolen property §22-3232
- Shoplifting § 22-3213
- Attempt theft of property valued in excess of $1000 § 22-3211
- Attempt unauthorized use of vehicles §22-3215
- Unauthorized Disposal of Solid Waste §8-902
- Illegal construction §113.7

**Category 2 Probable Cause Misdemeanors**

- Aggravated reckless driving §50-2201.04
- Leaving after colliding §50-2201.05c
- Operating or physically controlling a vehicle under the influence of drugs or alcohol §50-2201.05
- Operating a motor vehicle when the operators permit is revoked or suspended §50-1403.01

**Category 3 Probable Cause Misdemeanors**

- Panhandling §22-2301§22-2301
- Defacing public or private property §22-3312.01
- Defacement of certain symbols; displaying of certain emblems §22-3312.02
- Wearing Masks §22-3312.03
- Unlawful entry of a motor vehicle §22-1341
- Tampering with a detection device §22-1211
- Engaging in an unlawful protest targeting a residence as provided §22-2752
- Misdemeanor sexual abuse §22-3006

- Misdemeanor sexual abuse of a child or minor §22-3010.01
- Lewd, indecent, or obscene acts; sexual proposal to a minor §22-1312
- Stalking §22-3133
- Purchase, possession or consumption by persons under 21; misrepresentation of age §25-1002
- Violation of stay away order §23-584
  Intrafamily offense §16-1031
  (see objective 4.1.14 above. An officer can make an arrest of an offense in which probable cause exists and a domestic relationship between the victim and suspect is present).

## 4.1.16    Identify the three criteria required to make an arrest based on a probable cause misdemeanor

An officer can make an arrest without a warrant for any of the offenses falling under the **Category 1** Probable Cause Misdemeanors, as long as the officer has probable cause and reasonable belief that:

1. **Unless immediately arrested, the accused may not be apprehended:** For example, if the suspect is a known flight risk, has no fixed address, uses aliases and other identities, etc., it is possible that he or she may not be apprehended on a warrant and can be arrested in the field upon probable cause, or;

2. **The accused may cause injury to others:** In cases of assault or persons with known violent tendencies, to avoid the possibility of additional assaults or injuries to others, a field arrest can be made upon probable cause. For example, if two intoxicated friends engage in an argument over a sporting event and one attacks the other by punching him in the face and chest, a simple assault has occurred. If probable cause exists to make the arrest and the suspect is still apparently angry and violent, it would be lawful to make a field arrest based upon probable cause. This is because not doing so may result in injuries to others or more injuries to the victim because of the suspect's current state of impairment and demonstrated violence, or;

3. **The accused may dispose of, tamper with, or destroy evidence:** In cases involving circumstances in which evidence may be tampered with or destroyed or circumstances in which evidence cannot be seized or documented, a field arrest based upon probable cause can be made. For example, suppose probable cause exists to make an arrest for DUI or DWI. In that case, the evidence of the offense (suspect's blood alcohol level) will naturally diminish over the course of time. In such a case, a field arrest based on probable cause can be made.

An officer can make an arrest without a warrant for any of the offenses falling under the **Category 2** Probable Cause Misdemeanors, as long as the officer has probable cause and reasonable belief that unless arrested:

1. The accused may dispose of, tamper with, or destroy evidence.
2. The accused may cause injury to others or property.

An officer can make an arrest without a warrant for any offense falling under the **Category 3** Probable Cause Misdemeanor, as long as the officer has probable cause.

## 4.1.17    Define the arrest authority of individuals other than sworn police officers

There are circumstances where people other than sworn law enforcement officers can make arrests in Washington, DC:

1. **Special Police Officers:**  Special police officers (SPOs) have arrest powers while on duty and on the property which they have been hired to patrol. SPOs also have arrest powers while off the property if in fresh pursuit. When off duty or otherwise off the property, SPOs do not have the arrest authority granted to sworn members.
2. **Community Members** do not have arrest powers but can voluntarily detain a person who has committed a felony or probable cause misdemeanor until police arrive. Community members can also legally assist a sworn police officer or SPO in making an arrest when the need arises.

## 4.1.18    Identify the Stop or Field contact Report

D.C. Act 21-356, "Neighborhood Engagement Achieves Results Amendment Act of 2016" (NEAR Act), D.C. Official Code § 5-113, requires information collection specific to police stops and protective pat downs. Members shall be mindful of these reporting requirements when conducting stops in such a way that they are able to document all required information during the completion of their RMS reports. Members shall maintain records of all stops consistent with the rules outlined in this lesson.

A. For the purposes of NEAR Act data collection and GO-OPS-304.10 (Field Contacts, Stops, and Protective Pat Downs):

1. All arrests are also considered stops.

2. NEAR Act data collection requirements apply to all stopped individuals. Members shall fully document each individual stopped.

3. Required documentation varies by the circumstances of the stop.

    a. Stops that are resolved using a Notice of Infraction (NOI) are referred to as "NOI stops." This also includes stops resulting in notices of violation (NOV).

    b. All other stops shall be referred to as "stops."

B. All NOI stops shall be documented according to the following procedures.

1. All NOI stops shall be conducted by body-worn camera (BWC)-equipped members. In cases where the serious nature of an offense justifies a member not equipped with a BWC to conduct

the stop, he or she shall request that a BWC-equipped member respond to the scene. In such cases, the member conducting the stop shall also record the details of the stop, including a justification of the circumstances, in RMS.

2. In cases where an official government identification card is presented by the stopped individual, members may use available information (e.g., sex) from the identification card. Alternatively, members may document a person's sex, race, or ethnicity based on the member's observation or, in cases where members are unsure, may select "unknown."

3. All NOI stops resolved with a warning, where no other law enforcement action was taken, shall be documented by issuing a warning NOI or NOV as appropriate.

   a. Verbal warnings shall not be issued. Pursuant to GO-SPT-303.01 (Traffic Enforcement), verbal warnings shall only be given under extreme circumstances (e.g., receipt of a radio assignment requiring immediate response, motorist was en route to a hospital for emergency treatment of a sick or injured passenger). In the occasion that a verbal warning is issued, members shall document the details of the stop, including a justification of the extreme circumstances, in RMS using an "incident" card.

   b. When issuing the warning NOI, members shall indicate the reason for the stop by stating, "You were stopped because (specific violation indicated here)".

4. All NOI stops resulting only in issuance of an NOI, where no other law enforcement action was taken, shall be documented solely through issuance of the NOI.

   a. Members shall indicate the reason for the stop by stating, "You were stopped because (specific violation indicated here)" and document the reason for the stop on the NOI in the "RFS Code" field. Only one RFS Code shall be selected and based upon the initial reason that the stop originated, regardless of any other outcomes of the stop.

   b. Members shall indicate the approximate duration of the stop on the NOI in the "Approx. Duration of stop" field. Stop duration is approximate and measured in minutes; only covering the time in which the actual stop took place (e.g., not time spent on field contacts, arrests, or booking).

5. All stops resulting only in the issuance of an NOV, where no other law enforcement action was taken, shall be documented solely through issuance of the NOV using the "Notes" section as indicated below. Members shall submit a scanned copy of the NOV to the Strategic Change Division Adminbox.

C. All stops shall be documented according to the following procedures.

1. All stops regardless of the outcome of the event require a Central Complaint Number (CCN). For each event, members shall select "Yes" in response to "Was a Stop Involved?" to indicate that a stop occurred. This selection prompts all data collection fields necessary to document stops. RMS fields capture stop data requirements as indicated in this attachment.

2.  Members shall be mindful of the time that subjects are no longer considered stopped. The stop ends when the subject is either free to leave or probable cause has been established for an arrest. Stop duration shall be captured for each individual who is stopped and is approximate and measured in minutes; only covering the time in which the actual stop took place (e.g., not time spent on field contacts, arrests, or booking).

3.  Reports involving stops shall be properly classified and list the initial reason that the stop originated from the "What was the reason for the stop?" field. The internal narrative of the report shall contain a description of the member's reasonable suspicion justifying the stop, pat down, and any other outcomes of the stop.

4.  NEAR Act data collection requirements apply to all stopped individuals. Members shall fully document each individual stopped.

    a.  In cases where an official government identification card is presented by the stopped individual, members may use available information (e.g., sex) from the identification card. Alternatively, members may document a person's sex, race, or ethnicity based on the member's observation or, in cases where members are unsure, may select "unknown."

    b.  Members may document individuals who were present during the stop but not considered stopped either by adding them as a witness or by adding them to the stop card and selecting "no" under "was this person stopped?"

## 4.1.19    Complete a Stop and Protective Pat Down Report

**Documenting Pat Downs and Searches (GO-OPS-304.10)**

D.  Searches occurring during the stop shall be documented by selecting "Yes" in response to one or both of these questions: "Was this PERSON patted down and/or searched as a result of the stop (prior to arrest)?" and/or "Was this person's PROPERTY patted down and/or searched as a result of the stop (prior to arrest)?" Multiple searches can be entered on each type of search by selecting "+ Search Type."

E.  Property seized pursuant to a search conducted during a stop shall be documented on the stop card by selecting the category or categories that most closely describe each item seized. To ensure accurate data collection, this step shall be completed in addition to detailing the item(s) in the property card.

F.  Post-arrest searches are not subject to NEAR Act requirements and shall be documented in the arrest report.

G.  Reviewing officials shall review all RMS reports for conformity with GO-OPS-304.10 (Field Contacts, Stops, and Protective Pat Downs) ensuring that officers are properly classifying stops and documenting the factors that justify members' reasonable suspicion for the stop, and separately for a pat down, if applicable.

## Summary

As an officer, it is imperative that you become familiar with the Fourth Amendment and its purpose of protecting community members from unreasonable searches and seizures. Understanding legal concepts like the standards of proof for a stop, pat down, and arrest, and the totality of the circumstances for determining when a standard of proof has been met, is vital for operating as an MPD officer. As an officer, knowing and understanding the various criminal laws and concepts covered in this lesson will not only guide you in the field, but will reduce the possibility of civil liability.

## References

| | | |
|---|---|---|
| GO-PER-201.26 | Code of Conduct | 06/12/2024 |
| GO-OPS-304.10 | Field Contacts, Stops, and Protective Pat Downs | 09/01/2023 |
| GO-SPT-304.16 | Electronic Recording of Custodial Interrogations | 02/02/2006 |
| GO-PCA-501.07 | Arrest Procedures by Members of Departments Other than the Metropolitan Police Department | 12/01/1971 |
| GO-PCA-701.01 | Courts and Hearings | 12/31/2008 |
| TB 23-08 | Constitution of the United States of America | 07/20/2023 |
| | Cornell University Law School – Open Access Legal Information Institute | |
| | United States Courts – US Court Records | |
| | California State University – Knowledge Base of Legal Concepts | |
| CIR-24-01 | Secure DC Omnibus Emergency Amendment Act of 2024 | 03/12/2024 |

# Exhibit B

# Metropolitan Police Academy



# 5.1 Use of Force Overview

*May 29, 2025*

## Introduction

The Metropolitan Police Department (MPD) recognizes the value of life. The safety and protection of the public require a measured response that balances an officer's authority to use force and the dignity of human life.

Officers will be required to make split-second decisions regarding the use of force. This training will give the officer the knowledge and skills to make critical decisions about proper force utilization and suspect control. De-escalation techniques will be learned later but will be introduced in this lesson as another tool to use whenever feasible.

## 5.1.1    Identify the source of the authority for using force

**The Authority to Use Force**
As a member of MPD, you are authorized to use force, as necessary, in the accomplishment of your duties. Limitations on officers' authority to use force comes from three sources:

1. **DC Code**
   DC Code § 5-123.02 states that "Any officer who uses unnecessary or wanton severity in arresting or imprisoning any person shall be deemed guilty of assault and battery, and, upon conviction, punished therefore." This means that as a sworn Metropolitan Police Officer, the use of necessary force in performing your duties is authorized. However, using unnecessary or wanton severity in arresting someone could result in criminal sanctions against you.

2. **DC Municipal Regulations**
   DCMR Title 6A Section 207.1 states that, "It is the policy of the Metropolitan Police Department that each member of the department shall in all cases use only the minimum amount of force which is consistent with the accomplishment of their mission and shall exhaust every other reasonable means of apprehension or defense before resorting to the use of firearms."

3. **MPD Policy**
   GO 901.07 (Use of Force) states that, "Members of the Metropolitan Police Department (MPD) shall value and preserve the sanctity of human life at all times, especially when lawfully exercising the use of force. In situations where the use of force is justified, the utmost restraint should be exercised. Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others." Use of force is authorized to accomplish the following law enforcement objectives:

   - To affect lawful law enforcement objectives (e.g., arrest, detention, search)
   - To overcome resistance directed at the member or others
   - To prevent physical harm to the member or to others (including intervening in a suicide or other attempt to self-inflict injury)
   - To protect the member or a third party from unlawful force

- To prevent property damage or loss

This lesson applies to all sworn and trained professional staff members and establishes procedures for members who use force, whether on- or off-duty.

The MPD's Use of Force Framework is the core of the department's "Use of Force" training. It provides members with an organized way of making decisions about how to proceed in situations involving potential uses of force. While it is not possible to entirely replace judgment and discretion with detailed policy provisions, this lesson is intended to ensure de-escalation techniques are used whenever feasible, force is only used when necessary, and the amount of force used is proportionate to the situation the member encounters.

## 5.1.2        Describe the terminology for use of force

**Asphyxiating Restraints**
The use of any body part or object by a law enforcement officer against a person with the purpose, intent, or effect of controlling or restricting the person's airway or severely restricting the person's breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as by providing cardiopulmonary resuscitation, or the placement of a person by a law enforcement officer in a position in which that person's airway is restricted.

**Deadly Force**
Any force that is likely or intended to cause serious bodily injury or death.

**Deadly Weapon**
Any object, other than a body part or stationary object, that in the manner of its actual, attempted, or threatened use is likely to cause serious bodily injury or death.

**De-escalation**
Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in necessary force. Techniques may include verbal persuasion, warnings, slowing down the pace of an incident, and tactical repositioning.

**Less Lethal Weapon**
Type of weapon deployed with the intent or purpose of nullifying a threat without causing death (e.g., ECD, OC spray, ASP baton).

**Neck Restraint**
The use of any body part or object by a law enforcement officer to apply pressure against a person's neck, including the trachea, carotid artery, or jugular vein, with the purpose, intent, or effect of controlling or restricting the person's airway, blood flow, or breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as providing cardiopulmonary resuscitation (CPR). Neck restraints are prohibited restraint techniques.

**NOTE: It shall be unlawful for members to apply a neck restraint**, and for any member to observe another member applying a neck restraint and not immediately render first aid or request emergency

medical services. Any member who violates this provision shall be fined up to $25,000 or incarcerated for up to ten (10) years or both.

If a member applies or observes a neck restraint of any kind, they shall immediately render first aid on the person to whom the neck restraint was applied, immediately request emergency medical services, and notify their official. (DC Code § 5-125.03(a)(2)).

**Objective Reasonableness**
This standard requires that the reasonableness of a particular use of force must be judged from the perspective of a reasonable law enforcement officer on the scene in light of the totality of the circumstances confronting the member.

**The Preponderance of Evidence**
As noted previously, this is a standard of proof in administrative investigations, meaning there is evidence that it is more likely than not that an event occurred, and the accused is the one who committed the act.

**Probable Cause**
A set of facts, circumstances, and/or reliable information that would lead a reasonable and prudent police officer to believe that a crime is being committed, has been committed, or is about to be committed by a certain person.

**Serious Bodily Injury**
An extreme physical pain, illness, or impairment of physical condition, including physical injury that involves a substantial risk of death; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member or organ; or protracted loss of consciousness.

**Serious Use of Force**
Actions by members including:
- Firearms discharges (except negligent discharges determined to be misconduct by the Internal Affairs Division (IAD);
- Head strikes with a hard object;
- Those resulting in death or a serious bodily injury;
- Use of asphyxiating restraints or neck restraints;
- MPD canine bites (except bites determined to be misconduct by IAD).

**Use of Force**
Any physical coercion used to affect, influence, or persuade an individual to comply with an order from a member is considered a use of force.

The following actions are designated **Use of Force Investigation Incidents,** and members must complete a Force Incident Report (FIR) underlined immediately following the event:
- Deadly force
- Serious use of force
- Strike
- ASP strike
- Shield deployment resulting in injury or complaint of pain or injury

- Mountain bike strike
- ECD deployment (excluding negligent discharges determined to be misconduct by IAD)
- 40mm extended impact weapon deployment (excluding negligent discharges determined to be misconduct by IAD)
- Firearm discharges (excluding negligent discharges determined to be misconduct by IAD)
- Use of force indicating potential criminal conduct by the member
- Use of force resulting in visible injury
- Use of force resulting in complaint of injury or pain

The following actions are designated **Use of Force Supervisory Review Incidents** as long as the use of force does not result in injury or a complaint of injury or pain. Members <u>must</u> complete an FIR before the end of their shift.

- Takedowns
- Drawing and pointing a firearm at or in the direction of another person
- OC spray deployment
- ASP baton arm extraction
- ASP baton wristlock

**NOTE:** Minor injury or discomfort resulting from the application and general wearing of handcuffs is not, in and of itself, an injury due to use of force.

**Use of Force Framework**
The Use of Force Framework is the decision-making model specifically applicable to situations potentially resulting in the use of force. The Use of Force Framework contains four categories of perceived threats and responses, all of which are fluid, dynamic, and non-sequential. The Use of Force Framework allows officers to determine which action or actions are objectively reasonable and proportional, given the perceived threat.

## 5.1.3        Identify less lethal use of force options

**Less Lethal Weapons**
These are weapons deployed with the intent or purpose of nullifying a threat without causing death. These include but are not limited to:

- **Oleoresin Capsicum (OC Spray)**
  OC spray is a compound that causes swelling and irritates the eyes, causing tears, pain, and even temporary blindness. OC spray may be used in riot control, crowd control, and personal self-defense situations. Members of MPD are currently issued an MK-4 sized dispenser of OC spray to carry on patrol. It is intended to be used as a compliance technique for a subject actively resisting. Two additional sizes are deployed by MPD, the MK-9 and MK-46, which are much larger and used only for crowd control during riotous situations.

- **ASP Friction-Lock Baton**
  The ASP is a friction-locking expandable baton that can be easily carried and readily accessible on an officer's duty belt.

- **40mm Extended Impact Weapon**

  The Extended Impact Weapon is a device capable of firing a 40mm sponge projectile (either marking or non-marking) at a high velocity temporarily incapacitating an aggressive, non-compliant subject.

- **Electronic Control Device (ECD)**
  The ECD is designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and override the subject's voluntary motor responses. ECDs are also called Conducted Energy Devices (CEDs), Energy Conducting Devices (ECDs), Electronic Control Weapons (ECWs), and TASERs®.

When should a member use or request a standoff distance weapon? An officer may confront a situation that may escalate to a point where control of a subject is necessary to accomplish one or more law enforcement objectives. In these cases, approaching within reach of the subject presents a risk of harm to the member(s). One tactical option is the use of a less lethal weapon (OC spray, ECD, 40mm) that allows for compliance and control to be generated from a standoff distance.

Using less than lethal force options can be beneficial in many situations subject to the **Use of Force Factors** (See: pages 5 & 9), especially when a risk of harm to a member or another person exists.

## 5.1.4        Understand the department's policy on use of force

As previously mentioned, members must abide by department policy and guidelines set forth in **GO-RAR-901.07 (Use of Force)**. Members are also expected to only use force when necessary and shall never threaten to use force or use force for the following reasons:
- To punish a person or retaliate against a person for past conduct.
- To force compliance with a member's request unless that request is necessary to preserve a member, public safety, or criminal adjudication.
- Based on bias against a person's race, ethnicity, nationality, religion, disability, gender, gender identity, sexual orientation, or any other protected characteristic.

**De-escalation and Generating Voluntary Compliance**
Members should always attempt to diffuse any situation by using de-escalation techniques. This includes giving advice, verbal warnings, and tactical communications. Members should also consider why the subject is not cooperating. Is there an obvious medical condition, mental impairment, physical limitation, developmental disability, language barrier, drug use, or behavior crisis involved? Each situation will require the member to be tactful and determine what, if any, use of force is necessary.

When circumstances permit, using de-escalation techniques and generating voluntary compliance may help to resolve a situation without force. This means members should only use the amount of force proportionate to the circumstance.

**Use of Force Factors** that can determine the amount of force needed include, but are not limited to:
- The risk of harm presented by the subject.
- The risk of harm to the member or innocent subjects by using force.
- The seriousness of the law enforcement objective.

- Whether further de-escalation techniques are feasible, including the time available to a member to decide, and whether additional time could be gained through tactical means.
- Mental or physical disability, medical condition, and other physical and mental characteristics.
- Whether there are other exigent or emergency circumstances.

Members are trained in various force techniques and should use the training technique that is most applicable to the situation. Sound judgment and appropriate exercise of discretion should be the foundation of every member's decision-making process. Members need to constantly reevaluate the situation and circumstances and continue to respond proportionately.

**Proportionate Response**
A proportionate response requires members to:
- Assess the level of threat or resistance presented by the suspect, the imminence of danger, the suspect's mental capacity, their access to weapons, agency policies, and available options (e.g., calling upon other members with specialized training).
- Initiate the proportionate and objectively reasonable force response to overcome resistance.
- Modify their level of force to the amount of resistance the subject offers. As the subject offers less resistance, the member shall lower the amount or type of force used. Conversely, members are authorized to respond objectively and reasonably if resistance escalates.

Members shall not use deadly force against a person unless the member actually and reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances.
   a. In any grand jury, criminal, delinquency, or civil proceeding where a member's use of deadly force is a material issue, the trier of fact will consider the reasonableness of the member's belief and actions from the perspective of a reasonable law enforcement officer and the totality of the circumstances, which will include:
      1) Whether the subject of the use of deadly force possessed or appeared to possess a deadly weapon and refused to comply with the member's lawful order to surrender an object believed to be a deadly weapon before the member used deadly force;

      2) Whether the law enforcement officer or another law enforcement officer in close proximity engaged in reasonable de-escalation measures before the use of deadly force, including taking cover, requesting support from available mental health, behavioral health, or social workers, waiting for backup, trying to calm the subject of the use of force, or, if feasible, using non-deadly force before the use of deadly force; and

      3) Whether any conduct by the member before using deadly force unreasonably increased the risk of a confrontation, resulting in deadly force being used.

**NOTE:** This does not mean that the officer must go through every level of force before resorting to deadly force. In some situations, the officer may have to use lethal force as a starting point in resolving an incident without using any other force options.

**Displaying a Firearm**

Members shall only display a firearm when certain circumstances occur. Unholstering and/or pointing a firearm are tactics that shall be used with great caution.

Members shall only point a firearm at a subject when circumstances create a reasonable belief that it may be immediately necessary for the member to use deadly force.

When the member no longer reasonably believes that deadly force may be immediately necessary, the member shall, as soon as practicable, secure or holster the firearm.

**Tactical Considerations with Unholstered Firearms**

The presence of a member's firearm, under the right circumstances, can discourage resistance and ensure member safety in potentially dangerous situations without the need to resort to actual force.

Unnecessarily or prematurely drawing a firearm, however, can limit a member's options in controlling a situation, cause the subject to become anxious, and may result in an unwarranted or negligent discharge of the firearm.

**Warning to Subject**

If feasible, the member shall identify themselves as a law enforcement officer and state the intention to shoot before using a firearm.

**Use of Firearm**

To the greatest extent possible, a member shall ensure that using deadly force presents no substantial risk of injury to innocent persons. Members shall not discharge their weapons:
- Into a crowd.
- As a signal for help.
- As a warning shot.

Members shall not discharge their firearms, either at or from a moving vehicle, unless deadly force is being used against the member or another person/s. For the purposes of this lesson, a moving vehicle is not considered deadly force except when it is reasonable to believe the moving vehicle is being used to ram or attempt to ram a crowd of people with the intent to inflict fatal injuries. As a rule, members shall avoid tactics that could place them in a position where a vehicle could be used against them.

**Specific Precautions**

- **Handcuffs**

  You will learn how to apply and use handcuffs later in your training. Members may need to use hand controls (force) to move the person's wrists into a position that allows the subject to be placed in handcuffs.

  Handcuffs are uncomfortable and can pinch or scratch someone even with proper application. This in itself is not a use of force. It should be noted if the subject complains about the use of handcuffs, a member will notify a supervisor who will investigate the complaint.

**NOTE**: Members shall not use force against a subject in handcuffs unless the subject is actively assaulting, attempting to escape police custody, resisting a member's efforts to maintain custody or control over the subject, or actively spitting on a member. In these cases, members shall limit their force response to the minimum amount of force that is consistent with the Use of Force Framework and MPD policy that an objectively reasonable officer would use in light of the circumstances to bring an incident or person under control effectively. Any officer violating this policy's provisions shall be fined no more than the amount set forth in § 22-3571.01 or incarcerated for no more than ten (10) years, or both.

**Prohibited Restraint Techniques – Neck Restraints and Asphyxiating Restraints**

- **Neck Restraints and Asphyxiating Restraints**
  Neck restraints and asphyxiating restraints are not an authorized use of force and are unlawful.

  If a member applies or observes a prohibited restraint technique of any kind, they shall immediately render or cause to be rendered first aid on the person to whom the neck restraint was applied, or immediately request emergency medical services for the person to whom the neck restraint was applied. The member shall also notify their official. (DC Code § 5-125.03(a)(2)).

- **Positional Asphyxia**
  Once the situation is under control, members shall place the subject in a custodial restraint that does not block their ability to breathe. A member shall not place the subject on their stomach for an extended time. Members should watch for signs of difficulty breathing or any other life-threatening symptoms. In such cases, members must seek medical assistance immediately and contact an official to direct another means of custody, if applicable.

- **Spitting**
  Members may use control holds and tactical takedowns to gain control over a subject who is spitting on the member or others. Members may also use limited pressure to turn a subject's face away from the member to prevent the suspect from spitting directly at the member. Members may wish to don their personal protective equipment (PPE) for additional protection. Spit sock hoods may also be used on a subject who is actively spitting or when there is a reasonable belief that the subject will spit on others. Members shall strictly follow **GO-RAR-901.07 (Use of Force)** when gaining control of a spitting subject.

  **NOTE:** The pressure applied to turn a subject's face must not rise to the level of a strike and must be consistent with neck restraint restrictions. No other type of force is authorized to be used in response to spitting.

- **Hair Holds**
  Recent cases brought before the Office of Police Complaints (OPC) have highlighted members' use of "hair holds" on subjects during use of force situations, specifically as a compliance technique on a subject offering active resistance or below. The use of hair holds by members to overcome minimal levels of resistance from a subject has been deemed excessive by OPC.

Certain circumstances may arise where a member's use of a hair hold would be reasonable and proportionate to the threat level presented by a subject, and where other force options are not available or feasible.  In these rare and exigent circumstances, a member may grab or pull a subject's hair when they are struggling to gain control, **and the subject is assaulting the member or others**.

Members are **not** trained to perform hair holds and it is **not** a preferred tactic.

It is important to remember that all uses of force must be objectively reasonable and proportionate to the threat, and members must be able to articulate their actions.

## 5.1.5        Apply the concept of objective reasonableness in use of force as defined by Supreme Court cases

The concept of objective reasonableness was introduced on page 6. To provide further guidance, we now examine the concept in greater detail.

**Standards on Governing the Use of Force** - **The Reasonableness Test**
*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed. 2d 443 (1989).

**Facts of the case**
Graham was a person with diabetes, who asked his friend to drive him to a local store to purchase some orange juice to counteract an insulin reaction. Upon entering the store and seeing several people ahead of him, Graham hurried out and asked his friend to drive him to another friend's house. Officer Connor, a local police officer, became suspicious after seeing Graham hastily enter and leave the store. The officer followed the car and made an investigative stop, ordering the pair to wait until he found out what happened in the store.

Graham exited the car, ran around it twice, and finally sat down on the curb, where he briefly passed out. Graham's friend told the officer that Graham was suffering from a "sugar reaction." When backup officers arrived on the scene, one rolled Graham over on the sidewalk and handcuffed his hands tightly behind his back, ignoring the friend's pleas to get him some sugar. Another officer on the scene stated, "I've seen a lot of people with sugar diabetes, but they never acted like this. Ain't nothing wrong with … he's drunk. Lock [him] up."

Several officers lifted Graham from behind, carried him over to the friend's car, and placed him face down onto the hood. After regaining consciousness, Graham asked the officers to check his wallet for a diabetic decal that he carried. The officers, however, told him to "shut up" and shoved his face down against the hood of the car. Four officers then grabbed Graham and threw him headfirst into the police car. A friend of Graham's brought some orange juice to the car, but the officers refused to let him have any of it. Finally, Officer Connor received a report that Graham had done nothing wrong at the store; the officers then drove Graham home and released him.

Injuries sustained by Graham during the encounter included a broken foot, cuts on the wrists, a bruised forehead, and an injured shoulder. Graham also claimed to have developed a loud ringing in his right

ear. He filed a federal civil rights action pursuant to 42 U.S.C. 1983 alleging the use of excessive force and making an investigatory stop in violation of the Fourth Amendment.

During the federal civil trial, the defendants moved for a directed verdict (a request that the case be decided in their favor, which would stop the jury trial) at the close of the plaintiff's case in chief. In ruling on the motion, the District Court determined that the amount of force used by the officers was appropriate under the circumstances and granted the defendant's motion for a directed verdict. The Fourth Circuit Court of Appeals affirmed the judgment, ruling that the District Court had applied the correct legal standard in assessing the excessive force claim. However, the US Supreme Court vacated the order and remanded the case for trial, concluding the lower court applied the incorrect legal standard.

**The Supreme Court's Ruling**
The Court specifically rejected the notion that all excessive force claims under Section 1983 are governed by a single standard, stating:

- A court must first identify "the specific constitutional right allegedly infringed by the challenged application of force."
- "Seizure" triggering Fourth Amendment protection occurs when peace officers have "by means of physical force or show of authority in some way restrained the liberty of a citizen."
- "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of `the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake" paying "careful attention to the facts and circumstances of the particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."
- "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

**The Objective Reasonableness Test**
According to the Court, the reasonableness of a particular use of force must be judged from the perspective of *a reasonable officer on the scene*, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. (490 U. S. 396-9.)

Factors considered by the Court in determining reasonableness:
- The facts and circumstances of a particular case;
- The severity of the crime at issue;
- Whether the suspect poses an immediate threat to the safety of the officers or others; and
- Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Objective reasonableness includes an allowance for time available to make decisions in as much as officers are often forced to make split-second judgments in tense, uncertain, and rapidly evolving circumstances.

Reasonableness is judged from the perspective of a reasonable officer on the scene without the 20/20 vision of hindsight (meaning the ability to look in the past to see what you've done wrong).

Not every push or shove, even if it may later seem unnecessary while you are in the peace of a judge's chambers, violates the Fourth Amendment.

Evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force, nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

**GO-RAR-901.07 (Use of Force)** adopts this standard: "Objective reasonableness – the standard requiring the reasonableness of a particular use of force must be judged from the perspective of a reasonable member on the scene in light of the facts and circumstances confronting the member."

## 5.1.6     Understand the Use of Force Framework

**The Decision-making Model**
The MPD decision-making model is depicted in detail on the next page.



**The Use of Force Framework**
The Use of Force Framework is a training model that supports a reasonable escalation and de-escalation of applied force. It is a guideline for proportional responses to the action and level of resistance demonstrated by a subject.

The level of response is based on the situation and the subject's actions in response to the member. Responses may progress from the member's physical presence at the scene, to the application of deadly force.

Each time an officer encounters a situation where the possibility of violence or resistance to lawful arrest is present, that officer must, if possible, attempt to de-escalate the situation. This is done through advice, warning, verbal persuasion, tactical communication, and/or other de-escalation techniques. Members must attempt to de-escalate use of force situations whenever feasible.



### 5.1.7    Understand the elements of action and assessment

**Action and Assessment**
The application of force encompasses three main elements of action and assessment:

- **Tools**
  Tools include procedures, behavioral perspectives, and defensive equipment such as OC spray, a baton, and a firearm. Officers may rely upon various tools in response to their perception of the risk.

- **Tactics**
  Tactics incorporate the previously mentioned tools into strategies to accomplish an arrest, such as keeping the subject's hands visible at all times, maintaining cover or concealment during an initial approach, utilizing OC spray to control active resistance, etc. De-escalation through communication, as well as distance, are tactics that should be considered.

- **Timing**
  Timing is the correlation of tools and tactics to effectively apply the appropriate level of force required to establish and maintain lawful control. Effective use of timing is seen when an officer applies handcuffs during an arrest to minimize the potential risk for an assault, quickly exerts their baton to defend against an assault, etc.

**Totality of the Circumstances – (Reference Lesson 4.1 – Criminal Law)**
The totality of the circumstances is a concept involving the examination of all evidence and information available to the officer to make a decision, to the best of their ability, as to what exactly happened, who is involved, and whether there is enough proof (probable cause) to make an arrest, conduct a search, or obtain a warrant, or enough proof (reasonable articulable suspicion) to conduct a stop or a protective pat down. This includes the sources of the information and the credibility of the sources when acting on a tip. Information should be corroborated as much as possible, especially when you do not have enough information about the source to evaluate the veracity or reliability of the source or informant.

The totality of the circumstances is the product of an analysis of all the information obtained during a preliminary investigation. It involves the credibility of witnesses, complainants, and suspects and dictates the decisions the officer makes handling a scene.

Resistance and response are dynamic. The subject's behavior and the use of force to control it may escalate or de-escalate during any altercation. Therefore, it is important to understand that the suspect's behavior may not incrementally escalate or de-escalate in a linear sequence. An officer's use of force may need to start at any option, depending on what is objectively reasonable and according to MPD policy. An officer must use only the minimum amount of force necessary. Remember that an officer's actions amid violent turmoil are often judged long after, in a calm and distant environment.

**Threat Assessment Observations**
What factors help the officer perceive danger? A situational evaluation should include the subject's emotional state, resistive tension, early warning signs, pre-attack postures or gestures, access to weapons, apparent willingness to sustain injury, and non-compliance with a lawful order or request.

## 5.1.8      Identify the significance of officer/subject factors (totality of the circumstances)

**Officer / Subject Factors**
Officers should evaluate the significance of various factors that both the officer and the subject bring to the encounter and how those factors might influence the outcome.

This evaluation should include:
- Size – The officer's size as it relates to the size of the subject.
- Strength – The officer's strength as it relates to the strength of the subject.
- Skill level – The officer's skill as it relates to each of these factors.
- Injury/Exhaustion – Whether the officer or subject has sustained injury or reached exhaustion, and how that may affect the confrontation.
- Number of officers and subjects – The number of officers versus the number of subjects involved.

A law enforcement officer must understand that no set sequence of events applies to the force options available. The force option may escalate or change the situation in seconds.

An officer does not have to attempt every force option before resorting to deadly force. However, the officer must demonstrate that they acted according to MPD policy, used de-escalation techniques whenever feasible, force was used only when necessary, and that the amount of force used was proportionate to the situation the member encountered.

**NOTE:** An officer's application of force must be reasonable at the time it is applied. As a suspect escalates or de-escalates resistance or assault, the officer's force options must escalate or de-escalate appropriately in response.

Officers must be aware of and use effective positioning and cover when approaching or encountering subjects. They must maintain a tactical advantage with respect to their location. Officers in every situation or answering a call for service must recognize and immediately identify those areas that would provide cover from a hostile attack.

**Officer Safety and Control**
The focus of an officer's encounter should be primarily on the perceived actions of the suspect. Can the officer articulate suspicious or possibly confrontational behavior by the suspect? The officer safety and control principles must guide the officer's response to the suspect's perceived behavior.

**NOTE**: Verbal threats of violence alone do not justify the use of physical force; however, when combined with physical actions such as a fighting stance, clenching of fists, stepping towards the officer, or pulling away, verbal threats might indicate a potential use of force situation.

**Goal of Voluntary Compliance**
An officer should clearly and effectively communicate to a suspect regarding what they want the subject to do. Just as verbal communication sends a message to the subject, so too does the use of physical force. When applying force, a subject may go into survival mode and not accurately understand what to do. Simple, clear commands repeated in a clear, authoritative voice throughout the entire application of force will help the subject understand what the officer wants them to do.

**Use of Force Framework Levels**
It is important to understand that this framework is a starting point for discussing a complex issue: the justification for using force. Members must understand that no set order or sequence applies to the Use of Force Framework.

The force options may range from officer presence all the way to lethal force in a matter of seconds. An officer does not have to attempt every force option before resorting to the highest level. However, the officer must demonstrate that they acted according to MPD policy, which ensures that de-escalation techniques are used whenever feasible, that force is only used when necessary, and the amount of force used is proportionate to the situation that the member encounters.

**Passive Resister**
A passive resister denotes a situation where the subject displays a low level of noncompliant behavior by offering no physical or mechanical energy. Generally, this type of subject does not respond to an officer's request or commands and may be argumentative.

In such encounters, the officer at this level perceives an increased risk and must develop a plan and act tactically. The officer can deploy certain low-level tactics in response until control or cooperation is achieved.

Appropriate responses within this level are the following **Control Holds**:
- Soft, empty hand to maintain control
- Leaning on a subject's legs to hold them down
- Firm grip and escorting

**Active Resister**

An active resister signals the need for increased officer alertness due to a recognized danger. At this level, the subject is uncooperative and will not comply with the member's requests or commands. The subject exhibits physical and mechanical defiance or behaves in a way that causes the member to believe that the subject may be armed with a weapon. This includes such actions as bracing, tensing, pushing, verbally signaling an intention not to be taken into or retained in custody, and evasive movement intended to defeat a member's attempt at control.

The officer recognizes the situation is escalating, and the level of noncompliance is increasing in volatility, they can use compliance techniques and physical control tactics to gain control. The officer's actions may cause the subject pain but will not generally cause injury.

Appropriate responses within this level include the following **Compliance Techniques**:
- Control holds (noted above)
- Joint locks
- OC Spray
- Solo and team takedowns
- Wristlocks
- Use of ASP baton to conduct wristlock
- ASP baton arm extractions
- Use of patrol shield to pin down a subject

**Threatening Assailant**

At this level of the framework, there is an assessment of imminent bodily harm to the officer or others, which can include an actual or attempted assault on the officer. The officer may direct energy and tactics toward self-defense in response.

The perception of danger at this level has accelerated for the officer, and there is a more directed focus on officer safety and defense. The subject has gone beyond the level of single non-cooperativeness and is actively and aggressively assaulting (e.g., striking or kicking) the member, his- or herself, or others, or the threat of an aggressive assault is imminent. The subject has demonstrated a lack of concern for the member's safety; however, the subject does not pose an imminent threat of death or serious bodily injury to the member or others.

All force options other than deadly force are available to an officer in response. Although a range of force options are generally available, members shall adhere to policy requirements governing the use of specific force options and less lethal weapons. Defensive tactics can be employed to render the subject into submission forcibly; however, defensive tactics at this level are not likely or designed to cause death or serious bodily injury.

Appropriate responses within this level include the following **Defensive Tactics**:
- ASP baton strikes
- Striking and blocking techniques
- Mountain bike as an impact weapon
- Electronic control devices (ECDs)
- 40mm extended impact weapons

**Active Assailant**
This level of the framework represents a subject who poses an imminent danger of death or serious bodily injury to an officer or others. An officer must maintain the highest level of risk assessment and be prepared to use survival skills and lethal force in this situation.

A subject's action is life-threatening when it reasonably appears necessary for the officer to protect themselves or others, other than the subject from an immediate threat of death or serious bodily injury.

When the officer perceives that the subject poses an imminent danger of death or serious physical injury to the officer or another person, immediate countermeasures must be used to stop the threat.

All force options are available at this level, though deadly force shall only be used if the member reasonably believes that deadly force is immediately necessary to protect the member or another person other than the subject from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances. Examples of force in response by an officer at this level include the use of a firearm or a strike to the head with a hard object.

**NOTE**: When any force response is employed, members shall:
- Conduct a visual and verbal check of the subject to ascertain whether the subject needs medical care.
- Summon medical assistance immediately if a person is injured, complains of pain, or demonstrates life-threatening symptoms as established in **GO-PCA-502.07 (Medical Treatment and Hospitalization of Prisoners)**.
- Render first aid as soon as the scene is safe.
- Request for an official to respond.

## 5.1.9    Apply the concept of bystander liability (ABLE)

**Bystander Liability and Culpability**
Civil or criminal law enforcement officers may be concerned about liability issues throughout their careers. One type of liability is called bystander liability.

An officer may be held civilly or criminally liable for standing by and failing to intervene while violating a suspect's established constitutional rights. MPD policy requires officers to report any use of force incident in which they observe another member utilizing excessive force or engaging in any type of misconduct. Failure to intervene and/or report may lead to administrative sanctions, fines, or jail time.

Types of **Constitutional Rights Violations:**
- **Compelled Confession** – the use of force to extract a confession.
- **Warrantless Search** – when the officer knows or should have known that a warrant is required.
- **Unlawful Arrest** – when there is no probable cause to justify taking a subject into custody.
- **Excessive Use of Force** – when an officer knows or should have known that there is no necessity for the level of force used.

Any of the above examples may result in civil or criminal liability, even if you did not physically participate but merely stood by and did not intervene to stop the clear violation of the subject's constitutional rights.

**Legal Theory**

The main legal theory of bystander liability is conspiracy combined with duty, including the duty to keep a person in custody free from harm.
- **Conspiracy -** Courts have ruled that acquiescence can amount to a conspiracy agreement between all officers present when the bystander officer watches as an open breach of the law occurs and does not intervene to seek its prevention.
- **Duty -** There is a duty borne by police officers associated with protecting the constitutional rights of community members.

**Court Decisions**

- Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972)
  A police officer who fails to intervene to prevent a constitutional violation by other police officers may also be personally liable for civil damages. The Seventh Circuit Court of Appeals held that both supervisory and non-supervisory officers present during an unconstitutional act can be held liable.

- U.S. v. Reese, 2 F.3d 870 (9th Cir. 1993)
  The Ninth Circuit Court of Appeals held that a police sergeant who stood by and failed to prevent other officers from beating suspects may also be convicted of federal criminal civil rights violations.

- U.S. v. Koon 34 F.3d 1416 (9th Cir. 1994)
  As a result of the Rodney King beating by Lost Angeles officers, the Ninth Circuit Court of Appeals ruled that "...a person in official custody has a right to be free from harm inflicted by third persons, and … an official who willfully subjects a custodial subject to a deprivation of that right is subject to criminal liability."

In light of the above court decisions, police officers have a duty to intercede when their fellow officers violate a suspect's or other citizen's constitutional rights. Mere inaction may not protect the bystander officer.

Courts have recognized that intervening to stop a constitutional violation may be a defense to both civil and criminal liability if a realistic opportunity to prevent the violation existed at the time of the intervention.

## 5.1.10    Explain the Department's use of force reporting requirements (Force Incident Report – FIR)

**Notifications and On-Scene Responses**

Once members have used any use of force tactic, they need to notify an official, and supervisors will immediately respond to the scene. Supervisors and the watch commander will take the necessary steps to report and document the use of force by members.

**Reporting Requirements**

A **Force Incident Report** (FIR) shall be filled out for all Use of Force Supervisory Review Incidents and Use of Force Investigation Incidents. The FIR is a single document that replaces the Use of Force Incident Report (UFIR) and Reportable Incident Form (RIF). Charging information will be automatically uploaded into the FIR, provided the Mark43 arrest report is complete. Once completed, the watch commander will review the FIR.

Before the end of the member's shift, an FIR must be completed for **Use of Force Supervisory Review Incidents** involving:
- Takedowns
- Drawing and pointing a firearm at or in the direction of another person
- OC spray deployment
- ASP baton arm extraction
- ASP baton wristlock

An FIR must be completed immediately after the event for the following **Use of Force Investigation Incidents:**
- Strike
- ASP strike
- Shield deployment resulting in injury or complaint of pain or injury
- Mountain bike strike
- ECD deployment (excluding negligent discharges determined to be misconduct by IAD)
- 40mm extended impact weapon deployment (excluding negligent discharges determined to be misconduct by IAD)
- Firearm discharge (excluding negligent discharges determined to be misconduct by IAD)
- Deadly force
- Serious use of force
- Use of force indicating potential criminal conduct
- Use of force resulting in visible injury
- Use of force resulting in complaint of injury or pain

**Exception:**  When control holds are used, and there is no injury or complaint of pain or injury.

When completing an FIR, members should articulate the events as accurately and coherently as possible. Members should also articulate when they used de-escalation tactics and why they didn't implement techniques to help keep the situation calm (e.g., that a particular force option was not feasible at the time). Members need to document as much detail as possible in their narratives to help officials understand what happened on the scene. In the event that a member declines to complete a FIR, or declines to make a statement, the members supervisor will need to notify the watch commander.

Members cannot be compelled to complete reports or makes statements, but they must get approval from either the United States Attorney's Officer (USAO) or IAD to issue a reverse-Garrity warning.

**Body Worn Cameras (BWC)**
The BWC is one of the department's most important tools to help document a member's patrol activities. This tool is particularly useful in use of force investigations. After a use of force, one of the first questions asked by the department, the media, and activist groups is, "Was the officer wearing a body camera?"

A body camera program helps promote and ensure department transparency. When officers activate their body cameras, they are less likely to be perceived as concealing their actions. However, if that same officer is equipped with a camera and does not activate it, they will likely be viewed as having something to hide. That officer could even be accused of deliberately trying to cover up their actions.

Body cameras are a powerful tool and are here to stay. While interacting with the public, it is especially important to remember to activate your camera immediately when you receive a service call or whenever you self-initiate any field activities. This will not only protect you and your fellow officers and provide a valuable resource if your actions are questioned.

Officers may review BWC footage before writing initial reports except for serious uses of force and an incident involving an officer involved death. For any other incident, officers may review BWC footage prior to writing a report, but officers shall indicate whether the officer viewed body-worn camera footage prior to writing the report and specify what body-worn camera was viewed.

When releasing body-worn camera recordings, the likenesses of law enforcement officers acting in their professional capacities, other than those acting undercover, shall not be redacted or otherwise obscured.

**Note:** Officers are no longer required to notify contact subjects they are being recorded.
**Note**: The above is the information that General Counsel provides to officials during legal training.

## Summary

The Use of Force Framework is a tool designed to give members a path to follow to determine a proportional application of force appropriate to a subject's actions. With a complete understanding of the Use of Force Framework components and the circumstances of an arrest, members can apply the principles associated with applying force. Members have the option of escalating, de-escalating, disengaging, or maintaining a level of appropriate force until complete control of the subject is gained. Members, however, must consider what an objectively reasonable law enforcement officer would do under similar circumstances.

## References

| | | |
|---|---|---|
| GO-SPT-302.13 | Body Worn Cameras | 03/12/2024 |
| GO-PCA-502.07 | Medical Treatment and Hospitalization of Prisoners | 04/01/2014 |
| GO-RAR-901.04 | Less Lethal Weapons | 03/28/2024 |
| GO-RAR-901.07 | Use of Force | 03/28/2024 |
| CIR-24-01 | Secure DC Omnibus Emergency Amendment Act of 2024 | 03/12/2024 |

# Exhibit C

# GENERAL ORDER



## DISTRICT OF COLUMBIA

| Title | | |
|---|---|---|
| **Use of Force** | | |
| Topic | Series | Number |
| **RAR** | **901** | **07** |
| Effective Date | | |
| **March 28, 2024** | | |
| Replaces: GO-RAR -901.07 (Use of Force), Effective Date March 12, 2024 | | |
| Related to: GO-RAR-901.01 (Handling of Service Weapons) GO-RAR-901.04 (Less Lethal Weapons) | | |

| I. | Purpose | Page | 1 |
|---|---|---|---|
| II. | Procedures | Page | 2 |
| II.A | Use of Force Principles | Page | 2 |
| II.B | Specific Precautions | Page | 7 |
| II.C | Notifications and On-Scene Response | Page | 8 |
| II.D | Documentation and Reporting | Page | 9 |
| II.E | Investigative Responsibility | Page | 11 |
| II.F | Chain of Command Investigations | Page | 15 |
| II.G | Internal Affairs Division Investigations | Page | 16 |
| II.H | Investigative Conclusions | Page | 17 |
| II.I | Force-Related Duty Status Determination | Page | 18 |
| II.J | Use of Force Review Board | Page | 18 |
| II.K | Mandated Use of Force Training | Page | 22 |
| III. | Definitions | Page | 22 |

## I.      PURPOSE

Members of the Metropolitan Police Department (MPD) shall value and preserve the sanctity of human life at all times, especially when lawfully exercising the use of force. In situations where the use of force is justified, the utmost restraint should be exercised. Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others.

Regulations pertaining to the use of force by law enforcement officers are outlined in chapter six of the District of Columbia Municipal Regulations (DCMR), the Fourth Amendment of the United States Constitution, and various sections of District of Columbia (DC) Official Code. DCMR provides guidance regarding a law enforcement officer's use of force including, but not limited to, outlining the circumstances permitting appropriate levels of force and imposing restrictions on firearm discharges. The Fourth Amendment of the US Constitution guarantees people "the right to be secure in their persons" and provides a framework in which the courts can evaluate the use of force by law enforcement officers, including the "objective reasonableness" standard established in *Graham v. Connor* 490 U.S. 386 (1989). The "objective reasonableness" standard acknowledges the difficult decisions that members are forced to make under rapidly evolving and unpredictable circumstances.

This general order applies to all sworn and civilian department members and establishes procedures for members who use force, whether on or off duty. The MPD use of force framework is the core of the department's use of force training and provides members with an organized way of making decisions about how they shall act in situations that may involve potential uses of force. While it is not possible to entirely replace judgment and discretion with detailed policy provisions, this general order is intended to ensure that de-escalation techniques are used whenever feasible, that force is only used when necessary, and that the amount of force used is proportionate to the situation that the member encounters. The purpose of this general order is to outline when members may use force and provide procedures to follow when force is used to ensure that all incidents receive a thorough and impartial investigation.

## II.     PROCEDURES

A.     Use of Force Principles

1.     Any physical coercion used to affect, influence, or persuade an individual to comply with an order from a member is considered a use of force. Members shall only use force that is objectively reasonable. Members **may** use force only to accomplish the following specific law enforcement objectives:

| Law Enforcement Objectives |
|---|
| a.   To affect lawful law enforcement objectives (e.g., arrest, detention, search). |
| b.   To overcome resistance directed at the member or others. |
| c.   To prevent physical harm to the member or to another person (including intervening in a suicide or other attempt to self-inflict injury). |
| d.   To protect the member or a third party from unlawful force. |
| e.   To prevent property damage or loss. |

2.     Members **shall not** use or threaten to use force for the following reasons:

| Prohibitions |
|---|
| a.   To punish a person or retaliate against a person for past conduct. |
| b.   To force compliance with a member's request, unless that request is necessary to preserve member or public safety or criminal adjudication. |
| c.   Based on bias against a person's race, ethnicity, nationality, religion, disability, gender, gender identity, sexual orientation, or any other protected characteristic. |

3.     Members shall attempt to defuse use of force situations with de-escalation techniques whenever feasible.

a.     All members who encounter a situation where the possibility of violence or resistance to lawful arrest is present, shall, if possible, first attempt to defuse the situation through advice, warning, verbal persuasion, tactical communication, or other de-escalation techniques.

b.     When feasible, members shall consider whether a subject's failure to comply with a member's command is due to a medical condition, mental impairment, physical limitation, developmental disability,

language barrier, drug interaction, behavioral crisis, or other factors beyond the subject's control. In these situations, members shall consider whether specific techniques or resources would help to resolve the situation without force.

c.     When using force, members must be able to articulate the facts and circumstances surrounding their tactics, decision making, and the extent of force used in any given situation.

4.     Members shall only use the amount of force that is proportionate to the circumstances. If de-escalation tactics are not effective or feasible, the member may use an increasing level of force to overcome the level of resistance, as long as the force response remains proportionate to the perceived threat. In general, the greater threat and the more likely the threat will result in injury or death, the greater the level of force may be immediately necessary to overcome it. Some of the factors that members should consider when determining how much force to use include:

| Use of Force Factors | |
|---|---|
| (a) | The risk of harm presented by the subject. |
| (b) | The risk of harm to the member or innocent subjects by using force. |
| (c) | The seriousness of the law enforcement objective. |
| (d) | Whether further de-escalation techniques are feasible, including the time available to a member to decide, and whether additional time could be gained through tactical means. |
| (e) | Mental or physical disability, medical condition, and other physical and mental characteristics. |
| (f) | Whether there are other exigent or emergency circumstances. |

5.     Members are trained on a range of force options. It is not possible to determine ahead of time the proportionate level of force for every possible situation. Sound judgment and the appropriate exercise of discretion shall be the foundation of decision-making. The use of force framework contains four categories of perceived threats and force responses, all of which are fluid, dynamic, and non-sequential. The appropriate force response shall be based upon the member's perception of the threat depicted here and in accordance with department training and standards.

NOTE: The department recognizes and acknowledges that the level of resistance encountered by a member cannot always be accurately discerned from the video recordings or body worn camera (BWC) footage of an interaction.

## USE OF FORCE FRAMEWORK

| Category of Perceived Threat | | Force Response |
|---|---|---|
| **Passive Resister** | Subject displays a low level of noncompliant, passive resistance. Subject does not respond to the member's lawful requests or commands and may be argumentative. Noncompliance offers no physical (i.e., caused by the body) or mechanical (i.e., produced by tools or machines) energy. | **Control Holds**<br>Low-level physical tactics to gain control and cooperation (examples include soft empty hand controls, leaning on a subject's legs to hold them down, and firm grip). |
| **Active Resister** | Subject is uncooperative and will not comply with member's requests or commands. Subject exhibits physical and mechanical defiance or behaves in such a way that causes the member to believe that subject may be armed with a weapon, including evasive movements to defeat member's attempt at control, including bracing, tensing, pushing, or verbally signaling an intention not to be held in custody, provided that the intent to resist has been clearly manifested. | **Compliance Techniques**<br>Actions that may induce pain or cause discomfort to the subject who is actively resisting until control is achieved, but will not generally cause an injury when used in accordance with department training and standards. Examples include oleoresin capsicum (OC) spray, wrist locks, takedowns, ASP baton arm extractions, use of an ASP baton to conduct a wrist lock, and use of a patrol shield to pin a subject down. |
| **Threatening Assailant** | Subject has gone beyond the level of simple non-cooperativeness, and is actively and aggressively assaulting (e.g., striking, kicking) the member, themselves, or others, or the threat of an aggressive assault is imminent. Subject has demonstrated a lack of concern for the member's safety; however, subject does not pose an imminent threat of death or serious bodily injury to member or others. | **Defensive Tactics**<br>All force options other than deadly force. Although a range of force options are generally available, members shall adhere to policy requirements governing the use of specific force options and less lethal weapons outlined in GO-RAR-901.04 (Less Lethal Weapons). Defensive tactics are employed to forcibly render the subject into submission; however, these actions are not likely nor designed to cause death or serious bodily injury. Defensive tactics are primarily used to ensure the safety of the member and others [examples include strikes, ASP baton strikes, use of a police mountain bike as an impact weapon, electronic control devices (ECDs), and 40mm extended impact weapons]. |
| **Active Assailant** | Subject poses an imminent danger of death or serious bodily injury to member or another person (other than the subject). Subject's actions demonstrate subject's intent to inflict imminent death or serious bodily injury upon member or another person. | **Deadly Force**<br>All force options. Deadly force shall only be used if the member actually and reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances (examples include the use of a firearm or a strike to the head with a hard object). |

6.    As situations change, members shall reevaluate the circumstances and continue to respond proportionately. This approach requires members to:

| Proportionate Response |
|---|
| a.   Assess the level of threat or resistance presented by the suspect, the imminence of danger, the suspect's mental capacity, his or her access to |

|   | weapons, agency policies, available options (e.g., calling upon other members with specialized training). |
|---|---|
| b. | Initiate the proportionate and objectively reasonable force response to overcome resistance. |
| c. | Modify their level of force in relation to the amount of resistance offered by the subject. As the subject offers less resistance, the member shall lower the amount or type of force used. Conversely, if resistance escalates, members are authorized to respond in an objectively reasonable manner. |

7.    Members shall not use techniques or defensive weapons to apply force unless they have received the requisite training and the technique or weapon has been approved for use by the department. However, members may employ force as necessary to protect the life of a member or other individual subject to the imminent threat of death or serious bodily injury, when no other options are feasible, and the force is objectively reasonable and proportionate to the perceived threat.

8.    Deadly Force

Members shall not use deadly force against a person unless the member actually and reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances.

a.    In any grand jury, criminal, delinquency, or civil proceeding where a member's use of deadly force is a material issue, the trier of fact will consider the reasonableness of the member's belief and actions from the perspective of a reasonable law enforcement officer and the totality of the circumstances, which will include:

(1)    Whether the subject of the use of deadly force possessed or appeared to possess a deadly weapon and refused to comply with the member's lawful order to surrender an object believed to be a deadly weapon prior to the member using deadly force;

(2)    Whether the member, or another law enforcement officer in close proximity, engaged in reasonable de-escalation measures prior to the use of force, or, if feasible, using non-deadly force prior to the use of deadly force; and

(3)    Whether any conduct by the member prior to the use of deadly force unreasonably increased the risk of a confrontation resulting in deadly force being used.

b.    Threatening deadly force does not necessarily constitute deadly force so long as the member's purpose is limited to indicating that deadly force will be used if necessary.

c.   If feasible, the member shall identify him or herself as a law enforcement officer and state his or her intention to shoot before using a firearm.

d.   Members shall not discharge a firearm either at or from a moving vehicle unless deadly force is being used against the member or another person. For purposes of this order, a moving vehicle is not considered deadly force except when it is reasonable to believe that the moving vehicle is being used to ram, or attempt to ram, a crowd of people with the intent to inflict fatal injuries. Members shall avoid tactics that could place them in a position where a vehicle could be used against them

e.   To the greatest extent possible, members shall ensure that the use of deadly force presents no substantial risk of injury to innocent persons. Members shall not discharge their weapon into a crowd, as a signal for help, or as a warning shot.

f.   Members shall only display a firearm when certain circumstances occur. Unholstering or pointing a firearm are tactics that shall be used with great caution. The presence of a member's firearm, under the right circumstances, can discourage resistance and ensure member safety in potentially dangerous situations without the need to resort to actual force. However, unnecessarily or prematurely drawing a firearm can limit a member's options in controlling a situation, create great anxiety on the part of subjects, and may result in an unwarranted or negligent discharge of the firearm. Members shall only point a firearm at a subject when circumstances create a reasonable belief that it may be immediately necessary for the member to use deadly force. When the member no longer reasonably believes that deadly force may be immediately necessary, the member shall, as soon as practicable, secure or holster the firearm.

9.   When force is used, members shall promptly conduct a visual and verbal check of the subject, to include checking vital signs when appropriate, to determine the need for medical care.

a.   When a subject is injured, complains of pain, or demonstrates life-threatening symptoms, members shall immediately summon medical assistance and render first aid consistent with the member's training as soon as safe and practical. Injured subjects shall be treated with dignity and respect and shall be properly cared for while awaiting the arrival of emergency medical personnel. Members may use discretion in handcuffing subjects who are suffering from life-threatening injuries and are clearly incapacitated. Whenever possible, un-cuffed subjects should be guarded by two members.

b.   Members shall closely monitor subjects against whom force was used for signs that they require medical assistance, including but

not limited to, subjects that are believed to be pregnant, children, elderly, or physically frail.

10.    Members shall take steps to prevent or stop illegal or inappropriate uses of force by other members and report illegal and inappropriate uses of force by other members that they observe or of which they are made aware.

B.    Specific Precautions

1.    Handcuffs

a.    Proper application and general wearing of handcuffs may lead to complaints of minor pain or injury (e.g., pinching of skin or scratches) but is **not**, in and of itself, a use of force.

b.    When a subject complains of pain or injury that is associated with the application or wearing of handcuffs, members shall notify an official who shall investigate the complaint or injury in accordance with GO-PCA-502.07 (Medical Treatment and Hospitalization of Prisoners). If the investigating official determines the subject's injury or complaint of pain is not exclusively the result of the application and wearing of handcuffs or force was required to apply the handcuffs, he or she shall initiate a use of force investigation.

c.    When subjects resist being handcuffed, members may need to use hand controls in order to forcibly move the person's wrists or arms, or to physically maneuver the person's body so that the handcuffs can be applied.

d.    Members shall not use force against a subject in handcuffs **unless** the subject is actively assaulting, attempting to escape police custody, resisting members' efforts to maintain custody or control over the subject, or actively spitting on a member as authorized in this order. In these cases, members shall limit their force response to the minimum amount of force, consistent with the use of force framework, that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control.

2.    Prohibited Restraint Techniques

a.    Asphyxiating restraints and neck restraints are prohibited restraint techniques pursuant to DC Official Code § 5-125.03.

b.    Any member who uses a prohibited restraint technique or observes the application of a prohibited restraint technique shall immediately render, or cause to be rendered, first aid on the person on whom the prohibited restraint technique was used or immediately request emergency medical services for the person on whom the prohibited

restraint technique was used. Failure to do so shall be in violation of DC Official Code § 5-125.03.

3.    Positional Asphyxia

a.    Members shall position individuals in a manner to allow free breathing once the subject has been controlled and placed under custodial restraint using handcuffs or other authorized methods. Members shall seek medical assistance immediately if a person appears to be having difficulty breathing or is otherwise demonstrating life-threatening symptoms. An official shall direct alternative means to maintain custody, if appropriate.

b.    After gaining control of a subject, members shall position the subject in a manner to allow the subject to breathe unobstructed. Whenever feasible, members shall not force the subject to lie on his or her stomach for an extended period of time. Prisoners shall be carefully monitored for signs and symptoms of suffocation.

c.    Members shall not employ unauthorized use of custodial restraints while detaining or transporting a subject.

4.    Spitting

a.    Members may use control holds and tactical takedowns in order to gain control over a subject who is spitting on a member or others. Members may also use limited pressure to turn a suspect's face away from the member to prevent the suspect from spitting directly at a member, provided that the pressure does not rise to the level of a strike and is consistent with the restrictions on prohibited restraint techniques outlined in this order.

b.    No other types of force are authorized in response to spitting. Members may also don personal protective equipment (PPE) for additional protection against subjects who are spitting.

C.    Notifications and On-Scene Response

1.    Members shall immediately notify an official following all events requiring a force incident report (FIR), allegations of excessive force (even when the member has not used force on the subject), and negligent discharges of ECDs, 40mm extended impact weapons, and firearms. Upon notification, supervisors shall immediately respond to the scene and notify the watch commander.

2.    Supervisors shall immediately notify IAD of all incidents involving serious uses of force through the Real Time Crime Center (RTCC).

3.    Supervisors shall obtain incident summary (IS) tracking numbers before the end of the supervisor's shift.

4.   Upon notification by the supervisory official, watch commanders shall respond to the scene of all serious uses of force, all uses of force indicating potential criminal conduct, and all ECD and 40mm extended impact weapon deployments. If the watch commander is unavailable, he or she shall designate a lieutenant or above to respond to the scene.

5.   The watch commander shall make notification to the appropriate element if the investigation will be conducted by a unit outside of the member's organizational element.

6.   Responding officials shall ensure the scene is maintained and preserved, that witness canvasses are conducted, and that assistance of district personnel is provided to IAD, as necessary.

7.   Fraternal Order of Police (FOP) representatives shall be permitted access to their members at all times at the scene of serious use of force incidents to advise involved or witness FOP members of their right to be represented by legal counsel.

8.   Any statement that an FOP member is required to provide to an assigned investigator regarding a use of force will either be covered by a "Reverse Garrity" warning or will not be compelled until after the FOP member has been provided an opportunity to speak with an FOP representative and invoke the right to counsel. For any FOP member who invokes their right to legal counsel, the department shall coordinate with the member's counsel to schedule an interview with the FOP member and shall make all reasonable efforts for the interview to occur within two business days, where practicable, for witnesses to the use of force incident and three calendar days, where practicable, for target(s) of the use of force investigation. Extensions beyond these timelines may occur with the agreement of the chief of police and the chairman of the FOP or their respective designees.

9.   The watch commander on the scene of a deadly force incident shall ensure all members involved in the events leading up to the use of force, as well as in its use, deactivate their BWC as soon as the scene is secure, or at the direction of the responding IAD member. All members' BWCs and department-issued cell phones shall be submitted to the IAD member as soon as he or she arrives on the scene. All BWC deactivations must be in accordance with GO-SPT-302.13 (Body-Worn Camera Program). If a member is injured and must leave the scene to seek medical care, the member's BWC and department-issued cell phone shall be retrieved as soon as possible.

10.  In incidents where a member uses force outside of the District, whether on or off duty, the member shall immediately notify the watch commander through the RTCC.

     a.   In the case of deadly force, serious use force, and use of force indicating potential criminal conduct, the watch commander shall notify the RTCC to page the on-call IAD agent. An IAD agent shall

respond to the scene immediately. While the jurisdiction of occurrence will maintain primary responsibility for the criminal investigation, IAD shall initiate a concurrent administrative investigation and work closely with their investigators.

b.    In incidents where a member uses force other than deadly force, serious force, or force indicating potential criminal conduct, the member shall notify an official from the member's organizational element who shall obtain IS numbers before the end of his or her shift. In such cases, the appropriate law enforcement authority of the jurisdiction of occurrence will handle all criminal investigations and IAD shall only conduct a policy review.

D.    Use of Force Reporting Requirements

1.    The following actions require completion of a FIR **prior to the end of the member's shift** according to the procedures set forth in this order. Provided there is no visible injury or complaint of injury, the following actions require a documented supervisory review of the report and associated BWC footage. Supervisors and IAD shall review the BWC footage of the member completing the report and any additional BWC footage as reasonably necessary to ensure consistency between the BWC footage and the report and to confirm that the incident does not require a full use of force investigation.

| Use of Force Supervisory Review Incidents |
|---|
| Takedowns |
| Drawing and pointing a firearm at or in the direction of another person |
| OC spray deployment |
| ASP baton arm extraction |
| ASP baton wrist lock |

2.    The following actions require completion of a FIR **immediately following the event** according to the procedures set forth in this order. These actions require a full use of force investigation pursuant to the investigative procedures set forth in this order.

| Use of Force Investigation Incidents |
|---|
| Strike |
| ASP strike |
| Shield deployment resulting in injury or complaint of pain or injury |
| Mountain bike strike |
| ECD deployment (excluding negligent discharges determined to be misconduct by IAD) |
| 40mm extended impact weapon deployment (excluding negligent discharges determined to be misconduct by IAD) |
| Firearm discharges (excluding negligent discharges determined to be misconduct by IAD) |
| Deadly force |
| Serious use of force |
| Use of force indicating potential criminal conduct |
| Use of force resulting in visible injury |
| Use of force resulting in complaint of injury or pain |

3.    Members shall complete a FIR following all events involving use of force except control holds where there is no injury or complaint of injury.

4.    Members shall complete the FIR accurately and completely describing the facts and circumstances concerning the event, including articulating the specific facts to explain the member's actions and all de-escalation efforts. Pursuant to GO-SPT-302.13, members shall not review any BWC recordings to assist in initial report writing for any incident involving an officer-involved death or serious use of force. Upon completion, members shall submit the completed report.

5.    The supervisor shall review the relevant BWC footage and ensure that the report is completed properly prior to the end of the supervisor's shift. All properly completed reports shall be approved by the supervisor.

6.    The watch commander shall ensure that the report is completed properly prior to the end of the watch commander's shift. All properly completed reports shall be approved by the watch commander.

7.    If a member who was involved in a use of force incident or who was a witness to the use of force incident declines to complete the FIR, or declines to make a statement, the supervisor shall notify the watch commander. In these cases, members shall not be compelled to complete the report or make a statement (including interviews that are recorded by video or audio) until either the United States Attorney's Office (USAO) has issued a written declination or the element watch commander receives approval from IAD to issue a reverse-Garrity warning.

   a.    If IAD **authorizes** the issuance of a reverse-Garrity warning, the supervisor shall issue the warning to the member.

| Sample Reverse-Garrity Warning Language |
|---|
| "This form concerns administrative matters relating to the official business of the MPD. This form is not intended for the purpose of instituting a criminal prosecution against you. During the course of completing the form, even if you disclose criminal conduct, neither self-incriminating statements nor the fruits of any self-incriminating statements will be used against you in any criminal proceeding.<br><br>Since this is an administrative matter and any self-incriminating information you disclose will not be used against you in a court of law, you are required to fill out the form fully and truthfully. GO-PER-201.26 (Duties, Responsibilities and Conduct of Members of the Department) states in part, 'members shall respond truthfully when questioned by supervisory officers about matters relating to official business of the police department...' Failure to fill out the form will result in disciplinary action." |

   b.    If IAD **does not authorize** the issuance of a reverse-Garrity warning, the supervisor shall complete the Use of Force Preliminary Investigation Template prior to the end of the supervisor's shift.

8.    Members may consult with their own attorney at any time, for any reason.

E.    Investigative Responsibility

1.    The Force Investigations Team (FIT) shall investigate **all** incidents involving the following actions. IAB has the authority to assume control of any force-related incident investigation.

| IAD Investigations |
| --- |
| a. MPD use of force involving deadly force, serious use of force, or the use of force indicating potential criminal conduct. |
| b. MPD vehicular pursuits resulting in death. |
| c. All deaths while the deceased was in the custody or under the control of any member of MPD, or while the deceased was housed in any facility under the exclusive command of MPD. |
| d. Any use of an MPD canine resulting in a bite, to include any allegations of a canine bite (except bites determined to be misconduct by IAD). |
| e. MPD confirmed head strikes with a hard object, excluding allegations with no corroborative evidence or resulting injury. |
| f. Final investigations of MPD ECD deployments (including negligent discharges resulting in contact with a person or result in injury or complaint of pain). |
| g. Final investigations of MPD 40mm extended impact weapon deployments (including negligent discharges resulting in contact with a person or result in injury or complaint of pain). |
| h. Any discharge of a service pistol; authorized off-duty pistol; duty shotgun; or duty rifle, regardless of location, by a sworn member of the (1) MPD; (2) District of Columbia Housing Authority Police; (3) authorized, armed members of the District of Columbia Fire, and Emergency Medical Services Department's Arson Investigation Unit; and (4) authorized, armed members of the District of Columbia Office of the Inspector General. |
| i. Any use of force resulting in the death of a subject by any police officer employed by a bona-fide police agency legally empowered to operate or function within the District of Columbia. |
| j. Fatal and non-fatal shootings within the District of Columbia resulting from the discharge of a firearm involving any on-duty sworn active law enforcement member from an outside law enforcement agency, acting under the color of law. |

2.    The Security Officers Management Branch (SOMB) shall investigate use of force incidents involving security officers (SO) and special police officers (SPO) who fall under their purview when the incident does not involve deadly force or serious use of force. Responding on-scene officials shall collect SO, SPO, subject, and witness statements, video, photographs, and any other relevant evidence. Deadly force and serious use of force incidents involving an SPO shall be investigated by IAD. SOMB does not regulate or investigate private security working as a contractor for the federal government on federal property or armored car guards.

3.    The Criminal Investigations Division (CID) shall investigate the following types of incidents that occur in the District of Columbia:

a.    With the exception of the incidents investigated by FIT, all firearm discharges by retired MPD members or outside law enforcement members (active or retired) authorized to carry a concealed weapon under H.R. 218 [Law Enforcement Officers Safety Act

(Title 18 U.S. Code, Section 926)];

    b.    MPD member suicides, regardless of the means; and

    c.    Any discharge of a privately owned firearm not authorized for off-duty use unless used under the color of law within the District of Columbia by a sworn member of the MPD; the District of Columbia Housing Authority Police; authorized, armed members of the District of Columbia Fire and Emergency Medical Services Department's Arson Investigation Unit; or authorized, armed members of the District of Columbia Office of the Inspector General.

4.    With the exception of incidents involving evidence of serious misconduct, the member's chain of command shall investigate use of force incidents involving injury or complaint of pain or injury that is exclusively the result of the application and wearing of handcuffs, preliminary investigations of all ECDs and 40 mm extended impact weapon deployments, intentional and unintentional OC spray deployments, and any other use of force not investigated by IAD, SOMB, or CID.

    a.    In chain of command investigations, the commanding official may delegate responsibility for conducting the investigation to another official the rank of lieutenant or above and of a higher rank than the member who used force.

    b.    No supervisor shall investigate a use of force in which he or she was involved.

    c.    IAD shall conduct the final investigation of all use of force incidents involving ECDs and 40mm extended impact weapons, other than discharges at animals and training incidents, unless there is evidence of serious misconduct. IAD investigators are not required to respond to the scene of ECD and 40mm deployments unless there is a serious bodily injury.

5.    ECD Deployments

    a.    If evidence is discovered during the preliminary investigation of an ECD deployment that raises the possibility of disciplinary or criminal action, the member's ability to carry an ECD may be suspended and his or her ECD returned to the Metropolitan Police Academy (MPA) armorer pending completion of the final investigation.

    b.    In ECD deployments, the ranking official on-scene shall designate non-involved members to photograph the contact area after the probe has been removed (e.g., using AXON Capture) and collect the cartridge, wire leads, probes, and confetti tags as evidence. The ranking official shall also ensure, prior to the end of the shift,

that data from the BWC and ECD is downloaded, labeled, and categorized in accordance with GO-SPT-302.13.

c.    Members who used force are prohibited from collecting cartridges, wire leads, probes, and confetti tags unless exigent circumstances exist (e.g., failure to collect the items would result in the destruction of evidence).

6.    Negligent Discharges of a Less Lethal Weapon

After a negligent discharge of an ECD or 40mm extended impact weapon, whether on or off duty, the notified watch commander shall complete a PD Form 901b (Preliminary Report Form – Use of Force Incidents) and submit the completed PD Form 901b to iad.adminbox@dc.gov (copying the member's chain of command), prior to the end of the watch commander's shift. A copy shall also be attached to the watch commander's report. IAD shall review the incident and determine if the discharge appears to be negligent and whether the incident will be investigated as misconduct or a use of force.

a.    Negligent discharges of an ECD or 40mm extended impact weapon that **do not** result in contact with a person or injury or complaint of pain may be considered a misconduct violation based on the circumstances surrounding the discharge and may be assigned as a chain of command investigation.

b.    Negligent discharges of an ECD or 40mm extended impact weapon that result in contact with a person or result in an injury or complaint of pain shall be considered a use of force investigated by IAD.

7.    Negligent Discharges of a Firearm

a.    Members shall not display their firearms unnecessarily and shall handle and store their firearms in a safe manner at all times.

b.    Negligent discharges of a department firearm that **are not** at or in the direction of a person (e.g., firearms discharges occurring during range and training incidents, cleaning, or evidence recovery) may be considered a misconduct violation based on the circumstances surrounding the discharge.

c.    After a negligent discharge of a firearm, the notified watch commander shall immediately notify IAD through the RTCC and complete and submit a PD Form 901b to iad.adminbox@dc.gov (copying the member's chain of command), prior to the end of the watch commander's shift. A copy shall also be attached to the watch commander's report. IAD shall review the incident to confirm that the discharge appears to be negligent and whether the incident will be investigated as misconduct or a use of force.

       d.      All negligent discharge cases that are classified as misconduct rather than use of force shall not be subject to review by the Use of Force Review Board (UFRB).

    8.    Negligent Canine Bites

       a.      Negligent canine bites that are not the result of canine deployments or that do not result in an injury to a member of the public (e.g., training incidents) may be considered a misconduct violation by IAD based on the circumstances surrounding the bite.

       b.      All canine bites shall be handled according to the procedures set forth in GO-RAR-306.01 (Canine Program).

    9.    The Risk Management Division (RMD) shall conduct periodic audits of supervisory reviews and investigations at least annually to ensure that they are consistently reviewed and investigated pursuant to this order.

F.    Investigative Requirements

During use of force investigations, investigating members shall, as applicable:

1.    Notify the supervisors of any involved members.

2.    Review relevant BWC and ECD recordings and document findings. Ensure that the investigative findings are consistent with recordings and note any discrepancies.

3.    Photograph any person on whom force was used. Photograph injuries of all involved members and subjects.

4.    Interview all subjects on whom force was used and all appropriate MPD members, including supervisors.

       a.      Ensure that members involved in use of force incidents are sequestered until they are interviewed. Members who are sequestered shall have access to and be permitted to confer with their union representative and/or an attorney prior to any interviews.

       b.      Interview all complainants and witnesses, including MPD members and supervisors. Avoid leading questions. Whenever practicable, interview complainants and witnesses at sites and times convenient to them.

       c.      Avoid group interviews by conducting interviews separately, whenever possible. If a group interview is unavoidable, attempt to supplement the interview with subsequent individual interviews, whenever possible. Document any inconsistencies in member, complainant, and witness interview statements.

d.      Whenever practicable, interview complainants and witnesses at sites and times convenient to them.

5       Ensure that evidence is collected, preserved, documented and analyzed, (including canvassing the scene to locate witnesses and obtaining complainant medical records), pursuant to GO-SPT-304.08 (Crime Scene Response and Evidence Collection).

6.      In chain of command investigations, notify IAD of any evidence of criminal misconduct discovered during the use of force investigation.

7.      Complete and submit investigations by assigned deadlines. IAD shall conduct a quality control review of all chain of command investigations and may recommend to the IAB assistant chief that a case be reviewed by UFRB.

G.      Internal Affairs Division Investigations

1.      The scope of serious use of force and deadly force investigations shall be broader than the actions of the member(s) at the point that serious or deadly force is used. The actions, tactics, and decisions of all MPD participants in the event shall be assessed against MPD policy requirements to inform training and identify opportunities for improvement.

2.      Only IAD investigators specially trained in use of force investigations shall be assigned to lead use of force investigations involving deadly force or serious use of force.

3.      When conducting use of force investigations, IAD investigators shall, as applicable:

a.      Respond to the scene of the incident and assume responsibility for the investigation.

b.      Ensure BWCs and department-issued cell phones from all members involved in the use of force, as well as those involved in the events leading up to the use of force, are collected and ensure that the related recordings are immediately uploaded, labeled, and categorized in accordance with GO-SPT-302.13. BWCs and department-issued cell phones shall be transferred to an official in the members' unit for return prior to their next shift.

c.      Interview all members directly involved in the use of force, as well as those involved in the events leading up to the use of force, once immediately after the incident and at least once after all the relevant evidence has been collected and analyzed when necessary.

d.      Record by audio or video (in conformance with applicable laws and MPD orders) the interviews of subjects, members, and material witnesses. If a subject or non-member witness refuses to be

recorded, then a written narrative of the statement shall be prepared to be signed by the witness. Ensure that all recorded statements are transcribed and included in the investigative file for fatal uses of force, cases where identified misconduct will likely result in an adverse action hearing, in-custody deaths, vehicle pursuits resulting in a fatality, serious uses of force, and any other cases as determined by the IAD commanding official.

e.      In every investigation and in every interview of a member engaged in a serious use of force or deadly force, document the possibilities for de-escalation or whether no reasonable opportunity for de-escalation is apparent.

f.      Conduct a documented analysis of the events leading up to and following the incident.

g.      Involve the defensive tactics instructors when conducting a tactical review of the member(s)' actions. In high-risk entry incidents, involve Emergency Response Team officials in the tactical review Document these findings.

h.      Notify and consult with the USAO within 24 hours or the next business day about incidents of serious use of force, deadly force, use of force indicating potential criminal conduct, vehicle pursuits involving a fatality, and in-custody deaths involving a member. The USAO or relevant prosecuting authority will make the determination as to whether criminal wrongdoing is present.

i.      When evidence of potential criminal wrongdoing is determined, coordinate prosecutorial needs between the USAO or other appropriate prosecuting entity and the affected element or investigative unit and liaise with other applicable law enforcement agencies. Handle all arrests of police officers related to use of force investigations.

j.      Continue to pursue any investigative leads and collaborate with the USAO or prosecuting authority while the matter is under review.

k.      After receiving a letter of declination from the USAO or upon the conclusion of a criminal prosecution (absent special circumstances that must be documented), complete a final investigative report with conclusions and recommendations by the assigned deadline.

4.      The IAB assistant chief shall, in instances of a negligent or performance of duty firearm discharge, serious use of force, or any use of force indicating potential criminal conduct by a member, forward the preliminary report to the chief of police, within 24 hours of occurrence.

5.      IAD supervisors shall provide oversight of use of force investigations by periodically (i.e., bi-weekly at a minimum) reviewing investigative files and

documenting each review in writing to be included as part of the completed investigative file.

6.    All use of force investigations shall be submitted by the assigned deadline. IAD supervisors shall carefully scrutinize the recommendations and conclusions of IAD investigators, and if necessary, return investigations to IAD investigators for additional work.

H.    Investigative Conclusions

For all use of force investigations, the investigating member shall submit a final report with a description of the incident, any other uses of force or allegations of misconduct identified during the investigation, a summary and analysis of all relevant evidence gathered during the investigation, and proposed findings for each allegation of misconduct [pursuant to GO-PER-120.20 (Administrative Investigations)] and each use of force as outlined below:

| Required Findings for Use of Force |
|---|
| 1.  Document whether each use of force was **Justified** or **Not Justified** (i.e., whether the actions of the member were objectively reasonable in the circumstances); |
| 2.  Document whether each use of force (and events surrounding the use of force) was consistent with policy; |
| 3.  Document whether the member requires tactical improvement endeavors or formal re-training; and |
| 4.  Document any additional areas for policy and training improvements, risk management issues, equipment concerns, and areas for improvement that do not require formal re-training. |

I.    Force-Related Duty Status Determination

1.    The department has the sole authority and complete discretion to determine the duty status of a member. The duty-status decision will consider recommendations made by the Medical Services Division, IAB, and any department-recognized support professional. The department's duty-status decision shall not be subject to the contractual grievance procedure (or any other appeal).

2.    When a member is involved in a serious use of force incident, an incident where a person dies in police custody, or where the actions of the member results in, or is alleged to have resulted in, serious bodily injury or death, the member shall be placed on administrative leave with pay for three business days during which time the department shall designate a duty status pursuant to GO-OMA-120.24 (Revocation/Restoration of Police Powers).

3.    The IAB assistant chief may change the duty status of any member involved in a serious use of force incident as the investigation progresses and new information is revealed.

4.    Duty-status decisions do not preclude the Medical Services Division from placing a member in a sick leave status as a result of a serious use of force incident.

J.    Use of Force Review Board

1.    UFRB shall review all IAD use of force investigations of MPD members, chain of command investigations forwarded to UFRB by the IAB assistant chief, and vehicle pursuits resulting in a fatality.

2.    UFRB shall consist of the following 13 voting members and may also include non-voting members at the mayor's discretion. The chief of police or his or her designee shall determine the rotation schedule for the chairperson and Patrol Services representative who shall serve at least one year.

| UFRB Voting Members |
| --- |
| MPD assistant chief appointed by the chief of police (chairperson) |
| Six MPD members appointed by the chief of police who hold the rank of inspector or above or the civilian equivalent |
| Office of Police Complaints executive director |
| Civilian member appointed by the mayor with no current or prior affiliation with law enforcement who has personally experienced the use of force by a law enforcement officer |
| Civilian member appointed by the mayor with no current or prior affiliation with law enforcement who is a member of the DC Bar in good standing |
| Civilian member appointed by the mayor with no current or prior affiliation with law enforcement who is a District resident |
| Civilian member appointed by DC Council with no current law enforcement affiliation who has subject matter expertise in criminal justice policy |
| Civilian member appointed by DC Council with no current law enforcement affiliation who has subject matter expertise in law enforcement oversight and the use of force |
| **UFRB Non-Voting Members** |
| One member selected by the Fraternal Order of Police (consistent with the current Collective Bargaining Agreement) |
| Policy and Standards Branch director |
| MPA commanding official |

3.    IAB shall administer UFRB. The IAB assistant chief shall designate an IAB member to serve as the UFRB administrator who shall:

| UFRB Administrator Responsibilities | |
| --- | --- |
| a. | Coordinate with IAB to identify investigations for review. |
| b. | Track the progress of investigations and notify IAB of cases that are at risk of missing the 90-day deadline. |
| c. | Prepare proposed agendas for review and approval by the chairperson. |
| d. | Handle scheduling, notifications, and administrative tasks. |
| e. | Provide all pertinent reports, records, directives, lesson plans, statistical information, and evidence to be considered. |
| f. | Ensure that relevant and appropriate historical information about members and supervisors are available for consideration. |
| g. | Prepare a summary of proceedings including member attendance and conclusions that outline findings and recommendations |
| h. | Prepare memoranda to transmit findings and recommendations. |
| i. | Notify members and their chain of command of UFRB decisions. |
| j. | Maintain UFRB records reflecting adverse and corrective actions. |

| | |
|---|---|
| k. | Assist with the preparation of annual reports. |
| l. | Maintain complete historical records including agendas, correspondence, annual reports, decision point matrix analyses, and meeting summaries with detailed deliberation notes and actions taken in each case (i.e., issues discussed, actions taken, and specific findings). |

4.   The UFRB chairperson shall be responsible for conducting an orientation for newly appointed UFRB members at their first board meeting. The orientation shall consist of topics including, but not limited to, a review of related MPD policies, UFRB roles and responsibilities, and a general overview of operations. The Fraternal Order of Police non-voting UFRB member shall be notified of and permitted to attend all orientation sessions.

5.   Absent special circumstances, UFRB shall  meet twice monthly to review use of force incidents.

6.   The quorum for each UFRB proceeding shall be the majority of seated members. MPD UFRB members shall not be permitted to send a representative in their place. MPD UFRB members shall be excused from a proceeding only by the UFRB chairperson.

7.   Review Process

   a.   UFRB shall review the actions of all members involved in the events leading up to the use of force, as well as in its use (not just the actions of the member who used force). The actions of the members leading up to and following the use of force shall be reviewed to identify commendable actions or conduct warranting corrective intervention or training.

   b.   UFRB shall use the decision point analysis matrix to provide a meaningful independent analysis of the decision points faced by all MPD participants of the event. UFRB shall review use of force incidents and consider: compliance with official MPD guidance (i.e. policy, procedure, and training), whether proper tactics were used, risk management issues, adequacy of training, analysis of the events leading up to and following the incident, and whether the level of force used was appropriate for the incident. The analysis shall carefully scrutinize the various decision points of the member who used force as well as those of any member that is relevant to the use of force. Where appropriate, the analysis shall identify any policy, training, equipment, or tactical concerns raised by the actions of the participants.

   c.   If, at any time during the review process UFRB determines an IAD use of force investigation to be inadequate or lacking in quality or timeliness, the chairperson shall notify the IAD commanding official and IAB assistant chief.

   d.   When UFRB has additional questions or determines that an investigation is incomplete, UFRB may compel witnesses, reassign

the case to IAD for investigation, return the case to IAD for follow up, or return the case to the investigating unit for appropriate action. Any case returned to IAD or an investigative unit for completion or correction of an investigation shall be returned to the UFRB chairperson within five business days of receipt for a re-evaluation.

e.   UFRB may recommend to the chief of police use of force investigative protocols, standards for use of force investigations, training enhancements, and policy and procedure amendments.

8.   Referral of Findings and Recommendations

After evaluating each case, UFRB shall provide its conclusions pursuant to the following investigative review findings, which shall either affirm or reject the investigative recommendation. Dissenting or non-concurring members of a UFRB finding or recommendation may submit a minority report.

| Required Findings for Use of Force |
|---|
| 1.  Document whether each use of force was **Justified** or **Not Justified** (i.e., whether the actions of the member were objectively reasonable in the circumstances); |
| 2.  Document whether each use of force (and events surrounding the use of force) was consistent with policy and training; |
| 3.  Document whether the member requires tactical improvement endeavors or formal re-training; and |
| 4.  Document any additional areas for policy and training improvements, risk management issues, equipment concerns, and areas for improvement that do not require formal re-training. |

a.   When UFRB determines that a policy violation has occurred, UFRB shall forward the case to the Disciplinary Review Division (DRD) to determine the appropriate level of discipline.

b.   DRD shall implement education-based development or disciplinary action, when applicable. Upon resolution of the sanctions associated with the incident, DRD shall update the digital tracking system and electronically forward the information to the respective command and UFRB.

c.   In cases where there is no clear violation of policy or training, UFRB may request MPA and other applicable elements to research best practices and training recommendations, where warranted, to instruct involved individuals of potential areas of improvement.

d.   When UFRB determines that there has been an act that merits recognition, appropriate commendation recommendations shall be forwarded to the applicable element's commanding official or the MPD awards committee.

9.  UFRB shall complete, to the extent practicable, its review of each incident within 90 business days of the date that IS numbers were issued. This time period may be tolled due to criminal investigations and investigations conducted by the Office of the Inspector General, Office of the DC Auditor, or Office of Police Complaints. RMD shall conduct periodic audits to review the timeliness of cases pending submission to the UFRB.

10. Notwithstanding any other provision of law, the UFRB shall publish the findings of fact and merits determination for all UFRB investigations on the MPD website.

11. UFRB and IAB shall conduct an annual analysis of all use of force incidents to detect existing patterns, problems, and issues for submission to the Executive Office of the Chief of Police by February 15.

K.  Mandated Training

1.  The MPA commanding official shall ensure that all sworn members receive use of force training prior to completion of initial training and refresher training semiannually and that all civilian cell block technicians receive pre-service and annual in-service use of force training.

2.  The MPA commanding official shall provide copies of all recruit and in-service use of force lesson plans and training materials through the chain of command to the general counsel and the Policy and Standards Branch director on an annual basis for a documented legal sufficiency and policy review.

3.  The IAB assistant chief shall ensure that all IAD investigators assigned to lead serious use of force and deadly force investigations receive initial and refresher specialized investigative training on conducting a thorough tactical analysis, reviewing the decisions that led to the use of force and analyzing policy, training, and equipment issues.

III.  **DEFINITIONS**

When used in this directive, the following terms shall have the meanings designated.

|    | Term | Definition |
|----|------|------------|
| 1. | Asphyxiating restraint | Use of any body part or object by a law enforcement officer against a person with the purpose, intent, or effect of controlling or restricting the person's airway or severely restricting the person's breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as by providing cardiopulmonary resuscitation, or the placement of a person by a law enforcement officer in a position in which that person's airway is restricted. Asphyxiating restraints are prohibited restraint techniques. |
| 2. | Deadly force | Any force that is likely or intended to cause serious bodily injury or death. |
| 3. | Deadly weapon | Any object, other than a body part or stationary object, that in the manner of its actual, attempted, or threatened use is likely to cause serious bodily injury or death. |

| 4. | De-escalation | Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in necessary force. Techniques may include verbal persuasion, warnings, slowing down the pace of an incident, and tactical repositioning. |
| 5. | Less lethal weapon | Weapon deployed with the intent or purpose of nullifying a threat without causing death (e.g., ECD, OC spray, ASP baton). |
| 6. | Neck restraint | Use of any body part or object by a law enforcement officer to apply pressure against a person's neck, including the trachea, carotid artery, or jugular vein, with the purpose, intent, or effect of controlling or restricting the person's airway, blood flow, or breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as by providing cardiopulmonary resuscitation. Neck restraints are prohibited restraint techniques. Pursuant to the Secure DC Omnibus Emergency Amendment Act of 2024, this definition is administratively retroactive to July 22, 2020. |
| 7. | Objective reasonableness | Standard requiring the reasonableness of a particular use of force must be judged from the perspective of a reasonable law enforcement officer on the scene in light of the totality of the circumstances confronting the member. |
| 8. | Preponderance of the evidence | Standard of proof in administrative investigations in which it is more likely than not that the event occurred. |
| 9. | Probable cause | Set of facts, circumstances, or reliable information that would lead a reasonable and prudent police officer to believe that a crime has been committed, or is about to be committed, and that a certain person committed it. |
| 10. | Serious bodily injury | Extreme physical pain, illness, or impairment of physical condition including physical injury that involves a substantial risk of death; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member or organ; or protracted loss of consciousness. |
| 11. | Serious use of force | Actions by members including:<br>a. Firearms discharges (except negligent discharges determined to be misconduct by IAD);<br>b. Head strikes with a hard object;<br>c. Those resulting in death or serious bodily injury;<br>d. Use of asphyxiating restraints or neck restraints; and<br>e. MPD canine bites (except bites determined to be misconduct by IAD). |
| 12. | Use of force | Any physical coercion used to affect, influence, or persuade an individual to comply with an order from a member is considered a use of force. |
| 13. | Use of force indicating potential criminal conduct | Includes, but is not limited to, all strikes, blows, kicks or other similar uses of force against a handcuffed subject and all accusations or complaints of excessive force made against the member where there is objective, corroborating evidence indicating potential criminal conduct or other serious misconduct. This includes any use of force that clearly goes beyond that which an objectively reasonable officer would use in light of the circumstances under which the force was used, or any use of force which may rise to the level of a criminal act. |

Pamela A. Smith
Chief of Police

| Amendment # | Page # | Description of Change | Effective Date of Change | Name and Title of Authorizing Member |
|---|---|---|---|---|
| 1 | 11 | Revised Part II.D.4 to amend the prohibition for reviewing BWCs for initial report writing consistent with the *Secure DC Omnibus Emergency Amendment Act of 2024*. | 3/29/2024 | Maureen O'Connell, Director, Policy and Standards Branch |

# Exhibit D

# Metropolitan Police Academy



# 3.2 Basic Investigative Incident Reports

## Introduction

As a police officer, not every report taken will be for an offense and subsequent arrest. Many reports will be incident reports. Incident reports are just as critical as those taken for an offense and must be given the same due diligence and care during a preliminary investigation. Officers must not be lulled into a false sense of security simply because they have been dispatched to a scene of an incident and not an offense. Situational awareness is still critical and the ability to keep track of what is going on around you in a complex and dynamic environment will ensure your safety. Remember that regardless of how a dispatcher voices an assignment over the air, it is incumbent upon the officer to not only make the final determination, but to respond to the scene using the same level of caution as he or she would when responding to the scene of an offense report or an offense in progress.

By the conclusion of this lesson, you will have a clear understanding of how to conduct an investigation for an *Injured Person to the Hospital*, including how to handle the incident when the identity of the person is unknown. You will also gain full competency in understanding *Check on the Welfare* and *Missing Person* investigations.

## 3.2.1 Describe an *Injured Person to the Hospital* investigation

**General Order 401.01 - Field Reporting System**
This General Order states that: "Members shall complete an incident report for all injured persons on public space, and injured persons transported to the hospital regardless of the type of location."

When responding to the scene of an injured person, remember to treat this as seriously and with as much caution as you would when responding to the scene of an offense. Just because it is dispatched to you one way does not mean that it actually the nature of the call to which you are responding. Situational awareness is vitally important. It is not unheard of for officers to receive a call for a seemingly innocuous incident and because of the nature of the call let down their guard, only to discover too late that the call was a set-up for an ambush in which they are injured or killed.

Follow these steps:
- As you approach the scene of a call in which you were advised there is a potentially injured community member on scene, be sure to scan your environment before exiting your vehicle.
- After marking on the scene, your first priority is to locate the injured citizen and request medical help. You are then to deliver as much aid as you are able to provide until an ambulance arrives.
- Provide an update for the dispatcher so that he or she may relay that information to necessary parties. This does not mean that you tie up the air with superfluous transmissions, Rather, inform the dispatcher of the community member's condition and, if the person instead appears to be the victim of a crime, inform the dispatcher of that as well.
- You must voice to the dispatcher whether the injured community member is an adult or child, whether the person is conscious and breathing, and if there are any visible injuries. If there is no visible injury, inform the dispatcher where the community member states their is pain emanating from. It is important that you do so as informing the dispatcher of the injuries determines whether a DCFEMS Ambulance or Medic arrives on your scene, as one is equipped to handle higher levels of trauma than the other.
  ***NOTE:*** Do not voice the race of the community members over the air.

- You must then conduct a preliminary investigation in order to gain a grasp of the scene and situation in its entirety. Ask what happened leading up to the incident and allow the community member to tell you what occurred in his or her own words. It is your job to paraphrase what you are told for the report. Do not forget to capture the "who," "what," "when," "where," "how," and "why". The community member may be emotional as a result of injury or how it was sustained, and you should give the person the space for this, all the while exhibiting empathy and compassion.
- Do not forget to introduce and identify yourself when it is feasible to do so and does not jeopardize your safety or that of the community member whom you have been called upon to assist.

The following complainant / victim / witness information must be captured within the report:

- **Name** - Full name; Ask for an identification card from which you can copy down the information. If the community member does not have one, verbal identification will suffice.
- **Address** - Home and Work.
- **School Information** - Name and Address, if applicable.
- **Phone number** - Cell phone, Home, Work (Ask: "Which is easiest to get ahold of you?") In the case of theft, robbery, or lost property, make sure you obtain both the number of the stolen phone and a number that you can use to reach the complainant.
- **Email addresses** – Home and Work.

Many of the people you will help during the course of your career may have social media accounts that could assist in your investigation. These accounts will be on such sites as Facebook, LinkedIn, Twitter, Instagram, and countless other sites that allow constant contact between users. Being able to view the social media of a victim, for example, may provide crucial clues or information with regards to a potential suspect or in finding a missing person. Due to the sensitive nature of social media, because of the sheer amount of personal information posted by individuals on their accounts, it is important that you exercise tact when requesting social media information. Stress that the information will be used for no other purpose than assisting in the investigation and be mindful of how you phrase your requests. Some phrases that may be helpful to preface your request are:

- "May I…."
- "Would you mind…."
- "If it is all right with you…."
- "Would it be possible…."

Remember, the community member is under no obligation to provide his or her social media information to you, and you cannot attempt to coerce the person into doing so.

When gathering information from witnesses, your notebook will serve as a powerful documentary tool. So, whenever possible, make an attempt to get witnesses and victims to write down their statements. As noted in an earlier lesson, you should carry *Witness Statement* forms (PD119) in your patrol gear. These forms serve as official government documents and allow witnesses and community members who have been victims of an offense or find themselves at the center of an incident the ability to write what occurred in their own words.

In addition,

- Locate any and all witnesses to the incident in question and capture their information for your

report.

- Take note of any potential evidence that could have contributed to the citizen's injury, and if any is found place it on the property book at your element (See **General Order 601.1 - Recording, Handling and Disposition of Property Coming into the Custody of the Department**).
- If a defect on public space led to or directly contributed to the injury of a community member, request *District Crime Scene* to have photographs taken of the defect. You must take this step as the defect that caused the injury could lead to future litigation against the city, and as such, must be documented. In the event that no crime scene certified officer can respond, you must utilize your MPD issued phone and BWC to take photographs.
- If a defect is found, you also must raise the dispatcher and inform him or her of the defect and its location so the proper notification can be made. If you fail to do this, there is a risk that another citizen may suffer an injury.
- Be mindful of the fluidity of scenes and be sure to note the condition and state of the community member's clothing. Is it torn or does it appear to have been damaged during the commission of a crime? If so, seize the clothing as needed. This means that you must take care not to fall prey to a "tunnel vision" mindset. If your preliminary investigation reveals that an offense has occurred and it is no longer an incident, then you must take the appropriate police action.

You must request that an official respond to your scene for an *Injured Person to the Hospital,* per **General Order 401.01 - Field Reporting System**, when one of the following three criteria are met:

- The injured person is found to be suffering from injuries of an unknown nature - This means you arrived on the scene, conducted your preliminary investigation, and were unable to discover how the injuries to the community member were obtained.
- The injured community member cannot coherently describe how his or her injuries were obtained. The person may be flustered or disoriented and cannot give you a clear and concise reason behind the injuries, and your preliminary investigation is unable to elucidate further.
- The injured citizen is unconscious.

When an injured citizen is transported to the hospital, and your investigation did not reveal that he or she was the victim of a crime, then you must classify it as an *Injured Person to the Hospital* and complete an incident report.

When you are unable to ascertain the identity of the injured party, you must do an *Injured Person to the Hospital* report. Some examples of when this report is required include, but are not limited to when a community member is:

- semi-conscious, unconscious, intoxicated, and/or incoherent, and
- unaccompanied by anyone who knows the identity of the community member, and

You learned about teletypes in lesson 2.1 on *Roll Call*. There is a Teletype Unit that not only issues teletypes to the entire department, but continuously compiles information on stolen autos, missing persons, and injured persons who are transported to the hospital, amongst other duties. **You must notify the Teletype Unit by calling (202) 727-4225** when a citizen is transported to the hospital, and there is *any* indication, regardless of how slight, that they may be admitted, and no next of kin has been

notified.  Also, be sure to document in your notebook the name and number of the member whom you spoke with at Teletype.

Upon notifying Teletype, you will provide them with:

- the identity of the citizen, when known
- a description of the citizen (clothing, height, weight, etc.)
- a brief synopsis of how the citizen became injured, when known
- who transported the community member (medic or ambulance number)
- what location the community member was transported from
- what hospital the community member was taken to

### 3.2.2        Describe a *Check on the Welfare* investigation

During your time as a police officer, you will respond to many calls for service that are dispatched as *Check on the Welfare*. Welfare checks are conducted by MPD when a member is asked to respond to a location to determine the well-being or safety of one or more persons.  Some examples of this are:

- a therapist seeks police assistance in determining the welfare of a patient who may be struggling with mental health issues
- a community member is worried about an elderly neighbor he or she has not seen in a few days
- a teacher is concerned that a student with exemplary attendance is suddenly  absent from school
- the Child and Family Services Agency (CFSA) requests assistance in helping to verify the potential abuse of a child within a home

When you arrive on the scene in order to ascertain the welfare of the subject, you must remain cognizant of your surroundings as this directly impacts your safety. Maintaining situational awareness is a skill that you must continually hone and utilize. Do not disregard it, or think it unnecessary simply because of the nature of the call to which you are responding. You must always be ready for a multitude of different possibilities when arriving on a scene.

Whenever you are dispatched to a call for *Check on the Welfare*, you must complete an incident report. This report will be classified as either "*Check on Welfare of an Adult*" or "*Check on Welfare of a Juvenile*," depending on whether the subject is at least eighteen (18) years of age (for an adult) or younger (for a juvenile). If you determine that a crime has occurred, take a report for that offense instead.

If you make contact with the subject of your welfare check, be sure to capture the following information in your field notebook:

- **Name** - Full name; Ask for an identification card from which you can copy down the information. If the community member does not have one, verbal identification will suffice.
- **Address** - Home and Work.
- **School Information** - Name and Address, if applicable.
- **Phone number** - Cell phone, Home, Work (Ask: "Which is easiest to get ahold of you?") In the case of theft, robbery, or lost property, make sure you obtain both the number of the stolen phone and a number that you can use to reach the complainant.
- **Email addresses** – Home and Work.
- **Social Media** – Personal and Work.

Your report must include:

- the identity of the person requesting the check listed as the Reporting Person and the person being checked on as the Subject Person
- if the subject is a juvenile or otherwise vulnerable
- how the identity of the subject was obtained
- the state in which you found the subject
- how the welfare of the subject in question was determined. How were you able to verify their safety? Did you see the person yourself?
- a detailed description of all investigative steps you took

If you are unable to verify the welfare of a subject, there are some additional steps you need to take and record in the report, while being mindful of the Internal and External Narrative distinction:

- An official at your element must be notified. This official will review the situation and may order additional actions. If you cannot verify the welfare of a juvenile, you must additionally notify YFSD and CFSA. CFSA can be reached at (**202) 671-SAFE**. (**GO 304.02 Welfare Checks**).
- You must leave your contact information and the CCN of the report either with the reporting person or at the location of the welfare check. If for some reason that is not possible, you must describe why in your report.

There will be times when your *Check on the Welfare* call will reveal that an adult at the location has been neglected, abused, or is incapable of caring for themselves. During the times when you encounter a community member who is the victim of neglect or abuse, or is seen to be incapable of caring for himself or herself, you must:

- summon an official to the scene
- contact Adult Protective Services (APS) on their 24-hour hotline at **(202) 541-3950**. They are located at 645 H St. NE on the 3rd floor, operating from 0815-1645.

It should be noted that, per **Special Order 11-02 – Adult Protective Services,** "an adult shall ***not*** be considered to be committing self-neglect for the sole reason that he/she seeks treatment by spiritual means through prayer alone in accordance with a religious method of healing, in lieu of medical treatment." *However*, if you come into contact with a community member who is in desperate need of medical attention, yet they are refusing medical assistance, you ***must*** request that an ambulance respond to your scene. If the person is still refusing medical assistance and the religious request is honored by the EMTs that arrive on the scene, then contact your Watch Commander as he or she will make the determination whether the community member should be involuntarily taken to the Comprehensive Psychiatric Emergency Program (CPEP) for psychological evaluation.

This is yet another moment where the thoroughness of your investigation and your report will directly impact the type of assistance the community member receives and the urgency with which it is received. It is incumbent upon you, as the responding officer, to ensure that you document with as much detail as possible what you see, hear, and smell while on the scene of potential abuse or neglect. Remember, agencies that could assist the community member cannot respond to anything of which they have not been notified. Your report must include:

- the name, age, and a physical description of the adult in need of Protective Services
- the name of the possible abuser and all of his or her relevant information. Remember, capture as much data on this person as possible. Your initial report may be the basis upon which a later criminal investigation is launched.
- the type of abuse or neglect to which you are witness

- the basis and source of your knowledge of the abuse or neglect. What facts surrounding the situation lead you to believe that the adult in question is in need of Protective Services?
- any additional information you deem relevant. The more detail, the better. Paint the picture for those who are not able to be on the scene with you.
- the date and time notification to APS was made
- who you spoke with when you made the notification to APS

There will be times when the Child and Family Services Agency (CFSA) will seek your assistance checking the welfare of a juvenile. When you are able to locate the child, you must notify CFSA through the dispatcher or by calling **(202) 671-SAFE**. A CFSA agent will come out to speak with the juvenile, but if the agent is unable to give you an estimated time of arrival, then contact and be guided by your official. You must also contact your official when you are unable to locate a juvenile when attempting to check on their welfare.

**NOTE:** You are a mandatory reporter as a police officer. This means that you are required by law, DC Code § 7-1903, to report any cases of abuse or potential abuse.

## 3.2.3        Define key terms related to a *Missing Person* investigation (General Order 304.03)

### Missing Person

If you are approached by a community member who wishes to file a *Missing Person* report, you must first find out from where the individual is missing.

- A missing person is an adult or juvenile community member who is **missing from the person's lawful home within the District of Columbia** for a period of time that is regarded as suspicious or unusual when considering the behaviors, patterns, plans, or routines of the citizen. For example: A father calls 911 and requests police assistance because his son typically returns home after school, every day, no later than 1630 hours but today it is approaching 1900 hours and his son has yet to arrive. Based on his son's usually consistent behavior, the fact that he has not returned home from school is unusual and breaks with his normal pattern of behavior.
- A community member, regardless of their place of residence, who is missing for a period of time that is regarded as suspicious or unusual when considering his or her typical behaviors, patterns, plans, or routines **and** for whom there is **credible information to believe he or she was last seen within the District of Columbia** will also be classified as a missing person.
- If the missing individual is not a resident of the District or they went missing in another jurisdiction, then the community member wishing to file a *Missing Person* report must contact the police department of the jurisdiction in which the person lives or went missing. Although this is outside DC jurisdiction you could still provide guidance and assistance to ensure the reporting person finds the correct police phone number.

A missing person investigation must be conducted, and a report taken whether the individual went missing within the District of Columbia or the individual is a resident of the District of Columbia.

### Critical Missing Person

A *Critical Missing Person* is a community member who fits the formerly given criteria of a *Missing Person* and the person in question also meets one or more additional conditions. It is up to you, the primary

responding officer, to ascertain whether the individual in question will be considered to be a *Critically Missing Person*. Then, it is the responsibility of the Watch Commander to classify it as such.

A community member will be classified as critically missing if he or she is:

- an elderly citizen over the age of sixty-five (65)
- a juvenile under the age of fifteen (15)

  **NOTE: Juveniles fifteen (15) years of age and over shall be deemed critical when the circumstances of the incident meet the criteria outlined in Part III.3.c of G.O. 304.03.**

- mentally ill or a mental health consumer. It is important to determine whether the individual is currently suicidal. *Additionally, are they drug dependent and the dependency leads to a life-threatening situation? For example, the person requires insulin every four hours and he or she has been missing for five hours without their medication. Are they missing from a hospital or institution while presenting an imminent danger to him or herself or others?*

There may be additional factors that cause the Watch Commander to reach the conclusion that the *Missing Person* is at-risk and should be considered critically missing. For example, the community member is currently in the company of another person who could endanger his or her welfare or the community member is in real or suspected danger of foul play.

### Attempt to Locate
During your time as a patrol officer, there will come a time when you respond to the scene of an incident that is dispatched to you as a *Missing Person* because a community member has called in requesting assistance in locating an adult. Upon conducting a preliminary investigation, you may conclude that the missing adult in question does not meet any of the criteria of a *Missing Person***.** In that instance, the classification for the report is *Attempt to Locate* and information must be entered into the Washington Area Law Enforcement System (WALES).

### Silver Alert (Special Order 13-10)
The elderly community members whom you will serve and protect are a segment of the population that at times are in need of extra care. Some of the elderly suffer from dementia or similar cognitive disabilities, and at times they may become disoriented and unable to recall how they have reached a destination or how to return home. In order to assist in the safe return of an elderly community member over the age of sixty-five (65) who has been reported missing by family members, caretakers, or friends, a *Silver Alert*, which is similar to an *AMBER Alert*, can be implemented when the following criteria have been met:

- it is believed that the missing community member is in imminent danger or grave risk of bodily harm
- a thorough preliminary investigation has occurred, to include a canvass for the missing individual in order to eliminate alternative explanations for the person's absence
- the CCN is provided to the Silver Alert Coordinator

Once you believe you have enough information to initiate a *Silver Alert*, contact your Watch Commander. Your Watch Commander will in turn contact the CIC Watch Commander who will bring the information to the attention of the Silver Alert Coordinator.

### Placement Violation

A person twenty-one (21) years of age or under who is reported missing and who was placed by court order into a group home operated or contracted by the Department of Youth Rehabilitation Services (DYRS) or Court Social Services (CSS) shall **not** be classified as a *Missing Person*. The incident shall be classified as a *Placement Violation* by the Telephone Reporting Unit, Office of Unified Communications.

## 3.2.4    Describe a *Missing Person* Investigation

There is **no** minimum time requirement that an individual must be missing prior to a *Missing Person* report being filed. When you arrive on the scene for a missing person remember that the community member calling in to report another person missing may be distraught. While you should always show empathy and compassion while on scenes with worried individuals and victims, remain cognizant of the fact that the faster you are able to obtain accurate information, the faster you can issue a **Flash Look-Out** so that your fellow officers in the field can begin canvassing for the missing individual.

During the canvass, broadcast the last place the missing person was seen, as this is the first place your fellow officers will search if it differs from the location from which the person is reported missing. If he or she has been reported missing on prior occasions, ensure that those locations are thoroughly searched as well. If the location(s) are in another district, contact the dispatcher and request a district appropriate unit to canvass and search that location on your behalf. Remember not to become a victim of tunnel vision or linear thinking; utilize all the resources available to you. When a potential location of the *Missing Person* is in another jurisdiction, contact your Watch Commander as he or she will take the steps to notify and request assistance from the appropriate agency.

When you are on the scene of a *Missing Person* that involves a juvenile under the age of twelve (12) and you have actually responded to the home, you must thoroughly search the premises. Any place a child could potentially hide must be searched. This means you must look in the garage, closets, attics, and crawl spaces and beneath the bed regardless of whether the reporting person states that he or she has already searched and cleared the residence.

When canvassing for juveniles, make sure that you find out if they are currently participating in any extracurricular activities. For example, are they on a sports or debate team? In an afterschool program? In summer school? Do they attend a summer camp? All of this will provide you with critical information that can help you find the child. If the juvenile is involved in school activities, contact school security along with the School Resource Officer (a police officer assigned to a particular school or set of schools) through the dispatcher and request that the location is searched for the child.

You must gather the following information while interviewing the reporting person as it has a direct impact on the course of the investigation. In addition, it could provide much needed information regarding safety that you can relay to your fellow officers who will assist during the canvass for the missing person and for your report.

- How the reporting person is related to the missing person. What is the nature of the relationship? For example, are they siblings or in a romantic relationship? Is the missing person the child of the reporting person or simply a friend?
- The name, age, date of birth, and social security number of the missing person.
- The mental, physical, and health habits and history of the missing person. Include physical features such as tattoos and scars and a clothing description from when the missing person was last seen.

*3.2 Basic Investigative Incident Reports*

- You must obtain the information on any relevant **caution codes** that can be added to your *Missing Person* report and passed along to relevant parties. Note if the individual is:
  - armed and dangerous
  - prone to violent tendencies
  - a martial arts expert
  - an explosives expert
  - an escape risk
  - a sexually violent predator
- In addition to the caution codes that are relevant to safety concerns, it is also necessary to obtain information on any relevant **medical codes**, such as:
  - Does the missing person have a heart condition?
  - Is he or she prone to epileptic seizures?
  - Does the missing person have any known allergies?
  - Is the missing person an alcoholic?
  - Is he or she a hemophiliac?
  - Is the missing person diabetic?
  - Does he or she require any medication and currently in possession of that medication? How often is the person required to take the medication?
- Ascertain whether the missing person has any dependency on drugs (illegal or prescribed), and if they are prescribed drugs, are they on their person.
- Obtain names and addresses of friends and relatives where the missing person may be located. *These will be used to assist in canvassing for the missing person as these locations will also be checked.*
- Determine whether the person has been missing before and if so, where he or she was located. It is smart and necessary to check these areas during the canvas. *Check **Mark43** to see what previous reports say.*
- Find out whether the missing person has access to computers and social media.
- Obtain the cell phone number of the missing person, if applicable.
- Obtain a vehicle description, if applicable.
- Learn the maiden name of the missing person's mother.
- Obtain a photograph of the missing person if one is available, making sure to note within the incident report (PD 251) if no photograph was able to be provided.

It is your responsibility as the primary responding officer to gather as much information about the missing person as possible. The more you are able to learn about habits and behaviors, the greater the probability that you and your fellow officers will be able to locate the missing person before he or she comes to possible harm.

If during the course of your investigation you realize that the missing person in question can be classified as a *Critically Missing Person*, or the person meets the criteria for a *Silver Alert*, or you suspect foul play of any sort, notify your official immediately and be guided by his or her directives.

While you may have enough to know a citizen can be classified as a *Critical Missing Person*, **it is the Watch Commander that makes the final determination in that regard**. It is also the responsibility of the Watch Commander to set up a Command Post for missing persons under age 12, which is essentially the base of operations, at the location from which this type of community member was reported missing. Beyond age 12, it is at the discretion of the Watch Commander for critical cases. If it is determined by the Watch

Commander that it is indeed a *Critical Missing Person* investigation, the Youth and Family Services Division (YFSD) must be notified at **(202) 576-6768**. YFSD must also be immediately contacted if an adult is missing with a juvenile in his or her custody**.**

As noted, one of the first things you will do is quickly get a description of the missing person and issue a flash lookout so other officers can begin to canvass. After gathering as much information about the missing person as possible, members shall call the Teletype Unit as it may have information regarding the whereabouts of the individual being reported missing. If Teletype does not have the information an officer is seeking, an officer must then begin calling all of the hospitals within the District of Columbia. The hospital staff can tell officers whether anyone currently admitted is the missing person or perhaps matches a description given of the missing person.

There will be times when the staff of a particular hospital may not be willing to give that information to you over the phone, as they have no proof of your identity. In those instances, utilize your resources. Contact the dispatcher, request a unit that works within the appropriate district or PSA be sent to the hospital and have that officer make the inquiry in person. While you hope for the best, you should always be prepared for the worst and in doing so, know that anything could have happened to the citizen during the time he or she actually went missing, before the point that someone noticed. For this reason, you must also call the **Medical Examiner's Office (202) 698-9000**.

Just as you document the names of witnesses when you are able to speak with them in person on the scene, you must also note the names of every individual you speak with over the phone during the course of your investigation. For someone who works at a hospital, document a name along with the hospital he or she works for, the number you dialed, and the time that you spoke so it becomes part of your finished report.

If you are unable to get through to Teletype, then the **CCN Reconciliation System** is a useful tool. On the MPD homepage, you can find the CCN Reconciliation System by clicking on the **CCN Checkoff Link**. This is where you will go to search all of the reports that were submitted for an *Injured Citizen to the Hospital*. Searching the time frame between when the citizen was last seen and when he or she was reported missing can also aid you in ascertaining whether the person is truly missing or has been taken and admitted to the hospital for medical treatment.

Sometimes, the missing person has been placed under arrest or is currently in police custody. When you are searching for a missing adult, call the district stations and Central Cell Block. When trying to locate a juvenile, contact the Youth and Family Services Division and the Juvenile Processing Center to rule out that possibility. Also, check the Washington Area Law Enforcement System (WALES) in order to determine if there is any additional information that can be provided that may assist with your investigation.

If the person that you are attempting to find is under twenty-one (21) years of age, then the reporting person must be given a *Reporting Your Child Missing* form (PD899A). Be prepared for emotions to potentially run high on the side of the reporting person as this form directs them to http://mpdc.dc.gov/missing where the child's dentist will be able to add information concerning the dental records of the child. This form will be returned to the Missing Person Section at YFSD. If the child has never visited the dentist, document this information in your field notebook as it must be added to the incident report.

*3.2 Basic Investigative Incident Reports*

You must check all of the mentioned locations and sources, because you want to be able to definitively say that the community member in question is indeed missing to the best of your knowledge. This allows you to rule out as many explanations as possible that could explain the disappearance.

Your report must contain all of the information you obtained from the reporting person. You must also include any and all notifications you made and hospitals that were called, along with the names of the persons to whom you spoke and the date and time on which each conversation occurred. If a Command Post was established, ensure that this fact is included within the public narrative. Also, include the areas that were canvassed during the search.

If the missing person is located or returns on his or her own, complete a report for *Missing Person/Returned.* Include in the report where the community member was located, where he or she was during the time he or she could not be located, and the person's condition when he or she returned or was found.

**Court Ordered Violators and Group Homes**
There will be times when you come into contact with a youth who is twenty-one (21) years old or younger who has violated his or her court-ordered placement in a group home, not to include the Child and Family Services Agency group homes. These youth are **not** classified as *Missing Persons*, but as *Placement Violations*. When you come into contact with them, absent any offense for which an arrest must be made:

- The youth must be transported immediately to the Department of Youth Rehabilitation Services (DYRS) Youth Services Center (YSC) at 1000 Mt. Olivet Rd. NE.
- You must then contact Teletype in order to have the status of the youth in question updated throughout the system.
- You must note whom you spoke to at Teletype in your Field Notebook.
- No additional reports are to be completed outside of the aforementioned documentation.

In contrast, any youth twenty-one (21) years old or younger who are missing from any CFSA group home or who have not been committed to a group home via court order will be classified as *Missing Person* and the investigation shall be handled using the same standards as any other *Missing Person* investigation. If you locate the youth during the performance of your patrol duties, do ***not*** place the youth under arrest unless an arrestable offense has occurred. Instead:

- Transport the youth to CFSA, 400 6th ST SW, and turn the youth over to the custody of CFSA.
- Complete a supplemental report.

If you have any questions regarding how to transfer the custody of the youth to CFSA, contact your Watch Commander.

When you make contact with or locate a juvenile from another jurisdiction for whom a *Missing Person* report has been filed, the youth must be transported to the Juvenile Processing Center (JPC) and a delinquency report must be completed and submitted.

Adults who do not return to penal institutions from holiday leave or rehabilitative programs are *not* considered to be missing persons. Instead, these adults must be handled in accordance with **General Order PCA-501.08 - Arrests of Escapees from the D.C. Department of Corrections.**

**Locating Competent Out-of-State, Adult Missing Persons**

Competent adults can leave their homes for a myriad of reasons, some of which may be safety-related, and they cannot be forced to return against their will. When you locate such an individual:

- advise the individual that he or she is the subject of a *Missing Person* report as he or she may be unaware.
- inquire as to whether the individual wishes to have his or her whereabouts disclosed to the person who initially reported him or her missing.
- if after affirming the person's safety and well-being, the individual states that he or she does not want the reporting person to know of his or her location, inform the reporting person that the individual that was formerly missing has been located and is well, but does not wish to have his or her location disclosed.
- if the reporting person demands to know the location of the formerly missing person, inform him or her that such disclosure would constitute a violation and invasion of privacy.
- if the located adult was reported missing in another jurisdiction, contact Teletype so the unit can update the necessary party in the appropriate jurisdiction.

Close the case by preparing an incident report with the classification *Missing Person Found (Interstate)* and include the OCA number within the narrative.

## 3.2.5  Complete an Event Report for any of the incidents encountered in this instructional block

In your time at the academy, you will learn how to complete *Basic Investigative Incident Reports*. Please take special note of the following information:

Officers and/or their superiors are required to notify the CIC of the following situations:

- Crimes of violence
- Critical missing persons (AMBER and Silver alerts)
- Hospital details
- Injured officers
- Gun recoveries
- License plate reader arrests
- Suspicious packages
- Burglaries (excluding attempts)
- Vehicle pursuits
- Large vehicle disruptions
- Any other unusual occurrences
- Sounds of gunshots with property damage
- Sounds of gunshots with ballistic evidence recovered at the scene
- ADW gun where shots were fired
- Any other significant event involving gunfire

When you have filled out your narrative and made the proper contact, please indicate the name of the CIC staff member that was notified. The CIC can be reached by phone **(202) 727–9099** or by email at **CIC.adminbox@dc.gov.**

**Summary**

As you have learned, not every report you take will be for an offense, but this does not lessen their importance in any way and proper documentation on your part must occur. Every scene and call to which you respond requires empathy and compassion. When you respond to the scene of an injured person, he or she will look to you for support. You are the stabilizing influence for *Check on the Welfare* investigations, the person that is called when community members are worried and seeking reassurance. The same goes for receiving a call about a missing person, as you must take control of your scene while showing the compassion necessary for the reporting person to know you care about the safe return of his or her loved one nearly as much as they do.

Understanding how to handle your scene for the incidents about which you have just learned will ensure that you are policing to the best of your ability. It will also ensure that you are providing the type of protection and service that the citizens within the District of Columbia depend upon you to deliver.

# Metropolitan Police Academy



# 3.3 Crime Scene Awareness and Management

November 6, 2023

### 3.3.1 Explain the key considerations for officers when they arrive on a crime scene

Patrol officers encounter crime scenes on a daily basis. The scenes vary in size, complexity, and severity. Regardless of these variations, the first consideration on every scene must be safety. Scene safety is a phrase that you will hear repeatedly throughout your time in the academy and career, but what does it mean? **Safety** is defined as "the condition of being protected from danger, risk, or injury."

As a police officer, it will be your job to protect yourself and others from danger, risk, and injury. When you approach a crime scene, you must immediately assess any potential safety concerns.

Things to consider:
- The suspect's location.
- The location of weapons on the scene and if they are accessible to the victim or suspect.
- Hazardous scene conditions (e.g., condemned buildings, gas leaks, open manholes, stairwells, and doorways).
- Potential biohazards that may be present (e.g., blood, bodily fluids, drugs that can be absorbed through the skin like PCP).
- Potentially aggressive animals (e.g., dogs).
- Pests such as roaches, bedbugs, or even pets that could be infested with lice. (This is a serious issue. Many insects are easily transmitted through simple contact, and you do not want to bring these insects home with you.)

Remember that the assessment of safety never stops. Threats to safety can change with little or no warning. Protect yourself and your partner by taking control of the scene during an investigation. If a suspect is on the scene, an officer should be in control of the suspect at all times. If a weapon is on the scene, separate the victim and suspect from it, or secure the weapon if separation is not possible.

Always be mindful of your surroundings. Unsafe structures and buildings increase the chances of you or someone else being injured. While you are on the scene, be aware of what you are touching and where you are stepping. Always wear personal protective equipment (PPE), such as rubber gloves, when on crime scenes. If you are in a location that may be infested with pests and/or insects, limit your contact with that environment as much as possible.

Once scene safety concerns have been addressed, your next consideration is **securing the scene**. Securing the scene can help to minimize new safety risks from developing while providing the first step in preserving evidence. This is accomplished by **establishing scene boundaries** that encompass all areas known or suspected to contain evidence. You should always make your scene is large enough to encompass areas like flight paths/escape routes. It is far easier to decrease the size of a scene later than to increase the size of a scene as potential evidence may be destroyed.

> **For example:** You are on the scene of a homicide along a busy road. You have established scene boundaries around the area containing the body but chose not to block the street to keep traffic flowing. A crowd gathers at the boundaries while new information is uncovered that the suspect may have shot the victim from across the street. The area

across the street is not included within your scene so you must expand your scene boundaries. The first hurdle is to move the crowd, and this can prove very difficult when it includes potential family members and friends of the victim. Once you have moved the crowd, you now need to reestablish your scene boundaries. Expanding a scene often takes more police officers and resources than making the scene larger at the beginning.

When establishing scene boundaries, the preservation of evidence and the safety of emergency workers must take precedence over traffic concerns and pedestrian convenience. Showing respect and compassion to individuals inconvenienced by a crime scene is imperative, but MPD officers cannot sacrifice the integrity of the scene for the convenience of these individuals.

We have talked about where you should place the scene boundaries, but how do you physically establish scene boundaries? The first and most common way is for an officer to advise approaching individuals. Other methods of securing a scene are to use physical barriers such as crime scene tape, barricades, fences, walls, buildings, and anything else that physically blocks a person's passage into the scene. Once the boundaries are physically established, officers must be positioned to ensure that the boundaries are respected.

Once the boundaries are secure, an access point to the scene should be established. The primary responsibility of the officer assigned to the access point is to establish a crime scene log using their police notebook. A crime scene log is used to record the names of anyone who enters or is already inside the scene.

Crime scenes can occur in indoor or outdoor settings and all environmental conditions. Each type of location has unique challenges and requires a somewhat different response.

> **Outdoor scenes** have more potential access points. Every access point needs to be secured and monitored. Outdoor scenes generally require more officers to secure due to the increased number of access points and the fact that they can cover a much larger area. They also have the potential to be compromised by weather, such as rain, which can wash away possible evidence. In situations like this, it is important that officers be guided by the official on the scene and do what they can to preserve evidence without disturbing or contaminating it. It also is important to make sure you request the appropriate crime scene unit to respond in a timely fashion to facilitate the scene being processed in the fastest manner possible. This will help preserve as much evidence as possible during inclement weather or adverse conditions.
>
> **Indoor scenes** are often smaller and generally have limited entrance points, which can reduce the number of officers required to secure the scene. An indoor scene also creates a natural access point and allows a crime scene log to be more easily kept. The challenge with indoor scenes is that there are often many more hiding places for people and evidence to be concealed.

## 3.3.1-2    Crime scene communication

Police departments have traditionally tried to tightly control the flow of information regarding ongoing incidents and investigations. Generally, the release of information is centralized in the hands of senior commanders and designated spokespeople. There are good reasons for doing so. It ensures consistency

in the message that is provided to the public—with only a handful of officials speaking to the media, it is much less likely that multiple, conflicting messages will be disseminated.

There are also serious risks associated with releasing information:

- If a suspect is alerted that the police are specifically looking for certain pieces of evidence, it is possible that he or she will attempt to destroy or hide that evidence to prevent the police from finding it.
- If a suspect is alerted to the fact that the police are looking for him or her, he or she may flee. This could also create the potential for violence if the suspect has time to prepare, whereas the police may have been able to make an arrest without violence if the suspect was surprised.
- Sometimes initial information or reports are wrong. Investigators are trained to keep this possibility in mind and to seek out as much corroborating evidence as possible, but the media often reports whatever the initial account is as unquestioned fact. This has led to false narratives of events becoming widely believed by the public and to the misidentification of suspects.
- Individuals speaking to the media may not stick strictly to information that they know for certain to be true. Individuals may give in to the temptation to speculate or report information that they merely believe to be true but is inaccurate.
- Defense attorneys will attempt to claim that particularly widespread or sensational coverage is so prejudicial that it prevents their clients from getting a fair trial. If successful in court, these claims can endanger successful prosecutions.

Given these risks, it is understandable why many police agencies choose to tightly control the flow of information from within the agency to the public. When communication was limited to daily newspapers and nightly news broadcasts, such a system of controlling public statements worked fairly well. As we are all aware, however, information moves much, much faster today.

With access to the internet and social media literally in the palm of everyone's hands, information and misinformation can spread like wildfire. This has a number of implications for police communications:

- Trying to prevent *basic* information from being released, except on our timetable, is often futile and counterproductive. Witnesses, journalists, activists, and everyday people are often already talking about what they have seen or heard on platforms that have a global reach.
- Many departments have established presences on social media and use these to inform the public about serious crimes and other notable incidents. Often, officers have not received any additional training on communications and operate under the old mindset concerning print and broadcast media. This has led to situations where officers refuse to provide any sort of information about why they are present at a location, while their agency's official social media account has already released the nature of the incident for public consumption.
- When means of communication moved much more slowly, the measured, centralized release of information did not seem unusual and did not impact the general perception of law enforcement authority. Today, in contrast, people are generally used to receiving information within minutes (at the most) of a request or incident. The inclination of some agencies to wait hours, or even days, before releasing any information seems more and more unusual to people. This can have the effect of undermining trust in the agency.

Police agencies must adapt with changing technology, while not letting go of the solid fundamentals of good law enforcement communications strategy. The principles of the Marine Corps Command and Staff College related by Dr. Garcia provide a good guideline for police officers when it comes to communicating about crime scenes or ongoing investigations:

- **Engage:** Speak with the members of the community who are on scene. Simply refusing to speak is becoming less and less of an option, and your refusal to speak sends a message in itself.
- **Tell the truth**: Don't lie, but also don't reveal confidential or sensitive information. You are responsible for whatever you say so you will have to balance giving out information against potentially compromising an investigation. <u>If you are in doubt, err on the side of releasing less information.</u> However, just because you decide to avoid releasing specific information does not mean that you cannot engage and converse with community members.
- **Stay in your lane:** Talk only about things that are your direct responsibility. Adhering to this maxim will help you avoid compromising an investigation. In general, only talk about what you are immediately doing; if you're holding a crime scene, limit your remarks to holding the perimeter of the scene. Don't talk about what other officers or detectives are doing, as this increases the chances of inadvertently compromising the investigation. Once information has been released, we cannot recall it.

When speaking with members of the community on scenes, use plain English and not jargon or technical terms which can be confusing to people who are not professional law enforcement officers. You cannot assume that your audience is familiar with police procedures and terms. Also, the use of technical language can make officers seem disengaged, remote, or uncaring to the public.

Be mindful of your interactions with other officers. Laughing and joking on scenes can very easily send the wrong message and be misinterpreted. You will be judged by others on your bearing and manner. While jovial behavior is often innocent in nature (such as coworkers expressing comradery, expressing happiness upon seeing an old classmate from the Academy), to the public it appears that the officers have an inappropriate bearing and manner while handling the trauma experienced by a community member.

While engaging with members of the community, you must never lose sight of the fact that you are investigating a crime. The primary purpose of your engagement is to reassure community members regarding their safety, provide basic information about why the police are at a particular location (without compromising the investigation), and potentially gather additional information that would be beneficial to the case itself. Ensuring trust in law enforcement and reassuring the public of its safety are fundamental parts of the job of police officers. Each opportunity to engage allows MPD to positively build trust with our community. Of course, we are talking about times when a situation is under control, and it is safe and prudent to speak with bystanders.

With an active hazard or unsecured scene, or when other pressing tasks are to be accomplished, those will generally take priority over speaking with uninvolved parties. <u>For example</u>:

- You arrive on a scene and are told that it's a homicide, however the sergeant hands you a roll of crime scene tape and tells you, "Go secure the front of the building." As you secure the scene, you will be looking for potential evidence and, if found, you will keep it from being lost, destroyed, moved, tampered with, or missed by another officer. Once a detective or crime scene technician arrives on the scene, you should notify them of what you have found.

- You are maintaining the crime scene perimeter when you are approached by a member of the community who wants to know what happened. **Engage**: Introduce yourself and ask who he or she is. **Explain**: Tell the truth while staying in your lane by providing basic information which would not compromise any investigation. Saying to a member of the public that the police were called to the house and that officers are currently investigating what happened is acceptable. Even if there are pressing tasks, you should at least acknowledge the community member and tell him or her that an officer will come back to talk when possible.

- If a concerned community member asks if anyone is deceased, you may not disclose this information without consulting with an official or the lead detective on the case. A next of kin notification may not have been made and it should not come to the family through street rumors. If the member of the community is asking because they are a relative, friend, or other concerned party, acknowledge and respect the question. Identify and locate, when the timing is appropriate, a detective and/or official to speak with the community member.

- If a witness is known, this is something that may not be released, as it may imperil the investigation or the witness and his or her family. You should neither acknowledge if a witness has survived the attack nor to which hospital he or she was transported.

- Similarly, you should not disclose specifics about the crime, such as the type of weapon used, or statements made by a witness or suspect. You can reassure the community if the police are still looking for subjects or if there is no concern for continued public alarm. Encourage members of the community to call **(202) 727-9099** if they hear any details, and hand out a tip card if possible.

- If a lookout has been placed for a specific individual or vehicle, ascertain from a detective or supervisor if this information is for the general public or is being kept under wraps so as not to alert the suspects they are known and being sought. As deemed appropriate by the official, you may communicate this to the inquiring community member.

- Members of the media that arrive on the scene and are looking to conduct an interview or gather additional information for reporting purposes should be directed to an official on scene. It is not the role of a patrol officer to serve as the official spokesperson for the department, nor to make declarative statements to the media.

Officers are responsible for being engaged and providing good customer service through every interaction. Consider the following scenario:

You are an officer assigned to scout/cruiser 5031. You receive a radio assignment for the sound of gunshots at 1234 Main Street NE. Upon arrival on the scene, you and your partner find the front door of the home ajar. As you proceed to the door, you see that it has been "kicked in" and the locking mechanism destroyed.

You call out to the interior of the house and receive no answer. Carefully entering the home, you find an individual inside suffering from multiple gunshot wounds. The victim has been bound and possibly assaulted. You immediately call for assistance, give aid to the injured victim where possible, and check the house for any suspects or additional injured victims or complainants/witnesses.

A short time later, the EMS board has come and gone, and the house is filled with officials, detectives, and crime scene personnel. You and your partner are told to put up crime scene tape. As you begin laying out the crime scene tape and establishing the boundaries of the crime scene, you realize a small crowd of concerned community members have

gathered on the sidewalk directly in front of the residence. They begin calling out questions asking about the well-being of the occupants of the home. How do you respond?

In the past, officers would respond with little to no information. In fact, some officers have been rude and demanded the crowd disperse. However, you cannot and should not respond in this fashion. So, how should you respond? Depending on your knowledge and responsibilities, here are a few suggestions:

- When you are among the first responding officers, you are going to have more information than others when asked questions. At the same time, however, the department may be releasing information as the scene is being investigated (example Twitter feed: "MPD is investigating the sounds of gunshots at 1234 Main Street, NE, more information to be released later.") The community is not naive. So, how should you answer their questions about the well-being of the occupants? First, while you should not lie to them, you should keep in consideration that next of kin notifications have most likely not been made, even if the victim's body has been identified. You might answer in this manner, "The detectives are currently investigating a shooting that occurred inside the residence and will be getting in touch with the families of those persons involved."
- This may naturally be followed up by a community member asking, "Was anybody killed?" Here again, keep in mind the feelings of the family members who have not yet been notified and what the public actually needs to know at this moment. Consider answering in this manner: "I don't know much about the scene. I know that members of the District of Columbia Fire and Emergency Medical Services Department have come and done what they could, and the department is currently attempting to reach out to family members."
- Saying "Next of Kin" is a giveaway that someone is deceased inside. If the transport vehicle from the Office of the Chief Medical Examiner is on the scene, you can acknowledge that a death has occurred (if known), but you should refrain from disclosing the identity of the deceased. If members of the community want more information, this is an appropriate time to request an official to speak with members of the public. Let the community know you have requested an official or detective to come to speak with them.
- If someone in the crowd offers to call a family member, quickly contact one of the detectives and have them come out and talk with that individual.

Patrol officers do not have to carry the burden of public communications solely on their shoulders. They should confer with the detectives and/or officials on the scene as to how much they should say.

**Information that should be withheld**

Since we are discussing the responsibilities of the first officers on the scene, they should refrain from giving out specific information such as, "A female was criminally assaulted." In addition, this type of information should not be mentioned over the radio.

Other information that should be withheld at the crime scene is:
- The fact that a particular type of weapon was used (e.g., "They used a shotgun." "They used a machete." "She was raped at knifepoint." "She was strangled with a nylon hose.") This type of

specific information should be guarded and not shared as the detectives may use it during an interrogation to determine if someone is lying or not.

- Information that the residence was entered by kicking in the front door. Again, you should refrain from sharing this as it may cause concern among the local residents that their residences may be next, when in fact, this could very well have been a targeted location. Officers should attempt to ease the concerns of the community members for their own safety by assuring them that this appears to be an isolated incident if this is true.

Officers should ask those community members on the scene if they have any information that they would like to share that may assist the detectives in their investigation. Officers should keep in mind that the community members feel invested in the well-being of their neighbors and the neighborhood in general. When an incident occurs, it is normal for people to ask questions and want to know what happened. If it occurred in your neighborhood, you would want to know too.

Per **GO-SPT-302.13 (Body-Worn Camera Program)**, members shall activate their BWCs for all dispatched and self-initiated calls for service.

Each potential scenario is different, dynamic, and variable based upon the circumstances of that scene. Officers need to acknowledge and engage with members of the community. Lack of engagement, rude, or discourteous behavior undermines the fundamental principles of our agency and makes the work of each of our officers that much harder.

As noted, there will be times that officers are engaged in a law enforcement operation and the timing and release of information could be detrimental to the operation; however, officers should return and communicate on such scenes as soon as it is practicable to do so. Sufficient officers should be called to any scene to ensure MPD addresses and positively interacts with community members, where possible.

Every encounter with a member of the public is critical to building trust in our department and assuring the community we are here to help them. Your actions as a police officer will reflect on the MPD brand and are critical. Communicating appropriately is not just the responsibility of the Public Information Officer, district officials, or the Commander; it is a fundamental duty of each police officer in our department.

Appropriate communication with members of the community not only reflects the needs of the department but also the needs of the community. Every interaction a community member has with a member of the department should leave him or her feeling as if concerns have been acknowledged and addressed in some way. Consciously acting and communicating professionally reassures the public that MPD is engaged in their communities, cares about their well-being, and is working to keep them safe.

## 3.3.2  Identify the five basic search patterns

Once a crime scene is safe and secure, the search for and recovery of evidence can be particularly challenging. The only way officers can ensure that every area of a crime scene is searched for evidence is to use a systematic approach. This approach consists of five different search patterns:

**Spiral Search -** A search method in which the officers move in an inward spiral from the boundary of the scene to the center of the scene, or in an outward spiral from the center to the boundary. A spiral search is commonly used when looking for an object that is suspected to be a specific distance from another. For example: A cartridge casing from a gun or an object thrown by hand from a specific location but thrown in an unknown direction.



**Line search –** A search method used by multiple officers who stand in a long line and walk in straight lines going the same direction across the crime scene. Stakes and string can be used to create "lanes" for which each officer is responsible. A line search is commonly used when searching a large area looking for a large object.



**Zone search -** A search method in which the crime scene is divided into smaller sections and officers are assigned to search each section. Each of these sections can be subdivided into smaller sections for smaller teams to search thoroughly. A zone search is commonly used for recording the location and shapes of suspected blood patterns, projectile trajectories, and other types of evidence where the interrelationship of each piece of evidence is of the highest concern.



**Grid search -** A search method employed by one or more people overlapping separate line searches, thereby forming a grid. A grid search is commonly used for searching large areas such as a field or open lands.

**Wheel search pattern -** A search method employed by several people moving from the boundary of the scene straight toward the center of the scene (inward) or from the center straight to the boundary (outward). A wheel search pattern is commonly used for searching large open areas. Each section of the wheel is searched using a variation of the line or grid search.



### 3.3.3        Identify the types of evidence that may be found at a crime scene

Police officers have a responsibility to identify, document, and preserve evidence at any crime scene they encounter, but what is evidence? **Evidence** is defined as "information given personally, drawn from a document, or in the form of material objects, tending or used to establish facts in a legal investigation."

Evidence can either support or disprove an officer's theory of the events on a crime scene. It is the responsibility of every police officer investigating a crime to consider all relevant evidence in making their decisions and preserve it for analysis and judicial proceedings. There are several broad types of evidence.

**General Evidence**
General evidence is any physical item that provides a clue or leads to relevant facts in a criminal investigation. General evidence can be a physical item that provides insight into a case through its presence, position, or condition, or through the information it contains.

**Blood Stain Evidence:**
Blood Stain Evidence is present at a crime scene and the blood stain was deposited during or after and as a result of what occurred on the scene. When you observe what you believe to be a blood stain, but you were not present to witness its origin, it should be referred to as *suspected blood*. Analysis of blood stain evidence can assist investigators in answering a number of things, such as:

- Where did the blood come from?
- What caused the wounds?
- From what direction was the victim or suspect wounded?
- How were the victim and suspect positioned?
- What movements were made after the bloodshed?
- How many potential perpetrators were present?
- Does the blood stain evidence support or refute witness statements?

**DNA Evidence**
DNA or deoxyribonucleic acid is the building block for the human body. DNA is found in blood, saliva, skin, hair, and bone. DNA from an individual is the same no matter what type of cell it comes from. For example, the DNA from John's blood will be identical to the DNA from John's saliva.

DNA is a powerful investigative tool, and it can be recovered from a variety of surfaces (e.g., countertops, door handles, weapons, and other surfaces). If recovered, DNA has the potential to positively link a known suspect to a scene or to another piece of evidence. With the exception of identical twins, no two individuals have the same DNA.

If you are working on a case with no known suspects, DNA can be compared to an FBI database known as CODIS (the Combined DNA Index System). CODIS contains DNA profiles contributed by federal, state, and local participating forensic laboratories from all 50 states, the District of Columbia, the federal government, the U.S. Army Criminal Investigation Laboratory, and Puerto Rico.

**Trace Evidence**

Trace evidence refers to a very small piece of evidence left at or taken from a crime scene that may be used to identify or link a suspect to a crime. Trace evidence can consist of many things, including human hair, animal hair, textile fibers, rope, feathers, soil, glass, and building materials. Physical contact between a suspect and victim or a crime scene can result in the transfer of trace materials. The identification and comparison of these materials can often associate a suspect to a crime scene or another individual. Here is a description of some types of trace evidence:

- **Hair -** Examination can determine if a hair is animal or human. If animal, the species and possibly breed of the animal can also be determined. If human, the racial characteristics, body area, length, root type (whether it naturally shed or was forcibly removed), and any artificial treatment or damage can be determined.
- **Fibers -** Examination can determine if a fiber is natural or manmade. Questioned fibers can be compared to fibers from a known source to determine if they are consistent with the questioned fiber from that source. Questioned fibers can also be compared to other questioned fibers to determine if they are consistent, though the source is not known.
- **Fabric -** Examination can determine if a questioned piece of fabric and a known piece of fabric are consistent in color, construction, and composition. Torn pieces of fabric can be physically matched to a damaged garment.
- **Feathers -** Examination can determine the species of bird that a feather came from, and questioned and known samples of feathers can be compared.

**Fingerprints**

Fingerprint evidence plays a crucial role in criminal investigations. Since a person's fingerprints are unique and do not naturally change during their life, they can be used to quickly and effectively confirm or disprove a person's identity. Fingerprints collected at a crime scene have the potential to link a series of crimes together or to place a suspect at the crime scene.

**Footwear and Tire Impressions**

The basic theory behind footwear and tire track analysis is that, much like fingerprints, shoes and tires may leave behind either prints (referred to as "imprints") or impressions that can be examined by investigators. The type of evidence left behind depends largely on the type of surface traveled. Often criminals take steps to cover their face and hands but rarely take steps to cover their footwear.

Footwear and tire impressions are evaluated on the following characteristics:

- **Individual characteristics** are unique aspects of a particular shoe or tire that result from use, not the manufacturing process. These could be from damage such as a cut, gouge or crack, or a temporary alteration like a stone or twig stuck in the tread.
- **Wear characteristics** result from the natural erosion of the shoe or tread caused by use. Specific wear characteristics include the wear pattern and the basic position of tread wear, the wear

condition and the amount or depth of the wear, and, where extreme, the damage to or destruction of the tread. For instance, the location and amount of tread loss on a particular brand and style of shoe will be different for each person wearing the shoe based on how and where they walk, and the length of time they have owned the shoe.

### 3.3.4          Explain ways to minimize contamination of a crime scene

**Contamination** is the introduction of something to a scene that was not previously there. Each time you interact with a crime scene, you will leave something behind or take something away. It is very important that you minimize this interaction.

Only trained members shall process scenes and collect evidence. All evidence shall be collected in accordance with Attachment A (Responsibilities for Processing Incidents and Crime Scenes) from GO-OPS-304.08 (Crime Scene Response and Evidence Collection).

Preventing crime scene contamination begins with each officer. Officers must refrain from eating, drinking, using tobacco products, or engaging in any other behavior that could cause them to deposit trace evidence at a crime scene. Wearing personal protective equipment (PPE) like rubber gloves can help to prevent you from adding your fingerprints to the scene or depositing other trace evidence that could cloud an investigation.

***NOTE:*** Rubber gloves do **not** prevent you from picking up trace evidence from a surface onto the glove or from destroying fingerprints that may have been left on a surface you are touching.

Every action you take and everything you touch on a crime scene should have a valid and justifiable reason. As a general rule, you should never touch or move evidence. If you are forced to move evidence in order to provide a safe crime scene, it should be done so sparingly and with care and caution.

> <u>For example</u>: You arrive at the scene of a shooting where the victim and suspect are still on the scene. The firearm is also still present on the scene. While securing the suspect and rendering aid to the victim, you may need to move or secure the firearm to protect yourself or others from continued violence.

***NOTE:*** Officers should not disturb evidence unless it is to protect life or prevent injury.

Officers may also move evidence in situations where if the evidence was not moved, it could be lost or destroyed. Anytime you move evidence, you should always do what you can to first document its original location and condition through either photographing it or making notes when it is safe to do so.

With all that in mind here are some ways to minimize crime scene contamination:

- If your presence is not required on a scene, do not enter it. Every person's presence on the scene should be explainable and necessary.
- If you are on a scene and your presence is no longer required, you should leave the scene.
- When arriving on a scene, be careful where you park. Otherwise, you could easily drive over evidence and destroy a chance at solving a crime.

- Always be cautious where you step on a crime scene. You should use the same path to enter and exit the scene.
- No matter how many times a scene has been searched, you should always scan for evidence as you move about a scene.  It is not uncommon to find new evidence as you move around.
- Wear gloves and do not touch anything that is not absolutely necessary. Each time you touch something you leave something behind or take something with you.
- Do not use chalk to mark the location of cartridge casings or place anything over the top of the casings.

**It is critical that members do not do anything that may unintentionally contaminate forensic processing of the evidence.**

## 3.3.5     Explain the importance of documentation of crime scenes

**Crime scene photography** is very important because it begins the documentation process of a scene. A photograph captures and preserves an image of evidence in the state it is in at the time the photograph is taken.

MPD issues every officer both a body-worn camera (BWC) and a cellular telephone. Both of these devices are linked to an official evidence archive maintained by the department at **Evidence.com**. The primary use of the cell phone is to classify BWC videos in the field, so officers do not have to return to the station and use a desktop computer to tag their videos.

The cell phone also comes pre-loaded with **the AXON Capture app**. This app uses the cell phone's camera to take photographs and upload them to Evidence.com. Photographs taken with AXON Capture become official crime scene photos and must be categorized and retained appropriately.

Patrol officers are to use AXON Capture to take crime scene photographs when that is the **only** form of evidence processing necessary at a crime scene. This will generally be most misdemeanor offenses, assaults, robberies where only minor injury occurs, and other scenes requiring an investigation (like an MPD-involved traffic crash with minor damage only). Patrol officers are to take crime scene photos with their department cell phones *only* when it is the only kind of evidence processing necessary. For example, if there was a break-in where both photographs and fingerprinting were necessary, the officer would call for a crime scene trained unit, and the trained officer would then both fingerprint and take crime scene photos.

Keep in mind that taking pictures or videos of a crime scene creates evidence. Therefore, photos should only be taken with your department-issued cell phone. You should never share photographs of a crime scene on social media. You should never take pictures using your own cell phone as doing so could allow a defense attorney to obtain a court order to examine everything on your personal phone as well as any devices or social media accounts to which it is linked.

**Crime scene diagrams** are an important tool that crime scene technicians use to capture the overall layout of a scene. They also document the location evidence is discovered on the scene. A crime scene diagram

includes measurements of the distance between evidence and a permanent object or structure. A diagram allows for the reconstruction of a crime scene at a later date to assist an investigation or prosecution of a case.

Once evidence has been documented through photography and diagramming, it must be removed from the scene and stored for presentation at court.  Packaging and storage of evidence from scenes processed by the Department of Forensic Science (DFS) is generally done by the technician handling the scene. Evidence recovered on crime scenes processed by trained MPD members is packaged and stored by the officers at their respective element.

### 3.3.6       Differentiate between the roles of MPD members trained in evidence collection and evidence technicians assigned to the Department of Forensic Sciences

When more evidence must be processed than just crime scene photographs, you will need to call for an MPD member trained in evidence collection or a Department of Forensic Sciences (DFS) crime scene technician, depending on the type of crime scene (**GO-OPS304.08 [Crime Scene Response and Evidence Collection]**).

**MPD Members Trained in Evidence Collection**
Each district has a number of sworn officers who have been trained to process crime scenes when fingerprints, cartridge casings, or buccal swabs are the only form of forensic documentation required. These officers are assigned to each district and perform crime scene processing in addition to patrol duties. Generally, they handle non-violent burglaries and vehicle-related crimes (excluding carjackings), random gunfire calls for service, or when directed by a watch commander.

**Department of Forensic Sciences Evidence Technicians**
DFS Evidence Technicians work out of the Consolidated Forensics Lab. DFS is an independent city agency that provides integrated forensic, scientific, and crime scene services to the various DC government agencies tasked with investigating and enforcing laws, codes, and regulations. DFS technicians respond for the most serious criminal offenses and incidents that have the potential to develop into serious offenses (e.g., missing persons reports where kidnapping or other foul play is suspected or an unconscious injured individual where a violent assault is suspected). DFS handles all potential DNA evidence collection, firearms cases, cases involving other weapons, violent crimes that result in serious bodily injury or death, carjackings, and traffic-related fatalities. More information about the types of crime scenes that require a DFS response can be found in Attachment A (Responsibilities for Processing Incidents and Crime Scenes) from GO-OPS-304.08 (Crime Scene Response and Evidence Collection).

## Summary

Patrol officers encounter crime scenes daily. The first consideration at every scene, regardless of its size, complexity, or severity, must be safety and then its integrity. Officers have a responsibility to identify, document, and preserve evidence at any crime scene they encounter. Evidence is information given personally, drawn from a document, or in the form of material objects, tending or used to establish facts

in a legal investigation.  Officers at crime scenes should take great care to prevent or eliminate the possibility of crime scene contamination. Only trained members shall process scenes and collect evidence.

## References

| | | |
|---|---|---|
| GO 304.8 | Crime Scene Response and Evidence Collection | 08/28/2023 |
| SO 13-13 | Photographs, Video Recordings and Audio Recordings of Crime Scenes | 11/27/2013 |

Oxford Dictionaries. Oxford University Press Dictionaries. 1 January 2000. 7 May 2015 <http://www.oxforddictionaries.com/us/definition/american_english/evidence>.

National Criminal Justice Reference Service. Understanding DNA Evidence. April 2001 <https://www.ncjrs.gov/app/publications/abstract.aspx?id=264320>

Federal Bureau of Investigation.  Combined DNA Index System. 1 September 2011 < http://www.fbi.gov/about-us/lab/biometric-analysis/codis>

Forensic Magazine, On the scene and in the LAB. Crime Scene Integrity. 10 October 2011 < http://www.forensicmag.com/articles/2011/10/crime-scene-integrity>

# Metropolitan Police Academy



# 3.4 Property

## Introduction

In their duties, patrol officers will be required on occasion to take possession of various items of property. Such property may be needed as evidence for a trial, held for an arrestee until he or she is released, safeguarded for a citizen who lost something, or for a multitude of other reasons. Due to the sheer volume of property that MPD encounters, MPD has created an entire system for its collection and processing. The system spans the path of items, from the district all the way to the Evidence Control Division. Such a system would not be effective without a classification process that properly tracks the thousands of pieces of property that the department encounters on a yearly basis.

MPD officers must be adept at classifying property correctly in addition to being able to properly collect and safeguard it. There are few more important tasks MPD officers encounter than taking property into the custody of the department. Personal property, evidence, and other items are of the utmost importance to those connected with them. Consequently, the Department has instituted strict policies and procedures that allow MPD to take property into custody. Such tasks are made easier by specialized paperwork that matches each property task with its proper form. This lesson is an introduction to MPD property rules and procedures.

## 3.4.1      Identify Property Officer, Evidence Control Division, Evidence on Q Database, Station Clerk, and Property Clerk

MPD officers must be adept at handling property from its recovery out in the field to its actual processing at a MPD district station. It is important that MPD officers know each step of the property control process as well as the different jobs performed by those within MPD who are tasked with taking custody of the property after the officer is finished with it.

Per G.O. 601.01, "in all cases of property which comes into the possession of the Department, it is the responsibility of the member who first handles the property to ensure that the property is properly recorded and processed." The officer who completes the **Property Record** must also either tag (PD285) or secure the property in a **Property Bag** (PD14). The recovering officer must also make a record entry into the **Property Book** (PD82).

All property recovered by MPD officers must be reported on an Incident Report (PD251) in addition to the Property Record. All related reports, to include arrest paperwork, must denote the same Property Book (PD82) information throughout the handling of the arrest and incident.

There are several property books in a station and members shall complete each book based on the corresponding type of property they are documenting. Examples include prisoners, money, vehicle, and drugs. If drugs have been collected, they must be documented in the Drugs Property Books as well as placed in the **Narcotics Evidence Locker**.

The recovering officer is responsible for ensuring that all property is properly documented and safeguarded until he or she is relieved of the responsibility by the element **Property Officer**. After the recovering officer is finished with the Property Record, he or she will then bring it to a lieutenant or above for approval. The property is then ready to be taken to the element Property Officer.

The element Property Officer inspects the forms for accuracy and ensures that all information is entered into the **Evidence on Q database**, a database that is used by MPD for the tracking of all evidence. The element Property Officer also makes sure the description in the property book and property record match the actual item of property. Then, the Property Record is given a **Property Control Number**. This prepares the recovered property for transmittal to the **Property Control Branch**. Before forwarding an item, the element Property Officer must ensure that all property is securely wrapped, tied, marked, and/or tagged.

The element Property Officer is responsible for the security and safekeeping of property held at the element until its proper transfer to the **Evidence Control Division**. A transfer must be accompanied by the Property Record (PD81). Element Property Officers also make attempts to notify owners or their families of any property being held by MPD at their respective element. The Evidence Control Division controls the inventory of all types of property that comes into the possession of MPD.

In addition, the element Property Officer is responsible for:
- maintaining custody and control over all property held at the element
- safeguarding all evidence so as to maintain a proper chain of custody for court
- reviewing all property records (PD81s) and property listed thereon for accuracy and completeness;
- ensuring that miscellaneous property such as clothing, tools, and other loose items are securely wrapped or boxed with a property tag attached
- ensuring that all serial numbers and identification numbers are correctly entered on the property record
- continually reviewing the Property Book (PD82) to ensure that all items are listed accurately, and that the property control numbers are listed for all items.

When the element Property Officer is not available, the primary contact for all property issues becomes the element **Station Clerk**. Station Clerks review each entry made on the Property Book during their respective shifts. This is to ensure that personnel are adhering to MPD directives when taking possession of property. When the element Property Officer is not present, the Station Clerk makes certain the property destined for the element's property office is properly secured. When authorized, the Station Clerk also returns property to claimants.

The MPD **Property Clerk** is responsible for all property in the possession of the Evidence Control Division. Any disputes regarding property are resolved by the MPD Property Clerk. The MPD Property Clerk is a lieutenant or higher assigned to the Evidence Control Division.

## 3.4.2        Classify property that comes into departmental custody

**Found Property**
This is any property that the department comes into contact with that has no other obvious classification. This property has no current use as evidence and is found by an officer or a citizen who presented the property to an officer. Every attempt is made to contact the owner for all found property. Further description of how to handle and process Found Property is contained at the end of this lesson.

**NOTE:** For bicycles, you must check the National Bicycle registry for ownership of found bicycles.

**NOTE:** Property found at Metro facilities or on conveyances is turned over to WMATA employees who will

provide the MPD member with a receipt.

**Abandoned Property**
Abandoned property is found property that is specifically known to have been abandoned by someone. This type of property is processed in the same manner as Found Property. The primary difference between Found Property and Abandoned Property is the likelihood of finding an owner willing to accept the property.

***NOTE:*** Abandoned Vehicles are discussed in the Traffic training block.

**Evidence**
Evidence is physical proof that supports an assertion of alleged fact. In most MPD applications, evidence supports a criminal charge. Evidence is recorded on a MPD Property Record (PD81) in a Property Book (PD82). Narcotics are recorded on a DEA 7. Evidence is kept separate from all other types of property.

**Impounded Vehicles**
These are vehicles that MPD took possession of in order to take the vehicle off a public highway or street. There are many reasons why MPD will want to do this. Reasons can be criminal or non-criminal in nature. For example, there is a drunk driver who will be released in a few hours who cannot turn his vehicle over to a licensed, sober driver in the meantime. Another possible reason for MPD to impound a vehicle is if it is unregistered for over thirty (30) days. An Incident Report (PD251), Property Record (PD81), and Property Book entry (PD82) are required for impounded vehicles.

In the case of abandoned/junk cars that are not creating a safety hazard or need for immediate removal, officers should give a ticket to the owner/claimant, be sure to list the VIN on NOI if there is no tag, and notify the Department of Public Works (DPW) for removal. This can be done via the 311 App on your MPD issued phone.

**Property Removed from Impounded Vehicles**
Per G.O. 602.01, all impounded vehicles must be safeguarded by MPD. If a vehicle remains impounded for over twenty-four (24) hours, MPD will take possession of all property in the vehicle. The property is classified as *Removed from Impounded Vehicle*. All property is put on a Property Record (PD81) and in a Property Book (PD82).

**Safekeeping**
Occasionally, members take unattended property into custody so that it may be safeguarded until the owner is located. Such property shall be classified as *Safekeeping* and handled in the same manner as Found Property described above. A property record (PD81) and Property Book (PD82) are required for Safekeeping items. An Incident Report is also required. Attempts must be made at locating the owner while still on the original scene. Further attempts must be made prior to the end of the officer's tour of duty.

If a vehicle is encountered by MPD that has been reported stolen, MPD must take possession of the vehicle. It is then either released to the owner or an owner representative on the scene or it is taken to a private tow lot. Either way, an entry into the Property Book (PD82) is made and an Incident Report (PD 251) is completed. If the vehicle is released to the owner or an owner's representative on the scene, a Property Released on Scene (PD81A) form is required with no Property Record (PD81). However, if the vehicle cannot be released on scene and is towed, then only the Incident Report (PD251) and Property

Record (PD81) are utilized.

**Suspected Proceeds of a Crime**

This property is kept separate from prisoner property. Proceeds are usually taken from a person at the time of arrest. As its classification suggests, proceeds of a crime are suspected of having been acquired through the commission of a crime. For example, a person arrested for robbery may have a large amount of money in his or her possession that is suspected to have been taken during the crime. This money can be taken from the arrestee and classified as *Suspected Proceeds of a Crime*.

All seized money, regardless of classification, must have an accompanying Property Record (PD81) and must be photographed by an evidence technician. The money shall be separated by denominations when photographed. In the event that the money recovered is over $3,000, then a continuation report (PD202A) is used to record the exact denominations of the bills. The money shall also be placed in individual property bags by denominations. In addition, a minimum of two sworn members shall be present during the counting of the money. The money is required to be counted twice before it is turned over to the element Property Officer or Station Clerk.

*NOTE: Suspected Proceeds of a Crime* is only a temporary classification. The element Property Officer is responsible for notifying the recovering member and their official if the suspected proceeds have not been reclassified after ten (10) days. The recovering officer must reclassify or release the property within five (5) days of being notified by the element Property Officer or Property Clerk of the reclassification requirement.

Ultimately, Suspected Proceeds of a Crime shall either be released (via PD81C) or reclassified (via PD81D) as Found Property, Safekeeping, Prisoner Property, etc. The member papering the case is responsible for completing the PD81C in case the case has not already been papered and an AUSA or AAG subsequently releases any evidence hold on the property.

**Turned over to Police for Destruction**

This type of property has been given to the police department specifically in order for it to be destroyed. *Turned over to Police for Destruction* is written on the Property Record (PD81) and in the Property Book (PD82). Fireworks are the most common example and they will be discussed in an ACADIS module.

*NOTE:* Remember from a previous lesson that there are notifications that must be made to the Teletype Unit whenever a member is recovering, safekeeping, and impounding vehicles or license plates and any recovered, lost, or stolen weapons. Notifying Teletype is an integral part of the process in order to keep track of certain items that come into possession of the department.

## 3.4.3     Identify the PD forms related to handling property

In all cases where property comes into the possession of the department, it is the responsibility of the member who first handles the property to ensure that the property is accurately recorded and processed in accordance with the General Orders, taking special care to note timeliness, make a Violent Crime Suppression Division (VCSD) notification, the related crimes, and when $1,000.00 or more is involved. There are at least nine types of MPD forms that allow sworn members to process and safeguard property. These forms are utilized until the Property Record is signed and the property is finally turned over to the

element Property Officer. Members need to understand each type of form in order to properly take possession of the various types of recovered property.

### Property Bags/Envelopes (PD14)

All property taken into custody in any MPD facility needs to be securely wrapped, tied, boxed, marked, and/or tagged before it can be delivered to the Property Control Branch. Small articles and items which can reasonably fit inside should be placed inside a PD14 envelope/bag. This is the most commonly used PD form when taking property into custody. A good way to remember what goes into a PD14 is by referring to it as the "Property Bag." Property Bags/Envelopes, which are used to contain Prisoner Property, Found Property, etc., and Evidence Bags/Envelope, which are used to contain evidence shall be filled out the same way, except for the classification that is listed on the top of the bag.

Property Bags/Envelopes (PD14) can be found in the station. It is a good idea for Officers to also carry Property Bags with them on the street to handle situation when they take items from someone who has been placed under arrest. The items should be placed directly in the Property Bag to avoid loss.

Certain items are prohibited from being placed in a Property Bag and should be discarded. This includes:
- opened, perishable items
- food or beverages
- flammable items such as lighters or matches
- hazardous items

In addition to storing items of evidence at MPD facilities, the Property Bag/Envelope can be used to package items to submit for forensic testing at the Department of Forensic Sciences. When packaging items to be sent to DFS for testing, members will fill out and seal the Property Bag/Envelope normally. They will then sign, date, and place their CAD on the reverse side of the bag under the red *Tamper Evident* seal.

### Property Tags (PD285)

A Property Tag (PD285) follows the same guidelines as the Property Bag/Envelope (PD14). It is used for any item that does not fit into the Property Bag/Envelope or Evidence Bag/Envelope. All of the same information from the Property Bag should be transferred to the Property Tag. When a Property Tag is placed on an item, it should still be secured and nothing hazardous or dangerous should be tagged.

### Property Book (PD82)

A Property Book (PD82) is located in each station area. Officers are required to input information regarding any and all property taken into the custody of the department onto a page of the Property Book. This should be all of the same information from the Property Bag or Property Tag. The Property Book page and book number should then be recorded onto the Property Bag and Property Tag.

The left side of the property book is for the recording officer when the officer comes into possession of the property. The right side of the property book is for station personnel and is used when returning property to the owner.

Any corrections made to the Property Book must be made in red ink. The initials of the person making the correction along with his/her badge number must be written on the corrected entry. When corrections are made to the Property Book, a line in red shall be drawn through the incorrect entry. The

person who made the correction shall affix his or her initials and badge number at either end of the red line.

### Property Record (PD81)

The PD81 is the Property Record form. This is used when all property other than prison property is turned over to the Property Division. All property taken into custody should be given to the Station Clerk or the element Property Officer with a completed PD81. There are paper copies of the PD81 available in each station. Members can also download and type the information into the PD81, which is located on the MPD intranet in the MPD Online Forms. It is also helpful to save a copy to your personal N drive.

*NOTE:* This form must be approved by a Lieutenant or above.

### Continuation Report (PD202A)

This report is used whenever the narrative portion of the Property Record extends past the available space. It is useful when there is an excessive amount of property involved, or the circumstances require further articulation.

### Property Released on Scene / District (PD 81A)

As noted above, it is incumbent upon the MPD member to find the lawful owner upon coming into possession of property. In cases where the owner is found and the property is not needed by MPD, the property can be expeditiously released on scene. The *Property Released on Scene* form (PD81A) allows the officer to do so without having to take the property to his/her element. An entry into the Property Book (PD82), however, is still required. The *Property Released on Scene* (PD81A) is attached to this entry.

### Property Release (PD81C)

It is a common occurrence for MPD to take into possession property that is initially thought to be useful as evidence. Sometimes, however, it is determined that this property has no evidentiary value in a criminal case or investigation. In other instances, a disposition for a criminal case has been received and the property will no longer be needed as evidence. In such cases, the initial investigating officer must file a *Property Release* form (PD81C) and forward it to the Property Control Branch. The property will then either be released to its lawful owner or destroyed (example: narcotics). Note that for Suspected Proceeds of a Crime, any requested Property Release form to the investigating member must be completed within five (5) days of notification by an element Property Officer.

### Property Ownership / Classification Information Card (PD81D)

Sometimes it becomes apparent that the original classification of property taken by MPD is no longer appropriate. For example, a purse found on a crime scene and taken as Suspected Proceeds of a Crime is discovered to have no evidentiary value. MPD must then change the classification from Suspected Proceeds of a Crime to another, more applicable, one. Sometimes it is reclassified to be Found Property, Abandoned Property, etc. The form that is utilized for such instances is called the *Property Ownership / Classification Information Card* (PD 81D).

In other instances, a recovering officer may discover the identity of the owner/claimant of previously unclaimed Found Property. A *Property Ownership / Classification Information Card* form is completed in this circumstance as well, and the form is forwarded to Property Control Branch via the element Property Officer.

### Property Receipt (PD 82A)

There are occasions when a citizen will turn unclaimed property that he or she found over to MPD. This type of property shall be classified as Found Property. Upon taking possession of unclaimed property, it is MPD policy that the citizen be given a *Property Receipt* (PD82A). A copy of the Property Receipt is placed in a special file at the MPD member's element. This receipt is, of course, in addition to Property Record (PD 81) and Property Book (PD82) entry that is made for the item.

## 3.4.4    Describe the procedures for taking property into departmental custody

The property record is the centerpiece of the process of taking property into departmental custody. As already noted, with the exception of prisoner's property a Property Record must be completed whenever property is taken into departmental custody. This is in addition to the entry that is must be made in the Property Book as well as any Property Tag or Property Bag/Envelope information that needs to be completed.

When an MPD officer comes into possession of recovered property, he or she should first inspect it. For example, if the officer encounters a wallet, the officer should go through the wallet to look for any identification, money, credit cards, etc. All such contents shall be accounted for when the property is put on the Property Record and the Property Book. Another example can be a backpack or a purse. The same procedure holds true and the bag should be examined for recoverable items. Any weapons, drugs, or other contraband must be dealt with according to departmental procedures.

The officer shall then canvass and otherwise try to notify the owner of any recovered property. Hopefully, identification or other personal effects of the claimant will be found and assist in this effort. If the officer is unable to find the owner of the property, the property must be taken to an MPD district. Depending on the size of the property, it must either be bagged in a Property Bag/Envelope or tagged with a Property Tag.

**NOTE:** Be sure to include the CCN#, owner information (if available), and a thorough listing of the property on the Property Bag and in the Property Book.

The Property Record (PD81) consists of numerous spaces that describe the property and where it was found. Different sections are to be filled out by different MPD personnel.

A.  Recording Officer Information
    1.  N/A (Filled out by District/Element Property Officer, not recording officer)
    2.  Receiving Element - 1D, 2D, 3D…, NSID, etc.)
    3.  Property Book & Page Number
    4.   CCN - 15-123456Page 1 of 2, or 3,4,5 for page number
    5.  No. of Items listed below - How many items are going to the property division that are listed on this PD81.
    6.  No of Associates - How many people involved? Owner, Finder etc…
    7.  N/A (Filled out by District/Element Property Officer at a later date)
    8.  N/A (Filled in by Property Clerk)
    9.  Name of member recovering Property (Your name and badge number) may be different from box 10

10. N/A at time of submission

B.     Part 1 - Description of Property
1. Date recovered - The date the officer is putting the information in the Property Book and submitting the PD81. The date the officer comes into contact with the property.
2. Where was property found? - Location the property was recovered

Classification section:
1. Abandoned
2. Turned Over to Police for Destruction
3. Suspected Proceeds of Crime
4. Estate of Deceased
5. Evidence
6. Found
7. Safekeeping - Recovered Stolen Auto
8. Held for Civil Forfeiture
9. Impounded
10. Removed from Impounded Vehicle
11. Set Out for Eviction
12. Prisoner's Property
13. Alleged Mentally Ill
   a. Item No - Given to each individual item entered on the PD81 (1-5, continue onto another PD81 if more than 5, 6-10, etc.) Indicate page numbers in box between boxes 4 and 5. Ie. 1of 2 or 2 of 2.
   b. Description of Item: Give a brief description of the property. Do not give value when value is unknown (i.e. say yellow bracelet instead of gold, or shiny grey instead of silver), and note if broken before taken into police custody (I.e. Apple iPhone with cracked screen)
   c. Color
   d. Serial Number
   e. Classification - Choose from the above list and mark with the appropriate letter
   f. Quantity: How many? Do not use this if they are different (i.e. two cell phones should be recorded separately with different serial numbers, however 25 clear zip should be listed once with a quantity of 25).

The Following sections are to be completed by the reporting officer:
1. Part II - Motor Vehicles Impounded or in Custody: Self - explanatory, fill in fields where appropriate
2. Part III - Description of Firearms - Self - explanatory, fill in fields where appropriate
   Special Notes for filling out a Property Record Form (PD 81)
      1: Model # of weapon can be found on the slide of newer semi-automatic handguns and on the frame of most revolvers.
      2: Number of shots should indicate magazine capacity of semi-automatic or cylinder capacity of revolvers NOT the actual amount of cartridges in the firearm at the time of recovery.
      3: The officer turning over the property to either Station Clerk or the District/Element Property Officer should ensure the property has been signed for on the Property Book (PD82) by the station clerk or property before turning it over to them.
3. Part IV - Court Disposition: Completed by attorney
4. Part V - Property Ownership/Claim Information

a.  Item Nos - This corresponds with the item in question listed in Part 1, Section A, Item #
b.  Type of Associate: Owner (O), Claimant (C), Dependent (D), Lienholder (L), and Finder (F), displayed at the top. This corresponds with the item number
c.  Name of Associate - Last, First
d.  Address: #, Street, City, State, Zip
e.  Social Security Number (if necessary)
f.  Telephone Number
g.  Charge (If applicable)
h.  Arrest No. (If applicable)
i.  Disposition (If applicable)

5.  Part VI - Statement of Facts
a.  The narrative of the PD81 should include the circumstances by which MPD has come into possession of the listed property. The chain-of-custody for the property must also be included here.

The Property Book must also be completed with the requisite CCN#, Officer Name, the classification of the property, etc. A good description of the property being taken should also be written. Be sure to note the space where the element Property Officer or Station Clerk signs to acknowledge receipt of the property from the recovering member. Once complete, the Property Record (PD81) is ready for the lieutenant's signature. All Property Records must be approved by a lieutenant or above prior to listing items in the Property Book and giving them to the Property Clerk.

## 3.4.5          Describe a found property investigation

A common situation that MPD members will encounter is a Found Property investigation. Although not one of the more involved of MPD member tasks, its importance is readily apparent. As covered earlier in this lesson, the safeguarding of property is one of the most important functions of the Metropolitan Police Department. Suppose a community member presents an MPD member with property that has been found on the sidewalk. What steps must be taken? First, the MPD member must be diligent to safeguard the property. Then, the MPD member must investigate the circumstances that led to the property being found. Is it possible evidence of a crime? Was the property damaged? These are all part of a Found Property investigation. This type of investigation is recorded in the member's notebook before any departmental paperwork is initiated.

Upon being presented with Found Property, it is required that the MPD member give the citizen who found it the original of a Property Receipt (PD82A), described above. The MPD officer will turn over the form copy to his or her respective element. MPD officers should always have *Found Property* forms available for such scenarios. Please note that the Property Receipt does not infer any right to the property to the finder.

The MPD officer must then complete an Incident Report and Property Record and record an entry in the Property Book. Note that in most instances, the Property Receipt will have its Property Book entry information updated at the element. All of these tasks must be completed prior to the conclusion of the member's tour of duty.

It is however, required of the member to attempt to locate the owner of the recovered property. If this can be conveniently accomplished on the original scene, the MPD officer will obtain a signature on the *Property Released on Scene* form (PD81A). A lieutenant or above must approve of any property released

on the original scene. Satisfactory proof of ownership is required in order to release any property. If property is released on the scene, such a scenario must be articulated in the Incident Report (PD251). The MPD officer must still respond to the element complete the Property Record and Incident Report and to the property into the Property Book,.

The *Property Released on Scene* form is stapled to the Property Book entry. MPD requires that officers write "**RETURNED ON SCENE**" in bold red lettering across the *Property Released on Scene* form when doing. If the property was not returned on the scene, MPD officers must continue to reasonably attempt to find the owner of the property. If the owner is not found by the end of his or her tour of duty, the member must inform the Station Clerk who will then attempt to notify the owner. If there is still no owner found, the responsibility for the item ultimately falls upon the element Property Officer.

Remember that Found Property scenarios typically require Property Receipts and Property Released on Scene forms. This is in addition to the mandatory Property Record, Property Book entry, and Incident Report.

There are exceptions to the above procedure when encountering Found Property. For example, if the property is found inside a DC Taxicab Commission-licensed vehicle, the MPD officer must first follow the above procedures with the addition of making a notification to the DC Taxicab Commission. The notification must detail the property found. Additionally, the Incident Report must include the notification details, including the name of the person notified as well as when the notification was made.

If the Found Property was encountered on a Metrorail train or parking lot, the property must be turned over to a WMATA employee. The WMATA employee will then give the MPD officer a receipt. If the property is found on a WMATA bus, the bus driver will be given the property. Again, MPD officer will be given a receipt. Both types of property receipts must be given to the officer's element Station Clerk. An Incident Report, Property Book entry, and Property Record is still required. The narratives on these forms will indicate that the property was turned over to Metro-Transit.

***NOTE:*** Whenever taking property into the possession of the department, the recovering member must complete a Property Record, Incident Report and Property Book entry <u>every time</u>. When the Property Record is complete, it must be approved by a lieutenant or above. The Property Record will have a corresponding log in the Property Book. Every MPD member must be able to execute such tasks flawlessly. As has been mentioned earlier, there are few more important tasks that an MPD member will handling than the safeguarding of property.

**Summary**
By the end of this lesson, recruits should become adept at taking possession of different types of property and properly completing the corresponding paperwork and processing tasks. This lesson builds on the good notebook habits, basic investigative skills, and report writing abilities learned in prior lessons. It is imperative that an MPD member be able to safeguard and properly classify and process property.