## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>                    Plaintiff,<br><br>          v.<br><br>DONALD J. TRUMP, *in his official capacity*, U.S. DEPARTMENT OF DEFENSE, PETER HEGSETH, *in his official capacity*, U.S. ARMY, DANIEL P. DRISCOLL, *in his official capacity*, U.S. DEPARTMENT OF JUSTICE, PAMELA J. BONDI, *in her official capacity*, U.S. MARSHALS SERVICE, and GADYACES S. SERRALTA, *in his official capacity*,<br><br>                    Defendants. | Case No.: 1:25-cv-03005 (JMC)<br><br>Judge Jia M. Cobb |

### BRIEF OF *AMICI CURIAE* FORMER U.S. ARMY AND NAVY SECRETARIES AND RETIRED FOUR-STAR ADMIRALS AND GENERALS

Karen L. Dunn (D.C. Bar No. 1002520)
Jeannie S. Rhee (D.C. Bar No. 464127)
John Paredes (D.D.C. Bar No. NY0418)*
Dunn Isaacson Rhee LLP
401 9th St. NW
Washington, D.C. 20004
(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
jparedes@dirllp.com


*Admitted in NY only. Practice supervised by D.C. Bar members.*

**Application for admission to D.D.C. accepted. Oath of admission forthcoming.*

Jane Bentrott (D.C. Bar No. 1029681)
Protect Democracy United
2020 Pennsylvania Avenue NW
Suite #163
Washington, D.C. 20006
(202) 579-4582
jane.bentrott@protectdemocracy.org

Beau Tremitiere**
Protect Democracy United
300 Center Drive, Suite G-251
Superior, CO 80027
(202) 579-4582
beau.tremitiere@protectdemocracy.org

*Counsel for* Amici Curiae

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTEREST OF *AMICI CURIAE* ........................................................................................... 1

    INTRODUCTION ............................................................................................................ 4

    FACTUAL BACKGROUND ........................................................................................... 5

    ARGUMENT .................................................................................................................... 7

        I.     The Posse Comitatus Act Permits Non-Law-Enforcement Uses of Military Personnel for National Security and Civil Support; Violations Divert Them from Their Primary Mission ................................................................... 7

        II.    National Guard Personnel Are Not Specifically Trained to Operate in the Context of Domestic Law Enforcement ............................................................ 9

        III.   To Avoid Politicization of the Military, Deploying Military Personnel to Assist with Law Enforcement Should Be a Last Resort .................................. 11

    CONCLUSION .............................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**

*Bissonette v. Haig*,
  776 F.2d 1384 (8th Cir. 1985)
  *aff'd on reh'g en banc*, 800 F.2d 812 (8th Cir. 1986),
  *aff'd*, 485 U.S. 264 (1988) .......................................................................................... 9

*Greer v. Spock*,
  424 U.S. 828 (1976) ................................................................................................... 12

*Newsom v. Trump*,
  No. 3:25-cv-04870 (CRB), __ F. Supp. 3d __, 2025 WL 2501619
  (N.D. Cal. Sept. 2, 2025) ........................................................................................ 5, 13

*United States v. Allred*,
  867 F.2d 856 (5th Cir. 1989) ..................................................................................... 12

*United States v. Casper*,
  541 F.2d 1275 (8th Cir. 1976) .................................................................................... 10

*United States v. McArthur*,
  419 F. Supp. 186 (D.N.D. 1975) .................................................................................. 9

*United States v. Red Feather*,
  392 F. Supp. 916 (D.S.D. 1975) ................................................................................. 10

**Statutes**

10 U.S.C. § 275 ........................................................................................................... 5, 6

18 U.S.C. § 1385 ......................................................................................................... 4, 6

**Executive Orders**

Exec. Order No. 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025) ...................................... 6

Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sept. 5, 2025) ....................................... 6

**Administrative Material**

U.S. Department of Defense, Directive 1344.10, Political Activities By Members of the
  Armed Forces, § 4.1.2 *et seq.* (2008),
  https://www.fvap.gov/uploads/FVAP/Policies/doddirective134410.pdf ................................ 12

## Other Authorities

Arkin, Daniel & Mosheh Gains, *Hegseth Authorizes National Guard Troops in D.C. to Carry Weapons*, NBC News (Aug. 22, 2025), https://www.nbcnews.com/news/us-news/hegseth-authorizes-national-guard-troops-dc-carry-weapons-rcna226536 .......................................................................................... 10

Army Nat'l Guard, *About the Guard: How We Began*, https://www.nationalguard.mil/About-the-Guard/How-We-Began .......................................... 4

Army Nat'l Guard, *Our History*, https://nationalguard.com/guard-history ................................................................................... 4

Beynon, Steve & Konstantin Toropin, *Bragg Soldiers Who Cheered Trump's Political Attacks While in Uniform Were Checked for Allegiance, Appearance*, Military.com (June 11, 2025), https://www.military.com/daily-news/2025/06/11/bragg-soldiers-who-cheered-trumps-political-attacks-while-uniform-were-checked-allegiance-appearance.html ........................... 15

District of Columbia National Guard, *Joint Task Force (JTF) - DC* (Sept. 12, 2025), https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/ ..... 10

Doubler, Michael D., *Civilian in Peace, Soldier in War: The Army National Guard 1636-2000* (2003), https://www.nationalguard.mil/portals/31/Documents/About/Publications/Documents/I%20am%20the%20Guard.pdf ...................................................................................... 4

Garrett, Luke, *One Civilian Injured in Crash with D.C. National Guard Military Vehicle*, NPR (Aug. 20, 2025), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash ................................... 11

Gumbel, Andrew, *Troops and Marines Deeply Troubled by LA Deployment: 'Morale Is Not Great,'* Guardian (June 12, 2025), https://www.theguardian.com/us-news/2025/jun/12/los-angeles-national-guard-troops-marines-morale/ ......................................................................................................... 11

Horton, Alex, *National Guard Documents Show Public 'Fear,' Veterans' 'Shame,' Over D.C. Presence*, Wash. Post (Sept. 10, 2025), https://www.washingtonpost.com/national-security/2025/09/10/national-guard-trump-dc/ ..... 9

Jaffe, Greg, *Hegseth Authorizes Troops in D.C. to Carry Weapons*, N.Y. Times (Aug. 22, 2025), https://www.nytimes.com/2025/08/22/us/politics/national-guard-weapons.html ........................................................................................... 10, 14

Khurshudyan, Isabelle, et al., *With No End in Sight, National Guard Troops Deployed to DC Grow Weary*, CNN (Sept. 4, 2025), https://www.cnn.com/2025/09/04/politics/national-guardsmen-deployed-to-dc-balance . 10, 14

Klipp, Ken, *Amid Morale Problems, DC National Guard Commander Issued a Message of Gratitude to Troops' Families This Weekend*, Threads (Sept. 2, 2025), https://www.threads.com/@kenklipp/post/DOGuxh0igjL/video-amid-morale-problems-dc-national-guard-commander-issued-a-message-of-gratitude-t ................................................... 14

Mitchell, Schuyler, *The National Guard Soldier Pissed About Trump's DC Takeover*, Mother Jones (Sept. 3, 2025), https://www.motherjones.com/politics/2025/09/national-guard-morale-dc-takeover-interview-soldiers-pissed-angry/ ................................................................................. 9, 14, 15

National Guard Association of the United States, *Texas Guardsmen Rescue Over 520 Flood Victims* (Jul. 8, 2025), https://www.ngaus.org/newsroom/texas-guardsmen-rescue-over-520-flood-victims .............. 7

Reuters, *Trump Warns Protests at Military Parade Will Be Met With Force* (June 11, 2025), https://www.reuters.com/world/us/trump-warns-protests-army-parade-will-be-met-with-very-big-force-2025-06-10 ................................................................................ 15

S.C. Office of the Governor, *Gov. Henry McMaster Authorizes Deployment of National Guard to Washington, D.C.* (Aug. 16, 2025), https://governor.sc.gov/news/2025-08/gov-henry-mcmaster-authorizes-deployment-national-guard-washington-dc ................................................................................ 8

Shabad, Rebecca, *Mayor Muriel Bowser Says Trump's Surge of Federal Law Enforcement Has Lowered Crime in D.C.*, NBC News (Aug. 27, 2025), https://www.nbcnews.com/politics/politics-news/bowser-trump-police-takeover-lower-dc-crime-national-guard-ice-rcna227582 ................................................................ 14

Shorman, Jonathan, *Governors Split Over Mobilizing National Guard as Trump Seeks More Troops*, Stateline (Sept. 4, 2025), https://stateline.org/2025/09/04/governors-split-over-mobilizing-national-guard-as-trump-seeks-more-troops/ ................................................................................ 15

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are former secretaries of the Army and Navy and retired four-star admirals and generals. Collectively, they served under each president from John F. Kennedy to Barack Obama.

*Amici* are acutely interested in this case because presidential deployment of the National Guard to perform local law enforcement should be a rare and carefully considered occurrence that strictly complies with the Posse Comitatus Act. Domestic deployments that fail to adhere to these long-established guardrails threaten the Guard's core national security and disaster relief missions; place deployed personnel in fraught situations for which they lack specific training, thus posing safety concerns for servicemembers and the public alike; and risk inappropriately politicizing the military, creating additional risks to recruitment, retention, morale, and cohesion of the force.

This submission is based on *amici*'s collective experience serving in and leading our military, their direct experience commanding active-duty service personnel, and their interest in preserving our military's apolitical role in safeguarding national security.

*Amici*'s short biographies listed below capture a measure of their distinguished service to our country, as well as their expertise in matters encompassing the mission of the National Guard and armed services, and the well-being of all those who serve in uniform.

**Admiral Steve Abbot, United States Navy (Retired)**, graduated from the U.S. Naval Academy in 1966, after which he was deployed to Vietnam and began a 34-year career with the U.S. Navy. His final active-duty tour was as Deputy Commander-in-Chief, U.S. European Command from 1998 to 2000. Following his retirement, Admiral Abbot served as Deputy Homeland Security Advisor to President George W. Bush from 2001 to 2003.

---

[1] Pursuant to Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amici curiae* certify that no counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made a monetary contribution to the brief's preparation or submission.

**Admiral Thad Allen, United States Coast Guard (Retired)**, retired in 2010 as the 23rd Commandant of the U.S. Coast Guard. Admiral Allen led the federal responses to Hurricanes Katrina and Rita and the Deepwater Horizon oil spill. He led Atlantic Coast Guard forces in response to the 9/11 attacks and coordinated the Coast Guard response to the Haitian earthquake of 2010.

**Former Secretary of the Army Louis Caldera** graduated from the U.S. Military Academy at West Point and served in the Army on active duty from 1978 to 1983. He served in two Senate-confirmed positions in the Clinton Administration, including Secretary of the Army, and as an Assistant to the President and Director of the White House Military Office in the Obama Administration.

**General George Casey, United States Army (Retired)**, enjoyed a 41-year career in the U.S. Army. He is an accomplished soldier and an authority on strategic leadership. During his tenure as the Army Chief of Staff, he is widely credited with restoring balance to a war-weary Army and leading the transformation to keep it relevant in the 21st century. Prior to this, General Casey commanded the Multi-National Force – Iraq, a coalition of more than 30 countries.

**General Michael Hayden, United States Air Force (Retired)**, entered active military service in 1969. During his career, he rose to the rank of four-star general and served as Director of the Central Intelligence Agency and the National Security Agency. General Hayden also served as Commander of the Air Intelligence Agency and held senior staff positions at the Pentagon, Headquarters U.S. European Command, and the National Security Council.

**Admiral Samuel Jones Locklear, III, United States Navy (Retired)**, graduated from the U.S. Naval Academy in 1977. He served for 39 years and retired as commander of U.S. Pacific Command. His prior commands include Commander, U.S. Naval Forces Europe, U.S. Naval

Forces Africa, and Allied Joint Force Command Naples; Commander, U.S. 3rd Fleet; and Commander, Nimitz Strike Group.

**General Craig McKinley, United States Air Force (Retired)**, retired as a four-star general in November 2012 after 38 years of service. His last assignment was as the Chief of the National Guard Bureau, where he also served as a member of the Joint Chiefs of Staff. In this capacity, he was a military adviser to the President, the Secretary of Defense, and the National Security Council, and he was the Department of Defense's official channel of communication to the Governors and to State Adjutants General on all matters pertaining to the National Guard.

**Former Secretary of the Navy Sean O'Keefe** began his public service career in 1978 at the Department of Defense and as U.S. Senate staff until his appointment as the Department of Defense Comptroller and Chief Finance Officer in 1989. President George H.W. Bush later named him the 69th Secretary of the Navy. Secretary O'Keefe also served in President George W. Bush's Administration as Deputy Director of the Office of Management and Budget and the 10th Administrator of NASA.

**Admiral Bill Owens, United States Navy (Retired)**, retired in 1996 as the Vice Chairman of the Joint Chiefs of Staff. He began his career as a nuclear submariner, spending a total of 4,000 days—or more than ten years—aboard submarines, including duty in Vietnam. Admiral Owens was a senior military assistant to two Secretaries of Defense and served as commander of the U.S. 6th Fleet during Operation Desert Storm.

## INTRODUCTION

The National Guard, founded in 1636 as a citizen-soldier force, has a dual mission: (1) to serve as a reserve component of the active-duty military, and (2) to protect life and property within communities at home.[2] In the Guard's long and proud history, its members have fought in nearly every U.S. conflict since the Revolutionary War and have saved countless lives in major domestic disaster responses—indeed, thousands of members of the Guard are deployed abroad on any given day.[3]

Another tradition older than the United States itself is the strong aversion to military personnel under control of the national government engaging in local law enforcement. This prohibition was codified by Congress in 1878 in the Posse Comitatus Act,[4] 18 U.S.C. § 1385, and has been a bedrock of American federalism and civil-military relations ever since. Critically, the Posse Comitatus Act acknowledges the potential for extraordinary circumstances such as an internal rebellion justifying invocation of the Insurrection Act. Federal law also recognizes that states and territories may authorize National Guard under their control to support local law enforcement within their own communities. Notwithstanding these limited exceptions, strict adherence to this principle—that military personnel operating at the direction of the President and his subordinates may not engage in domestic law enforcement—has been a touchstone of Republican and Democratic administrations alike.

---

[2] *See About the Guard: How We Began*, Nat'l Guard, https://www.nationalguard.mil/About-the-Guard/How-We-Began (last visited Sept. 14, 2025); *Our History*, Army Nat'l Guard, https://nationalguard.com/guard-history (last visited Sept. 14, 2025).

[3] *See generally* Michael D. Doubler, *Civilian in Peace, Soldier in War: The Army National Guard 1636-2000* (2003), https://www.nationalguard.mil/portals/31/Documents/About/Publications/Documents/I%20am%20the%20Guard.pdf.

[4] Specifically, the Posse Comitatus Act prohibits federal military personnel from acting as a domestic police force unless doing so is "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

Any domestic deployment that fails to comply with the foundational principles of the Posse Comitatus Act and similar authorities[5] poses multiple risks to the core mission of the Guard and to the well-being of the troops. *First*, deploying military personnel in the context of domestic law enforcement diverts them from their primary mission, which is to be trained and ready to fight and win the nation's wars, and protect communities after disasters. Accordingly, such assignments come at the expense of local, state, and national safety, as well as troop morale. *Second*, active-duty National Guard personnel are neither intended nor specifically trained to conduct domestic law enforcement operations, which poses a danger to the safety of both the troops and the public. *Third*, use of federal military personnel in the context of law enforcement operations should be a last resort to avoid the politicization of the military, which inevitably erodes public trust, hurts recruitment, and undermines troop morale.

*Amici* submit this brief to more fully explain these risks and assist the Court in its disposition of the pending motion.

## FACTUAL BACKGROUND

The summer of 2025 has seen stark deviations from the traditional roles of the National Guard. Beginning on June 7, 2025, President Trump issued orders federalizing and deploying the California National Guard in southern California over the objections of California's governor. Underscoring the aberrational nature of this deployment, a federal court has since found that the actions the troops were ordered to undertake in California violated the Posse Comitatus Act.[6]

---

[5] For example, 10 U.S.C. § 275, which restricts the direct participation of military personnel in activities like searches, seizures, and arrests, with exceptions requiring authorization by law or regulation.

[6] *Newsom v. Trump*, No. 3:25-cv-04870 (CRB), __ F. Supp. 3d __, 2025 WL 2501619, *1 (N.D. Cal. Sept. 2, 2025).

Continuing this recent—and concerning—trend, on August 11, 2025, President Trump declared a crime emergency in Washington, D.C., and began to deploy to the District the D.C. National Guard as well as Guard troops from eight cooperating states. As in California, the local authorities never requested these deployments. Unlike in the California litigation, here the Administration does not dispute that law enforcement is a central purpose of the Guard's deployment. Rather, the President and other federal officials expressly describe the mission as designed in part to address crime.[7]

On September 4, 2025, the District of Columbia filed the present action against Defendants alleging that the deployment and conduct of the Guard in the District of Columbia is unlawful under, *inter alia*, the Posse Comitatus Act, 18 U.S.C. § 1385, and 10 U.S.C. § 275. The next day, President Trump signed an order renaming the Department of Defense the Department of War, authorizing the deployments, and setting the parameters for the use of force for the Guard troops deployed in the nation's capital. President Trump's order purports to "sharpen[] the Department's focus on [] our adversaries' focus on our willingness and availability to wage war to secure what is ours."[8] Consistent with this aggressive posture, the President has also ordered the Department to "ensure the availability of a standing National Guard quick reaction force that shall be resourced, trained, and available for rapid nationwide deployment."[9]

With these actions, the Administration has abandoned the American tradition against domestic deployment of the military for local law enforcement. Instead, against the backdrop of threats to deploy the Guard in additional cities, thousands of troops already have been deployed in our communities over the objections of local leaders.

---

[7] Exec. Order No. 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025).
[8] Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sept. 5, 2025).
[9] Exec. Order No. 14339, *supra* note 7.

**ARGUMENT**

**I.    The Posse Comitatus Act Permits Non-Law-Enforcement Uses of Military Personnel for National Security and Civil Support; Violations Divert Them from Their Primary Mission**

The National Guard is unique within the U.S. military as a dual-status force with state *and* federal responsibilities, allowing it to be activated under the authority of either state or federal leadership, pursuant to strict limitations set forth in law. The Guard plays a critical role in protecting national security as the primary combat reserve of the U.S. Army and U.S. Air Force. Within the United States, the Guard primarily provides domestic civil support, natural disaster relief, border security, election support, and other support as requested by governors and/or the President. In rare times of civil unrest, the Guard has been called to provide law enforcement support, but almost always under the direction of the relevant governor, not the President. With limited exceptions, the Posse Comitatus Act prohibits the National Guard from engaging in domestic law enforcement while in federalized status.

According to the National Guard Association of the United States, "[t]he National Guard are a critical component of disaster response across the nation, with members trained to use military expertise and equipment [to] provide fast and effective emergency support in severe weather events such as hurricanes and wildfires, and to conduct search and rescue operations."[10] The D.C. National Guard, along with the National Guards of the states of Ohio, South Carolina, West Virginia, Mississippi, Tennessee, Louisiana, South Dakota, and Georgia—the eight states that have sent over 1,000 additional Guard troops to the capital—are vital to local disaster preparedness and emergency response needs.

---

[10] *E.g.*, *Texas Guardsmen Rescue Over 520 Flood Victims*, Nat'l Guard Assoc. of the U.S. (Jul. 8, 2025), https://www.ngaus.org/newsroom/texas-guardsmen-rescue-over-520-flood-victims.

South Carolina's governor seemed to acknowledge the risks of sending National Guard troops away to D.C. during the state's hurricane season, stating that "should a hurricane or natural disaster threaten our state, these men and women can and will be immediately recalled home to respond."[11] But the governor's statement elides the likely operational difficulties of recalling hundreds of deployed troops and diverting them to a disaster zone, not to mention the risk of burnout among service members immediately recalled from one mission to another. Ultimately, the diversion of Guard troops from their home states during critical times—including, for many of the states participating in the D.C. deployment, hurricane season—risks degrading those states' emergency preparedness.

The proliferation of domestic deployments of the National Guard for missions outside their core duties also threatens the long-term readiness of the Guard and the U.S. military. Non-emergency deployments—especially lengthy or back-to-back deployments—reduce combat preparedness by cutting into training time and contributing to fatigue and burnout. Most Guard members have families and civilian lives that they put on hold when deployed, as well as employers who may grow frustrated by frequent, months-long absences on politically controversial missions.

Excessive or inappropriate deployments can seriously impair morale and exacerbate retention and recruitment challenges within the National Guard. A National Guard Public Affairs document highlighted "[m]entions of [f]atigue, confusion, and demoralization" among the National Guard troops deployed in the District, who cited concerns that they are "just gardening,"

---

[11] *Gov. Henry McMaster Authorizes Deployment of National Guard to Washington, D.C.*, S.C. Office of the Governor (Aug. 16, 2025), https://governor.sc.gov/news/2025-08/gov-henry-mcmaster-authorizes-deployment-national-guard-washington-dc.

have an "unclear mission," and are driving a "wedge between citizens and the military."[12] A National Guard recruiter from a state that deployed troops to D.C. has reportedly stated that the D.C. mission "has deterred potential recruits and pushed already disillusioned soldiers to their breaking points."[13] *Amici* are concerned for the Guard's readiness for the primary purposes for which it was built: as combat reserve forces to protect national security, and within each state, rapid response to the needs of local communities.

## II.  <u>National Guard Personnel Are Not Specifically Trained to Operate in the Context of Domestic Law Enforcement</u>

National Guard personnel typically receive limited instruction and training on how to handle civil disturbances. The minimal training they receive pales in comparison to the in-depth and ongoing education provided to civilian law enforcement officers. Domestic law enforcement—particularly in emotionally charged situations and instances of civil unrest—requires a specific skill set for which law enforcement officers train extensively and continually, including training in de-escalation and in respecting civilians' constitutional rights on U.S. soil. Military personnel do not receive that specific training. *See Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985) ("[M]ilitary enforcement of the civil law leaves the protection of vital Fourth and Fifth Amendment rights in the hands of persons who are not trained to uphold these rights."), *aff'd on reh'g* en banc, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988); *United States v. McArthur*, 419 F. Supp. 186, 193–94 (D.N.D. 1975) ("It is the nature of their primary mission that military personnel must be trained to operate under circumstances where the protection of

---

[12] Alex Horton, *National Guard Documents Show Public 'Fear,' Veterans' 'Shame,' Over D.C. Presence*, Wash. Post (Sept. 10, 2025), https://www.washingtonpost.com/national-security/2025/09/10/national-guard-trump-dc/.

[13] Schuyler Mitchell, *The National Guard Soldier Pissed About Trump's DC Takeover*, Mother Jones (Sept. 3, 2025), https://www.motherjones.com/politics/2025/09/national-guard-morale-dc-takeover-interview-soldiers-pissed-angry/.

constitutional freedoms cannot receive the consideration needed in order to assure their preservation. The posse comitatus statute is intended to meet that danger."), *aff'd sub nom. United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976). Our longstanding tradition of entrusting domestic law enforcement to local, state, and federal police has allowed the U.S. military to remain focused on its core mission.

The more than 2,000 Guard troops that make up Joint Task Force DC[14] have reportedly been divided into two groups: the "safe and secure mission" and the "beautification task force."[15] *Amici* are concerned that the troops assigned to the "safe and secure mission"—those tasked with law enforcement activities—are not set up for success, with potentially grave risks of escalation or confusion. *See, e.g.*, *United States v. Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1975) ("Activities which constitute an active role in direct law enforcement are: arrest; seizure of evidence; search of a person; search of a building; investigation of crime; interviewing witnesses; pursuit of an escaped civilian prisoner; search of an area for a suspect and other like activities."). Indeed, most of the Guard members deployed to D.C. reportedly lack law enforcement training,[16] inviting confusion and disagreement over what constitutes appropriate conduct in contentious civilian situations and risking miscalculations in the heat of the moment. Nonetheless, Secretary Hegseth signed an order authorizing the Guard members deployed to Washington, D.C. to carry weapons of war as part of their mission.[17] *Amici* are concerned that this could put both the troops

---

[14] *Joint Task Force (JTF) - DC*, District of Columbia National Guard (Sept. 12, 2025), https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/.
[15] Isabelle Khurshudyan et al., *With No End in Sight, National Guard Troops Deployed to DC Grow Weary*, CNN (Sept. 4, 2025), https://www.cnn.com/2025/09/04/politics/national-guardsmen-deployed-to-dc-balance.
[16] Greg Jaffe, *Hegseth Authorizes Troops in D.C. to Carry Weapons*, N.Y. Times (Aug. 22, 2025), https://www.nytimes.com/2025/08/22/us/politics/national-guard-weapons.html.
[17] Mosheh Gains & Daniel Arkin, *Hegseth Authorizes National Guard Troops in D.C. to Carry Weapons*, NBC News (Aug. 22, 2025, 14:51 ET), https://www.nbcnews.com/news/us-news/hegseth-authorizes-national-guard-troops-dc-carry-weapons-rcna226536.

and the public they are sworn to protect at risk, as the weapons training received by the Guard is not applicable to patrolling the streets of American cities in peacetime.

These differences could lead to deadly consequences. For example, in a joint operation between the Los Angeles Police Department and the Marines during the 1992 Los Angeles riots, a police officer asked fellow Marines to "cover me," intending for the Marines to be prepared to fire to protect him *only if necessary*. The Marines, however, understood the request in their own parlance and fired over 200 rounds into a civilian's house.[18] These seemingly small details can be the difference between life and death for soldiers, law enforcement officers, and the people they are sworn to protect. More recently, on August 20, 2025, a sixteen-ton National Guard Mine-Resistant Ambush Protected All-Terrain Vehicle (MATV) driving through downtown Washington, D.C. in a five-vehicle convoy reportedly crashed into a car, injuring the civilian driver and causing him to be hospitalized.[19] These examples underscore the importance of adhering to the foundational principle that the military should be kept out of civilian law enforcement whenever possible.

### III.     To Avoid Politicization of the Military, Deploying Military Personnel to Assist with Law Enforcement Should Be a Last Resort

A bedrock principle of American democracy is that our military is apolitical. That principle is reflected in the legislative and judicial history of the Posse Comitatus Act, which Congress passed in 1878 to restore the traditional separation between the federal military and civilian authorities in domestic affairs that had come undone during the Civil War and politically turbulent

---

[18] *E.g.*, Andrew Gumbel, *Troops and Marines Deeply Troubled by LA Deployment: 'Morale Is Not Great,'* Guardian (June 12, 2025, 06:00 ET), https://www.theguardian.com/us-news/2025/jun/12/los-angeles-national-guard-troops-marines-morale/.

[19] Luke Garrett, *One Civilian Injured in Crash with D.C. National Guard Military Vehicle*, NPR (Aug. 20, 2025, 16:17 ET), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash.

Reconstruction era. *See United States v. Allred*, 867 F.2d 856, 870 (5th Cir. 1989) (explaining that the "legislative and judicial history of the Act . . . indicates that its purpose springs from an attempt to end the use of federal troops to police state elections in ex-Confederate states"). Efforts to establish new governments in ex-Confederate states were particularly contentious during the decade following the Civil War, with presidents receiving more requests for military aid from state governors in those years than all previous decades combined, and sometimes even receiving simultaneous requests from two rival governors claiming legitimacy in the same state after an election. Courts and military scholars alike have recognized the American tradition and practical need to keep the military apolitical. *See, e.g.*, *Greer v. Spock*, 424 U.S. 828, 839 (1976) (upholding military regulation prohibiting partisan political activity and recognizing the need for the military to be "insulated from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates"). As the Supreme Court has observed, the policy keeping the military apolitical is rooted in "American constitutional tradition" and has been "reflected in numerous laws and military regulations throughout our history." *Id.*

Accordingly, U.S. military personnel are not permitted to engage in political conduct while on duty or to use their military status to endorse political candidates or political causes.[20] Critical to the military's ability to carry out its core functions is retaining the public's respect and maintaining cohesion and unity within its ranks—regardless of the political leanings of individual citizens or soldiers. Particular caution is therefore necessary if the U.S. military is to be deployed domestically in the context of a politically charged situation. It is essential that such deployments be a last resort, especially in the context of constitutionally protected activities or activities likely to be perceived as partisan intimidation tactics.

---

[20] *See* U.S. Dep't of Def., Directive 1344.10, Political Activities By Members of the Armed Forces, § 4.1.2 *et seq.* (2008), https://www.fvap.gov/uploads/FVAP/Policies/doddirective134410.pdf.

For example, members of the military were ordered to accompany federal agents on an operation in MacArthur Park in Los Angeles, for the stated purpose of "demonstrating federal reach and presence."[21] According to the troops' own planning documents, the operation was rated high-risk due in part to likely crowds, and the risk of inaction was low and hypothetical.[22] *Amici* are concerned that service members deployed on these and similar missions could be perceived as entangled with a partisan undertaking, thereby risking the trust of all Americans.

In line with the need to avoid politicizing the military, federal deployments on U.S. soil have hitherto been rare—reserved for the most serious situations and only with clear legal justification. Prior to the recent deployment in Southern California that a federal district court found to have violated the Posse Comitatus Act, *Newsom v. Trump*, No. 3:25-cv-04870 (CRB), __ F. Supp. 3d __, 2025 WL 2501619, *1 (N.D. Cal. Sept. 2, 2025), the last major domestic deployment of federal troops occurred during the 1992 Los Angeles riots. In stark contrast to the present deployment in D.C., the 1992 deployment occurred at the request of California Governor Pete Wilson pursuant to the Insurrection Act. Further, that deployment followed dozens of civilian fatalities, the burning of entire blocks of homes and businesses, and widespread violence and looting. Notwithstanding routine crime that is troubling wherever it occurs, the situation in Washington, D.C. appears to be markedly different from Los Angeles in 1992. As of the filing of this brief, there have been no reports of widespread unrest of any kind, nor have Defendants claimed as much.

Deployments over the objections of state and local officials have been even rarer, involving situations where state and local officials openly defied court orders or refused to protect citizens exercising their constitutional rights, such as when the Alabama National Guard was federalized

---

[21] *Newsom*, 2025 WL 2501619 at *7.
[22] *Id.*

in 1965 to protect those marching from Selma to Montgomery for civil rights. Yet here, Washington, D.C. officials have not requested National Guard assistance and, to the contrary, have commented that the deployment of military troops would be more likely to escalate, rather than lessen, the public safety risk.[23] Moreover, reports of the troops' low morale have surfaced, including discomfort with being drawn into domestic policing and concerns that much of the public view the deployments as political, unnecessarily pitting the Guard against the people they have sworn to protect.[24]

*Amici* are concerned that the morale of troops has been and will be undermined if their sacrifices are perceived to be part of a political exercise rather than in response to a true crime emergency or operational need.[25] Particularly given its breadth and aberrant nature, the troops reportedly lack a clear understanding of their mission or how to know if it has been achieved.[26] As in California, the local authorities do not support the local deployment of the military, exacerbating the corrosive appearance that the military is being set against the civilian population, at least as to the Guard members assigned to the "Safe and Secure Task Force." On the other hand, many other Guard members deployed to Washington have been assigned to the "Beautification Task Force."

---

[23] Rebecca Shabad, *Mayor Muriel Bowser Says Trump's Surge of Federal Law Enforcement Has Lowered Crime in D.C.*, NBC News (Aug. 27, 2025, 17:43 ET), https://www.nbcnews.com/politics/politics-news/bowser-trump-police-takeover-lower-dc-crime-national-guard-ice-rcna227582.

[24] "'Go home,' a crowd of people chanted . . . to some troops standing outside the Columbia Heights metro." Khurshudyan, *supra* note 15.

[25] *See, e.g.*, Ken Klipp, *Amid Morale Problems, DC National Guard Commander Issued a Message of Gratitude to Troops' Families This Weekend*, Threads (Sept. 2, 2025), https://www.threads.com/@kenklipp/post/DOGuxh0igjL/video-amid-morale-problems-dc-national-guard-commander-issued-a-message-of-gratitude-t.

[26] One Guard member spoke out, saying: "There's no clear mission or understanding of that mission." Mitchell, *supra* note 13. And "[a] South Carolina National Guard officer who knows soldiers deployed to Washington said that all servicemembers must obey lawful orders, but 'the problem is, this is not a clear set mission.'" Khurshudyan, *supra* note 15. *See also* Jaffe, *supra* note 16.

These troops have reportedly been nicknamed the "National Guardeners," as their assignments have included cleaning up trash, raking leaves, and laying mulch in city parks.[27] While Guard members and their families are accustomed to sacrificing for their country, *amici* are concerned that this use of the Guard degrades morale—particularly as many have missed holidays and important life events with their families, such as their children's first days of school, for operations that many perceive to be part of a politicized battle for control rather than for an emergency need.[28]

The risks of politicization under these circumstances are profound and not speculative, especially where the President has, in his official capacity, overtly pitted the military against his professed political opponents. In a recent speech before U.S. Army personnel at Fort Bragg, President Trump repeatedly referred to the Los Angeles protests and denounced the Governor of California, while encouraging service personnel to cheer as if at a political rally.[29] Speaking in advance of a military parade held in observance of the Army's 250th birthday, President Trump said, "For those people that want to protest, they're going to be met with very big force."[30] While the President is entitled to criticize his political opponents, involving the military in domestic political skirmishes risks harming the military's ability to recruit and retain servicemembers and garner broad public support for its budgets and programs, therefore undermining its ability to

---

[27] Mitchell, *supra* note 13.

[28] *See, e.g.*, Jonathan Shorman, *Governors Split Over Mobilizing National Guard as Trump Seeks More Troops*, Stateline (Sept. 4, 2025, 05:00 ET), https://stateline.org/2025/09/04/governors-split-over-mobilizing-national-guard-as-trump-seeks-more-troops/.

[29] Konstantin Toropin & Steve Beynon, *Bragg Soldiers Who Cheered Trump's Political Attacks While in Uniform Were Checked for Allegiance, Appearance*, Military.com (June 11, 2025, 17:50 ET), https://www.military.com/daily-news/2025/06/11/bragg-soldiers-who-cheered-trumps-political-attacks-while-uniform-were-checked-allegiance-appearance.html (reporting on the event and the aftermath, and noting "no fat soldiers" were allowed to attend, and soldiers who disagree with the current administration were instructed not to attend).

[30] *Trump Warns Protests at Military Parade Will Be Met With Force*, Reuters (June 11, 2025, 09:58 ET), https://www.reuters.com/world/us/trump-warns-protests-army-parade-will-be-met-with-very-big-force-2025-06-10.

achieve its core mission of protecting the nation. It is precisely for this reason that the military should be kept out of domestic law enforcement whenever possible.

## CONCLUSION

The National Guard serves a critical role in U.S. national security. Domestic deployments that fail to adhere to exacting legal requirements and long-established guardrails threaten their core national security and disaster relief missions, put the military at risk of politicization, and pose serious risks to both servicemembers and civilians. We appreciate the Court's due consideration of these critical factors in adjudicating the issues presented in the pending motion.

Dated: September 15, 2025

Karen L. Dunn (D.C. Bar No. 1002520)
Jeannie S. Rhee (D.C. Bar No. 464127)
John Paredes (D.D.C. Bar No. NY0418)*
Dunn Isaacson Rhee LLP
401 9th St. NW
Washington, D.C. 20004
(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
jparedes@dirllp.com

*Admitted in NY only. Practice supervised by D.C. Bar members.*

**Application for admission to D.D.C. accepted. Oath of admission forthcoming.*

Respectfully Submitted,

/s/ *Jane Bentrott*

Jane Bentrott (D.C. Bar No. 1029681)
Protect Democracy United
2020 Pennsylvania Avenue NW
Suite #163
Washington, D.C. 20006
(202) 579-4582
jane.bentrott@protectdemocracy.org

Beau Tremitiere**
Protect Democracy United
300 Center Drive, Suite G-251
Superior, CO 80027
(202) 579-4582
beau.tremitiere@protectdemocracy.org

*Counsel for* Amici Curiae