# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,                     *

      *Plaintiff*,                           *

    v.                                    *        No. 1:25-cv-03005-JMC

DONALD J. TRUMP, *et al.*,                *

      *Defendants*.                         *

                      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**BRIEF FOR THE STATES OF MARYLAND, CALIFORNIA, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, MAINE, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................1

IDENTITY AND INTERESTS OF AMICI ...............................................................1

ARGUMENT ............................................................................................................3

I.    THE CONSTITUTION PRECLUDES USING THE MILITARY AS LAW ENFORCEMENT IN THE
      DISTRICT OF COLUMBIA..............................................................................3

II.   DEPLOYMENT OF THE NATIONAL GUARD INFRINGES ON THE POLICE POWERS
      RESERVED TO STATES AND LOCALITIES...................................................6

III.  FEDERALLY DIRECTED NATIONAL GUARD ELEMENTS SHOULD NOT DISPLACE LOCAL
      LAW ENFORCEMENT .....................................................................................8

IV.   STATES NEED THE NATIONAL GUARD TO BE AVAILABLE FOR VITAL NATURAL
      DISASTER AND SECURITY FUNCTIONS.......................................................11

V.    CALIFORNIA'S EXPERIENCE ILLUSTRATES THE HARM CAUSED BY DEPLOYING THE
      FEDERALIZED NATIONAL GUARD.................................................................13

CONCLUSION.........................................................................................................17

# TABLE OF AUTHORITIES

Page

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982)...................... 7, 15

*Bissonette v. Haig*, 776 F.2d 1384 (8th Cir. 1985) ................................................... 3, 4

*Laird v. Tatum*, 408 U.S. 1 (1972) ................................................................ 3

*Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724 (1985) ............................... 6

*New York v. New Jersey*, 598 U.S. 218 (2023)..................................................... 7

*Perpich v. Department of Def.*, 496 U.S. 334 (1990)............................................... 5

*Reid v. Covert*, 354 U.S. 1 (1957) ................................................................ 4, 7

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 15.................................................................... 4

U.S. Const. art. II, § 2, cl. 1 ................................................................... 4

## Statutes

D.C. Code § 5-101.03(1), (2), (10) ............................................................. 7

Pub. L. No. 108-458, 118 Stat. 3638 (2004)..................................................... 9

## Rules

D.D.C. Loc. Civ. R. 7(o)(1) .................................................................... 2

## Miscellaneous

Alyce McFadden, *Protesters Against National Guard Deployment Flood D.C. Streets*, N.Y. Times (Aug. 16, 2025), https://tinyl.co/3hLF ...................................................... 16

Amici Curiae Brief of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals, *Newsom v. Trump* ("*Newsom v. Trump*") (June 11, 2025) ...............................11

Anshu Siripurapu et al., *What Does the U.S. National Guard Do?*, Council on Foreign Relations (last updated Sept. 3, 2025), https://tinyurl.com/3t44h3td .................................... 12

Army National Guard, Basic Training Phases, https://tinyurl.com/23n4kveh ............................ 10

Brad Ulery, *Washington, DC, Residents Protest Against Trump's Troop Deployment to the City*, Reuters (Sept. 6, 2025), https://tinyurl.com/26qndmgt ......................................... 16

Colo. Nat'l Guard Pub. Affairs, *Colorado National Guard Supports Hurricane Milton Relief Efforts*, Colo. Nat'l Guard (Oct. 9, 2024), https://tinyurl.com/mr2jbe95 ............................. 12

D.C. Nat'l Guard, *National Guard Support to the District of Columbia and the 60th Presidential Inauguration* (Jan. 13, 2025), https://tinyurl.com/yv242vvh ................................................. 13

Decl. of Brandi Jones, 19 (ECF 183-7), *Newsom v. Trump* (Sept. 2, 2025) ................................ 16

Decl. of Brian Olmstead, 12-14 (ECF 8-2), *Newsom v. Trump* (June 11, 2025) ......................... 16

Decl. of Carlos A. Singer, 7-10 (ECF 183-3), *Newsom v. Trump* (Sept. 2, 2025) ....................... 14

Decl. of Joseph Zizi, 12 (ECF 77-3), *Newsom v. Trump* (June 16, 2025) .................................... 16

Decl. of Oliver Alpuche, 10 (ECF 183-6), *Newsom v. Trump* (Sept. 2, 2025) ............................ 14

Decl. of Paul S. Eck. 9, 11-12 (ECF 87-2), *Newsom v. Trump* (June 19, 2025) .......................... 15

Declaration and Resolves of the First Continental Congress (Oct. 14, 1774), https://tinyurl.com/v2ntbfj7 ........................................................................................................................... 4

Dep't of Just. Off. of the Insp. Gen., A Review of the Department of Justice's Response to Protest Activity and Civil Unrest in Washington, D.C. in Late May and Early June 2020 (24-085), https://tinyurl.com/4u5wydjs ............................................................................................. 9

Edward Orozco Flores et al., *The Effects of Recent Federal Immigration Enforcement on California's Private Sector Employment*, U.C. Merced Community & Labor Ctr. (Aug. 2025), https://tinyl.co/3cKl ................................................................................................... 14

Emergency Mgmt. Assistance Compact (EMAC), *What is EMAC?*, https://tinyurl.com/4s5yzh6a ................................................................................................................................................. 12

Exec. Order No. 14,347, Restoring the United States Department of War, 90 Fed. Reg. 43,893 (Sept. 5, 2025) ......................................................................................................................... 8

Final Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, H.R. Rep. No. 117-663 (2022) .............................................................................. 10

Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181 (1940). 5

*Governor Carney to Activate Delaware National Guard to Assist with Florida's Hurricane Response*, Office of the Governor (Oct. 8, 2024), https://tinyurl.com/4z5vxdux ................... 12

Hailey Branson-Potts & Phi Do, *Veterans' Advocates Warn of Low Morale Amid L.A. Deployment*, L.A. Times (June 24, 2025), https://tinyurl.com/yc8ymxse ............................ 16

Hayley Smith, *California's National Guard Fire Crews Are Operating at 40% Capacity Due to Trump's Deployment*, L.A. Times (June 26, 2025), https://tinyl.co/3gw6 ............................ 15

Isabelle Khurshudyan et al., *With No End in Sight, National Guard Troops Deployed to DC Grow Weary*, CNN (Sept. 4, 2025), https://tinyl.co/3hH3 ................................................................. 16

Jill Cowan & Mimi Dwyer, *Federal Agents March Through L.A. Park, Spurring Local Outrage*, N.Y. Times (July 7, 2025), https://tinyurl.com/ye6dvrec ........................................................ 14

Jonathan J. Cooper & Leah Askarinam, *Trump Expands Targets for Possible Military Deployment to More Democratic-Led Cities*, PBS (Aug. 24, 2025), https://tinyl.co/3hHN .. 17

Juliana Kim et al., *Trump Threatens 'Apocalypse Now'-Style Action Against Chicago to Boost Deportations*, NPR (Sept. 6, 2025), https://tinyurl.com/4j6uv38x ........................................... 2

Julie Watson & Christopher Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://tinyurl.com/mvsjm34m ............... 14

Lt. Col. Bradford Leighton, *Ill. Nat'l Guard Helps Civilian Agencies Fight flooding*, Nat'l Guard (June 3, 2019), https://tinyurl.com/yza95rrs .................................................................... 11

Lt. Col. Mark C. Weston, U.S. Army War College Strategy Research Project, Review of the Posse Comitatus Act After Hurricane Katrina 16 (2006), https://apps.dtic.mil/sti/tr/pdf/ADA448803.pdf....................................................................... 10

Maj. J. Scott Detweiler, *Vermont National Guard[] Support Cyclone Beryl Response*, DVIDS (July 11, 2024), https://tinyurl.com/53kpe6yv........................................................................... 11

Md. Nat'l Guard, *Maryland National Guard Activated to Support Winter Storm Response Across the State* (Jan. 8, 2025), https://tinyurl.com/nufjdnmt ............................................................ 11

Md. Nat'l Guard, *Press Release: Maryland National Guard Mobilized for Hurricane Helene Support in North Carolina* (Sept. 28, 2024), https://tinyurl.com/mr42nftw. .......................... 12

Memorandum from Deputy Assistant Att'y Gen. Mary C. Lawton to Assistant Att'y Gen. Antonin Scalia, *Laws Relating to Civil Disturbances* (Jan. 6, 1975) ....................................... 5

Police Exec. Res. Forum, MPD Leaders Should Remain in Charge of Their Police Department (Aug. 16, 2025), https://tinyurl.com/3wn4f4z9 ....................................................................... 8

President Dwight D. Eisenhower, Radio and Television Address to the American People on the Situation in Little Rock (Sept. 24, 1957), https://tinyurl.com/yzer647h .................................. 6

President George Bush, Address to the Nation on the Civil Disturbances in Los Angeles, California (May 1, 1992), https://tinyurl.com/bdferz78 ........................................................... 6

Presidential Memoranda, Department of Defense Security for the Protection of Department of Homeland Security Functions (June 7, 2025), https://tinyl.co/3hFo ...................................... 13

Sgt. 1st Class Jon Soucy, *National Guard Members Continue LA Wildfire Response,* National Guard (Jan. 21, 2025), https://tinyurl.com/j2nmkwmv .........................................................11

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://tinyurl.com/bd7v8ree ............................................................. 16

State of Conn., *Governor Lamont Announces Connecticut National Guard Sending Additional Soldiers and Aircraft to North Carolina for Further Hurricane Helene Disaster Assistance* (Oct. 3, 2024), https://tinyurl.com/3etmyduu .......................................................................... 12

State of N.Y., *Governor Hochul Announces 65 New York National Guard Soldiers and Airmen Are Deploying to Assist in Florida in Responding to the Impact of Hurricane Milton*, New York's Governor's Office (Oct. 9, 2024), https://tinyurl.com/3new5njc ................................ 12

*The Federalist* No. 29 (Hamilton) ............................................................................... 6

Trial Tr. 130:2-4 (ECF 162), *Newsom v. Trump* (Aug. 11, 2025) ................................... 15

U.S. Air Force, Basic Military Training, https://tinyurl.com/4wy75u4z ...................................... 10

U.S. Dep't of Def., Trump Renames DOD to Department of War, https://tinyurl.com/ymy9w5zw ...................................................................................... 8

William Blackstone, *Commentaries on the Laws of England* (1769) ............................................. 7

## INTRODUCTION

President Trump's deployment of National Guard units without the consent of the District of Columbia, and in violation of the statutes on which the President relies, is unlawful, unconstitutional, and undemocratic.  It is also inconsistent with one of our Nation's founding principles, namely that freedom depends on subordinating the military to civilian authority.  By calling forth troops when there is no invasion to repel and no rebellion to suppress, and when state and local law enforcement are fully able to execute the laws, the President flouts the vision of our Founders, undermines the rule of law, and sets a chilling precedent that threatens the constitutional rights of Americans everywhere.

The District of Columbia and States across the country rely on the National Guard to protect their residents and save lives.  National Guard troops fight fires, respond to hurricanes, protect residents from flooding, and provide security at major events.  By unlawfully deploying National Guard troops, and by threatening to deploy the Guard of every State at his whim, the President has attacked State sovereignty, harmed local jurisdictions, and made us less safe.

These harms are not abstract.  As discussed below, California—one of the amici—is currently experiencing these harms from President Trump's deployment of the California National Guard in Los Angeles.  Among other things, that deployment has diverted the National Guard from important state missions and undermined local law enforcement by raising tensions within communities.  All amici States are threatened by such injuries so long as the President wields unchecked authority to militarize our nation's streets.

## IDENTITY AND INTERESTS OF AMICI

The States of Maryland, California, Arizona, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin ("the States")

respectfully submit this brief in support of plaintiff District of Columbia's motion for a preliminary injunction.[1] Because President Trump continues to threaten many of the States with similar action, they have significant interests in preventing the President's unlawful deployment of the National Guard in the District of Columbia and elsewhere.

First, the States have a sovereign interest in protecting public safety in accordance with their own laws and law enforcement agencies, which are bound by policies and rules of conduct tailored to the communities they serve. Today federally directed troops patrol the District of Columbia, but tomorrow they may be deployed elsewhere, as the President has repeatedly threatened and has already ordered in California.[2] Supplanting state law enforcement with federally directed soldiers would violate the Constitution, infringe on state sovereignty, and impede States' own efforts to effectuate their police powers and execute their laws. If anything, such disruption of criminal authorities makes law enforcement less effective.

Second, the States have an interest in ensuring that their National Guard units are available and able to perform the essential services they provide. As discussed below, National Guard personnel provide a host of critical services across the country. For instance, they respond to wildfires, floods, and hurricanes; respond to chemical, biological, radiological, and nuclear incidents; and provide cybersecurity and election support. Allowing the unlawful deployment, federalization, or other presidential direction of the National Guard necessarily pulls

---

[1] The States submit this brief based on this Court's Local Civil Rule 7(o)(1), under which "a state may file an amicus curiae brief without the consent of the parties or leave of Court." *Id.*

[2] Juliana Kim et al., *Trump Threatens 'Apocalypse Now'-Style Action Against Chicago to Boost Deportations*, NPR (Sept. 6, 2025), https://tinyurl.com/4j6uv38x ("Trump had mentioned the three cities—Chicago, Baltimore and New Orleans—this week as possible places for troop deployment in order to curb crime, though data shows that violent crime has trended down in those cities over the last few years.").

servicemembers away from responding to emergencies and performing vital services for which they are specially trained, and which the States cannot easily replace.

Third, and finally, the States have a compelling interest in maintaining a free society in which neither speech nor commerce is chilled by the presence of military forces. The District of Columbia and California have already seen significant declines in economic activity due to the deployment of National Guard troops. Indeed, soldiers' patrols have often left streets deserted, silencing the vibrant activity that defines a thriving community. The States accordingly support the District of Columbia in its effort to restore economic liberty and the freedom of expression that animates a healthy democracy.

## ARGUMENT

I. **THE CONSTITUTION PRECLUDES USING THE MILITARY AS LAW ENFORCEMENT IN THE DISTRICT OF COLUMBIA.**

Using the military for local law enforcement, as the President has done in the District, upsets the careful balance between civilian and military authority set forth in the Constitution. Maintaining civilian control is vital for maintaining the compact that exists between the public and all levels of government, including within the States, because the "use of military forces to seize civilians can expose civilian government to the threat of military rule and the suspension of constitutional liberties." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985), *on reh'g*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988). Military force may also threaten "vital Fourth and Fifth Amendment rights," "chill the exercise" of the rights to "speak freely and to vote," and "create the atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Id.* Accordingly, there is a "traditional and strong resistance of Americans to any military intrusion into civilian affairs" with "deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). The

President's actions thus threaten the "civilian rule [that] is basic to our system of government." *Bissonette*, 776 F.2d at 1387.

Indeed, from the birth of the republic, our leaders recognized that standing armies represent an inherent threat to liberty and, in peacetime, must not be deployed without the consent of the local populace. The Continental Congress stated in 1774 that "keeping a standing army in these colonies, in times of peace, without the consent of the legislature of that colony, in which such army is kept, is against law." Declaration and Resolves of the First Continental Congress (Oct. 14, 1774), https://tinyurl.com/v2ntbfj7; *see also* William S. Fields & David T. Hart, *The Militia and the Constitution: A Legal History*, 136 Mil. L. Rev. 1, 26 (1992) (explaining that several early state declarations of rights agreed that "standing armies are dangerous to liberty, and ought not to be raised or kept up, without legislative consent").

Accordingly, the framers of the Constitution recognized that an army, while "a necessary institution," was also "dangerous to liberty if not confined within its essential bounds." *Reid v. Covert*, 354 U.S. 1, 24 (1957) (plurality opinion). The Constitution reflects this delicate balance, and that is particularly true with respect to state militias: States retain the authority to appoint officers and train the militia, and Congress holds the power to "call[] forth the Militia" only in specified circumstances, namely, "to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Accordingly, the President holds the role of "Commander in Chief of . . . the Militia of the several States," but only "when called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

Acting under the Militia Clauses, in the early 20th century Congress created the modern National Guard as the successor to the state militia and clarified the circumstances under which the National Guard may be federalized and deployed. *See Perpich v. Dep't of Def.*, 496 U.S. 334,

342 (1990).  As the House Report accompanying the new law explained, the National Guard was "never designed to be a militia of the United States"; thus, the President could not call up the National Guard at his pleasure but only in specific enumerated "contingencies."[3]  The House Report emphasized that "[i]t was the hereditary fear of standing armies, as a menace to liberty in time of peace, which led the framers of the Constitution to provide that the militia should always remain a militia of the States."[4]

    While the name and precise legal authorities of the National Guard have evolved over time, the federal government may use these military units to suppress disorder only as "a last resort"—such as when a State requests help to quell an insurrection, when assistance is necessary to enforce a federal court order, or when state and local law enforcement are unable to enforce the law.[5]  Thus, the militia or National Guard was called to respond to armed uprisings like the Whiskey Rebellion in 1794, the refusal to comply with desegregation orders in Little Rock in 1957, and the Los Angeles riots in 1992.  Yet even when Presidents have deployed the National Guard, they have made plain the inherent limits of the Guard's authority, stressing that National Guard personnel are not "used to relieve local and state authorities of their primary duty to preserve the peace and order of the community" (as President Eisenhower put it in 1957), but may be used, for example, to

---

[3] Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 195 n.74 (1940) (quoting H.R. Rep. No. 1094, 57th Cong., 1st Sess., at 22-23 (1902)).

[4] *Id.*

[5] Mem. from Deputy Assistant Att'y Gen. Mary C. Lawton to Assistant Att'y Gen. Antonin Scalia, Law Relating to Civil Disturbances, at 9 (Jan. 6, 1975), https://tinyurl.com/yc8ns5mx.

supplement state resources in preventing unrest "at the request of the Governor and the Mayor" (as President George H.W. Bush explained in 1992).[6]

When debating the Constitution, Alexander Hamilton thought it "preposterous" that militia would ever be forcibly deployed to another jurisdiction to impose a President's will. *The Federalist* No. 29 (Hamilton) (rejecting the "exaggerated and improbable suggestions" that federally controlled militia "of Virginia are to be dragged from their homes five or six hundred miles, to tame the republican contumacy of Massachusetts"). Yet today, President Trump has departed from the constitutional framework governing the National Guard by placing multiple state Guard formations under de facto federal control and deploying them into a non-consenting jurisdiction—all without any of the exigencies that the Constitution demands, such as an invasion or insurrection. (ECF 3-1, at 27-31.)

## II. DEPLOYMENT OF THE NATIONAL GUARD INFRINGES ON THE POLICE POWERS RESERVED TO STATES AND LOCALITIES.

The use of the military under federal direction to conduct domestic law enforcement also infringes upon the authority of States and localities to exercise their police powers. The Constitution establishes a federal government of limited, enumerated powers, and general police power is not among them. Rather, it is States that enjoy "great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756 (1985) (citation omitted). As the Supreme Court recently explained, the "ability to protect the people, property, and economic activity within its borders" is a "fundamental aspect of a State's sovereign power." *New York v.*

---

[6] President Dwight D. Eisenhower, Radio and Television Address to the American People on the Situation in Little Rock (Sept. 24, 1957), https://tinyurl.com/yzer647h; President George Bush, Address to the Nation on the Civil Disturbances in Los Angeles, California (May 1, 1992), https://tinyurl.com/bdferz78.

*New Jersey*, 598 U.S. 218, 225 (2023).  Although the District of Columbia is not a State, it holds similar sovereign authority and police powers to "prevent crime and arrest offenders" within its jurisdiction.  D.C. Code § 5-101.03(1), (2), (10).

Just as deploying the National Guard in the District interferes with enforcement of local law by city police (ECF 3-1, at 41-42), a federal deployment of the National Guard in the States would infringe on their sovereign rights and ability to enforce state laws.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (explaining that States have a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and that "this involves the power to create and enforce a legal code, both civil and criminal").

Commentators as early as Blackstone recognized that public policing involves the regulation of "domestic order" and ensures that people "conform their general behaviour to the rules of propriety."  4 William Blackstone, *Commentaries on the Laws of England* 162 (1769).  By contrast, the President's deployment of armed soldiers *disrupts* the normal domestic order, creates obstacles for the investigation and prosecution of criminal activity, and undermines cooperation with law enforcement generally.  (*See* ECF 3-1, at 42-43.)  And as the Founders were all too aware, the presence of armed soldiers in American cities, under outside control, breeds mistrust of government authority and chills free expression.  *See Reid*, 354 U.S. at 27 (recounting the presence of British troops quartered in Boston "to support unpopular royal governors and to intimidate the local populace").  The President's use of National Guard soldiers for ordinary law enforcement undermines the sovereignty of States and localities, and threatens the civil liberties of their residents.

### III.    FEDERALLY DIRECTED NATIONAL GUARD ELEMENTS SHOULD NOT DISPLACE LOCAL LAW ENFORCEMENT

The National Guard is meant to respond to emergencies and serve military purposes. Indeed, just over a week ago, President Trump purported to rename the Department of Defense the "Department of War" because the name "demonstrates our ability and willingness to fight and win wars on behalf of our Nation at a moment's notice, not just to defend." Exec. Order No. 14,347, Restoring the United States Department of War, 90 Fed. Reg. 43,893 (Sept. 5, 2025). The National Guard, when under federal control, is directly answerable to the "Department of War," which Secretary Hegseth characterized as focusing on "[m]aximum lethality, not tepid legality; violent effect, not politically correct."[7]

Assigning "lethal" soldiers under federal command to conduct domestic police patrols is inappropriate. Rather, as the District of Columbia has explained (ECF 3-1, at 39-40, 42-43), and as the States' experience confirms, respecting local control of law enforcement makes policing more effective and safer for all involved. "Local agencies are responsive to their local communities in a way that federal agencies," and certainly federalized soldiers, "are not."[8] State and city police officers are more familiar with the laws they are enforcing. Their training and practices, such as rules of engagement and policies on use of force, are often tailored to local needs. Local police officers have built relationships with community members, understand relevant interests, and have greater knowledge of the geography, conditions, and people. For these reasons, "local agencies are better equipped than the federal government to handle local policing."[9]

---

[7] U.S. Dep't of Def., Trump Renames DOD to Department of War, https://tinyurl.com/ymy9w5zw.

[8] Police Exec. Res. Forum, MPD Leaders Should Remain in Charge of Their Police Department (Aug. 16, 2025), https://tinyurl.com/3wn4f4z9.

[9] *Id.*

Displacing local authority not only deprives communities of the advantages of local control but also introduces new complications and dangers.  Situations where local authority is sidelined are rare, so law enforcement agencies and personnel do not have established systems or a body of experience upon which to draw in such situations.  Displacing local authority complicates communication and coordination among law enforcement units and increases the risk of conflict between separate law enforcement operations.  (*See* ECF 3-1, at 42-43.)  For all these reasons, this country's law, policy, and practice have consistently favored local control of law enforcement resources except in the most unusual circumstances.  *See, e.g.*, Dep't of Just. Off. of the Insp. Gen., A Review of the Department of Justice's Response to Protest Activity and Civil Unrest in Washington, D.C. in Late May and Early June 2020 at 15 (24-085), https://tinyurl.com/4u5wydjs (noting that the Attorney General's manual on emergency response starts from the premise that "initial responsibility for managing domestic incidents—including civil disturbances—generally falls on state and local authorities").

Local control means generally allowing each jurisdiction to decide when it can handle law enforcement problems on its own and when it needs outside help.  When cities need help, they can call on neighboring jurisdictions with which they have longstanding relationships.  For example, the Intelligence Reform and Terrorism Prevention Act of 2004 established a framework for jurisdictions in the National Capital Region to enter into mutual aid agreements to render law enforcement and other assistance in dealing with large events or emergencies.  *See* Pub. L. No. 108-458, § 7302, 118 Stat. 3638, 3840 (codified at 42 U.S.C. § 5196 note).  State and local governments in the region established such an agreement in 2005; that agreement allows the District of Columbia to call for rapid assistance from the state police of Maryland and Virginia, the local police departments of several Maryland and Virginia cities and counties, and other state

and federal law enforcement agencies.  Indeed, the District of Columbia used these mechanisms to obtain additional law enforcement support when the Capitol was attacked on January 6, 2021. *See* Final Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, H.R. Rep. No. 117-663, app. 1 at 710 (2022).

In situations of genuine need, the orderly use of such interstate mechanisms by local leaders is a far more sensible means of delivering law enforcement assistance than pushing aside local authorities and trucking in National Guard forces from distant States.  Law enforcement officers from neighboring jurisdictions are more likely to have established relationships with local authorities and greater familiarity with the relevant geography, people, and conditions.

Moreover, National Guard units are not a natural fit for law enforcement missions. National Guard basic training is geared toward preparing a fighting force.  *See* Army National Guard, Basic Training Phases, https://tinyurl.com/23n4kveh (basic training for Army National Guard); U.S. Air Force, Basic Military Training, https://tinyurl.com/4wy75u4z (basic training common to active-duty U.S. Air Force and Air National Guard).

National Guard personnel generally do not receive the same training as civilian law enforcement on matters such as criminal procedure, civil rights, criminal investigation, and de-escalation.  *See* Lt. Col. Mark C. Weston, U.S. Army War College Strategy Research Project, Review of the Posse Comitatus Act After Hurricane Katrina 1, 16 (2006), https://apps.dtic.mil/sti/tr/pdf/ADA448803.pdf ("The character of law enforcement de-escalates to use lesser forms of force while the military escalates to use deadly force in accomplishing the mission.  Simply put, law enforcement personnel search and capture, while the military search and destroy." (footnote omitted)); *see also* Amici Curiae Brief of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals at 7, *Newsom v. Trump*, No. 3:25-cv-

04870-CRB ("*Newsom v. Trump*") (N.D. Cal. June 11, 2025), ECF 31-1 ("Personnel in the U.S. military . . . do not receive extensive training on how to operate safely and effectively in the context of domestic law enforcement. Our longstanding tradition of entrusting domestic law enforcement to local, state, and federal law enforcement personnel has . . . allowed the U.S. military to remain focused on its core mission.").

## IV.   STATES NEED THE NATIONAL GUARD TO BE AVAILABLE FOR VITAL NATURAL DISASTER AND SECURITY FUNCTIONS.

While the National Guard may be called into federal service in limited circumstances, its routine and most indispensable role is serving States and local jurisdictions.  Like the District of Columbia, the States depend on the National Guard to respond to emergencies that imperil our communities and to provide security during high-profile events.  Dispatching members of the Guard for law enforcement missions for which they are neither properly trained nor needed impairs their ability to prepare for and participate in the essential tasks on which the local jurisdictions depend.

As the States have experienced, the National Guard's response to natural disasters and other emergencies frequently saves lives.  For example, the National Guard frequently responds to catastrophic wildfires,[10] winter storms,[11] hurricanes,[12] and floods.  *See* Lt. Col. Bradford Leighton, *Ill. Nat'l Guard Helps Civilian Agencies Fight flooding*, Nat'l Guard (June 3, 2019), https://tinyurl .com/yza95rrs.  In 2022 alone, over 100,000 members of the National Guard were deployed to

---

[10] *See* Sgt. 1st Class Jon Soucy, *National Guard Members Continue LA Wildfire Response,* Nat'l Guard (Jan. 21, 2025), https://tinyurl.com/j2nmkwmv.

[11] Md. Nat'l Guard, *Maryland National Guard Activated to Support Winter Storm Response Across the State* (Jan. 8, 2025), https://tinyurl.com/nufjdnmt.

[12] Maj. J. Scott Detweiler, *Vermont National Guard[] Support Cyclone Beryl Response*, DVIDS (July 11, 2024), https://tinyurl.com/53kpe6yv.

fight wildfires in nineteen States. Anshu Siripurapu et al., *What Does the U.S. National Guard Do?*, Council on Foreign Relations (last updated Sept. 3, 2025), https://tinyurl.com/3t44h3td.

States also send members of their National Guard to assist other States facing natural disasters. Indeed, all 50 States, plus the District of Columbia, Puerto Rico, Guam, U.S. Virgin Islands, and the Northern Mariana Islands, have enacted legislation to join the Emergency Management Assistance Compact ("EMAC"). Emergency Mgmt. Assistance Compact (EMAC), *What is EMAC?*, https://tinyurl.com/4s5yzh6a. EMAC is a formal compact, ratified by Congress, that facilitates States' sharing of personnel and resources when a governor in one State declares an emergency and requests assistance. *Id.*

For example, in 2024, several States—including amici New York, Colorado, and Delaware—sent needed personnel and resources to Florida to help respond to Hurricane Milton.[13] And various States, including amici Connecticut and Maryland, similarly rushed to provide requested assistance to North Carolina in the wake of Hurricane Helene in 2024.[14] As the nation faces increasingly catastrophic wildfires, hurricanes, and other natural disasters, a robust,

---

[13] *See* State of N.Y., *Governor Hochul Announces 65 New York National Guard Soldiers and Airmen Are Deploying to Assist in Florida in Responding to the Impact of Hurricane Milton*, New York's Governor's Office (Oct. 9, 2024), https://tinyurl.com/3new5njc; Colo. Nat'l Guard Pub. Affairs, *Colorado National Guard Supports Hurricane Milton Relief Efforts*, Colo. Nat'l Guard (Oct. 9, 2024), https://tinyurl.com/mr2jbe95; *Governor Carney to Activate Delaware National Guard to Assist with Florida's Hurricane Response*, Office of the Governor (Oct. 8, 2024), https://tinyurl.com/4z5vxdux.

[14] State of Conn., *Governor Lamont Announces Connecticut National Guard Sending Additional Soldiers and Aircraft to North Carolina for Further Hurricane Helene Disaster Assistance* (Oct. 3, 2024), https://tinyurl.com/3etmyduu; Md. Nat'l Guard, *Press Release: Maryland National Guard Mobilized for Hurricane Helene Support in North Carolina* (Sept. 28, 2024), https://tinyurl.com/mr42nftw.

responsive National Guard is essential to support state and local efforts to protect people and property.

Additionally, States sometimes activate members of the National Guard to provide security support at major events. For example, Guard members of about 40 States provided security for President Trump's 2025 inauguration, in a tradition dating back to the first inauguration of President George Washington. D.C. Nat'l Guard, *National Guard Support to the District of Columbia and the 60th Presidential Inauguration* (Jan. 13, 2025), https://tinyurl.com/yv242vvh.

All of this work is vital, and much of it arises abruptly. The States lack the resources to do the National Guard's vital work if its members are suddenly whisked from their state missions and pressed into service as domestic law enforcement. Unlawful activation of the National Guard risks significant harm to people and property as the Guard's resources are diverted from its core mission.

## V. CALIFORNIA'S EXPERIENCE ILLUSTRATES THE HARM CAUSED BY DEPLOYING THE FEDERALIZED NATIONAL GUARD.

The experience of California, as the first State to experience President Trump's deployment of the National Guard without its Governor's consent, serves as a warning of the harm caused by a continuous military presence in a State. For more than three months, federalized California National Guard troops have been deployed in California's communities. On June 7, 2025, President Trump ordered the federalization of California's National Guard and deployed its members throughout Southern California for 60 days, through August 6. Presidential Memoranda, Department of Defense Security for the Protection of Department of Homeland Security Functions (June 7, 2025), https://tinyl.co/3hFo. One day before the order was set to expire, Secretary Hegseth issued a new order, deploying federalized Guard troops for an additional 90 days, through November 5. DA Activation Order 004-25 12406, *Newsom v. Trump* (ECF No. 140-2).

Deploying California's National Guard harms the State, in a manner likely to recur whenever the military is deployed domestically without the consent of the State's governor (or in the case of the District, its Mayor). First, the militarized presence of National Guard troops harms the economy by stoking fear and causing the public to stay home, fail to report for work, and avoid areas where the military is deployed. For example, on July 7, ninety troops and over a dozen military vehicles accompanied federal law enforcement agents on a large-scale immigration operation in Los Angeles's MacArthur Park. Julie Watson & Christopher Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://tinyurl.com/mvsjm34m. Los Angeles Mayor Karen Bass condemned the operation, describing it as looking like "a city under siege, under armed occupation" and how "a city looks before a coup." Jill Cowan & Mimi Dwyer, *Federal Agents March Through L.A. Park, Spurring Local Outrage*, N.Y. Times (July 7, 2025), https://tinyurl.com/ye6dvrec (last accessed Sept. 11, 2025) (noting that a convenience store owner closed his store near MacArthur Park due to the show of military force). The number of people reporting to work in California's private sector decreased by 3.1% in June 2025 and by 4.9% in July 2025, directly coinciding with the deployment of troops to Southern California and their participation in immigration enforcement actions. *See* Edward Orozco Flores et al., *The Effects of Recent Federal Immigration Enforcement on California's Private Sector Employment*, U.C. Merced Cmty. & Labor Ctr. (Aug. 2025), https://tinyl.co/3cKl.

The ongoing military presence in downtown Los Angeles has sharply decreased consumer activity and harmed businesses so severely that some may never recover. *See* Decl. of Carlos A. Singer ¶¶ 7-10 (ECF 183-3), *Newsom v. Trump* (Sept. 2, 2025); Decl. of Oliver Alpuche ¶ 10 (ECF 183-6), *Newsom v. Trump* (Sept. 2, 2025) (noting a 40% drop in business for a downtown Los Angeles business owner since the federalization began). Since the deployment, participation in

community events and festivals has declined, and normally vibrant areas are empty. Decl. of Oliver Alpuche ¶¶ 4, 13-14 (ECF 183-6), *Newsom v. Trump* (Sept. 2, 2025) (reporting 2,000 fewer attendees than in prior years at the annual DTLA Proud Festival). The District of Columbia is experiencing similar harms, with consumer activity plummeting in industries such as tourism, restaurants, and hospitality. (*See* ECF 1 ¶¶ 134-35; ECF 3-1, at 41-44.) The result is less income for businesses and less tax revenue for the State (or, in this case, the District).

Second, the deployment in California has diverted National Guard troops from vital state functions, such as fighting wildfires. In June 2025, the majority of the California Guard's specialized fire crews were diverted from its wildfire-fighting task force in the midst of peak fire season, and instead deployed into the streets of Los Angeles. Hayley Smith, *California's National Guard Fire Crews Are Operating at 40% Capacity Due to Trump's Deployment*, L.A. Times (June 26, 2025), https://tinyl.co/3gw6; *see* Decl. of Paul S. Eck. ¶¶ 9, 11-12 (ECF 87-2), *Newsom v. Trump* (June 19, 2025) (federalization resulted in a 60% overall reduction in the task force's capacity, a 35% to 45% reduction in hand crew staffing, and a 75% reduction in strike team capacity). Diverting resources from important state functions imperils a State's ability to protect its residents.

Third, the President's deployment of troops escalates tensions in communities and harms a State's (or the District's) interest in maintaining stable communities. *See Alfred L. Snapp & Son*, 458 U.S. at 609. Using federalized troops as local law enforcement sows chaos and fear, and can spur unrest rather than solve problems. For example, the Commanding General of the National Guard deployed in California testified that news coverage of the troops' presence at an immigration enforcement operation in Carpinteria, California sparked protests at a different operation in Camarillo, California. *See* Trial Tr. 130:2-4 (ECF 162), *Newsom v. Trump* (Aug. 11, 2025). Rather

than quelling civil unrest, the presence of military troops on the streets of Los Angeles only inflamed protests further. Decl. of Brian Olmstead ¶¶ 12-14 (ECF 8-2), *Newsom v. Trump* (June 11, 2025). When troops were initially mobilized to Los Angeles, tensions heightened and arrests increased, necessitating additional resources from the California Highway Patrol. Decl. of Joseph Zizi ¶ 12 (ECF 77-3), *Newsom v. Trump* (June 16, 2025). While protests have subsided significantly since then, every time troops are mobilized, the risk of unrest is once again heightened. The District has seen similar protests against the National Guard deployment. *See* Brad Ulery, *Washington, DC, Residents Protest Against Trump's Troop Deployment to the City*, Reuters (Sept. 6, 2025), https://tinyurl.com/26qndmgt; Alyce McFadden, *Protesters Against National Guard Deployment Flood D.C. Streets*, N.Y. Times (Aug. 16, 2025), https://tinyl.co /3hLF.

Fourth, National Guard morale is depleted when the federal government deploys members of the Guard as a police force on the streets of their own communities. Hailey Branson-Potts & Phi Do, *Veterans' Advocates Warn of Low Morale Amid L.A. Deployment*, L.A. Times (June 24, 2025), https://tinyurl.com/yc8ymxse; Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. Times (July 16, 2025), https://tinyurl.com/bd7v8ree. The deployment hurts the morale of the troops and of their families as well. Decl. of Brandi Jones ¶ 19 (ECF 183-7), *Newsom v. Trump* (Sept. 2, 2025) (describing negative impact of deployment to Los Angeles on morale of military families). Like the other harms described above, this one is not unique to California; low morale already pervades the federally deployed National Guard in the District. *See* Isabelle Khurshudyan et al., *With No End in Sight, National Guard Troops Deployed to DC Grow Weary*, CNN (Sept. 4, 2025), https://tinyl.co/3hH3. This strain on morale further threatens the readiness of State National Guard units.

The harms California has endured from federalizing its National Guard lay bare the consequences of deploying the military without the consent of local leadership. Although California and the District of Columbia were the first places subjected to unlawful federalized deployments, President Trump has stated they will not be the last. Jonathan J. Cooper & Leah Askarinam, *Trump Expands Targets for Possible Military Deployment to More Democratic-Led Cities*, PBS (Aug. 24, 2025), https://tinyl.co/3hHN. California's experience underscores that the President's action here is not just unlawful—it inflicts concrete damage that this Court can and should prevent. The States urge the Court to grant a preliminary injunction and make clear that the Constitution prohibits the use of soldiers as local law enforcement.

## CONCLUSION

The District of Columbia's motion for a preliminary injunction should be granted.

Respectfully submitted,

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
Supervising Deputy Attorney General

/s/ Barbara Horne-Petersdorf
_____
BARBARA HORNE-PETERSDORF
Deputy Attorney General
300 S. Spring St.
Los Angeles, CA 90013
(213) 269-6667
Barbara.HornePetersdorf@doj.ca.gov

Attorneys for the State of California


KRISTIN K. MAYES
Attorney General of Arizona

WILLIAM TONG
Attorney General of Connecticut

ANNE E. LOPEZ
Attorney General of Hawaiʻi

AARON M. FREY
Attorney General of Maine

DANA NESSEL
Attorney General of Michigan

AARON D. FORD
Attorney General of Nevada

RAÚL TORREZ
Attorney General of New Mexico

JEFF JACKSON
Attorney General of North Carolina

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Michael Drezner
_____
MICHAEL DREZNER
ADAM KIRSCHNER
JAMES C. LUH
VIRGINIA A. WILLIAMSON (D.C. Bar No.
  187220)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.md.us

Attorneys for the State of Maryland


PHILIP J. WEISER
Attorney General of Colorado

KATHLEEN JENNINGS
Attorney General of Delaware

KWAME RAOUL
Attorney General of Illinois

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

KEITH ELLISON
Attorney General of Minnesota

MATTHEW J. PLATKIN
Attorney General of New Jersey

LETITIA JAMES
Attorney General of New York

DAN RAYFIELD
Attorney General of Oregon

PETER F. NERONHA
Attorney General of Rhode Island

CHARITY R. CLARK
Attorney General of Vermont

NICHOLAS W. BROWN
Attorney General of Washington

JOSHUA L. KAUL
Attorney General of Wisconsin

September 15, 2025