**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DISTRICT OF COLUMBIA,

        *Plaintiff,*

        v.

DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

        *Defendants.*

Civil Action No. 1:25-cv-03005-JMC

**BRIEF OF LAW ENFORCEMENT ACTION PARTNERSHIP, CENTER FOR POLICING EQUITY, NATIONAL POLICE ACCOUNTABILITY PROJECT, AND THE POLICING PROJECT AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND SECTION 705 STAY**

Trisha Anderson, Bar No. 497224
Joshua A. Matz, Bar No. 1045064
Martin Totaro*
Hecker Fink LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
tanderson@heckerfink.com
mtotaro@heckerfink.com

*Counsel for Amici Curiae*

*\*Pro hac vice application pending*

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* .................................................................................. 1

BACKGROUND AND SUMMARY OF ARGUMENT ............................................ 3

ARGUMENT ................................................................................................................ 4

    The Actions of Defendants in Violation of the Posse Comitatus Act and Other Laws
    Place D.C. Citizens and D.C. Law Enforcement at Risk .......................................... 4

        A.  National Guard Troops Lack the Training, Experience, and Guidance
            Necessary To Engage in the Kind of Law-Enforcement Functions Performed
            by Local Police. .......................................................................................... 5

            1.  National Guard troops are focused on a military mission and typically do
                not train for or engage in law-enforcement functions. ........................... 5

            2.  Any law-enforcement training National Guard troops patrolling D.C. may
                have received is not adequate to safely and effectively perform day-to-day
                policing. .................................................................................................. 9

        B.  The Deployment of National Guard Troops To Perform Everyday Law-
            Enforcement Functions Threatens To Undermine Public Trust in Law
            Enforcement and Public Safety. .............................................................. 11

            1.  The deployment of National Guard troops in D.C. threatens to undermine
                public trust in law enforcement. .......................................................... 11

            2.  The deployment of National Guard troops in D.C. threatens to undermine
                public safety. ....................................................................................... 16

CONCLUSION ........................................................................................................... 16

# TABLE OF AUTHORITIES

**CASES**

*Bissonette v. Haig*,
    776 F.2d 1384 (8th Cir. 1985) .......................................................................... 16

*Pappas v. Giuliani*,
    290 F.3d 143 (2d Cir. 2002) ............................................................................. 11

**STATUTES**

32 U.S.C. § 102 ........................................................................................................... 5

32 U.S.C. § 502(a) ...................................................................................................... 7

**OTHER AUTHORITIES**

*About the Guard: How We Began*, Nat'l Guard ........................................................... 5

Adam Trahan & Douglas Evans, *Perceptions of Legal System Legitimacy Among Family
    Members of Individuals Incarcerated for Sex Offenses*, 30 Psych. Pub. Pol'y & L. 80
    (2024) ............................................................................................................... 14

Alexandra Marquez & Gordon Lubold, *Some National Guard Troops in Washington Set to
    Carry Firearms*, NBC News (Aug. 16, 2025) ...................................................... 9

Anshu Siripurapu et al., *What Does the U.S. National Guard Do?*, Council on Foreign Rels.
    (Sept. 3, 2025) .................................................................................................. 8

Ash Gautam, *Balancing Interests in Public Access to Police Disciplinary Records*,
    100 Tex. L. Rev. 1405 (2022) ........................................................................... 14

Barry Friedman & Maria Ponomarenko, *Democratic Policing*, 90 N.Y.U. L. Rev. 1827
    (2015) ............................................................................................................... 13

*Basic Training Phases*, Nat'l Guard ........................................................................... 8

Christopher Purdy, *What We Lose by Distorting the Mission of the National Guard*, The
    Atlantic (Aug. 31, 2025) ................................................................................... 16

Cong. Rsch. Serv., *Use of Militia, National Guard, or Federal Armed Forces Within the
    District of Columbia Prior to 2020* (2021) .......................................................... 6

Debo P. Adegbile, *Policing Through an American Prism*, 126 Yale L.J. 2222 (2017) ............... 12

Donell Harvin, *How to Truly Keep Washington, DC Safe: President Trump's Militarized Approach Undercuts What's Been Working*, Just Sec. (Aug. 15, 2025) ................................................................................ 13, 14

*Final Report of the President's Task Force on 21st Century Policing* (2015) ............................ 12

*Frequently Asked Questions*, Army Nat'l Guard .......................................................................... 8

Greg Jaffe, *Hegseth Authorizes Troops in D.C. to Carry Weapons*, N.Y. Times (Aug. 22, 2025) ............................................................................................................... 8

Int'l Ass'n of Chiefs of Police, *Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practices Guide for Local Law Enforcement* (2009) ................................................................................................................... 11, 12

Jim Greenhill, *"Surge" Extends Minnesota Guard Unit's Iraq Tour Up to 125 Days*, Nat'l Guard (Jan. 11, 2007) ................................................................................... 5

Jon Soucy, *National Guard Remains a Vital Component of the War Fight*, U.S. Army (Mar. 22, 2016) ................................................................................................. 5

Jonathan Shorman, *Governors Split Over Mobilizing National Guard as Trump Seeks More Troops*, Stateline (Sept. 4, 2025) ......................................................................... 8

Kathryn Watson & Eleanor Watson, *What the National Guard and Federal Law Enforcement Can and Can't Do in D.C.*, CBS News (Aug. 12, 2025) ................................. 9

Luke William Hunt, *Trump's Deployment of the National Guard to Fight Crime Blurs the Legal Distinction Between the Police and the Military*, The Conversation (Sept. 5, 2025) ................................................................................. 7

Mark F. Cancian & Chris H. Park, *Sending the National Guard Into D.C. Is the Wrong Solution to a Crime Problem*, Ctr. for Strategic and Int'l Stud. (Aug. 12, 2025) ........................................................................................... 7, 8, 9, 10

Mark Nevitt, *Trump, the National Guard, and the District of Columbia: What You Need to Know*, Just Sec. (Aug. 18, 2025) ............................................................ 9

*Metropolitan Police Academy: 5.3 Four Pillars of Communication*, Metro. Police Dep't .......... 10

Michael Friedman, *What Happens When We Don't Trust Law Enforcement?*, Psych. Today (Sept. 9, 2014) ............................................................................... 14

*Military Police*, Nat'l Guard ..................................................................................................... 8

*Mission & Vision*, D.C. Nat'l Guard .......................................................................................... 7

iii

Monica C. Bell, *Police Reform and the Dismantling of Legal Estrangement*, 126 Yale L.J. 2054 (2017) ............................................................................ 15

*MPD Academy Curriculum*, Metro. Police Dep't.................................................. 10

*MPDC: Mission and Value Statement*, Metro. Police Dep't ................................ 7

Nicole Markus, *Bowser Continues to Walk the Trump Tightrope*, Politico (Aug. 27, 2025)....... 13

*Office of Police Complaints*, DC.gov ................................................................ 13, 14

*Past and Post War*, D.C. Nat'l Guard............................................................... 5

Rachel Moran, *Police Privacy*, 10 U.C. Irvine L. Rev. 153 (2019) .................... 11

Richard Brown, *Do We Trust the Police?*, Psych. Today (Apr. 28, 2023)............. 15

Rick Trinkner & Tom R. Tyler, *Bounded Authority: Expanding "Appropriate" Police Behavior Beyond Procedural Justice*, 42 Law & Hum. Behav. 280 (2018) ...... 15

Tom R. Tyler, *Why People Obey the Law* (1990)............................................. 11

Tom Tyler, *Police Discretion in the Century Surveillance State*, 2016 U. Chi. Legal F. 579 (2016)............................................................. 14, 15

Tracey L. Meares, *Trust & Models of Policing*, 151 Dædalus 161 (2022)............ 11, 15

## INTEREST OF *AMICI CURIAE*

*Amici* share a longstanding commitment to promoting the public's trust and confidence in effective, equitable law enforcement, with the goal of making our communities safer. As we explain below, that trust results from accountability, transparency, and training in how to best engage with communities on a day-by-day basis.[1] That trust, however, is undermined by the deployment of National Guard troops to the streets of D.C. to conduct ordinary law-enforcement functions.

The Law Enforcement Action Partnership (LEAP) is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law-enforcement officials advocating for criminal justice and drug policy reforms that will make our communities safer and more just. Founded by five police officers in 2002 with a sole focus on drug policy, today LEAP's speakers bureau numbers more than 275 criminal justice professionals advising on police-community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support of allied efforts, LEAP reaches audiences across a wide spectrum of affiliations and beliefs, calling for more practical and ethical policies from a public safety perspective.

The Center for Policing Equity (CPE) is a racial justice nonprofit that provides leaders with data, stories, and relationships to facilitate changes that are bold, innovative, and lasting. CPE gathers and analyzes data on behaviors within public safety systems and uses those data to help communities achieve safer policing outcomes. This work is also the basis of CPE's National Justice Database, the nation's first database tracking national statistics on police behavior. This

---

[1] No part of this brief was authored by any party's counsel, and no person or entity other than *amici* funded its preparation or submission.

database allows CPE to provide others with a clearer picture of the approaches, measures, and methods that work best in redesigning public safety to better keep vulnerable communities safe.

The National Police Accountability Project (NPAP) was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil rights lawyers. NPAP has over 550 attorney members practicing in every region of the United States, including a number of members that represent victims of federal law enforcement violence. Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for nonprofit organizations and community groups working to end police violence. NPAP also advocates for legislation to increase police accountability and appears regularly as *amicus curiae* in cases, such as this one, presenting issues of particular importance for its members and their clients.

The Policing Project at New York University School of Law is dedicated to ensuring that policing is effective, equitable, and democratically accountable. The Policing Project facilitates public engagement on policing policies and practices, with the twin aims of giving communities a voice in how they are policed and developing greater mutual trust between the police and the communities they serve. The Policing Project believes in "front-end accountability"—that policing should operate according to laws and regulations in place before police act, rather than simply trying to correct the situation when something goes wrong. The Policing Project pursues this mission through a variety of strategies, including drafting and promoting legislation regarding policing and litigating when these principles are not respected. It works regularly with policing agencies and jurisdictions that share its goals. Recognizing that police officers are not always

trained to deal with the raft of reasons that people call 911 for assistance, the Policing Project also is a national leader in the field of alternative first response.

## BACKGROUND AND SUMMARY OF ARGUMENT

*Amici*, all experts in law enforcement, submit this brief to illuminate the fuller context and adverse consequences of the federal government's decision to send thousands of National Guard troops to patrol the streets of the District of Columbia despite the general legal prohibition against military forces providing domestic law enforcement. The District's preliminary-injunction motion explains why defendants' actions violate the Posse Comitatus Act and other laws. *Amici* focus on the irreparable injuries and public harm that will occur if Defendants' actions are allowed to stand.

Simply put, Defendants' decision to deploy National Guard troops to perform law-enforcement functions in the District threatens to undermine local trust in law enforcement and to weaken (not strengthen) public safety. National Guard troops are focused on a military mission and receive training in the tactics and skills necessary to perform that mission. They are not trained to be ordinary police officers, nor do they have the experience and knowledge of the local community that can help local police perform their jobs safely and effectively. Deploying such troops into a civilian law-enforcement setting invites deleterious and even disastrous results.

Specifically, the deployment of armed National Guard troops to patrol D.C. communities risks escalating situations that ordinary police are better equipped to defuse because those troops lack the experience and training of local police officers. It also risks errors of judgment in sensitive situations that could result in unnecessary shows of force or other law-enforcement power. Not only does this endanger public safety—creating the potential for harm to D.C. residents and local law enforcement alike—it threatens to erode the public's trust in law enforcement that local authorities work hard to develop and maintain. Local officials rely on that trust day in and day out to safely and effectively protect local communities and enforce the laws. Any erosion of such trust

3

will decrease the likelihood that D.C. residents will report crime or cooperate with investigations, and increase the risk of tension and violence between residents and police. Once eroded, trust built over years cannot easily be restored even after the National Guard troops have left D.C. In its analysis of the equities bearing on entry of a preliminary injunction, the Court should assign these considerations substantial weight, as they strike at the heart of public trust, order, and safety.

## ARGUMENT

### THE ACTIONS OF DEFENDANTS IN VIOLATION OF THE POSSE COMITATUS ACT AND OTHER LAWS PLACE D.C. CITIZENS AND D.C. LAW ENFORCEMENT AT RISK

Local law-enforcement officers are trained on, and are constantly learning through on-the-job experience, how to be effective in conducting day-to-day policing. This training and experience helps them hone the judgment needed to make on-the-spot decisions that will best promote public safety while maintaining strong relationships with the community. This includes knowing when and how to exercise the unique powers of law enforcement and when other measures will suffice. They are also trained to recognize the importance of developing relationships of trust with the communities that they serve.

Members of the National Guard do not have the same mission, training, and experience, and lack connection to local communities. The National Guard most often assists other parts of the military in missions abroad and, domestically, performs functions other than law enforcement, such as responding to natural disasters or providing security for discrete purposes, such as special events. Focused on a military mission and lacking the training and experience of local law-enforcement officers, National Guard troops are not well-suited to conduct ordinary policing. The performance of everyday police responsibilities by the National Guard in the District threatens to undermine public trust in law enforcement, and puts public safety at risk. This irreparably harms D.C. and shows that the equities strongly favor entry of a preliminary injunction.

4

A.    **National Guard Troops Lack the Training, Experience, and Guidance Necessary To Engage in the Kind of Law-Enforcement Functions Performed by Local Police.**

1.    **National Guard troops are focused on a military mission and typically do not train for or engage in law-enforcement functions.**

The National Guard dates back almost 400 years, when the first militia regiments in North America were organized in Massachusetts based on an order of the Massachusetts Bay Colony's General Court. *About the Guard: How We Began*, Nat'l Guard.[2] Over the past several centuries, the National Guard has maintained its focus on a military mission. By statute, and "[i]n accordance with the traditional military policy of the United States," the "strength and organization of the Army National Guard and the Air National Guard as an integral part of the first line defenses of the United States [must] be maintained and assured at all times." 32 U.S.C. § 102.

The National Guard has been used extensively in overseas military operations. For example, "[i]n early 2005, more than half the combat power in Iraq came from the National Guard." Jim Greenhill, *"Surge" Extends Minnesota Guard Unit's Iraq Tour Up to 125 Days*, Nat'l Guard (Jan. 11, 2007).[3] In 2016, the Army National Guard accounted for "roughly 40 percent of the Army's combat capability." Jon Soucy, *National Guard Remains a Vital Component of the War Fight*, U.S. Army (Mar. 22, 2016).[4] The D.C. National Guard has assisted in those efforts, deploying overseas more than 1,200 soldiers and completing over ninety whole-unit deployments in support of the War on Terror. *Past and Post War*, D.C. Nat'l Guard.[5]

The D.C. National Guard has been deployed domestically. Before 2020, however, there were only "10 instances in which the militia, National Guard, or federal armed forces were used

---

[2] https://www.nationalguard.mil/About-the-Guard/How-We-Began.
[3] https://www.nationalguard.mil/News/Article-View/Article/572868/surge-extends-minnesota-guard-units-iraq-tour-up-to-125-days/.
[4] https://www.army.mil/article/164663/national_guard_remains_a_vital_component_of_the_war_fight.
[5] https://dc.ng.mil/About-Us/Heritage/History/Past-and-post-war/.

for operations within the geographic boundaries of Washington, DC, due to violence or anticipated violence." Cong. Rsch. Serv., *Use of Militia, National Guard, or Federal Armed Forces Within the District of Columbia Prior to 2020*, at 1 (2021). In these instances—some of the most significant moments in American history—the D.C. National Guard deployed to defend the nation's capital or perform critical security functions:

- The D.C. Militia attempted to defend the city during the War of 1812, when British military forces captured the District after "rout[ing] a U.S. force of approximately 5,000 soldiers";

- Federal armed forces, including federalized militia, "mann[ed] a series of forts and artillery batteries surrounding the capital" throughout the Civil War;

- The D.C. National Guard "protect[ed] reservoirs and power plants around [D.C.]" from espionage attacks shortly before the United States entered World War I;

- The D.C. National Guard "provid[ed] security for the U.S. Capitol" in the wake of Martin Luther King, Jr.'s assassination and the ensuing riots;

- The D.C. National Guard "mobilized . . . for security duty throughout [D.C.] and "provid[ed] perimeter security at the U.S. Capitol Complex" in the days following the September 11, 2001 terrorist attacks.

*Id.* at 3, 7, 8, 13, 16. While there have been additional deployments in the District for other purposes, "such as natural disaster response, counterdrug operations, and general crowd and traffic control support," *id.* at 1, none of these deployments involved using the National Guard for the kinds of routine law-enforcement purposes that the Guard is engaged in now.

Given the National Guard's traditional deployment overseas and, when necessary, for discrete disaster response and security functions domestically, a primary focus of troop training is on military engagement and the performance of security functions. Among the D.C. National

Guard's stated priorities are "grow[ing] combat-ready Soldiers and Airmen," "focus[ing] on wartime mission and build[ing] lethal formations," and "evolv[ing] [the Guard's] formations to be ready for the next fight." *Mission & Vision*, D.C. Nat'l Guard.[6] This combat-centered training differs significantly from that of D.C. Metropolitan Police Officers, whose primary responsibility is local law enforcement and whose mission is to "protect [the District's] "residents and visitors with the highest regard for the sanctity of human life." *MPDC: Mission and Value Statement*, Metro. Police Dep't.[7]

    While police train to maintain peace in local communities, National Guard troops train primarily for war. *See* Mark F. Cancian & Chris H. Park, *Sending the National Guard Into D.C. Is the Wrong Solution to a Crime Problem*, Ctr. for Strategic and Int'l Stud. (Aug. 12, 2025);[8] Luke William Hunt, *Trump's Deployment of the National Guard to Fight Crime Blurs the Legal Distinction Between the Police and the Military*, The Conversation (Sept. 5, 2025) (distinguishing between state and local police training, which "focus[es] on law enforcement and maintaining order," and National Guard training, which focuses on "the skills it takes to become a Soldier").[9] The Guard's statutory training requirements do not include any law-enforcement functions. Instead, "each company, battery, squadron, and detachment of the National Guard" is required to focus on "drill and instruction, including indoor target practice" and "training at encampments, maneuvers, outdoor target practice, or other exercises." 32 U.S.C. § 502(a). Basic training for National Guard troops is geared toward the "fundamentals of soldiering," including "hand-to-hand combat and guerilla exercises," "convoy operations," "defeating improvised explosive devices,"

---

[6] https://dc.ng.mil/About-Us/Mission-Vision/.
[7] https://mpdc.dc.gov/page/mpdc-mission-and-value-statement.
[8] https://www.csis.org/analysis/sending-national-guard-dc-wrong-solution-crime-problem.
[9] https://theconversation.com/trumps-deployment-of-the-national-guard-to-fight-crime-blurs-the-legal-distinction-between-the-police-and-the-military-264548.

and "tactical foot marches." *Basic Training Phases*, Nat'l Guard.[10] And troops typically receive additional, continuing training "one drill weekend each month and one two-week annual training period each year." *Frequently Asked Questions*, Army Nat'l Guard;[11] Anshu Siripurapu et al., *What Does the U.S. National Guard Do?*, Council on Foreign Rels. (Sept. 3, 2025) (explaining that many National Guard troops "serve part-time while holding civilian jobs or attending school").[12] Deploying National Guard troops for routine law enforcement is thus "beyond what they're trained" to do. Jonathan Shorman, *Governors Split Over Mobilizing National Guard as Trump Seeks More Troops*, Stateline (Sept. 4, 2025) (describing statement by a former Air Force Reserve major general).[13]

According to reporting, most National Guard troops who have been recently deployed in the District "do not have law enforcement training." Greg Jaffe, *Hegseth Authorizes Troops in D.C. to Carry Weapons*, N.Y. Times (Aug. 22, 2025).[14] The "primary" domestic security-related training that National Guard troops do receive involves "[c]rowd control" and "dealing with unruly citizens"—not the nuances of day-to-day policing. Cancian & Park, *supra*. Some National Guard troops, such as troops training to be military police, receive additional law-enforcement training, but the focus of that training is not the same as general police training. Military police "control traffic, prevent crime and respond to . . . emergencies," but their primary duty is to "protect the lives and property on Army National Guard installations by enforcing military laws and regulations." *Military Police*, Nat'l Guard.[15]

---

[10] https://nationalguard.com/basic-combat-training/basic-training-phases.
[11] https://www.nationalguard.mil/About-the-Guard/Army-National-Guard/FAQ/.
[12] https://www.cfr.org/backgrounder/what-does-us-national-guard-do.
[13] https://stateline.org/2025/09/04/governors-split-over-mobilizing-national-guard-as-trump-seeks-more-troops/.
[14] https://www.nytimes.com/2025/08/22/us/politics/national-guard-weapons.html.
[15] https://nationalguard.com/31b-military-police.

2.    **Any law-enforcement training National Guard troops patrolling D.C. may have received is not adequate to safely and effectively perform day-to-day policing.**

National Guard troops plainly are engaged in patrolling the streets of D.C. and engaging in law enforcement functions. Compl. ¶¶ 119-124. They are now even carrying weapons in performing such functions. *See* Alexandra Marquez & Gordon Lubold, *Some National Guard Troops in Washington Set to Carry Firearms*, NBC News (Aug. 16, 2025);[16] Compl. ¶¶ 110-111, 119. Yet critical questions remain unanswered about any law-enforcement training or guidance provided to National Guard troops. *See* Kathryn Watson & Eleanor Watson, *What the National Guard and Federal Law Enforcement Can and Can't Do in D.C.*, CBS News (Aug. 12, 2025).[17] For example, have the troops deployed to conduct patrols in D.C. been provided with any law-enforcement training or guidance? Have armed troops been trained on uses of force in a law-enforcement context? What are the rules for the use of force? What is the chain of command? What are the accountability mechanisms for inappropriate uses of force or other law-enforcement powers? And do the same rules apply to troops regardless of where their unit is based? *See* Mark Nevitt, *Trump, the National Guard, and the District of Columbia: What You Need to Know*, Just Sec. (Aug. 18, 2025) (outlining these and other questions);[18] *see id.* ("Relevant state laws governing National Guard usage vary widely by state."). These issues are of paramount importance because military forces, like the National Guard, "are less familiar than police with the nuances of citizens' rights and the conditions under which force is permissible" and "are taught to treat civilians as potential threats and to always be ready to respond." Cancian & Park, *supra*.

---

[16] https://www.nbcnews.com/politics/politics-news/west-virginia-governor-deploys-national-guard-dc-trump-police-takeover-rcna225386.

[17] https://www.cbsnews.com/news/national-guard-federal-law-enforcement-dc-restrictions/.

[18] https://www.justsecurity.org/119178/trump-national-guard-dc/.

Even if National Guard troops have received some law-enforcement training before their deployment in the District, any such training could not be as comprehensive as what local police receive, nor could it include the kind of training that experience provides. Training for police officers focuses on the nuts and bolts of on-the-ground policing. Police academy training for the D.C. Metropolitan Police lasts thirty-seven weeks, during which time recruits "complete a full program of classroom, scenario, physical, and tactical training to prepare them for the challenges of being a police officer." *MPD Academy Curriculum*, Metro. Police Dep't.[19] Training subjects "include laws of arrest, search and seizure, criminal law, traffic regulations, human relations, community policing, and ethics." *Id.* Recruit officers also "receive skills training in operation of emergency police vehicles, self-defense, advanced first aid, and much more." *Id.* And the police department posts the curriculum on a public website and expressly invites scrutiny, so that "members of the public [can] provide comments and feedback for consideration in future updates." *Id*. Moreover, the D.C. Metropolitan Police instructs officers to use de-escalation tactics, such as "verbal persuasion, warnings, slowing down the pace of an incident, and tactical repositioning." *See Metropolitan Police Academy: 5.3 Four Pillars of Communication*, Metro. Police Dep't.[20] These de-escalation tactics are designed to "stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in necessary force." *Id.*

Given the National Guard's focus on performing a military mission and not on ordinary policing, the only reasonable inference to be drawn is that National Guard troops have been deployed with weapons to patrol the streets of D.C. without the kind of training and experience

---

[19] https://mpdc.dc.gov/page/mpd-academy-curriculum.
[20]  https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/5.3%20Four%20 Pillars%20of%20Communication%20FINAL.pdf.

that law-enforcement officers require to safely and effectively perform their duties. This poses severe and irreparable harm to D.C. by undermining public safety and community trust in law enforcement, as described below.

**B.      The Deployment of National Guard Troops To Perform Everyday Law-Enforcement Functions Threatens To Undermine Public Trust in Law Enforcement and Public Safety.**

The deployment of National Guard troops to patrol the streets of D.C. in support of a crime-fighting mission threatens to undermine the trust between law enforcement and community members that takes years to develop. An erosion of that trust will have a detrimental impact on public safety, including by reducing cooperation and crime reporting by the public. That harm is irreparable because trust, once breached, is difficult to regain.

**1.      The deployment of National Guard troops in D.C. threatens to undermine public trust in law enforcement.**

"Building trust between legal authorities and members of the public is a cornerstone of strategies that promote safe communities." Tracey L. Meares, *Trust & Models of Policing*, 151 Dædalus 161, 172 (2022); *see also, e.g.*, Rachel Moran, *Police Privacy*, 10 U.C. Irvine L. Rev. 153, 185-86 (2019) ("Mistrust of the police undermines the legitimacy of both law enforcement and the rule of law more generally."). As one court explained, "[t]he effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias." *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002) (citing Tom R. Tyler, *Why People Obey the Law* 22-23, 67 (1990)). And "[t]he most important aspect of promoting trust-based approaches is the training of agency personnel." Meares, *supra*, at 166; *see* Int'l Ass'n of Chiefs of Police, *Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practices Guide for Local Law Enforcement* 10-11 (2009) (outlining training and education as strategies for

11

building community trust);[21] Debo P. Adegbile, *Policing Through an American Prism*, 126 Yale L.J. 2222, 2256 (2017) (recounting how "[m]ore trainings, new de-escalation policies, and the release of police data led to a decrease in both crime rates and excessive force complaints" in the Dallas police department).

The federal government's deployment of National Guard troops in the District will erode the trust of District residents and visitors, who will be policed by individuals largely unfamiliar with the local community and with more training in military tactics than community-oriented methods. Lack of training and guidance creates a greater risk of mistakes while performing law-enforcement functions, including in sensitive situations regarding appropriate uses of force. Common sense dictates that a National Guard member with less experience in, for example, de-escalation will not perform in the same manner as a police officer who has been trained to handle such situations and has confronted similar situations many times before. The lack of local familiarity and connection is also damaging. "[L]aw enforcement cannot build community trust if it is seen as an occupying force coming in from outside to impose control on the community." *Final Report of the President's Task Force on 21st Century Policing* 1 (2015).[22] A police officer who knows and understands the local community is more likely to deploy effective tactics with the minimum show of law-enforcement power than a member of the National Guard who lacks training and guidance and is unfamiliar with the local community.

Errors attributable to the lack of training or guidance for National Guard members are likely to harm the public's trust in law enforcement in general. Here, that risk is especially acute where there are numerous agencies deployed in a law-enforcement capacity and where the line

---

[21] https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-w0724-pub.pdf.
[22]     https://www.govinfo.gov/content/pkg/GOVPUB-J36-PURL-gpo64136/pdf/GOVPUB-J36-PURL-gpo64136.pdf.

between military and law-enforcement agents is blurry. If law-enforcement personnel make mistakes, the public's confidence in policing diminishes. And if the public is not always aware of which type of officer—local or federal—is making the mistake, the community's trust and confidence in local law enforcement will not be restored when federal officers leave. D.C. Mayor Muriel Bowser has described a "break in trust" between law enforcement and the community resulting from National Guard troops and other federal agents engaging in law enforcement. Nicole Markus, *Bowser Continues to Walk the Trump Tightrope,* Politico (Aug. 27, 2025).[23]

Trust in law enforcement is further eroded by the lack of accountability of National Guard troops to the communities they are patrolling. *See* Donell Harvin, *How to Truly Keep Washington, DC Safe: President Trump's Militarized Approach Undercuts What's Been Working*, Just Sec. (Aug. 15, 2025) (explaining that the D.C. Metropolitan Police Department is accountable to DC residents and elected officials, whereas the National Guard is not).[24] An important part of building trust between the local community and the police who serve that community is the ability to hold the police department and individual officers accountable. *See* Barry Friedman & Maria Ponomarenko, *Democratic Policing*, 90 N.Y.U. L. Rev. 1827, 1880-81 (2015). D.C. has established accountability mechanisms for law enforcement that foster such trust. For example, the police's "training, policies and procedures are reviewed by elected officials and oversight bodies." Harvin*, supra*. And the statutorily created and independent Office of Police Complaints "increase[s] community trust in the District of Columbia police forces by providing a fair, thorough, and independent system of civilian oversight of law enforcement." *Office of Police Complaints*, DC.gov ("The agency's functions are to conduct fair and thorough investigations of

---

[23] https://www.politico.com/news/2025/08/27/bowser-trump-tightrope-washington-police-00531535.
[24] https://www.justsecurity.org/119047/trump-federalization-takeover-dc/.

citizen complaints, provide a reliable system of civilian oversight of law enforcement policies, procedures, and training, and promote positive community-police interactions.").[25] By contrast, National Guard troops operate with little community oversight because "their missions are governed by military regulations, not municipal codes, and their actions are rarely subject to public complaint processes or civilians courts." Harvin, *supra*; *see* Ash Gautam, *Balancing Interests in Public Access to Police Disciplinary Records*, 100 Tex. L. Rev. 1405, 1415 (2022) ("A number of scholars, journalists, activists, lawmakers, and even police chiefs and other police advocates argue that transparency is an important solution to the police's continuing public trust problem." (quotation marks omitted)).

An erosion of trust between law enforcement and the community makes the work of law enforcement more difficult and ultimately diminishes public safety. Community members with "low levels of perceived legitimacy and trust in criminal justice systems, particularly police, are less likely to report crimes to police and cooperate with subsequent investigations." Adam Trahan & Douglas Evans, *Perceptions of Legal System Legitimacy Among Family Members of Individuals Incarcerated for Sex Offenses*, 30 Psych. Pub. Pol'y & L. 80, 87 (2024) (citations omitted); *see* Michael Friedman, *What Happens When We Don't Trust Law Enforcement?*, Psych. Today (Sept. 9, 2014) ("Trust in law enforcement is essential for the belief in the legitimacy of law enforcement, or feeling an obligation to obey the law and defer to decisions made by legal authorities.").[26] This lack of community participation hinders the effectiveness of law enforcement. *See, e.g.*, Tom Tyler, *Police Discretion in the 21st Century Surveillance State*, 2016 U. Chi. Legal F. 579, 584 (2016) (*Police Discretion*) ("Many of the problems that the police identify as making policing

---

[25] https://policecomplaints.dc.gov/page/about-office-police-complaints.
[26] https://www.psychologytoday.com/us/blog/brick-brick/201409/what-happens-when-we-dont-trust-law-enforcement.

more difficult," "such as widespread disregard of police authority and a broad unwillingness to work with the police, are linked to a lack of trust and confidence in the police."); Monica C. Bell, *Police Reform and the Dismantling of Legal Estrangement*, 126 Yale L.J. 2054, 2059 (2017) ("Empirical evidence suggests that feelings of distrust manifest themselves in a reduced likelihood among African Americans to accept law enforcement officers' directives and cooperate with their crime-fighting efforts."). That, in turn, irreparably harms public safety as crimes go unreported and unaddressed.

By contrast, "when people perceive that legal authorities are treating them fairly, they say they are more likely to comply, cooperate, and engage with the law and authorities' directives." Meares, *supra*, at 165; *see* Richard Brown, *Do We Trust the Police?*, Psych. Today (Apr. 28, 2023) ("Police forces that are trusted by their communities can perform their duties more effectively, which, in turn, helps to foster positive relationships between the police and the communities they serve."). That brings its own set of benefits. When law-enforcement authorities "hold up their end of the relationship by wielding their power in appropriate ways, citizens in turn feel a sense of responsibility as members of society to comply with the law, cooperate with law enforcement, and participate in the legal system." Rick Trinkner & Tom R. Tyler, *Bounded Authority: Expanding "Appropriate" Police Behavior Beyond Procedural Justice*, 42 Law & Hum. Behav. 280, 289 (2018). And "[i]f people in the community have greater trust in the police," conflicts in the aftermath of high-visibility police shootings "are less likely to begin and escalate into resistance and physical violence." Tyler, *Police Discretion*, *supra*, at 583. Community trust in its law enforcement accordingly benefits the public and law enforcement alike.

2.      **The deployment of National Guard troops in D.C. threatens to undermine public safety.**

In addition to undermining the carefully built trust of D.C. residents in law enforcement, dispatching National Guard troops to patrol D.C. neighborhoods also threatens to irreparably harm public safety. The troops' very presence may "create the atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985). And tasking National Guard troops with "roles far outside their intended purpose" creates the risk that they will "escalate tensions in the very neighborhoods they're meant to protect." Christopher Purdy, *What We Lose by Distorting the Mission of the National Guard*, The Atlantic (Aug. 31, 2025).[27] The deployment of troops to local neighborhoods thus inherently risks escalating, rather than de-escalating, any situation that requires law-enforcement intervention.

This escalatory risk poses a grave threat to the safety not only of the public, but also of the local police that the National Guard are deployed ostensibly to assist. To the extent tensions rise or situations get out of hand, local law enforcement may be required to respond to diffuse tension or come to the aid of Guard members. Police officers who may have successfully avoided escalation in the first place would now be placed in harm's way. Deployment of armed National Guard troops to patrol the streets of D.C. thus strikes at the heart of public safety—but it points against, rather than for, their deployment. Their deployment irreparably injures the public trust, order, and safety. National Guard troops should play no role in conducting ordinary law-enforcement functions in the District.

## CONCLUSION

Plaintiff's preliminary-injunction motion should be granted.

---

[27]    https://www.theatlantic.com/politics/archive/2025/08/what-we-lose-misusing-national-guard/684070/.

Dated: September 15, 2025

Respectfully Submitted,

Trisha Anderson, Bar No. 497224
Joshua A. Matz, Bar No. 1045064
Martin Totaro*
Hecker Fink LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
tanderson@heckerfink.com
mtotaro@heckerfink.com

*Counsel for Amici Curiae*

*Pro hac vice application pending*

17

## CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of LCvR 5.4, complies with the requirements set forth in Federal Rule of Appellate Procedure 29(a)(4), and does not exceed 25 pages in length.

Trisha Anderson