UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

          Plaintiff,

    v.

DONALD J. TRUMP, *et al.*,

          Defendants.

Civil Action No. 1:25-cv-03005-JMC

## COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ..................................................................................................................1

Background ...................................................................................................................5

    I.      Statutory Background ................................................................................5

        A.      The National Guard System .............................................................5

        B.      The D.C. Home Rule Act .................................................................7

        C.      The Emergency Management Assistant Compact ............................8

        D.      The Posse Comitatus Act ..................................................................9

    II.     Factual Background .....................................................................................9

    III.    Procedural History ..................................................................................14

Legal Standards .........................................................................................................15

Argument ...................................................................................................................16

    I.      Plaintiff's Claims All Fail. ........................................................................16

        A.      The President Has Authority to Deploy the Guard in the District and Does Not Need Permission from the District's Local Government. ......................16

            1.      The Home Rule Act Does Not Preclude the Deployment of the D.C. National Guard by the President. ...........................................16

            2.      Defendants May Coordinate the Deployment of Non-DC National Guard Members. ...........................................................20

            3.      Defendants Have Not Unlawfully Assumed Command and Control Over Out-of-State National Guard Troops. ........................................25

        B.      Plaintiffs Do Not and Cannot State a Valid Claim Under the PCA. .............26

            1.      Plaintiff Cannot Civilly Enforce the PCA Against the Federal Government. ...........................................................................26

            2.      The PCA's Criminal Prohibition Does Not Apply Here. ...................28

            3.      The Guard Has Express Authorization to Execute the Laws ...........29

            4.      The Guard Is Not Executing the Laws. ...............................................30

5.      Plaintiff Fails to Plausibly Plead or Demonstrate a Likelihood of Showing Willfulness................................................................................31

C.      Plaintiff's Arbitrary and Capricious Claim Fails. ................................................32

D.      Plaintiff's Constitutional Claims Fail as a Matter of Law...................................34

E.      The District's Ultra Vires Claim Fails as a Matter of Law. .............................35

F.      The President Should Be Dismissed and Excluded From Any Preliminary Injunction..................................................................................................................36

II.      Plaintiff Has Not Shown that It Will Face Irreparable Harm Absent a Preliminary Injunction and Lacks Standing As to Some Claims For Similar Reasons. ....................37

III.      The Balance of Equities and Public Interest Weigh Against Relief. ...........................42

IV.      Any Preliminary Injunction Should Be Stayed or At Least Administratively Stayed. 43

V.      The Court Should Deny Plaintiff's Request for a Stay on the Same Grounds. ..........44

Conclusion ............................................................................................................................................44

# TABLE OF AUTHORITIES

## Constitution

U.S. Const. art. I, § 8, cl. 15 ..................................................................................................... 5, 35

*U.S. Const. art. I, § 8, cl. 17 ........................................................................................................ 7

## Cases

*Alabama-Coushatta Tribe of Texas v. United States,*
  757 F.3d 484 (5th Cir. 2014) .................................................................................................. 34

*American School of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) .................................................................................................................. 27

*Arab v. Blinken,*
  600 F. Supp. 3d 59 (D.D.C. 2022) .......................................................................................... 16

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ................................................................................................................ 27

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................................ 16

*Ass'n of Admin. L. Judges v. U.S. OPM,*
  640 F. Supp. 2d 66 (D.D.C. 2009) .......................................................................................... 34

*Ass'n of Civilian Technicians, Inc. v. United States,*
  603 F.3d 989 (D.C. Cir. 2010) ................................................................................................ 25

*Banner v. United States,*
  428 F.3d 303 (D.C. Cir. 2005) ............................................................................................. 7, 37

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................................ 16

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................................ 33, 34

*Black Lives Matter D.C. v. Trump,*
  544 F. Supp. 3d 15 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr,* 71 F.4th 1003 (D.C. Cir. 2023) ....................................................................................................................................... 26, 27

*Browning v. Clinton,*
  292 F.3d 235 (D.C. Cir. 2002) ................................................................................................ 16

*Bryan v. United States,*
  524 U.S. 184 (1998) ................................................................................................................ 31

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ........................................................................................................41

*Cobell v. Kempthorne,*
    455 F.3d 301 (D.C. Cir. 2006) ...................................................................................34

*Connecticut v. U.S. Dep't of the Interior,*
    344 F. Supp. 3d 279 (D.D.C. 2018) ..........................................................................16

*District of Columbia v. Murphy,*
    314 U.S. 441 (1941) .....................................................................................................7

*District of Columbia v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d 1 (D.D.C. 2020) ..............................................................................44

*E. Atl. Servs. & Trading LLC v. Mayorkas,*
    2024 WL 4332554 (D.D.C. Sept. 27, 2024) .............................................................16

*English v. Trump,*
    279 F. Supp. 3d 307 (D.D.C. 2018) ..........................................................................37

*\*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ...............................................................................3, 36

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...............................................................................................32, 37

*Fuld v. Palestinian Liberation Org.,*
    606 U.S. 1 (2025) ........................................................................................................22

*Hayes v. Hawes,*
    921 F.2d 100 (7th Cir. 1990) .......................................................................................9

*\*In re Debs,*
    158 U.S. 564 (1895) ...................................................................................................30

*\*In re Neagle,*
    135 U.S. 1 (1890) .......................................................................................................30

*Jones v. U.S. Secret. Serv.,*
    701 F. Supp. 3d 4 (D.D.C. 2023), *aff'd*, 143 F.4th 489 (D.C. Cir. 2025) ...............34

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) .............................................................................................33, 34

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ...................................................................................................16

*Moran v. U.S. Capitol Police Bd.*,
  820 F. Supp. 2d 48 (D.D.C. 2011) .................................................................15

*Mueller v. City of Joliet*,
  943 F.3d 834 (7th Cir. 2019) ................................................................ 3, 29

*Newdow v. Roberts*,
  603 F.3d 1002(D.C. Cir. 2010) ...............................................................37

*Newsom v. Trump*,
  141 F.4th 1032 (9th Cir. 2025) ...............................................................28

*Newsom v. Trump*,
  --- F. Supp. 3d ----, 2025 WL 2501619 (N.D. Cal. 2025), *appeal filed*, No. 25-5553 (9th Cir. Sep. 3, 2025) ............................................................................................ 27, 28

*Norton v. Southern Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................ 33, 34

*Nuclear Reg. Comm'n v. Texas*,
  605 U.S. 665 (2025) ............................................................................. 3, 36

*Nyunt v. Chairman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009) ................................................................36

*Oestereich v. Selective Serv. System Loc. Board No. 11*,
  393 U.S. 233 (1968) ............................................................................ 3, 36

*Patterson v. Haaland*,
  2022 WL 4534685 (D.D.C. Sept. 28, 2022) ............................................16

*Perpich v. Dep't of Def.*,
  496 U.S. 334 (1990) ...............................................................................5

*Ratzlaf v. United States*,
  510 U.S. 135 (1994) ..............................................................................31

*Robinson v. Overseas Military Sales Corp.*,
  21 F.3d 502 (2d Cir. 1994) .....................................................................26

*Schmidt v. U.S. Capitol Police Bd.*,
  826 F. Supp. 2d 59 (D.D.C. 2011) ..........................................................15

*Scott v. Apple Inc.*,
  757 F. Supp. 3d 1 (D.D.C. 2024) ............................................................16

*Seegars v. Ashcroft*,
  297 F. Supp. 2d 201 (D.D.C. 2004), *partially reversed on other grounds by* 396 F.3d 1248 (D.C. Cir. 2005) ..................................................................................................6

*Smith v. United States,*
  293 F.3d 984 (7th Cir. 2002) .................................................................................26

*Sunshine Anthracite Coal Co. v. Adkins,*
  310 U.S. 381 (1940) .............................................................................................27

*Taylor v. Trump,*
  No. CV 25-1161 (TJK), 2025 WL 1517209 (D.D.C. May 27, 2025) ....................37

*\*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) .........................................................................................27

*United States v. Kahn,*
  35 F.3d 426 (9th Cir. 1994) ...................................................................................9

*United States v. Mousavi,*
  604 F.3d 1084 (9th Cir. 2010) ..............................................................................31

*United States v. Texas,*
  599 U.S. 670 (2023) .............................................................................................27

*United States v. Yunis,*
  681 F. Supp. 891 (D.D.C. 1988) ..........................................................................31

*United States v. Yunis,*
  924 F.2d 1086 (D.C. Cir. 1991) .............................................................................9

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs,*
  714 F.3d 186 (4th Cir. 2013) ................................................................................33

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .................................................................................................16

**Statutes and Court Rule**

5 U.S.C. § 551(13) ....................................................................................................34

5 U.S.C. § 704 ..........................................................................................................33

5 U.S.C. § 705 ..........................................................................................................44

10 U.S.C. § 275 ........................................................................................................35

18 U.S.C. § 1385 ......................................................................................9, 26, 28, 31

32 U.S.C. § 314(b) ......................................................................................................6

*32 U.S.C. § 502(f) ...............................................................................................22, 29

D.C. Code § 1-201.01 et seq. ......................................................................................7

D.C. Code § 1–203.02 ................................................................................................................7

D.C. Code § 1-204.33 ................................................................................................................7

D.C. Code § 1-204.46 ................................................................................................................8

D.C. Code § 1-206.01 ................................................................................................................8

*D.C. Code § 1-206.02 .......................................................................................................*passim*

D.C. Code § 1-207.40(a) ..........................................................................................................39

D.C. Code § 5-201 ....................................................................................................................8

D.C. Code § 7–2331 ................................................................................................................20

D.C. Code § 7–2332 ...........................................................................................................20, 21

D.C. Code § 22-4502.01(c) ......................................................................................................40

D.C. Code § 22-4505(b) ...........................................................................................................40

D.C. Code § 23-501 ..................................................................................................................8

D.C. Code § 23-581 ..................................................................................................................8

*D.C. Code § 49-102 .......................................................................................................7, 19, 29

*D.C. Code § 49-103 .........................................................................................................18, 19

D.C. Code § 49-301 ............................................................................................................6, 17

D.C. Code § 49-304 ..................................................................................................................6

D.C. Code § 49-305 ................................................................................................................17

D.C. Code § 49-404 ..................................................................................................................6

D.C. Code § 49-409 ............................................................................................................6, 17

An Act to Provide for the Operation of the Militia of the District of Columbia,
    ch. 328, 25 Stat. 772 (1889) ...............................................................................................5

*District of Columbia Self–Government and Governmental Reorganization Act ("Home Rule
    Act"),
    Pub. L. No. 93–198, 87 Stat. 774 (1973)) .........................................................................7

*Emergency Management Assistance Compact ("EMAC"),
    Pub. L. No. 104-321, 110 Stat. 3877 (1996) ............................................................8, 21, 22

Fed. R. Civ. P. 12(b) ......................................................................................................... 15, 16

**Legislative Materials**

93 Cong. Rec. 33,347 (Oct. 9, 1973) ...............................................................................39

93 Cong. Rec. 33,593 (Oct. 10, 1973) .............................................................................39

93 Cong. Rec. 42,020 (Dec. 17, 1973) ............................................................................39

**Administrative & Executive Materials**

*Exec. Order No. 11,485,
    34 Fed. Reg. 15411 (Oct. 3, 1969) ....................................................................... 6, 19

*Exec. Order No. 14,333,
    90 Fed. Reg. 39301 (Aug. 11, 2025) .................................................................... 9, 10

*Exec. Order No. 14,339,
    90 Fed. Reg, 42121 (Aug. 25, 2025) .................................................................. 11, 12

*_Authority to Use Troops to Prevent Interference with Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions_,
    1 Op. O.L.C. Supp. 343, 344 (1971) ................................................................... 9, 30

*_Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia_,
    13 Op. O.L.C. 91, 93 (1989) ............................................................................._passim_

Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, _Re Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia_ (July 30, 1963) ...............................................................................................29

*Presidential Memorandum, _Restoring Law and Order in the District of Columbia_ (Aug. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/................................................................................................ 11, 32

**Other Authorities**

Andrea Sachs & Federica Cocco, _D.C. Tourism Was Already Struggling. Then the National Guard Arrived_, Washington Post (Aug. 29, 2025), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts...............................................................................................................41

D.C. Home Rule,
    https://dccouncil.gov/dc-home-rule/.............................................................................17

District of Columbia National Guard, About Us,
    https://dc.ng.mil/About-Us/ (last visited Sep. 16, 2025) ...............................................17

DODD 1200.17 ......................................................................................................................26

Gabe Cohen, *DC sues Trump administration over National Guard deployment*, CNN (Sept. 4, 2025),
    https://www.cnn.com/2025/09/04/politics/washington-dc-sues-trump-national-guard .............14

Greg Norman, *Bowser pushes police recruitment, says DC needs 'hundreds more' cops as Trump federal takeover nears end*, Fox News (Sept. 3, 2025),
    https://www.foxnews.com/politics/bowser-pushes-police-recruitment-says-dc-needs-hundreds-more-cops-trump-federal-takeover-nears-end ......................................................................................10

Homa Bash, *Police Union president raises concerns about MPD staffing crisis*, Fox 5 Washington D.C. (May 27, 2025),
    https://www.fox5dc.com/news/police-union-president-says-mpd-is-facing-staffing-crisis ..........10

Jeff Abell, *National Guard's presence slashes D.C. crime rates, with seven days homicide-free*, FOX45 NEWS (Aug. 20, 2025),
    https://foxbaltimore.com/newsletter-daily/national-guards-presence-slashes-dc-crime-rates-with-seven-days-homicide-free....................................................................................................43

Mayor's Order 2025-090, "Creation of the Safe and Beautiful Emergency Operations Center" (Sept. 2, 2025) ("Mayor's Order")........................................................................................... 12, 14

Press Release, Congressman Andrew Garbarino, House of Representatives, House Passes Garbarino Bill to Support D.C. Police and Restore Public Safety (June 10, 2025),
    https://garbarino.house.gov/media/press-releases/house-passes-garbarino-bill-support-dc-police-and-restore-public-safety....................................................................................................11

Ted Oberg, *DC attorney general sues feds to end National Guard deployment*, NBC Washington (Sept. 4, 2025),
    https://www.nbcwashington.com/news/local/dc-attorney-general-sues-feds-to-end-national-guard-deployment/3983862 .........................................................................................................14

*Authorities marked with an asterisk are those on which we chiefly rely

## INTRODUCTION

Since President Trump mobilized the National Guard on August 11, 2025 to address the epidemic of violent crime in our Nation's capital, the District of Columbia ("District" or "D.C.") government has cooperated closely with the federal government to restore law and order in the District. Guardsmen from D.C. and several states have provided support to both the D.C. Metropolitan Police Department ("MPD") and federal law enforcement agencies operating in the District. The D.C. government has assigned MPD officials to coordinate operations with the Guard by working from the Guard's D.C. headquarters, sharing intelligence, and providing MPD escorts to Guardsmen traveling to their operating areas within the District. The close coordination occurs at the highest levels, with the commander of the National Guard's Joint Task Force and the MPD's Special Operations Division participating in daily briefings to support the President's objective. This joint effort has extended to other quality-of-life issues in the District. The Guard and D.C. officials have coordinated to beautify the Nation's capital—with D.C. submitting 40 requests to the National Guard to assist in beautification projects, which have since been fulfilled.

The District has recognized the success of this partnership. An Order signed by the D.C. Mayor celebrated the District's improved safety: "Since August 11, 2025, due to the cooperative efforts between District and federal officials, violent crime in the District has noticeably decreased." To continue the cooperation, the Mayor tasked her government with "continu[ing] to prioritize DC National Guard for typical mission-focused activities." But two days after that order was signed, D.C.'s Attorney General filed a lawsuit that would reverse the past month's progress, a lawsuit that the District's Mayor has declined to support.

The action is a political stunt. It is belied by federal law, D.C. law, and Plaintiff's cooperation with Defendants. Because D.C.'s claims fail as a matter of law, the Complaint should be dismissed. The motion for a preliminary injunction should similarly be denied because Plaintiff has no possibility

of success on the merits. Even if the Court declines to dismiss the Complaint at this time, and even if the D.C. Attorney General's failure to show a likelihood of success were not dispositive, he satisfies none of the other requirements for injunctive relief.

Initially, the D.C. Attorney General's claims fail as a matter of law. His primary contention is that the President needs the Mayor's consent before deploying the National Guard. Even putting aside the District's close coordination with the federal government, this contention is a non-starter. Under federal law, it is the President—not the Mayor—who is the Commander in Chief of the D.C. National Guard. Indeed, under the Home Rule Act, Congress delegated to the District's Council some (though by no means all) of Congress's legislative authority over the District, but made clear that the District government may not exercise "any greater authority over . . . the National Guard of the District of Columbia" than it did prior to Home Rule. Simply put, the D.C. Mayor and District Council do not command the D.C. National Guard. The D.C. Attorney General also contends that a compact between the 50 states, Puerto Rico, U.S. territories, and the District precludes the deployment, but this argument likewise goes nowhere. The compact provides a mechanism for parties to request assistance from other parties, but the compact does not restrict the power of the President at all, let alone override the President's authority as Commander in Chief of the D.C. National Guard, or require the President to obtain the consent of a local official before exercising his express statutory authority over the Guard.

The D.C. Attorney General further asserts claims under the Posse Comitatus Act ("PCA"), which criminalizes willful use of certain military components to execute the laws without Congressional authorization. That claim borders on the frivolous. Initially, there is no private right of action for civil injunctive relief from an asserted violation of the PCA, which is a criminal statute that the Executive Branch enforces. In any event, Guard personnel in D.C. do not fall within the PCA since, as the D.C. Attorney General acknowledges, they are not operating in a federalized status under

Title 10. *See Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019) (holding that Posse Comitatus Act "does not apply to Title 32 National Guard duty"). They also have not engaged in law enforcement. But even if they had, the D.C. Guard is expressly authorized by law in multiple provisions to engage in law-enforcement activity, as the Office of Legal Counsel ("OLC") has consistently concluded since at least the Kennedy Administration. And the PCA only criminalizes "willful" violations, which requires a showing that Defendants acted with knowledge that their conduct was unlawful. The oddity of applying this mens rea requirement to the federal government only underscores that there is no civil cause of action to enforce the PCA against Defendants. But in any event, the D.C. Attorney General cannot plausibly plead that the willfulness requirement is met here—particularly given OLC's longstanding views that the PCA only applies to Title 10 service members and that the President is expressly authorized to direct the D.C. National Guard to engage in law enforcement activities.

The D.C. Attorney General also asserts a hodgepodge of constitutional claims, but those claims are simply derivative of his (incorrect) arguments that the President's actions violate federal statutes, and in any event fail. Finally, the D.C. Attorney General asserts an "ultra vires" claim. Even if ultra vires review is available here, it requires a plaintiff to satisfy one of the most demanding standards known to the law. It is "a Hail Mary pass," *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted), requiring a showing that an agency is engaged in "blatantly lawless" action, *Oestereich v. Selective Serv. System Loc. Board No. 11*, 393 U.S. 233, 238 (1968), or "that the agency has plainly and openly crossed a congressionally drawn line in the sand," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022). Even if the D.C. Attorney General had colorable legal theories, Plaintiff does not state a cognizable ultra vires claim under this demanding standard.

Because Plaintiff's claims have no merit, the motion should be denied without analysis of the remaining preliminary injunction requirements. In any event, analysis of those factors underscores that Plaintiff is not entitled to any relief.

The D.C. Attorney General's attempted showing of irreparable harm falls flat (and Plaintiff lacks standing as to some claims for the same reasons its irreparable harm showing fails). Putting aside the peculiarity of Plaintiff asserting "irreparable harm" where the Mayor has acknowledged the resounding success of the operation, the D.C. Attorney General mostly just claims that the deployment of the Guard inflicts injuries to the District's sovereignty. That reasoning fails because the District is not a sovereign, the President under D.C. law remains the Commander in Chief of the D.C. National Guard, and because the Guard is in any event not making arrests, conducting searches and seizures, or deciding what crimes to investigate, and is *cooperating with* (not interfering with) the MPD. The D.C. Attorney General complains that members of the Guard do not have to comply with the District's ban on carrying unregistered firearms, but it is unremarkable that members of the Guard carry guns, and the D.C. Code specifies that these prohibitions do not apply to members of the National Guard. Plaintiff also hypothesizes that the Guard may engage in unlawful and potentially deadly uses of force or create danger for its citizens. Plaintiff provides no evidence that these fears will materialize or are likely to materialize—nor does this speculation even make sense given the limited nature of the Guard's activities and the close cooperation with the MPD. Plaintiff's bare speculation on this point would not even be sufficient to establish Article III standing for such alleged future injuries; it certainly does not establish irreparable harm.

By contrast, granting the requested injunction would improperly impinge on the President's express statutory authority as Commander in Chief of the D.C. National Guard, as well as the President's efforts to address rates of crime in the District that everyone agrees are unacceptably high—efforts that, as the District's Mayor has acknowledged, are already bearing fruit.

The motion for a preliminary injunction should be denied and the case should be dismissed.

## BACKGROUND

### I.   Statutory Background

### A.   The National Guard System

The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15. Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Dep't of Def.*, 496 U.S. 334, 338 (1990) (citation omitted). State National Guard units are a uniquely hybrid organization. An individual who enlists in the National Guard of a state simultaneously enlists in the National Guard of the United States. *Id.* at 345. Guard members are in state service status—not part of the federal military—until they receive express orders directing them into federal service.

Guard members may have one of three statuses at any given time: (1) federal active duty under Title 10; (2) state control in support of a federal mission under Title 32; or (3) state active duty. Title 10 gives the Federal Government authority to raise and employ military forces, including National Guard units, under federal control and at federal expense for national defense purposes. Title 32 authorizes use of the National Guard for a federal purpose and at federal expense but under state control. Finally, the Governor of a state may order that state's National Guard into state active duty pursuant to state law at state expense.

The National Guard system operates differently in the District. Congress created the D.C. National Guard in its current form and organization in 1889 when it passed the District of Columbia Militia Act,[1] which was later incorporated into the District of Columbia Code as Title 49. Reflecting the District's unique status, the D.C. National Guard differs from state militias. "[T]he organized

---

[1] *See* An Act to Provide for the Operation of the Militia of the District of Columbia, ch. 328, 25 Stat. 772 (1889).

militia of the District of Columbia, which is organized, armed, and controlled by the President of the United States, is essentially a component of the federal government." *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 241 (D.D.C. 2004), *partially reversed on other grounds by* 396 F.3d 1248 (D.C. Cir. 2005). The President, rather than a local official, is the D.C. National Guard's Commander in Chief. D.C. Code § 49-409. And the President appoints and commissions the National Guard's Commanding General. *Id.* § 49-301(a). He also chooses the D.C. Guard's Adjutant General. *Id.* § 49-304; *see also* 32 U.S.C. § 314(b). The President has delegated command of the D.C. Guard in its militia status to the Secretary of Defense, who has delegated that responsibility to the Secretary of the Army. *See* Exec. Order No. 11,485, §§ 1, 4, 34 Fed. Reg. 15411, 15411 (Oct. 3, 1969).

While in its militia status, the D.C. Guard is expressly authorized by law to engage in law-enforcement activity. The D.C. Code recognizes the Guard's use "to aid the civil authorities in the execution of the laws." D.C. Code § 49-404. In addition, the Code states that the Commanding General "may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper." D.C. Code § 49-102. "The authorization to order out the Guard for 'other duties, as he may deem proper' has long been viewed as broad enough to include law enforcement activities." *Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 93 (1989) ("*Use of the National Guard*").

In addition to these statutes, Executive Order 11,485 provides that "[s]ubject to the direction of the President as Commander in Chief, the Secretary may order out the National Guard under [Title 49] of the District of Columbia Code to aid the civil authorities of the District of Columbia." Exec. Order No. 11,485, § 1. "Civil authorities" is defined broadly to include "[t]hose elected and appointed officers and employees who constitute the government of the United States, the governments of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, United States territories, and political subdivisions thereof." U.S. Joint Chiefs of Staff, Joint Publication 3-28, Defense Support to

Civil Authorities, p. GL 5 (31 July 31, 2013) (attached as exhibit to Doane Decl.). Moreover, the same document that defines "civil authorities" specifically contemplates support to "local, state, and federal civil authorities" when such support is requested "by a federal agency with lead responsibility and approved by SecDef." *Id.* at p. I-7.

### B.  The D.C. Home Rule Act

The District is "an exceptional community . . . established under the Constitution as the seat of the National Government." *District of Columbia v. Murphy*, 314 U.S. 441, 452 (1941). The Constitution grants to Congress plenary and exclusive legislative authority over the District, providing that "[t]he Congress shall have the power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17 (first ellipses in original). "In the 1870s, Congress unified the District government under a three-person commission appointed by the President." *Banner v. United States*, 428 F.3d 303, 305 (D.C. Cir. 2005). Later, in 1967, the commission "was replaced with a commissioner and council, also presidentially appointed." *Id.*

In 1973, Congress passed and President Nixon signed the District of Columbia Self–Government and Governmental Reorganization Act ("Home Rule Act"). Pub. L. No. 93–198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1–201.01 et seq.). Under that law, "a mayor and council elected by residents of the District exercise certain executive and legislative powers delegated by Congress." *Banner*, 428 F.3d at 305. In addition to serving as Commander in Chief of the D.C. National Guard, the President appoints D.C.'s local government judges. D.C. Code § 1-204.33. The District Council's authority is limited to "rightful subjects of legislation," and the Home Rule Act lists certain matters that are not rightful subjects. D.C. Code §§ 1–203.02, 1–206.02(a)(4)-(a)(8). Any Council enactment becomes law only if Congress declines to pass a joint resolution of disapproval within thirty days (sixty days for criminal laws). *See id.* § 1–206.02(c)(1)–(c)(2). Congress can enact

legislation concerning the District on any subject and repeal Council enactments at any time. *Id.* § 1–206.01. And the Act prohibits District officers and employees from expending funds unless authorized to do so by Congress. *Id.* § 1–204.46. In addition, the District Council has no power over the courts, federal property, or any federal agency.

Nor does the District government have exclusive law enforcement jurisdiction in the city. Congress has vested in the United States Park Police the power to make arrests in federal parks and federally controlled areas. D.C. Code § 5-201. Officials of the U.S. Marshal's Service can make arrests for crimes committed in their presence. *Id.* §§ 23-501, 23-581. And as relevant here, the Act states that the District Government may not exercise any "greater authority over . . . the National Guard of the District of Columbia" than it did prior to Home Rule. *Id.* § 1-206.02(b). In short, the federal government exercises significant authority over municipal functions in D.C.

### C. The Emergency Management Assistant Compact

The Emergency Management Assistance Compact ("EMAC") is an interstate compact among the 50 states, which Congress approved. Pub. L. No. 104-321, 110 Stat. 3877 (1996), art. I. The District purported to join the compact after Congress approved it. The EMAC provides "for mutual cooperation in emergency-related exercises," including "the giving and receiving of aid by party states or subdivisions of party states during emergencies." *Id.* "Mutual assistance in this compact may include the use of the states' National Guard forces, either in accordance with the National Guard Mutual Assistance Compact or by mutual agreement between states." *Id.* Any "party state may request assistance to another party state." *Id.* art. III.B. A party state requested to provide aid "shall take such action as is necessary to provide and make available the resources covered by this compact in accordance with the terms hereof; provided that it is understood that the state rendering aid may withhold resources to the extent necessary to provide reasonable protection for such state." *Id.* art. IV.

### D. The Posse Comitatus Act

The PCA states in full as follows: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385. The PCA thus generally forbids using the Armed Forces "to execute the laws," 18 U.S.C. 1385, such as by directly engaging in domestic law-enforcement duties normally assigned to civilian police. See, *e.g.*, *United States v. Kahn*, 35 F.3d 426, 431 (9th Cir. 1994); *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991); *Hayes v. Hawes*, 921 F.2d 100, 104 (7th Cir. 1990) (per curiam). It was "designed to prevent the use of troops in direct law enforcement under command of minor civilian officials." *Authority to Use Troops to Prevent Interference with Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Op. O.L.C. Supp. 343, 344 (1971) ("*Authority to Use Troops*").

## II.    Factual Background[2]

**A.1.**    On August 11, 2025, President Trump issued Executive Order 14333, "Declaring a Crime Emergency in the District of Columbia." Noting that Washington, D.C. "is our Nation's capital and home to the central institutions of American governance," the Executive Order highlighted that "violence in the capital now urgently endangers public servants, citizens, and tourists, disrupts safe and secure transportation and the proper functioning of the Federal Government, and forces the diversion of critical public resources toward emergency response and security measures." Exec. Order No. 14,333, § 1, 90 Fed. Reg. 39301 (Aug. 11, 2025). The Order notes that our Nation's capital is

---

[2] This is a combined memorandum opposing Plaintiff's motion for a preliminary injunction and supporting Defendants' motion to dismiss. For purposes of opposing the preliminary injunction, Defendants cite declarations and other materials that are beyond the scope of a court's inquiry under Rule 12(b)(6). But to be clear, the Court need not consider any of these materials in resolving the motion to dismiss since, as discussed below, Plaintiff's claims all fail as a matter of law. Accordingly, Defendants are not filing the declarations alongside the motion to dismiss.

"among the most violent jurisdictions in the United States." *Id.* § 1. The District has a higher violent crime, murder, and robbery rate than all 50 states, and has the Nation's highest vehicle theft rate. *Id.*

In addition to the many individual tragedies associated with the District's high levels of crime, its violent crime crisis has significant implications for federal functions and operations. "Violence and crime hamper the recruitment and retention of essential Federal employees, undermine critical functions of Government and thus the well-being of the entire Nation, and erode confidence in the strength of the United States." *Id.* And the violent crime crisis endangers Government workers at the Federal buildings in the District where they work. *Id.* Finding that "these conditions cannot persist," *id.*, President Trump "determine[d] that special conditions of an emergency nature exist that require the use of the Metropolitan Police Department of the District of Columbia . . . for Federal purposes," *id.* § 2.

The District's efforts to reduce violent crime have been hampered by an acknowledged shortage of police officers. As recently as August 28, Mayor Bowser repeated that the District's longstanding goal has been a force of 4,000 officers; the District currently has approximately 3,188 officers.[3] Earlier this year, the head of D.C.'s Police Union similarly stated that the Metropolitan Police Department faces a staffing crisis, and elaborated that "I've been on the Metropolitan Police Department for 20 years now and what I can tell you is the condition of this police department is the worst that I have ever seen it."[4] The District's police shortage has also prompted concerns from

---

[3] Greg Norman, *Bowser pushes police recruitment, says DC needs 'hundreds more' cops as Trump federal takeover nears end*, Fox News (Sept. 3, 2025), https://www.foxnews.com/politics/bowser-pushes-police-recruitment-says-dc-needs-hundreds-more-cops-trump-federal-takeover-nears-end.

[4] Homa Bash, *Police Union president raises concerns about MPD staffing crisis*, Fox 5 Washington D.C. (May 27, 2025), https://www.fox5dc.com/news/police-union-president-says-mpd-is-facing-staffing-crisis.

members of Congress; for example, one Representative noted that "[h]undreds of fewer officers on the streets have emboldened criminals, eroding public safety as well as officer morale."[5]

2.      On the same day he issued Executive Order 14333, President Trump issued a Presidential Memorandum directing the Secretary of Defense to mobilize the D.C. National Guard to address crime in the Nation's capital. The Memorandum highlighted the unique nature of the District and the President's obligation to "ensure that all citizens can avail themselves of the right to interact with their elected representatives, and that the Federal Government can properly function, without fear of being subjected to violent, menacing street crime." *See* Presidential Memorandum, *Restoring Law and Order in the District of Columbia*, § 1 (Aug. 11, 2025).[6] The mobilization directs the Secretary of Defense "to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission." *Id.* § 2.

3.      On August 25, 2025, President Trump issued Executive Order 14339, "Additional Measures to Address the Crime Emergency in the District of Columbia." Among other things, that Order: directed the National Park Service to hire additional park police; directed the United States Attorney to hire additional prosecutors to focus on prosecuting violent and property crimes; and directed the D.C. Safe and Beautiful Task Force (which had been established by Executive Order 14252 on March 27, 2025) to take various actions to ensure public safety. Exec. Order No. 14339, § 2(a-c, e-f), 90 Fed. Reg, 42121 (Aug. 25, 2025). And as relevant here, the Executive Order directed the Secretary of Defense to "create and begin training, manning, hiring, and equipping a specialized unit

---

[5] *See* Press Release, Congressman Andrew Garbarino, House of Representatives, House Passes Garbarino Bill to Support D.C. Police and Restore Public Safety (June 10, 2025), https://garbarino.house.gov/media/press-releases/house-passes-garbarino-bill-support-dc-police-and-restore-public-safety.

[6] *Available at* https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/

within the District of Columbia National Guard, subject to activation under Title 32 of the United States Code, that is dedicated to ensuring public safety and order in the Nation's capital." *Id.* § 2(d)(i).

    **B.**    Approximately one week later, Mayor Bowser issued Mayor's Order 2025-090, "Creation of the Safe and Beautiful Emergency Operations Center" (Sept. 2, 2025) ("Mayor's Order"). Section I.B of that Mayor's Order identified "common goals" with the President's Safe and Beautiful Task Force. This includes "Public Safety and Justice," described as "[j]oint federal and MPD efforts to deter crime, increase patrols, improve investigations and devote appropriate resources to District detention facilities." Mayor's Order § I.B.1. The Mayor's Order formally established the Safe and Beautiful Emergency Operations Center ("SBEOC") to manage the District's response to the Task Force and the Presidential declaration of an emergency on a "continuing basis," by ensuring coordination with "enhanced federal law enforcement efforts." Mayor's Order § II. The Mayor's Order noted that "the District will continue to communicate its priorities to federal counterparts and other ways the federal government can assist the District, with the primary goal of reducing gun violence, other violent crime and achieving the goals of the SBEOC workstreams." Mayor's Order § II.D. Finally, the Mayor's Order noted that "[t]he SBEOC will also continue to prioritize DC National Guard for typical mission-focused activities." Mayor's Order § II.E.

    **C.**    The National Guard's efforts in the District have been organized with a Commanding General overseeing the Joint Task Force District of Columbia ("JTF-DC") and Task Force Support, the latter of which handles the beautification mission. Declaration of Lawrence Doane ("Doane Decl.") ¶ 3. The JTF-DC mission is to provide support to the MPD as well as federal law enforcement agencies in the District. *Id.* ¶ 4. JTF-DC consists of personnel from the D.C. National Guard and Guardsmen from six states (South Carolina, West Virginia, Mississippi, Louisiana, Tennessee, and Ohio). *Id.* ¶ 8.

The JTF-DC has worked cooperatively with the D.C. Government. There are daily coordination meetings between JTF-DC, the MPD, the Washington Metro Transit Police Department, the Marshals Service, and the Park Police. *Id.* ¶ 11. Two DC-MPD liaisons are assigned to the JTF-DC Operations Center to ensure coordination and cooperation between the entities. *Id.* Each day, the MPD provides the JTF-DC with an Officer Awareness Packet that informs them of suspects to be on the lookout for, as well as any relevant planned MPD operations. *Id.* ¶ 12. The MPD also gives the JTF-DC daily updates on the location and frequency of reported crime, as well as provides a police escort to JTF-DC forces when they are transported to their operating area. *Id.* When Guard forces observe crime or other situations that require a police response, they call 9-1-1, which dispatches MPD forces to the relevant site; MPD then contacts the JTF-DC Operations Center to coordinate their response and to connect the responding MPD officers with the Guard personnel on site. *Id.* ¶ 14. The Guard has also completed 40 beautification projects within the District at the D.C. Government's request. Declaration of Christopher York ("York Decl.") ¶ 11.

Guardsmen's activities are limited. As part of the current operation, they do not make arrests, conduct searches or seizures, or engage in similar functions. Doane Decl. ¶¶ 4, 7. They do not share equipment with law enforcement agencies, or use helicopters or other air assets. *Id.* ¶ 4. They may make temporary detentions until law enforcement arrives but "[t]he decision of whether to arrest an individual, and any investigation of the underlying incident, are solely the responsibility of the supported law enforcement agency." *Id.* ¶ 7. The JTF-DC supports the MPD and other law enforcement agencies by acting as a presence to deter crime, report crimes they witness, and assist law enforcement in support missions when they are requested to do so. *Id.* ¶ 6.

Although Guardsmen do not personally engage in law enforcement, their work has been necessary for the federal government to surge law enforcement resources to the District. Guardsmen have provided a presence at sites where the United States Park Police typically patrol, freeing those

Park Police to partner with MPD off federal property within the District. Declaration of Donald Snider ("Snider Decl.") ¶ 10. As Mayor Bowser highlighted, the close cooperation between the District and Federal Government has yielded progress in combatting crime. Mayor Bowser's order correctly concluded that "[s]ince August 11, 2025, *due to the cooperative efforts between District and federal officials, violent crime in the District has noticeably decreased.*" Mayor's Order § I.E (emphasis added).

## III.    Procedural History

Two days after the Mayor signed her order noting the success of the federal-District cooperative effort, the D.C. Attorney General filed this action. ECF No. 1 ("Compl." or "Complaint"). His action asserts claims against President Trump; against the Department of Defense, Secretary Hegseth, the Army, and Army Secretary (collectively, "DoD Defendants"[7]); and against the Department of Justice, Attorney General Bondi, as well as the United States Marshals Service and its Director (collectively, "DOJ Defendants"). Mayor Bowser was informed of the lawsuit the morning it was filed[8] and has "repeatedly declined to endorse the lawsuit."[9]

The Complaint asserts four claims. The first, an Administrative Procedure Act ("APA") claim against the DOJ and DoD Defendants, contends that the deployment of the Guard and out-of-state troops violates the Home Rule Act and the EMAC, that DOJ and DoD Defendants have acted unlawfully by assuming command and control over out-of-state National Guard units in Title 32 status, and that the activities of the National Guard troops violate the PCA. Compl. ¶¶ 139-58. The

---

[7] On September 5, President Trump issued an Executive Order authorizing the agency to use a secondary title—the Department of War—in certain contexts. For ease of reference, this brief describes the parties consistent with how the D.C. Attorney General has named them.

[8] Ted Oberg, *DC attorney general sues feds to end National Guard deployment*, NBC Washington (Sept. 4, 2025), https://www.nbcwashington.com/news/local/dc-attorney-general-sues-feds-to-end-national-guard-deployment/3983862/.

[9] Gabe Cohen, *DC sues Trump administration over National Guard deployment*, CNN (Sept. 4, 2025), https://www.cnn.com/2025/09/04/politics/washington-dc-sues-trump-national-guard.

second, also against the DOJ and DoD Defendants and purportedly asserted under the APA, contends that the Guard's deployment and various operational decisions are "arbitrary and capricious" because, inter alia, the Guardsmen allegedly lack sufficient training, because Defendants supposedly failed to weigh the costs and benefits of operational decisions (such as the specific types of guns given to Guardsmen), and alleged failures to consider relevant factors. *Id.* ¶¶ 159-67. The third, against all Defendants, asserts constitutional violations, specifically the constitutional separation of powers doctrine, the Take Care Clause, and the District Clause, *id.* ¶¶ 168-79; as discussed further below, these constitutional claims are entirely derivative (and thus rise and fall with) Plaintiff's claims that the challenged actions violate federal statutes. Finally, the District purports to assert an equitable "ultra vires" claim against all Defendants. *Id.* ¶¶ 180-85.

On September 9, Plaintiff moved for a preliminary injunction, requesting, inter alia, that the Court enjoin Defendants from deploying National Guard troops "to conduct law enforcement in the District of Columbia without the express consent of the Mayor." ECF No. 3 at 1.

## LEGAL STANDARDS

Defendants move to dismiss under Federal Rule of Civil Procedure Rules 12(b)(1) and 12(b)(6). To survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing that the court has jurisdiction by a preponderance of the evidence. *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011). "Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A motion to

dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is designed to 'test[ ] the legal sufficiency of a complaint.'" *Scott v. Apple Inc.*, 757 F. Supp. 3d 1, 11 (D.D.C. 2024) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant must establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

**ARGUMENT**

## I. Plaintiff's Claims All Fail.

Plaintiff's claims all fail as a matter of law. The Court should thus dismiss the Complaint.[10] Even if the Court does not dismiss the Complaint now, the preliminary injunction motion should be denied because Plaintiff has no possibility (let alone a likelihood) of success on the merits.

### A. The President Has Authority to Deploy the Guard in the District and Does Not Need Permission from the District's Local Government.

#### 1. The Home Rule Act Does Not Preclude the Deployment of the D.C. National Guard by the President.

Plaintiff's principal argument is that the Home Rule Act precludes the President from deploying the Guard without the Mayor's express consent. That argument is plainly without merit.

---

[10] Defendants respectfully request that the Court waive the requirement under Local Civil Rule 7(n), to the extent it applies here, to file a certified list of the contents of an administrative record simultaneously with the filing of Defendants' Rule 12(b) motion to dismiss. Local Civil Rule 7(n) indicates that it is meant to aid in the decision of a dispositive motion that relies on an administrative record. *See* LCvR 7(n)(1). Thus, "the general practice in this Court" is to waive Local Civil Rule 7(n) when "the administrative record is not necessary for [the court's] decision." *Arab v. Blinken*, 600 F. Supp. 3d 59, 65 n.2 (D.D.C. 2022); *see also, e.g.*, *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018); *Patterson v. Haaland*, 2022 WL 4534685, at *1 & n.2 (D.D.C. Sept. 28, 2022); *E. Atl. Servs. & Trading LLC v. Mayorkas*, 2024 WL 4332554, at *6 (D.D.C. Sept. 27, 2024).

The President is the Commander in Chief of the D.C. National Guard at all times. *See* D.C. Code § 49-409. Congress has given the President control over the D.C. National Guard's operations, including by commissioning its officers, *id.* § 49-305, approving "regulations for the government of the militia," *id.* § 49-805, and appointing the Commanding General, *id.* § 49-301. As such, "the President . . . stands in a relation to the D.C. National Guard that is similar to the relation obtaining between the Governors of the several States and their respective State National Guard units." *Use of National Guard*, 13 Op. O.L.C. at 94 (citation omitted). "The D.C. National Guard is the only National Guard unit, out of all of the 54 states and territories, which reports directly to the President." District of Columbia National Guard, About Us, https://dc.ng.mil/About-Us/ (last visited Sep. 16, 2025).

Nothing in the Home Rule Act changes that result. The Home Rule Act specifically limits the District's authority regarding the D.C. National Guard by providing that "[n]othing in this chapter shall be construed as vesting in the District government any greater authority over . . . the National Guard of the District of Columbia . . . than was vested in the Commissioner prior to January 2, 1975." D.C. Code § 1-206.02(b). Prior to January 2, 1975, the District government was headed by a mayor-commissioner who was appointed by the President. *See* D.C. Home Rule, https://dccouncil.gov/dc-home-rule/ (noting that the District's "commissioner form of government was replaced in 1967 by a mayor-commissioner and a nine-member city council appointed by the President"). Plaintiff cites nothing requiring the President to obtain the consent of the presidentially-appointed commissioner in using the National Guard. That should be the end of the analysis.

Plaintiff nonetheless asserts that the D.C. Code limits the ability of the President to call out the National Guard only "where there is a 'tumult, riot, mob,' or similar disturbance, and the Mayor, the U.S. Marshal for the District, or the National Capital Service Director requests 'aid in suppressing such violence and enforcing the laws.'" Pl. Mem. at 20 (quoting D.C. Code § 49-103). That is not what Section 49-103 says. It states:

- 17 -

When there is in the District of Columbia a tumult, riot, mob, or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws, or when such tumult, riot, or mob is threatened, it shall be lawful for the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, to call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws; the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same, and no member thereof who shall be thus ordered out by proper authority for any such duty shall be liable to civil or criminal prosecution for any act done in the discharge of his military duty.

D.C Code § 49-103.

This provision provides a procedural mechanism for the Mayor to *request* the assistance of the D.C. National Guard. Neither she nor the D.C. government exercise any command or control over the Guard, and so she may request the services of the Guard through the President. Nothing in the statute suggests this provision is the exclusive vehicle to mobilize the Guard to respond to violent lawbreaking. Instead, it recognizes it is "lawful" for the Mayor and two federal officials "to call on" the President for "aid." *Id.* That procedural mechanism does not divest the President of his authority to call out the D.C. National Guard, just as a governor of a state can call out its National Guard regardless of whether a request is made by a given municipality in that state. The code provision makes this clear—although the Mayor can request the deployment of the D.C. National Guard, the decision is ultimately within the discretion of the President, as Commander in Chief of the D.C. National Guard, who "shall thereupon order out so much and such portion of the militia as *he* may deem necessary." *Id.* (emphasis added).

Because the President serves as the Commander in Chief of the D.C. National Guard, he does not need specific statutory authority to deploy it. But in any event, the D.C Code does provide that specific statutory authority. The Code authorizes the Commanding General of the D.C. National Guard to "order out any portion of the National Guard for . . . other duties, as he may deem proper."

*Id.* § 49-102. As discussed below, this provision "has long been viewed as broad enough to include law enforcement activities." *Use of the National Guard*, 13 Op. O.L.C. at 93; *see also infra* p. 29.

This reading does not "render largely superfluous section 49-103," as Plaintiff asserts. Pl. Mem. at 21. As noted above, that Section allows three individuals outside the Guard's chain of command, including the Mayor, to request the mobilization of the D.C. National Guard. And it does so by merely confirming such requests are "lawful." D.C. Code § 49-103. It does not limit the ability of the President, as Commander in Chief and functionally serving in the role of a Governor of a state, to independently determine that mobilization of the D.C. National Guard is necessary. Nor is this reading inconsistent with the District's authority under the Home Rule Act to maintain a police force, preserve the public peace, and the like. *See* Pl. Mem. at 21-22. The Mayor does not have sole control over those charged with providing for public safety within D.C. As explained, the U.S. Park Police and Marshal's service, among others—and over which the Mayor lacks authority—already has concurrent jurisdiction with MPD.

This reading of Section 49-103 is reinforced by Executive Order 11485. That 1969 Executive Order—which predates the Home Rule Act—provides that the Secretary of Defense may order out the D.C. National Guard "to aid the civil authorities of the District of Columbia," Exec. Order No. 11,485 § 1, which is defined to include federal authorities, *see* Joint Publication 3-28. The Home Rule Act, by definition, does not displace that pre-existing authority vested with Secretary. *See* D.C. Code § 1-206.02(b). Nor would it make sense to condition the use of the D.C. National Guard (a federal entity) on the consent of a local official. In the seat of our Federal Government, the D.C. National Guard is regularly used to support federal authorities (for example, during Presidential Inaugurations, National Special Security Events, and other similar events). Doane Decl. ¶ 13.

### 2. Defendants May Coordinate the Deployment of Non-DC National Guard Members.

Plaintiff next claims that Defendants have acted unlawfully by directing out-of-state National Guard troops in state militia status to be sent to the District without the Mayor's consent and in violation of the EMAC. *See* Pl. Mem. at 22-27. This argument also fails for multiple reasons.

For starters, not only does the Compact not serve as the exclusive mechanism for Guardsmen from other states—the EMAC *cannot* be used to accept Guardsmen into D.C. from the states. EMAC assistance is an entirely state enterprise; Congress approved the EMAC but the federal government is not a party. When a state sends Guardsmen to another state, that is thus a form of *state* active duty, not duty in support of a federal mission under Title 32. EMAC assistance is also state funded. But the D.C. Guard *has no* state active duty status, and the District's Mayor has no authority to call out the D.C. Guard. *See supra* pp. 18-19. Since the Mayor cannot call out the Guard and thus cannot send them into other states, she could not enter into a mutual agreement to accept them from other states. Although the D.C. Code authorizes the District to join the Compact and the Mayor to execute it, D.C. Code §§ 7–2331, 7-2332, the terms of the EMAC that *apply* to D.C. do not include the National Guard terms (which is only a small subset of the EMAC). So the EMAC is simply inapplicable here.

But even if the EMAC *could* be used to accept Guardsmen from the states into D.C., nothing in the Compact remotely suggests that it is the *sole* mechanism for obtaining assistance; instead, it merely provides a mechanism by which Governors (and the President in the case of the District) can request assistance from one another. Even if the EMAC provides the President—and not the Mayor, as discussed below—with the ability to request assistance from out-of-District National Guards, it does not act as a silent jurisdiction-stripping provision that precludes the President from deploying the Guard in his role as the D.C. National Guard's Commander in Chief. The relevant provision of the D.C. Code authorizing the Mayor to execute the EMAC simply states that "[t]he Mayor is hereby authorized to execute, on behalf of the District of Columbia, the [EMAC]." D.C. Code § 7-2332.

Nowhere does it purport to confer exclusive authority on the Mayor. And even if the Compact was the exclusive mechanism for obtaining National Guard assistance from states, the appropriate authority to make that request would be the *President*, since he is Commander in Chief of the D.C. National Guard—just as governors are commanders in chief over their National Guard units.

Reading the compact in the way Plaintiff proposes is particularly untenable because Congress approved the compact *before* D.C. joined, and it has never approved D.C. joining the compact. Compl. ¶ 47. Congress certainly has not consented to the bizarre scheme Plaintiff now attributes to the Compact, under which the D.C. Mayor rather than the D.C. Guard's Commander in Chief is the exclusive authority to request assistance.

All of this, again, is underscored by the Home Rule Act. Recall that the Home Rule Act specifically carved out the D.C. National Guard from its other provisions such that the District lacks "any greater authority over" the National Guard "than was vested in the Commissioner prior to January 2, 1975." D.C. Code § 1-206.02(b). The District's sweeping view that the EMAC provides the District's Mayor with the exclusive ability to obtain out-of-District assistance (even though she has no power over the District's National Guard) is inconsistent with the Home Rule Act. That reading would provide the Mayor with "greater authority" than existed prior to 1975. Put another way, the D.C. Council would not have had authority to delegate exclusive authority to the Mayor over D.C. National Guard operations when it purported to authorize the Mayor to execute the EMAC.[11]

---

[11] Plaintiff asserts that "when it ratified the agreement, Congress added a narrow provision specifying that the Compact did not affect 'the authority of the President' to send *federalized* National Guard troops into a state under 'the Constitution and Title 10.'" Pl. Mem. at 24, quoting Pub. L. No. 104-321, art. XIII, § 2(6). According to the District, "[t]hat exception would make no sense if the President could mandate the sending of non-federalized National Guard troops whenever and wherever he wished." *Id.* Plaintiff's argument fails. First, the ratification, styled as congressional consent, identifies the specific states that were then parties to the EMAC—the District (and its National Guard's unique status as a federal entity) is not listed among them. Second, the provision cross-references Article XIII of the EMAC, which states that the EMAC does not authorize the use of "military force by the

This is also underscored by the basic structure of the statutory creation that is the District government. The District government is not a separate or dual sovereign. Congress through the Home Rule Act provided it with some limited legislative and executive power. But D.C. is not a sovereign. Congress did not give the District the power exclusive of the President to decree that another State's guard cannot be sent to D.C. without its consent. Plaintiff's citation to *Fuld v. Palestinian Liberation Org.*, 606 U.S. 1, 14 (2025), for the proposition that "it is a basic precept of our federal system that states may not exert their sovereign authority beyond their borders without the receiving jurisdiction's consent," Pl. Mem. at 23, is thus misplaced.

Plaintiff's focus on the EMAC is further misplaced because the President has express statutory authority to request assistance from other state National Guard units. Title 32 authorizes National Guard members to "be ordered to perform training or other duty," which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f), (f)(2)(A). Plaintiff asserts that it "cannot be right" that Section 502(f)'s "training or other duty" provision can be construed to permit the President to request the assistance of out-of-District National Guard units. *See* Pl. Mem. at 25-27. But that is precisely what the plain text of Section 502(f) prescribes. It authorizes the President or Secretary to request National Guard units to support a federal mission, which necessarily includes operations in the District, where the President's authority overlaps as both the Commander in Chief of the federal military and the D.C.

National Guard of a state at any place outside that state in any emergency for which the President is authorized by law to call into federal service the militia, or for any purpose [in violation of the PCA]." Congress' clarification that the EMAC's restriction regarding the PCA does not affect the President's Title 10 authority says nothing about the President's inherent authority as Commander in Chief or his authority under Title 32. Third, and as noted above, the District could not have granted itself greater authority over the D.C. National Guard than what existed prior to the Home Rule Act merely because the D.C. Council authorized the Mayor to execute the Compact.

National Guard. And nothing in Section 502(f) limits the types of missions that the President and Secretary of Defense can request.

Plaintiff raises a hodge-podge of additional arguments, but none have merit. For example, Plaintiff asserts that Defendants' interpretation of the statutory scheme would "allow the President to send National Guard troops into a state *without* consent of the state's legislature or governor." Pl. Mem. at 26. But this ignores two realities on the ground. First, the President stands in the role of the Governor as it relates to the D.C. National Guard, meaning he can consent to the use of out-of-District National Guard troops within the District. *See Use of the National Guard*, 13 Op. O.L.C. at 94 (1989). And second, the states sending National Guard troops to D.C. have *also* consented to the mobilization to protect the Nation's capital. Plaintiff fails to identify any Guard unit operating "without consent of the state's legislature of governor," Pl. Mem. at 26, as it contends.

Plaintiff also asserts that the out-of-District National Guard members "have been permitted to operate independently of MPD, even though their organizational units are not subject to the District's 'operational control,' their personnel have not been made its 'agents,' and the District has not 'specifically authorized' them to make arrests." *Id.* at 24. These assertions are all incorrect or non-sequiturs.

First, while the D.C. National Guard has "coordinating and tasking authority over . . . out-of-district forces," those forces "remain under the administrative command and control of their sending state Adjutants General and ultimately their State Governors," and "[a]ll tasks assigned to out-of-district forces are within parameters set by their State Governors." Doane Decl. ¶ 9; *see also* Snider Decl. ¶ 12 ("The D.C. National Guard is the lead National Guard unit that is augmented by National Guard units from several states.  To the best of my knowledge, National Guard units conduct high visibility patrols, carry out beautification efforts, and serve as a quick response force. "). In that regard, "[o]ut-of-district forces may be withdrawn, or their operations further limited by their State Governors

at any time," and the D.C. National Guard "has no disciplinary or administrative authority over" them. Doane Decl. ¶ 9.

Second, the D.C. National Guard—including the out-of-District National Guard members it is coordinating—work regularly with the District, Mayor Bowser's staff, and the MPD. The federal surge command post operates out of MPD's Joint Operations Command Center, "where over 20 agencies and National Guard personnel liaise 24 hours a day, seven days a week, including members of the MPD and [Executive Office of the Mayor] staff." Snider Decl. ¶ 7; *see also id.* ¶ 6 (noting close coordination with the Executive Office of the Mayor and other agencies); Doane Decl. ¶ 11 (noting "daily multiagency coordination meeting[s] with the [U.S. Marshalls Service], [U.S. Park Police], DC-MPD, and the Washington Metro Transit Police Department"). Colonel Doane of the D.C. National Guard has "been in daily contact with Commander Jason Bagshaw, of DC-MPD's Special Operations Division to coordinate JTF-DC operations in support of DC-MPD." *Id.* In fact, "two DC-MPD liaisons are assigned to the JTF-DC Operations Center located at the DCNG Armory to ensure coordination and cooperation between the DC-MPD and JTF-DC." *Id.*

Third, neither the D.C. National Guard nor out-of-District National Guard members are making arrests or engaging in direct law enforcement activity. *Id.* ¶ 4; Snider Decl. ¶¶ 14-16. Instead, "the D.C. National Guard, augmented by National Guard units from various states, [have served] as a high visibility deterrence force across Washington D.C." Snider Decl. ¶ 9. "The decision of whether to arrest an individual, and any investigation of the underlying incident, are solely the responsibility of the supported law enforcement agency." Doane Decl. ¶ 7. To that end, when National Guard personnel witness a crime, a person in distress, or another emergency, they call 911 so that MPD can coordinate operations and dispatch police to the scene. *Id.*; *see also* Snider Decl. ¶ 9 ("If any member of the National Guard witnesses a crime, they are under orders issued by their leadership to call 911.").

And at bottom, "[a]ll JTF-DC operations are vetted and approved by supported law enforcement partners." Doane Decl. ¶ 14.

### 3. Defendants Have Not Unlawfully Assumed Command and Control Over Out-of-State National Guard Troops.

Plaintiff next asserts that Defendants have violated the Constitution and federal law by exercising command and control over out-of-state National Guard units in state militia status. *See* Pl. Mem. at 27-31. The District is wrong on both the law and the facts.

The parties all agree that out-of-District National Guard units are all operating in Title 32 status. *See Id.* at 29. The District nonetheless contends that the "federal government is commanding these units directly" by "plac[ing] all of the National Guard units in the District 'under the command' of DCNG, which is directed and controlled by the U.S. Army." *Id.* at 29. The District's principal legal argument appears to be that National Guard units operating under Title 32 status "must be 'under the command of the State Governor' and subject to the governor's 'day-to-day' control." *Id.* at 28. But the case the District cites for that proposition, *Association of Civilian Technicians, Inc. v. United States*, merely addresses the structure of National Guards in the context of the reinstatement of National Guard members, noting that "a State National Guard is under the command of the state Governor" and observing that, while the United States has regulations and orders that apply to National Guards generally, "day-to-day operations" are left to the states. 603 F.3d 989, 992-93 (D.C. Cir. 2010). Those unremarkable observations about the military's structure say nothing about operations or coordination of out-of-District Guard Members, much less the unique structure of the D.C. National Guard commanded by the President.

In any event, the District oversimplifies the facts when it characterizes out-of-District National Guard members as being under the "command and control" of the D.C. National Guard. It is well-settled doctrine that, during domestic operations, National Guard units operating in a Title 32 status shall remain under the command and control of their respective state governors and adjutant generals.

*See* DODD 1200.17. That does not mean, however, that there is no coordination amongst those Guard units: Unity of effort is maintained between out-of-state units and local commanders where the unit receives priorities from the local commander but remains under the command and control of their state chains of command.. In this regard, and as described in detail in Part I.A.2, *supra*, the D.C. National Guard operates as a liaison and chief coordinating element for the out-of-District National Guard units that have been deployed in the District and are in Title 32 status.[12] This argument accordingly has no merit.

### B.  Plaintiff Does Not and Cannot State a Valid Claim Under the PCA.

The District's claim under the PCA likewise plainly fails, for at least five reasons.

### 1.  Plaintiff Cannot Civilly Enforce the PCA Against the Federal Government.

Plaintiff lacks a cause of action to enforce the PCA. That Act imposes criminal penalties for "willfully us[ing] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Numerous other courts have similarly found that the PCA does not create a private civil cause of action. *See, e.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). Those decisions are correct. The PCA is a criminal statute with no express cause of action. As Judge Friedrich observed in *Black Lives Matter*,

---

[12] Plaintiff relies upon various statements offered by state officials regarding the support they are providing pursuant to the President's request. *See* Pl. Mem. at 30. None of those statements are inconsistent with the command structure set forth in Department of Defense regulations and policies. And at bottom, the scope of those missions are dictated by the Memoranda of Understanding defining the scope of those missions.

"[c]riminal statutes like the PCA do not always—or even generally—create a cause of action for civil damages." 544 F. Supp. 3d at 40.

Nor does the D.C. Attorney General have any equitable cause of action to enforce compliance with the PCA. "[T]he statutory grant" empowering federal courts to issue equitable remedies "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2551 (2025) (citation omitted). Where courts have enjoined federal or state governments in equity, it has typically been for civil violations on behalf of plaintiffs subject to a relevant regulatory scheme. *See, e.g., American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). By contrast, there is no historical basis for a court to enjoin the federal government to comply with a criminal statute that protects the public at large.

Indeed, the Executive Branch has exclusive authority over prosecuting federal crimes, including its exercise of prosecutorial discretion. *See, e.g., United States v. Texas*, 599 U.S. 670, 680 (2023). That authority cannot be transferred to private citizens, *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), and courts cannot adjudicate a private citizen's (or a State's) grievance over the Executive Branch's prosecutorial decisions, *see Texas*, 599 U.S. at 680-81. These principles operate as a "limitation[]" on "[t]he power of federal courts of equity to enjoin unlawful executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Allowing a plaintiff to pursue a civil PCA claim—under an ultra vires theory or otherwise—would conflict with these settled principles.

Indeed, in the 147-year history of the PCA, the government is aware of only a single case granting injunctive relief in a civil action on PCA grounds, a decision from the Northern District of California two weeks ago arising out of the deployment of the National Guard in Southern California. *See Newsom v. Trump*, --- F. Supp. 3d ----, 2025 WL 2501619, at *27-28 (N.D. Cal. 2025), *appeal filed*, No. 25-5553 (9th Cir. Sep. 3, 2025). That decision (which it bears mentioning did not enjoin the

deployment itself), is clearly wrong and will not withstand appellate review. In fact, the district court's injunction has since been administratively stayed by the Ninth Circuit and the district court's interim injunction on other claims was stayed by a unanimous panel. *See* No. 25-5553, ECF No. 7.1 (9th Cir.); *Newsom v. Trump*, 141 F.4th 1032, 1040-41 (9th Cir. 2025) (per curiam). But even that court did not dispute that the PCA does not itself provide for a cause of action, and instead granted an injunction based on a non-statutory *ultra vires* theory. 2025 WL 2501619, at *27 n.26. That, too, was incorrect: *Ultra vires* review is not available to grant a type of injunction (such as an injunction against the federal government based on a criminal statute the federal government enforces) that is not available in equity at all. And the court's conclusion that California met the extremely high bar for relief on an *ultra vires* theory was plainly erroneous. In any event, this case presents a number of threshold legal obstacles that were inapplicable in this case, including that the PCA does not apply to Title 32 National Guard duty in the first place and additional federal statutes expressly authorize law enforcement that are applicable in the District but not in California. The D.C. Attorney General categorically cannot assert a claim under the PCA.

### 2. The PCA's Criminal Prohibition Does Not Apply Here.

Even if Plaintiff could seek injunctive relief in a civil action based on the PCA, the PCA does not apply to the Guard's activities in D.C. The PCA applies to those who "use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force." 18 U.S.C. § 1385. But the National Guard units in the District are not part of the federalized military contemplated by the PCA. As OLC explained in 1989, "[s]ince by its terms the Posse Comitatus Act applies only to the use of the Army or the Air Force, it applies to a National Guard only when it has been put into federal service as part of the Army or Air Force." *Use of the National Guard*, 13 Op. O.L.C. at 92.. When "the described use for the District of Columbia National Guard would be for it in its militia rather than federal service capacity, it is not prohibited by the Posse Comitatus Act." *Id.*

As the Complaint notes, the National Guard units in the District are "in a Title 32 status." Compl. ¶ 105. Title 32 is a hybrid status where the Guard performs federal actions and is paid with federal funds, but as a legal matter it remains under the command and control of the state governor. *See* 32 U.S.C. § 502(f). Here, because the President is the Commander in Chief of the D.C. Guard and acts as the equivalent of a state governor, there is no PCA problem with the Guard acting under Title 32. *See Mueller*, 943 F.3d at 837 (holding that Posse Comitatus Act "does not apply to Title 32 National Guard duty"). By contrast, "Federal service for purposes of the Posse Comitatus Act refers to standing active-duty forces organized under Title 10 of the U.S. Code." *Id.*

### 3. The Guard Has Express Authorization to Execute the Laws

Even if Plaintiff could seek relief under the PCA and even if the PCA applied to the D.C. Guard, Congress has expressly authorized the Guard to execute the laws within the District. Section 49-102 of the D.C. Code authorizes the Commanding General of the National Guard to "order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper."

The District contends that this provision does not authorize execution of the laws. *See* Pl. Mem. at 21. Since at least the Kennedy Administration, OLC has concluded otherwise, interpreting the authorization to order out the Guard for "other duties, as he may deem proper" as including law enforcement activities. In 1963, for example, OLC concluded that Section 49-102 authorized "the President to request or urge the commanding general to use the National Guard in support of activities of the District of Columbia police whenever he feels that the welfare, safety, or interest of the public would be served thereby." *See* Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia* at 2 (July 30, 1963). In 1989, the Office repeated that "[t]he authorization to

order out the Guard for 'other duties, as he may deem proper' has long been viewed as broad enough to include law enforcement activities." *Use of the National Guard*, 13 Op. O.L.C. at 94. OLC's longstanding interpretation is correct. There is no ambiguity in "other duties, as he may deem proper," which provides broad authority to order out the Guard. And even if Plaintiff were correct that this broad phrase should be read by reference to the items that precede it, these items are not merely "ceremonial"; "inspections" and "escorts," for example, are core police and law enforcement duties.

Other considerations reinforce what the text of Section 39-602 makes clear. As OLC observed in 1989, "[t]his natural reading of section 39-602 is especially appropriate in light of section 39-104 of the Code, which makes it clear that the National Guard, acting as militia, may be 'called . . . to aid the civil authorities in the execution of the laws.'" *Use of the National Guard*, 13 Op. O.L.C. at 94 (omission in original) And as OLC further noted, since the President is Commander in Chief of the D.C. National Guard, use of the National Guard for law enforcement in the District "might also be supported on the basis of the President's inherent constitutional authority to use any forces at his command to carry out the laws." *Id.* at 93 n.6.

That is particularly true because, as OLC also noted, the D.C. Code is itself federal law. *Id.* Unlike states, D.C.'s elected officials exercise power vested by the Constitution in Congress and delegated by Congress. Any law that the D.C. Council or its Mayor could create is necessarily federal. Similarly, the violent crime problem is not simply a local concern, but also endangers federal property and officials. As then-Assistant Attorney General Rehnquist explained more than half a century ago, the President has inherent Article II authority "to use troops for the protection of federal property and federal functions." *Authority to Use Troops*, 1 Op. O.L.C. at 343; *see also id.* at 344 (discussing decisions in *In re Neagle*, 135 U.S. 1 (1890) and *In re Debs*, 158 U.S. 564 (1895)).

### 4. The Guard Is Not Executing the Laws.

Notwithstanding the Guard's clear authority to execute the law in the District, the Guard is

not executing the laws for PCA purposes. Courts have articulated three tests to determine whether the PCA was violated: "whether civilian law enforcement agents made direct active use of military personnel to execute the laws," "whether use of any part of the Army or Air Force pervaded the activities of the civilian law enforcement agents," and "whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." *United States v. Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988). However articulated, the Guard is not in any meaningful sense engaged in active and direct law execution. It is not making arrests, conducting searches and seizures, determining what crime to investigate, or making prosecution decisions.

### 5. Plaintiff Fails to Plausibly Plead or Demonstrate a Likelihood of Showing Willfulness.

Finally, Plaintiff fails to demonstrate willfulness. Again, the PCA provides that, absent express authorization, anyone who "*willfully* uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385 (emphasis added). Notably, lack of willfulness is not merely an affirmative defense; rather, as the plain language of the statute makes clear, absent willfulness there is no violation of the PCA in the first place. In the context of a criminal statute, "the word 'willful' generally indicates a requirement of specific intent." *United States v. Mousavi*, 604 F.3d 1084, 1092 (9th Cir. 2010). Although the specific "construction is often dependent on the context in which it appears," *Bryan v. United States*, 524 U.S. 184, 191 (1998), willfulness at least requires proof "that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

Of course, the very presence of this issue underscores that there cannot be a civil PCA claim here. Such an inquiry is nonsensical as applied to an equitable cause of action against the federal government. To state the obvious, when Congress intends to provide for judicial review of Presidential

and federal agency action, it very rarely (if ever) makes the outcome of that review depend on questions of governmental scienter.

But in any event, the Complaint does not plausibly plead willfulness. Indeed, it does not even *allege* it; the sole mention of willfulness is in a paragraph that merely quotes the PCA's text. Compl. ¶ 50. The same is true of Plaintiff's preliminary injunction brief: the only mention of willfulness is a bare citation to the statutory text. Pl. Mem. at 31. Plaintiff has thus not even attempted to show that it is likely to succeed in demonstrating willfulness. Nor could it. Even assuming the D.C. Attorney General could assert a claim under the PCA, and even assuming his legal contentions are correct, it would be absurd to contend that Defendants are "willfully" violating the PCA when their actions are consistent with OLC's views dating back to at least the Kennedy Administration that the PCA does not apply to National Guardsmen in a Title 32 status (a view that is also supported by caselaw) and that federal law in any event authorizes the President to use the Guard for law enforcement. Plaintiff's PCA claim plainly fails.

### C. Plaintiff's Arbitrary and Capricious Claim Fails.

Plaintiff also contends that the government's decision to "deploy[] National Guard troops to support law enforcement and deputiz[e] them as Special Deputy U.S. Marshals" is arbitrary and capricious. Compl. ¶ 164. This claim fails as a matter of law as well.

As an initial matter, the APA does not provide for judicial review of the government's decision to mobilize the National Guard to address crime in the District. The President, in his capacity as Commander in Chief of the D.C. National Guard, directly ordered the deployment of guardsman to D.C. "to address the epidemic of crime in our Nation's capital." Presidential Memorandum, *Restoring Law and Order in the District of Columbia*, § 2 (Aug. 11, 2025). But the President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding that the Presidents' "actions are not subject to [the APA's] requirements" and are thus not reviewable

under the APA). Plaintiff's request to enjoin the deployment of National Guard troops cannot be based on the APA or its standards.

Plaintiff also cannot pursue an APA claim against the agency defendants because it has not identified any final agency action distinct from the Presidential Memorandum. Plaintiff complains that agency defendants acted arbitrarily and capriciously by (1) "deputiz[ing] thousands of troops" and (2) "order[ing] troops patrolling the District to carry their service weapons." Pl. Mem. at 39, 40. But this constitutes an impermissible programmatic attack on ongoing agency activities—not a claim directed at discrete, final agency actions subject to challenge under the APA.

The APA permits review only over "final agency action," 5 U.S.C. § 704, which means that the action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Additionally, and key here, these final agency actions must be "circumscribed [and] discrete." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990), including how it "operat[es] a program," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013).

Plaintiff's arbitrary and capricious claim flunks these requirements. To start, Plaintiff cannot challenge wholesale the deputation of "thousands of troops" by inaccurately casting numerous individual actions as a singular "decision." *See* Pl. Mem. at 39. This constitutes an impermissible programmatic challenge to a series of discrete agency actions which "cannot be laid before the court for wholesale correction under the APA." *Lujan*, 497 U.S. at 890-93. "Under the terms of the APA, [the plaintiff] must direct its attack against some particular 'agency action' that causes it harm." *Id.* at 891. Plaintiff's challenge is "to the way the Government administers th[is] program[] and not to a

particular and identifiable action taken by the Government." *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 491 (5th Cir. 2014).

Nor may the D.C. Attorney General bring an APA challenge to National Guard members' authority to carry their service weapons. Here too, the D.C. Attorney General identifies no final agency action. Indeed, finality aside, Plaintiff has not explained how Defendants "collectively . . . ordering the troops . . . to be armed," Compl. ¶ 144, qualifies as "agency action" at all. And it is doubtful such a "collective order" regarding the day-to-day operations of agency personnel fits into any category of "agency action" in 5 U.S.C. § 551(13). *See, e.g.*, *Ass'n of Admin. L. Judges v. U.S. OPM*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (finding that "OPM's memo to agencies" was "not part of a rule, order, sanction or relief"). Regardless, the finality requirement dooms Plaintiff's challenge on this score. The Secretary's directive that troops shall be armed did not determine any "rights or obligations" or result in "legal consequences." *Bennett*, 520 U.S. at 177-78.

At bottom, the District's arbitrary and capricious claim objects to aspects of the agencies' general implementation of the President's deployment of the Guard. Yet an "on-going program or policy is not, in itself, a final agency action under the APA." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). And "broad programmatic attack[s]' that seek 'wholesale improvement' of an agency's work are not reviewable" under the APA. *Jones v. U.S. Secret. Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023) (quoting *Norton*, 542 U.S. at 64), *aff'd*, 143 F.4th 489 (D.C. Cir. 2025).

### D. Plaintiff's Constitutional Claims Fail as a Matter of Law.

The Complaint also asserts constitutional claims, specifically that the challenged actions "violate the constitutional separation of powers doctrine, the Take Care Clause, and the District Clause, and impermissibly arrogate to the Executive power that is reserved to Congress, the states, or the District." Compl. ¶ 179. These claims are not freestanding theories but instead are entirely derivative of Plaintiff's contention that the Guard's deployment violates federal statutes. Plaintiff

contends that "[t]he Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes." *Id.* ¶ 174. Plaintiff asserts that Defendants violated the District Clause because they are undertaking activities that are not permitted by the Home Rule Act. *Id.* ¶ 175. And Plaintiff claims that Defendants have "disregarded the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement; and attempted to supplant the Mayor's authority over law enforcement in the District." *Id.* ¶ 177. Because these substantive theories all fail as a matter of law, the District's constitutional claims also must be dismissed.

Even if the Complaint could be read to assert freestanding constitutional theories independent of federal statutes, any such theories would likewise fail. There is no independent constitutional bar on the military executing the laws. Indeed, the Constitution expressly empowers Congress "[t]o provide for calling forth the Militia to execute the Laws of the Union." U.S. Const. art. I. § 8 cl. 15. And the PCA was enacted nearly a century after the Constitution's ratification, only criminalizes willful violations, contemplates statutory and constitutional authorizations for the military to engage in law enforcement, and did not even include the Navy or Marines until 2021 (and still does not include the Coast Guard). Similarly, the District's limited self-governance on certain matters exists only by the grace of Congress (which has exclusive legislative authority over the District) and did not exist until 1973. Under any reading, these claims must be dismissed.

### E.  The District's Ultra Vires Claim Fails as a Matter of Law.

Finally, the District's ultra vires claim fails. As discussed above, ultra vires review is not even available for purposes of obtaining an injunction based on the PCA. But in any event, *ultra vires* review, even where available, requires a plaintiff to satisfy among the most demanding standards known in the law. As then-Judge Kavanaugh put it, *ultra vires* review is "essentially a Hail Mary pass— and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589

F.3d 445, 449 (D.C. Cir. 2009); *see also NRC v. Texas*, 145 S. Ct. at 1776 (repeating this). Under an *ultra vires* theory, "[t]he agency overstep must be 'plain on the record and on the face of the [statute].'" *Fed. Express Corp.*, 39 F.4th at 765 (second alteration in original) (quoting *Oestereich v. Selective Serv. System Loc. Board No. 11*, 393 U.S. 233, 238 n.7 (1968)). That overstep must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless" agency action. *Oestereich*, 393 U.S. at 238. A plaintiff seeking to challenge agency action via a nonstatutory *ultra vires* action "must show more than the type of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review." *Federal Express Corp.*, 39 F.4th at 765 (citation omitted). "In other words, ultra vires claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." *Id.* (emphasis omitted).

For the reasons described above, none of Plaintiff's claims have any merit whatsoever. But regardless, Plaintiff obviously cannot show that the deployment of the Guard represents "blatantly lawless" action. Even if this Court were to *agree* with some of Plaintiff's arguments—which it should not—that is simply not close enough to state a claim under an *ultra vires* theory. *Cf. NRC v. Texas*, 605 U.S. at 682 (noting that D.C. Circuit had previously rejected Texas's statutory argument and stating that "[e]ven if one were to disagree with the D. C. Circuit's conclusion, the statutory argument falls well shy of a meritorious" *ultra vires* claim). At the very least, Plaintiff is not entitled to maintain claims challenging the same purported agency actions on *both* APA and ultra vires grounds. *Ultra vires* review is not available where a plaintiff has an alternative path to judicial review. *Id.* The Court should dismiss the District's APA and *ultra vires* claims. But at the very least, Plaintiff cannot have both.

### F.  The President Should Be Dismissed and Excluded From Any Preliminary Injunction.

If the Court concludes that some portion of Plaintiff's claims should not be dismissed, it should still dismiss those claims as to the President. In addition, if the Court enters a preliminary injunction, that remedy should not run against the President. "[C]ourts do not have jurisdiction to

enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("Federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties.").

**II. Plaintiff Has Not Shown that It Will Face Irreparable Harm Absent a Preliminary Injunction and Lacks Standing As to Some Claims For Similar Reasons.**

Because Plaintiff has no likelihood of success, this Court—even if it does not grant Defendants' motion to dismiss at this time—should deny the motion for a preliminary injunction without examination of the remaining preliminary injunction requirements. Failure to show a likelihood of success on the merits is enough to show that a preliminary injunction is not warranted. *See, e.g.*, *Taylor v. Trump*, No. CV 25-1161 (TJK), 2025 WL 1517209, at *4 (D.D.C. May 27, 2025); *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018). Consideration of the remaining preliminary injunction factors is particularly unnecessary here because this is not a situation where, for example, Plaintiff asserts fact-bound claims that the record does not yet support but might support in the future. Rather, Plaintiff's claims fail as a matter of law and they have no possibility of succeeding on them. In any event, Plaintiff has also not made an adequate showing of irreparable harm.

Relatedly, Plaintiff does not have standing to make some of its arguments. As discussed above, the District government is not a separate sovereign in the way an ordinary state or constitutional sovereign is. *See Banner*, 428 F.3d at 309 ("Congress *is* the District's government"). It is instead a statutory creation with a set of delegated authorities. Plaintiff perhaps has standing to vindicate the *specific* rights that they say (incorrectly) the Mayor has under D.C. law and the EMAC. But apart from that, Plaintiff as an entity simply does not suffer any freestanding sovereign injury or other injury in fact, precisely because it has no freestanding sovereign power to vindicate. For example, the D.C. Attorney General plainly does not have standing to make the sort of constitutional argument set forth in page 27 of his brief. Nor does he have standing to challenge the Marshals' Service deputations or

other operational decisions (such as related to Guardsmen's training, or their carrying of service weapons). None of these assertions involve injuries to any purported statutory right Congress has granted to the District Government specifically. And none of Plaintiff's specific assertions demonstrate irreparable harm justifying an injunction either.

**1.** Plaintiff's principal irreparable harm argument is that the deployment of the Guard inflicts an injury on the District's sovereignty, because it is supposedly "depriving the District of one of the core rights of self-government afforded in the Home Rule Act: the authority to control law enforcement operations in the District" and "has divested the District of its authority under the Assistance Compact." Pl. Mem. at 41. This just repeats Plaintiff's incorrect merits arguments. But putting that aside, Plaintiff never specifically explains how the Guard's presence imposes any sovereign injury. And in fact, the Guard's presence does not in any meaningful way deprive the District of any authority it has to control law enforcement operations. As discussed above, the Guard is not making arrests, conducting searches and seizures, or making decisions on whether to arrest, prosecute, or investigate crime, decisions that remain with the MPD (or, for matters within the jurisdiction of a federal law enforcement agency, with that law enforcement agency). *See supra* p. 13. Indeed, much of their activities consist of providing a presence in certain areas, and thus freeing up the District's undermanned police to conduct law enforcement; and MPD and the Guard are actively coordinating their efforts and assisting each other. That is affirmatively *helpful*, as Mayor Bowser's statements make clear, and consistent with the purpose of the mission to support the MPD and other law enforcement agencies. Doane Decl. ¶ 4. It is certainly not a form of irreparable harm.

But even assuming the Guard's presence imposes some distinct "sovereign injury" on the District (which it does not), that hardly qualifies as irreparable harm warranting the extraordinary remedy of a preliminary injunction given that the District government is *itself* a statutory creation of relatively recent vintage, with a limited set of delegated authorities. As noted above, the District's

legislative authority is limited to certain subjects, the Council's enactments only become law absent a joint resolution of disapproval from Congress, Congress can repeal D.C. council enactments at any time, the city council has no power over the courts, federal property, or any federal agency, and other federal agencies have concurrent jurisdiction over certain areas of the District. *See supra* pp. 7-8. Indeed, although the MPD has law enforcement jurisdiction throughout the District—and the Guard's deployment does not interfere with that jurisdiction in the slightest—even that local authority is not independent of Presidential control. The Home Rule Act provides that if the President determines that special conditions of an emergency nature require use of the MPD "for federal purposes, he may direct the Mayor to provide him, and the Mayor shall provide, such services of the Metropolitan Police force as the President may deem necessary and appropriate." D.C. Code § 1-207.40(a). The President's ultimate authority to take control of the MPD was a significant aspect of the Home Rule Act that was necessary to its passage. The White House specifically requested that authority. *See* 93 Cong. Rec. 33,593, 33,635 (Oct. 10, 1973) (statement of Rep. Adams); *accord id.* at 33,651 (statement of Rep. McKinney) ("The White House had a shopping list, asking for one thing . . ., and that was that the President have emergency power over the police force of the District of Columbia."). And multiple members of Congress explained that the President's ultimate power to assume control of the police was necessary to ensure that Federal interests remain protected in the District.[13]

---

[13] *See* 93 Cong. Rec. 33,347 33,387 (Oct. 9, 1973) (statement of Rep. Mann) (noting that "giv[ing] the President the right to declare an emergency and take charge of all the police forces, including the Metropolitan police," is an "additional power[] granted in this bill to protect the Federal interests"); 93 Cong. Rec. 42,020, 42,051 (Dec. 17, 1973) (statement of Rep. Gude) (the "emergency control of the police by the President" "carefully and rightly protect[s] the Federal interest in this Capital City").

**2.** Plaintiff next asserts that the Guard's deployment has "suspended" the operations of its laws, because the Guardsmen carry guns, and multiple code provisions impose gun-free zones or otherwise restrict the carrying of firearms. D.C. Code §§ 22-4502.01(c), 22-4505(b)(3). As Plaintiff acknowledges, these prohibitions do not apply to members of the National Guard while on duty. Pl. Mem. at 42. But even if Plaintiff were correct that the "National Guard troops have been deployed unlawfully," *id.*, the idea that Guardsmen carrying guns irreparably harms the District is farcical. The gun-free zone provision also does not apply to, among others, members of the Army, Navy, Air Force, or Marine Corps; the Post Office or its employees (when on duty); policemen; other law enforcement officials; marshals, sheriffs, prison, or jail wardens, or their deputies; banking institutions; public carriers who transport mail; and anyone who lives or works within 1,000 feet of a gun free zone. D.C. Code § 22-4502.01(c). The ban on carrying unregistered firearms (in additional to National Guard members while on duty) similarly does not apply to members of the Army, Navy, Air Force, or Marine Corps, officers and employees of the United States authorized to carry a firearm, as well as active or retired law enforcement officers carrying required identification. *Id.* § 22-4505(b)(1)-(4). Even if the Guard were unlawfully deployed, National Guardsmen on active duty are obviously not analogous to ordinary civilians who are generally subject to these provisions under District law.

**3.** Plaintiff's contention that "Defendants' deployments also pose an immediate risk of serious public safety harms," Pl. Mem. at 43, lacks any factual basis. Members of the Guard are carrying their service-issued weapons, with which they are thus familiar. Doane Decl. ¶ 5. And Guardsmen are also performing a limited set of duties. Again, they are not authorized to effect arrests, conduct searches or seizures, or engage in other similar direct law enforcement activity; nor are they authorized to use helicopters or other air assets. *Id.* ¶¶ 4, 7. Instead, they "act as a presence to deter crime, report any crime they witness to law enforcement, and assist law enforcement in other support missions when requested." *Id.* ¶ 6. Plaintiff's contention that "[t]he court need not await a tragic event before

providing a remedy for these unsafe conditions," Pl. Mem. at 43 (citation modified), is political grandstanding without any basis in law or fact. Indeed, the District's wholly unsupported speculation about future tragedies would not even be sufficient to confer Article III standing, let alone for irreparable harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983).

**4.** Plaintiff's contention that the Guard's presence "is likely to undermine trust in District law enforcement generally[,]" Pl. Mem. at 43, is conclusory and makes no sense. National Guardsmen are required when on duty to wear their military uniforms such that they are clearly marked and distinguished from civilian law enforcement personnel. *See Employment Guidance for the District of Columbia National Guard and Out-of-District National Guard Service Members* at 2 (Aug. 20, 2025) (included as exhibit to Doane Declaration). No one can reasonably confuse the Guardsmen with members of the MPD or otherwise conflate National Guardsmen with local law enforcement officials.

**5.** Finally, Plaintiff cites a Washington Post article stating that "the week federal forces dispersed across the capital, foot traffic in D.C. dropped 7 percent on average," and that "[t]he sight of National Guard troops . . . authorized to carry weapons" is likely to further "chill demand." *See* Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Washington Post (Aug. 29, 2025).[14] That article does not remotely support the District's assertion that the Guard's presence is causing any sort of substantial ongoing harm to the District's economy. For starters, the article notes that, even before the Guard showed up, "[b]y several key indicators— marketing forecasts, street-level foot traffic, hotel occupancy—Washington's tourism economy is sliding." *Id.* Similarly, weeks before the federal deployment, the District's marketing organization partner "had forecast a roughly 5 percent dip in international visitors this year." *Id.* And the alleged

---

[14]    https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trumptakeover-national-guard-impacts/.

economic harm that the article was discussing was a potential diminution in tourism during the last weeks of tourist season before school starts, a period that has now passed.

In any event, a single-digit drop in foot traffic, over one week, that could be attributable to any number of causes, is hardly evidence of "irreparable harm" justifying an injunction. Indeed, if anything, one would expect the Guard's presence to improve the District's economy over the intermediate and long-term, given the resulting drops in crime that the Mayor has acknowledged. *See supra* p. 14. To the extent a small number of customers are "frightened away" by the Guard's presence or that presence has "given District residents a 'palpable sense of fear,'" Pl. Mem. at 43 (citation omitted), those fears are unwarranted. Indeed, if certain residents have misguided apprehensions about the Guard's presence, the D.C. Attorney General should be working to allay any such apprehensions by explaining the relevant facts to his constituents—particularly the Guard's limited role, its cooperation with the MPD, and the resulting improvement in public safety—rather than stoking any such misplaced fears through this meritless lawsuit.

### III. The Balance of Equities and Public Interest Weigh Against Relief.

In contrast to the nonexistent harm to Plaintiff resulting from the Guard's deployment, granting a preliminary injunction would inflict irreparable harm on the Government and the public interest. Initially, it would impinge on the President's longstanding and express authority as Commander in Chief of the D.C. National Guard, as well as impermissibly second guess the President's judgment (with which everyone agrees) that crime rates in the District are unacceptably high, and his judgment that Guard involvement would improve conditions (a judgment with which the District's Mayor apparently agrees).

Indeed, as discussed above, the extensive coordination between the MPD and Guard forces is a compelling example of cooperation between the local and federal governments: Guardsmen have deployed to, inter alia, parks, monuments, the National Mall, metro stations, and Union Station,

creating visible deterrence while freeing up personnel-strapped local police to perform law enforcement; local police share crime and operational data with the Guard on a daily basis; Guardsmen contact local police where they observe crime or other situations requiring police involvement, and engage in temporary detentions when necessary; but decisions whether to investigate alleged criminal activity, or make arrests are left to the MPD or other law enforcement agencies. *See supra* p. 13. And this scheme is delivering benefits to residents, federal employees, and visitors in our Nation's capital. Mayor Bowser has noted that "violent crime in the District has noticeably decreased" due to this Federal-District cooperation. *See supra* p. 14. Indeed, only nine days after National Guard troops were first deployed, the District went seven days without a homicide, for the first time "in a long time[.]"[15] There is no sensible reason for an injunction unwinding this arrangement now, particularly since the District's claims have no merit.

### IV. Any Preliminary Injunction Should Be Stayed or At Least Administratively Stayed.

The Court should deny the preliminary injunction motion and dismiss this case. But if the Court grants a preliminary injunction, the Court should stay any relief pending appeal. At the very least, the Court should administratively stay any injunctive order for 14 days. That would allow Defendants to seek emergency relief in the court of appeals (if the Solicitor General so authorizes) and would allow the court of appeals to consider any such motion in an orderly fashion. By contrast, the D.C. Attorney General cannot plausibly contend that any injunction needs to go into effect immediately, particularly since he waited nearly a month to even seek an injunction. Similarly, Plaintiff has also sought discovery (a request Defendants will separately oppose) and is willing to delay a

---

[15] Jeff Abell, *National Guard's presence slashes D.C. crime rates, with seven days homicide-free*, FOX45 NEWS (Aug. 20, 2025), https://foxbaltimore.com/newsletter-daily/national-guards-presence-slashes-dc-crime-rates-with-seven-days-homicide-free.

preliminary injunction decision by several weeks while it conducts any permitted discovery—which further underscores that it has no basis to oppose a reasonable administrative stay of any injunction.

**V. The Court Should Deny Plaintiff's Request for a Stay on the Same Grounds.**

Plaintiff also seek a stay under 5 U.S.C. § 705 but, as they note, "[t]he factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). The Court should accordingly reject Plaintiff's request for a Section 705 stay for all the same reasons set forth above.

## CONCLUSION

Plaintiff's motion for a preliminary injunction and Section 705 stay should be denied and this action should be dismissed.

Dated: September 16, 2025                    Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General
                                             Civil Division

                                             ERIC J. HAMILTON
                                             Deputy Assistant Attorney General

                                             JOHN BAILEY
                                             Counsel to the Assistant Attorney General

                                             ALEXANDER K. HAAS
                                             Branch Director, Federal Programs Branch

                                             BRAD P. ROSENBERG
                                             Special Counsel, Federal Programs Branch

                                             *s/ Andrew M. Bernie*
                                             Andrew M. Bernie
                                             U.S. Department of Justice
                                             Civil Division
                                             950 Pennsylvania Avenue NW
                                             Washington, DC 20530
                                             Phone: 202-514-3511
                                             Email: andrew.bernie@usdoj.gov

*Attorneys for Defendants*