**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, | |
| Plaintiff, | Case No.: 1:25-cv-03005 (JMC) |
| v. | Judge Jia M. Cobb |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

**COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................3

I.    THE DISTRICT HAS PROPERLY STATED A CLAIM AND IS LIKELY TO
      SUCCEED ON THE MERITS ................................................................................3

   A. Defendants Lack Statutory Authority to Direct National Guard Units to Police the
      District in the Present Circumstances...............................................................3

      1.    Defendants lack statutory authority to direct the D.C. National Guard to
            police the District..........................................................................................3

      2.    Defendants lack statutory authority to direct out-of-state National Guard units
            to police the District.................................................................................10

   B. Defendants Have Unlawfully Assumed Command and Control Over Out-of-State
      National Guard Troops in State Militia Status ...................................................16

   C. Defendants Have Violated the Posse Comitatus Act and 10 U.S.C. § 275 ....................21

      1.    The District may challenge Defendants' violations of the PCA and
            section 275 ..............................................................................................22

      2.    The actions taken by DCNG and the out-of-state National Guard troops in
            the District are subject to the PCA and section 275.................................25

      3.    No statute expressly authorizes Defendants to use DCNG or out-of-state
            National Guard troops for law enforcement ............................................27

      4.    The National Guard troops in the District are engaged in law enforcement
            prohibited by the PCA and section 275....................................................30

      5.    Defendants have the requisite intent to violate the PCA and section 275. ..........31

   D. Defendants' Deputations of National Guard Troops and Order to Arm Those
      Troops Are Arbitrary and Capricious .............................................................35

   E. Defendants' Other Reviewability Arguments Fail............................................37

II.   THE DISTRICT IS SUFFERING SEVERE AND IRREPARABLE HARM .....................39

III.  THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES FAVOR
      AN INJUNCTION ..............................................................................................42

CONCLUSION.............................................................................................................43

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) ............................................................... 17, 19, 20

*Alabama-Coushatta Tribe of Texas v. United States*,
757 F.3d 484 (5th Cir. 2014) .......................................................................... 37

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ..................................................................... 36

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................................................ 39

*Ass'n of Admin. L. Judges v. OPM*,
640 F. Supp. 2d 66 (D.D.C. 2009) ................................................................. 36

*Ass'n of Civilian Technicians, Inc. v. United States*,
603 F.3d 989 (D.C. Cir. 2010) ......................................................... 17, 19, 20

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................ 35

*Biden v. Texas*,
597 U.S. 785 (2022) ........................................................................................ 36

*Bilski v. Kappos*,
561 U.S. 593 (2010) .......................................................................................... 5

*Bissonette v. Haig*,
800 F.2d 812 (8th Cir. 1986) .......................................................................... 23

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) .................................................................. 24

*Browder v. United States*,
312 U.S. 335 (1941) ........................................................................................ 32

*Bryan v. United States*,
524 U.S. 184 (1998) ........................................................................................ 32

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .................................................................. 37, 39

*Cheek v. United States*,
498 U.S. 192 (1991) ........................................................................................ 32

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) .................................................................................. 23, 25

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) .......................................................................................... 5

*Clark v. Martinez*,
   543 U.S. 371 ................................................................................................ 11, 12

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   698 F. Supp. 3d 39 (D.D.C. 2023) ............................................................ 22

*District of Columbia v. John R. Thompson Co.*,
   346 U.S. 100 (1953) .................................................................................. 12

*Dorsey v. United States*,
   567 U.S. 260 (2012) .................................................................................. 27

*Dubin v. United States*,
   599 U.S. 110 (2023) .................................................................................... 5

*Ela v. Smith*,
   71 Mass. 121 (1855) .................................................................................... 6

*Fed. Express Corp. v. U.S. Dep't of Corr.*,
   39 F.4th 756 (D.C. Cir. 2022) ............................................................. 37, 38

*Gen. Elec. Co. v. EPA*,
   290 F.3d 377 (D.C. Cir. 2002) .................................................................. 36

*Global Health Council v. Trump*,
   No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025) ..................... 40

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ................................................................. 40

*Hayes v. Hawes*,
   921 F.2d 100 (7th Cir. 1990) .................................................................... 22

*Humane Society of the United States v. Glickman*,
   217 F.3d 882 (D.C. Cir. 2000) .................................................................. 23

*Holmes v. Cal. Nat'l Guard*,
   109 Cal. Rptr. 2d 154 (Cal. Ct. App. 2001) ............................................. 17

*In re Debs*,
   158 U.S. 564 (1895) .................................................................................. 29

*In re Neagle*,
   135 U.S. 1 (1890) ...................................................................................... 29

*In re Sealed Case*,
   551 F.3d 1047 (D.C. Cir. 2009) ................................................................ 17

*Lederhouse v. United States*,
   126 F. Supp 217 (W.D.N.Y. 1954) .......................................................... 17

*Lewis v. U.S. Parole Comm'n*,
   743 F. Supp. 3d 181 .................................................................................. 38

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .................................................................................. 37

*Mandato v. United States*,
    2019 WL 13251552 (E.D. Va. Oct. 3, 2019) ............................................................. 23

*McDonnell Douglas Corp. v. Dinall*,
    57 F.3d 1162 (D.C. Cir. 1995) ............................................................................. 23

*Morton v. Mancari*,
    417 U.S. 535 (1974) ............................................................................................. 13

*Mueller v. City of Joliet*,
    943 F.3d 834 (7th Cir. 2019) .............................................................................. 26

*Nat. Res. Def. Council v. Pena*,
    147 F.3d 1012 (D.C. Cir. 1998) ........................................................................ 19

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ............................................................................... 36

*Newsom v. Trump*,
    2025 WL 2501619 (N.D. Cal. Sept. 2, 2025) ............................................... 31, 34

*Perpich v. Dep't of Def.*,
    496 U.S. 334 (1990) ............................................................................................. 20

*Protect Our Communities Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) .............................................................................. 23

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ............................................................................................. 13

*Rainbow Navigation., Inc. v. Dep't of Navy*,
    783 F.2d 1072 (D.C. Cir. 1986) .................................................................... 24, 33

*Robinson v. Overseas Military Sales Corp.*,
    827 F. Supp. 915 (E.D.N.Y. 1993) .................................................................. 25

*Sanchez v. Office of State Superintendent of Educ.*,
    45 F.4th 388 (D.C. Cir. 2022) .............................................................. 16, 18, 30

*Smith v. United States*,
    293 F.3d 984 (7th Cir. 2002) .............................................................................. 24

*State v. Coit*,
    8 Ohio Dec. 62 (Com. Pl. 1896) ......................................................................... 6

*Susman Godfrey LLP v. Exec. Off. of President*,
    2025 WL 1779830 (D.D.C. June 27, 2025) ...................................................... 42

*Theodore Roosevelt Conservation Pshp. v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ........................................................................... 25

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ....................................................................................... 25

*United States ex rel. Gillett v. Dern*,
    74 F.2d 485 (D.C. Cir. 1934) ...................................................................... 17, 20

*United States v. Al-Talib*,
   55 F.3d 923 (4th Cir. 1995) ......................................................................... 27

*United States v. Bannon*,
   101 F.4th 16 (D.C. Cir. 2024) ........................................................... 31, 32, 33

*United States v. Cardenas-Tovar*,
   No. 3:19-CR-4370, 2020 WL 905634 (S.D. Cal. Feb. 25, 2020) ................... 25

*United States v. Chon*,
   210 F.3d 990 (9th Cir. 2000) ....................................................................... 26

*United States v. Dreyer*,
   804 F.3d 1266 (9th Cir. 2015) ..................................................................... 22

*United States v. Johnson*,
   410 F.3d 137 (4th Cir. 2005) .......................................................... 23, 24, 33, 34

*United States v. Miller*,
   799 F.3d 1097 (D.C. Cir. 2015) ................................................................... 22

*United States v. Red Feather*,
   392 F. Supp. 916 (D.S.D. 1975) ............................................................. 23, 34

*United States v. Walden*,
   490 F.2d 372 (4th Cir. 1974) ................................................................. 23, 33

*United States v. Yunis*,
   924 F.2d 1086 (D.C. Cir. 1991) ................................................................... 28

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
   530 F.3d 925 (D.C. Cir. 2008) .............................................................. 23, 36

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ...................................................................................... 8

*Whren v. United States*,
   517 U.S. 806 (1996) .................................................................................... 30

*Wrynn v. United States*,
   200 F. Supp. 457 (E.D.N.Y. 1961) .............................................................. 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................. 9, 29

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ........................................................................................ 29

## Constitution, Statutes, and Regulations

U.S. Const. art. I, § 8, cl. 16 ...................................................................... 17, 20

U.S. Const. art. I, § 8, cl. 17 ................................................................. 4, 10, 29

2 U.S.C. § 192 ................................................................................................ 33

5 U.S.C. § 551 ................................................................................................ 36

5 U.S.C. § 705 ................................................................................................ 25

5 U.S.C. § 706 ................................................................................................ 25

10 U.S.C. § 15 (1952) ............................................................................... 24, 33

10 U.S.C. § 275 ............................................. 2, 21, 22, 25, 26, 27, 30, 31, 34

18 U.S.C. § 1385 ...................................................................................... 27, 29

32 U.S.C. § 502 ................................................... 1, 11, 12, 13, 38, 39

D.C. Code § 1-204.04 ................................................................................ 4, 12

D.C. Code § 1-204.22 ................................................................................ 4, 12

D.C. Code § 1-206.02 ..................................................................................... 12

D.C. Code § 1-207.40 ................................................................................ 4, 40

D.C. Code § 5-101.03 ................................................................................ 4, 40

D.C. Code § 49-102 ................................... 1, 4, 5, 6, 7, 11, 27, 28, 38

D.C. Code § 49-103 ...................................................... 4, 5, 6, 7, 10

D.C. Code § 49-215 .......................................................................................... 5

D.C. Code § 49-409 .......................................................................................... 8

D.C. Code § 49-805 .......................................................................................... 9

Act of June 18, 1878, ch. 263, 202 Stat. 152 .............................................. 24

Emergency Management Assistance Compact, Pub. L. No. 104-321 (1996) ........................ 13, 14

28 C.F.R. § 0.112 ........................................................................................... 35

## Other Authorities

3 The Debates in the Several State Conventions on the Adoption of the Federal
 Constitution (Jonathan Elliot ed., 1836) ................................................. 17

93 Cong. Rec. 33,651 (1973) .......................................................................... 8

*Application of the Posse Comitatus Act to Assistance to the United States National
 Central Bureau,*
  13 Op. O.L.C. 195 (1989) .......................................................................... 35

*Authority to use Troops to Prevent Interference With Federal Employees by Mayday
 Demonstrations and Consequent Impairment of Government Function,*
 1 Supp. Op. O.L.C. 343 (1971) ................................................................ 29

Black's Law Dictionary (12th ed. 2024) ........................................................ 8

Cong. Research Serv., *Use of Militia, National Guard, or Federal Armed Forces within
 the District of Columbia Prior to 2020* (Aug. 25, 2021) ........................... 7

Dep't of Defense Instruction 3025.21 (2019) .......................................... 26, 31

H.R. Rep. No. 97-71 (1981) ......................................................................... 34

*Member of National Guard—Government Clerk Absent on Parade*,
  20 Op. Att'y Gen. 437 (1892) .................................................................................... 5

*Mil. Support for Customs & Border Prot. Along the S. Border Under the Posse
  Comitatus Act*,
  2021 WL 298369 (O.L.C. Jan. 19, 2021) ............................................. 26, 27, 28, 34

Nat'l Guard Bureau, NRG 500-5, Nat'l Guard Domestic Law Enforcement Support &
  Mission Assurance Ops. (Aug. 18, 2010) ............................................................... 21

Office of Inspector General, Dep't of Justice, *A Review of the Department of Justice's
  Response to Protest Activity and Civil Unrest in Washington, D.C. in Late May and
  Early June 2020* (July 2024) ..................................................................................... 7

Off. of the Gen. Counsel, Nat'l Guard Bureau, Dep't of Defense, Domestic
  Operations Law and Policy (3d ed. 2024) ...................................................... 14, 15, 31

OLC Mem., *Re: Authority to use the National Guard of the District of Columbia to
  supplement civilian police force activities during a massive demonstration or parade
  in the District of Columbia* (July 30, 1963) ...................................................... 7, 9, 28

OLC Mem., *Re: Amenability of members of the National Guard of the District of
  Columbia to courts-martial or other disciplinary action for failure to participate
  in formations ordered pursuant to Section 44 of the Act of March 1, 1889*
  (Aug. 9, 1963) ................................................................................................. 7, 28

Frederic J. Stimson, American Statute Law (1886) ....................................................... 6, 9

Supervision and Control of the National Guard of the District of Columbia,
  Exec. Order No. 11,485, 34 Fed. Reg. 15,411 (Oct. 3, 1969) ................................ 10

*Use of Military Force in Domestic Disturbances*,
  45 Yale L.J. 879 (1936) ............................................................................................. 6

*Use of the National Guard to Support Drug Interdiction Efforts in the District of
  Columbia*,
  13 Op. O.L.C. 91 (1989) ......................................................................................... 28

G.E. Voyle, A Military Dictionary (3d ed. 1876) ....................................................... 4, 5

## INTRODUCTION

Defendants have deployed thousands of armed National Guard troops onto the streets of the District of Columbia to conduct patrols, detain and handcuff suspects, and maintain law and order as they see fit. Defendants justify that unprecedented application of military power in an American city based on a series of remarkable assertions of authority. They contend that the President may use the D.C. National Guard as a parallel, federally run police force in the District whenever he wishes. Opp. 18-19 (ECF No. 34). They argue that the President may summon other states' National Guard units to invade the District—or any state—and police its streets against the will of the receiving jurisdiction. Opp. 22-23. And they claim that the President may place National Guard troops under pervasive federal command, order them to conduct law enforcement, and avoid the strictures of the Posse Comitatus Act (PCA) simply by leaving those forces in Title 32 status—and that, even if such conduct flagrantly violates the PCA, courts are powerless to stop it. Opp. 26-32. Defendants do not deny these consequences of their position; they embrace them.

One would expect rock-solid legal foundations for such sweeping assertions of power. But Defendants' brief reveals that these claims rest on the most attenuated statutory grounds. They claim that the President may order the D.C. National Guard to do whatever he wishes based on a residual clause in a provision about "[p]rescribing drills" and conducting "parades," D.C. Code § 49-102, despite a wealth of textual evidence that the provision does not authorize law enforcement. They state that the President and the Secretary of Defense may authorize invasions of any jurisdiction based on an obscure 2006 amendment allowing them to "request" that National Guard troops perform "training or other duties," 32 U.S.C. § 502(f)—but offer only a sentence of bald assertion to support that expansive reading. *See* Opp. 23. And they claim that the PCA cannot be invoked by private parties and that it is categorically inapplicable to National

1

Guard troops in Title 32 status, despite decades of precedents enforcing that statute against the federal government and holding that it applies to any National Guard troops under federal command and control.

Equally remarkable is what Defendants fail to address. Defendants make no argument that their conduct is consistent with 10 U.S.C. § 275 and its implementing regulations, even though the District explained at length why Defendants are violating those provisions. *See* Mem. 31-38 (ECF No. 3-1). Defendants make no serious attempt to argue that the Constitution or federal law permits troops in state militia status to operate under federal command. *See* Opp. 25. Nor do Defendants contest the merits of the District's claim that the deputations and order to arm National Guard troops are arbitrary and capricious. *See* Opp. 32-34. On all of these claims— and still others—Defendants have forfeited any defense.

Lacking a persuasive legal response, Defendants lace their brief with political attacks and accusations of bad faith. These attacks are deeply unfortunate, not least because they are false. The Mayor has unequivocally stated that she opposes the presence of out-of-state National Guard troops in the District, that their involvement in law enforcement is "not working," that the use of such forces to police the District is "[u]nAmerican," and that she has "asked [the President] to remove them." Haynes Decl. Exs. 35, 37; Compl. ¶¶ 96-98, ECF No. 1; *Oversight of the District of Columbia: Hearing Before H. Oversight & Gov't Reform Comm.*, at 4:56:43-4:57:22 (Sept. 18, 2025) ("House Oversight Hearing").[1] The statements of the Mayor that Defendants characterize as expressions of support for the presence of National Guard forces were referring to federal *civilian* law enforcement assistance; the Mayor has explicitly said they did not concern the National Guard. House Oversight Hearing at 4:57:00-4:57:08. The fact that the Mayor and the

---

[1] *Available at* https://oversight.house.gov/hearing/oversight-of-the-district-of-columbia/.

Police Chief have done their best to coordinate with the National Guard troops deployed in the District against their will is not a sign of acquiescence—let alone support—but of responsible government.

The District will continue to suffer severe and irreparable injury until this incursion is stopped. Each day that heavily armed military troops with no meaningful law enforcement training police the District, the District's congressionally delegated authority over policing is being trampled, its economy and tax base are being injured, and public safety is placed at risk. Defendants' blithe assertion—unsupported by any evidence—that their incursion poses no harm blinks reality and contradicts the views of the District's leaders, its residents, numerous civic organizations, and military and law enforcement experts. Further, there is no doubt that if the President succeeds in his unlawful incursion here, he will replicate it throughout the country—as he has already done repeatedly in the handful of weeks since this suit was filed.

The motion to dismiss should be denied and the motion for a preliminary injunction should be granted.

## ARGUMENT

### I. THE DISTRICT HAS PROPERLY STATED A CLAIM AND IS LIKELY TO SUCCEED ON THE MERITS.

#### A. Defendants Lack Statutory Authority to Direct National Guard Units to Police the District in the Present Circumstances.

*1. Defendants lack statutory authority to direct the D.C. National Guard to police the District.*

No statute gives Defendants authority to direct the D.C. National Guard (DCNG) to police the District in the circumstances present here. Mem. 18-22. The Home Rule Act generally vests authority over District law enforcement in the District's elected Mayor and Council: it makes the Mayor the District's "chief executive officer," vests in her the power to

3

oversee the police force and maintain public peace in the District, and gives the Council authority to enact a comprehensive police code.  D.C. Code §§ 1-204.22, 1-204.04; *see id.* §§ 5-101.03, 5-105-01, 5-1015.05.  By contrast, Congress gave the President only a narrow, time-limited authority to require the services of the District's Metropolitan Police Department (MPD) in emergency circumstances.  *Id.* § 1-207.40.  And it set forth specific circumstances in which the President, as Commander-in-Chief of the D.C. National Guard, can deploy DCNG.  *See id.* §§ 49-102, 49-103.  Congress made these choices in the exercise of its "exclusive" authority over the District.  U.S. Const. art., § 8, cl. 17.  If Defendants seek to direct DCNG to conduct law enforcement, they must point to some affirmative grant of statutory authority that permits them to do so notwithstanding the directives generally vesting authority over District law enforcement in the Mayor.

Defendants identify none.  Defendants' principal contention is that the words "other duties" in D.C. Code § 49-102 somehow authorize the President to use DCNG for law enforcement.  Opp. 18-19.  That reading does not withstand scrutiny.  These terms appear in a provision entitled "Prescribing drills," at the end of a list stating that the Commanding General "shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard, and may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper."  D.C. Code § 49-102.  All of the items in this list refer to forms of training or evaluation:  A "drill" is an "instruction given to all officers and soldiers of the army to fit them for their respective duties." G.E. Voyle, A Military Dictionary 115 (3d ed. 1876) ("Military Dictionary").[2]  A "parade" is a "military term" defined as "an assembly and orderly arrangement of troops, in full equipments, for inspection or

---

[2] *Available at* https://archive.org/details/amilitarydictio00stegoog/mode/2up.

evolutions before some superior officer." *Member of National Guard—Government Clerk Absent on Parade*, 20 Op. Att'y Gen. 437, 438 (1892) (quoting Webster's International Dictionary). And contrary to the government's somewhat baffling suggestion, the terms "inspection" and "escort" do not refer to "core police and law enforcement duties." Opp. 30. These are standard military terms that refer, respectively, to the examination of "*personnel* and *matériel* of [an officer's] command" and "[a] guard of troops attending an officer or person of distinction when traveling." Military Dictionary at 131, 200 (defining "inspection" and "escort"); *see* D.C. Code § 49-215 (requiring "[a]n annual inspection and muster of each organization of the National Guard, and an inspection of their armories and of public property in their possession"). It follows that the phrase "other duties" should be read to authorize duties "similar in nature" to these forms of instruction and training that precede it—not a vastly broader power to engage in law enforcement activity wholly dissimilar from the surrounding provision. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001); *see Dubin v. United States*, 599 U.S. 110, 120-22 (2023) (title canon).

This reading is reinforced by section 49-103. That provision contains a specific, narrow authorization for the President to order DCNG to "aid" the District in "enforcing the laws" only when the Mayor, the U.S. Marshal, or the National Capital Service Director requests such aid for the purpose of suppressing a "tumult, riot, mob," or similar disturbance. D.C. Code § 49-103. Defendants' reading of section 49-102 would render this provision superfluous; on their view, the President may order DCNG to conduct law enforcement whenever he wishes, regardless of whether there is a "riot" or anyone requests aid. *See Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010) (explaining that one provision should not be read to render another superfluous). Defendants suggest that section 49-103 retains some minimal function under their interpretation

5

because it makes clear that it is "lawful" for the Mayor to request such aid.  Opp. 19.  But Congress obviously did not need to give the Mayor permission to make *requests* of the President. The only respect in which this provision does any work is by limiting the circumstances in which the President may *grant* such requests.

Statutory history and context confirm this understanding.  When Congress enacted the D.C. militia code in 1889, "most" states had laws explicitly granting their governors open-ended authority to call up the militia to "execute the laws."  Frederic J. Stimson, American Statute Law § 298 (1886).[3]  Other states, in contrast, granted a narrower authority akin to section 49-103, which permitted governors to call up the militia only when requested to "aid the civil authority" in putting down riots or other similar disturbances.  *See, e.g.*, *Ela v. Smith*, 71 Mass. 121, 135 (1855) (describing Massachusetts law).  It was well-established that the latter type of provision authorized militias to "perform only such service and render such aid as is required by the civil officers."  *Id.* at 140; *see State v. Coit*, 8 Ohio Dec. 62, 63 (Com. Pl. 1896) (similar); *see generally Use of Military Force in Domestic Disturbances*, 45 Yale L.J. 879, 883 (1936).  In the D.C. militia code, Congress conspicuously chose to borrow the second type of provision and declined to include the first.  The court should not countermand that considered decision by reading the phrase "other duties" in section 49-102 to carry precisely the meaning Congress chose not to adopt.

Nor does post-enactment history support Defendants' reading.  The Executive first appears to have suggested that section 49-102 conferred authority to "support [the] activities of the District of Columbia police" in an unpublished, thinly reasoned Office of Legal Counsel

---

[3] *Available at* https://babel.hathitrust.org/cgi/pt?id=uiug.30112022927104&seq=123.

(OLC) memorandum issued 74 years after the statute's enactment.[4]  Less than two weeks after issuing that memorandum, OLC advised the Executive to limit its reliance on this novel interpretation, explaining that courts might read "the term 'other duties' . . . *in pari materia* with the other terms used in that section which relate primarily to drill- and training-type activities as distinguished from the aid-to-civil authorities-type activities expressly covered by" section 49-103.[5]  Since then, the Executive has often relied on authorities other than section 49-102 when it wishes to call up DCNG to assist with law enforcement.  In 1968, for instance, the President received a mayoral request for assistance under section 49-103 and invoked the Insurrection Act to use DCNG for law enforcement during the riots following the assassination of Dr. Martin Luther King, Jr.[6]  And in 2020, the first Trump administration instructed the U.S. Marshal for the District of Columbia to request the services of DCNG pursuant to section 49-103 so that DCNG could engage in law enforcement during protests following the murder of George Floyd.[7]  That effort would have been wholly unnecessary if the Administration had confidence that section 49-102 confers the sweeping authority it now claims.

The absence of any limiting principle confirms that Defendants' reading cannot be correct.  Their interpretation of the statute would apparently enable the President to establish DCNG as a parallel District police force and use it to investigate crimes, arrest offenders, control

---

[4] OLC Mem., *Re: Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia*, at 3 (July 30, 1963) ("Authority to use the National Guard"); *available at* https://www.justice.gov/d9/crt/legacy/2011/06/14/113-FM-crd-part7.pdf (p. 16).

[5] OLC Mem., *Re: Amenability of members of the National Guard of the District of Columbia to courts-martial or other disciplinary action for failure to participate in formations ordered pursuant to Section 44 of the Act of March 1, 1889*, at 3-4 (Aug. 9, 1963) ("Amenability of the National Guard"), *available at* https://www.justice.gov/d9/crt/legacy/2011/06/14/113-FM-crd-part5.pdf (p. 5).

[6] *See* Cong. Research Serv., *Use of Militia, National Guard, or Federal Armed Forces within the District of Columbia Prior to 2020*, at 13 (Aug. 25, 2021), *available at* https://www.congress.gov/crs_external_products/R/PDF/R46886/R46886.3.pdf.

[7] *See* Office of Inspector General, Dep't of Justice, *A Review of the Department of Justice's Response to Protest Activity and Civil Unrest in Washington, D.C. in Late May and Early June 2020*, at 73-74 (July 2024), *available at* https://oig.justice.gov/sites/default/files/reports/24-085.pdf.

traffic, and otherwise take over District law enforcement.  It is profoundly implausible that Congress would have buried this sweeping grant of authority over District law enforcement in the words "other duties" in a provision entitled "Prescribing drills" in the District's militia code. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (statutes should not be read to "hide elephants in mouseholes").  Nothing in the background or history of the D.C. militia code or the Home Rule Act suggests that Congress understood the Act to grant the President such authority.  On the contrary, as Defendants ultimately concede, *see* Opp. 39, the drafters of the Home Rule Act and the White House believed that the narrow grant of emergency authority in section 740 provided the President all of the power he needed to command District law enforcement.  *See, e.g.*, 93 Cong. Rec. 33,651 (1973) (statement of Rep. McKinney) (stating that section 740 was the "one thing" the White House asked for).  The President's insistence on that narrow, time-limited authority would have been wholly illogical if the President had at his disposal a National Guard that could be converted into his private police force at will.

Pivoting away from any specific statutory basis for the use of DCNG for law enforcement, Defendants alternatively contend that the President's status as "Commander-in-Chief" of DCNG allows him to use DCNG for any purpose he wishes, including law enforcement.  Opp. 18-19.  That claim is meritless.  The designation of the President as "Commander-in-Chief" in D.C. Code § 49-409 merely gives him *command* of DCNG; it does not dictate *what* he may lawfully direct DCNG to do.  *See* Black's Law Dictionary (12th ed. 2024) (defining "commander-in-chief" as "[s]omeone who holds supreme or highest command of armed forces").  Congress specified and limited the scope of the President's authority in the highly reticulated terms of Title 49 of the D.C. Code.  It is those provisions, not the general designation of the President as "Commander-in-Chief," that delineate the scope of the President's

authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 643-44 (1952) (Jackson, J., concurring in the judgment) (explaining that "the title Commander-in-Chief" does not permit the President to override "limitation[s]" enacted by Congress); *see also* D.C. Code § 49-805 (stating that the President may approve rules for the militia only on "matters not specifically provided for by law"). Otherwise, the President's authority over DCNG would be unbounded and the detailed specification of authorities in Title 49 would be meaningless.

History and context confirm this straightforward reading. When Congress enacted the D.C. militia code in 1889, every state designated its governor as "Commander-in-Chief" of its militia. Stimson, *supra*, § 297. At the same time, states separately delineated the circumstances in which governors could call out the militia to execute the laws, suppress insurrections, or perform other functions—making clear that the title of Commander-in-Chief did not itself confer all of those authorities (or whatever other powers the governor wished). *Id.* § 298. As Defendants' own authority explains, D.C.'s militia code was "patterned after" these state statutes. *Authority to Use the National Guard* at 2. Indeed, the drafters of the act stated that it contained "only the usual and necessary provisions that are included in the militia codes of nearly all the States," and "place[d] the militia of the District of Columbia on the same footing as those of the several States." H.R. Rep. No. 50-809, at 1-2 (1888). The statute should not be read to use a basic term in a manner vastly more expansive than those model statutes.

Finally, Defendants suggest that the President granted the Secretary of Defense authority to use DCNG to conduct law enforcement in Executive Order 11,485. Opp. 19. But the President cannot grant new authority over the District by executive order; rather, any such delegation must come from Congress, which has "exclusive" jurisdiction over the District. U.S. Const. art. I, § 8, cl. 17. And this executive order does not purport to grant new authority. It

9

merely delegates the President's statutory power to "order out the National Guard under Title 39 of the District of Columbia Code to aid the civil authorities of the District of Columbia." Supervision and Control of the National Guard of the District of Columbia, Exec. Order No. 11,485, § 1, 34 Fed. Reg. 15,411 (Oct. 3, 1969).  Far from granting new authority, this provision explicitly delegates the authority conferred "under Title 39" (now codified at Title 49).[8]  D.C. Code § 49-103.  Indeed, the fact that the executive order only delegated the authority to "aid the civil authorities of the District of Columbia" suggests that it was referring to section 49-103— which uses parallel language—as the source of authority to use DCNG for domestic law enforcement in the District.[9]

In sum, Defendants cannot identify any provision that authorizes them to use DCNG for law enforcement in the circumstances present here.  The Complaint therefore states a claim that the deployment of DCNG to engage in law enforcement is unlawful.  *See* Compl. ¶¶ 112-24, 146-47.  And, in light of the ample record evidence confirming that Defendants are in fact using DCNG for law enforcement, *see infra* pp. 30-31, the District is likely to succeed on the merits of that claim.

### 2. *Defendants lack statutory authority to direct out-of-state National Guard units to police the District.*

Defendants also fail to identify any statutory authority that permits them to direct out-of-state National Guard troops to police the District over the District's objection.  The sole statutory basis they identify for this deployment is 32 U.S.C. § 502(f).  But as the District's opening brief

---

[8] The provisions governing DCNG were recodified from Title 39 to Title 49 in 2001.  *See* Parallel Reference Table, D.C. Code (2001 ed.).

[9] Defendants claim that a 2024 publication defines the words "civil authorities of the District of Columbia" in this 1969 executive order to include the civil authorities of "the United States," "the 50 states," "the Commonwealth of Puerto Rico," and all "United States territories."  Opp. 6, 19.  The 2024 publication they cite does not reference this executive order, does not pertain specifically to the District, and does not define the phrase "civil authorities of the District of Columbia."  *See* Doane Decl. att. 2.  And it is hard to imagine how "the civil authorities of the District of Columbia" could include the governments of all 50 states and Puerto Rico.

explains, section 502—much like D.C. Code § 49-102—is concerned with ordering National

Guard troops to perform "training" and "drills." *See* Mem. 24-26.  Every indication of statutory

meaning suggests that the narrow authorization in section 502(f) to request "training or *other*

*duties*" authorizes the President to request that National Guard units perform duties *similar to*

training—not the dissimilar, far broader authority to order out-of-state troops to invade and

police other jurisdictions without their consent.  *See id.*  The structure and history of the statute

confirm that Congress did not intend to convey such an extraordinary power in the vague,

ancillary language of section 502(f).  *Id.* at 26-27.  And constitutional considerations counsel

strongly against adopting such a reading.  *Id.* at 27.

Defendants do not engage with any of these textual, structural, or constitutional

arguments.  Instead, their response consists, in full, of the following retort: "[N]othing in Section

502(f) limits the type of missions that the President and Secretary of Defense can request."  Opp.

23.  That is *ipse dixit*, not statutory analysis.  And it cannot be taken seriously as an interpretation

of section 502(f).  Is Defendants' view that this statute permits the President to order

Massachusetts to invade Maine?  That the Defense Secretary can authorize Virginia troops to

establish a permanent crime-fighting unit in Georgia?  Defendants do not attempt to offer any

limiting principle, let alone one that would prevent these untenable results.

Defendants suggest that the Court can ignore the stark implications of their reading of

section 502(f) because "D.C. is not a sovereign."  Opp. 22.  Even if that were true, it would be no

answer to the statutory problems with Defendants' reading: there is no plausible textual basis for

reading section 502(f) to allow invasions of the District but not other States.  *See Clark v.*

*Martinez*, 543 U.S. 371, 382 (2005) (rejecting the "novel interpretive approach . . . which would

render every statute a chameleon, its meaning subject to change depending on the presence or

11

absence of constitutional concerns in each individual case").[10]  In any event, the District Clause unquestionably gives Congress the authority to prevent States from exerting their sovereign will on the Capital—indeed, that was its central purpose.  *See* Mem. 27.  In the Home Rule Act, Congress delegated the bulk of its authority over the District to the Mayor and the Council, including the "executive power" of the District and most of its legislative powers.  D.C. Code §§ 1-204.22, 1-204.04.  Nothing in the Home Rule Act conveys such authority to the President.

Defendants claim (Opp. 21) that Congress gave the President authority to consent to invasions of the District by preserving his authority "over . . . the National Guard of the District of Columbia."  D.C. Code § 1-206.02(b).  But by its plain terms, that reservation simply allows the President to exert authority "over" DCNG.  *Id.*  It does not allow him to unilaterally authorize *other states* to intrude on the District and conduct law enforcement here.  Nor does the general authorization for the President to act as "Commander-in-Chief" of DCNG implicitly convey such a power.  *Contra* Opp. 23-24.  The President's authority as Commander-in-Chief is (as the name suggests) the power to command forces under his supervision, *see supra* pp. 8-9, not to authorize actions by out-of-state militia troops over which he exercises no lawful command.

The absence of any basis in section 502(f) for the deployments of out-of-state troops into the District is sufficient to conclude that these deployments are unlawful.  But the Emergency Management Assistance Compact (Assistance Compact or EMAC) lends still further support for this conclusion.  In that compact, Congress specifically considered the question of when states can send National Guard units to each other's aid, and provided that such units could be sent to

---

[10] For similar reasons, Defendants are wrong to suggest that the District "does not have standing" to identify the constitutional problems posed by Defendants' reading.  Opp. 37.  The District identifies constitutional problems raised by the application of section 502(f) to the District itself.  *See* Mem. 27 (citing *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953)).  And, in any event, the Supreme Court has expressly held that a litigant may invoke the "constitutional doubts" raised by the application of an interpretation to "other litigants or factual circumstances" as reason not to adopt that interpretation.  *Clark*, 543 U.S. at 381 (internal quotation marks omitted).

another state only upon "request" of the receiving state and by "mutual agreement." Pub. L. No. 104-321, arts. I, III.B, IV. Here, the Mayor made no such "request" of other states and furnished no such "agreement." The President therefore may not use section 502(f) to supplant the Mayor's authority and render the requirements of the Assistance Compact nugatory.

Defendants contend that the Assistance Compact is irrelevant because Congress did not state that the compact is the sole means of securing National Guard assistance from other states. Opp. 20. But it is "a commonplace of statutory construction" that where Congress has provided a specific, detailed mechanism for exercising certain authority, the government may not circumvent that mechanism by invoking general statutory language elsewhere. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (cleaned up); *see Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"). That inference is especially strong here. When it ratified the Assistance Compact, Congress specifically preserved the President's authority to order the deployment of National Guard troops to other states under the Constitution and Title 10. *See* Pub. L. No. 104-321, § 2(6). It conspicuously did not state that he retained any authority to do so under Title 32. And nothing in the text or history of section 502(f) even hints that Congress contemplated that the provision would vest him with that authority.

Defendants also contend that, for several reasons, the District government cannot invoke the Assistance Compact. These arguments are meritless; indeed, each is belied by Defendants' own statements to the contrary.

First, Defendants suggest that the Assistance Compact has no force in the District because Congress "never approved D.C. joining the compact." Opp. 21. That is demonstrably false. The

13

Compact to which Congress assented expressly defined the term "states" to include "the District of Columbia," and provided that "this compact shall become effective as to any other state upon enactment by such state." Pub. L. No. 104-321, arts. I, XI.A. Perhaps for that reason, DoD's own Domestic Operations Law and Policy Manual—a guide signed by the general counsel of the DoD National Guard Bureau—states that the "DC government" is a "party to EMAC" and that "the Mayor is authorized to execute EMACs on behalf of DC." Off. of the Gen. Counsel, Nat'l Guard Bureau, Dep't of Defense, Domestic Operations Law and Policy 75 (3d ed. 2024) ("Domestic Operations Manual").[11]

Second, Defendants argue that the Mayor cannot request the aid of National Guard units from other states because she is not in command of DCNG. Opp. 20-21. That does not follow. The Mayor does not require command of D.C.'s National Guard in order to request the assistance of *out-of-state* National Guard units. Nothing in the Assistance Compact makes the ability to request National Guard resources contingent on a jurisdiction's willingness or ability to send those same resources upon request. *See* Assistance Compact art. I ("Mutual assistance . . . *may* include the use of the states' National Guard forces"). Once again, Defendants themselves have conceded this exact point: the Domestic Operations Manual states that while "DCNG is . . . not eligible for deployment under EMAC," the "DC government, as a party to EMAC, could receive other States' resources, *including their NG [National Guard] in SAD [state active duty]*, to assist DC government." Domestic Operations Manual at 75. The manual goes on to explain that "[a] civilian official in the Emergency Management Office, acting on behalf of the Mayor," may make such a request for "other state SAD forces," and that neither the DCNG Commanding General nor the Secretary of the Army "enters the EMAC on behalf of DC." *Id.*

---

[11] *Available at* https://www.ngbpmc.ng.mil/Portals/27/Publications/special%20documents/2024%20Domestic%20Ops%20Law%20and%20Policy%20Handbook.pdf?ver=1452dVabcyPsIzwcEMKQiA%3d%3d.

Third, Defendants claim that the Assistance Compact "cannot be used to accept Guardsmen into D.C. from the states" because missions under the compact must be conducted under "state active duty, not . . . Title 32." Opp. 20 (emphasis omitted). The premise of this argument is incorrect: As the body responsible for overseeing implementation of the Assistance Compact explains, "States deploy National Guard resources in SAD [state active duty] *and T32 [Title 32]* under EMAC," and may "receive approval for the use of T32 DoD funds from the Secretary of Defense." The National Guard & EMAC, Nat'l Emergency Mgmt. Ass'n.[12] And the conclusion would not follow in any event. Just because DCNG operates in Title 32 status does not mean that the District cannot accept *other* states' troops in state active duty status. Yet again, the Domestic Operations Manual squarely addresses this point, explaining that the Mayor may "receive other State's resources, including their NG *in SAD [state active duty]*." Domestic Operations Manual at 75 (emphasis added).

Finally, Defendants offer a series of irrelevant and misleading factual assertions. They observe (Opp. 23) that the sending states have consented to the deployments of their troops into the District. But putting aside that some states understood themselves to be "ordered" to do so, *see* Mem. 30, that is beside the point: what matters is that the District has neither requested nor agreed to these deployments, and that the local government (not the President) is responsible for providing such consent unless the troops are federalized. The fact that the Mayor lacks any "operational control" over these troops (Opp. 23-24) only confirms that their deployment is unlawful. *See* Assistance Compact art. IV.

Nor is it relevant that the District has attempted to coordinate with the troops while they are here. *See* Opp. 24. The Mayor has made unequivocally clear that she does not consent to

---

[12] *Available at* https://www.emacweb.org/index.php/learn/learn-about-emac-your-discipline/national-guard.

these deployments, did not request them, and wishes them to end.  *See supra* p. 2.  And her attempts to minimize their harms to the District once they have arrived does not somehow cure the absence of her "request" or "agreement" at the outset.  Assistance Compact arts. I, III.B.

Last, Defendants suggest that National Guard troops are not "making arrests or engaging in direct law enforcement activity."  Opp. 24-25.  This disputed factual claim is irrelevant to the motion to dismiss.  *See Sanchez v. Office of State Superintendent of Educ.*, 45 F.4th 388, 393 (D.C. Cir. 2022) ("at the motion-to-dismiss stage, we accept as true the facts pleaded in plaintiffs' complaint").  And it is rebutted by considerable evidence to the contrary, including documented instances in which National Guard units are detaining and handcuffing subjects.  *See infra* pp. 30-31.  In any event, the tasks that National Guard units are indisputably engaged in—including conducting security patrols while armed, temporarily detaining individuals engaged in crime, and performing traffic control—are law enforcement tasks by any definition.  Defendants cannot authorize other states to invade the District and perform these tasks under section 502(f).  Defendants' attempt to do so is therefore unlawful.

### B. Defendants Have Unlawfully Assumed Command and Control Over Out-of-State National Guard Troops in State Militia Status.

Defendants have also violated the Constitution and federal law by exercising command and control over out-of-state National Guard units in state militia status.  Mem. 27-31.  A mountain of precedent—and the text of the Constitution itself—make clear that National Guard troops in state militia status must be subject to the command of their governors, not the President or his subordinates.  *See* Mem. 28.  And the great weight of the evidence indicates that, here, the out-of-state National Guard troops in the District are operating under the command of the Army, the Secretary of Defense, and the President.  Mem. 29-31.

Defendants hardly contest either of these propositions.  On the law, they cherry-pick one of the many cases the District cites and half-heartedly attempt to distinguish it.  Opp. 25.  But they do not actually dispute the principle that state militia troops must operate under state command.  And they simply ignore the numerous authorities confirming that foundational proposition.  *See, e.g.*, U.S. Const. art. I, § 8, cl. 16 (the President may "govern[]" the militia only when it is "employed in the Service of the United States"); *Abbott v. Biden*, 70 F.4th 817, 829 (5th Cir. 2023) ("The States . . . retain exclusive power to . . . govern the non-federalized militia."); *United States ex rel. Gillett v. Dern*, 74 F.2d 485, 487 (D.C. Cir. 1934) ("except when employed in the service of the United States, the whole government of the militia is within the province of the states"); *In re Sealed Case*, 551 F.3d 1047, 1050 (D.C. Cir. 2009) (Kavanaugh, J., concurring in the judgment) (the National Guard "is not under the 'control or supervision' of the President, Secretary of Defense, or Secretary of the Army, except in those rare circumstances when a state Guard itself is federally called forth for domestic purposes under the Militia Clause"); 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 424 (Jonathan Elliot ed., 1836) (James Madison) (no proposition is more "certain" and "positive" than that "state governments are to govern the militia" except when it is "called forth for general national purposes").[13]  Even the sole case that Defendants address confirms as much:  It explains that "Title 32 provides . . . that when not called to federal duty by the President, a state National Guard is under the command of the state Governor and the State Adjutant General."  *Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 993 (D.C. Cir. 2010) (citation omitted).

---

[13] *See also, e.g.*, *Holmes v. Cal. Nat'l Guard*, 90 Cal. App. 4th 297, 317 (2001) ("[U]ntil they are called into active federal service, the various state National Guards are governed not by the federal government, but by the individual states."); *Lederhouse v. United States*, 126 F. Supp 217, 218 (W.D.N.Y. 1954) ("The whole government of the militia remained with the States, except when employed in the service of the United States.").

Defendants' factual response is equally unpersuasive.  To start, Defendants do not dispute that the facts alleged in Plaintiffs' complaint establish an unlawful degree of federal control over the out-of-state forces.  *See, e.g.*, Compl. ¶¶ 103-110.  They merely argue that *new* evidence provided by their declarants show that the District's allegations are "oversimplifie[d]."  Opp. 25.  But Defendants cannot rely on new facts to support their Rule 12(b) motion, *see Sanchez*, 45 F.4th at 393, so they have effectively forfeited their motion to dismiss this claim.

As to their opposition to the preliminary injunction motion, Defendants' new facts do nothing to disprove the contention that the federal government is commanding the out-of-state troops—if anything, they confirm it.  Defendants produce an August 20 memorandum from the Secretary of Defense that directly orders out-of-state National Guard forces to "be armed with their service-issued weapons" and to wear "military uniforms," and instructs "[t]he Secretary of the Army, through the Interim Commanding General of the DCNG, [to] . . . assign[] tasks for" out-of-state National Guard troops.  Mem. for Secretary of the Army et al. from the Secretary of Defense, at 2 (Aug. 20, 2025) ("Hegseth Mem."), Doane Decl. att. 1.  Defendants also furnish a declaration from the commander of Joint Task Force-DC—who is in turn commanded by the Secretary of the Army—affirming that he "assign[s] tasks" to "[a]ll out of district forces," that such forces are "working under" him, and that they conduct "operations" directed by JTF-DC and follow its "instruct[ions]."  Doane Decl. ¶¶ 3, 9, 13-14.

Further, Defendants' declarants state that "[a]ll" National Guard troops in the District have been deputized as Special Deputy U.S. Marshals.  Doane Decl. ¶ 7.  As the District has explained—and as Defendants do not dispute—those deputations require personnel to act "as directed by" the "Federal Official[s]" leading the mission for which they have been deputized.  Mem. 29 (internal quotation marks omitted).  In this case, those officials are the Secretary of the

18

Army and the Secretary of Defense. *Id.*; *see* Snider Decl. ¶ 12 (USMS official stating that "I do not direct National Guard units in performing these mission sets").

Defendants' own statements confirm that out-of-state troops operate under federal command. On September 23, the National Guard stated that the out-of-state National Guard forces in the District "have integrated under one command to support Joint Task Force – District of Columbia."[14] Defendants' brief likewise concedes that the statements by out-of-state officials acknowledging that they operate "under the command" of DCNG, Haynes Decl. Ex. 18, and that they have been "directed" and "order[ed]" by federal officials, *id.* Exs. 15, 45, are not "inconsistent with the command structure" Defendants have established. Opp. 26 n.12.

Even without the benefit of discovery, this evidence establishes a "likelihood" that federal officials are unlawfully governing out-of-state troops. *See, e.g.*, *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998) (describing the "evidentiary support required for preliminary injunctive relief"). Federal authorities "govern" militia forces within the meaning of the Constitution and federal law if, among other things, they issue "orders" to such troops, 3 Joseph Story, Commentaries on the Constitution of the United States § 399 (1833), exercise "command and control" over them, *Abbott*, 70 F.4th at 831, or "control [their] day-to-day operations," *Ass'n of Civilian Technicians*, 603 F.3d at 992. The evidence makes clear that federal officials are overtly doing all of those things. They have issued orders to such troops, *see* Hegseth Mem. at 2, assumed "command" of their operations, *Guard Members Unite*, and "assign[ed]" them their daily operational "tasks," Doane Decl. ¶ 9.

---

[14] National Guard, "Mississippi, Louisiana Guard Members Unite for DC Task Force Mission" (Sept. 23, 2025) ("Guard Members Unite"), https://www.nationalguard.mil/News/Article-View/Article/4313111/mississippi-louisiana-guard-members-unite-for-dc-task-force-mission/.

Defendants suggest that state governors remain in "command and control" of their forces because they retain the residual authority to set the "parameters" for what operations the federal government may assign their forces and because they exercise "administrative" command. *Id.* But the Constitution does not permit the federal government to assume the greater part of command of the militia and leave scraps for the states. On the contrary, it provides that, "except when employed in the service of the United States, the *whole* government of the militia is within the province of the state." *Dern*, 74 F.2d at 487 (emphasis added); *see* U.S. Const. art. I, § 8, cl. 16 (the federal government may only "govern[] such Part of [the Militia] as may be employed in the Service of the United States"); *Abbott*, 70 F.4th at 835 (a governor has "exclusive constitutional authority to 'govern' the non-federalized [state] militia"); *Perpich v. Dep't of Def.*, 496 U.S. 334, 348 (1990) ("[A]ll [National Guard troops] now must keep three hats in their closets—a civilian hat, a state militia hat, and an army hat—only one of which is worn at any particular time."). Indeed, Defendants' arrangement flips the proper division of authority on its head: When troops are in state militia status, the federal government may set general rules of organization, but it must "leav[e] control of the day-to-day operations to the states." *Ass'n of Civilian Technicians*, 603 F.3d at 992; *see Dern*, 74 F.2d at 487 ("The United States may organize, may arm, and discipline," but "the government of the militia is committed to the states."). Defendants have done the reverse, giving the federal government day-to-day control while relegating the states to a subsidiary administrative role.

Finally, Defendants' own policies confirm that this arrangement is unlawful. The Department of Defense instructs that when state National Guard units work alongside federally controlled forces, the forces "must establish separate state and federal chains of command," "ensure that the orders from the respective chains of commands given to the forces are kept

separate," and exercise authority "in a completely mutually exclusive manner."  Nat'l Guard

Bureau, NRG 500-5, Nat'l Guard Domestic Law Enforcement Support & Mission Assurance

Ops. § 4-2(e), (g) (h) (Aug. 18, 2010).[15]  Defendants are violating this "settled doctrine"

governing the command of "National Guard units operating in a Title 32 status," Opp. 25, by

placing out-of-state National Guard troops in state militia status under unified federal command.

### C.  Defendants Have Violated the Posse Comitatus Act and 10 U.S.C. § 275.

Defendants have also violated the Posse Comitatus Act and 10 U.S.C. § 275 by directing

National Guard troops under federal military command to engage in law enforcement activities

in the District.  As the District's opening brief explains, it is well-established that personnel

operating under federal military command are part of the "Army" subject to the prohibitions of

both the PCA and section 275.  *See* Mem. 32-34.  The activities that National Guard troops are

undisputedly engaged in—including detentions, armed security patrols, and traffic control—

constitute core law enforcement activities prohibited by those statutes.  *Id.* at 36-37.  And no

statute authorizes these troops to engage in such law enforcement, let alone "expressly," as

would be necessary to override the PCA or section 275.  *Id.* at 37-38.

Defendants offer little substantive response to these points.  As an initial matter, they fail

to respond to the District's arguments under section 275 at all.  *Compare* Mem. 31-38 (repeatedly

invoking this statute), *with* Opp. 26-32 (failing to mention or address section 275).  And nearly

all of the counterarguments that Defendants do raise in opposition to the District's PCA claim

have no application to section 275: section 275 is not a criminal prohibition, *contra* Opp. 26-28,

it does not include a willfulness requirement, *contra* Opp. 31-32, its implementing regulations

extend to personnel under the command of DoD leadership regardless of their formal status,

---

[15] *Available at* https://www.ngbpmc.ng.mil/Portals/27/Publications/ngr/ngr%20500-5.pdf?ver=2018-09-07-082540-767.

*contra* Opp. 28-29, and those regulations expressly list several of Defendants' activities as prohibited forms of law enforcement, *contra* Opp. 30-31.  By failing to address these points in their response, Defendants have forfeited them.  *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 62 (D.D.C. 2023), *aff'd*, 146 F.4th 1144 (D.C. Cir. 2025) ("A movant forfeits an argument that it fails to raise in its first brief supporting its motion.").[16]

In any event, Defendants' arguments are meritless across the board.  Their view boils down to the position that the Army may take direct command of National Guard troops, employ them throughout the country as a military police force, and avoid the limits of the PCA by formally keeping those troops in Title 32 status.  If accepted, that position would make a mockery of our Nation's historic commitment to the separation of military and civil power.  It is not the law.

### 1. The District may challenge Defendants' violations of the PCA and section 275.

To begin, Defendants are incorrect that the District cannot challenge their conduct because the PCA is a "criminal statute."  Opp. 26.  This argument ignores section 275, which is not a criminal statute and which has long been deemed subject to judicial enforcement.  *See, e.g.*, *United States v. Dreyer*, 804 F.3d 1266 (9th Cir. 2015) (en banc) (enforcing section 275); *Hayes v. Hawes*, 921 F.2d 100 (7th Cir. 1990) (same); *see also United States v. Walden*, 490 F.2d 372, 373-76 (4th Cir. 1974) (finding that the Marines violated a regulation extending the PCA to the Navy prior to the enactment of section 275).  Furthermore, it is well established that plaintiffs

---

[16] Defendants' suggestion that they preserved their defense under section 275 by mentioning the statute in a quotation on page 35 of their opposition—without providing any substantive argument or response to the District's claims—is plainly without merit.  Tr. of Discovery Hearing at 56-57 (Sept. 18, 2025); *see United States v. Miller*, 799 F.3d 1097, 1108 (D.C. Cir. 2015) ("passing references, which contain no discussion of the relevant law, are not enough to raise . . . issues for our review" (cleaned up)).

may challenge agency actions that violate federal criminal statutes through both the APA and equitable actions. In *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), the Supreme Court held that even though the Trade Secrets Act is "a criminal statute" that affords no "private right of action," plaintiffs may enforce that provision when seeking "judicial review of agency action pursuant to . . . the APA" because the statute "place[s] substantive limits on agency action." *Id.* at 317-18. Similarly, in *Humane Society of the United States v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000), the D.C. Circuit rejected the contention that the Migratory Bird Treaty cannot be enforced against federal agencies because its only express enforcement mechanism is criminal prosecution, given that the "equity injunction" remains "a method for review of" such claims. *Id.* at 886. Courts have repeatedly applied these principles to authorize both APA and equitable claims against agencies for violation of criminal laws. *See, e.g.*, *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 585 (9th Cir. 2016); *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008); *McDonnell Douglas Corp. v. Dinall*, 57 F.3d 1162, 1164 (D.C. Cir. 1995). The same principles authorize the District to challenge Defendants' violations of the PCA.

Indeed, for nearly a century, *every* case interpreting the PCA has arisen from claims raised by private individuals. Those claims arose in various postures: as defenses to criminal prosecution,[17] as challenges to the use of evidence,[18] and in affirmative civil suits.[19] The common denominator of those cases was that courts permitted private litigants to challenge government conduct as unlawful because it was taken in violation of the PCA. Defendants'

---

[17] S*ee, e.g. United States v. Cardenas-Tovar*, No. 3:19-CR-4370, 2020 WL 905634 (S.D. Cal. Feb. 25, 2020).
[18] S*ee, e.g.*, *United States v. Johnson*, 410 F.3d 137, 146-49 (4th Cir. 2005); *United States v. Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1975).
[19] *See, e.g.*, *Mandato v. United States*, No. 1:19-cv-00772, 2019 WL 13251552, at *4-5 (E.D. Va. Oct. 3, 2019); *Bissonette v. Haig*, 800 F.2d 812, 814-16 (8th Cir. 1986), *aff'd by equally divided Court*, 485 U.S. 264 (1988); *Wrynn v. United States*, 200 F. Supp. 457 (E.D.N.Y. 1961).

position (Opp. 27) that the federal government has "exclusive authority" to enforce the PCA is irreconcilable with this body of case law. Further, it would negate the statute's core purpose, which was to prevent the federal government *itself* from using the military for domestic law enforcement. This foundational statute would be of little use if enforcement was at the discretion of the very entity it was designed to constrain.

Defendants' argument is particularly misplaced because, from its enactment until 1956, the PCA was not framed solely as a criminal prohibition. Rather, it stated that, absent express statutory authority, "*[i]t shall not be lawful* to employ any part of the Army of the United States, as a posse comitatus, or otherwise, for the purpose of executing the laws," and separately made criminal prosecution a possible sanction for violation of that prohibition. 10 U.S.C. § 15 (1952) (emphasis added); *see* Act of June 18, 1878, ch. 263, § 15, 202 Stat. 152. When Congress recodified the PCA as part of a general codification of Title 10 in 1956, it rephrased the statute to its present form. *See* 70A Stat. 626 (1956). Congress expressly stated, however, that this codification was intended to "restate, without substantive change, the law replaced by" this provision, *id.* at 640, and the D.C. Circuit has made clear that similar reformulations from the same enactment should not be read to have substantive effect. *See Rainbow Nav., Inc. v. Dep't of Navy*, 783 F.2d 1072, 1076-77 (D.C. Cir. 1986). It is therefore inappropriate to read this reformulation as stripping private litigants of the ability to bring claims under the PCA.

The government's cases do not suggest otherwise. All of the precedents it cites in which courts declined to permit PCA claims to proceed were private suits *for damages* asserted as freestanding claims under the PCA itself. *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021) ("the PCA does not create a private civil cause of action for damages"); *Smith v. United States*, 293 F.3d 984, 986, 988 (7th Cir. 2002) (rejecting suit seeking "return of

[property] plus damages" under the PCA); *Robinson v. Overseas Military Sales Corp.*, 827 F. Supp. 915, 920 (E.D.N.Y. 1993) (dismissing suit "to recover damages").  But the Supreme Court and the D.C. Circuit have held that the absence of a private action for damages does not preclude plaintiffs from invoking a statute as the basis for an APA or equitable claim.  *See Chrysler Corp.*, 441 U.S. at 317-18; *Theodore Roosevelt Conservation Pshp. v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010); *Glickman*, 217 F.3d at 886.  Defendants similarly err (Opp. 27) in suggesting that there is no historical basis to enjoin agency actions that violate criminal statutes.  The D.C. Circuit has identified such an equitable tradition.  *See Glickman*, 217 F.2d at 886.  And, in any event, where APA review is available, the plaintiff may obtain vacatur or a stay of the challenged agency action.  *See* 5 U.S.C. §§ 705, 706(2).  No separate equitable tradition need be identified to support such relief.  *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.").

    2.   *The actions taken by DCNG and the out-of-state National Guard troops in the District are subject to the PCA and section 275.*

Defendants also fail to show that the actions of the National Guard troops in the District are not subject to the PCA and section 275.  As the opening brief demonstrates, a wealth of precedent—including from the Department of Justice itself—establishes that personnel operating under federal command and control are subject to the PCA and section 275, even if they are formally in Title 32 status.  *See* Mem. 32-34.  Defendants concede that DCNG is subject to the pervasive control of the President, the Secretary of Defense, and the Secretary of the Army.  *See* Opp.  6, 17, 21; *see also* Doane Decl. att. 2, at D-10 ("The District of Columbia NG is a federal militia and operates under the federal chain of command at all times.").  And the evidence makes

clear that out-of-state National Guard forces are operating under the command of DCNG and the Army.  *See supra* Section I.B.

Defendants respond to none of this.  They make no argument that these forces are not subject to section 275—perhaps because DoD regulations and precedent make clear that this statute applies even to civilians operating under federal command.  *See* Dep't of Defense Instruction 3025.21, at 23-24 (2019); *United States v. Chon*, 210 F.3d 990, 993-94 (9th Cir. 2000).  As to the PCA, they assert in a pair of conclusory paragraphs that troops in Title 32 status are *never* subject to the PCA, regardless of the amount of control the federal government exercises.  Opp. 28-29.  But they simply ignore the body of precedent stating the contrary.  *See* Mem. 32-34.  The sole case that Defendants do cite held simply that a sergeant serving in the Illinois National Guard in Title 32 status under state command was not subject to the PCA. *Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019).  That opinion had no occasion to consider, and did not address, whether the PCA would apply to an officer formally in Title 32 status who was nonetheless subject to federal command and control.

Defendants also cite a 1989 OLC opinion stating that the DCNG is not subject to the PCA when used in "its militia rather than federal service capacity."  Opp. 28 (internal quotation marks omitted).  As the opening brief explained, that thinly reasoned opinion did not grapple with the fact that DCNG is subject to the pervasive command of the Army and the President.  *See* Mem. 36 n.14; *see* Amicus Br. of Democracy Forward Foundation 5-8 (ECF No. 23).  And it is inconsistent with a later OLC opinion, which Defendants ignore, that said that application of the PCA applies to any troops under "federal command and control."  *Mil. Support for Customs & Border Prot. Along the S. Border Under the Posse Comitatus Act*, 2021 WL 298369, at *5 & n.3

26

(O.L.C. Jan. 19, 2021). Defendants offer no response to these points and nothing but a bare citation to the OLC opinion to support its conclusion.

### 3. No statute expressly authorizes Defendants to use DCNG or out-of-state National Guard troops for law enforcement.

Defendants also offer no persuasive argument that the National Guard troops in the District have been "expressly authorized by the Constitution or Act of Congress" to engage in law enforcement. 18 U.S.C. § 1385; *see* 10 U.S.C. § 275 (prohibiting law enforcement conduct unless "otherwise authorized by law"). Defendants make no argument that the *out-of-state* National Guard troops have been expressly authorized to engage in law enforcement, and thus have forfeited any such contention as to those personnel. *See* Opp. 29-31. With regard to DCNG, Defendants claim that the vague language of section 49-102—permitting troops to engage in "drills, inspections, parades, escort, or other duties"—constitutes such authorization. Opp. 29.

As explained above, Defendants are incorrect that section 49-102 authorizes the use of DCNG for law enforcement. *See supra* pp. 4-8. And it certainly does not do so "expressly." Courts and OLC have held that a statute grants express authorization only if it "clearly" indicates that Congress wished to override the prohibitions of the PCA. *Military Support for Customs and Border Protection*, 2021 WL 298369, at *7-9; *Johnson*, 410 F.3d 137; *see Dorsey v. United States*, 567 U.S. 260, 273-75 (2012). Section 49-102 does not mention law enforcement, reference the PCA, or otherwise indicate that Congress "recognized a special need for military assistance in law enforcement." *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995). Deeming this generic language sufficient to override the PCA would read the words "expressly authorized" out of the statute.

Defendants do not grapple with the words "expressly authorized" or the precedent interpreting it. Instead, they merely cite two earlier, largely conclusory OLC memoranda as support for their view. But the 1963 memorandum they cite does not discuss the PCA at all; it states only that section 49-102 permits DCNG to "*support* activities of the civilian police force," *Authority to Use the National Guard* at 2—conduct that has long been held not to constitute a violation of the PCA. *See, e.g.*, *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (provision of "indirect assistance" not a violation of the PCA). Further, in a separate memorandum issued less than two weeks later, OLC cautioned that even this tentative reading might "not be sustained by the courts," which could read section 49-102 (correctly) as limited to "drill- and training-type activities." *Amenability of the National Guard* at 3. That acknowledgment of ambiguity is fatal to Defendants' claim of express authorization. *See Military Support for Customs and Border Protection*, 2021 WL 298369, at *8 ("with two plausible interpretations available, we cannot say that Congress expressly authorized" a violation of the PCA).

The 1989 OLC opinion that Defendants cite adds nothing. It selectively quotes the language of the earlier opinions without meaningfully elaborating on their reasoning. *See Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 93 & n.5 (1989). And like the first opinion, it adopts an interpretation of section 49-102 that is irreconcilable with its text, structure, and history—and that is, at minimum, not so "clearly" correct that it could be viewed as express authorization. *Military Support for Customs and Border Protection*, 2021 WL 298369, at *7-8.

Defendants separately contend that, even absent express statutory authority, the President has inherent constitutional authority to order DCNG to engage in law enforcement whenever he

wishes.  Opp. 30.  But the PCA only permits the President to use federal forces to execute laws when "expressly authorized" by the Constitution or an Act of Congress.  An unstated "inherent authority" is self-evidently not an "express" authority that can serve as the basis for an exception. 18 U.S.C. § 1385.

Regardless, Congress has exercised its "exclusive" constitutional authority over the District to limit the circumstances in which the President may use DCNG, U.S. Const. art. I, § 8, cl. 17, and the President's delegated power does not include the power to direct DCNG to engage in law enforcement activities in the circumstances present here.  When acting against the express or implied wishes of Congress, the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter," and he can succeed only if his power is "both 'exclusive' and 'conclusive.'"  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)). But, here, it is Congress's power that is both express and "exclusive," and Defendants offer no authority for the proposition that the President's "inherent" authority somehow trumps that express grant of power.

In any event, neither the OLC opinion nor the cases that Defendants cite support such a broad view of the President's inherent authority.  OLC merely opined that the PCA did not preclude the President from using troops to thwart a planned traffic obstruction designed to prevent federal government employees from accessing their offices.[20]  Defendants similarly rely on 135-year-old dicta from *In re Neagle*, 135 U.S. 1 (1890), and *In re Debs*, 158 U.S. 564 (1895), that suggest that the President could use armed forces to protect the safety of federal personnel or property.  *See* Opp. 30; *Authority to use Troops*, 1 Supp. Op. O.L.C. at

---

[20] *Authority to use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Function*, 1 Supp. Op. O.L.C. 343, 344 (1971) ("Authority to use Troops").

344.   Defendants find no support in these cases for their expansive theory of a protective power that allows the President to direct federal troops to enforce any "federal law"—a view that would eviscerate both the PCA and the limits on the President's power over the District.

      4.   *The National Guard troops in the District are engaged in law enforcement prohibited by the PCA and section 275.*

Defendants briefly contend that National Guard troops in the District are not engaged in law enforcement prohibited by the PCA.  Opp. 31-32.  Again, however, they make no argument as to section 275, and their own declarations concede that National Guard forces are engaged in conduct expressly barred by that statute's implementing regulation.  *Compare, e.g.*, Doane Decl. ¶¶ 7, 13 (troops "temporarily detain" offenders and provide "area security"), *and* Snider Decl. ¶ 11 (troops provide "crowd and traffic control"), *with* DoDI 2025.21, at 18-19 (prohibiting officers subject to the PCA from conducting "apprehension[s]," "security functions," and "crowd and traffic control").

Defendants' factual assertions also do nothing to undermine the District's PCA claim. They have no bearing on the motion to dismiss, as the Complaint plainly alleges that Defendants are engaged in law enforcement conduct that violates the PCA.  Compl. ¶¶ 112-24; *see Sanchez*, 45 F.4th at 393.  As to the preliminary injunction motion, Defendants suggest that National Guard troops are not violating the PCA because they are "not making arrests, conducting searches and seizures, determining what crimes to investigate, or making prosecution decisions." Opp. 31.  But National Guard troops are in fact making "seizures" by temporarily detaining individuals—indeed, publicly available evidence shows officers handcuffing and physically restraining subjects.[21]  *See Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("Temporary

---

[21] *See, e.g.*, Statement of Offense, United States v. Beidleman, 25-cr-00270 (D.D.C. Aug. 30, 2025) (explaining how two members of the Mississippi National Guard detained an individual by putting him "into flexicuffs and plac[ing] him on the ground"); LA National Guard MPs Train on Handcuffing Techniques while Deployed to Washington,

detention of individuals . . . constitutes a 'seizure' of 'persons' within the meaning of [the Fourth

Amendment]."). And, in any event, conducting armed presence patrols, providing area security,

and performing crowd and traffic control are all forms of law enforcement subject to the PCA, as

Defendants themselves have repeatedly acknowledged. *See* Domestic Operations Manual at 46

("The [PCA] . . . limits direct assistance to civilian law enforcement such as . . . security

functions" and "crowd and traffic control"); *Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL

2501619, at *4 (N.D. Cal. Sept. 2, 2025) (reprinting Army training materials stating that "PCA

Prohibits . . . Security patrols," "Traffic control," and "Crowd control," except where expressly

authorized by the Constitution or federal law); *see also* Mem. 36-37.

    5.  *Defendants have the requisite intent to violate the PCA and section 275.*

    In a final effort to avoid the clear import of the PCA, Defendants claim that the District

cannot prevail because Defendants have not "willfully" violated the statute. Opp. 31-32. Once

again, this argument disregards section 275, which indisputably contains no willfulness

requirement. *See* 10 U.S.C. § 275; *see* DoDI 3025.21, at 18 (stating simply that covered

personnel "are prohibited from providing . . . direct civilian law enforcement assistance").

Defendants' arguments therefore have no bearing on the District's claims under that statute.

    Defendants are also incorrect that the word "willfully" in the PCA requires a showing that

Defendants knew their actions to be unlawful. As the D.C. Circuit has recently explained, the

"term 'willful' is a word of many meanings, and its construction is often influenced by its

context.'" *United States v. Bannon*, 101 F.4th 16, 22 (D.C. Cir. 2024), *reh'g en banc denied*,

2025 WL 1503223 (May 27, 2025) (cleaned up). In some highly technical criminal statutes—

such as tax-law prohibitions—the term requires that the defendant have "knowledge that his

---

D.C., Defense Visual Information Distribution Service (Sept. 18, 2025), https://www.dvidshub.net/image/9329623/la-national-guard-mps-train-handcuffing-techniques-while-deployed-washington-dc; Mem. 16 & n.11.

conduct was unlawful." *Id.* (giving examples). But in other contexts, it refers simply to a "deliberate and intentional act." *Id.*; *see, e.g.*, *Browder v. United States*, 312 U.S. 335, 341 (1941); *Cheek v. United States*, 498 U.S. 192, 208-09 (1991) (Scalia, J., concurring in the judgment) ("One may say, as the law does in many contexts, that 'willfully' refers to consciousness of the act but not to consciousness that the act is unlawful.").

The D.C. Circuit recently adopted such an interpretation in *Bannon*. It held that the history, context, and structure of the prohibition on "willfully" refusing to answer congressional subpoenas, 2 U.S.C. § 192, as well as decades of precedent, established that the statute used the term to require that a failure to appear "be only 'deliberate' and 'intentional.'" *Bannon*, 101 F.4th at 21. Notably, the D.C. Circuit adopted that interpretation at the federal government's urging: In contrast to its brief here, the Department of Justice argued there that while "[i]n many criminal statutes, 'willfully' means that the defendant acted . . . with 'knowledge that his conduct was unlawful' . . . [i]n other contexts, 'willfully' means something less—'an intentional as distinguished from an accidental act.'" Br. for Appellee 42-43, *United States v. Bannon*, No. 22-3086, 2023 WL 3790883 (D.C. Cir. June 2023) (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998); *Browder*, 312 U.S. at 341-42).

Here, as in *Bannon*, the term "willfully" should be construed to require, at most, an intentional and deliberate act. The PCA is not a "highly technical statute[] that present[s] the danger of ensnaring individuals engaged in apparently innocent conduct," like criminal tax laws. *Bryan*, 524 U.S. at 194. The PCA's mandates are not so novel or elusive that someone is likely to accidentally violate it. On the contrary, the statute has been on the books for nearly 150 years. And throughout United States history, it has been "a fundamental policy to use civilian, rather than military, officials . . . in preserving law and order." *United States v. Walden*, 490 F.2d

372, 373 (4th Cir. 1974). Requiring evidence of bad faith "would undermine the statute's function" by making it "exceedingly difficult" to invoke, thwarting its essential role in preventing military interference in civilian affairs. *Bannon*, 101 F.4th at 22.

Statutory history powerfully reinforces these points. From the enactment of the PCA until 1956, the statute's legal prohibition did not contain a willfulness requirement; as noted above, it stated simply that "[i]t shall not be lawful to employ any part of the Army in the United States, as a posse comitatus, or otherwise, for the purpose of executing laws," and separately made a person who "willfully violat[ed] the provisions of this section" subject to criminal prosecution. 10 U.S.C. § 15 (1952). When Congress recodified this provision in 1956, it condensed the wording of the statute in a way that made it appear that the word "willfully" applied to the entirety of the statute. *See* 70A Stat. 626. But as explained above, Congress expressly stated that its "purpose [was] to restate, without substantive change, the law replaced by [the codification] on the effective date of this Act," *id.* at 640, and the D.C. Circuit has instructed that revisions from the same codification should be not be read to effect any material change. *Rainbow Nav.*, 783 F.2d at 1076–77. Reading the word "willfully" to limit the statute's legal prohibition to knowing violations of the law would represent a dramatic narrowing of the statute's scope. This history accordingly counsels strongly in favor of interpreting the term as a mere intent requirement, if it should be afforded any effect at all outside of the context of a criminal prosecution.

This reading is consistent with the practice of all three branches of the federal government. For decades, courts have found violations of the PCA without requiring more than an intentional act, or in many instances without inquiring into questions of willfulness at all. *See, e.g., Johnson*, 410 F.3d at 146-49 (analyzing a PCA claim without a discussion of "willfulness");

*Red Feather*, 392 F. Supp. at 925 (same).  Similarly, when Congress enacted section 275 to extend the requirements of the PCA to DoD entities that were outside its scope, it omitted the willfulness requirement entirely, suggesting that it did not understand this to be a relevant or meaningful part of the underlying prohibition.  *See* 10 U.S.C. § 275; H.R. Rep. No. 97-71, pt. 2 (1981).  And when the Executive Branch has advised personnel and agencies about how to comply with the PCA, it has not suggested that agencies may take any actions that they do not "know" to violate the Act.  It has simply instructed them to avoid actions that constitute prohibited acts under the statute.  *See, e.g.*, *Military Support for Customs*, 2021 WL 298369 (considering whether conduct violates the PCA without discussing willfulness); *Application of the Posse Comitatus Act to Assistance to the United States National Central Bureau*, 13 Op. O.L.C. 195 (1989) (same).

Accordingly, Defendants' attempt to evade judicial scrutiny based on the word "willful" is untenable.  The District has alleged and established that Defendants deliberately and intentionally took actions prohibited by the PCA.  *See* Compl. ¶¶ 5, 112-124, 153-156; *see supra* pp. 30-31.  And if more were required, the fact that Defendants are engaged in the precise forms of law enforcement conduct expressly prohibited by DoD policy, their failure to address or reconcile their conduct with judicial and Executive Branch precedent that directly contradicts their position, and their continued pursuit of such actions even after being alerted to such precedent establishes knowledge that their conduct is unlawful.  *See Newsom*, 2025 WL 2501619, at *25 (finding Defendants acted "willfully" to violate the PCA because Defendants "knowingly contradicted their own training materials")*.*  At minimum, if this Court concludes that Defendants' conduct is prohibited by the PCA, Defendants cannot avoid forward-looking relief by claiming ignorance of the law after the date of that decision.  *See Johnson*, 410 F.3d at

149 (declining to order suppression as a backward-looking remedy, but reserving the possibility of forward-looking relief "should there be evidence of widespread or repeated violations of the Act, or ineffectiveness of enforcement by the military" (cleaned up)).

### D. Defendants' Deputations of National Guard Troops and Order to Arm Those Troops Are Arbitrary and Capricious.

The Agency Defendants have also engaged in arbitrary and capricious action by failing to provide any reasoned explanations for their decisions to deputize as Special Deputy U.S. Marshals National Guard troops without law enforcement training or experience, and to order that those forces be armed with military-grade weapons while patrolling District streets.  Mem. 39-41.  Defendants do not attempt to defend these decisions on the merits, thus forfeiting any such defense.  Instead, they argue only that the deputations and the order to arm these troops are not "final agency action" subject to APA review.  Opp. 33-34.  That argument fails.

An action is "final" under the APA if it "mark[s] the consummation of the agency's decisionmaking process" and carries "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  The deputation of personnel as Special Deputy U.S. Marshals marks the consummation of the agency's decisionmaking process.  Pursuant to USMS policy, deputations must be "[a]pproved by DOJ and conferred by the USMS," USMS Policy Directive 17.11.G.2 (Oct. 7, 2020), Haynes Decl. Ex. 28, and Defendants' declarants unequivocally state that the troops in the District have received "Special Deputation Appointment[s]," Snider Decl. ¶ 11 n.7, and been "sworn in as Special Deputies," Doane Decl. ¶ 7.  Defendants do not contest that these appointments carry "legal consequences," as they plainly do.  *See* 28 C.F.R. § 0.112 (deputation grants officers the legal authority to "perform the functions of a Deputy U.S. Marshal"); Doane Decl. ¶ 7 (deputation "authorizes service members to carry their service-issued weapon").  And the fact that these deputations are numerous makes no difference for finality—particularly given

35

that the deputations occurred *en masse* in joint swearings-in conducted for hundreds of troops at a time.  Haynes Decl. Exs. 22-27; *see New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

The order that National Guard troops be armed also constitutes final agency action. Defendants took this action through an order issued by the Secretary of Defense—a paradigmatic example of final agency action.  *See* Hegseth Mem. at 2; "National Guard authorized to carry weapons in support of law enforcement" (Aug. 23, 2025), Haynes Decl. Ex. 20; *see also* 5 U.S.C. § 551(13) (defining "agency action" to include "orders").  There is nothing "tentative" about this decision, which "reads like a ukase": "It commands, it requires, it orders." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *cf. Ass'n of Admin. L. Judges v. OPM*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (holding that an agency's notice that "it planned to post an ALJ vacancy announcement" was not final because it "was an anticipatory step" rather than an "order").  And it carries the rather straightforward legal consequences of both authorizing and requiring forces in the District to carry weapons that would otherwise be unlawful.  *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 808-09 (2022) (agency action final because it "bound [agency] staff"); *Venetian Casino Resort*, 530 F.3d at 931 (agency action final because it "permit[ed] employees" to take certain actions); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002) (agency action final because it "determines the rights and obligations of both applicants and the Agency").

Defendants err in suggesting that the District's challenge to these discrete decisions constitutes a "programmatic" attack to an "ongoing program or policy."  Opp. 33-34.  The District is not challenging the "continuing (and thus constantly changing) operations" of an

agency. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (emphasis in original). It is challenging "a single [agency] order"—Secretary Hegseth's decision to arm troops—and "a completed universe of particular [agency] orders"—the deputation of those forces as Special Deputy U.S. Marshals. *Id.* These are "identifiable action[s] or event[s]" easily susceptible to APA review. *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Lujan*, 497 U.S. at 899).

**E. Defendants' Other Reviewability Arguments Fail.**

Defendants advance several remaining arguments for why the District cannot maintain claims under the APA, a theory of *ultra vires* action, or the Constitution. None has merit.

*First*, in responding to the District's arbitrary-and-capricious challenges, Defendants argue that "the President is not an agency, and his actions are not subject to APA review." Opp. 32. But the District does not challenge the actions of the President pursuant to the APA. Rather, the District challenges the Agency Defendants' decisions to direct DCNG and out-of-state National Guard units to conduct law enforcement in the District, to place them under federal command, to deputize them as Special Deputy U.S. Marshals, and to order them to be armed. None of those actions are compelled by the President's memorandum. And regardless, the existence of an executive order does not shield agency actions taken pursuant to that order from APA review. *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

*Second*, Defendants argue that *ultra vires* review is unavailable unless a plaintiff "can demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." Opp. 36 (quoting *Fed. Express Corp. v. U.S. Dep't of Corr.*, 39 F.4th 756, 765 (D.C. Cir. 2022)). But even assuming that standard applies, the District has made that showing here: Defendants have offered no support—beyond an outdated and unreasoned OLC opinion—for

37

their theory that D.C. Code § 49-102 (relating to drills and training) authorizes DCNG to do law enforcement. *See supra* pp. 4-8. They have similarly advanced no substantive argument for why 32 U.S.C. § 502(f), which likewise authorizes training and similar missions, allows out-of-state National Guard units to do law enforcement in the District—particularly over the Mayor's objection. *See supra* pp. 11-12. Defendants have also stepped well outside the bounds of permissible interpretation of the PCA by placing military forces under the command and control of the U.S. Army and authorizing them to do law enforcement. *See supra* pp. 21-35. These are not mere "routine error[s] in statutory interpretation," but actions clearly in excess of any lawful authority. *Fed. Express Corp.*, 39 F.4th at 765.

Defendants further claim that the District "is not entitled to maintain claims challenging the same purported agency actions on both APA and *ultra vires* grounds." Opp. 36. That would only be true if the District advanced "both a well-pleaded APA claim and a duplicative *ultra vires* claim." *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 200 (D.D.C. 2024). If this court accepts as well-pleaded the District's APA claims against Agency Defendants, as it should, the court need not address any *ultra vires* claims challenging the same actions. But if for any reason the court rejects the District's APA claims, it should allow the District's *ultra vires* claims to proceed. And the District's *ultra vires* claim against the President, who is not amenable to suit under the APA, should proceed in any event.

*Third*, Defendants argue that the District has asserted constitutional theories that are not "freestanding" but rather are "are entirely derivative of [the] contention that the Guard's deployment violates federal statutes." Opp. 34. This argument ignores several of the District's independent constitutional claims. In particular, Defendants violated the Constitution's Militia Clause by assuming command of state militias. *See supra* pp. 16-12; Compl. ¶¶ 151-52. In

addition, Defendants violated the District Clause by disregarding Congress's authority to legislate for the District and usurping the Mayor's local law-enforcement authority.  Mem. 18-22; Compl. ¶¶ 168-79.  And Defendants violated the Constitution's separation of powers and the Take Care Clause by taking actions "not even contemplated by Congress."  *Chamber of Com. of the U.S.*, 74 F.3d at 1332; *see Global Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at \*8 (D.C. Cir. Aug. 13, 2025) (acknowledging the distinction between contravening a statute and acting wholly without statutory basis).  Claims involving the "absence of any statutory authority" are reviewable for injunctive relief directly under the Constitution.  *Dalton v. Specter*, 511 U.S. 462, 473 (1994) (emphasis omitted).

## II.  THE DISTRICT IS SUFFERING SEVERE AND IRREPARABLE HARM.

The District has demonstrated that it is suffering severe and irreparable injury from the unlawful deployment of armed National Guard troops to engage in law enforcement activities throughout the District.  Mem. 41-44.  Defendants offer no evidence to rebut this showing.  And what few legal arguments and conjectures they offer in response are unconvincing.

*First*, the District is suffering irreparable injury from Defendants' unlawful intrusion on its authority to control law enforcement operations, determine how best to preserve the peace, and prevent crime in the District.  Mem. 41-43.  Defendants suggest that their establishment of a parallel police force in the District does not offend this interest.  But a state or the federal government obviously suffers severe sovereign injury if another jurisdiction unlawfully engages in law enforcement activities vested exclusively in that jurisdiction.  Amicus Br. of Maryland *et al.* 6-7 (ECF No. 17); *cf. Arizona v. United States*, 567 U.S. 387, 407-10 (2012) (finding intrusion on federal authority where state engaged in immigration enforcement entrusted exclusively to the federal government).  The same is true of the District, which was delegated

much of Congress's "exclusive" authority to govern the District, including virtually all of its local police powers. *See* D.C. Code § 5-101.03(1), (2), (10). The fact that Congress vested the Executive Branch with exceedingly narrow authority to involve itself in local District policing—in time-limited emergencies, *see id.* § 1-207.40, on federal land, *see id.* § 5-201, and to conduct arrests for certain serious, ongoing, or imminent crimes, *id.* §§ 23-501, 23-581—merely confirms that Congress guarded against such interferences when it adopted Home Rule. The District suffers irreparable injury when the federal executive disregards those limits and seizes a portion of one of the District's core police powers for itself. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (intrusion on District's "law enforcement and public safety interests" constitutes "irreparable harm"); Amicus Br. of Civil Rights & Legal Servs. Orgs. 15-22 (ECF No. 20).

*Second*, the District is suffering irreparable injury because the armed, untrained National Guard units patrolling the District are undermining the work of MPD and threatening public safety. Mem. 42-43. Defendants assert this claim lacks any "factual basis." Opp. 40. But the District submitted detailed declarations from experts in law enforcement and National Guard operations who explained at length the basis for these claimed harms, including the risk that such poorly trained forces could produce deadly confrontations. *See* Buchanan Decl. ¶¶ 34-48; Hall Decl. ¶¶ 51-65. Defendants ignore those declarations, as well as the multiple amici who reaffirm their conclusions. *See, e.g.*, Amicus Br. of Maryland et al. 8-11; Amicus Br. of Law Enforcement Action Partnership 4-16 (ECF No. 19); Amicus Br. of NAACP Legal Defense Fund 10-12 (ECF No. 22). Instead, they resort to their unfortunate practice of mischaracterizing the Mayor's statements, claiming that the Mayor described these forces as "affirmatively *helpful*," Opp. 38 (emphasis in original), when she actually said that their attempt to engage in policing is "not

working" and that her supportive statements referred only to federal civilian law enforcement, *see supra* p. 2.

Nor do Defendants rebut the District's claimed harms by asserting that National Guard troops are "familiar" with their military weapons and are "performing a limited set of duties." Opp. 40. As the experts and amici explain, the fact that National Guard troops are trained in the military use of their weapons but lack expertise in using such weapons in an urban policing environment, training in de-escalation techniques, or knowledge of the rules governing the permissible use of force is what *heightens* the risk of harm. *See* Buchanan Decl. ¶¶ 39-41, 44-48; Hall Decl. ¶¶ 62-64; Amicus Br. of Former U.S. Army and Navy Secretaries et al. 9-11 (ECF No. 14). And the tasks in which National Guard troops are indisputably engaged—presence patrols while armed, temporary detentions of criminal suspects, area security, and crowd control—are exactly the ones that produce risks of harm and interference with trained law enforcement. *See* Buchanan Decl. ¶ 48. Those risks in and of themselves are sufficient to establish irreparable harm. And the need for MPD officers to expend scarce law enforcement resources to monitor the work of National Guard troops, escort them, and engage in coordination to mitigate the risks they pose also present a here-and-now injury to the District. *See* Doane Decl. ¶¶ 11-14; *see also* Compl. ¶¶ 129-33 (describing incident in which a 16-ton Mine Resistant Ambush Protected All-Terrain Vehicle crashed into a car, injuring the civilian driver).

Along similar lines, Defendants are wrong that it "makes no sense" to suggest that the National Guard troops will undermine trust in District law enforcement. Opp. 41. The experts explain that residents lose trust in law enforcement generally when they see armed military personnel patrolling their communities, particularly where the lines between military and civilian law enforcement have become blurred. Hall Decl ¶¶ 49-57; *see* Brief of Amicus Curiae Legal

Defense Fund 11-12. It is remarkable for Defendants to suggest that no one could "conflate National Guardsmen with local law enforcement officials" when Defendants devote much of their brief and their public communications to contending that National Guard units are acting at the behest of the District and conducting operations on MPD's behalf. *See* Opp. 1, 4, 13-14, 24. Residents could be forgiven for taking the federal government at its word.

*Third*, the National Guard deployment is harming the District's economy, which will in turn foreseeably cause pocketbook injury to the District itself. Mem. 43-44. Defendants do not dispute that these injuries are cognizable, nor that they would be irreparable if proven. *See, e.g.*, *Susman Godfrey LLP v. Exec. Off. of President*, --- F. Supp. 3d ---, 2025 WL 1779830, at *24 (D.D.C. June 27, 2025) (where "sovereign immunity prevents a plaintiff from seeking monetary damages, courts have acknowledged that financial losses can constitute irreparable harm" (cleaned up)). They simply dispute that the economic downturn has been significant or sustained enough. Opp. 41-42. But Defendants (again) ignore the District's declarant, who explained that the presence of the National Guard is causing tourism and economic activity to slow. *See* Schwalb Decl. ¶¶ 3-4; *see also* Amicus Br. of Religious Leaders *et al.* 5-7 (ECF No. 24). All Defendants offer in response is bald speculation that the presence of the National Guard troops will "improve the District's economy," and that others are to blame for any economic downturn. Opp. 42. But speculation of government counsel is not evidence, and the weight of the evidence suggests that armed National Guard troops indefinitely patrolling the District are in fact driving away business.

## III.  THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES FAVOR AN INJUNCTION.

The public interest and the balance of the equities favor issuance of an injunction. Mem. 44-45. On the District's side of the ledger, the District has shown a high likelihood of success on

the merits; a strong interest in the enforcement of its laws, including its rights under the Home Rule Act; and a powerful public interest in ensuring that military abides by its governing laws and is not misused to engage in domestic law enforcement. Mem. 44-45. Amici powerfully reinforce these interests. And Defendants do not address any of them. *See* Opp. 42-43.

The only interests that Defendants invoke are nonexistent or unsubstantiated. The government claims that an injunction would interfere with the President's "longstanding and express authority as Commander in Chief of the D.C. National Guard." Opp. 42. But that authority does not give him the power he claims here and would have bearing, if at all, on only one of the District's legal claims. *See supra* Section I.A.

Defendants also speculate that the National Guard deployment is helping lower crime in the District. Opp. 42-43. They identify no evidentiary support for that claim. Contrary to Defendants' suggestion, the Mayor has made clear that she believes any decreases in crime over the past several months are attributable to the surge of federal civilian law enforcement in the District, not the National Guard. *See supra* p. 41. An injunction against the deployment of the National Guard for law enforcement would not "unwind" any of that progress; on the contrary, it would enable law enforcement officers to better do their jobs to protect the District free from the unlawful intrusion of federally commanded military forces.[22]

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied and the Motion for a Preliminary Injunction and Rule 705 Stay should be granted.

---

[22] Because Defendants' arguments lack merit and the equities tip decisively in the District's favor, Defendants' request for a stay pending appeal should be denied. *See* Opp. 43. Should the court grant a preliminary injunction, the District does not oppose the entry of a time-limited administrative stay to permit orderly resolution of any request for emergency relief.

Dated: September 30, 2025              Respectfully submitted,

                                      BRIAN L. SCHWALB
                                      Attorney General for the District of Columbia

                                      EMMA SIMSON (D.C. Bar No. 1026153)
                                      ELIZA H. SIMON (D.C. Bar No. 90035651)
                                      Senior Counsels to the Attorney General

                                      /s/ Mitchell P. Reich
                                      MITCHELL P. REICH (D.C. Bar No. 1044671)
                                      Senior Counsel to the Attorney General

                                      BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
                                      Assistant Deputy Attorney General
                                      Legal Counsel Division

                                      ALICIA M. LENDON (D.C. Bar No. 1765057)
                                      Chief, Civil Rights and Elder Justice Section
                                      Public Advocacy Division

                                      PAMELA DISNEY (D.C. Bar No. 1601225)
                                      ANDREW MENDRALA (D.C. Bar No. 1009841)
                                      CHRISTOPHER PEÑA (D.C. Bar No. 888324806)
                                      CHARLES SINKS (D.C. Bar No. 888273315)
                                      HANNAH COLE-CHU (D.C. Bar No. 1613497)
                                      Assistant Attorneys General

                                      Office of the Attorney General for
                                       the District of Columbia
                                      400 6th Street NW, 10th Floor
                                      Washington, D.C. 20001
                                      Tel: (202) 279-1261
                                      mitchell.reich@dc.gov

                                      *Attorneys for the District of Columbia*

44