# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

               Plaintiff,

    v.

DONALD J. TRUMP, *et al.*,

               Defendants.

Case No. 25-cv-3005 (JMC)

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTEREST OF *AMICUS CURIAE* ..................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

ARGUMENT ......................................................................................................................... 5

    I.    Defendants Have No Authority to Use National Guard Troops to Police the District of Columbia ................................................................................................. 5

        A.    The President Lacks Inherent Constitutional Authority to Use the National Guard for Crime Reduction .......................................................... 6

        B.    The President Lacks Statutory Authority to Use the National Guard for Crime Reduction ...................................................................................... 8

    II.    Defendants Have No Authority to Use Troops from Other Jurisdictions to Police the District ...................................................................................................... 16

CONCLUSION ...................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramski v. United States*,
    573 U.S. 169 (2014) ................................................................................................... 20

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) ................................................................................................... 2, 9

*Fischer v. United States*,
    603 U.S. 480 (2024) ................................................................................................... 2, 9, 10

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ................................................................................................... 13, 17

*In re Neagle*,
    135 U.S. 1 (1890) ....................................................................................................... 7

*Jarecki v. G. D. Searle & Co.*,
    367 U.S. 303 (1961) ................................................................................................... 10

*Martin v. United States*,
    145 S. Ct. 1689 (2025) ............................................................................................... 7, 8

*Roberts v. Sea-Land Servs., Inc.*,
    566 U.S. 93 (2012) ..................................................................................................... 20

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................................................... 9

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993) ................................................................................................... 9

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................................................... 13

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................................................... 13, 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................................... 5, 8

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 15 ............................................................................................. 6

**TABLE OF AUTHORITIES – cont'd**

Page(s)

U.S. Const. art. I, § 8, cl. 17 ........................................................................ 6


STATUTES AND LEGISLATIVE MATERIALS

An Act to Provide for the Organization of the Militia of the District of Columbia,
    ch. 328, 25 Stat. 772 (1889) ................................................ 14

D.C. Code § 39-602 ............................................................................ 16

D.C. Code § 49-102 ............................................................... 2, 3, 8-13

D.C. Code § 49-103 ............................................................................ 3, 14

D.C. Code § 49-404 ....................................................................... 3, 13, 14

10 U.S.C. § 251 ........................................................................... 18, 19

10 U.S.C. § 252 ................................................................................. 18

10 U.S.C. § 253 ................................................................................. 19

10 U.S.C. § 254 ................................................................................. 19

10 U.S.C. § 275 ................................................................................. 19

10 U.S.C. § 284(a) ............................................................................ 19

10 U.S.C. § 284(b) ............................................................................ 19

10 U.S.C. § 284(g)(2) ....................................................................... 19

10 U.S.C. § 12406 ............................................................................. 19

18 U.S.C. § 1385 ............................................................................... 18

32 U.S.C. § 112(b) ............................................................................ 19

32 U.S.C. § 112(c) ............................................................................ 19

32 U.S.C. § 502(a) ............................................................................ 4, 17

32 U.S.C. § 502(f)(1) ........................................................................ 4, 17

32 U.S.C. § 502(f)(2) .................................................................. 16, 17, 19

32 U.S.C. § 502(f)(2)(A) ............................................................... 4, 17, 19

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

EXECUTIVE BRANCH MATERIALS

*Authority to Use Troops to Prevent Interference with Federal Employees by
Mayday Demonstrations and Consequent Impairment of Government Functions*,
1 Supp. Op. O.L.C. 343 (1971) ....................................................................... 6, 7

Exec. Order No. 11485, 34 Fed. Reg. 15411 (Oct. 3, 1969) ............................. 14, 15

Memorandum for the Assistant Attorney General, Civil Division, from Norbert
A. Schlei, Assistant Attorney General, OLC, *Memorandum Concerning the
Amenability of Members of the National Guard of the District of Columbia to
Courts-Martial* (Aug. 9, 1963) ...................................................................... 11, 12

Memorandum for the Deputy Attorney General, from Mary C. Lawton, Deputy
Assistant Attorney General, OLC, *Re: Law Relating to Civil Disturbances*
(Jan. 6, 1975) ................................................................................................. 6, 7

Norbert A. Schlei, Assistant Attorney General, OLC, *Re: Authority to Use the
National Guard of the District of Columbia to Supplement Civilian Police Force
Activities During a Massive Demonstration or Parade in the District of Columbia*
(July 30, 1963) ............................................................................................... 15

*Use of the National Guard to Support Drug Interdiction Efforts in the District of
Columbia*, 13 Op. O.L.C. 91 (1989) ............................................................ 7, 15, 16


BOOKS, ARTICLES, AND OTHER AUTHORITIES

Alex Horton, *National Guard Documents Show Public "Fear," Veterans' "Shame"
Over D.C. Presence*, Wash. Post (Sept. 10, 2025) ....................................... 20

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
(2012) .............................................................................................................. 9, 10

Paul Sonne et al., *Pentagon Disarms National Guard Activated in D.C., Sends
Active-Duty Forces Home*, Wash. Post (June 5, 2020) ................................. 18, 20

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees.  Accordingly, CAC has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

If Defendants want to end lawlessness in the District of Columbia, they should start with their own actions.  No statute even plausibly sanctions their use of the National Guard as a roving crime-reduction squad.  Nor does any statute authorize Defendants to import troops from other jurisdictions to police the District, thereby evading the constraints Congress has imposed on federalizing the National Guard and using military power for domestic law enforcement.  Because there is no legal basis for this unprecedented deployment of armed soldiers into the streets and neighborhoods of Washington, D.C., the Motion to Dismiss should be denied.

**1.** Defendants point to just one statutory provision to justify their transformation of the D.C. National Guard into an auxiliary police force: Section 49-102 of the D.C. Code.  More accurately, they offer just *two words* from this provision, "other duties," which they construe in isolation from everything surrounding those words.  Basic principles of statutory construction refute this implausible reading.

Most obviously, the term "other duties" must be construed in light of the sentence that contains it, which leaves no doubt that this term refers only to training and ceremonial duties,

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission.  All parties have consented to the filing of this brief.

entirely unlike the coercive law enforcement functions that Defendants have imposed on the Guard. The phrase in question—"drills, inspections, parades, escort, or other duties," D.C. Code § 49-102—is "a list of specific items separated by commas and followed by a general or collective term," *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008), which means that the "general or collective term at the end" is "controlled and defined by reference to the specific classes [of terms] that precede it," *Fischer v. United States*, 603 U.S. 480, 487 (2024) (citation omitted). Those preceding terms do not remotely resemble crime-fighting duties like identifying perceived offenses and detaining suspects, much less the many other law enforcement powers that Defendants could assign the Guard if their interpretation were correct—like searching homes, making formal arrests, and conducting interrogations. That is why even the Justice Department has cautioned against reliance on this strained interpretation, and why no other President has ever employed the provision in this way during the 136 years it has existed.

If more were needed, additional features of the text confirm that "other duties" lacks the meaning that Defendants claim. Among them, Section 49-102 empowers the Guard's Commanding General—not the President—to order the performance of these "other duties." D.C. Code § 49-102. Under Defendants' reading, therefore, the Commanding General, on his own initiative, could order the Guard to fight crime on an ongoing basis across Washington, D.C. If that were not implausible enough, a further implication of Defendants' reading is that any of the Guard's commanding officers could deploy their own troops for whatever law enforcement activities they deemed appropriate. Section 49-102 authorizes the commanding officer of any regiment to "assemble his command . . . for drill, instruction, *or other business, as he may deem expedient*." *Id.* (emphasis added). The term "other business" is just as broad as the term "other duties" in the sentence before it. So if Defendants are correct that "[t]here is no ambiguity in

2

'other duties, as he may deem proper,'" MTD 30, then there also is no ambiguity in "other business, as he may deem expedient," D.C. Code § 49-102, and troops could be sent on law enforcement missions at the whim of their individual commanders. Like other aspects of the text, this problem illustrates how badly Defendants have misread the two words on which their case depends.

Every effort to marshal support for Defendants' reading falls flat. The executive order they cite does not say what they claim. The two memos on which they rely from the Justice Department's Office of Legal Counsel are unpersuasive and virtually devoid of reasoning. The D.C. Code's recognition that the Guard may be used "to aid the civil authorities in the execution of the laws," D.C. Code § 49-404, does not support their extraordinary reading of "other duties." Instead, it is explained by the existence of a different provision that expressly authorizes troops to enforce the laws—in response to riots and mobs, and only upon request by local authorities. *See* D.C. Code § 49-103. Nor does any inherent presidential power legitimize Defendants' actions, despite their brief gestures to the contrary.

**2.** Just as Defendants lack authority to convert the D.C. National Guard into a supplemental police force, they also lack authority to bring troops from other jurisdictions into the District to participate in that effort. Their claim of statutory authority on this second point is eerily familiar and just as flimsy.

Defendants insist that a few words from 32 U.S.C. § 502, titled "Required drills and field exercises," gives presidents the power to use a willing state's National Guard for any activity the President might devise. That is not hyperbole but Defendants' explicit position. According to them, not only does Section 502 allow governors to send their troops into another jurisdiction at the President's behest, but "nothing" in the statute "limits the types of missions that the President

and Secretary of Defense can request." MTD 23. So long as a compliant governor lends troops, the National Guard may be sent anywhere to do anything the President orders.

The provision on which Defendants base this staggering claim, however, simply requires National Guard troops to "assemble for drill and instruction" and to "participate in training at encampments, maneuvers, outdoor target practice, or other exercises," 32 U.S.C. § 502(a), as well as to perform "training or other duty in addition to" those just mentioned, *id.* § 502(f)(1). This additional "training or duty" may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." *Id.* § 502(f)(2)(A). The reference to "operations or missions" here cannot support the immense power that Defendants try to wring from it.

To start, because Defendants' use of the D.C. National Guard as a crime-fighting force is illegal, it is not a valid "operation or mission" for which out-of-state troops may be ordered to perform duties under Section 502(f)(2).

Furthermore, every interpretive canon that precludes Defendants' broad reading of "other duties" in the D.C. Code applies with equal force here, where Defendants' reading ignores surrounding context while exemplifying the mistake of claiming broad and unusual authority from vague terms or ancillary provisions.

What is more, Defendants' use of Section 502—if permitted—would allow presidents to evade the requirements and restrictions of the Insurrection Act, the Posse Comitatus Act, and numerous other statutes. Congress has expressly authorized military participation in law enforcement under various laws but has always imposed conditions and limits on that authority. Defendants' maneuver sidesteps those limits: instead of federalizing the National Guard, invoking the Insurrection Act, or employing similar statutes on the terms Congress has set, future

presidents could simply rely on ideologically aligned governors to deploy military force domestically at will.  It is inconceivable that Congress allowed this simply by adding the "operations or missions" provision to a statute focused on drills and field exercises.

Worse, Defendants' new tactic opens a dangerous accountability gap that Congress cannot have intended.  By Defendants' own telling, the out-of-state troops who are patrolling the District to combat law breaking are entirely outside the "disciplinary or administrative authority" of any local officials, including the D.C. National Guard, the District's local government, and even the President.  MTD 24 (quoting Decl. of Colonel Lawrence M. Doane, ¶ 9 (Docket No. 34-1)).  These armed forces instead are said to remain under the "command and control" of their own governors, *id.*, who, troublingly, come entirely from the President's own political party and openly express disdain for the District's elected leaders while professing fealty to the President. *See* Amicus Br. of South Carolina et al. at 3, 9 (Dkt. No. 36).

Congress did not sanction this powder keg of a situation, in Section 502(f) or in any other statute.  Because Defendants have no lawful authority for their unprecedented actions, their Motion to Dismiss should be denied.

## ARGUMENT

### I.    Defendants Have No Authority to Use National Guard Troops to Police the District of Columbia.

Any power claimed by the President "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Yet Defendants offer no credible basis—statutory or constitutional—for assigning crime-fighting duties to National Guard troops in the District of Columbia.

**A.      The President Lacks Inherent Constitutional Authority to Use the National Guard for Crime Reduction.**

The Constitution does not give presidents inherent power to employ National Guard troops to fight crime in the District of Columbia.  Defendants do not seriously contend otherwise, and for good reason.  Congress, not the President, has the constitutional authority to "provide for calling forth the Militia to execute the Laws of the Union."  U.S. Const. art. I, § 8, cl. 15.  And Congress has "exclusive" authority to legislate over the District.  *Id.* art. I, § 8, cl. 17.

Even the Department of Justice's Office of Legal Counsel, while suggesting that presidents may have inherent authority "to use troops for the protection of federal property and federal functions" like delivering the mail, has distinguished such "essentially protective duties" from "law enforcement duties."  *Authority to Use Troops to Prevent Interference with Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Supp. Op. O.L.C. 343, 344 (1971); *accord* Memorandum for the Deputy Attorney General, from Mary C. Lawton, Deputy Assistant Attorney General, OLC, *Re: Law Relating to Civil Disturbances* 5 (Jan. 6, 1975) (differentiating the "protective purpose" of safeguarding "Federal property" and "the performance of Federal functions" from any broader authority to use the Guard for "enforcement of Federal law").

That is why OLC itself has indicated that any authority to use the National Guard in the District of Columbia for "law enforcement" or to quell "a disorder" must derive from statute.  *Id.* at 5-6, 9-10.  While presidents may have inherent authority "to use troops to protect a foreign embassy from demonstrators in order to carry out the [nation's] treaty obligations," OLC has explained, it "is doubtful that troops could be used on regular guard duty at embassies in this country or could be used to protect against crimes, such as burglary," or for other duties that "involve criminal law enforcement."  *Id.* at 10.  In response to anticipated unrest or obstruction

of federal functions, OLC has opined, "troops may be used to cordon off the White House" or "safeguard bridges used by federal workers to enter the city," but "the role played by the military should be limited to protection, not affirmative law enforcement." *Id.* at 10-11.  And "if serious violence occurs beyond the control of police," any use of the National Guard that goes beyond these protective functions must rest on statutory authority.  1 Supp. Op. O.L.C. at 344-45.

The Department of Defense has also long distinguished law enforcement from protecting federal property and functions—and has agreed that law enforcement requires statutory authority.  *See* Mem. from Mary C. Lawton, OLC, *supra*, at 10 (describing the Department's position that Title 10 must be invoked to use troops for activities that "involve criminal law enforcement"); *Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 91 n.2 (1989) ("We have been informed by the Department of Defense that '[t]he D.C. National Guard, like the State and Territorial National Guards, may normally be called into federal service for civil law enforcement purposes only pursuant to [Title 10].'").

To be sure, in a footnote with no analysis, OLC also briefly suggested that because the D.C. Code is federal law, the President may have inherent constitutional authority "to use any forces at his command" to carry out—it seems—any D.C. law.  *Id.* at 93 n.6.  If taken seriously, that view would allow presidents to use any military personnel (not just the National Guard) anywhere in the country (not just in the District of Columbia) to carry out any federal law.  OLC's only citation for that remarkable suggestion, *In re Neagle*, 135 U.S. 1 (1890), at most "may stand for the proposition that federal law will sometimes preempt a state criminal law when it conflicts with a federal officer's duties."  *Martin v. United States*, 145 S. Ct. 1689, 1701-02 (2025).  Even if *Neagle* were relevant, it "does not speak to a situation where . . .

Congress has entered the field," *id.* at 1702, as Congress has done with respect to military participation in law enforcement.

In short, as even the executive branch has recognized, there is no inherent constitutional authority supporting Defendants' use of the National Guard to reduce crime. Any power here must come from statute. And such power is sorely lacking, as discussed below.

### B. The President Lacks Statutory Authority to Use the National Guard for Crime Reduction.

#### 1. *Statutory Context and Basic Interpretative Principles Refute Defendants' Reading of the D.C. Code.*

It is obvious that no statute "expressly authorizes the President," *Youngstown*, 343 U.S. at 585, to use National Guard troops for law enforcement. Nor is there any statute "from which such a power can fairly be implied." *Id.*

Defendants muster just one "specific statutory authority," MTD 18, that they seriously contend offers support for their position: D.C. Code § 49-102 ("Prescribing drills"). But for many reasons, that will not do. Here is what that section says in full:

> The Commanding General shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard, and may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper. The commanding officer of any regiment, battalion or company may also assemble his command, or any part thereof, in the evening for drill, instruction, or other business, as he may deem expedient; but no parade shall be performed by any regiment, battalion, company, or part thereof, without the permission of the Commanding General.

It does not take a sophisticated reader to grasp the implausibility of these words allowing armed troops to patrol the breadth of the District on a daily basis with a mission to "lower the crime rate." Memorandum for the Secretary of the Army from Pete Hegseth, Secretary of Defense, at 1 (Aug. 20, 2025) (Dkt. No. 34-1). The two words on which Defendants' entire case rests, "other duties," lack the vast meaning ascribed to them.

"Over and over," the Supreme Court has "stressed that [i]n expounding a statute, we must not be guided by a single . . . member of a sentence, but look to the provisions of the whole law." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (quotation marks omitted).  Because "associated words bear on one another's meaning," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 168 (2012), interpretation demands "[l]ooking at the provision as a whole, rather than focusing on two words in isolation," *United States v. Texas*, 599 U.S. 670, 697 (2023) (Gorsuch, J., concurring in the judgment).

The way to interpret a general term like "other duties," D.C. Code § 49-102, "is to look for guidance from whatever examples come before it," *Fischer v. United States*, 603 U.S. 480, 487 (2024).  "[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'"  *Id.* (citation omitted).  That approach avoids "ascribing to one word a meaning so broad that it is inconsistent with the company it keeps."  *Id.* (quotation marks omitted).  More specifically, "under the related canon of *ejusdem generis*, a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes [of terms] that precede it."  *Id.* (quotation marks omitted).

The phrase on which Defendants rely—"drills, inspections, parades, escort, or other duties," D.C. Code § 49-102—is "a list of specific items separated by commas and followed by a general or collective term."  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008).  The *ejusdem generis* canon governs formulations like this, "when a drafter has tacked a catchall phrase at the end of an enumeration of specifics, as in *dogs, cats, horses, cattle, and other animals*."  Scalia & Garner, *supra*, at 199.  This canon "implies the addition of *similar* after the word *other*," *id.*, as in "other similar animals," or, here, "other similar duties."  Courts have

applied this rule "to all sorts of syntactic constructions that have particularized lists followed by a broad, generic phrase." *Id.* at 200. Such holdings "are legion." *Id.* at 201.

Defendants' reading runs headlong into these principles. They ascribe a meaning to "other duties" that renders the term completely unlike what precedes it: "drills, inspections, parades, escort." D.C. Code § 49-102. Two of those words pertain to military training ("drills, inspection"); one refers to a purely ceremonial duty ("parades"); and one refers to a largely ceremonial duty that simply involves accompanying designated persons as they travel from one place to another ("escort"). But Defendants read the catchall term "other duties" as grounds to establish a supplemental police force with power to "assist law enforcement," Decl. of Colonel Lawrence M. Doane, ¶ 6 (Docket No. 34-1), identify perceived crimes, *id.* ¶ 7, look out for "suspects," *id.* ¶ 12, and physically detain people against their will, *id.* ¶ 7. Further, if Defendants' arguments were correct, troops could be authorized to do much more, including making formal arrests, searching homes, conducting interrogations—the list goes on. Such activities are "so dissimilar from the previously enumerated examples" that they cannot plausibly be within the scope of the general phrase that follows. *Fischer*, 603 U.S. at 489.

In short, the term "other duties" in § 49-102 "does not stand alone, but gathers meaning from the words around it." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961). The way to construe that term is to "[c]onsider the listed elements, as well as the broad term at the end, and ask what category would come into the reasonable person's mind." Scalia & Garner, *supra*, at 208. A reasonable person would not think that using the Guard to conduct roving crime-fighting patrols fits within the same category as "drills, inspections, parades, escort." D.C. Code § 49-102.

For this reason, even OLC has advised against relying on the interpretation of § 49-102 that Defendants advocate. After a decision was made to use National Guard troops to supplement the police in "handling the crowd that [was] expected to participate" in the historic March on Washington in 1963, a question arose about court-martialing troops who might refuse to serve in this mission. OLC advised against relying on the term "other duties" in § 49-102 as authority for this planned use of the Guard, recognizing the risk that "such a construction would not be sustained by the courts." Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant Attorney General, OLC, *Memorandum Concerning the Amenability of Members of the National Guard of the District of Columbia to Courts-Martial* 3 (Aug. 9, 1963). As OLC explained, "the term 'other duties', as that term is used in Section 44, might be construed by the courts *in pari materia* with the other terms used in that section which relate primarily to drill- and training-type activities as distinguished from the aid-to-civil-authorities-type activities expressly covered by Section 48." *Id.* [2]

Numerous additional aspects of the text confirm that the term "other duties" in Section 49-102 cannot have the broad meaning that Defendants assert. First, the reference to "drills, inspections, parades, escort, or other duties" comes after language in the same sentence making unmistakably clear the limited focus on training and ceremonial functions: "The Commanding General *shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard*, and may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper." D.C. Code § 49-102 (emphasis added). As this additional reference to "drills" and "parades" underscores,

---

[2] The "Section 48" referred to here, which "expressly" governs "aid-to-civil-authorities-type activities," *id.*, is now codified as D.C. Code § 49-103 and addresses the suppression of riots at the request of local officials. Defendants do not invoke that provision here.

Section 49-102 addresses only "drill- and training-type activities."  Mem. from Norbert A. Schlei, OLC, *supra*, at 3.

Moreover, Section 49-102 empowers the Guard's *Commanding General*—not the President—to order troops to perform "other duties."  D.C. Code § 49-102.  Under Defendants' reading, the Commanding General, on his own whim, could order the Guard's troops to fight crime across Washington, D.C., on an ongoing basis, whether by patrolling the city, detaining suspects, and collaborating with the police force—as troops are doing now—or by making formal arrests, searching homes, and carrying out other law enforcement tasks the Commanding General might order in the future.

If that were not implausible enough, the further implication of Defendants' reading is that *any* of the Guard's commanding officers—by themselves—may deploy their own troops for whatever law enforcement activities they deem appropriate.  The second half of Section 49-102 says: "The commanding officer of any regiment, battalion or company may also assemble his command, or any part thereof, in the evening for drill, instruction, *or other business*, as he may deem expedient."  D.C. Code § 49-102 (emphasis added).  The term "other business" is just as capacious as the term "other duties" in the previous sentence.  Defendants cannot credibly maintain that "other business" is limited by the antecedent reference to "drill, instruction," because they deny that same point when it comes to the term "other duties" in the previous sentence.  If Defendants are correct that "[t]here is no ambiguity in 'other duties, as he may deem proper,'" MTD 30, then there is also no ambiguity in "other business, as he may deem expedient," D.C. Code § 49-102.

Notably, too, the *only* textual limit on the discretion of commanding officers with respect to "other business" is that "no parade shall be performed . . . without the permission of the

Commanding General." *Id.* One could hardly ask for a clearer indication that this sentence is directed exclusively at ceremonial and training functions, not at detentions, armed patrols, apprehension of suspects, or other law enforcement activities. And there is no plausible textual basis for treating the prior sentence any differently.

By reading two vague words in a manner that does violence to the entire surrounding context, Defendants violate the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quotation marks omitted). Congress normally does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), or grant "broad and unusual authority" through "vague terms or ancillary provisions," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). There is no reason to think Congress did so here.

### 2. There Is No Persuasive Support for Defendants' Reading.

None of Defendants' efforts to justify their acontextual reading of "other duties" is persuasive.

First, Defendants highlight a different part of the D.C. Code, Section 49-404, which recognizes that the Guard may be used "to aid the civil authorities in the execution of the laws." MTD 6 (quoting D.C. Code § 49-404). But no one disputes that the D.C. Code allows the Guard to aid civil authorities in the execution of the laws—under Section 49-103, which Defendants have not invoked here (and could not). The existence of Section 49-103 fully explains the reference to aiding the civil authorities in Section 49-404. Nothing about Section 49-404 suggests the existence of some additional authority to execute the laws beyond what 49-103 provides.

13

The similar phrasing of the two sections makes this clear.  Section 49-404, on which Defendants rely, exempts the enrolled militia from any duty "except when called into the service of the United States, or to aid the civil authorities *in the execution of the laws or suppression of riots*."  D.C. Code § 49-404 (emphasis added).  Compare this language with Section 49-103 ("Suppression of riots"), which provides for requesting aid "in *suppressing such violence and enforcing the laws*" when there is a tumult, riot, or mob.  *Id.* § 49-103 (emphasis added).

The link between these two sections is even more obvious in the original statute creating the D.C. National Guard.  *See* An Act to Provide for the Organization of the Militia of the District of Columbia, ch. 328, 25 Stat. 772 (1889).  That statute contains not only the language quoted above, *see id.* §§ 4, 45, 25 Stat. at 773, 778, but also another section that similarly mentions the Guard being required "for the suppression of riots, or to aid civil officers in the execution of the laws," *id.* § 10, 25 Stat. at 774.  In that section, "suppression of riots" is paired with aiding civil officers "in the execution of the laws," *id.*, unmistakably referring to the almost identical language in what is now codified as Section 49-103, *see id.* § 45, 25 Stat. at 778.  And right after the section that is now 49-103, yet another provision refers to troops being "ordered on duty to aid the civil authorities."  *Id.* § 46, 25 Stat. at 778.  In context, that language clearly refers to the section immediately before it—the predecessor to 49-103.  The upshot is that, under both the original statute and the modern D.C. Code, references to the Guard aiding the execution of the laws are textually connected with Section 49-103.  They do not refer to some other, atextual law enforcement power.

Defendants also rely on Executive Order 11485, but, among other problems, they omit part of the sentence they quote, which authorizes the use of the National Guard to aid the civil authorities "under title 39 of the District of Columbia Code."  Exec. Order No. 11485, § 1, 34

Fed. Reg. 15411 (Oct. 3, 1969). That sentence does not purport to supply any authority beyond the terms of the D.C. Code. On the contrary, it underscores that the D.C. Code's statutory provisions are the *sole* legal authority under which the National Guard may be used "to aid civil authorities," *id.*, by assisting with "law enforcement," *id.* § 2.

Finally, Defendants cite OLC's supposedly "longstanding interpretation" that the term "other duties" encompasses law enforcement activities. MTD 30. But neither of the OLC memos that Defendants cite is remotely persuasive. The 1963 memo simply asserts that the language "parades, escort, or other duties, as he may deem proper" is "broad enough to be construed as authorizing the commanding general to use the National Guard to support activities of the civilian police force during any massive demonstration or parade in the District." Norbert A. Schlei, Assistant Attorney General, OLC, *Re: Authority to Use the National Guard of the District of Columbia to Supplement Civilian Police Force Activities During a Massive Demonstration or Parade in the District of Columbia* 2 (July 30, 1963). The sum of the memo's reasoning is that, because the President is in charge of the D.C. Guard, "it would certainly not seem inappropriate for the President to request or urge the commanding general to use the National Guard in support of activities of the District of Columbia police whenever he feels that the welfare, safety, or interest of the public would be served thereby." *Id.* at 3. That casual remark lacks any serious analysis of text, structure, or context. And only a week later, OLC itself warned against relying on this interpretation in court. *See supra* at 11.

As for the 1989 OLC memo, its cursory discussion is no more persuasive. Again citing Section 49-102, the memo simply asserts, without analysis, that "other duties" covers law enforcement, offering only the 1963 memo as support. 13 Op. O.L.C. at 93. Implausibly claiming that its gloss on "other duties" is the "natural reading" of the statute, *id.*, the memo fails

15

even to acknowledge the avalanche of textual considerations weighing against that view. OLC then asserts that its reading "is especially appropriate" in light of Section 49-404, "which makes it clear that the National Guard . . . may be 'called . . . to aid the civil authorities in the execution of the laws.'" *Id.* (quoting former D.C. Code § 39-602). But as explained above, the D.C. Code permits the Guard to aid civil authorities in the execution of the law only under Section 49-103, which Defendants do not even attempt to invoke here.

* * *

If "other duties" confers the power that Defendants claim, Section 49-102 provides no limiting principle to temper that power. And Defendants do not even try to identify any limit. Instead, they suggest that the President "does not need specific statutory authority" for what they are doing. MTD 18. But being Commander in Chief of the D.C. National Guard does not make the President the Commander in Chief of the District of Columbia. Congress ultimately decides what law governs in the District, and it has enacted nothing that even plausibly allows presidents to use the National Guard as a roving crime-reduction force.

## II. Defendants Have No Authority to Use Troops from Other Jurisdictions to Police the District.

No statutory authority permits Defendants to use other jurisdictions' National Guards to reduce crime in the District of Columbia either. Defendants' reliance on 32 U.S.C. § 502(f)(2) for this authority is déjà vu all over again. Citing a nondescript reference to "operations or missions," tucked at the end of a provision titled "drills and field exercises," Defendants claim stunningly broad leeway to use military power for domestic law enforcement—and apparently for anything else.

Section 502 does not plausibly confer the unbounded power Defendants claim. It requires National Guard components to "assemble for drill and instruction" and to "participate in

training at encampments, maneuvers, outdoor target practice, or other exercises." *Id.* § 502(a).

Subsection (f) allows troops to be ordered "to perform training or other duty in addition to" the

duties just mentioned. *Id.* § 502(f)(1). This additional "training or duty" may include:

> (A) Support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense.
>
> (B) Support of training operations and training missions assigned in whole or in part to the National Guard by the Secretary concerned, but only to the extent that such training missions and training operations—
>
>> (i) are performed in the United States or the Commonwealth of Puerto Rico or possessions of the United States; and
>>
>> (ii) are only to instruct active duty military, foreign military . . . , Department of Defense contractor personnel, or Department of Defense civilian employees.

*Id.* § 502(f)(2). Defendants assert that "operations or missions undertaken . . . at the request of

the President," *id.* 502(f)(2)(A), can cover *anything*. Literally. They say that "nothing in Section

502(f) limits the types of missions that the President and Secretary of Defense can request."

MTD 23. So long as a willing governor lends troops, the National Guard may be sent anywhere

to do anything the President orders.

One can scarcely imagine a bigger elephant crammed into a smaller mousehole. *See*

*Whitman*, 531 U.S. at 468. Defendants' reading is the poster child for "broad and unusual

authority" wrested from "vague terms or ancillary provisions." *Gonzales*, 546 U.S. at 267. It is

unsustainable for many reasons.

To start, using the District's own National Guard to fight crime in Washington, D.C., is

unlawful, as discussed earlier. *See supra* Part I. As a result, this unlawful effort is not a valid

"operation or mission" for which out-of-state troops may be ordered to perform duties under

Section 502(f). *Cf.* Decl. of Donald Snider ¶ 12 (Dkt. No. 34-3) (explaining that "[t]he D.C.

National Guard is the lead National Guard unit that is augmented by National Guard units from several states").

In addition, every statutory canon that dooms Defendants' reading of "other duties" in the D.C. Code speaks with equally decisive force to "operations or missions" here. *See supra* at 9-10. The surrounding context leaves no doubt that these three words, placed where they are in this statute, cannot possibly confer the kind of sweeping authority that would allow governors to order military forces into another jurisdiction to perform policing tasks at the behest of the President or Secretary of Defense. That may be why no President has ever used Section 502(f)(2) in this way, except when President Trump decided to respond to the Black Lives Matter protests in 2020 by importing thousands of out-of-state troops. *See* Paul Sonne et al., *Pentagon Disarms National Guard Activated in D.C., Sends Active-Duty Forces Home*, Wash. Post (June 5, 2020).

Critically, Defendants' reading of Section 502(f)(2) would allow presidents to evade the requirements and restrictions of the Insurrection Act, 10 U.S.C. § 251 *et seq.*, the Posse Comitatus Act, 18 U.S.C. § 1385, and multiple other statutes that address in precise terms the use of the military for law enforcement. That cannot be what Congress intended when (f)(2) was added to Section 502 in 2006, and it certainly is not what the provision says. Yet under Defendants' approach, a President with sympathetic governors on his side could easily dodge the prohibition on willfully using the military "to execute the laws" without express authorization. 18 U.S.C. § 1385. Likewise, a President could freely exploit National Guard forces without federalizing them by making the required finding that "unlawful obstructions, combinations, or assemblages" have made it "impracticable to enforce the laws of the United States." 10 U.S.C. § 252. Nor would the President need an "insurrection," or a request to help suppress it from a

state's legislature, *id.* § 251, before sending a different state's National Guard troops into that state to execute the law, enforce order, or perform whatever other "operations or missions" the President might devise, 32 U.S.C. § 502(f)(2)(A).

Instead, the President could send troops anywhere for whatever reason he wished. He would not have to stay within the parameters of the laws that expressly allow him, under specific conditions, to use military force to ensure "the execution of the laws." 10 U.S.C. § 253(1); *see id.* § 12406. Although Congress has gone to the trouble, in numerous statutes, of authorizing military participation in law enforcement, *e.g.*, 10 U.S.C. § 284(a); 32 U.S.C. § 112(b), and although Congress has invariably placed limits and bounds on that authority, *e.g.*, 32 U.S.C. § 112(c); 10 U.S.C. § 284(b), § 284(g)(2), § 275, § 254, those statutes and their limits could be sidelined whenever compliant governors were willing to lend their troops to the President's agenda. Instead of federalizing the National Guard, invoking the Insurrection Act, or employing similar statutes on the terms Congress has set—as past presidents have done—future presidents could simply rely on ideologically aligned governors to deploy military force domestically at will.

All of this is even more implausible as a valid interpretation of Section 502(f)(2) because of the dangerous accountability gap that would follow. By Defendants' own telling, the armed troops they have brought in to patrol the District are under the "command and control" of their own states. Doane Decl., *supra*, ¶ 9. It is undisputed that the D.C. National Guard, like the District's local government, "has no disciplinary or administrative authority over these forces." *Id.*; *see* MTD 23-24. So Defendants' position is this: the President may order a willing governor's troops into any state, for any type of mission—which can involve law enforcement activities like detentions, arrests, searches, or interrogations—while these troops remain entirely

outside the "disciplinary and administrative authority" of the both the President and the jurisdiction in which they are operating, as well as outside the limits set by the Posse Comitatus Act and other statutes.

That the President must rely on the acquiescence of a sympathetic governor for these troops hardly makes this reading of Section 502(f) more credible. *Contra* MTD 23. If anything, things become only more fraught when a President can solicit troops controlled by allied politicians and send them to police jurisdictions whose residents are less loyal to the President and his policies. Strikingly, only Republican governors have chosen to lend their troops for President Trump's operation, *see* Alex Horton, *National Guard Documents Show Public "Fear," Veterans' "Shame" Over D.C. Presence*, Wash. Post (Sept. 10, 2025), much like five years ago during the Black Lives Matter protests, *see* Sonne, *supra*. In their *amicus* brief filed here, these governors freely disparage the District's elected officials while professing fealty to President Trump. *See* Amicus Br. of South Carolina et al. at 3, 9 (Dkt. No. 36). In short, thanks to Defendants' new means of procuring military power untethered by statutory constraints, politicians are sending armed soldiers into another American jurisdiction while aiming hostility and partisan vitriol at its leaders. The notion that Congress sanctioned this disturbing result simply by adding the "operations or missions" clause to the tail end of a statute devoted to "drills and field exercises" is implausible.

Even if Defendants' boundless reading of "operations or missions" were credible in isolation, the interpretive task is "to fit, if possible, all parts into an harmonious whole," *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quotation marks omitted), and to avoid making any statutory provisions "utterly ineffectual," *Abramski v. United States*, 573 U.S. 169, 181 (2014). The limitless (and dangerous) new authority that Defendants claim to find in

Section 502(f)(2) sets that provision at odds with numerous other statutes in which Congress has carefully spelled out the conditions under which presidents may use military power for domestic law enforcement.

Because Defendants have no legal authority to bring National Guard troops from other jurisdictions to police the District of Columbia—or to use the District's own National Guard for that purpose—this case should be allowed to proceed.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied.

Respectfully submitted,

Dated: October 7, 2025

/s/ Brianne J. Gorod
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org