**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DISTRICT OF COLUMBIA

v.

DONALD J. TRUMP, *et al.*,

Case No. 1:25-cv-3005 (JMC)

**BRIEF OF THE STEADY STATE AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF DISTRICT OF COLUMBIA'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Gregory S. Smith (DC Bar No. 472802)
Law Offices of Gregory S. Smith
913 East Capitol Street, S.E.
Washington, D.C. 20003
Telephone: (202) 460-3381
gsmith@dctriallawyers.com
*Lead Attorney to be Noticed, The Steady State*

Steven Cash (DC Bar No. 502439)
7707 MacArthur Boulevard
Cabin John, MD 20818
Telephone: (212) 685-9660
cashs@thesteadystate.org
*Executive Director, The Steady State*

i

## TABLE OF CONTENTS

INTERESTS OF *AMICUS CURIAE* ............................................................. 1

ARGUMENT AND CITATION OF AUTHORITIES ................................................... 2

    A.  Overview of Executive Deployment of the Military for Domestic Purposes ............... 2

    B.  Recent Events Have Accelerated and Amplified Authoritarianism Concerns.............. 7

        1.  Recent Trump Administration Attempts to Unlawfully Redefine the Military ....... 8

        2.  Recent Expansions of National Guard Deployments for Domestic Purposes ....... 11

        3.  Recent Elimination of DOJ Guardrails and Potential Legal Mischief Inherent in Designation of Amorphous "Antifa" as a "Domestic Terrorst Organization" . 19

        4.  Recent Accelaration of Executive Overreach and Growing Authoritarianism...... 23

CONCLUSION ................................................................................... 25

CERTIFICATE OF COMPLIANCE WITH TYPEFACE & LENGTH LIMITS ....................... 26

CERTIFICATE OF SERVICE .................................................................... 26

# TABLE OF AUTHORITIES

Page

## CASES

*Dames & Moore v. Regan,* 453 U.S. 654 (1981) ................................................................ 2

*Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010) ............................................ 21, 22

*Newsom v. Trump,* No. 3:25-cv-04870-CRB (N.D. Cal. 2025), ECF #166-1 ................... 7

*Nixon v. Administrator of General Services,* 433 U.S. 425 (1977) .................................. 2

*Oregon v. Trump,* No. 3:25-cv-1756 (D. Ore. 2025), ECF #56 ....................................... 17

*United States v. Nixon,* 418 U.S. 683 (1974) ................................................................... 2

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) (Jackson, J., concurring) ............................ 2, 3, 4, 5, 6, 7, 8, 9, 10, 25


## STATUTES

10 U.S.C. § 12406 .............................................................................................................. 6

18 U.S.C. § 2331(5) ........................................................................................................... 22

46 U.S.C. § 552(a) ............................................................................................................. 8

Authorization for Use of Military Force of 2001, Pub. L. 107-40, 115 Stat. 224 .............. 9

National Security Act of 1947, Pub.L. 80-253, 61 Stat. 495 (codified as amended in 50
U.S.C.) .......................................................................................................................... 4, 8


## OTHER SOURCES AND AUTHORITIES

### United States Government Publications

*"U.S. Department of War", Transcript:  Secretary of War Pete Hegseth Addresses
Generals and Flag Officers at Quantico, Virginia, Sept. 30, 2025,*
*https://www.war.gov/News/Transcripts/Transcript/Article/4318689/secretary-of-war-
pete-hegseth-addresses-general-and-flag-officers-at-quantico-v/* .................................. 10

*Additional Measures To Address the Crime Emergency in the District of Columbia, E.O.
14339, 90 FR 42121 (Aug. 28, 2025)* ............................................................................ 19

*Journal and Law Review Articles*

Hon. William H. Rehnquist, *Robert H. Jackson: A Perspective Twenty-Five Years Later,*
44 Albany L. Rev. 539 (1980) ......................................................................................................3

Gerard N. Magliocca, *The Untold Story of Robert H. Jackson's Youngstown*
*Concurrence,* 50 J. of S. Ct. Hist. No. 1 (2025) ......................................................................2, 3

*Magazine and News Articles*

Eli Stokols and Josh Gerstein, *Former GOP Officials Fear US Strikes on Alleged Drug*
*Smugglers Aren't Legal,* Politico, Sept. 16, 2025,
https://www.politico.com/news/2025/09/16/trump-gop-officials-strikes-venezuela-
00567212........................................................................................................................9, 10

Chris Hippensteel, *Trump is Expanding the National Guard's Role.  Some Former*
*Generals Worry,* New York Times, Sept. 21, 2025,
https://www.nytimes.com/2025/09/21/us/national-guard-crime-washington-cities.html..12, 13, 16

Alex Horton, *National Guard Documents Show Public "Fear," Veterans' "Shame" Over*
*D.C. Presence,* Washington Post, Sept. 10, 2025,
https://www.washingtonpost.com/national-security/2025/09/10/national-guard-trump-dc/ ........12

Hyung-Jin Kim and Kim Tong-Hyung, *Yoon Suk Yeol removed as South Korea's*
*president over short-lived martial law,* Associated Press, April 5, 2025,
https://apnews.com/article/south-korea-martial-law-yoon-constitutional-court-
8cdcf4944c2e3cd9edf723bc29ba51ff...............................................................................15

Sarah McCammon, Ryan Lucas and Alex Korma, *Trump says D.C. is Now "Crime*
*Free." What's the Reality?* NPR Sept. 3, 2025, https://www.npr.org/2025/09/03/nx-s1-
5526908/trump-says-d-c-is-now-crime-free-whats-the-reality ............................................15

Ben Mause, *DC goes without $1B in public safety funds as Trump's takeover continues,*
Baltimore Sun, Aug. 15, 2025, https://www.baltimoresun.com/2025/08/15/dc-goes-
without-1b-in-public-safety-funds-as-trumps-takeover-continues/....................................15

Alex Gangitano and Ella Lee, *Trump prods at Chicago Takeover as legal, political*
*challenges loom,* The Hill, Sept. 4, 2025, https://thehill.com/homenews/5484929-trump-
chicago-national-guard/ .......................................................................................................16

Tom Polansek and Ted Hesson, *Trump Administration says it launches ICE crackdown*
*in Illinois,* Reuters, Sept. 9, 2025, https://www.reuters.com/world/us/trump-
administration-says-it-launches-ice-crackdown-illinois-2025-09-08/ ...............................16

Dietrich Knauth and Phil Stewart, *US judge blocks Trump from sending any National*
*Guard troops to Portland for now,* Reuters, Oct. 6, 2025,
https://www.reuters.com/world/us/newsom-says-he-will-sue-trump-sending-california-
national-guard-oregon-2025-10-05/......................................................................................17

Jenna Prestininzi, *Trump advisor Stephen Miller cites "plenary" authority. What does he mean?*, Detroit Free Press, Oct. 8, 2025, https://www.freep.com/story/news/local/michigan/2025/10/08/plenary-authority-donald-trump-adviser-stephen-miller-military/86579198007/ ...................................................17

Jon Seidel and Tina Sfondeles, *Federal judge hits Trump administration credibility in siding with city and state against National Guard deployment*, Chicago Sun-Times, Oct. 10, 2025, https://chicago.suntimes.com/donald-trump/2025/10/09/federal-judge-set-to-hear-arguments-in-high-stakes-national-guard-hearing .......................................................17

Emily Schmall, Andrea Shalal and Joseph Ax, *Trump's threat to invoke Insurrection Act escalates showdown with Democratic cities*, Reuters, Oct. 8, 2025, https://www.reuters.com/world/us/trumps-threat-invoke-insurrection-act-escalates-showdown-with-democratic-cities-2025-10-07/ ...............................................................17

Luke Broadwater and Emily Cochrane, *Trump Signs Off on Sending the National Guard to Memphis*, New York Times, Sept. 15, 2025, https://www.nytimes.com/2025/09/15/us/politics/trump-memphis-national-guard-crime.html ...........................................................................................................17

Alex Horton and Tara Copp, *Pentagon Plan Envisions 1,000 Troops for Louisiana Policing Mission*, Washington Post, Sept. 13, 2025, https://www.washingtonpost.com/national-security/2025/09/13/trump-national-guard-louisiana/ ..................................................................................................................18

Leo Sands and Molly Hennessy-Fiske, *Louisiana governor requests National Guard for New Orleans, Baton Rouge*, Washington Post, Sept. 30, 2025, https://www.washingtonpost.com/nation/2025/09/30/louisiana-national-guard-jeff-landry/ ..................................................................................................................................18

John Ismay, Helene Cooper and Eric Schmitt, *Trump Orders Expansion of National Guard's Role in Law Enforcement*, New York Times, Aug. 25, 2025, https://www.nytimes.com/2025/08/25/us/politics/trump-national-guard.html ....................18, 19

Lauren Victory, *37 Arrested in South Shore ICE Raid, DHS Claims it Was Targeting Tren De Aragua Gang Members*, CBS News Oct. 1, 2025, https://www.cbsnews.com/chicago/news/south-shore-chicago-ice-raid-dhs-tren-de-aragua-gang/ ..................................................................................................................19

Jacob Rosen and Joe Walsh, *Judge Who Reviewed James Comey's Indictment Was Confused by Prosecutor's Handling of Case, Transcript Shows*, CBS News, Sept. 26, 2025, https://www.cbsnews.com/news/judge-james-comey-indictment-confusion-trump ...........20

Jonah E. Bromwich, *A Closer Look at the Counts in the Letitia James Indictment.*, New York Times, Oct. 9, 2025, https://www.nytimes.com/2025/10/09/us/politics/letitia-james-indictment-charges.html .......................................................................................................20

*Thomas E. Brzozowski, You Can't Designate "Antifa." Banks and Platforms Will Act
Like You Did Anyway, Lawfare, Oct. 1, 2025, https://www.lawfaremedia.org/article/you-
can-t-designate--antifa--banks-and-platforms-will-act-like-you-did-anyway* .................................21

*Katie Rogers and Zolan Kanno-Youngs, White House Plans Broad Crackdown on
Liberal Groups, New York Times, Sept. 15, 2025,
https://www.nytimes.com/2025/09/15/us/politics/jd-vance-charlie-kirk-show.html* ......................22

*John Bowden, Kristi Noem Repeatedly Refuses to Say if She Thinks Democrats Should be
Considered Terrorists, The Independent, Sept. 25, 2025,
https://www.independent.co.uk/news/world/americas/us-politics/kristi-noem-democrats-
terrorists-dhs-b2833675.html* ..................................................................................................22

*Bess Levin, Trump Calls Democrats the Party of 'Satan,' Vanity Fair, Oct. 7, 2025,
https://www.vanityfair.com/news/story/trump-calls-democrats-the-party-of-satan-as-
blue-states-are-hit-with-funding-cuts-national-guard-deployments* ........................................22

*Betsy Klein and Donald Judd, Trump takes aim at Antifa – and the Press – in White
House roundtable, CNN, Oct. 8, 2025, https://edition.cnn.com/2025/10/08/politics/antifa-
white-house-roundtable* ..........................................................................................................23

*Megan Lebowitz, Trump says Gov. JB Pritzker and Chicago Mayor Brandon Johnson
"should be in jail," NBC News, Oct. 8, 2025, https://www.nbcnews.com/politics/white-
house/trump-says-gov-jb-pritzker-chicago-mayor-brandon-johnson-jail-rcna236339* ................23

*Thomas B. Edsall, Trump is Not Afraid of Civil War. Neither is Stephen Miller, New York
Times, Oct. 7, 2025, https://www.nytimes.com/2025/10/07/opinion/trump-miller-kirk-
aftermath.html* ........................................................................................................................23

*Garry Kasparov, The Race to Save America's Democracy, The Atlantic, Sept. 28, 2025,
https://www.theatlantic.com/politics/archive/2025/09/putin-trump-elections-
autocrat/684298/* ...............................................................................................................24, 25

*Thomas B. Edsall, Most Americans don't want troops deployed without an external
threat, Reuters/Ipsos poll finds, Reuters, Oct. 8, 2025,
https://www.reuters.com/world/us/most-americans-dont-want-troops-deployed-without-
an-external-threat-reutersipsos-2025-10-08/* ...........................................................................24

*Tom Nichols, The Civil-Military Crisis is Here, The Atlantic, Oct. 7, 2025,
https://www.theatlantic.com/newsletters/archive/2025/10/civil-military-crisis-trump-
hegseth/684486/* .....................................................................................................................25

*Video Footage*

ABC News, *LIVE: Pete Hegseth Speaks on 'Department of War'*, Sept. 5, 2025,
*https://www.youtube.com/watch?v=JWgcndjkUGs*.........................................................................8

Senator Jack Reed, *Reed Rebukes Trump's Military Strike in the Caribbean and
"Department of War" Rebranding*, September 9, 2025,
*https://www.youtube.com/watch?v=ynZ0GwuVYLM*, transcript at
*https://www.reed.senate.gov/news/releases/reed-rebukes-trumps-military-strike-in-the-
caribbean-and-department-of-war-rebranding* ............................................................................8

CBS News, *Watch: Trump gives lengthy address to senior military leaders at Quantico*,
Sept. 30, 2025,  *https://www.cbsnews.com/video/trump-gives-lengthy-address-military-
leaders-quantico/* .................................................................................................................10, 11

*Social Media Posts*

@JDVance, X, Sept. 6, 2025, *https://x.com/JDVance/status/1964341436096057502* .....................9

@realDonaldTrump, *Truth Social*, Sept. 15, 2025,
*https://truthsocial.com/@realDonaldTrump/posts/115210075167747572*.....................................9

@StephenM, X, Oct. 4, 2025, *https://x.com/StephenM/status/1974647432299327904* .................17

**\*Denotes principally relied upon authorities, pursuant to LCvR 7(a).**

Non-party The Steady State, an unincorporated association, is a non-profit, advocacy organization comprised of more than 330 former senior U.S. government officials who have served in positions of responsibility and trust within the Departments of State, Defense, Homeland Security, Justice, in the Intelligence Community, on Congressional staff, and at other institutions. The Steady State respectfully offers this brief as *amicus curiae* in support of Plaintiff, the District of Columbia ("District")'s Opposition to Defendants' Motion to Dismiss.

## INTERESTS OF *AMICUS CURIAE*

The collective careers of *Amicus*' members span decades of service across Republican and Democratic administrations in the Executive, Legislative, and Judicial branches of government. The Steady State's members have served as ambassadors, foreign service officers, intelligence officers, policy advisors, oversight officials, prosecutors, and senior Department of Defense officials. We have dedicated our professional lives to defending American democratic values and the rule of law at home and promoting those values abroad. *Amicus* members have also had extensive experience balancing national security imperatives with the constitutional and legal frameworks that protect individual rights. A key part of *Amicus* members' training and professional ethos is a deep respect for the rule of law as a constraint on their activities. We understand the importance of oversight and adherence to the constitution and laws, and welcome such constraints to ensure the unique skills of such offices are not misused by those in power.

*Amicus*' members have studied, reported on, and confronted the rise of authoritarian regimes across the globe—regimes that frequently misuse military, paramilitary, and intelligence elements to violate the law, suppress lawful dissent, and consolidate power in a political leader. Members of The Steady State have spent most of our careers focused on such threats abroad, dealing with autocracies, dictatorships, and tyrannies, as well as regions that have experienced

democratic backsliding into authoritarianism. Members of The Steady State have served in or worked with the very same military and security elements now being deployed in the District and elsewhere in the United States by the federal Government. We understand how dangerous these institutions can be when not constrained by law and directed solely by the whim of a political leader. We believe our experience gives us a unique perspective that may prove useful to the Court. *Amicus*, in this submission, will attempt to detail how perilous it can be to democracy when the military is used domestically, outside the bounds of the law, and for political purposes.

## ARGUMENT AND CITATION OF AUTHORITIES

Our observations on deployment of the U.S. military domestically as indicators of authoritarian intent and deterrents to democratic activities relate solely to military forces under Presidential control. The deployment of the National Guard or other uniformed armed forces either under the command of state and local authorities, or to provide personnel and technical assistance to state and local authorities, are not addressed herein.

### A.    Overview of Executive Deployment of the Military for Domestic Purposes

Any evaluation of the legality of the actions of President Trump and the other federal Defendants in this case, must begin with Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 649-50 (1952) (Jackson, J., concurring). That opinion was no ordinary concurrence. Unanimous opinions such as *United States v. Nixon*, 418 U.S. 683 (1974) and *Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977) later embraced Justice Jackson's *Youngstown* concurrence, and it was also expressly declared authoritative in an opinion written by Justice Rehnquist in *Dames & Moore v. Regan*, 453 U.S. 654, 661-62 (1981).

"Justice Jackson's 1952 concurrence in *Youngstown* … is [now considered] the founding constitutional text for separation of powers between Congress and the president," Magliocca, *The*

*Untold Story of Robert H. Jackson's Youngstown Concurrence*, 50 J. of S. Ct. Hist. No. 1 at 8 (2025). Chief Justice Rehnquist, who himself had clerked for Justice Jackson when the *Youngstown* concurrence was written, later called the opinion "[a] 'state paper' of the same order as the best of the Federalist Papers, or of John Marshall's opinions for the Court." Rehnquist, *Robert H. Jackson: A Perspective Twenty-Five Years Later*, 44 Albany L. Rev. 539 (1980).

The Steady State's members' collective experiences, studying and spending time in a variety of environments over many decades, reveal that authoritarian regimes historically do not rise so often in sudden bursts, but more typically through incremental changes and erosions of democratic protections. In our experience, such losses of civil rights and liberties increasingly become difficult to reverse and eventually reach a point of no return. Thus, courts must focus not only on immediate risks, but also on the means utilized – as Justice Jackson's *Youngstown* opinion confirms. *See* 343 U.S. at 653 ("I am not alarmed that it would plunge us straightaway into dictatorship, but it is at least a step in that wrong direction.") (Jackson, J., concurring).

The strength of Justice Jackson's separation-of-powers analysis in *Youngstown* drew not merely from his earlier uniquely extensive service as an Assistant Attorney General, Solicitor General, and U.S. Attorney General, but equally from his post-World War II role as the United States' Chief Prosecutor at the Nuremberg Trials. There, Justice Jackson confronted, face-to-face and in open court, the inner machinery of a regime that had weaponized its military and security apparatus in an advanced society to crush lawful dissent, dismantle institutional constraints, and concentrate power in the hands of a single leader. This direct encounter with the legal aftermath of authoritarian rule imbued his *Youngstown* concurrence with a moral clarity few judicial writings have matched. His warning that "comprehensive and undefined presidential powers" carry "grave dangers for the country" was informed by the hard proofs he

had seen and presented at Nuremberg – that such powers, unchecked, can destroy a constitutional democracy from within. *See Youngstown*, 343 U.S. at 634 (1952) (Jackson, J., concurring).

The Steady State's members have, in our own way, also seen many of these same truths. Serving in the national security and intelligence community created by the National Security Act of 1947, ch. 343, 61 Stat. 495 (codified as amended in sections of 50 U.S.C.) – an architecture deliberately designed in the shadow of World War II and tempered by the Cold War – we have worked in many of the same institutions whose integrity is essential to preserving democratic governance. Like Justice Jackson, our professional lives have brought us into direct contact with regimes that may deploy military and security forces to entrench political power, silence dissent, and bypass the rule of law. These experiences – rooted in decades of service as senior defense and intelligence officers, prosecutors, and diplomats – give *Amicus* a perspective uniquely suited to assist the Court in understanding the perils Justice Jackson warned against and why the constitutional limits he championed remain vital to American democracy today.

In his opinion, Justice Jackson emphasized "the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy." *Youngstown*, 343 U.S. at 644 (Jackson, J., concurring). This principle – grounded in the lessons of Nuremberg and carried forward in the design of America's postwar national security structure – remains a vital safeguard against the misuse of military and security institutions for domestic political purposes. Through that lens, informed by the experience of those who have served at the highest levels of that structure, The Steady State now offers this brief in support of the Plaintiff.

As Justice Jackson cogently noted, "[t]he purpose of the Constitution was not only to grant power, but to keep it from getting out of hand." *Id.* at 640 (Jackson, J., concurring). Justice Jackson went out of his way to stress the special risks of a President using military powers for

4

domestic policies: "Congress has forbidden him to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress." *Id.* at 644-45 (Jackson, J., concurring).  While noting how "I should indulge the widest latitude of interpretation to sustain his exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society, … when it is turned inward, not because of rebellion … it should have no such indulgence." *Id.* at 645. And he made clear that it is ultimately up to the Judicial Branch itself to preserve this distinction.  *Id.* at 642 (Jackson, J., concurring) (warning "no doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled … [that he] can vastly enlarge his mastery over the internal affairs of the country").

Jackson's *Youngstown* opinion specifically cited to examples from Weimar Germany, the French Republic, and World War II-era Great Britain.  In France and Great Britain, he noted, emergency powers given to the Executive in wartime had maintained legislative controls, and such "parliamentary control made emergency powers compatible with freedom." *Youngstown*, 343 U.S. at 652.  In Germany, by contrast, despite the new Weimar Constitution being "designed to secure her liberties in the Western tradition, … the President of the Republic, without concurrence of the Reichstag, was empowered temporarily to suspend any or all individual rights if public safety and order were seriously disturbed or endangered." *Id.* at 651 (Jackson, J., concurring).  Those temporal limits on the use of such powers proved utterly inadequate to stem the tide: "This proved a temptation to every government … and in 13 years suspension of rights was invoked on more than 250 occasions.  Finally, Hitler persuaded President Von Hindenburg to suspend all such rights, and they were never restored." *Id.* at 651 (Jackson, J., concurring).

In the instant case, we have seen similar creep.  President Trump's use of ostensibly temporary powers to call the National Guard to operate in the District for 30 days has already been extended, and with more extensions likely.  Temporal limits have proven inadequate.  The Steady State's members' own experiences reinforce and confirm Justice Jackson's conclusion that "emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them." *Id.* at 652 (Jackson, J., concurring).

Justice Jackson also stressed "the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy." *Id.* at 644 (Jackson, J., concurring).  Consistent with Justice Jackson's analysis in *Youngstown*, not only is there a needed separation regarding the use of war powers as an instrument of domestic policy, but also this separation is a foundational tenet of American democracy, rooted in the protections of the Third, Fourth, Fifth, and Sixth Amendments, and with specific limits contained in the Posse Comitatus Act – precluding "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress" any military participation in civilian law enforcement.

Congress has also placed specific limits on the exercise of the war powers at issue here.  Congress, through 10 U.S.C. § 12406, allows a President to federalize the National Guard only when one of the statute's three enumerated conditions is met:  (1) if the United States is "invaded or in danger of invasion by a foreign nation," (2) "there is rebellion or danger of a rebellion against the authority of the Government of the United States," or (3) "the President is unable with the regular forces to execute the laws of the United States." *Id.*  None of those conditions have been met in the District.  And as noted, the Posse Comitatus Act also bars military participation in civilian law enforcement absent a specific Constitutional or statutory exception.

In opposing the Complaint, the Government claims, in part, that a President's decision to deploy the National Guard is unreviewable, a position no Court has accepted. Such efforts to avoid judicial review only heighten the concerns of *Amicus* and its members. If Congress' limits on executive power could be unilaterally declared satisfied and unreviewable based only on a President's linguistic choices, this Court would abdicate its proper role and essentially establish the very Weimar standard Justice Jackson had decried. The security challenges Justice Jackson's Greatest Generation faced were existential, likely exceeding our own, yet he still warned courts to reject any paradigm in which "necessity knows no law." *Youngstown*, 343 U.S. at 646.

The Steady State's members' experiences, not only around the world but as members of the Executive Branch, in service at some of the very institutions most subject to abuse (and which were in the class of "security" institutions Justice Jackson confronted at Nuremberg), lead us to strongly agree with his conclusion that "men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations." *Id.* at 655 (Jackson, J., concurring). And those principles grow more pressing daily, given this Administration's unprecedented, even relentless recent assaults on many of those same institutions put into place to establish checks on Executive power.

**B.  Recent Events Have Accelerated and Amplified Authoritarianism Concerns**

The Steady State previously filed an *amicus curiae* brief in the case challenging President Trump's deployment of the National Guard in Los Angeles. *See* ECF #166-1, *Newsom v. Trump*, No. 3:25-cv-04870-CRB (N.D. Cal.). Deployment of troops there, however, was merely temporary, whereas the President's call-up and recent extension of troops in the District beyond the 30-day statutory period portends a continuous, perhaps even indefinite militarization of our nation's capital. Since then, we have also seen many other disturbing and unprecedented events.

7

The authoritarian risks America now faces are exponentially greater than just two months ago. Taken together, these events raise red flags and reveal ominous challenges our society now faces if troop deployments are continued in American cities for domestic purposes. And this evolving situation now raises far larger issues than simply "preventing another Kent State."

    **1.   Recent Trump Administration Attempts to Unlawfully Redefine the Military**

On September 5, 2025, Secretary of Defense Pete Hegseth stood before President Trump to announce a purported renaming of the Department of Defense as the "Department of War."[1] More than a mere semantic change, Hegseth explained the "War" Department would implement a fundamental change in focus to "lethality" – to a fighting group of "warriors" not tethered to constraints of "legality" he openly castigated as insufficiently "tepid":

> At your direction, Mr. President, the War Department's going to … go on offense, not just on defense. ***Maximum lethality – not tepid legality.*** Violent effect, not politically correct. We're gonna raise up warriors, not just defenders. So this War Department, Mr. President, just like America, is back.

(emphasis added).[2] Around this same time, the renamed "War Department" announced the first of what would be several military strikes against small boats in international waters near Venezuela – killing all 13 civilians aboard. This order, apparently executed by the Navy,[3] was premised on a theory the boat was smuggling drugs for a Venezuelan cartel known as Tren de Aragua ("TdA"), though those facts (as with the other 3 military strikes) are unconfirmed. That

---

[1] The original "Department of War" had been renamed the Department of the Army and consolidated with the Departments of the Navy and Air Force into the National Military Establishment, headed by the Secretary of Defense, pursuant to the National Security Act of 1947. Pub.L. 80-253, 61 Stat. 495. The National Military Establishment was subsequently renamed by the The National Security Act Amendments of 1949 as the Department of Defense. Pub.L. 81-216, 63 Stat. 578. The Secretary of Defense lacks authority to overrule an Act of Congress, but this purported renaming is consistent with President Trump's pattern of ignoring federal statutes and authorities.
[2] ABC News LIVE: *Pete Hegseth Speaks on 'Department of War'* (YouTube 1:00) (Sept. 10, 2025).
[3] As Sen. Jack Reed noted on the Senate floor on Sept. 9, 2025, "the U.S. military simply does not have the authority to use lethal force against a civilian vessel unless acting in self-defense." Of the service branches, only the U.S. Coast Guard, which is part of DHS and not DoD, has law enforcement authorities. *See* 46 U.S.C. § 552(a).

extrajudicial killing obviously was not remotely acceptable under a "law enforcement" paradigm and was unprecedented. While combatting terrorism had expanded after 9/11/2001 from a law enforcement concern into a military endeavor when adjacent to Congress' Authorization for Use of Military Force of 2001, Pub. L. 107-40, 115 Stat. 224 ("AUMF"), here the White House never asked Congress to declare war on Venezuela or TdA.[4] Even John Yoo, a former DOJ official whose expansive views of Executive power led him to author the OLC "enhanced interrogation techniques" memos under President George W. Bush, criticized these actions:

> There has to be a line between crime and war…. We can't just consider anything that harms the country to be a matter for the military. Because that could potentially include every crime.[5]

When some legal scholars suggested these extrajudicial killings might even rise to the level of "war crimes," Vice President J.D. Vance essentially laughed off such legal concerns, posting on X, "I don't give a shit what you call it." President Trump then wrote, "These extremely violent trafficking cartels POSE a THREAT to U.S. National Security, Foreign Policy and vital U.S. interests." Despite a notice sent to Congress two days *after* the first strike, calling TdA "designated terrorist organization" threatening the U.S., Yale Law School Dean Harold Koh called TdA's designation as a foreign terrorist organization ("FTO") inadequate:

> Where is the declaration of war against Venezuela? There is none…. FTO designation is what you use when you're trying to freeze their bank accounts. It's not a death warrant.[6]

Brian Finucane, a former State Department attorney, similarly noted:

---

[4] Even if the underlying facts asserted as the basis for this strike had been proven – and they have not yet been – drug smuggling is not even a crime eligible for capital punishment in the U.S. While previous frameworks were developed under the AUMF by the Obama Administration for drone strikes against al Qaeda and ISIS, those required consideration of whether capture was feasible before resorting to deadly force. Here, there was apparently none. Former Yale Law School Dean Harold Koh notes, "This is so beyond anything that the most lawless administration ever did before that to treat it as somehow continuous is a real disservice to thoughtful people." *See Former GOP Officials Fear US Strikes on Alleged Drug Smugglers Aren't Legal,* Politico, Sept. 16, 2025.

[5] *Id.*

[6] *See* note 4, *supra.*

> What separates the U.S. military from a death squad is the law…. I'm very concerned that the American public does not grasp the stakes here: The President is asserting a license to kill without due process and outside the context of armed conflict.[7]

Former Scalia law clerk and deputy assistant attorney general Ed Whelan concurred: "There is a line between legitimate acts of war (or of self-defense) and murder. It would be good for government officials to care about staying on the right side of that line."[8]

Less than a month later, on September 30, 2025, The Administration called an unprecedented mandatory in-person meeting of all 800 senior military officials from around the world in Quantico, where Hegseth and President Trump spoke to them directly. Hegseth told them the new "warrior ethos" meant "the liberation of America's warriors, in name, in deed and in authorities. You kill people and break things for a living. You are not politically correct and don't necessarily belong always in polite society." He told them "we also don't fight with stupid rules of engagement. We untie the hands of our warfighters to intimidate, demoralize, hunt and kill the enemies of our country," and then stated, "if the words I'm speaking today are making your heart sink, then you should do the honorable thing and resign."[9] Hegseth's speech was then followed by a longer, highly partisan speech from President Trump, in which he claimed the U.S. has domestic enemies, "insurrectionists" "paid by the radical left." Trump claimed U.S. cities

> are run by the radical-left Democrats … they're very unsafe places, and *we're going to straighten them out one by one. And this is going to be a major part for some of the people in this room. That's a war too. It's a war from within…. And I told Pete we should use some of these dangerous cities as training grounds for our military – National Guard but military – because we're going into Chicago very soon.*[10]

---

[7] *Id.*
[8] *Id.*
[9] U.S. Department of War, *Transcript: Secretary of War Pete Hegseth Addresses Generals and Flag Officers at Quantico, Virginia* (Sept. 30, 2025).
[10] CBS News, *Watch: Trump gives lengthy address to senior military leaders at Quantico*, (YouTube 41:27), (Sept. 30, 2025).

10

(emphasis added).  Trump told senior officials "our inner cities" are "a big part of war now."[11]

Risks of turning over domestic law enforcement to a now-untethered War Department "liberated" from "legality" and focused on "lethality," are magnified given this Administration's earlier firing of the DoD's Inspector General and all senior JAG officers, and new restrictions on press access at the Pentagon.  Placing thousands of "warriors" into our cities, at at a time of more limited oversight, risks producing another Kent State tragedy – or even far worse, given this Administration's penchant for never admitting mistakes and doubling down whenever criticized.

### 2.    Recent Expansions of National Guard Deployment for Domestic Purposes

Simultaneously with this asserted diminishment of the law's ability to constrain the military's own actions has been the vast expansion of Trump's expressed plans to mobilize National Guard forces for domestic purposes, targeting states and cities known to be less politically supportive of his policies.  These actions are without precedent in our history.

While temporarily delivering relief and maintaining order in times of great need are established parts of the National Guard's mission, using the Guard for generalized law enforcement is not.  There is no requirement, preference or need for crime control resources to be provided by military personnel.  *Amicus* members have studied how the presence of military personnel – armed, uniformed, and trained for combat – transforms the psychology of civilians. Unlike local police, military forces are trained to confront external enemies with whatever force is necessary to subdue or extinguish a threat, not to engage in proportionate, community-based responses to domestic unrest.  Such deployments cause fear, escalate tensions, and often provoke further unrest.  Their appearance on city streets signals that political dissent is an existential threat to the state, not a protected right of the people, and is a clear warning sign that the true

---

[11] *Id.* at 12:05.

intent of the government's actions is to threaten force as a means of eliminating political opposition.  It emphasizes that conformity and silence are essential to living without harm.  The purpose of their presence, when imposed without local invitation, is to instill fear in civilians not supporting the federal administration.  *Amicus* members recall vividly how militarized public spaces in Latin America in the 1970s helped consolidate military juntas, how tanks in Tiananmen Square in 1989 ended a student protest movement, and how soldiers in public squares in Egypt during the Arab Spring cast a pall over growing efforts at democratic reform, which then died.

When soldiers arrive at the request of a local official to restore order or provide essential services after a hurricane, wildfire or highly destructive riot, the population naturally sees them as supportive, nonpartisan helpers.  But when heavily armed military personnel arrive uninvited in moments of social unrest – particularly if the protests involve criticism of federal policy or federal officials – the public perception is unmistakably different: evoking fear, not reassurance.

As Maj. Gen. Randy E. Manner, former acting vice chief of the National Guard Bureau has noted, deploying the Guard to the District can be seen as an attempt to "intimidate the local population," while politicizing the force and misusing its limited resources."[12]  The National Guard's own internal documents, measuring public sentiment about the federal takeover of policing in Washington, D.C., confirm public views of this mission as about "leveraging fear" and driving a "wedge between citizens and the military," even promoting a sense of "shame" among some troops and veterans – as domestic mobilizations rooted in politics risk damaging Americans' confidence in the longstanding precedent of an apolitical military.[13]

---

[12] *Trump is Expanding the National Guard's Role. Some Former Generals Worry*, New York Times, Sept. 21, 2025 (using the military to police American citizens "is the beginning of a divide between our military and our citizens").
[13] *National Guard Documents Show Public "Fear," Veterans' "Shame" Over D.C. Presence*, Washington Post, Sept. 10, 2025.

Beyond this diminishment of the military's own prestige domestically when placed into the middle of political disputes is the potential harm to our national security generally.  As Maj. Gen. Manner notes, such deployments necessarily divert from "another part of their mission: serving as a reserve force to support the active-duty U.S. military abroad," and can also become "disincentives for retention, for morale, for recruiting."[14]  Mobilized Guard members are called away from higher-paying jobs and families, and as Gen. William Enyart noted:

> It's one thing when you're out there sandbagging to prevent the Mississippi River from washing the town away.  It's another thing when you're fulfilling a president's political desires.[15]

Foreign prestige is also at risk.  *Amicus* members have long advanced the values of liberty and self-governance in their diplomatic, defense and intelligence careers.  We are gravely concerned the use of U.S. military forces against Americans is now undermining America's credibility in advancing its interests overseas, including the championing of democracy. Authoritarian governments around the world have already begun pointing to the United States' domestic deployments of the military to justify their own crackdowns.  When our country fails to uphold democratic norms at home, it loses both moral authority and strategic influence abroad.

In *Amicus* members' experience as former national security, foreign policy and homeland security officials examining other countries, we were taught and trained to look for "indicators of autocracy."  Such recognized indicators of illegitimate uses of power included situations such as leaders searching for reasons to stretch interpretations of the law, and the magnification or exaggeration of events to justify an overreach of power – the very same types of indicators we are now similarly witnessing within our own country today.  *Amicus'* members have directly observed this phenomenon and its negative aftermath in a variety of countries, including:

---

[14] *See* note 12, *supra.*
[15] *Id.*

- Russia, where military-style police suppress political protests under the guise of national security;

- China, where the Peoples' Liberation Army has historically been deployed against student demonstrators, most notably during the crackdown at the Tiananmen Square massacre;

- Taiwan, where minor incidents of violence led to a state-run suppression of anti-government protests and became a pretense for decades of martial law, from 1949-87;

- Turkey, where domestic military deployments have been used to crush opposition following mass protests;

- South Africa, where apartheid security forces previously repressed political opponents; after the end of the apartheid government, post-apartheid reform emphasized oversight to prevent military use for partisan political agendas;

- The Philippines, where armed forces are employed in campaigns against civil society actors under the pretext of anti-drug or anti-terror operations; and

- El Salvador, where US-trained military death squads terrorized the population during the civil war of the 1970s and 1980s. For the past several years, under the current Bukele administration, the security forces have been re-politicized and used to support human rights abuses against the general population.

In each of these examples, authoritarian leaders justified their actions as necessary for public safety, while, in fact, using military force to erode political freedoms and dismantle or corrode institutional checks on executive power. *Amicus* members have witnessed the slippery slope from such conduct to repressive rule, when the powers of an executive were not timely or adequately checked, allowing authoritarianism and a loss of rights to then become difficult or even impossible to reclaim, as a country eventually reaches a point of no return as it slides into autocracy. *Amicus* members further emphasize that in the authoritarian regimes we have studied—whether in Moscow, Beijing, Ankara, or Manila—the pattern is typically not one of local leaders requesting help, but of central governments deploying military forces to override regional or municipal authority. Where a country's institutions can hold firm, however, the results can be dramatically different. In South Korea in December 2024, for example, President

14

Yoon Suk Yeol declared martial law to counter exaggerated accounts of anti-state activities and threats to national security – but in that case, the legislature was quick to respond by lifting martial law, even impeaching and removing the president from office to protect its democracy.[16]

The global attempts at authoritarianism *Amicus* members have experienced echo loudly in President Trump's recent deployment of the military, in contravention of municipal leaders' assessments of need.  President Trump's claim of a "crime emergency" to justify unprecedented deployment of the military to urban centers is a well-worn justification *Amicus* members often saw employed by repressive regimes worldwide when seeking to expand their own powers.  And here, the claim is also belied by the Administration's own crime figures.  As DC's Attorney General notes in the Complaint, crime rates in the District were down even before the Guard was deployed, and no "crime emergency" ever existed to justify this action, much less an extension even after Trump himself bragged violent crime in DC had been eliminated.[17]  And there has been no showing – none at all – that these same crime control functions could not have been performed just as well, or even better, by equivalent civilian law enforcement investments or a surge of federal civil law enforcement personnel.  Indeed, in the District, the Administration's argument becomes even more absurd when viewed alongside the mid-year unexpected clawback of the District's funding – a move that starved the District of policing resources, only to then be told that National Guard troops were "needed" to address violent crime rates that were at historic lows.[18]  At best, this claim was disingenuous; at worst, it suggests a manufactured crisis.

---

[16] Hyung-Jin Kim and Kim Tong-Hyung, *Yoon Suk Yeol removed as South Korea's president over short-lived martial law*, Associated Press, Updated 3:03 AM EDT, April 5, 2025, *available at* https://apnews.com/article/south-korea-martial-law-yoon-constitutional-court-8cdcf4944c2e3cd9edf723bc29ba51ff.
[17] *Trump says D.C. is Now "Crime Free." What's the Reality?* NPR Sept. 3, 2025.  In truth, violent crime was not eliminated in the District, as many National Guard units have simply patrolled in tourist areas such as the National Mall, often performing mere landscaping, trash pick-up, graffiti-removal and other performative services.
[18] *DC goes without $1B in public safety funds as Trump's takeover continues*, Baltimore Sun, Aug. 15, 2025.

Moreover, the bigger issue here is ultimately not if deployment of military forces might reduce crime. It likely does in current North Korea, and it likely did in Nazi Germany and in the novel "1984." The real question is whether the law condones normalization of the militarization of our streets and related military control of residents, despite our Founder's warnings against standing armies, and the statutory limits of the Posse Comitatus Act. It does not.

Despite such criticisms, President Trump has recently called for even more expansions of National Guard deployments, to many U.S. cities – now including not only Los Angeles and the District, but also Memphis, Portland, Chicago, and other urban areas. Democratic Governors – most notably Governor Pritzker of Illinois – have resisted, and Brig. Gen. David L. McGinnis, former Chief of Staff of the National Guard Association of the United States, has described any move to deploy the Guard over governors' wishes as firmly "outside of the constitutional box."[19] Initially, even President Trump appeared to realize that deploying a state's National Guard over its sitting governor's objection might be a legal bridge too far.[20]

But that modicum of self-restraint was recently abandoned, when Hegseth ordered 200 members of the Oregon National Guard into federal service to enter Portland. This Executive action was ordered over objections from Oregon's Gov. Tina Kotec, who told Trump, "There is no insurrection, there is no threat to national security." Trump's original plan to send troops into Portland was announced September 5, a day after Fox News aired a "special report" about a protest in Portland on Labor Day, which misleadingly mixed in clips of 2020 protesters. Trump

---

[19] *See* note 12, *supra*.
[20] *See Trump prods at Chicago Takeover as legal, political challenges loom*, The Hill, Sept. 4, 2025 (Trump "appeared to acknowledge limits" on his ability to deploy the National Guard in Chicago). While Trump had earlier threatened to deploy the National Guard there, even posting a meme of the 1979 Vietnam War movie *Apocalypse Now* with an image of the Chicago skyline, Gov. Pritzker pushed back, warning that such deployments "might be a dress rehearsal for using the military to manipulate the 2026 midterm congressional elections." The Guard was then not mobilized; instead, on September 8, 2025, DHS announced a deportation crackdown in Chicago to be operated by ICE. *See Trump Administration says it launches ICE crackdown in Illinois*, Reuters, Sept. 9, 2025.

responded to Gov. Kotec, "[A]m I watching things on television that are different than what's happening?  My people tell me different."  After the deployment, Oregon sued, and on October 4, 2025, District Judge Karin J. Immergut issued a TRO blocking the 200 troops.  She found Trump had acted in a manner "untethered from the facts."  *Oregon v. Trump*, No. 3:25-cv-1756 (D. Ore.), ECF #56, at 23.  *Id.* at 30 ("[T]his is a nation of Constitutional law, not martial law.").

Rather than standing down after this ruling, White House Deputy Chief of Staff Stephen Miller only ramped up, remarkably accusing Trump-appointed Judge Immergut on "X" of "legal insurrection."[21]  The Administration also brazenly tried to circumvent her ruling by trying to mobilize California and Texas National Guard troops for deployment into Portland, forcing her to issue yet another TRO.[22]  When asked if the Administration would comply, Stephen Miller asserted President Trump held "plenary" authority, thus rejecting all checks and balances.[23]

Because Texas' Governor had supported the Oregon effort, President Trump redirected his Texas National Guard troops to Chicago instead, where they recently arrived but faced a lawsuit.  Yesterday that Court, after a four-hour hearing, orally granted a TRO (written order to follow).[24]  Trump has threatened to invoke the Insurrection Act to try get around court rulings.[25]

National Guard troops have also been called up in states with Republican Governors, for deployment into their own urban centers led by Democratic Mayors.  The National Guard is now deployed in Memphis, where more than a third of Tennessee's Black residents live, and where crime rates had also dropped, over its Mayor's objections.[26]  Yet even in these states with Republican governors, the process was unprecedented.  The Washington Post on September 13,

---

[21] Stephen Miller (@StephenM), *Legal Insurrection…*, X (Oct. 4, 2025, 9:26 PM EST).
[22] *US judge blocks Trump from sending any National Guard troops to Portland for now*, Reuters, Oct. 6, 2025.
[23] *Trump advisor Stephen Miller cites "plenary" authority. What does he mean?* Detroit Free Press, Oct. 8, 2025.
[24] *Federal judge hits Trump administration credibility in siding with city and state against National Guard deployment*, Chicago Sun-Times, Oct. 10, 2025.
[25] *Trump's threat to invoke Insurrection Act escalates showdown with Democratic cities*, Reuters, Oct. 8, 2025.
[26] *Trump Signs Off on Sending the National Guard to Memphis*, New York Times, Sept. 15, 2025.

2025 reported on a draft memo from Hegseth to Attorney General Bondi and DHS Secretary Noem, calling for activation of 1,000 Louisiana National Guard troops for a law enforcement mission in that state's "urban centers," to last until September 30, 2026.[27]  While the draft memo had not yet issued, it revealed a President "looking at states led by Republican governors who may be willing to accept troops in predominantly blue cities, such as Memphis and New Orleans – even if no event-driven emergency has occurred."  While Governors do have authority to invoke Title 32 and request federal funds for mobilized National Guard troops, the memo's top-down focus troubled Gen. Randy Manner, former acting vice chief of the National Guard:

> "The governor is supposed to request this, not the president or the secretary of defense," Manner said, calling the move "absolutely nothing more than a political grab of power" by Trump…. "I've never heard of this kind of thing happening before this administration – not in my 35 years" of military service.[28]

Beyond this vast geographic expansion of such National Guard deployments is a systemic change also recently adopted for the scope of the Guard's deployments.  Tucked in the Executive Order for deployment of the National Guard in D.C., President Trump also directed Hegseth to plan for his Department to take on a larger role in domestic law enforcement, including "quelling civil disturbances," by formalizing the creation of specially-trained National Guard units in the District of Columbia and all 50 states that can be mobilized quickly for ensuring the public safety and order," with tasks to include "quelling civil disturbances."  As one critic noted:

> Having soldiers police protests, as this order envisions, threatens fundamental liberties and public safety, and it violates a centuries-old principle against involving the military in domestic law enforcement.[29]

---

[27] *Pentagon Plan Envisions 1,000 Troops for Louisiana Policing Mission*, Washington Post, Sept. 13, 2025.
[28] *Id.*  By the end of the month, Louisiana's Governor had requested deployment of these military troops.  *Louisiana governor requests National Guard for New Orleans, Baton Rouge*, Washington Post, Sept. 30, 2025.
[29] *Trump Orders Expansion of National Guard's Role in Law Enforcement*, New York Times, Aug. 25, 2025.

Moreover, the same Executive Order directs the creation of "a standing National Guard 'quick reaction force' that would be available for rapid deployment anywhere in the country."[30] It "also directs a new task force, to be led by White House advisor Stephen Miller, to create an online portal for 'Americans with law enforcement or other relevant backgrounds and experience' to apply to join federal agents in enforcing Mr. Trump's 'crime emergency' order in the District of Columbia." This "specialized force proposed for the Guard in D.C. would be deputized to enforce federal law according to the executive order. The idea of Stephen Miller deputizing private individuals to join the Guard's law enforcement activities is shocking.[31]

Risks of overaggressive domestic deployment of firepower are apparent. Already, on October 1, 2025, Chicago saw shock and awe as Black Hawk helicopters fly over a South Shore apartment complex in the middle of the night, jolting people from their beds as ICE and other armed agents repelled down and detained 300 residents, including U.S. citizens, with toddlers put in zip ties, before arresting 37. DHS said it was targeting TdA.[32] If a "warrior" military had actively been a part of that raid, might it have gone even further? If our "War" Department believes it can legally execute suspected TdA gang members in waters near Venezuela, based on a "War on Drugs" threat still thousands of miles away, why not also on the streets of Chicago?

3. **Recent Elimination of DOJ Guardrails, and Potential Legal Mischief Inherent in Designation of an Amorphous "Antifa" as a "Domestic Terrorist Organization"**

Beyond these concerns of the National Guard expansively engaging directly in law enforcement is the Trump Administration's recent blatant overriding of DOJ's longstanding

---

[30] *Id.* (citing White House Executive Order entitled, *Additional Measures to Address the Crime Emergency in the District of Columbia*, issued August 25, 2025).

[31] Given the breadth of the stated criteria, it seems apparent that many January 6 Defendants who had stormed the Capitol and were even convicted before being pardoned would likely now qualify for this new "specialized" force.

[32] *37 Arrested in South Shore ICE Raid, DHS Claims it Was Targeting Tren De Aragua Gang Members*, CBS News Oct. 1, 2025.

tradition of independence, and its attempt to designate "Antifa" as a "domestic terrorist organization." In light of these events, the risks to our constitutional order have become grave.

President Trump recently directed that federal criminal charges be filed against former FBI Director James Comey. A federal indictment was hastily returned in the Eastern District of Virginia, after newly-appointed Acting U.S. Attorney Lindsey Halligan (Trump's former personal lawyer with no prosecutorial experience), replaced fired U.S. Attorney Erik Siebert, after his office had declined to file charges after deeming them unwarranted.[33] Yesterday, it happened again. Halligan indicted New York's Attorney General after Siebert had demurred.[34]

This idea of a President installing and directly ordering a loyalist to prosecute his political enemies is utterly unprecedented. But it is also just the latest example of political interference in DOJ's independence. This second term (even beyond Trump's unusually sweeping exercise of clemency powers on Day 1) has seen directed dismissals of federal criminal charges against NYC Mayor Eric Adams and others with whom Trump is politically aligned leading to resignations by career prosecutors, while DOJ employees who merely did their jobs (prosecuting January 6 defendants) or exercising free speech (FBI Agents taking a knee after George Floyd's murder) were purged. New DOJ hires are reportedly now asked in interviews if Trump won the 2020 election, revealing a goal of filling DOJ with loyalists. None of this comports with the historic independence of DOJ or the presumption of regularity that justifies judicial deference.

Compounding these concerns even more is President Trump's recent Executive Order issued September 22, 2025, purporting to designate a mere ideology, "Antifa," as a "domestic terrorist organization." The amorphous nature of this designation is by design. "Antifa," short

---

[33] The docket indicates the indictment was presented in court by Halligan alone, leading to speculation that all other lawyers in that office perhaps boycotted participation due to ethical concerns. *Judge Who Reviewed James Comey's Indictment Was Confused by Prosecutor's Handling of Case, Transcript Shows*, CBS News, Sept. 26, 2025.
[34] *A Closer Look at the Counts in the Letitia James Indictment*, New York Times, Oct. 9, 2025.

for "anti-fascism," is a belief likely shared by most Americans since World War II – but it is not an organization.[35]  Despite the Executive Order's description of Antifa as "a militarist, anarchist enterprise that calls for the overthrow of the U.S. government," no such "enterprise" with leaders or assets exists.  Instead, the Executive Order announcing this description merely catalogues supposed Antifa incidents – the doxing of officers in Portland, an assault on a journalist, and violence at a march in Pacific Beach – meaning almost any protest that later results in a physical confrontation, or even flag burning, may then get classified as "incitement" by "Antifa."

Nor is there even a recognized statutory category for the phrase "domestic terrorist organizations."  The Foreign Terrorist Organization (FTO) list under 8 U.S.C. § 1189 and the Specially Designated Global Terrorist (SDGT) program under Executive Order 13224, which is exercised under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*, are both regimes built for foreign threats.  The FTO specifically applies only to "foreign organizations" and the IEEPA requires a threat from a source "in whole or substantial part outside the United States," with EO 13224 relying on that foreign nexus.  Likewise, the criminal "material support" offense that attaches to such designations, 18 U.S.C. § 2339B, makes it a crime to knowingly provide material support to a designated FTO, meaning it is pegged to the FTO list, not domestic entities.  The Supreme Court's leading case on "material support" also underscores this foreign/domestic line.  In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), 18 U.S.C. § 2339B was upheld only after the Court emphasized Congress's special prerogatives in foreign affairs and national security.  Chief Justice Roberts cautioned that the

---

[35] *You Can't Designate "Antifa." Banks and Platforms Will Act Like You Did Anyway*, Lawfare, Oct. 1, 2025 ("As then-FBI Director Christopher Wray told Congress in 2020, 'Antifa' is 'more of an ideology or a movement than an organization.'").

opinion should not be read to suggest that Congress could impose the same ban on coordinated advocacy by domestic groups, a context in which First Amendment protections are at an apex.[36]

Conflating National Guard deployments with domestic law enforcement, however, may blur this constitutional line drawn in *Humanitarian Law Project*, as domestic law enforcement that becomes a regular part of military operations may then get classified as a part of "national security."  The Trump Administration likely is keenly aware of the broad deference typically shown by Courts to the Executive Branch exercising national security powers.  If its "Antifa" designation is upheld on this basis, its malleable definition will likely morph into meaning any group opposing "MAGA," and infuse the designation with massive punitive consequences, at a time when progressive fundraising organizations, such as ActBlue and the Soros Foundation, are already being targeted by Trump for investigation as alleged funders of "agitation."[37]  Some MAGA supporters have already called "Black Lives Matter" and "No Kings" parts of "Antifa," and such calls may grow to include any entity they dislike, including possibly the Democratic Party itself.[38]  At an October 8 "roundtable," Trump officials pledged to destroy "Antifa," which

---

[36] No federal authority presently exists to designate purely domestic groups as "terrorist organizations."  While Congress has defined the general term "domestic terrorism" in 18 U.S.C. § 2331(5), that provision is definitional only; it creates no designation authority, imposes no listing structure for entities or organizations, and adds no standalone criminal penalties.  Put simply, no statute authorizes the federal government to designate a domestic organization as a terrorist entity with the legal consequences that attach to FTOs and SDGTs.  Political violence can still be prosecuted, but the government in those cases must use ordinary criminal laws such as conspiracy, assault, arson, or weapons offenses if it seeks to punish such criminal activities.

[37] *White House Plans Broad Crackdown on Liberal Groups*, New York Times, Sept. 15, 2025 (after Charlie Kirk's death, Trump admits to talking to the attorney general and others about bringing charges under the Racketeer Influenced and Corrupt Organizations Act against "some of the people that you've been reading about that have been putting up millions and millions of dollars for agitation.").

[38]  *Kristi Noem Repeatedly Refuses to Say if She Thinks Democrats Should be Considered Terrorists,* The Independent, Sept. 25, 2025 (pressed on if she agreed with Stephen Miller's comment after Charlie Kirk's death that "The Democrat Party is not a political party. It is a domestic extremist organization," Noem would not give a direct answer).  More recently, President Trump told Navy sailors October 5 that "We have to take care of this little gnat that's on our shoulder called the Democrats," three days after he had described the Democratic Party on Truth Social as "The Party of Hate, Evil and Satan."  *Trump Calls Democrats the Party of 'Satan,'* Vanity Fair, Oct. 7, 2025.

Secretary Noem called "just as dangerous" as MS-13, TdA, ISIS, Hamas and Hezbollah.[39]

Trump also claimed Illinois' Governor and Chicago's Mayor "should be in jail."[40]

At Charlie Kirk's memorial service, Stephen Miller had threatened political opponents

that "the power of law enforcement under President Trump's leadership will be used to find you,

will be used to take away your money, take away your power, and if you have broken the law, to

take away your freedom."[41]  Harvard professor Theda Skocpol warns that Trump and his allies

are now stirring the pot, "trying to provoke protests and demonstrations that they can then call

'violent' even if there are fewer destructive elements than after the usual big football victory or

loss."[42]  Summing up our current situation, Dartmouth political scientist Sean Westwood notes:

> Polarization feels almost quaint relative to the profound stress the
> Trump administration is imposing on our democracy…. What we
> are witnessing is not yet a war, but it is far more than mere
> political division.  It is a systematic terror campaign on
> institutional legitimacy…. While political violence and
> polarization remain serious concerns, our primary focus must shift
> to countering the deliberate democratic degradation unfolding
> before us.  The conflict is no longer defined by the distance
> between the left and right, but by the state-sanctioned assault on
> the norms, laws and institutions that guarantee a liberal society.[43]

### 4.  Recent Acceleration of Executive Overreach and Growing Authoritarianism

Given the relentless rollout of these developments on multiple levels and at breathtaking

speed, America is approaching a tipping point.  The Steady State agrees with *The Atlantic* writer

Garry Kasparov, who as a former world chess champion personally witnessed Vladimir Putin's

rise to power in Russia before moving to America, that "beneath the breaking-news barrage, we

---

[39] *Trump takes aim at Antifa – and the Press – in White House roundtable*, CNN, Oct. 8, 2025.

[40] *Trump says Gov. JB Pritzker and Chicago Mayor Brandon Johnson "should be in jail,"* NBC News, Oct. 8, 2025.

[41] *Trump is Not Afraid of Civil War. Neither is Stephen Miller,* New York Times, Oct. 7, 2025 (Harvard political scientist Ryan Enos: "There is no doubt about what Trump is doing in the wake of Kirk's killing.  His attacks on his political opponents are purely authoritarian, and he sees the killing of Kirk as an opportunity to accomplish what he has been talking about since he entered politics: using the power of the state to punish those who defy him.").

[42] *Id.*

[43] *Id.*

can trace the thread of advancing authoritarianism…. Although Trump himself may operate on

instinct, his more disciplined advisors are masterminding a steady accumulation of power."[44]

> Last week, Trump signed an order to send the National Guard into
> Memphis as part of his administration's campaign to normalize the
> militarization of cities and states run by the opposing party. The
> move is straight from Vladimir Putin's playbook. But because
> America's institutions are stronger and more resilient than those of
> post-Soviet Russia, the Trump Administration has to act quickly if
> it wants to undermine them. Otherwise, there is a chance it could
> be stopped.[45]

Against that backdrop, it is vital for this Court to do its duty, by standing in the breach to

assert its proper authority as the arm of a co-equal branch of our federal government, defending

the constitution. That may not seem easy given recent attacks on judges. But appeasement or

avoidance on such issues is fruitless, since "every time a check on executive power is curbed, it

becomes easier to remove the next safeguard, and the next."[46] Polls also confirm that most

Americans do not support deployment of troops domestically for law enforcement purposes.[47]

The fact that President Trump was duly elected is no answer – "so were Putin, Recep

Taypip Erdogan and Viktor Orban. There are plenty of examples of elected leaders who have

subverted the democratic system that brought them to power…. Trump has already tried to

overthrow an election, and he has demonstrated this term that he stops only when the courts or

lawmakers make it impossible to go on."[48]

It is no longer a dystopian fantasy to imagine, as Gov. Pritzker warns, that urban voters

may need to walk past rows of machine gun-bearing soldiers to cast ballots in 2026. Nor can we

---

[44] *The Race to Save America's Democracy*, The Atlantic, Sept. 28, 2025.
[45] *Id.*
[46] *Id.*
[47] *Most Americans don't want troops deployed without an external threat, Reuters/Ipsos poll finds*, Reuters, Oct. 8, 2025.
[48] *See* note 44, *supra* ("Aspiring authoritarians never ask for permission; they see what they can get away with.").

be confident DOJ and our military can avoid political pressures and resist further depletion of the guardrails that have traditionally rendered court review of their activities unnecessary.[49]

> The Constitution is a piece of paper.  It is a remarkable and world-changing piece of paper, but its power has endured only because Americans have historically been willing to fight and die for the principles it codifies.  Assumptions about the fortitude of America's democracy ignore the uncomfortable truth that democracy is an *active* process, one that requires constant commitment to its preservation.[50]

In the Nuremberg trials Justice Jackson had attended as its lead prosecutor, a recurring theme involved recognition of the German bar and judiciary's abject failures, as they had too often compromised away the rule of law as Hitler's fascist excesses in tearing down institutional limits were initially tolerated and then grew beyond any control.  In his *Youngstown* concurrence, Jackson sternly warned present and future jurists confronted with such challenges that no matter what, and even if "[s]uch institutions may be destined to pass away … it is the duty of the Court to be last, not first, to give them up." 343 U.S. at 655 (Jackson, J. concurring).

## CONCLUSION

The United States is not immune.  This danger is no longer hypothetical.  It is real and is happening here.  The Executive Branch's recent actions and legal arguments demonstrate a view that the President is above the law, including with respect to domestic deployments of thousands of military personnel, decisions it says are unreviewable and without restriction.  That is not so. The preservation of our Republic, and its representative democracy, demands vigilant resistance to the normalization of military forces in our civil society.  *Amicus* urges the Court to fulfill its responsibilities and retain America's steady state by granting the relief the District seeks.

---

[49] *See, e.g., The Civil-Military Crisis is Here*, The Atlantic, Oct. 7, 2025 ("the U.S. armed forces are still led by generals and admirals whose oath is to the Constitution, not the commander in chief.  But for how long?").
[50] *See* note 44, *supra*.

This 10th day of October 2025.       Respectfully submitted,

 /s/ Gregory S. Smith_____
Gregory S. Smith (DC Bar No. 472802)
*Attorney for The Steady State*

 /s/ Steven A. Cash_____
Steven A. Cash, Esq. (DC Bar No. 502439)
*Executive Director, The Steady State*

## CERTIFICATE OF COMPLIANCE

This BRIEF OF THE STEADY STATE AS *AMICUS CURIAE* IN SUPPORT OF THE PLAINTIFF's type size and typeface comply with federal and local rules because the text of this brief is no more than 25 pages, and it has been prepared in Microsoft Word using proportionately spaced typeface and 12-point Times New Roman font for its text, and 10-point Times New Roman font for its footnotes. I understand a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

This __ day of October, 2025.

 /s/ Gregory S. Smith_____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing is automatically being served upon all counsel of record as an attachment to the Consent Motion of The Steady State for Leave to File *Amicus Curiae* Brief in Support of the District of Columbia, via this Court's ECF system.

This 10th day of October, 2025.

____/s/_Gregory S. Smith_____
Gregory S. Smith