UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

    Plaintiff,

   v.

DONALD J. TRUMP, *et al.*,

    Defendants.

Civil Action No. 1:25-cv-03005-JMC

**<u>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 3

I.     The President Has Authority to Deploy the Guard in the District. .............................. 3

II.    Defendants May Coordinate the Deployment of Non-DC National Guard Members. ........... 9

III.   Plaintiff Lacks Standing To Challenge Who Controls Out-of-State National Guard
Troops. ............................................................................................................ 12

IV.   Plaintiff's APA Claim Must Be Dismissed. ...................................................... 13

V.    Plaintiff's Posse Comitatus Act and Section 275 Claim Must Be Dismissed. ........... 15

VI.   Plaintiff's Constitutional Claims Must Be Dismissed. ...................................... 24

VII.  Plaintiff's Ultra Vires Claims Must Be Dismissed. .......................................... 25

Conclusion ........................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ..................................................................................................... 17, 18

*Bennett v. Spear,*
    520 U.S. 154 (1997) ..................................................................................................... 13, 14

*Bissonette v. Haig,*
    776 F.2d 1384 (8th Cir. 1985) .......................................................................................... 16

*Bissonette v. Haig,*
    800 F.2d 812 (8th Cir. 1986), *aff;d by equally divided Court*, 485 U.S. 264 (1988) ........................... 16, 17

*Black Lives Matter D.C. v. Trump,*
    544 F. Supp. 3d 15 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) 15

*Bryan v. United States,*
    524 U.S. 184 (1998) ........................................................................................................ 22

*Bufkin v. Collins,*
    604 U.S. 369 (2025) .......................................................................................................... 6

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) ..................................................................................................... 17, 18

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ........................................................................................... 25

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................................................................ 13

*Gilbert v. United States,*
    165 F.3d 470 (6th Cir. 1999) ......................................................................................... 18, 19

*Hearst Radio v. FCC,*
    167 F.2d 225 (1948) ........................................................................................................ 14

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ........................................................................................................ 12

*Mandato v. United States,*
    No. 1:19-cv-00772, 2019 WL 13251552 (E.D. Va. Oct. 3, 2019) ....................................... 16

*Marx v. Gen. Revenue Corp.,*
    568 U.S. 371 (2013) .......................................................................................................... 6

*Mitchum v. Foster*,
407 U.S. 225 (1972) ................................................................................................................19

*Morton v. Mancari*,
417 U.S. 535 (1974) ................................................................................................................12

*Mueller v. City of Joliet*,
943 F.3d 834 (7th Cir. 2019) ..................................................................................................18

*Nat'l Sec. Counselors v. CIA*,
898 F. Supp. 2d 233 (D.D.C. 2012), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020) ...........................12

*Newsom v. Trump*,
No. 25-CV-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025), *appeal filed*, No. 25-5553 (9th Cir. Sep. 3, 2025) ..................................................................................................................15, 20

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ............................................................................................................14, 15

*Nuclear Reg. Comm'n v. Texas*,
605 U.S. 665 (2025) ................................................................................................................25

*Oesterich v. Selective Serv. System Loc. Board No. 11*,
393 U.S. 233 (1968) ................................................................................................................25

*Ratzlaf v. United States*,
510 U.S. 135 (1994) ..........................................................................................................21, 22

*Robinson v. Overseas Mil. Sales Corp.*,
21 F.3d 502 (2d Cir. 1994) .....................................................................................................15

*Seegars v. Ashcroft*,
297 F. Supp. 2d 201 (D.D.C. 2004), *partially reversed on other grounds sub nom. by Seegars v, Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) ...............................................................................................4

*Smith v. United States*,
293 F.3d 984 (7th Cir. 2002) ..................................................................................................15

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) ................................................................................................................17

*United States v. Allred*,
867 F.2d 856 (5th Cir. 1989) ..................................................................................................19

*United States v. Bannon*,
101 F.4th 16 (D.C. Cir. 2024), *petition for cert. docketed*, No. 25-453 (U.S. Oct. 10, 2025) ...........21, 22

*United States v. Cardenas-Tovar*,
No. 3:19-CR-4370, 2020 WL 905634 (S.D. Cal. Feb. 25, 2020) ...........................................16

*United States v. Hernandez-Garcia,*
  44 F.4th 1157 (9th Cir. 2022) ..................................................................... 19

*United States v. Johnson,*
  410 F.3d 137 (4th Cir. 2005) ....................................................................... 16

*United States v. Red Feather,*
  392 F. Supp. 916 (D.S.D. 1975) .................................................................. 16

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................................... 17, 18

*United States v. Yunis,*
  681 F. Supp. 891 (D.D.C. 1988) .................................................................. 22

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ...................................................................................... 8

*Wrynn v. United States,*
  200 F. Supp. 457 (E.D.N.Y. 1961) .............................................................. 17

## Statutes

2 U.S.C. § 192 ..................................................................................................... 21

5 U.S.C. § 702(1) ................................................................................................ 17

5 U.S.C. § 703 ..................................................................................................... 16

10 U.S.C. § 15 (1925) ......................................................................................... 20

10 U.S.C. § 275 ...................................................................................... 2, 23, 24

18 U.S.C. § 1385 ......................................................................................... 19, 20

18 U.S.C. § 1905 ................................................................................................. 18

28 U.S.C. § 1346(b) ............................................................................................ 16

28 U.S.C. § 2674 et seq. ..................................................................................... 16

32 U.S.C. § 502 ................................................................................................... 10

D.C. Code § 1-206.02(b) ...................................................................................... 3

D.C. Code § 5-201 ................................................................................................ 9

D.C. Code § 23-501 .............................................................................................. 9

D.C. Code § 23-581 .............................................................................................. 9

D.C. Code § 49-102 ................................................................................................ 7, 19

D.C. Code § 49-103 ....................................................................................................6

D.C. Code § 49-301(a) ................................................................................................4

D.C. Code § 49-305 ....................................................................................................4

D.C. Code § 49-404 .............................................................................................7, 8, 19

D.C. Code § 49-409 ....................................................................................................4

D.C. Code § 49-805 ....................................................................................................4

20 Stat. 145 (1878) ...................................................................................................20

**Administrative & Executive Materials**

Exec. Order No. 11,485,
   34 Fed. Reg. 15411 (Oct. 3, 1969) .......................................................................7

Presidential Memorandum, *Restoring Law & Order in the District of Columbia* (Aug. 11, 2025) ..............13

**Other Authorities**

Dep't of Defense Instruction 3025.21 (2019) ..............................................................24

Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant
   Attorney General, Office of Legal Counsel, *Re Authority to use the National Guard of the District of
   Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of
   Columbia* (July 30, 1963) ...................................................................................8

*Mil. Support for Customs & Border Prot. Along the S. Border Under the Posse Comitatus Act*,
   2021 WL 298369 (O.L.C. Jan. 19, 2021) ............................................................21

*Use of the Nat'l Guard to Support Drug Interdiction Efforts in the D.C.*,
   13 Op. OLC 91 (1989) .................................................................................7, 8, 9

**INTRODUCTION**

Plaintiff's opposition to Defendants' motion to dismiss (Opp.) fails to rehabilitate the claims in Plaintiff's Complaint (Compl.), all of which fail as a matter of law. As to the deployment of the District of Columbia (D.C. or District) National Guard, the Home Rule Act neither gives the D.C. government any authority over the Guard nor requires the President to obtain the District's consent before deploying it. Plaintiff does not contend otherwise and, indeed, does not appear to dispute that the President may deploy the Guard without the District's consent. Plaintiff instead cites irrelevant Home Rule Act provisions relating to the Metropolitan Police Department (MPD), and argues that these provisions mean that the Guard cannot "police the District" (whatever that means) without the D.C. Mayor's consent. But whatever qualified control the Mayor has over the MPD is irrelevant here, and does not constrain the President's authority over the D.C. National Guard, a separate entity and a *federal* entity at that—particularly since the Home Rule Act of which the MPD provisions are a part expressly directs that nothing in the Act vests in the District government greater authority over the D.C. Guard than it had prior to Home Rule. Contrary to Plaintiff's assertions, the President does not need "affirmative" statutory authorization to use the Guard for law enforcement purposes. In any event, at least two provisions provide that authorization. Plaintiff essentially ignores one of these provisions entirely and, as to the other, advances an implausibly narrow interpretation that conflicts with more than six decades of considered Executive Branch practice.

Plaintiff's challenge to the deployment of Guard personnel from other states likewise fails. Plaintiff again repeatedly complains that the District government did not consent to the deployment but Plaintiff's argument—based on purported lack of statutory authority to coordinate the deployment of Guard personnel from other states—would mean that the President could not seek assistance from out-of-District Guard personnel *even with* the District's consent. In any event, the President plainly has statutory authority to request assistance from state National Guard units. Title 32 authorizes National

Guard members to be ordered to perform duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense," which is squarely on point here. Plaintiff's contention that this authorization is limited to activities "similar to training" has no statutory basis. And Plaintiff's argument that the Emergency Management Assistance Compact (EMAC)—to which the federal government was not a party, and which concerns requests among the States to each other—somehow displaces the President's express statutory authority under Title 32 is implausible in the extreme. Plaintiff also renews its contention that the federal government is unlawfully commanding the day-to-day operations of out-of-state National Guard members in Title 32 status but, even crediting Plaintiff's conclusory allegations on this point, Plaintiff does not have standing to assert this alleged grievance since any alleged injury would be inflicted on State executive authorities allegedly divested of command and control of their Guard personnel, not on the District.

Plaintiff's invocation of the Posse Comitatus Act (PCA) likewise fails. Plaintiff cannot civilly enforce the PCA at all. The PCA is a criminal statute, and Plaintiff does not identify a single case implying a civil cause of action under the PCA—for damages or injunctive relief. And that is only the most fundamental of the many legal defects barring this claim. The D.C. Guard is expressly authorized to engage in law execution. Plaintiff's complaint does not plead or even attempt to plead the requisite willfulness; Plaintiff's contentions that it need not show willfulness at all or that willfulness merely requires an intentional act both fail. Perhaps recognizing the many insuperable obstacles standing in the way of its PCA claim, Plaintiff contends that none of this matters because 10 U.S.C. § 275 supposedly allows it to assert PCA-like claims with none of the PCA's limitations, and Plaintiff further asserts that Defendants forfeited arguments in opposition to that supposed claim. This gambit fails on every level. Defendants "forfeited" nothing; Plaintiff's motion and Complaint referenced the PCA and Section 275 interchangeably and Plaintiff's sources note that the legal standards for both are the same. And Section 275 is just a directive for the Secretary of Defense to promulgate regulations. It

does not expand the scope of the PCA, does not furnish Plaintiff with a cause of action, and any cause of action based on it would in any event fail for the same reasons a claim based on the PCA itself fails.

Plaintiff's remaining claims likewise fail as a matter of law. Although Plaintiff contends that its "constitutional" claims are reviewable, Plaintiff does not meaningfully address Defendants' point that on the merits those claims are simply derivative of Plaintiff's arguments that Defendants' actions violate federal statutes and/or were taken in the absence of statutory authority. As to Plaintiff's Administrative Procedure Act (APA) claims, the decision to actually deploy the Guard was made by the President, who is not subject to the APA. And Plaintiff's arbitrary and capricious claims concerning the deputation of Guardsman and their authority to carry weapons are not cognizable APA claims. Finally, as to Plaintiff's purported ultra vires claim, Plaintiff does not come close to plausibly pleading that it can satisfy the standards for obtaining relief on that claim, which is one of the most demanding standards known to the law. The Court should dismiss Plaintiff's Complaint.

## ARGUMENT

## I.    The President Has Authority to Deploy the Guard in the District.

In its Complaint and preliminary injunction papers, Plaintiff appeared to contend that the President's deployment of the D.C. National Guard was unlawful because, according to Plaintiff, the President was required under the Home Rule Act to obtain the D.C. Mayor's consent for the deployment and he did not do so. ECF No. 3-1 at 18; Compl. ¶¶ 146-47. But as Defendants pointed out in the motion to dismiss, any such argument plainly fails. The Mayor and D.C. government have no authority over the Guard. The Home Rule Act specifically addresses whether the statute provides the D.C. government with any additional power over the D.C. National Guard. And it expressly says that it does not: "Nothing in this chapter shall be construed as vesting in the District government any greater authority over . . . the National Guard of the District of Columbia . . . than was vested in the Commissioner prior to January 2, 1975." D.C. Code § 1-206.02(b). And before January 2, 1975, the

District government was headed by an appointee of the President. MTD at 17. Plaintiff does not contend that, prior to January 2, 1975, the President was required to obtain the consent of the appointed commissioner before using the D.C. Guard. That should be the end of the analysis.

But that is not all. More broadly, the D.C. National Guard itself "is essentially a component of the federal government."[1] The President is the Guard's Commander in Chief, D.C. Code § 49-409, appoints and commissions its Commanding General, *id.* § 49-301(a), commissions its officers, *id.* § 49-305, chooses its Adjutant General, *id.* § 49-304, and approves "regulations for the government of the militia," *id.* § 49-805. D.C.'s Mayor, by contrast, simply has no power over the D.C. National Guard; so her consent or lack of consent is irrelevant to the legality of the Guard's deployment.

Perhaps recognizing this, Plaintiff's opposition to the motion to dismiss appears to abandon any claim that the President needs the Mayor's authority to *deploy* the D.C. Guard. Rather, Plaintiff's contention appears to be: (1) the Home Rule Act makes the Mayor D.C.'s chief executive officer, and vests in her the power to oversee the Metropolitan Police Force, while also empowering the District Council to enact a comprehensive police code; and (2) the Act thus prevents the President from using the Guard "to police the District" without the Mayor's consent. Opp. at 3-4.

This argument fails. For starters, if Plaintiff now concedes that the President may deploy the D.C. Guard without the D.C. government's consent (as it must), it is unclear on what basis Plaintiff contends that the deployed Guard may not "police the District"—or what this even means. Indeed, the Complaint does not plausibly allege that the Guard is "policing the District" in either any ordinary sense of the term or by usurping the role of the MPD. If the Guard is prohibited from acting as a mere presence to deter crime, from reporting crimes they witness, and from assisting law enforcement in support missions when they are requested to do so, as well as from completing beautification

---

[1] *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 241 (D.D.C. 2004), *partially reversed on other grounds sub nom. by Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005).

projects within the District at the D.C. Government's request, it is not clear what Plaintiff believes the Guard *can do* in the District once lawfully deployed.

In any event, this argument is a non-sequitur. This case does not concern a federal takeover of the MPD or any action directed at the MPD at all. Whatever power the Mayor has over the MPD[2] is not a constraint on the President's authority over the D.C. National Guard, which is a federal entity—just as the Mayor's asserted authority over the MPD is not a constraint on the federal government's authority over the U.S. Park Police and Marshal's service (among others), which also have concurrent jurisdiction within the District. *See* MTD at 19. And again, any reading of the Home Rule Act's MPD provisions as imposing a constraint on the President's authority over the D.C. Guard would be contrary to Section 1-206.02(b), which expressly directs that the Act may not be construed to give the District's government any additional authority over the Guard.

Plaintiff's reliance on Section 49-103—again, presumably for the proposition that the D.C. Guard may be deployed without the D.C. government's consent but cannot "police the District" without that consent—is similarly misplaced. Plaintiff describes that provision as allowing "the President to order [the D.C. Guard] to 'aid' the District in 'enforcing the laws' only when the Mayor, the U.S. Marshal, or the National Capital Service Director requests such aid for the purpose of suppressing a 'tumult, riot, mob,' or similar disturbance." Opp. at 5 (citation omitted). But as we pointed out in the motion to dismiss, that is not what Section 49-103 says. It instead provides a procedural mechanism for the Mayor and other specified officials to request the President to provide the Guard's assistance. MTD at 18. That does not give the Mayor or other officials any control over the Guard's deployment, let alone provide support for Plaintiff's extravagant claim that she wields an

---

[2] As noted in the motion to dismiss, the Mayor's authority over the MPD is qualified, not absolute. And the President's authority to take control of the MPD was a significant aspect of the Home Rule Act that was necessary to its passage. MTD at 39.

effective veto over its use. Quite the opposite. The reason the Mayor *must make* a request is because the D.C. National Guard is a federal entity over which D.C. officials have no control. Nothing in this provision even plausibly divests the President of his authority over the D.C. National Guard.

Plaintiff contends that this reading renders Section 49-103 "superfluous." Opp. at 5. But "[t]he canon against surplusage is not an absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). The canon would not be a justification for adopting Plaintiff's construction of Section 49-103—as conditioning the President's use of a federal entity on the request of a local official who otherwise has no role in that entity's operation—which is contrary to both the statute's language and common sense.

In any event, declining to adopt Plaintiff's implausible reading of Section 49-103 in no way renders that provision superfluous. To the contrary, properly construed the statute still does plenty of work. First of all, it identifies the three specific individuals outside the Guard's chain of command who can make a request of the President, and confirms that such requests from these three individuals are "lawful." D.C. Code § 49-103. Second, it makes clear that Guardsmen ordered out shall not "be liable to civil or criminal prosecution for any act done in the discharge of his military duty." *Id.* And third, Section 49-103 makes clear that, while the Mayor may *make* a request, the decision is ultimately within the discretion of the President, who "shall thereupon order out so much and such portion of the militia as *he* may deem necessary." *Id.* (emphasis added). Section 49-103 thus not only performs "a function," *Bufkin v. Collins*, 604 U.S. 369, 386 (2025), but it underscores that the District's government has no authority to constrain or place conditions on the President's use of the D.C. Guard.

Given all of this, Plaintiffs are thus incorrect to claim that Defendants "must point to some affirmative grant of statutory authority that permits them to [conduct law enforcement] notwithstanding the directives generally vesting authority over District law enforcement in the Mayor." Opp. at 4. Those directives have nothing to do with—and cannot be read to constrain—the President's authority over the National Guard. To be sure, the Guard must comply with any applicable

laws. But what Plaintiff is claiming—that the President needs *affirmative* statutory authority to either deploy the Guard or direct it to engage in activities that Plaintiff characterizes as "policing the District"—is incorrect. The D.C. Code is itself federal law and the President is Commander in Chief of the D.C. National Guard, a federal entity. The President does not need express statutory authority to enforce federal law using federal forces at his command.

In any event, he has such express authority. To start with a provision cited in Defendants' motion to dismiss that Plaintiff does not meaningfully discuss, the D.C. Code recognizes the Guard's use "to aid the civil authorities in the execution of the laws." D.C. Code § 49-404; *Use of the Nat'l Guard to Support Drug Interdiction Efforts in the D.C.,* 13 Op. OLC 91, 97 (1989) (concluding that Section 49-404 and 49-102 both authorize the Guard to engage in law enforcement activity).

In addition, a 1969 Executive Order predating the Home Rule Act provides that the Secretary of Defense may order out the D.C. National Guard "to aid the civil authorities of the District of Columbia." Exec. Order No. 11,485 § 1, 34 Fed. Reg. 15411 (Oct. 3, 1969). Plaintiff brushes this aside, noting that "the President cannot grant new authority over the District by executive order." Opp. at 9. This misses the point, which is that, prior to the Home Rule Act, the President's authority was well understood to encompass ordering out the Guard to aid the civil authorities. Congress made clear in Section 1-206.02(b) that the Home Rule Act does not displace that preexisting authority.

Section 49-102—which provides that the Commanding General "may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper," D.C. Code § 49-102—likewise confers such authority. The phrase "other duties, as he may deem proper" provides broad authority to order out the Guard. Plaintiff insists that this phrase should be read by reference to the items that precede it. Opp. at 5. But even if true, the Guard's duties—principally acting as a deterrence force—are not different in kind from the preceding items. And

Section 49-102 does not stand alone. As noted, the Code separately provides that the Guard may be "called . . . to aid the civil authorities in the execution of the laws." D.C. Code § 49-404.

The Executive Branch, moreover, has so interpreted Section 49-102 for more than six decades. In 1963, OLC concluded that Section 49-102 authorized "the President to request or urge the commanding general to use the National Guard in support of activities of the District of Columbia police whenever he feels that the welfare, safety, or interest of the public would be served thereby." *See* Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia* at 3 (July 30, 1963). Plaintiff characterizes this opinion as "outdated," Opp. at 37, but OLC has consistently adhered to that analysis, explaining more recently that "[t]he authorization to order out the Guard for 'other duties, as he may deem proper' has long been viewed as broad enough to include law enforcement activities." *Use of the National Guard to Support Drug Interdiction*, 13 Op. O.L.C. at 93. And OLC's analysis is not "unreasoned." Opp. at 37. OLC explained that "[t]his natural reading of section [49-102] is especially appropriate in light of section [49-404] of the Code, which makes it clear that the National Guard, acting as militia, may be 'called . . . to aid the civil authorities in the execution of the laws.'" *Id.* (omission in original). OLC further noted that, in reliance on Section 49-102, "the National Guard has been used in its militia capacity to support law enforcement activities of the District of Columbia Metropolitan Police." *Id.*

Finally, recognizing the President's authority to deploy the D.C. National Guard does not conflict with the principle that Congress does not hide elephants in mouseholes, Opp. at 8 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)), and certainly does not reflect a "profoundly implausible" result, *id.* First of all, while Plaintiff professes concern about the President setting up the D.C. Guard "as a parallel District police force and us[ing] it to investigate crimes, arrest offenders,

control traffic, and otherwise take over District law enforcement," Opp. at 7-8, nothing like that is happening and the Complaint does not allege otherwise. The Guard is not making arrests, conducting searches and seizures, or making decisions on whether to arrest, prosecute, or investigate crime. MTD at 13. Plaintiff's heated rhetoric—including but not limited to its repeated contentions that the Guard is invading the District, Opp. at 1, 11, 16—in addition to being irresponsible, has no basis in reality.

In any event, there is no "elephant" here. D.C. is not a sovereign. MTD at 4; *see also* Opp. at 11 (not specifically disputing this). The D.C. Government is a statutory creation of Congress, with a limited set of authorities, that expressly does not include any authority over the D.C. National Guard that it did not have prior to the Home Rule Act. Notably, other components of the federal government *already* have broad law enforcement powers within D.C. Indeed, Congress has vested in the United States Park Police "the same powers and duties as the Metropolitan Police of the District." D.C. Code § 5-201. Officials of the U.S. Marshal's Service can also make arrests for crimes committed in their presence. *Id.* §§ 23-501, 23-581. And as OLC has observed, the D.C. Code is itself federal law. *Use of the National Guard to Support Drug Interdiction*, 13 Op. O.L.C. at 93 n.6. The violent crime problem in D.C. is not simply a local concern, but also endangers federal property and officials, concerns that implicate the President's Article II authority to use troops for the protection of federal property and functions. MTD at 30. There is simply nothing remarkable about the President's deployment of the Guard here, which falls squarely within his statutory and constitutional authority. Plaintiff's challenge to that deployment must be dismissed.

## II.   Defendants May Coordinate the Deployment of Non-DC National Guard Members.

Plaintiff's challenge to the deployment of National Guard members from other states likewise must be dismissed. Contrary to Plaintiff's argument, the President has express statutory authority to request assistance from other state National Guard units. Title 32 authorizes National Guard members to "be ordered to perform training or other duty," which may include "[s]upport of operations or

missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f), (f)(2)(A). Section 502 thus authorizes the President or Secretary to request National Guard units to support a federal mission, which necessarily includes operations in the District. And nothing in this language limits the type of missions that the President and Secretary of Defense can request. This is not "*ipse dixit*." Opp. at 11. It is what the statute unambiguously says.

Plaintiff insists that because Section 502(f) refers to "training or other duties," "it authorizes the President to request that National Guard units perform duties similar to training." Opp. at 11 (emphasis omitted). Even putting aside that Plaintiff does not identify what duties "similar to training" it believes the statute encompasses, this argument goes nowhere. Section 502 specifically addresses training because the statute *requires* all Guard units to undertake certain training under military regulations *without further request* from the President or Secretary of Defense, and regulates how credit for that training is counted. 32 U.S.C. § 502(a)-(e). But it separately states that Guard members may "be ordered to perform training or other duty in addition to that prescribed under subsection (a)," and provides that this "training *or duty ordered to be performed*" may include either "[s]support of training operations and training missions" or "[s]support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." *Id.* § 502(f), (f)(2)(A)-(B) (emphasis added). It is impossible to read this latter provision as encompassing only duties "similar to training."

Plaintiff's legal position on this point is also difficult to understand. Plaintiff repeatedly suggests that the problem with the out-of-state deployment is that the District's government has not consented to it. *See* Opp. at 10 ("Defendants also fail to identify any statutory authority that permits them to direct out-of-state National Guard troops to police the District over the District's objection."); *id.* at 11 (contending that Section 502(f) does not convey "authority to order out-of-state troops to invade and police other jurisdictions without their consent"). But Plaintiff again does not logically explain how the consent or non-consent of the District's government is legally relevant—

under Section 502(f) or otherwise. If Plaintiff is correct that the President needs statutory authority to coordinate the deployment of out-of-state Guardsmen in the District and that neither Section 502(f) nor any other statute confers such authority, that would presumably mean that the President could not obtain the assistance of out-of-state Guardsmen in a Title 32 status *at all*, with or without the District's agreement. That cannot possibly be right.

Plaintiff's continued reliance on the EMAC for the proposition that the President cannot obtain assistance from states under Title 32 remains indefensible. The EMAC's general provisions are not specific to D.C., do not refer to the Mayor, and are also not limited to National Guard assistance. Plaintiff has no persuasive response to Defendants' point that, even if the Compact was the exclusive mechanism for obtaining Guard assistance from states, the appropriate authority to make that request would be the *President*, not the D.C. Mayor. MTD at 21. Indeed, it would make no sense to read the EMAC to authorize the Mayor to make binding requests on other parties to the compact, since the Mayor indisputably has no reciprocal power to fulfill requests from states (since she has no control over the D.C. National Guard)—an asymmetry Plaintiff does not dispute.

In any event, the EMAC obviously is not the sole mechanism for obtaining assistance from states. Nothing in the language of the Compact suggests it is exclusive and Plaintiff does not contend otherwise. Nor does Plaintiff even point to any legislative history indicating that anyone in Congress thought that its approval of the Compact both divested the President of his authority to request assistance from the states and placed that responsibility solely in the hands of a local official with no Guard-related responsibilities. Plaintiff contends "that where Congress has provided a specific, detailed mechanism for exercising certain authority, the government may not circumvent that mechanism by invoking general statutory language elsewhere." Opp. at 13. But even assuming this principle is sound, the obvious response is that the EMAC and Title 32 are very different types of authority. The EMAC is authority given to the several States (as well as the District, Puerto Rico, and

U.S. territories) to obtain assistance *from each other*. Title 32 authorizes *the President* to authorize use of the National Guard for a federal purpose and at federal expense. Plaintiff also references the principle that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Opp. at 13 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). But that principle supports Defendants' position here. The EMAC and the President's Title 32 are distinct and comfortably coexist. It is Plaintiffs' position— reading a compact between states as displacing the President's authority under the Constitution and a federal statute—which would subvert that principle.

## III.    Plaintiff Lacks Standing To Challenge Who Controls Out-of-State National Guard Troops.

Plaintiff also challenges the out-of-state deployment on the grounds that the federal government is unlawfully commanding the day-to-day operations of state National Guard members. This claim fails on its facts, as explained in Defendants' opposition to Plaintiff's motion for a preliminary injunction. But even accepting this conclusory allegation as true, Plaintiff plainly has no standing to vindicate, for example, the Governor of Ohio's interest in exercising command and control over the Ohio National Guard. As explained in Defendants' Motion, Plaintiff might have standing to vindicate specific rights that they (wrongly) say the Mayor has under D.C. law or the EMAC—but Plaintiff simply does not suffer any freestanding sovereign injury or other injury because it has no freestanding sovereign power to vindicate. *See* MTD at 37-38. And even if it did, Plaintiff would of course still lack standing to assert an injury on behalf of another State or its Governor.

To this, Plaintiff has no response. It does not even assert that, much less meaningfully explain how, it has standing to contest who is controlling the daily operations of out-of-state Guardsman. This is unsurprising, as such a "generalized grievance, no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013). Regardless, Plaintiff has conceded this argument by failing to address it. *See, e.g., Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 268 (D.D.C.

2012) ("[T]he Court may treat the plaintiff's failure to oppose the defendant's . . . arguments as a decision to concede those arguments." (citation omitted)), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020).

## IV.    Plaintiff's APA Claim Must Be Dismissed.

Plaintiff's APA claim likewise fails. At the threshold, Plaintiff concedes that Presidential action is not subject to the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); Opp. at 37. That means the APA provides no basis to challenge the President's decision to deploy the Guard to D.C. "to address the epidemic of crime in our Nation's capital." Presidential Memorandum, *Restoring Law & Order in the District of Columbia*, § 2 (Aug. 11, 2025). Plaintiff is wrong to assert that it may nonetheless challenge the agency Defendants' "decisions to direct" Guardsman "pursuant to that order." Opp. at 37. Such a challenge is indistinguishable from a challenge to the Presidential Memorandum itself, and thus cannot be brought under the APA or its standards. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (final agency action must carry independent legal consequences). Indeed, even if the agency Defendants' actions were somehow enjoined or vacated because of this suit, the challenged "mobilization and duration of duty shall remain in effect until [the President] determine[s] that conditions of law and order have been restored in the District." Presidential Memorandum § 2. Plaintiff's request to enjoin that mobilization and deployment thus cannot be based on the APA.

Plaintiff's arbitrary and capricious claims concerning the deputation of Guardsman and their authority to carry weapons also fail on threshold grounds. Those challenges amount to impermissible programmatic attacks on aspects of the National Guard's day-to-day operations, not claims based on discrete final agency action. Start with Plaintiff's wholesale challenge to the "deput[ation] [of] thousands of troops" as Special Deputy U.S. Marshals. PI Mot. at 39. Plaintiff concedes, as it must, that this claim does not target a discrete decision or action. For example, some deputations involved "leaders of the DCNG that are in command of the Joint Task Force-DC," Compl. ¶ 112, whereas other deputations occurred later and involved out-of-state National Guard units in state militia status,

*see id.* ¶ 152. Yet Plaintiff does not identify any particular deputation as arbitrary and capricious, and instead vaguely challenges an amalgamation of "numerous . . . deputations" that occurred at different times and under different conditions. Opp. at 35-36. This is precisely the sort of "broad programmatic attack" on an agency's day-to-day operations that cannot be brought under the APA, and allowing this claim to proceed would straightforwardly violate the APA's "limitation to discrete agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Nor may Plaintiff bring an APA challenge to National Guard members' authority to carry their service weapons. Plaintiff contends that this supposed claim satisfies APA finality standards because the Secretary of Defense issued a memorandum that included a directive that Guardsman carry their service weapons. *See* Opp. at 36. True enough. But the APA "does not provide judicial review for everything done by an administrative agency." *Hearst Radio v. FCC*, 167 F.2d 225, 227 (1948). To be final for purposes of APA review, the Secretary's directive must still determine "rights or obligations" or result in "legal consequences." *Bennett*, 520 U.S. at 177-78 (citation omitted). The Secretary's memorandum does neither. Plaintiff's sole response is that the memorandum carries legal consequences because it authorizes Guardsman "to carry weapons that would otherwise be unlawful." Opp. at 36. But putting aside that the authorization to carry weapons does not determine rights or obligations or result in legal consequences to Plaintiff, this is incorrect. As the Complaint explains, the National Guard members' legal authorization to carry service weapons traces to the Marshal's deputation authority—not the Secretary's directive. *See* Compl. ¶ 115 ("Those deputized by the USMS . . . 'have Title 18 authority . . . to . . . [c]arry firearms for personal protection or the protection of those covered under the federal assault statues.'" (second omission in original) (quoting USMS Policy Directive 17.11.D.4 (10/07/2020)). The Secretary's memo determines no rights or obligations.

The APA does not permit review of Defendants' general implementation of the President's deployment. This limitation is a feature, not a bug. It both "protect[s] agencies from undue judicial

interference with their lawful discretion," and "avoid[s] judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66.

## V. Plaintiff's Posse Comitatus Act and Section 275 Claim Must Be Dismissed.

Plaintiff's PCA and Section 275 claim also fails as a matter of law.[3]

**1.** Plaintiff's PCA claim fails at the outset because Plaintiff lacks a cause of action to enforce the PCA. Plaintiff does not dispute that every court to consider the issue has concluded that the PCA does not create a private civil cause of action for damages. *See, e.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). And in the 147-year history of the PCA, the government is aware of only one case granting injunctive relief against the federal government in a civil action on PCA grounds: the Northern District of California's decision in *Newsom v. Trump* last month. *See* No. 25-CV-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025), *appeal filed*, No. 25-5553 (9th Cir. Sep. 3, 2025). That decision was wrong and will not withstand appellate review (the injunction has since been administratively stayed by the Ninth Circuit, *see* No. 25-5553, ECF No. 7.1 (9th Cir. Sept. 4, 2025)). But even that court did not dispute that the PCA does not provide for a cause of action, and instead granted an injunction based on a non-statutory *ultra vires* theory. *Newsom*, 2025 WL 2501619, at *27 n.26. There is *no decision from any court* allowing a civil claim under the PCA against the Government.

Plaintiff's response—"for nearly a century, *every* case interpreting the PCA has arisen from claims raised by private individuals," Opp. at 23—misses the point. That criminal statutes can provide

---

[3] Defendants argued in opposing the preliminary injunction motion that the Guard is not in fact executing the laws. That contention remains correct and the preliminary injunction motion fails for that additional reason. The Guard is not making arrests, conducting searches and seizures, determining what crime to investigate, or making prosecution decisions. Defendants do not contend, however, that the Court can resolve that question in the context of a motion to dismiss under Rule 12.

a defense in criminal proceedings[4] or a basis for suppression of evidence in such proceedings[5] does not support Plaintiff's argument. Criminal defendants can file a suppression motion without a freestanding cause of action, and the Administrative Procedure Act provides that agency action "is subject to judicial review in civil or criminal proceedings for judicial enforcement." 5 U.S.C. § 703. But Plaintiff here is not seeking to raise an asserted violation of the PCA as a *defense* to civil or criminal enforcement, but rather to wield the PCA as a sword against the federal government itself.

Plaintiff also references supposed "case[s] interpreting the PCA" "in affirmative civil suits," Opp. at 23, but the sparse authority Plaintiff cites lend no support to its position. *Mandato v. United States*, No. 1:19-cv-00772, 2019 WL 13251552 (E.D. Va. Oct. 3, 2019), was not a PCA case. That case instead involved a lawsuit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2674 et seq.—unlike the PCA, the FTCA waives the federal government's sovereign immunity for certain civil claims. In holding that the FTCA's sovereign immunity waiver did not apply (and thus that the court did not have jurisdiction over the plaintiff's suit), the court simply rejected plaintiff's attempted invocation of the PCA to avoid the FTCA's discretionary function exception. *Mandato*, 2019 WL 13251552, at *4.

*Bissonette v. Haig*, 800 F.2d 812 (8th Cir. 1986) (en banc), *aff'd by equally divided Court*, 485 U.S. 264 (1988), was not a PCA case either. In that case—involving extreme facts that bear no resemblance to those alleged in the Complaint here[6]—plaintiffs brought an action for damages and the Eighth Circuit held that the Complaint adequately stated a claim sufficient to withstand a motion to dismiss,

---

[4] *United States v. Cardenas-Tovar*, No. 3:19-CR-4370, 2020 WL 905634 (S.D. Cal. Feb. 25, 2020)); *United States v. Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1975).

[5] *United States v. Johnson*, 410 F.3d 137, 146-49 (4th Cir. 2005)

[6] As the earlier panel opinion in that case recounted, the plaintiffs alleged "that the defendants seized and confined plaintiffs within an 'armed perimeter,'" and where an entire village was sealed off *for ten weeks. Bissonette v. Haig*, 776 F.2d 1384, 1385 (8th Cir. 1985)

reasoning in part that a seizure contrary to the PCA was also unreasonable under the Fourth Amendment. *Id.* at 813. The only other case Plaintiff cites—a 64 year-old Eastern District of New York decision—is also an FTCA case, and the court dismissed the plaintiff's complaint on the grounds that the complained of conduct was contrary to the PCA and thus necessarily outside the scope of the federal employee's employment. *Wrynn v. United States*, 200 F. Supp. 457, 465 (E.D.N.Y. 1961).

More broadly, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). By enacting the PCA as a criminal statute, without any accompanying civil remedies, Congress displaced any private action for civil injunctive relief, consistent with the Executive Branch's exclusive authority to prosecute federal crimes, *see, e.g.*, *United States v. Texas*, 599 U.S. 670, 680 (2023). This explains why there is no historic tradition of allowing civil injunctive relief for criminal violations.

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), on which Plaintiff relies, further underscores the impropriety of creating a cause of action here. There, the Court refused to create a freestanding "private right of action" under the Trade Secrets Act, a criminal statute that applied only to government actors. *Id.* at 316. The Court explained that it "rarely" inferred a cause of action from "a criminal statute." *Chrysler*, 441 U.S. at 316.

Plaintiff suggests that it can enforce the PCA's requirements as part of an APA challenge to agency action, but enforcement of a criminal statute the Executive Branch administers is not available under the APA. The APA provides that it does not affect "other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702(1). It is a basic feature of our federal system that the Executive Branch has exclusive authority over prosecuting federal crimes, including its exercise of prosecutorial discretion. *See, e.g.*, *Texas*, 599 U.S. at 680. That authority cannot be transferred to private citizens, *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), and courts cannot adjudicate a private

citizen's (or a State's) grievance over the Executive Branch's prosecutorial decisions, *see Texas*, 599 U.S. at 680-81. These principles operate as a "limitation[]" on "[t]he power of federal courts of equity to enjoin unlawful executive action." *Armstrong*, 575 U.S. at 327. Allowing a plaintiff to pursue private enforcement of the PCA through a civil action under the APA would conflict with these settled principles. *Chrysler* is not to the contrary. The issue of whether criminal prosecutorial discretion should preclude APA review was not implicated in that case because the criminal statute had been incorporated into civil regulations that bound the agency. 441 U.S. at 318 n.48. Although the Department of War has adopted regulations implementing the PCA, those regulations expressly allow for protection of federal property and functions. *See infra* p. 24. In addition, APA enforcement of the PCA would require a court to inquire into impossible (and bizarre) questions of governmental willfulness—namely, that the agency would not be acting contrary to law unless it had the mens rea required under the PCA. *See infra* pp. 20-23. By contrast, the statute at issue in *Chrysler* did not contain a willfulness requirement. *See* 18 U.S.C. § 1905. And in any event, APA review of the President's deployment decision is unavailable. *See supra* p. 13.

**2.** Even if the PCA supplied a private cause of action to seek injunctive relief, it simply does not apply to the Guard's activities in the District. All agree that the National Guard members involved in the challenged deployment are "in a Title 32 status." Compl. ¶ 105. That is sufficient to dispose of Plaintiff's PCA claim: "The [PCA] . . . does not apply to Title 32 National Guard duty." *Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019). Plaintiff attempts to distinguish *Mueller*, arguing the court "did not address" whether the PCA applied to a servicemember only "formally in Title 32 status." Opp. at 26. But the Seventh Circuit's analysis is crystal clear. "Federal service for purposes of the [PCA] refers to standing active duty forces organized under Title 10 of the U.S. Code." *Mueller*, 943 F.3d at 837. Plaintiff responds that a "body of precedent" supports its contrary position, relying on *Gilbert v. United States*, 165 F.3d 470, 473 (6th Cir. 1999). But *Gilbert* just confirms that whether the

PCA applies turns on formal status under Title 10. *See* 165 F.3d at 473 ("The [PCA] does not apply to members of the National Guard unless they have been called into 'federal service,'" and that "triggering event" does not occur "until such time as [the Guard] [is] ordered into active federal duty by an official acting under a grant of statutory authority from Congress.'") (citation omitted).

**3.** Plaintiff fails to plausibly allege a PCA violation for another fundamental reason: the PCA does not apply because Congress has "expressly authorized" the Guard to execute the laws within the District. 18 U.S.C. § 1385. As explained already, Section 49-404 recognizes the Guard's use "to aid the civil authorities in the execution of the laws." D.C. Code § 49-404. A clearer authorization for law execution is difficult to imagine. Section 49-102 also expressly permits the Commanding General of the National Guard to "order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper." D.C. Code § 49-102. Law enforcement duties are among the "other duties, as he may deem proper" authorized by Section 49-102. *See supra* pp. 7-8.

Plaintiff tries to avoid the plain language of these provisions by asserting that "express authorization" exists only where Congress "'clearly' indicates that [it] wishes to override the prohibitions of the PCA," and Section 49-102 "does not mention law enforcement [or] reference the PCA." Opp. at 27 (citation omitted). Putting aside that Section 49-404 does mention law execution, that is not the law. As the Supreme Court has observed, "it is evident that, in order to qualify under the 'expressly authorized' exception of" a statute, "a federal law need not contain an express reference to that statute," nor is any "prescribed formula . . . required." *Mitchum v. Foster*, 407 U.S. 225, 237 (1972) (citation omitted). And courts have repeatedly found express authorization even when the statute providing that authorization makes no mention of the PCA. *See, e.g.*, *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1164 (9th Cir. 2022); *United States v. Allred*, 867 F.2d 856, 870–71 (5th Cir. 1989). Indeed, in *Hernandez-Garcia* the provision the Ninth Circuit considered not only made no mention of the PCA, but was buried within an approximately 800-page omnibus authorization act. Neither the

district court nor the unanimous Ninth Circuit panel had any difficulty concluding that the provision constituted express authorization for PCA purposes. Similarly, Plaintiff has given no good reason for this Court to create a bespoke, express-reference rule here. Ordinary rules of construction apply, and the plain meaning of Sections 49-404 and 49-102 expressly authorizes Guardsmen to execute the laws.

**4.** The Complaint also fails to plausibly plead willfulness. The PCA provides for criminal penalties only where an individual "*willfully* uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws." 18 U.S.C. § 1385 (emphasis added). Plaintiff initially disputes that it must demonstrate willfulness at all, contending that, prior to 1956, "the statute's legal prohibition did not contain a willfulness requirement" and Congress intended when it amended the statute to restate it without substantive change. Opp. at 33. But the plain language of the PCA makes clear that, absent willfulness, there is no violation of the statute in the first place; no amount of historical context can displace this plain language. In any event, Plaintiff's historical detour comes up empty. The PCA has always been limited to criminal enforcement, regardless of where it was codified. *See, e.g.*, 20 Stat. 145, 152 (1878) ("any person willfully violating [the PCA] shall be deemed guilty of a misdemeanor"); 10 U.S.C. § 15 (1925) (same). And both before 1956 and in its current form, willfulness has been required. Simply put, there is no violation of the PCA without willfulness. That was true in the past and it remains the case today. Nor, again, does it matter that other courts considering the PCA in a defensive context—such as a motion to suppress evidence—have not analyzed willfulness. Opp. at 33-34. If Plaintiff wants to assert a civil claim under the PCA—assuming a civil claim under the PCA is available, which it is not— Plaintiff must satisfy all of its elements; it cannot pick and choose. Notably, the sole court that has allowed a civil claim based on the PCA made clear that the plaintiffs *were required* to show willfulness; it concluded wrongly that the willfulness requirement was satisfied in that case but it did not hold that the plaintiffs were not required to show willfulness at all. *See Newsom*, 2025 WL 2501619, at \*25.

Nor does Plaintiff appear to dispute that it could not demonstrate willfulness if willfulness means "that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994). As noted in the motion to dismiss, it would be absurd to contend that Defendants *knew* the Guard's activities are unlawful given OLC's views dating back to at least the Kennedy Administration that the PCA does not apply to Guardsmen in a Title 32 status[7] and that federal law in any event authorizes the President to use the Guard for law enforcement. MTD at 32.

Plaintiff thus seeks to water down the PCA's willfulness requirement to accommodate their attempt to use this criminal statute as the basis for a civil suit against the Government. Citing the D.C. Circuit's decision in *United States v. Bannon*, 101 F.4th 16 (D.C. Cir. 2024), *petition for cert. docketed*, No. 25-453 (U.S. Oct. 10, 2025), Plaintiff contends that willfulness in the PCA should only be read to mandate "an intentional and deliberate act." Opp. at 32. It is doubtful that *Bannon*'s logic applies here. In that case, the defendant was convicted of violating the contempt of Congress statute, 2 U.S.C. § 192, which criminalizes "willfully" failing to respond to a congressional subpoena. There was no dispute that the defendant "deliberately and intentionally refused to comply with a congressional subpoena." 101 F.4th at 18; *see also id.* at 21 (he "deliberately refused to comply with the Select Committee's subpoena in that he knew what the subpoena required and intentionally did not respond"). The court "held that an advice of counsel defense—which ultimately seeks to show the defendant acted in good faith—is unavailable under this statute." *Id.* at 21.

Here, by contrast, Plaintiff's interpretation is that criminal defendants act "willfully" for PCA purposes if they engage in any intentional act, even if they believe that the act does not fall within the

---

[7] Plaintiff's citation of a 2021 OLC opinion adds nothing to the analysis. *See Mil. Support for Customs & Border Prot. Along the S. Border Under the Posse Comitatus Act*, 2021 WL 298369, at *5 & n.3 (O.L.C. Jan. 19, 2021). That opinion cited *Mueller* and noted that Guardsmen "who would be considered as either part of the Army or Air Force" were subject to the PCA. There is no inconsistency between that opinion and the case law concerning Title 32 or OLC's opinions as to the D.C. Guard.

statute in the first place (because it does not constitute execution of the laws or because it is expressly authorized by statute). Moreover, it is the "general" rule that "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf*, 510 U.S. at 137). The decision in *Bannon* was based almost entirely on the unique context of the statute concerning congressional subpoenas. The Court based its conclusion on binding precedent specific to Section 192, as well as practical concerns that requiring a showing of bad faith in that context would undermine Congress's ability to enforce its subpoenas and ultimately to legislate. 101 F.4th at 22. None of that logic or precedent applies to the PCA.

Relatedly, Plaintiff's breezy assertion that the PCA is not a highly technical statute, and its "mandates are not so novel or elusive that someone is likely to accidentally violate it," Opp. at 32, cannot be taken seriously. Plaintiff itself contends that the Executive Branch has been interpreting the PCA incorrectly for more than 60 years. *See supra* pp. 7-8. Courts have also articulated multiple, open-ended tests for determining whether the PCA was violated. *United States v. Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988). And more generally, courts have grappled in dozens of cases with how to apply the PCA, including what entities are and are not subject to it, what statutes expressly authorize law execution, and what activities do and do not qualify as impermissible execution of the laws. Given this complex and often-debated subject, this is very likely not the sort of situation in which statutory context supports diluting the PCA's willfulness mandate to require only an intentional act. And Plaintiff does not even contend that it could satisfy *any other* standard.

In any event, the Court need not decide what mens rea standard "willfulness" requires here because the Complaint does not adequately plead willfulness under any standard. Indeed, it does not even try to do so. The sole mention of willfulness is in a paragraph that merely quotes the PCA's text. Compl. ¶ 50. And Plaintiff does not meaningfully grapple with Defendants' central point, which is

that, regardless of the specific scienter requirement that applies, it is nonsensical to think that Congress intended to provide for judicial review of government action while making the outcome of that review depend on questions of governmental scienter in the first place—which only reinforces that civil enforcement of the PCA against the Government is not available.

**5.** Plaintiff's invocation of 10 U.S.C. § 275 likewise fails. First of all, Plaintiff's insistence that Defendants "forfeited" arguments concerning Section 275 has no merit. Opp. at 21-22. Plaintiff's preliminary injunction motion repeatedly simply listed Section 275 alongside the PCA, while not asserting any independent argument based on Section 275 alone. PI Mot. at 31, 32, 33, 34. Plaintiff's Complaint similarly just referenced the PCA and Section 275 simultaneously, *see, e.g.*, Compl. ¶¶ 153-56, while referring to Section 275 as the PCA's "counterpart," *id.* ¶ 5. Defendants were not required to separately discuss a provision that Plaintiff itself treated as parallel to the PCA.

Section 275 also adds nothing to the analysis. Plaintiff boldly insists that Section 275 replicates the PCA's prohibitions without any of its limitations (i.e., it is not a criminal prohibition, does not require willfulness, and extends to Guard members in Title 32 status that are not subject to the PCA). Opp. at 21. Section 275 will not bear this interpretation. That provision simply directs the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity" under Chapter 15 ("Military Support for Civilian Law Enforcement Agencies") "does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law." 10 U.S.C. § 275. For starters, the mere directive to the Secretary to promulgate regulations does not create a civil cause of action or create any judicially enforceable rights. And even if it did, Plaintiff's remedy (if any) would be to attempt to challenge the failure to promulgate regulations. Indeed, while Plaintiff contends that Section 275 "has long been deemed subject to judicial enforcement," Opp. at 22, the cases Plaintiff cites simply entertain challenges in the traditional

defensive contexts in which courts have sometimes entertained challenges based on the PCA itself (e.g., motions to suppress evidence in criminal proceedings). Plaintiffs do not cite any case in which a court has allowed a cause of action against the Government based on Section 275.

Nor is Section 275 broader than the PCA in any relevant respect. As Plaintiff's complaint notes, the apparent purpose of Section 275 was to "extend[] PCA-like limits to military establishments not initially covered by the PCA." Compl. ¶ 52. And as Plaintiff's preliminary injunction motion itself contends, the standard for identifying violations under regulations promulgated under Section 275 is the same as under the PCA. PI Mot. at 32. Indeed, the text of Section 275 suggests that it is if anything slightly narrower than the PCA. It applies only to "direct participation" in specifically identified activities ("a search, seizure, arrest, or other similar activity"), exempts any action "authorized by law" (it does not use the PCA's "expressly authorized" language, and is also not limited to "the Constitution or Act[s] of Congress"), and applies only to the Army, Navy, Air Force, or Marine Corps (and so does not apply to Guard troops in a non-federalized Title 32 status).[8] 10 U.S.C. § 275. In any event, even if Plaintiff had a cause of action based on Section 275 (which it does not), Section 275 is certainly not meaningfully *broader* than the PCA, and any claim based on it fails for the same reasons.

## VI.    Plaintiff's Constitutional Claims Must Be Dismissed.

Plaintiff's constitutional claims also fail as a matter of law, because they are entirely derivative of Plaintiff's contention that the Guard's deployment and alleged actions violate federal statutes. Plaintiff frames this as a question of "reviewability" but the point is that, even if Plaintiff's purported "constitutional" claims are reviewable, they rise and fall with Plaintiff's statutory arguments. Plaintiff's opposition confirms this point. Plaintiff contends that "Defendants violated the District Clause by

---

[8] Agency regulations are also clear that "[f]ederal action, including the use of Federal military forces, is authorized when necessary to protect Federal property or functions." Dep't of Defense Instruction 3025.21, at 17 (2019).

disregarding Congress's authority to legislate for the District and usurping the Mayor's local law-enforcement authority." Opp. at 39. This is just an argument that Defendants' actions violate the Home Rule Act. Plaintiff also asserts that "Defendants violated the Constitution's separation of powers and the Take Care Clause by taking actions not even contemplated by Congress." Opp. at 39 (cleaned up). Again, this is just a lack of statutory authority argument dressed up in constitutional garb. The constitutional claims fail for the same reasons the statutory claims fail.

## VII.    Plaintiff's Ultra Vires Claims Must Be Dismissed.

Finally, even if ultra vires review were available, Plaintiff plainly has not plausibly pled that it can satisfy the extraordinarily demanding standards for obtaining relief under any ultra vires theory.

That claim requires Plaintiff to satisfy one of the most demanding standards known to the law, a "Hail Mary pass," *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted), requiring a showing that an agency is engaged in "blatantly lawless" action, *Oestereich v. Selective Serv. System Loc. Board No. 11*, 393 U.S. 233, 238 (1968), or "that the agency has plainly and openly crossed a congressionally drawn line in the sand," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022). Plaintiff half-heartedly appears to suggest that this standard might not apply here, *see* Opp. at 37, but it plainly does and Plaintiff offers no argument to the contrary. And that standard obviously is not satisfied here. At best, Plaintiff has advanced highly debatable readings of the D.C. Code, Section 502(f), the EMAC, and the PCA. Even if Plaintiff were right in their reading of the relevant law, this falls well short of a viable ultra vires claim, which is reserved for egregious and obvious disregard of statutory limits that leaves no room for reasoned disagreement. *At most*, Plaintiff has alleged the sort of "routine error in statutory interpretation" that cannot support a nonstatutory ultra vires cause of action. *Fed. Express Corp.*, 39 F.4th at 765. This claim must be dismissed.

## CONCLUSION

The Complaint should be dismissed in its entirety.

Dated: October 17, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           ERIC J. HAMILTON
                                           Deputy Assistant Attorney General

                                           JOHN BAILEY
                                           Counsel to the Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Branch Director

                                           BRAD P. ROSENBERG
                                           Special Counsel

                                           *s/ Andrew M. Bernie*
                                           Andrew M. Bernie
                                           U.S. Department of Justice
                                           Civil Division
                                           950 Pennsylvania Avenue NW
                                           Washington, DC 20530
                                           Phone: 202-514-3511
                                           Email: andrew.bernie@usdoj.gov

                                           *Attorneys for Defendants*