# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

               Plaintiff,

        v.

DONALD J. TRUMP, *et al.*,

               Defendants.

Civil Action No. 1:25-cv-03005-JMC

## SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.     Discovery Confirms Defendants Have Not Unlawfully Assumed Command and Control Over Out-of-State National Guard Troops. .................................................. 2

II.    Discovery Confirms the Guard's Lawful, Cooperative Role in Supporting Civil Authorities, Not Federal Law Enforcement Operations. ........................................... 8

III.   Discovery Confirms Plaintiff's Allegations of Irreparable Harm Are Illusory. ....... 13

IV.   Plaintiff's Arbitrary and Capricious Claim Flunks the Finality Requirement. .......... 15

CONCLUSION ..................................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Alabama-Coushatta Tribe of Tex. v. United States,*
    757 F.3d 484 (5th Cir. 2014) ...................................................................................... 15

*Ass'n of Admin. L. Judges v. U.S. OPM,*
    640 F. Supp. 2d 66 (D.D.C. 2009) .............................................................................. 16

*Bennett v. Spear,*
    520 U.S. 154 (1997) ..................................................................................................... 16

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ..................................................................................................... 15

*Ratzlaf v. United States,*
    510 U.S. 135 (1994) ................................................................................................. 1, 10

*Safari Club Int'l v. Jewell,*
    47 F. Supp. 3d 29 (D.D.C. 2014) ................................................................................ 14

*United States v. Beidleman,*
    No. 25-cr-270, 2025 WL 2803850 (D.D.C. Oct. 1, 2025) ......................................... 12

*United States v. Yunis,*
    681 F. Supp. 891 (D.D.C. 1988), *aff'd,* 924 F.2d 1086 (D.C. Cir. 1991) ................... 8

**Statutes**

5 U.S.C. § 551(13) ............................................................................................................. 16

18 U.S.C. § 111(a) ............................................................................................................. 12

32 U.S.C. § 502(f) ............................................................................................................... 6

D.C. Code § 49-404 ................................................................................................. 9, 11, 12

**Administrative & Executive Materials**

Exec. Order No. 11,485,
    34 Fed. Reg. 15411 (Oct. 3, 1969) ............................................................................. 10

Exec. Order No. 14,333,
    90 Fed. Reg. 39301 (Aug. 11, 2025) ........................................................................... 15

**Other Authorities**

Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant
    Attorney General, Office of Legal Counsel, *Re Authority to use the National Guard of the District of*

*Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia* (July 30, 1963) ....................................................................................................................................9

*Use of the National Guard to Support Drug Interdiction Efforts in the D.C.,*
13 Op. O.L.C. 91 (1989)...................................................................................................................................9

# INTRODUCTION

Discovery confirms that Defendants have not unlawfully assumed command and control over out-of-state National Guard troops and that Plaintiff's claims rest on mischaracterizations of both law and fact. The record demonstrates that the D.C. National Guard (DCNG) operates as a liaison and coordinating element for out-of-District National Guard units deployed in Title 32 status. While DCNG possesses coordinating and tasking authority, those forces "remain under the administrative command and control of their sending state Adjutants General and ultimately their State Governors," and "[a]ll tasks assigned to out-of-district forces are within parameters set by their State Governors." Decl. of Colonel Lawrence M. Doane ("Doane Decl.") ¶ 9, ECF No. 34-1. The Memoranda of Understanding (MOUs) produced in discovery reaffirm that governors retain full authority to withdraw or restrict their troops and that coordination through DCNG does not displace state command. *See* Pl.'s Ex. 6 at 0614-0617 (DCNG MOU), ECF No. 70-1; *see also* Defs.' Ex. 1 (Sec'y of Def. Aug. 21, 2025 Mem.).

Discovery likewise confirms that the Guard's activities in the District remain fully consistent with its lawful role in supporting civil authorities. Contrary to Plaintiff's assertions, the Guard has not engaged in core law-enforcement functions. The record demonstrates that Guardsmen do not make arrests, conduct searches or seizures, or perform other such activities. *See* Doane Decl. ¶¶ 4, 7; *see also* Defs.' Ex. 1. Policies and use-of-force rules expressly instruct Guardsmen to defer to law enforcement and to act only in a supportive capacity. Pl.'s Ex. 32 at 0182, ECF No. 69-2; Defs.' Ex. 1. This record of adherence to legal guidance defeats any suggestion of a "willful" violation of the Posse Comitatus Act (PCA). *See Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

Plaintiff's remaining claims fare no better. Discovery demonstrates that the District's allegations of irreparable harm are unsupported by any evidence of actual injury or public-safety risk, and its arbitrary-and-capricious claim fails because the challenged documents do not constitute final

agency action. For these reasons, Plaintiff's motion for a preliminary injunction and Section 705 stay should be denied.

## ARGUMENT

### I.    Discovery Confirms Defendants Have Not Unlawfully Assumed Command and Control Over Out-of-State National Guard Troops.

Discovery confirms that Defendants have not unlawfully assumed command and control over out-of-state National Guard troops. Under settled law, out-of-District National Guard units operating under The Emergency Management Assistance Compact (EMAC) orders remain in Title 32 status under the command of their respective governors and adjutants general. *See* Pl.'s Mem. in Supp. of Prelim. Inj. ("PI Mem."), at 29, ECF No. 3-1. The District, nonetheless, contends that the "DCNG and the Department of Defense are in practice exercising pervasive control over the operations of all National Guard forces in the District, while the sending states' governors and adjutant generals exert no meaningful direction or command over the troops they have sent here." Pl.'s Suppl. Br. at 2, ECF No. 70. The District's characterization of "pervasive control" mistakes operational coordination for command authority. *See id.* The record shows that out-of-state National Guard troops remain in Title 32 status and are subject to recall or reassignment by their home states at any time. *See* e.g., Defs.' Ex. 1; Pl.'s Ex. 6 at 0614-0617.

Daily briefings, shared tasking orders, and logistical synchronization among participating out-of-District National Guard units are features of multistate operations grounded in prudent coordination, not an unlawful assumption of command. Such coordination is essential to ensure unity of effort, safety, and compliance with standing rules of engagement and the DCNG's mission parameters. Nothing in the cited documents, including Colonel Doane's formal orders or the U.S. Army's daily updates, suggest that the federal government or DCNG has displaced the lawful command of the sending states. *See* Pl.'s Ex. 13 (Fragmentary Order (FRAGO) 8), ECF No. 69-2; *see also* Pl.'s Ex. 16 (Sept. 12 Email from Eric James Riley) at 0029-31 (providing a daily update on JTF-

DC operations directly to the Secretary of the Army), ECF No. 69-2. The operational framework in the District reflects precisely what Congress contemplated: a lawful collaboration in which the President commands the DCNG, state governors retain control over their own Guards under Title 32, and DCNG serves as a liaison and chief coordinating element for the out-of-District National Guard units.

Plaintiff contends Defendants' organizational charts demonstrate that all National Guard troops in the District are operating under the command and control of the DCNG and federal military. ECF No. 70 at 2. The District is wrong on both the law and facts. The organizational materials cited by Plaintiff demonstrate, at most, that DCNG operates as a liaison and chief coordinating element for the out-of-District National Guard units that have been deployed in the District and are in Title 32 status. *See id.* While the DCNG has "coordinating and tasking authority over . . . out of district forces," those forces "remain under the administrative command and control of their sending state Adjutants General and ultimately their State Governors," and "[a]ll tasks assigned to out-of-district forces are within parameters set by their State Governors." Doane Decl. ¶ 9. In that regard, "[o]ut-of-district forces may be withdrawn, or their operations further limited by their State Governors at any time," and the DCNG "has no disciplinary or administrative authority over" them. *See id.* None of the additional documents produced in discovery alter or undermine this reality; to the contrary, they are consistent with the structure set forth in Colonel Doane's declaration and confirm that out-of-state National Guard troops continue to operate under the command of their respective governors and adjutants general. *See* Doane Decl. ¶ 9.

The depiction of mission tasking through DCNG in the organizational charts does not displace the formal command retained by each participating state, which remains free to withdraw or redirect its personnel. *See* ECF No. 70. A memorandum issued by the Secretary of Defense expressly states, "[a]t all times, any supporting out-of-district NG personnel will remain under the administrative

command and control of their State Governor." Defs.' Ex. 1 at 0153. Further, a MOU between the DCNG and supporting states preserves each governor's authority to "decline missions that will compromise his or her ability to respond to emergency requirements." Pl.'s Ex. 6 at 0614. Plaintiff wrongly asserts this provision represents a "narrow exception." *See* ECF No. 70. To the contrary, this provision's capacious language is an affirmation of continuing state command authority under Title 32 and gives governors broad discretion to decline missions. The limited instances in which states have exercised this prerogative underscores the cooperative nature of the mission, not any absence of state authority. Governors had, and continue to have, the discretion to decline missions as they deem appropriate. Pl.'s Ex. 6 at 0614-0617. The MOU's references to DCNG's "tactical control" and "operational direction" simply ensure unity of effort and safety in a multi-jurisdictional mission; they do not alter the constitutional and statutory command relationships that Congress and states have long maintained. *See id* at 0615. Coordination is not command, and nothing in the cited documents suggests Defendants have unlawfully assumed control over out-of-state National Guard troops.

Next, Plaintiff asserts the MOUs governing deployments confirm that all National Guard troops in the District are operating under the command and control of DCNG and the federal military while reserving minimal authority to the states. ECF No. 70 at 4. Contrary to Plaintiff's claim, the MOUs reaffirm that out-of-state National Guard troops deployed under EMAC remain under the command of their respective governors and adjutants general. Specifically, they establish, "[s]ending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment." Pl.'s Ex. 6 at 0615. Further, the MOUs state that the DCNG Commanding General will "assume the lead role in coordinating" the operation and provide "operational direction for mission accomplishment" to ensure unity of effort. *Id.* Nothing in the MOUs purports to divest the sending states of their command authority. Indeed, paragraph 3.1

4

expressly preserves the governor's right to "decline missions that will compromise his or her ability to respond to emergency requirements," language that affirms the continuing command prerogatives of each state. *See id.* at 0614. Put simply, the MOUs do not allow Defendants to unlawfully assume command and control over out-of-state National Guard troops.

To the extent the MOUs reference "operational direction," that phrase reflects coordination authority within the DCNG's area of responsibility. *See id.* at 0615. The MOUs, thereby, ensure consistency and safety in joint operations within the District while maintaining the sovereign command of the participating states, precisely the structure Congress and EMAC contemplate. In short, the MOUs Plaintiff cites confirm lawful coordination, not unlawful control. *See* ECF No. 70 at 4-5. They reflect a cooperative framework under which DCNG synchronizes multistate Guard efforts while each governor retains ultimate command authority over their forces. The District's reading ignores both the plain terms of the agreements and the statutory guardrails Congress enacted to govern such deployments. *See id.*

Further, Plaintiff's reliance on daily operational updates stating that Joint Task Force–District of Columbia (JTF-DC) "maintain[s] command and control of all JTF-DC person[ne]l assigned and operating within District of Columbia" is misplaced. *See* Defs.' Ex. 2 at 0866. That language reflects military terminology describing administrative and operational oversight within a joint task force, not an expansion of legal command authority over out-of-state National Guard troops. "Command and control" in this context simply means that JTF-DC, the coordinating headquarters, directs the daily synchronization of missions and resources within the District to ensure unity of effort. *See id.* It does not alter the fundamental Title 32 structure under which each participating National Guard unit remains under the command of its respective governor and adjutant general. Indeed, Defendants' evidence and declarations confirm that out-of-state National Guard troops may be withdrawn or restricted at any time by their home states and that DCNG possesses no administrative authority over

them. *See* Doane Decl. ¶ 9. For that reason, the "command and control" terminology used in JTF-DC updates is operational shorthand for coordination within the joint framework, not evidence of federal usurpation of state authority. *See* Defs.' Ex. 2.

Plaintiff's unremarkable observations about the military's structure say nothing about operations or coordination of out-of-District Guard Members, much less the unique structure of the DCNG commanded by the President. The President has express statutory authority to request assistance from other state National Guard units. Title 32 authorizes National Guard members to "be ordered to perform training or other duty," which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f), (f)(2)(A). Section 502 thus authorizes the President or Secretary to request National Guard units to support a federal mission, which necessarily includes operations in the District. And nothing in this language limits the type of missions that the President and Secretary of Defense can request.

The organizational charts Plaintiff references simply reflect this statutory and operational reality: the President, as the Commander in Chief of the DCNG, possesses lawful authority over the DCNG and may designate its Commanding General to coordinate joint operations within the District. *See* ECF No. 70 at 2-3. Moreover, the states sending National Guard troops to D.C. have *also* consented to the mobilization to protect the Nation's capital. Plaintiff fails to identify any Guard unit operating without consent of the state's legislature or governor or where "the sending states' governors and adjutant generals exert no meaningful direction or command over the troops they have sent here." *See* ECF No. 70 at 2. The organizational charts do not—and cannot—alter the statutory chain of command established by Congress. And coordination of missions through DCNG does not convert those state forces into a federally commanded military unit.

Plaintiff also contends that "out-of-state commanders, by contrast, are virtually nowhere to be found in Defendants' operational documents" and "adjutant generals respond to those emails with

one-line acknowledgements." ECF No. 70 at 6. One-line acknowledgments from adjutants general do not evidence a transfer of legal command; rather, they reflect routine communication and coordination where sending-state commanders retain authority while receiving situational reports from the DCNG. The governing framework remains dispositive: out-of-state National Guard troops are in Title 32 status and remain under the command of their respective governors even when missions are coordinated through JTF-DC. Discovery confirms that governors may "decline missions that will compromise [their] ability to respond to emergency requirements," underscoring continuing state command prerogatives rather than their absence. Pl.'s Ex. 6 at 0614. Moreover, several produced emails reflect active back-and-forth exchanges between DCNG and sending-state commanders regarding tasking parameters, consistent with lawful coordination as opposed to federal assumption of state command. *See, e.g.,* Defs.' Ex. 3 at 0056 (Aug. 12, 2025 email from Ohio Adjutant General: "My Governor said he wouldn't rule out supporting but would need more details."); Defs.' Ex. 4 at 0001 (Aug. 12, 2025 email from West Virginia Adjutant General: "We think, depending on when the orders came, and funding, we could do 500-600 in the near term."); Defs.' Ex. 5 at 0022 (September 12, 2025 email from Alabama Adjutant General: "Gov Ivey approves AL backfilling TN. We begun prep' for the mission").

But even accepting Plaintiff's flawed view of the record, the District plainly has no standing to challenge who controls out-of-District Guardsmen—an argument that Plaintiff has conceded. *See* Defs.' Reply ISO MTD at 12-13, ECF No. 68. Plaintiff cannot vindicate, for example, the Governor of Ohio's interest in exercising command and control over the Ohio National Guard. Plaintiff might have standing to vindicate specific rights that they (wrongly) say the Mayor has under D.C. law or the EMAC—but Plaintiff simply does not suffer any freestanding sovereign injury or other injury because it has no freestanding sovereign power to vindicate. *See* Defs.' Mem. ISO MTD at 37-38, ECF No.

35-1. And even if it did, Plaintiff would of course still lack standing to assert an injury on behalf of another State or its Governor.

## II.  Discovery Confirms the Guard's Lawful, Cooperative Role in Supporting Civil Authorities, Not Federal Law Enforcement Operations.

Discovery confirms that the DCNG's activities in the District remain fully consistent with its lawful role in supporting civil authorities. Contrary to Plaintiff's characterization, the Guard has not engaged in core law-enforcement functions but has instead operated in a cooperative capacity expressly authorized by statute and reaffirmed by decades of Office of Legal Counsel (OLC) precedent. Plaintiff's contention that the memorandum authorizing the deputation of National Guard "confers" federal law-enforcement authority on the Guard is wrong as a matter of law. It also misses the mark: regardless of authority, discovery has revealed no evidence that the National Guard members deployed to the District have engaged in law enforcement activities.

The Guard is thereby not executing the laws for PCA purposes. Courts have articulated three tests to determine whether the PCA was violated: "whether civilian law enforcement agents made direct active use of military personnel to execute the laws," "whether use of any part of the Army or Air Force pervaded the activities of the civilian law enforcement agents," and "whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." *United States v. Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988) (citation modified), *aff'd*, 924 F.2d 1086 (D.C. Cir. 1991). However articulated, the Guard is not in any meaningful sense engaged in active and direct law execution. The record demonstrates that, as part of the current operation, the Guard does not make arrests, conduct searches or seizures, or engage in similar functions. Doane Decl. ¶¶ 4, 7. Nor does the Guard share equipment with law enforcement agencies or use helicopters or other air assets. *Id.* ¶ 4. Guardsmen may make temporary detentions until law enforcement arrives, but "[t]he decision of whether to arrest an individual, and any investigation of

the underlying incident, are solely the responsibility of the supported law enforcement agency." *Id.* ¶ 7.

Rather than engaging in law enforcement, the JTF-DC supports the MPD and other law enforcement agencies by acting as a presence to deter crime, reporting crimes they witness, and assisting law enforcement in support missions when requested to do so. *Id.* ¶ 6. Specifically, Guardsmen have provided a presence at sites where the United States Park Police typically patrol, freeing those Park Police to partner with MPD off federal property within the District. Decl. of Donald Snider ("Snider Decl.") ¶ 10, ECF No. 34-3. In other words, the Guard indirectly supports the law enforcement activities of MPD and other federal law enforcement agencies by providing presence patrols—the Guard does not itself engage in law enforcement.  This dooms Plaintiff's PCA claim.

Even if discovery had shown that the Guard was engaging in law enforcement, the PCA claim still fails. Several statutes expressly authorize the D.C. Guard to engage in law-enforcement activity, as the OLC has consistently concluded since at least the Kennedy Administration. In 1963, OLC concluded that the provision authorizes "the President to request or urge the commanding general to use the National Guard in support of activities of the District of Columbia police whenever he feels that the welfare, safety, or interest of the public would be served thereby." *See* Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia* at 3 (July 30, 1963). OLC has reaffirmed that interpretation for decades, explaining that "[t]he authorization to order out the Guard for 'other duties, as he may deem proper' has long been viewed as broad enough to include law enforcement activities." *Use of the National Guard to Support Drug Interdiction Efforts in the D.C.*, 13 Op. O.L.C. 91, 93 (1989). Read together with D.C. Code § 49-404, which permits the Guard

9

to "aid the civil authorities in the execution of the laws," this framework makes clear that the President retains lawful authority to direct the D.C. National Guard in support of civil authorities. *See* Exec. Order No. 11,485 § 1, 34 Fed. Reg. 15411 (Oct. 3, 1969).

Even if the DCNG were engaged in law enforcement activities and no statute expressly authorized such conduct, Plaintiff's PCA claim would still fail. Discovery has revealed no evidence of a "willful" violation, which requires a showing that Defendants acted with knowledge that their conduct was unlawful. To the contrary, the record demonstrates that Defendants have been compliant with the PCA. For example, memoranda and rules for the use of force expressly instruct Guardsmen not to perform direct law-enforcement functions and "support" the civilian law-enforcement agency who is "the lead." Pl.'s Ex. 32 at 0182; Defs.' Ex 1. This record of adherence to legal guidance defeats any suggestion that Defendants "willfully" violated the PCA. *See Ratzlaf*, 510 U.S. at 137. Additionally, the Plaintiff cannot plausibly plead that the willfullness requirement is met here, particularly given OLC's longstanding views that the PCA only applies to Title 10 service members and that the President is expressly authorized to direct the DCNG to engage in law enforcement activities.

Together or separately, none of the records cited by Plaintiff suggest that the Guard is engaging in law enforcement. Start with the memorandum authorizing the deputation of National Guard forces. The deputation memo does not expand the Guard's powers beyond what the law already permits nor require Guardsmen to engage in particular activities. Rather, the memo merely demonstrates how the DCNG and MPD lawfully coordinate. Pl.'s Ex. 1, ECF No. 70-1. It ensures that Guardsmen may lawfully coordinate with federal officers when supporting ongoing missions. Additionally, it does not alter the Guard's duty status, transform Guardsmen into federal police, or allow them to make arrests, conduct searches or seizures, or engage in similar functions. Discovery demonstrates the Guard remains a lawful, statutorily sanctioned force assisting civil authorities under the President's command, not an unlawful "federal military police force." *See* ECF 70 at 1.

Further, Plaintiff's reliance on JTF-DC organizational documents does nothing to bolster its claim that National Guard troops in the District are engaged in core law enforcement activities. The cited provisions simply acknowledge that Guardsmen support law-enforcement agencies, consistent with express statutory authority allowing the DCNG "to aid the civil authorities in the execution of the laws." D.C. Code § 49-404. Neither the DCNG nor out-of-District National Guard members are making arrests or engaging in direct law enforcement activity. Doane Decl. ¶ 4; Snider Decl. ¶¶ 14-16. In fact, Plaintiff fails to identify a single instance that suggests otherwise. Rather, "the D.C. National Guard, augmented by National Guard units from various states, [have served] as a high visibility deterrence force across Washington D.C." Snider Decl. ¶ 9. "The decision of whether to arrest an individual, and any investigation of the underlying incident, are solely the responsibility of the supported law enforcement agency." Doane Decl. ¶ 7. And at bottom, "[a]ll JTF-DC operations are vetted and approved by supported law enforcement partners." Doane Decl. ¶ 14.

Next, Plaintiff's references to day-to-day updates regarding the work of the Guard fails to understand the purpose of those updates. The D.C. Guard's "presence patrols" are not law enforcement activities or equivalent to arrests, searches, or seizures; rather, they are deterrence and visibility missions designed to assist MPD. *See* ECF 70 at 9. The extensive coordination between the MPD and Guard forces is a compelling example of cooperation between the local and federal governments: Guardsmen have deployed to, inter alia, parks, monuments, the National Mall, metro stations, and Union Station, creating visible deterrence while freeing up personnel-strapped local police to perform law enforcement; local police share crime and operational data with the Guard on a daily basis; Guardsmen contact local police where they observe crime or other situations requiring police involvement, and engage in temporary detentions when necessary; but decisions whether to investigate alleged criminal activity, or make arrests are left to the MPD or other law enforcement agencies. If the Guard is prohibited from acting as a mere presence to deter crime, from reporting

11

crimes they witness, and from assisting law enforcement in support missions when they are requested to do so, as well as from completing beautification projects within the District at the D.C. Government's request, it is not clear what Plaintiff believes the Guard can do in the District once lawfully deployed.

The incidents Plaintiff highlights do not rise to the level of law enforcement activities. *See* ECF No. 70 at 9-10. When Guardsmen responded to disturbances or shootings, they did so in coordination with MPD and the U.S. Marshals Service, securing perimeters and ensuring public safety until law enforcement arrived. The August 30 update noting that the Guard "secured the assailants" at a Metro station is a clear example of how they worked in coordination with MPD as "police support was immediately on-site." *See* Pl.'s Ex. 2 at 0011, ECF No. 70-1. Guardsmen did not make arrests, conduct searches or seizures, or engage in similar functions. *See id.* Their actions were limited to maintaining order and protecting bystanders until MPD arrived at the scene of the incident, "aid[ing] the civil authorities in the execution of the laws." D.C. Code § 49-404. Notably, in that case, the Government moved to dismiss the federal charges against the assailants referenced in General Leland Blanchard's email to pursue similar charges in Superior Court of the District of Columbia. *See* Pl.'s Ex. 2 at 0011, ECF No. 70-1; *United States v. Beidleman*, No. 25-cr-270, 2025 WL 2803850 at *1 (D.D.C. Oct. 1, 2025). As the court's opinion confirms, the criminal charge against the Defendant did not rest on a judicial finding that the Guardsmen were acting as federal law-enforcement officers. *See generally id.* Rather, the Court dismissed the case with prejudice because "the [G]overnment's reasons for keeping open the possibility' of a later prosecution were 'somewhat murky' at best" and doing so "would result in harassment of the defendant and would otherwise be contrary to the manifest public interest." *Id.* at *3-4 (citations omitted). The Court emphasized that the case turned on the propriety of the Government's charging decisions, not on a determination that the National Guardsmen were federal officers "lawfully engaged in official duties" under 18 U.S.C. § 111(a). *See id.* at *2. (citation omitted).

12

Lastly, Defendants' policies, orders, and training materials do not suggest that troops are expected or permitted to engage in law enforcement activities. The cited materials merely reflect operational preparedness and safety protocols applicable to a wide range of missions that consist of providing a presence in certain areas and freeing up the District's undermanned police to conduct law enforcement. The requirement that Guardsmen comply with DCNG's use-of-force policy, or that some troops receive instruction in handcuffing or defensive techniques, does not convert their activities into law enforcement.

### III.    Discovery Confirms Plaintiff's Allegations of Irreparable Harm Are Illusory.

Discovery has shown that Plaintiff's hyperbolic assertions of irreparable harm have no basis in reality. Indeed, for all its heated rhetoric, it is telling that Plaintiff's lead argument on this score focuses on evidence regarding the probable length of the deployment—which is relevant only to the possible quantum, not existence, of any harm—rather than evidence that shows concrete harm to it or the public. *See* ECF No. 70 at 13. As for harm itself, conspicuously absent from the District's supplemental brief is *any* evidence that Guardsman have: (1) "ma[de] unlawful stops and seizures"; (2) "engag[ed] in unlawful and potential[ly] deadly uses of force"; (3) "fail[ed] to document interactions or preserve evidence appropriately"; (4) engaged in conduct resulting "in harm to . . . civilians [or] officers"; or (5) "otherwise undermin[ed] the District's ability to bring prosecutions." PI Mem. at 42-43 (citation omitted). The parade of harms imagined by Plaintiff simply has no support in the record, and injunctive relief must be denied on that basis alone.

Nor does any evidence support Plaintiff's claim that the deployment is somehow "threatening public safety." ECF No. 70 at 14. Plaintiff has (unsurprisingly) identified no evidence even suggesting that the Guard's deployment has resulted in an increased risk to public safety. Instead, Plaintiff points to parts of the record that acknowledge *members of the National Guard* "may expect a heightened threat environment," including by "actors engaging in grievance-based violence" as well as "individuals

inspired by foreign terrorist organizations." Pl.'s Ex. 42 at 3478, ECF No. 69-2; ECF No. 70 at 14. But there is absolutely no indication that the Guard's presence or activities have made members of the public less safe. Plaintiff also vaguely gestures at evidence acknowledging the deployment may lead to increased protests, but there is also no evidence that any protest or demonstration has threatened public safety. And it cannot possibly be right that a jurisdiction experiences irreparable harm anytime a federal policy leads to protests within its borders. Such an attenuated and indirect assertion of harm is not even enough to establish Article III standing, much less entitlement to the extraordinary remedy of injunctive relief.

Plaintiff's actions in response to the Guard's deployment likewise fail to establish irreparable injury. The District claims the deployment "made it necessary for MPD" to take certain actions, including, for example, increasing patrols in the vicinity of where Guardsmen are lodged. ECF No. 70 at 14. But just as a plaintiff cannot spend their way to standing, irreparable harm "cannot arise from plaintiff's own actions." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 33 (D.D.C. 2014). And, regardless, the cited evidence belies Plaintiff's suggestions that MPD was somehow forced to divert resources because of the deployment. The evidence merely shows that MPD "*agreed* to increase patrols in the vicinity of JTF lodging," Pl.'s Ex. 43 at 0324, ECF No. 69-2 (emphasis added), and that there is a mechanism for Guardsmen to request an MPD escort, *see* Pl.'s Ex. 44 at 3413, ECF No. 69-2. Plaintiff's gripe about the deployment requiring "additional trainings and preparation by the District's emergency responders," ECF No. 70 at 15, is even more illusory—the cited document shows that *the District itself* "request[ed] coordination with [Joint Task Force D.C.] . . . to ensure local emergency responders can safely assist service members." Pl.'s Ex. 45 at 0451-52, ECF No. 70-1. Plaintiff's voluntary coordination with the Joint Task Force cannot establish irreparable harm.

**IV.** **Plaintiff's Arbitrary and Capricious Claim Flunks the Finality Requirement.**

Discovery confirms that Plaintiff's arbitrary and capricious claim flunks the finality requirement. Plaintiff contends discovery allegedly reveals there was a "singular decision" authorizing the deputation of National Guard troops: a memorandum signed by the Deputy Attorney General that authorizes the deputations of National Guard forces in the District. ECF No. 70 at 11. However, the Deputy Attorney General's memorandum does not constitute "final agency action" but rather an internal implementation document issued pursuant to President Trump's August 11, 2025 Executive Order 14333, "Declaring a Crime Emergency in the District of Columbia." 90 Fed. Reg. 39301 (Aug. 11, 2025). This memorandum merely approved the U.S. Marshals Service's operational request to deputize National Guard troops acting under presidential command—it was not the "consummation" of any independent agency decision-making process. *See* Pl.'s Ex. 36 at 1946-1947, ECF No. 70-1; *see also* ECF No. 70 at 12.

Plaintiff cannot challenge wholesale the deputation of "all National Guard forces" by casting numerous individual actions as a singular "decision." *See* ECF No. 70 at 11-12. This constitutes an impermissible programmatic challenge to a series of discrete agency actions which "cannot be laid before the court for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-93 (1990). "Under the terms of the APA, [the plaintiff] must direct its attack against some particular 'agency action' that causes it harm." *Id.* at 891. Plaintiff's challenge is "to the way the Government administers th[is] program[] and not to a particular and identifiable action taken by the Government." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 491 (5th Cir. 2014).

Nor does discovery allow the D.C. Attorney General to bring an APA challenge to National Guard members' authority "to arm troops" or carry their service weapons. *See* ECF No. 70 at 12. Here too, the D.C. Attorney General identifies no final agency action. Finality aside, Plaintiff has not explained how Defendants "decision to arm troops," ECF No. 70 at 12, qualifies as "agency action"

at all. And it is doubtful such a "collective order" regarding the day-to-day operations of agency personnel fits into any category of "agency action" in 5 U.S.C. § 551(13). *See, e.g.*, *Ass'n of Admin. L. Judges v. U.S. OPM*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (finding that "OPM's memo to agencies" was "not part of a rule, order, sanction or relief"). Regardless, the finality requirement dooms Plaintiff's challenge on this score. The Secretary's directive that troops shall be armed did not determine any "rights or obligations" or result in "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).

Next, Plaintiff contends memoranda from the Deputy Attorney General and U.S. Marshals Service do not explain why they authorized or extended deputation of troops. ECF No. 70 at 12-13. To the contrary, the Deputy Attorney General's memorandum implicitly makes clear they approved the request to deputize troops "in support of the Make D.C. Safe Beautiful Again Surge Operation . . . to protect federal property and functions in the District of Columbia and to support other Federal law enforcement agencies." Pl.'s Ex. 1 at 3338. The memorandum also states the Deputy Attorney General approved the request "to help lower the crime rate in Washington, D.C." *Id.* at 3337. Ultimately, the Deputy Attorney General reviewed and approved the request notwithstanding that it was subject to "sufficient"—not "substantial," as Plaintiff incorrectly asserts—policy concerns. *See id*; *see also* ECF No. 70.

The U.S. Marshals Service memorandum that Plaintiff cites expressly recognizes that National Guard personnel are being deputized to support "the Make D.C. Safe and Beautiful Again Surge Operation." Pl.'s Ex. 36 at 1946. Because their duties are limited to supporting federal law enforcement operations and they "are not authorized to effect arrests or engage in other similar direct law enforcement activity," the memorandum did not require the same prior-law-enforcement credentials ordinarily expected of deputations. Pl.'s Ex. 1 at 3337-3338.

As the contemporaneous Deputy Attorney General memorandum confirms, "NG SMs are not authorized to effect arrests or engage in other similar direct law enforcement activity." Pl.'s Ex. 1 at 3337-3338. That language undercuts Plaintiff's contention that Defendants failed to weigh "the costs of ordering such untrained forces to be armed with military weapons while patrolling the District" because the record indicates Guard members are not authorized to act as law-enforcement officers. *See* ECF No. 70 at 13. In short, both memoranda reflect a routine exercise of delegated administrative discretion to facilitate interagency support, not an arbitrary policy decision subject to APA review.

For these reasons, Plaintiff's arbitrary and capricious claim flunks the finality requirement. There was no "singular decision" authorizing deputations because the deputations were operational steps in executing a presidential directive, not discrete policymaking subject to review under the APA. And the memoranda document interagency coordination undertaken pursuant to that directive, reflecting agency approval and oversight.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a preliminary injunction and Section 705 stay should be denied.

Dated:  October 22, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General

                                            JOHN BAILEY
                                            Counsel to the Assistant Attorney General

                                            ALEXANDER K. HAAS
                                            Branch Director

BRAD P. ROSENBERG
Special counsel

ANDREW M. BERNIE
Civil Division, U.S. Department of Justice

*/s/ Kian K. Azimpoor*

KIAN KEVIN AZIMPOOR
U.S. Department of Justice
Trial Attorney
Civil Division, Federal Programs
Branch 1100 L Street, NW
Washington, D.C. 20005
Phone: 202-598-0860
Email: kian.k.azimpoor@usdoj.gov

*Attorneys for Defendants*

18