# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>        Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        Defendants. | Case No.: 1:25-cv-03005 (JMC)<br><br>Judge Jia M. Cobb |

**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION AND SECTION 705 STAY**

## INTRODUCTION

Discovery has confirmed that all of the National Guard troops in the District are operating under federal command, engaged in core law enforcement activities, and likely to remain here indefinitely—potentially through at least the summer of 2026. As Defendants' documents make clear, all of the out-of-state troops in the District report to and receive orders directly from a colonel in the District of Columbia National Guard (DCNG), who in turn reports to the Secretary of the Army, while out-of-state officials do little more than receive periodic email updates from DCNG about what their troops are up to. The U.S. Department of Justice has deputized all of the National Guard personnel in the District as Special Deputy U.S. Marshals for the express purpose of "confer[ring] the law enforcement authority needed to perform [their] duties." Ex. 1 (Special Deputation Mem., Aug. 21, 2025) at 3337.[1] The Commander of DCNG has flatly stated that "our Soldiers are deputized Federal Law Enforcement." Ex. 2 (Aug. 30 Email from Leland Blanchard) at 0011. And, on a daily basis, those troops are engaging in armed presence patrols, detaining individuals, assisting in the execution of warrants, or performing other core law enforcement tasks.

In short, the documents disclosed in discovery leave no reasonable factual dispute that both DCNG and the out-of-state troops are operating as a federal military police force in the District. Defendants' own documents confirm that this deployment has inflamed tensions in the District and diverted resources of the Metropolitan Police Department (MPD). As the Mayor recently reiterated, this deployment is not "legal," the District does not support "the use of the Guard to

---

[1] All page numbers refer to the last four digits of the Bates number for the relevant page of the document—e.g., 3337 refers to the document labeled DCNG_DEF_00003337. Additionally, with the consent of the Defendants, the District has stricken the "Confidential" designation on certain exhibits submitted with this brief.

1

police our local laws," and the ongoing incursion threatens to "interfere with the very nature of American democracy."[2]

ARGUMENT

1. **Discovery Confirms that All National Guard Troops in the District Are Operating under the Command and Control of DCNG and the Federal Military.**

Discovery confirms that all National Guard troops in the District are operating under the command and control of DCNG and the federal military. Defendants' own organizational charts and memoranda expressly say so. And Defendants' daily orders and updates reveal that DCNG and the Department of Defense are in practice exercising pervasive control over the operations of all National Guard forces in the District, while the sending states' governors and adjutant generals exert no meaningful direction or command over the troops they have sent here.

The organizational charts governing Joint Task Force – District of Columbia (JTF-DC) make clear that all forces in the District report to DCNG and the Department of Defense. On the first full day that National Guard troops were deployed in the District, Defendants issued the following organizational chart:



---

[2] DC Mayor's Office, *Mayor Bowser Participates in Fireside Chat at the Fortune Most Powerful Women Summit, 10/15/25*, at 4:50-6:40 (YouTube, Oct. 15, 2025), https://tinyurl.com/3wz2d3zz.

2

Ex. 3 (Daily Update for Aug. 12) at 3699.[3]  This chart spells out the chain of command in plain terms: It provides that JTF-DC reports to DCNG, which in turn reports to the Secretary of the Army and the Office of the Secretary of Defense ("OSD").  JTF-DC includes all of the National Guard troops in the District.  *See, e.g.*, ECF No. 34-1 (Doane Decl.) ¶ 8.  DCNG and the Department of Defense thus command all of these forces.

A second organizational chart confirms the point.  It provides that JTF-DC is structured as follows:



Ex. 4 (JTF-DC Task Organization) at 0143; *see also, e.g.*, Ex. 5 (Daily Update for Aug. 21) at 3717 (reprinting similar organizational chart).  This chart states that every task force in JTF-DC reports directly to DCNG Colonel Lawrence Doane.  Some of those task forces consist exclusively of out-of-state troops—for instance, Task Force Palmetto consists only of South Carolina troops ("2x IN

---

[3] Defendants consented to the District's use of this image from confidential Exhibit 3.

3

Co (SC)"), and Task Force Magnolia consists of both Mississippi and Louisiana troops ("2x M Co (MS)" and "MP Co (LA)"). Another task force consists of a mix of DCNG units—identified in the chart by their names or numbers, such as "273rd"—and forces from Ohio ("MP Co (OH)") and Tennessee ("MP Co (TN)"). This document thus confirms that DCNG, and by extension the federal military, stands in command of all National Guard forces in the District.

The memoranda of understanding governing the deployments say the same thing. DCNG entered an identical memorandum of understanding (MOU) with each of the states that sent National Guard troops to the District. *See* Ex. 6 (DCNG MOUs). Paragraph 3.5 of each of those MOUs provides that "[a]ll National Guard forces participating in activities supporting Make DC Safe and Beautiful *will receive operational direction for tasks from the Commanding General, DCNG*." *Id.* at 0615, ¶ 3.5 (emphasis added). The MOUs also provide that the Commanding General of DCNG "will assume the lead role in coordinating the [operation] and tasking units from a supporting State, Commonwealth, or the District of Columbia," and that DCNG "will retain tactical control providing operational direction for mission accomplishment." *Id.* at 0614-15, ¶ 3.2. Further, the MOUs require out of-of-state forces to conduct their operations "consistently with any relevant Secretary of Defense utilization memorandum [that] should be issued," *id.* at 0615, ¶ 3.3, and to "comply with the DCNG Rules for the Use of Force and Rules of Conduct," *id.* ¶ 3.5.

By contrast, these MOUs reserve minimal authority to the states. Although Colonel Doane represented in his sworn declaration that "[a]ny out of state force can refuse any task assigned to them should their Governor or Adjutant General object to the assignment," ECF No. 34-1 (Doane Decl.) ¶ 9, the MOUs actually say that the governor of a sending state may "decline missions *that will compromise his or her ability to respond to emergency requirements*." Ex. 6 at 0615, ¶ 3.1

4

(emphasis added). It is difficult to see how that narrow exception would provide a basis to refuse a given tasking, and the record reveals just one instance in which a state requested, at the outset of the deployment, that their troops be exempted from certain types of missions. *See* Ex. 7 (Aug. 21 Email from Peter Rakowsky) at 3352. The MOUs also contain the formalistic assertion that out-of-state forces "remain under the command and control" of their respective adjutants general and commanding generals. Ex. 6 at 0614-15, ¶ 3.2. But that reservation has little significance in light of the MOUs' grant of "tactical control" and "operational direction" over out-of-state forces to DCNG later in the same sentence. *See id.* ¶¶ 3.2, 3.3, 3.5. It is also contradicted by the U.S. Army's own daily updates, which have said nearly every day since August 22 that the role of JTF-DC is to "*[m]aintain command and control of all JTF-DC person[ne]l* assigned and operating within the District of Columbia." Ex. 8 (Daily Update for Aug. 22) at 3719 (emphasis added); *see also, e.g.*, Ex. 9 (Daily Update for Sept. 16) at 3768 ("Maintain C2 [command and control] of all JTF-DC personnel assigned."); Ex. 10 (Daily Update for Oct. 4) at 3804 (same).

Other documents confirm that DCNG and the federal military command and control all National Guard forces in the District. At the outset of the operation, the National Guard Bureau issued a memorandum stating that "[t]he Secretary of the Army, through the Commanding General, DCNG, will coordinate the employment of DCNG and any other NG forces employed in D.C in a duty status pursuant to 32 USC 502(f) . . . by assigning tasks for supporting NG [service members]." Ex. 11 (Personnel Guidance Mem., Aug. 12, 2025) at 0364. On August 20, the U.S. Army stated that the National Guard operation in the District is "commanded by the President of the United States through the Secretary of Defense." Ex. 12 (Storyboard for Aug. 20) at 3716.

The practice of DCNG over the past two months removes any doubt on this score. Nearly every day since the arrival of the out-of-state troops, Colonel Doane has issued formal orders

5

jointly to DCNG and the out-of-state units in the District, dictating precisely which tasks each unit should perform over the following days. *See, e.g.*, Ex. 13 (Fragmentary Order (FRAGO) 8) at 3427 (directing the West Virginia National Guard to "[p]rovide support to ▇▇▇▇ ▇▇▇▇ at ▇▇▇▇"); Ex. 14 (Fragmentary Order (FRAGO) 9) at 3435 (directing the Mississippi National Guard to "[a]ssume responsibility of ▇▇▇▇"); Ex. 15 (Fragmentary Order (FRAGO) 10) at 3442 (directing the Tennessee National Guard to "[m]aintain presence around ▇▇▇▇ from ▇▇▇▇ "with ▇ personnel [in support of] law enforcement partners"). Similarly, the U.S. Army has issued a daily update delineating in minute detail the taskings for District and out-of-state National Guard units over both the prior 24 hours and the next 24 hours, down to which locations the forces will patrol and for what time period. *See* Ex. 16 (Sept. 12 Email from Eric James Riley) at 0029-31 (providing a daily update on JTF-DC operations directly to the Secretary of the Army); *see also, e.g.*, Ex. 8 (Daily Update for Aug. 22); Ex. 29 (Daily Update for Sep. 9).

The out-of-state commanders, by contrast, are virtually nowhere to be found in Defendants' operational documents. Instead, DCNG Commanding General Leland Blanchard sends periodic emails to the sending states' adjutant generals telling them about the "work your Soldiers are doing for us." Ex. 17 (Aug. 24 Email from Leland Blanchard) at 0008-09; *see also* Ex. 18 (Aug. 20 Email from Leland Blanchard) at 0006-07; Ex. 2 at 0010-0011; Ex. 19 (Sept. 17 Email from Leland Blanchard) at 0016-17. The adjutant generals respond to those emails with one-line acknowledgments. *See*, *e.g.*, Ex. 18 (Aug. 21 Email from James Seward) at 0006 (West Virginia Adjutant General: "Thanks, got it."); Ex. 21 (Aug. 31 Email from Matthew Woodruff) at 0063 (Ohio Adjutant General: "Thanks for the great update and taking care of the team."). Despite the fact that the District requested production of "[a]ll documents, agreements, or communications

6

with governors, adjutants general, or their designees related to the command of National Guard units in the District of Columbia," ECF No. 43, at 7-8 (capitalization omitted), Defendants have not produced evidence of any meaningful direction or control being exercised by the governors or adjutant generals of the sending states during the deployment.

In sum, the factual record overwhelmingly establishes that DCNG and the federal government exercise command and control over all National Guard troops in the District. For the reasons the District has explained, the assertion of federal command over troops in state militia status violates the Militia Clauses of the Constitution and the statutes governing the National Guard. Mem. 27-31 (ECF No. 3-1); Reply (ECF No. 57) 16-21. And the assertion of federal command subjects the activities of those forces to the Posse Comitatus Act and 10 U.S.C. § 275. Mem. 32-36; Reply 25-27. In light of their own documents, Defendants cannot plausibly contest that the factual predicates for those conclusions are satisfied.

   **2. Discovery Confirms that National Guard Troops in the District Are Exercising Core Law Enforcement Responsibilities.**

Discovery has also resolved any doubt that the National Guard troops in the District have been instructed to engage in—and are in fact engaged in—law enforcement activities prohibited by the Posse Comitatus Act (PCA) and 10 U.S.C. § 275. The organizing documents for the deployment make clear that its express purpose is to enable those troops to engage in law enforcement, and Defendants' day-to-day taskings and updates show the troops doing just that.

The memorandum authorizing the deputation of National Guard forces states in unambiguous terms that Defendants have conferred law enforcement authority on these troops. On August 22, the Deputy Attorney General signed a decision memorandum authorizing deputation of all National Guard troops in the District for the stated purpose of "grant[ing] *federal law enforcement authority* to United States National Guard (USNG) Service Members (SM)" so

7

that they could "help lower the crime rate in Washington, DC." Ex. 1 at 3337 (emphasis added). The memorandum explains that deputation is required because "[t]he duties the National Guard (NG) SMs [servicemembers] are expected to perform *require law enforcement authority* which they current lack," and because "[s]pecial deputation would *confer the law enforcement authority needed to perform those duties*." *Id.* (emphases added). Although the memorandum asserts that National Guard troops would not be permitted to engage in "arrests" or "similar direct law enforcement activity," it explains that "[t]his restriction does not preclude the Secretary of the Army from authorizing the use of NG personnel to conduct the full range of civil disturbance operations, short of arrest," *id.* at 3338—operations that include (but are not limited to) a wide range of law enforcement activities, *see* Dep't of Defense Instruction (DoDI) 3025.21, at 26 (Feb. 27, 2023) (describing civil disturbance operations as including tasks necessary for "protecting life and property and maintaining law and order in the civilian community" and "ensur[ing] that law and order are maintained"). On September 22—after National Guard troops had been deployed in the District for over a month—the Deputy Attorney General authorized an extension of this deputation until November 30 because "[t]he duties that USNG are expected to perform" continued to "require law enforcement authority." Ex. 22 (Special Deputation Extension Mem., Sept. 22, 2025) at 3340.

      Other organizational documents for JTF-DC similarly make clear that Defendants expect the National Guard troops in the District to engage in core law enforcement activities. The MOUs between DCNG and the sending states provide that the troops' "duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents." Ex. 6 at 0615, ¶ 3.3. They also expressly invoke various law enforcement authorities in the D.C. Code. *Id.* at 0614, ¶¶ 1.3, 1.4. The Operational Order governing JTF-DC states that the troops'

8

"mission" includes "provid[ing] . . . traffic control points[] and roving patrol support" to law enforcement agencies," Ex. 23 (Operational Order (OPORD) 11-2025, Aug. 12, 2025) at 0161. And both the Army and the DCNG repeatedly informed National Guard troops that they would be expected to engage in standard law enforcement tasks in order to support "Law Enforcement missions," "prevent disruption of law enforcement op[eration]s," and serve as a "crime deterrent." *See* Ex. 25 (Fragmentary Order (FRAGO) 11) at 0230 (stating that "[a]ll service members will be armed . . . ISO [in support of] Law Enforcement missions"); Ex. 18 at 0007 (stating that troops "will take on missions such as . . . site security[] and perimeter security" to "prevent disruption of law enforcement ops"); Ex. 26 (Army Headquarters Execution Order (HQDA EXORD) 290-25, Aug. 11, 2025) at 0176-77 (describing the intent of the operation as "provid[ing] a visible crime deterrent to increase safety," including by conducting "vehicle patrols" and providing a "mobile QRF [Quick Reaction Force] able to respond to incidents across the District"). Defendants themselves have said that this conduct constitutes "direct participation in civilian law enforcement activities." Ex. 24 (Mem. from the Secretary of Defense for the Secretary of the Army, Dec. 30, 2021) at 0148 (stating that "crowd control" and "traffic control" constitute direct participation in civilian law enforcement)

      Defendants' day-to-day updates regarding the work of the National Guard troops confirm that those soldiers are regularly engaged in law enforcement activities. Nearly every day for the past two months, National Guard troops have conducted numerous armed "presence patrols" throughout the District—in parks, residential neighborhoods, high-traffic commercial areas, and metro stations—and provided "support to LE [law enforcement]" at designated locations. Ex. 16 at 0029-31; *see, e.g.*, Ex. 27 (Daily Update for Aug. 14) at 3725; Ex. 9 (Daily Update for Sept. 16) at 3768; Ex. 10 (Daily Update for Oct. 4) at 3804. National Guard forces have "respond[ed] to a

9

shooting incident," Ex. 28 (Storyboard for Oct. 11) at 3819, and deployed dozens of servicemembers to serve as an "immediate response force" and to "directly support [U.S. Marshals Service] operations," Ex. 29 (Daily Update for Sept. 9) at 3754. ▐ ▐National Guard forces conducted planning for a "US Marshals Strike Force perimeter security mission." Ex. 30 (Daily Updates for Aug. 26 to Aug. 31). On August 30, they "establish[ed] a cordon and security while the [U.S. Marshals Service] serve[d] high risk warrants." Ex. 2 at 0011. ▐ they "[e]stablished [an] outer cordon" in support of the service of another warrant. Ex. 31 (Daily Update for Sept. 8) at 3752.

An update from August 30 is particularly notable. That day, General Blanchard reported that soldiers had "br[oken] up a fight in [a] Metro Station," "secured the assailants," and "escort[ed] them off the train." Ex. 2 at 0011. As if to remove any doubt about the nature of these actions, General Blanchard observed that the assailants would face federal charges because they had assaulted the National Guard officers during this operation and "reminder, our Soldiers are Deputized Federal Law Enforcement." *Id.*[4]

Defendants' policies, orders, and training materials provide yet further confirmation that Defendants permit and expect troops to engage in law enforcement activities. All National Guard troops in the District have agreed to comply with DCNG's use of force policy, *see* Ex. 6 at 615, ¶ 3.5, ▐ ▐ Ex. 32 ▐ ▐. Shortly after they arrived in the District, out-of-state

---

[4] Publicly available records reveal that at least one person who allegedly assaulted Mississippi National Guard troops nominally in state militia status was charged with assaulting federal employees. *See* Information, *United States v. Beidleman*, 1:25-cr-00270-SLS (D.D.C. Sept. 8, 2025), ECF No. 7 (charging defendant with assaulting federal employees under 18 U.S.C. § 111(a)(1)).

10

National Guard units received cases filled with hundreds of "disposable restraints (flex cuffs)." Ex. 14 at 3434. Colonel Doane later instructed "TFs [task forces] that require handcuffs" on how they could order more. Ex. 33 (Fragmentary Order (FRAGO) 48) at 3640-41. And the Army's daily updates depict National Guard troops training on "handcuffing techniques," Ex. 34 (Storyboard for Sept. 21) at 3779, as well as "weapon retention and takedown defense." *See* Ex. 35 (Storyboard for Sept. 5) at 3747.

These documents thus reaffirm several times over that Defendants have instructed National Guard troops to engage in, and that those troops are in fact engaged in, law enforcement conduct prohibited by the PCA and section 275. The very purpose of the PCA was to prohibit the deputation of military personnel as U.S. Marshals, Mem. 31—something that Defendants have done here, and with the express aim of granting the troops "federal law enforcement authority." Ex. 1 at 3337. And the PCA and section 275 prohibit military personnel from engaging in "security functions" or "crowd control," conducting "seizures" or "apprehensions," or using "force" on civilian populations. DoDI 3025.21 at 18-19 (listing law enforcement activities prohibited by section 275); *see* Reply at 30-31 (listing conduct prohibited by the PCA). The National Guard forces in the District have been allowed to engage in all of those activities and are actually engaging in many of them on a daily basis. There is no doubt that this conduct is law enforcement subject to the PCA and section 275.

### 3. Discovery Refutes Defendants' Finality Arguments.

Discovery also confirms that Defendants' finality arguments are without merit. Defendants asserted in their opposition brief that there was no "singular 'decision'" authorizing the deputation of National Guard troops. *See* Opp. 33. Although there need not be a singular decision authorizing the deputations, *see* Reply at 35-36, discovery reveals that there was: the Deputy Attorney General

11

signed a formal decision memorandum authorizing the deputations of all National Guard forces in the District, which he later extended through November 30. *See* Ex. 1 at 3337-39.; Ex. 22 at 3340-42. Those memoranda, which "APPROVE[D]" the requested course of action, plainly marked the consummation of the agency's decisionmaking process. Ex. 1 at 3339; Ex. 22 at 3342; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). And they stated that the deputations "confer . . . law enforcement authority," which is a legal consequence by any measure. Ex. 1 at 3337; Ex. 22 at 3340. Like the decision to arm troops—which was also embodied in a discrete, declarative agency order, *see* Reply at 36—the decision to deputize troops was thus a paradigmatic final agency action subject to review under the Administrative Procedure Act (APA).

Because Defendants have forfeited any merits defense to the District's arbitrary-and-capricious challenge, *see* Reply at 35, that is sufficient to establish that the District's arbitrary-and-capricious claim is likely to succeed. But Defendants' documents also make clear that both the deputations and the decision to arm the troops lack any reasoned basis. The Deputy Attorney General's decision memoranda do not contain any explanation as to why he authorized or extended deputation of the troops without requiring them to satisfy the ordinary prerequisites for deputation—an omission that is especially notable given that the memoranda state that the deputations required high-level approval because they were "controversial" or implicated substantial "policy concerns." Ex. 1 at 3338. The U.S. Marshals Service similarly issued a memorandum waiving a battery of ordinary requirements for deputation—including the requirement that deputized personnel be employed by a law enforcement agency, have successfully completed a basic law enforcement training program, and have a year of law enforcement experience—without any explanation or consideration of the drawbacks of this course of action. Ex. 36 (Mem. to USMS Special Deputation Prog., Aug. 25, 2025) at 1946. And Defendants have

12

produced nothing suggesting that they acknowledged or weighed the costs of ordering such untrained forces to be armed with military weapons while patrolling the District. *See* Reply at 36.

To the extent Defendants contend that they did not take final agency action authorizing the deployment of DCNG, *see* Opp. 32-33, discovery likewise confirms that is not true. The Secretary of the Army issued a memorandum mobilizing DCNG, which states: "I approve the use of the DCNG to provide critical support to law enforcement efforts in the District of Columbia." Ex. 37 (Mem. from the Secretary of the Army, Aug. 11, 2025) at 2234. General Blanchard ordered the deployment of DCNG pursuant to that direction. Ex. 38 (DCNG Permanent Order 25-223, Aug. 11, 2025) at 1940. When the period of that deployment ended, the Secretary of the Army issued a subsequent memorandum stating: "I am extending this mobilization through 30 November 2025." Ex. 20 (Mem. from Secretary of the Army, Sept. 3, 2025) at 1939. These are final agency actions readily subject to APA review. *See* Reply at 37.

4. **Discovery Underscores the Irreparable Harm that the District Faces and Reinforces the Need for Injunctive Relief.**

Finally, documents produced in discovery reinforce that the equities favor the grant of preliminary injunctive relief.

First, discovery has made clear that Defendants have no intention of ending this deployment soon. General Blanchard has told his officers "to plan and prepare for a long-term persistent presence," which he believes may run at least through the celebration of "America 250" in the summer of 2026. Ex. 19 (Sept. 17 Email from Leland Blanchard) at 0017. He has therefore instructed National Guard troops in the District to "work quickly toward 'wintering' our formation." *Id.*; *see, e.g.*, Ex. 39 (Fragmentary Order (FRAGO) 24, Sept. 6, 2025) at 3522 (ordering troops to "[c]omplete Cold Weather gear tracker" (cleaned up)); Ex. 40 ███████

13

████████████████████████████████ In addition, Defendants have continued to cycle additional states' National Guard units into the District, including by receiving the deployment of approximately 200 Alabama troops in mid-September, Ex. 41 (Sept. 17 Email from David Prichett) at 0035, and extending the deputation of all National Guard troops until at least November 30, *see* Ex. 22 at 3340-42. Defendants are thus engaged in a long-term law enforcement operation in the District—a grave "incursion on [the District's] sovereignty" that "constitutes proof of an irreparable harm." *Illinois v. Trump*, No. 25-2798, -- F. 4th --, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025).

Second, the documents make clear that the deployments are placing burdens on the District and threatening public safety. In their internal documents and communications, Defendants candidly acknowledge that the deployments and the decision to arm the troops increased the threat of criminal activity and unrest in the District. *See, e.g.*, Ex. 23 at 0160-61 (stating that the deployment "presents an opportunity for criminal, violent extremists, issue motivated groups and lone actors to advance their interests"); Ex. 18 (Aug. 20 Email from Leland Blanchard) at 0007 (acknowledging that "[a]rming will cause an increase in protesters"). Those increased tensions and threats have materialized: On August 29, DCNG stated that the "heightened threat environment" had ██████████████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 42 ████████████████████████ ████████; *see* Ex. 43 ██████████████████████████████████ ████████████████.

MPD has borne some of the burdens of these increased tensions. The heightened threat environment made it necessary for MPD to "increase patrols in the vicinity of JTF lodging," Ex.

14

43 at 0324, and provide "escort[s]" to National Guard troops, Ex. 44 (Fragmentary Order (FRAGO) 6, Aug. 18, 2025) at 3413. Further, the dangers posed by large, mine-resistant ambush protected military vehicles in the District have required additional trainings and preparation by the District's emergency responders to ensure they can "safely assist service members in the event of a vehicle accident or fire." *See, e.g.*, Ex. 45 (Fragmentary Order (FRAGO) 30 (Sept. 10, 2025) at 0451-52. And Defendants' acknowledgment that they deputized National Guard troops without requiring them to possess any of the standard training or experience, *see* Ex. 36 at 1946, underscores the substantial threat these troops pose to the public's "significant interest in having only well-trained law enforcement officers deployed in their communities." *Illinois*, 2025 WL 2937065, at *8. Defendants' documents thus further demonstrate that the ongoing military incursion on the District is causing severe and irreparable harm and that the equities tip sharply in favor of injunctive relief.

## CONCLUSION

For the foregoing reasons, and those in the District's opening brief and reply, the Motion for a Preliminary Injunction and Section 705 Stay should be granted.

Dated: October 17, 2025

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (D.C. Bar No. 1026153)
ELIZA H. SIMON (D.C. Bar No. 90035651)
Senior Counsels to the Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH (D.C. Bar No. 1044671)
Senior Counsel to the Attorney General

BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
Assistant Deputy Attorney General
Legal Counsel Division

ALICIA M. LENDON (D.C. Bar No. 1765057)
Chief, Civil Rights and Elder Justice Section
Public Advocacy Division

PAMELA DISNEY (D.C. Bar No. 1601225)
ANDREW MENDRALA (D.C. Bar No. 1009841)
CHRISTOPHER PEÑA (D.C. Bar No. 888324806)
CHARLES SINKS (D.C. Bar No. 888273315)
HANNAH COLE-CHU (D.C. Bar No. 1613497)
Assistant Attorneys General
Office of the Attorney General for
 the District of Columbia
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel: (202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*