Case 1:25-cv-03005-JMC     Document 87-1     Filed 11/18/25     Page 1 of 37

E-FILED
11/17/2025 6:56 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| MAYOR LEE HARRIS,<br>in his official capacity; | ) | |
| COMMISSIONER ERIKA SUGARMON,<br>in her official capacity; | ) | |
| COMMISSIONER HENRI E. BROOKS,<br>in his official capacity; | ) | |
| COUNCILMEMBER JB SMILEY, JR.,<br>in his official capacity; | ) | |
| REPRESENTATIVE GA HARDAWAY,<br>in his official capacity | ) | |
| REPRESENTATIVE GABBY SALINAS,<br>in her personal and official capacities; and | ) | |
| SENATOR JEFF YARBRO,<br>in his personal and official capacities; | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 25-1461-I |
| GOVERNOR BILL LEE,<br>in his official capacity; | ) | |
| ATTORNEY GENERAL JONATHAN<br>SKRMETTI, in his official capacity; and | ) | |
| MAJOR GENERAL WARNER A. ROSS, III,<br>in his official capacity; | ) | |
| Defendants. | ) | |

## <u>ORDER ON PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION</u>

This matter came before the Court for hearing on November 3, 2025, on Plaintiffs'
*Motion for Temporary Injunction.* Plaintiffs seek a temporary injunction restraining Defendants
from "taking further action under the Title 32 deployment of the [Tennessee] National Guard" in
Memphis. Defendants oppose the motion. Based on Plaintiffs' motion, Defendants' response,
the declarations, memoranda, and arguments of counsel, the Court finds that Plaintiffs have met

their burden at this stage of the proceedings, and Plaintiffs' temporary injunction motion should be granted for the reasons discussed below.

## I.    BACKGROUND

Plaintiffs filed their lawsuit on October 17, 2025, challenging the deployment of the Tennessee National Guard to Memphis, Tennessee, following President Donald Trump's September 15, 2025 Memorandum "Restoring Law and Order in Memphis."  Plaintiffs allege the deployment is unlawful under Tennessee statutes, Tenn. Code Ann. §§ 58-1-106 and -301, and violates Article III, § 5 of the Tennessee Constitution.  Plaintiffs seek declaratory and injunctive relief but do not seek damages.

Plaintiffs are the Mayor of Shelby County Lee Harris; Shelby County Commissioners Erika Sugarmon and Henri E. Brooks; City of Memphis Councilmember JB Smiley, Jr.; State Representatives G.A. Hardaway, Sr. and Gabby Salinas; and State Senator Jeff Yarbro; who sue in their official capacities.  Representative Salinas and Senator Yarbro also sue in their personal capacities.  Defendants are Governor Bill Lee, Attorney General Jonathan Skrmetti, and Major General Warner A. Ross, III, who are named in their official capacities.

With their complaint, Plaintiffs moved for entry of a restraining order under Tennessee Rule of Civil Procedure 65.03, asking the Court to restrain Defendants "from taking further action under the Title 32 deployment of the National Guard and restoring the status quo ante."[1]

---

[1]    Plaintiffs also submitted a proposed temporary restraining order, which the Court did not enter, that more specifically requested that Defendants be restrained from:

1.  Continuing the activation of the Tennessee National Guard ordered into service by Defendant Governor Bill Lee in order to support Operation Memphis Safe and the Memphis Safe Task Force;

2.  Ordering any additional members of the Tennessee National Guard into service in order to support Operation Memphis Safe and the Memphis Safe Task Force;

3.  Continuing the deployment of the Tennessee National Guard members to the City of

In the alternative, Plaintiffs moved for a temporary injunction under Rule 65.04 for the same relief.  In support of their motion, Plaintiffs filed the following exhibits:

Ex. A – Tennessee Attorney General Opinion No. 21-05 (May 6, 2021);

Ex. B – Letter from Senator Yarbro to Attorney General Skrmetti (Sept. 29, 2025);

Ex. C – Letter from Representative Salinas to Governor Bill Lee (Sept. 10, 2025);

Exs. D-J – Declarations by each Plaintiff attesting to their position and authority as a member of the governing body to which they are publicly elected and currently serve; the deprivation of their respective authority, right, and duty to request, debate, and vote on the Governor's deployment of Tennessee National Guard personnel to Memphis; the fact that there has been no declaration, resolution or other act adopted or approved by their respective governing body declaring a public safety crisis, disaster, rebellion, invasion, or other condition that would warrant deployment of the Tennessee National Guard to Memphis; their opposition to the Governor's deployment of the Tennessee National Guard to Memphis; the absence of any "breakdown of law and order" in Memphis or Shelby County requiring the assistance of the National Guard; and the potential harm caused by the National Guard deployment, including the diversion of public resources, increased costs and other burdens placed on the criminal justice system, overcrowding of jail facilities, and public fear, tension, and confusion caused to Memphis residents by the National Guard's military presence; and

Ex. K – Letter from Attorney General Skrmetti to Representatives Justin J. Pearson and Gabby Salinas (Oct. 17, 2025).

_____

Memphis, Shelby County or any other county or municipality within the State of Tennessee in order to support Operation Memphis or the Memphis Safe Task Force; and

4.  Ordering the deployment of any additional members of the Tennessee National Guard to the City of Memphis, Shelby County, or any other county or municipality within the State of Tennessee in order to support Operation Memphis Safe or the Memphis Safe Task Force.

Pltfs' Proposed Restraining Order.

The Court denied the requested restraining order and set a November 3 hearing on the temporary injunction motion. *See* Oct. 17, 2025 Order. On October 23, 2025, Defendants filed (1) a motion for continuance of the temporary injunction hearing, (2) a motion to advance the trial on the merits with the continued temporary injunction hearing, and (3) a motion for expedited hearing on the first two motions. Plaintiffs opposed Defendants' motions for continuance and to advance the trial on the merits, but took no position on the motion for expedited hearing. The Court excepted Defendants' motions from oral argument under Davidson County Local Rules, denied each motion based on the parties' papers, and ordered that the temporary injunction hearing would proceed as scheduled. *See* Oct. 27, 2025 Order.

Defendants filed their response in opposition to the motion for injunctive relief, with the following exhibits:

Ex. 1 – Excerpts of a 2024 Tennessee Bureau of Investigation report on statewide and Memphis crime statistics;

Ex. 2 – Declaration of Chad Hunt, Chief Inspector of the U.S. Marshals Service and Commander of the Memphis Safe Task Force, attesting that the Tennessee National Guard was activated to support the Memphis Safe Task Force and its personnel were "specially deputized" by the U.S. Marshals Service to assist with law enforcement, but not to conduct arrests, searches, seizures, or other direct law enforcement activities;

Ex. 3 – Action Memo from the Under Secretary of War for Policy (Sept. 18, 2023);

      Tab 3-A:  Letter from the Secretary of War[2] to Governor Lee (Sept. 23, 2025);

      Tab 3-B:  Memorandum from the Secretary of War to the United States Attorney General and Secretary of Homeland Security (Sept. 23, 2025);

---

[2]     By executive order, President Trump authorized the Department of Defense and the Secretary of Defense to be referred to as the Department of War and the Secretary of War in certain contexts. *See*

Tab 3-C:  Memorandum from President Trump to multiple federal departments and agencies establishing the Memphis Safe Task Force (Sept. 15, 2023); and

Tab 3-D:  Policy Coordination Task Sheet;

Ex. 4 – Declaration of Jennifer Pontow, Tennessee Department of Military's Fiscal Director, attesting that no Tennessee state taxpayer dollars are being used for Tennessee National Guard operations in Memphis;

Ex. 5 – Declaration of Dallas Clements, Lt. Colonel and Deputy J3/Director of Military Support for the Tennessee National Guard, attesting that the Tennessee National Guard's mission is to support federal, state, and local law enforcement agencies in Memphis;

Ex. 6 – "JFHQ-TN OPORD 25-46 Support to Memphis" document, stating the mission as: "On order, the Tennessee National Guard supports state and local law enforcement agencies in Memphis, TN through the Memphis Safe Task Force in order to reduce violent crime in the city";

Ex. 7 – Shelby County Charter;

Ex. 8 – Tennessee Bureau of Investigations "Crime Insight" chart for Memphis (Sept. 2024 – Sept. 2025); and

Notice of Filing – October 31, 2025 weekly column excerpt from the "Commercial Appeal" newspaper.

During the temporary injunction hearing, Plaintiffs agreed that they request temporary injunction relief against Governor Lee and Major General Ross, and not as to Attorney General Skrmetti.

---

https://www.whitehouse.gov/presidential-actions/2025/09/restoring-the-united-states-department-of-war/.

## II.    TEMPORARY INJUNCTION STANDARD

Under Rule 65.04 of the Tennessee Rules of Civil Procedure, "[a] temporary injunction may be granted during the pendency of an action if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual."  Tenn. R. Civ. P. 65.04(2).  The standard for determining whether injunctive relief is appropriate, requires a court to consider the well-known four-factor test: "(1) the threat of irreparable harm to plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on the defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest." *Fisher v. Hargett*, 604 S.W.3d 381, 394 (Tenn. 2020) (internal quotation omitted); *Gentry v. McCain*, 329 S.W.3d 786, 792 (Tenn. Ct. App. 2010).  All factors are to be considered, and no single factor is controlling.  The grant or denial of a request for temporary injunction is discretionary with the trial court.  *Fisher*, 604 S.W.3d at 395.

## III.    FINDINGS OF FACT

The Court makes the following findings of fact required under Rule 65.04(6) based on the limited record at this stage of the proceedings:

Plaintiffs are currently serving elected public officials of Shelby County, the City of Memphis, and the Tennessee General Assembly, and they sue in their official capacities.  State Representative Salinas and State Senator Yarbro also sue as taxpayers in their personal capacities.

Defendants are Governor Bill Lee, Attorney General Jonathan Skrmetti, and Tennessee National Guard Major General Warner A. Ross, III, Adjutant General of the Tennessee National Guard, who are sued in their official capacities.

On September 15, 2025, Governor Bill Lee met with President Donald Trump in the Oval Office of the White House, at which time President Trump signed a memorandum "Restoring Law and Order in Memphis," establishing the "Memphis Safe Task Force" (the "Memphis Memo"). *See* Defs' Ex. 3-C.[3]

The Memphis Memo states that the objective of the Memphis Safe Task Force is to:

> end street and violent crime in Memphis to the greatest possible extent through the promotion and facilitation of hypervigilant policing, aggressive prosecution, complex investigations, financial enforcement, and large-scale saturation of besieged neighborhoods with law enforcement personnel, and which shall coordinate closely with State officials in Tennessee and local officials in Memphis to share information, develop joint priorities, and maximize resources to make Memphis safe and restore public order.

Defs' Ex. 3-C.

The Memphis Memo directs that the Memphis Safe Task Force will be chaired by a person selected and appointed by the United States Attorney General and will include representatives of various federal departments and agencies. *Id*.

Section 3 of the Memphis Memo directs that the Secretary of War "shall request" the Governor of Tennessee, under 32 U.S.C. § 502,

> make available National Guard units of Tennessee to support public safety and law enforcement operations in Memphis, in such numbers and for such duration as the Governor may deem necessary and appropriate to assist with the activities of the Task Force. The Attorney General and Secretary of Homeland Security

---

[3]    Exhibit 3 to Defendants' Response consists of an unauthenticated "Action Memo" from the Under Secretary of War for Policy to the Secretary of War regarding "Authorization of Title 32, U.S. Code, Duty Status for Members of the Tennessee National Guard to Support Law and Order in Memphis, Pursuant to Presidential Memorandum." Attached to the Action Memo are unauthenticated documents marked as Exhibits 3-A through 3-D. Plaintiffs raised no evidentiary objections to these documents.

<u>shall request such National Guard support</u> as necessary and appropriate to accomplish this mission.

*Id*. (emphasis added).

On the same day, Governor Lee's office issued a press release stating that the Governor had joined the President at the White House for the signing of the Memphis Memo "<u>to request that President Trump grant activation of the Tennessee National Guard under Title 32 orders</u> . . . to fight crime in Memphis." ("Governor's Press Release") (emphasis added). *See* https://www.tn.gov/governor/news/2025/9/15/icymi--gov--lee--president-trump-meet-in-oval-office-to-discuss-strategic-mission-to-address-crime-in-memphis.html.

The Governor's Press Release describes the Memphis Safe Task Force as establishing "strong coordination and shared resources between law enforcement agencies at all levels of government, including the Tennessee National Guard, Federal Bureau of Investigation, Drug Enforcement Agency, Tennessee Highway Patrol, Memphis Police Department, and others," and states that "[t]o further support the mission, Gov. Lee has authorized an additional surge of Tennessee Highway Patrol troopers into Shelby County."

The Governor's Press Release is the only document in the record issued by or on behalf of Governor Lee mentioning the Memphis Safe Task Force or the use of the Tennessee National Guard in Memphis.

By letter dated September 23, 2025, from the Secretary of War to Governor Lee, the Secretary states that the President's Memphis Memo "<u>directs the Attorney General of the United States and Secretary of Homeland Security to make requests for National Guard support</u>, as necessary and appropriate, to accomplish the mission directed in" the Memphis Memo. *See* Defs' Ex. 3-A (emphasis added).

The letter further states that the Department of War "is prepared to authorize and fund the use of up to 1,000 Tennessee National Guard personnel" in a Title 32 duty status "through September 30, 2026, in response to such a request." *Id.*

By a separate memorandum dated September 23, 2025, to the United States Attorney General and the Secretary of Homeland Security, the Secretary of War "propose[d] that the Department of Homeland Security and the Department of Justice request assistance from the Department of War." *See* Defs' Ex. 3-B, (emphasis added).

The Secretary further stated that the Department of War "is prepared to authorize and fund . . . use of Tennessee National Guard personnel . . . to assist [the Department of War] in fulfilling your requests to support your efforts to support state and local law enforcement in Memphis, Tennessee, consistent with the Presidential Memorandum through September 30, 2026." *Id.*

The record does not contain any written request from the President, the Secretary of the Department of War, the Secretary of the Department of Homeland Security, the United States Attorney General, or the Department of Justice, to Governor Lee for activation of Tennessee National Guard personnel to support the Memphis Safe Task Force.

The record also does not contain any written order, command, memorandum, or other writing by Governor Lee ordering the activation of Tennessee National Guard personnel for deployment to Memphis to support the Memphis Safe Task Force, or state and local law enforcement agencies in Memphis.

Sometime in September 2025, Chad Hunt, Chief Inspector of the U.S. Marshals Service, was appointed Commander of the Memphis Safe Task Force. *See* Defs' Ex. 2.

Commander Hunt attests that the Memphis Safe Task Force includes "31 partner agencies and approximately 1,741 personnel," from participating federal, state, and local law enforcement agencies, including the U.S. Marshals Service; Bureau of Alcohol, Tobacco, Firearms and Explosives; Drug Enforcement Administration; Federal Bureau of Investigation; Homeland Security Investigations; Tennessee Bureau of Investigation; Tennessee Highway Patrol; Tennessee National Guard; Memphis Police Department; Shelby County Sheriff's Office; and others. *Id*.

The Tennessee National Guard is the only military force activated and assigned duties as part of the Memphis Safe Task Force.

The U.S. Marshals Service "specially deputized" the Tennessee National Guard personnel deployed to Memphis to support and assist with law enforcement activities as part of the Memphis Safe Task Force. *See* Defs' Ex. 2.

Under their special deputization, Tennessee National Guard personnel are not permitted to conduct arrests, searches, seizures, or engage in other direct law enforcement actions for the Memphis Safe Task Force. Their duties are limited to conducting patrols and serving support and deterrence functions. *See* Defs' Exs. 2 and 5.

Attached to Defendants' response is a document titled "JFHQ-TN OPORD 25-46 Support to Memphis,"[4] that refers to the President's Memphis Memo and states the mission as: "On order, the Tennessee National Guard supports state and local law enforcement agencies in Memphis, TN through the Memphis Safe Task Force in order to reduce violent crime in the city." *See* Defs' Ex. 6.

---

[4]    This document is unauthenticated, but Plaintiffs do not object to the Court's consideration of it.

On October 10, 2025, Tennessee National Guard personnel were deployed to Memphis as part of the Memphis Safe Task Force under Title 32 status.

The Tennessee National Guard members supporting the Memphis Safe Task Force are on active *state* duty under 32 U.S.C. § 502, but their deployment is federally funded and no Tennessee state taxpayer dollars are being used. *See* Defs' Ex. 4.

There is no rebellion or invasion currently taking place in Memphis or Shelby County, Tennessee. *See* Pltfs' Exs. D-J.

Neither Shelby County nor the City of Memphis has declared a "breakdown of law and order" or other existing condition in Memphis, or adopted any resolution requesting the Governor to order members of the Tennessee National Guard to active state duty in Memphis or Shelby County. *See* Pltfs' Exs. D-F and J.

The General Assembly has not declared that public safety requires or that other conditions exist that would warrant a military deployment to Memphis, or enacted any law requesting deployment of Tennessee National Guard personnel to Memphis *See* Pltfs' Exs. G-I.

Mayor Harris was not consulted and did not agree to the deployment of Tennessee National Guard personnel to assist or support local law enforcement in Memphis and Shelby County. *See* Pltfs' Ex. J.

Mayor Harris is aware that the Tennessee National Guard deployment under 32 U.S.C. § 502 is federally funded, but anticipates increased costs to and financial strain on Shelby County resources from increased arrests, detentions, and criminal court operations. *Id*.

## IV.    LEGAL PRINCIPLES

### A.    Federal Constitution and Statutes

Article I, § 8 of the United States Constitution gives Congress the power to provide for the "common defense," to "raise and support armies" and maintain a navy, and to organize and call forth "the militia."   U.S. Const., art. I, § 8, cls. 12, 13, 15, 16.   A "militia" is generally described as a group of able-bodies citizens, armed and trained for duty, who may be called up, but are not kept on service like standing armies in peace time.   *See Perpich v. Dep't of Defense*, 469 U.S. 334 (1990).[5]   Under federal law, the "organized militia" came to be known at the national guard of the several states and the "unorganized" militia came to be known as the "reserve militia."   *Id*. at 342.   Since 1933, federal law provides that persons enlisting in a state national guard are simultaneously enlisted in the federal national guard, which in turn is part of the national army.   *Id*. at 345.   The dual nature of enlisted national guard members, as explained in *Perpich*, is that enlistees remain state guard members "unless and until ordered to active federal duty" and revert to state guard status when they are relieved from federal duty.   *Id*.   Until 1952, the authority to order national guard members to active duty was limited to national emergencies.   Beginning in 1952, however, Congress was authorized to call up national guard members to federal "active duty or active duty for training" absent emergency conditions, but only with the state governors' approval.   *Id.* at 346.

---

[5]    In *Perpich,* the Supreme Court addressed different issues than are raised in this case about the President's authority to call up state national guard units to active *federal* duty outside of the United States without the consent of that state's governor.   *Id*. at 336.   While not directly on point here, the Supreme Court included a helpful discussion of the history and evolution of federal and state militia and national guard forces.

Under federal law, national guard members may be called to active duty under "Title 10 status" for *federal* active duty and are under the command of the President.[6]  10 U.S.C. § 12406. National guard members may also be called to active duty under "Title 32 status" to perform training or other duties, which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or the Secretary of Defense." 32 U.S.C. § 502. National guard members called to "active duty" under Title 32 status, as in this case, are called for *state* active duty, not *federal* active duty, and are subject to the command of the state governor, with costs borne by the federal government.  32 U.S.C. §§ 101(19) and 502(f).

### B.    Tennessee Constitution and Statutes

Since its inception, Tennessee's Constitution has declared that "the sure and certain [defense] of a free people is a well regulated Militia and as standing armies in time of peace are dangerous to freedom, they ought to be avoided."  Tenn. Const., art. XI, § 24 (1796).  This provision was carried forward to the current 1870 Tennessee Constitution.  Tenn. Const., art. I, § 24 (1870).  The current Constitution further provides that the Governor,

> shall be commander-in-chief of the Army and Navy of this State, and of the Militia, except when they shall be called into the service of the United States.  But the Militia shall not be called into service except in case of rebellion or invasion, and then only when the General Assembly shall declare, by law, that the public safety requires it.

Tenn. Const., art. III, § 5.

In 1970, the General Assembly enacted the "Tennessee Military Code" (the "Military Code") establishing the Governor's command over Tennessee's military forces, including the

---

[6]    In contrast to the current case, the activation of national guard personnel for deployment in other U.S. cities, such as Portland and Chicago, was made by the President under "Title 10 status" to protect federal facilities, over the objection of the governors of those states, and are subject to the President's command.  *See Oregon v. Trump*, ---F.Supp.3d---, 2025 WL 2817646, *1 (D. Ore. Oct. 4, 2025); *Illinois v. Trump*, 155 F.4th 929, 933 (7th Cir. Oct. 16, 2025); *cf. Yount v. State*, 774 S.W.2d 919 (Tenn. 1989) (Tennessee Air National Guard unit activated for *federal* active duty under "Title 10" status).

Tennessee National Guard. Tenn. Code Ann. §§ 58-1-101, *et seq.* Relevant to the issues presented here, § 58-1-104(a) establishes that "the military forces of the state, in conformity with the Constitution of Tennessee," are divided into the army, the navy, and the militia. *Id*., § 58-1-104(a). Under § 58-1-104(b), the "army" is defined as the Tennessee National Guard, which is made up of the army national guard, the air national guard, and an "inactive national guard." The Military Code further provides that the "militia" consists of "all able-bodied male citizens who are residents of this state and between eighteen (18) and forty-five (45) years of age and who are not members of the army or navy." *Id*., § 58-1-104(d).

The Governor is the commander-in-chief of Tennessee's military forces, "except when they shall have been called into the service of the United States . . . ." *Id*., § 58-1-105. The Military Code establishes the Governor's authority and powers as commander-in-chief as follows:

> (1)    To issue all such orders, rules and regulations as may be necessary to provide for the organization, government, discipline, maintenance, training, and equipment of the national guard. All such orders, rules and regulations issued by the governor shall have the force and effect of law, but they shall conform to the laws and regulations of the United States relating to the organization, discipline and training of the national guard, to parts 1, 2 and 4-6 of this chapter and as nearly as practicable to the laws and regulations governing the United States army and the United States air force;
>
> (2)    Upon the duly and legally constituted call of the president of the United States, to call into service all or any portion of the military forces of the state;
>
> (3)    To appoint, commission and determine the grade of all officers and to select all warrant officers;
>
> (4)    To determine and fix the home station and location of the various units of the national guard;
>
> (5)    To provide such buildings, facilities and grounds as may be necessary to conduct the various activities of the branches and units of the national guard;
>
> (6)    To have, exercise and enjoy such other, further and general powers with respect to the military forces, as may be necessary to execute parts 1, 2 and 4-6 of this chapter or any other statute, or any constitutional provision affecting the

military forces, as such statutes and constitution may now exist, or with any amendments thereto or changes therein; and

(7)    To issue rules, regulations and guidelines specifying the manner, conditions and time period in which a military unit may engage in voluntary aid or assistance.

*Id.*, § 58-1-105.  The Governor is further empowered under the Military Code to:

in case of invasion, disaster, insurrection, riot, attack, or combination to oppose the enforcement of the law by force and violence, or imminent danger thereof, or other grave emergency, to order into the active service of the state, for such period, to such extent and in such manner at the governor may deem necessary, all or part of the national guard or the Tennessee state guard, but, in accordance with the constitution, may not call the militia into service except in case of rebellion or invasion, and then only when the general assembly shall declare by law that the public safety requires it.

*Id.*, § 58-1-106 (a).

As an "alternative and cumulative procedure," § 58-1-106(c) provides that:

upon the request of the governing body of a city or county, and its representation, by resolution duly and regularly adopted, that there is a breakdown of law and order, a grievous breach of the peace, a riot, resistance to process of this state, or disaster, or imminent danger thereof, the governor may order into the active service of the state, for such period, to such extent and in such manner as the governor may deem necessary, all, or any part of, the national guard, or the Tennessee state guard. . . . .

*Id.*, § 58-1-106 (c).  "Whenever members of the military forces are called into active service of the state, they shall serve for such period as the governor may direct, not to exceed the duration of the emergency for which they may be called."  *Id.*, § 58-1-106 (b).

Separately, Part 3 of the Military Code, provides that the Governor, "with the advice and consent of the general assembly, and pursuant to the laws of the United States, shall call the militia, or any portion thereof, into active service[7] at any time that public safety requires it . . . ."  *Id.*, § 58-1-301.

---

[7]    The Military Code defines the terms "active service," "national guard," "air national guard," and "army national guard" for purposes of Parts 1, 2 and 4-6, but not for Part 3 regarding the "militia."

## V.    ANALYSIS AND CONCLUSIONS OF LAW

Plaintiffs challenge the activation and deployment of Tennessee National Guard personnel to implement Section 3 of the President's Memphis Memo establishing the Memphis Safe Task Force, as violating the Tennessee Constitution and Military Code.  They ask the Court to temporarily enjoin Defendants from "taking further action" to continue this deployment or order additional Tennessee National Guard personnel into service.   In response, Defendants argue as threshold issues that the Court need not reach the merits of Plaintiffs' claims because they cannot clear three justiciability hurdles:   (i) Plaintiffs' lack of standing; (ii) Defendants' sovereign immunity; and (iii) the insulation of the Governor's actions from judicial review by the political question doctrine.   Justiciability issues more typically are raised in Rule12.02 pre-answer motions to dismiss for lack of subject matter jurisdiction or failure to state claims for relief, but the Court preliminarily addresses each threshold argument raised by Defendants.

### A.    Justiciability Issues

#### 1.    *Plaintiffs' Standing*

"Standing is one of the justiciability doctrines that guide courts in determining whether to hear and decide a particular case."  *Case v. Wilmington Tr., N.A.*, 703 S.W.3d 274, 281 (Tenn. 2024).  The doctrine of standing determines "whether a particular litigant is entitled to have the court decide the merits of his or her dispute."  *Id.*  Although a party's standing may turn on the nature of the claim, ***likelihood of success on the merits is not a factor***.  *Id.* (emphasis added). Standing is a threshold issue determined as of the date of filing the complaint.  *See Fisher v. Hargett,* 604 S.W.3d 381, 396 (Tenn. 2020); *LaFollette Med. Ctr. v. City of LaFollette*, 115 S.W.3d 500, 504 (Tenn. Ct. App. 2003); *Bowers v. Est. of Mounger*, 542 S.W.3d 470, 481 (Tenn. Ct. App. 2017).

The Tennessee Supreme Court recently clarified the standing analysis in *Case v. Wilmington Trust*. 703 S.W.3d at 281. Under prior Tennessee case law, such as *City of Memphis v. Hargett*, the Tennessee Supreme Court had drawn a distinction between two categories of standing—constitutional and non-constitutional standing—relying on federal jurisprudence. 414 S.W.3d 88, 98 (Tenn. 2013). In *Wilmington Trust*, however, the Court reexamined standing under the Tennessee Constitution, finding it "is not coincident with the United States Constitution in its constraint on judicial power." *Id.* at 286. Tennessee's approach to standing is not grounded in the "cases" or "controversies" language of the United States Constitution, but turns instead on two separate state constitutional provisions. First, the Open Courts Clause requires that "all courts shall be open," and anyone who suffers "an injury done him in his lands, goods, person or reputation" has a right to pursue a remedy. *Id.* at 286 (citing Tenn. Const. art. I, § 17). Second, the Separation of Powers Clause prohibits the judicial branch from exercising powers of either the legislative or executive branches of government such that those seeking a remedy in court must "allege an injury in fact not common to the public." *Id.* at 291 (citing Tenn. Const., art. II, § 2). The Supreme Court in *Wilmington Trust* further recognized that the role of state courts, as courts of general jurisdiction, are "inherently different from the role of federal courts of limited jurisdiction." *Id.* (citations omitted).

Under the Tennessee Constitution's Open Courts provision, a plaintiff has standing in "private rights" cases if they "assert injury to a cognizable legal right." *Id.* That is, the violation of a legal right alone, such as a trespass to land, is sufficient to access the courts even if there is no "injury in fact." *Id.* In such cases, nominal damages may be awarded. *Id.*

In "public rights" cases, the state Constitution's Separation of Powers Clause demands more.[8]  In addition to alleging a violation of a legal right, a plaintiff must also establish the three "indispensable elements" of standing.  *See City of Memphis*, 414 S.W.3d at 98 (quoting *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006)).  "First, a party must show an injury that is 'distinct and palpable'; injuries that are conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry are insufficient in this regard."  *Id.* (quoting *Darnell*, 195 S.W.3d at 620).  Second, "a party must demonstrate a causal connection between the alleged injury and the challenged conduct."  *Id.*  And third, "the injury must be capable of being redressed by a favorable decision of the court."  *Id.*

Here, Plaintiffs seek declaratory relief in their official capacities under the Declaratory Judgment Act, Tenn. Code Ann. §§ 29-14-101, *et seq.*, and seek both declaratory and injunctive relief under Tenn. Code Ann. § 1-3-121, claiming Defendants' actions in deploying Tennessee National Guard members to Memphis as part of the Memphis Safe Task Force violates Tennessee statutes and the Tennessee Constitution.  Plaintiffs Salinas and Yarbro also seek relief in their personal capacities as taxpayers.

Under the Declaratory Judgment Act, "the only 'controversy' needed . . . is that 'the question must be real, and not theoretical; the person raising it must have a real interest, and there must be some one having a real interest in the question who may oppose the declaration sought.'"  *Wilmington Trust*, 703 S.W.3d at 289 n.13 (quoting *Miller v. Miller*, 261 S.W. 965, 972 (Tenn. 1924)); *see also Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 838 (Tenn. 2008) (noting that, even if a present injury is not alleged, only "a bona fide disagreement must exist" between the parties under the Declaratory Judgment Act).  Furthermore, in cases seeking

---

[8]    The Supreme Court in *Wilmington Trust* declined to "articulate a test distinguishing between public and private rights" beyond existing case law.  703 S.W.3d at 291 n.16; *cf. Patten v. City of Chattanooga*, 65 S.W. 414, 420 (Tenn. 1901).

prospective relief, the Declaratory Judgment Act "should operate as preventive clinics as well as hospitals for the injured." *Colonial Pipeline*, 263 S.W.3d at 836-37 (quoting Henry R. Gibson, *Gibson's Suits in Chancery*, § 545 (6th ed.1982)).

The Court finds under the *Wilmington Trust* analysis, that this is a "public rights" case and Plaintiffs must preliminarily establish the three elements of standing. Plaintiffs are publicly elected and currently serving members of their respective county, city, and state legislative bodies. Each alleges that the Tennessee Constitution, state statutes, or city and county charters convey to them legislative authority, rights, and duties to debate and vote on, or to request by a duly adopted resolution, the deployment of the Tennessee National Guard to Memphis. They alleged they have been deprived of their authority, rights, and duties. They allege that the conditions permitting the Governor's activation of National Guard members for state active duty have not been met, making the National Guard's deployment to Memphis unlawful and unconstitutional. Mayor Harris is Shelby County's elected chief executive and responsible for the administration of the County government, and alleges that Defendants' unlawful action in deploying the National Guard to Memphis and Shelby County impedes his ability to perform his executive duties, has diverted his time and attention away from his regular functions, and is causing financial and reputational harm to the County. The county, city, and state legislators allege Defendants' unlawful actions have impeded their respective legislative powers, duties, and rights to debate and vote on the conditions that may warrant National Guard deployment, injuring them in their official capacities.

The Court concludes that Plaintiffs preliminarily have met the three essential elements of standing. First, each Plaintiff has alleged a distinct and palpable injury that is not hypothetical or predicated upon an interest in common with the general public arising from their positions as

publicly elected and currently serving officials.  Second, the Court finds each Plaintiff has shown a causal connection between their alleged injuries and Defendants' deployment of the National Guard to Memphis.  Third, the Court finds Plaintiffs' alleged injuries are capable of being redressed by a favorable order for declaratory or injunctive relief.  Accordingly, the Court concludes each Plaintiff has standing.[9]

Plaintiffs also seek both declaratory and injunctive relief under Tenn. Code Ann. § 1-3-121, which provides:  "Notwithstanding any law to the contrary, a cause of action shall exist . . . for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action."  Under this section, Plaintiffs contend they are "affected persons" entitled to bring their causes of action.

Defendants argue Plaintiffs lack standing under § 1-3-121 to the extent they sue in their official capacities because "affected persons" under the statute do not include governmental entities.  But Plaintiffs do not bring suit on behalf of or in the name of the governmental bodies of which they are members.  Each Plaintiff, instead, sues in his or her own name as an "affected person" in his or her official capacity.  Thus, the Court finds each Plaintiff is an "affected person" with standing to challenge governmental action under § 1-3-121.

### 2. Defendants' Sovereign Immunity

Defendants next contend they are protected from suit under the doctrine of sovereign immunity.  The Tennessee Constitution provides that "[s]uits may be brought against the State in such manner and in such courts as the Legislature may by law direct."  Tenn. Const., art. I, § 17.  Accordingly, the State cannot be sued unless the suit is expressly authorized.  *See Mullins v.*

---

[9]    Plaintiffs allege, in the alternative, that Representative Salinas and Senator Yarbro have standing as taxpayers to seek redress for the illegal expenditure of state funds and made demand for the governmental entity to correct the illegality.  *See Fannon v. City of LaFollette*, 329 S.W.3d 18, 427 (Tenn. 2010).  The record, however, at this stage of the proceedings, does not establish that state taxpayer dollars are being expended for the National Guard deployment.  *See* Defs' Ex. 4.

*State*, 320 S.W.3d 273, 278 (Tenn. 2010) ("It has long been well-established that the State of Tennessee, as a sovereign, is immune from lawsuits except as it consents to be sued."); *Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 167-68 (Tenn. 2022); *cf.* Tenn. Code Ann. § 20-13-102 ("No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property . . . ."). There is a presumption of sovereign immunity and, in order for the Court to find a waiver, Plaintiffs must show that their suit is "explicitly authorized by statute." *See Rausch*, 645 S.W.3d at 167-68; *Colonial Pipeline*, 263 S.W.3d at 849. Defendants assert Plaintiffs here cannot make that showing.

Plaintiffs bring their declaratory judgment and injunctive relief claims under Tenn. Code Ann. § 1-3-121 and § 29-14-102. As noted above, Section 1-3-121 provides:

> Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action. A cause of action shall not exist under this chapter to seek damages.

In *Rausch*, the Tennessee Supreme Court held that the legislature "clearly and unmistakably waived sovereign immunity by enacting Tennessee Code Annotated section 1-3-121." 645 S.W.3d at 168. The Court explained that this statute contains "distinct language . . . to adopt a unique, claim-specific and remedy-specific waiver of sovereign immunity." *Id.* The Court determined that the statute's plain language "expressly recognizes the existence of causes of action 'regarding the legality or constitutionality of a governmental action' that seek declaratory or injunctive relief" and waives sovereign immunity in those cases. *Id.*; *see also Parents' Choice Tennessee*, 2024 WL 1670663, at *17-18 (discussing the applicability of § 1-3-121).

The claims Plaintiffs bring and remedies they seek fit squarely within § 1-3-121. Their claims challenge the legality and constitutionality of Defendants' actions in deploying the Tennessee National Guard to Memphis under Title 32 status as part of the Memphis Safe Task Force; the remedies they seek are declaratory and injunctive relief; and they do not seek damages. Thus, the Court finds that under the plain language of § 1-3-121 and the Supreme Court's decision in *Rausch*, Defendants' sovereign immunity is waived as to Plaintiffs' declaratory judgment claims and request for declaratory and injunctive relief brought under this statute.

Plaintiffs further rely on the Declaratory Judgment Act, which authorizes this Court "to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tenn. Code Ann. § 29-14-102(a). The Tennessee Supreme Court has held that the Declaratory Judgment Act, Tenn. Code Ann. §§ 29-14-101, *et seq.*, "does not contain an explicit waiver of sovereign immunity." *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 853 (Tenn. 2008). The Supreme Court also has held that where a plaintiff's declaratory judgment claim challenges the constitutionality of state statues against state officers, sovereign immunity does not attach. *Id*. Here, Plaintiffs do not challenge the constitutionality of the statutes that authorize the Governor to deploy the National Guard. They instead argue that the Governor actions are unlawful under the statutes that empower him to exercise his authority as commander-in-chief. Thus, the Court finds that Defendants' sovereign immunity has not been waived under the Declaratory Judgment Act, § 29-14-102; but is waived under § 1-3-121, and Plaintiffs' may proceed on their claims under that statute.

### 3. *Political Question Doctrine*

Defendants next argue that the Governor's deployment of Tennessee National Guard

members to Memphis is insulated from judicial review under the political question doctrine. Defendants further claim that the Governor has discretion over whether and when to call up the National Guard—as the Army of Tennessee—and his exercise of that discretion in a nonjusticiable political question.

The political question doctrine applies "[w]here the question presented and the relief sought [in a lawsuit] are of the type that do not admit of judicial resolution, or if the issue presented is a purely 'political question,' the separation of powers provisions of our constitution make it non-justiciable." *Bredesen v. Tenn. Jud. Selection Comm'n*, 214 S.W.3d 419, 435 (Tenn. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 516-17 (1969)). In *Bredesen*, the Tennessee Supreme Court turned to the United States Supreme Court decision in *Baker v. Carr*, 386 U.S. 186 (1962), as summarized in *Mayhew v. Wilder*, 46 S.W.3d 760, 773 (Tenn. Ct. App. 2001), *perm. app. denied* (Tenn. 2001), *reh'g denied* (Tenn. 2001), to determine what factors make a political question non-justiciable:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id*.

Defendants contend at least two of the political question factors apply in this case: (i) the Tennessee Constitution has committed the issue of when to use the Tennessee National Guard to the Governor; and (ii) there are no judicially discoverable and manageable standards for resolving when the Governor may call up the National Guard.

The Court finds that the first factor—whether the Tennessee Constitution has committed the issue of when to use the National Guard to the Governor—is not met. The power committed to the Governor as commander-in-chief of the Army and Militia is not unfettered. Whether the National Guard is deemed to be the Army or the Militia, both Article III, § 5 of the Tennessee Constitution and the Military Code impose limits on the Governor's exercise of his power. The Governor may only call the Militia into service in cases of rebellion or invasion and only with the General Assembly's declaration that the public safety requires it. And while the Constitution refers to Tennessee's "army," Tennessee's Military Code defines the "army" as the Tennessee National Guard, and establishes the Governor's powers and authority as the commander-in-chief of the state's military forces, including when and under what conditions he may call the National Guard into active serve. Tenn. Code Ann. § 58-1-105, -106.

The Court also finds that the second factor—whether there are judicially discoverable and manageable standard for resolving when the Governor may call up the National Guard—is not met. Again, the Tennessee Constitution and the Military Code establish conditions for calling the National Guard into active service and limit the Governor's powers and authority. Plaintiffs challenge the Governor's exercise of those powers on the basis that constitutional and statutory conditions are not met. And in cases such as this, courts routinely are called on to construe the Constitution and statutes to determine whether their requirements have been met. These are questions of law for the courts to decide. *See Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn. 2000). The Court concludes that this case involves issues of statutory construction regarding the conditions under which the Governor may call the Tennessee National Guard into active state service. Principles of statutory construction supply discoverable and

manageable standards for resolving those issues, and the Governor's decision is not protected from judicial review under the political question doctrine.

### B. Temporary Injunction Factors

Turning to the merits of Plaintiffs' request for a temporary injunction, the Court notes that the record does not contain any direct request to Governor Lee for the activation and deployment of the Tennessee National Guard to support the Memphis Safe Task Force from the President, the Secretary of War, the United States Attorney General, or the Secretary of Homeland Security.  The record also does not contain any written command, order, or other directive by Governor Lee, as commander-in-chief, activating the Tennessee National Guard to support the Memphis Safe Task Force.

The documents in the record show only indirect requests or proposals for such requests. For example, the President directed that the Secretary of War shall request Governor Lee to activate the Tennessee National Guard under 32 U.S.C. § 502; but there is no direct request by the Secretary of War to Governor Lee.  Instead, in his September 23 Letter, the Secretary of War advised Governor Lee that the President directed the United States Attorney General and Secretary of Homeland Security to request Tennessee Guard support from Governor Lee, with the expectation they would request National Guard support for the Memphis Safe Task Force. The Secretary of War further proposed that the Department of Homeland Security and the Department of Justice request assistance from the Department of War to authorize and fund the use of the Tennessee National Guard in Memphis under the Memphis Safe Task Force.  Notably, Governor Lee's press release on the same day as his meeting at the White House with President Trump states that the Governor requested the President grant activation of the Tennessee National Guard under Title 32 Orders.

The absence of a clear documentary record establishing (i) any request made directly to Governor Lee or (ii) a command or order by Governor Lee activating the Tennessee National Guard, makes it difficult for the Court to evaluate the circumstances of and purposes for the Tennessee National Guard's activation and deployment to Memphis. For purposes of the temporary injunction hearing, the Court must evaluate Plaintiffs' likelihood of success on the merits of their claims based on the record as presented by the parties.

### 1. *Likelihood of Success on the Merits*

The parties contend that the central question presented is whether the National Guard is deemed to be Tennessee's "militia" or "army," and what constitutional and statutory requirements are implicated. If the National Guard is Tennessee's "militia," as Plaintiffs insist, Article III, § 5 limits the Governor's deployment of the National Guard to cases of "rebellion or invasion, and then only when the General Assembly shall declare, by law, that the public safety requires it." If, however, the National Guard is Tennessee's "army," as Defendants insist, the Governor's authority to deploy Guard personnel is not so circumscribed by the Constitution, but is governed by Tennessee statutes, specifically the Military Code under Tenn. Code Ann. § 58-1-104, -106, and -301.

<u>Violation of the Tennessee Constitution</u>. Plaintiffs contend they are likely to succeed on the merits of their claim that the Memphis deployment violates Article III, § 5 of the Tennessee Constitution, because the Tennessee National Guard is the "militia," which "shall not be called into service except in cases of rebellion or invasion and then only when the General Assembly shall declare, by law, that the public safety requires it." And, because the record establishes that no condition of rebellion or invasion has been proclaimed to exist in Memphis, nor has the General Assembly issued any declaration that the public safety requires deployment of the

National Guard to Memphis, the requirements Article III, § 5 are not met.  In support of their argument, Plaintiffs rely on an 1885 Tennessee Supreme Court decision in *I.S. Green and Eastman G. Currey v. State*, 83 Tenn. 708 (1885), a 1939 federal district court decision, *Joyner v. Browning*, 30 F. Supp. 512 (W.D. Tenn. 1939), and a now-withdrawn Tennessee Attorney General opinion, and urge the Court to view the term "militia" through a historical lens and conclude that the Tennessee's national guard is the "militia" for purposes of the Tennessee Constitution.

Defendants rely on provisions of Tennessee's Military Code, which distinguish the "army" from the "militia," and plainly define the National Guard as part of the "army."  They contend that the Governor, as the commander-in-chief of Tennessee's military forces, is authorized to call the National Guard into active state service to support the Memphis Safe Task Force.

Based on the issues presented, the Court finds it need not reach the constitutional question of whether the Tennessee National Guard is the "militia" or the "army" for purposes of Article III, § 5 of the Tennessee Constitution.  Courts are to refrain from "addressing constitutional issues when a case can be decided on non-constitutional grounds." *State v. Thompson*, 151 S.W.3d 434, 442 (Tenn. 2004); *Wilson v. Wilson*, 984 S.W.2d 898, 902 (Tenn. 1998)); *see also Haynes v. City of Pigeon Forge*, 883 S.W.2d 619, 620 (Tenn. Ct. App. 1994) ("courts do not decide constitutional questions unless the issue's resolution is absolutely necessary for determination of the case and the rights of the parties.").  Thus, the Court finds it can consider the likelihood of success on the merits factor based on Plaintiffs' statutory claims.

<u>*Violation of Tennessee Statutes*</u>.  Plaintiffs allege that the Governor's activation and deployment of the Tennessee National Guard to Memphis exceeds his statutory authority as

commander-in-chief of the state's military forces and violates several statutes. Under section 58-1-106(a) of the Military Code, the Governor may "order into active service of the state" all, or any part, of the National Guard "in cases of invasion, disaster, insurrection, riot, attack, or combination to oppose the enforcement of the law by force or violence, or imminent danger thereof, or other grave emergency." In contrast, section 58-1-301 provides the Governor, "with the advice of the general assembly, and under the law of the United States, shall call the "militia" into active service "at any time that public safety requires it." Tenn. Code Ann. § 58-1-301.

Plaintiffs contend that none of the statutory conditions of section 106(a) has been met or duly declared that would warrant activating all or any part of the Tennessee National Guard. The purposes of the Memphis Safe Task Force stated in the Memphis Memo are to fight violent crime in Memphis and support law enforcement efforts to restore public safety and order. The Memphis Memo more specifically states that the purpose of mobilizing the Tennessee National Guard is "to support public safety and law enforcement operations in Memphis, in such numbers and for such duration as the Governor may deem necessary and appropriate . . . ." Plaintiffs contend supporting public safety and law enforcement operations is not one of the enumerated conditions allowing the Governor to order the National Guard into active service under § 58-1-106(a).

Defendants respond that the Governor exercised his discretion to order the National Guard to Memphis to combat "unbridled criminal activity" that threatens the public order and well being of Memphians, which Defendants submit constitutes a "grave emergency" or a "disaster" under § 58-1-106(a). Defendants rely on the high crime rate statistics and gang activity in Memphis to support their assertions.

- 28 -

The Court finds there no evidence in the record documenting the Governor's exercise of his authority as commander-in-chief of Tennessee's military forces to activate the National Guard based on any finding that the ongoing criminal activity in Memphis constitutes either a "grave emergency" or a "disaster" for purposes of § 58-1-106(a). Neither term is defined for purposes of the Military Code. Based on the plain language of the statute, the Court construes the terms "grave emergency" and "disaster" in the context of the other enumerated conditions listed in subsection 58-1-106(a) under which the Governor may call the National Guard into active service of the state. Further, the reference in §58-1-106(b) addressing how long the called up military forces shall serve, limiting it to the "duration of the emergency" for which they are called, supports a construction that the conditions listed in subsection 106(a) must constitute an emergency condition.

It is the court's duty in construing a statute to ascertain and give effect to the intention and purposes of the legislature. *Lipscomb v. Doe*, 32 S.W.3d 840, 844 (Tenn. 2000). Legislative intent is determined based on "the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language." *Id.* (internal quotation omitted). Where the statute is unambiguous, courts are to apply its plain meaning. *Id.*; *Carson Creek Vacation Resorts, Inc. v. Tenn. Dep't of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993). Where the statute is ambiguous, courts look to the entire statutory scheme and elsewhere to ascertain the legislative intent and purpose. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). "The statute must be construed in its entirety, and it should be assumed that the legislature used each word purposely and that those words convey some intent and have a meaning and purpose." *Id.* The background, purpose, and circumstances of the words used are to be considered, without taking a word or few words from their context and

determining their meaning in isolation. *Id.* The Tennessee Supreme Court has held that when interpreting statutes, "[t]he text of the statute is of primary importance . . . . A statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says." *Kampmeyer v. State*, 639 S.W.3d 21, 26 (Tenn. 2022) (citations and quotations omitted).

Applying the foregoing principles of statutory construction, the Court finds that neither "grave emergency" nor "disaster" can fairly be construed to include "ongoing criminal activity"—which plainly is a law enforcement concern—and is not the type of emergency that would warrant the activation and deployment of National Guard members who are not trained law enforcement personnel. This conclusion is bolstered by the fact that the National Guard members, who have been specially deputized by the U.S. Marshals Service, are limited to supporting the law enforcement activities of other federal, state and local law enforcement agencies, and they have no authority to engage in typical law enforcement activities such as arrests or seizures. The documents in the record—from the President's Memphis Memo to the JFHQ-TN OPORD document—make clear that the purpose of the Memphis Safe Task Force is to fight crime and the purpose of the National Guard's deployment is to support public safety and law enforcement efforts by other federal, state, and local law enforcement agencies in Memphis. Fighting crime and supporting law enforcement agencies are not among the listed emergency conditions permitting the Governor to call the National Guard into active state service. Thus, the Court concludes Plaintiffs have shown a likelihood of success on the merits that the Memphis deployment violates section 58-1-106(a) of the Military Code.

Alternatively and cumulatively, section 58-1-106(c) authorizes the Governor to order the National Guard into active service of the state upon the request of the governing body of the city

or county, based on a duly adopted resolution that there is a "breakdown of law and order, a grievous breach of the peace, a riot, resistance to process of this state, or disaster, or imminent danger thereof."  Again, there is no documentary proof in the record of any request by the governing bodies of either Shelby County or the City of Memphis, through duly adopted resolutions, for the Governor's deployment of the National Guard to Memphis.  Thus, Plaintiffs have shown a likelihood of success on the merits that the Memphis deployment violates § 58-1-106(c).

Finally, turning to Plaintiffs additional argument that Tenn. Code Ann. § 58-1-301 has been violated because the Tennessee National Guard is the "militia," and the Governor did not obtain the general assembly's advice and consent, the Court finds § 58-1-301 does not apply to the facts of this case.  The Military Code specifically defines the "army" as composed of the army national guard and the air national guard and, together with an inactive national guard, which comprise the Tennessee National Guard.  Tenn. Code Ann. § 58-1-104(b).  The Military Code separately defines the "militia."  *Id.*, § 58-1-104(d).  Thus, Plaintiffs have not shown a likelihood of success on the merits as to their claim that Defendants have violated § 58-1-301 based on their argument that the National Guard is the "militia."

### 2. Irreparable Harm

Plaintiffs contend that Mayor Harris is suffering ongoing and irreparable harm in his ability to perform his duties as Mayor of Shelby County, and the deployment is causing immediate and irreparable harm to the County by the increased number of arrests, over burdening the criminal justice system, and overcrowding jail facilities.  In addition, Mayor Harris attests that the presence of National Guard troops militarizes Memphis streets and creates public fear and insecurity and damages the city and county's reputation.  The other Plaintiffs, each of

whom is a publicly elected member of a county, city, or state legislative body, claim they have been deprived of their statutory and constitutional rights and duties to debate and vote on the deployment of the Tennessee National Guard to Memphis. Plaintiffs contend that a temporary injunction is necessary to restrain the ongoing deployment, which is causing irreparable injury that increases with every day the deployment continues, cannot be adequately compensated by money damages, and will render a final judgment ineffectual.

Defendants contend Plaintiffs have not demonstrated irreparable harm, arguing that they only allege harm on behalf of the legislative bodies in which they serve, but do not allege any harm to themselves individually. Defendants claim this is not the type of irreparable harm that an injunction is intended to protect. Closely related to Defendants' argument based on Plaintiffs' lack of standing, they argue that the required showing of irreparable harm imposes a greater burden they have failed to meet.

The Court finds that this case raises important questions concerning the use of the state's military forces for domestic law enforcement purposes. Plaintiffs challenge the activation of the National Guard to Memphis and Shelby County as interfering with their official duties (in the case of Mayor Harris), or as having deprived them of the ability to exercise their authority, rights, and duties as current elected public officials under Tennessee law. The Court finds this issue implicates the type of immediate and irreparable harm that cannot adequately be compensated by money damages, and that warrants the issuance of temporary injunctive relief pending a determination on the merits. Accordingly, this factor weighs in favor of granting temporary injunctive relief.

### 3. Balance of Harms

Defendants maintain that the Tennessee National Guard is not conducting any arrests, searches, seizures, or other direct law enforcement activities, and the National Guard is instead

serving a support and deterrence function to other federal, state, and local law enforcement agencies.  Commander Hunt attests that the Memphis Safe Task Force currently has 31 federal, state and local law enforcement agencies involved.  If the Tennessee National Guard deployment were to be enjoined, however, Defendants insist the Memphis Safe Task Force would lose the benefit of the National Guard's valuable support and deterrence functions.

Plaintiffs respond that Defendants would not be subject to harm if the injunction were granted because Defendants have no legitimate interest in violating Tennessee law. *See Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 841 (E.D. Tenn. 2022).  By comparison, Plaintiffs' legislative rights and duties to vote on or adopt resolutions requiring or requesting the deployment of the National Guard have been compromised.

The Court finds that the National Guard's limited role as part of the Memphis Safe Task Force is to serve a support and deterrence function.  That role does not appear to be critical to the Memphis Safe Task Force's mission of fighting violent crime through its ongoing law enforcement activities being conducted by more than 30 participating federal, state, and local law enforcement agencies.  While the U.S. Marshals Service has specially deputized Tennessee National Guard members to perform support duties, they are a military force; they are not trained in local law enforcement practices and they are not deputized to make arrests, seizures, or conduct other law enforcement activities.  In addition, Governor Lee's office announced in its press release that the Governor has "authorized an additional surge of Tennessee Highway Patrol troopers into Shelby County," and "Tennessee has pledged an unprecedented $200 million to fight violent crime," with "more than $40 million . . . obligated across Shelby County to support local law enforcement agencies."  (Gov's Press Release.)  Thus, the Court finds that the balance of harms factor weighs in favor of granting temporary injunctive relief.

### 4. *Public Interest*

There are several competing public interests at stake in this case. There is a significant public interest in ensuring that the county, city, and state officials publicly elected by Memphis voters are allowed to exercise their duties and rights to debate, make decisions, and vote on matters that are within their constitutional and statutory authority. The residents of Memphis also have a strong public interest in not being subjected to domestic military occupation for law enforcement purposes under circumstances where it is not statutorily authorized.

Defendants respond that granting a temporary injunction will damage the public interest because it would stop the National Guard's lawful operations in Memphis and fail to support the ongoing law enforcement efforts there. They also claim an injunction will damage the public interest in failing to stop violent crime in Memphis and ensuring the public safety. They further claim that an injunction will have broader implications in potentially limiting "the State's emergency response capabilities." Defendants insist that if an injunction issues, it should be narrowly tailored and specific as to what is or is not permitted under the Memphis Safe Task Force and, in any event, an immediate appeal should be granted.

The Court does not conclude that a narrow injunction limited to the deployment of National Guard troops to Memphis "to support law enforcement efforts" as part of the Memphis Safe Task Force will severely hamper the Memphis Safe Task Force activities or otherwise limit or implicate the state's emergency response capabilities. Tennessee's emergency preparedness, response, recovery, and mitigation statutes are comprehensive, and the Governor's powers under those statutes are quite broad. *See* Title 58, Ch. 2. The Governor's powers and authority to order Tennessee's national guard into active service under § 58-1-106 when the statutorily defined conditions are met will remain unaffected by an injunction. Thus, the Court finds that the public interest factors favor granting injunctive relief.

## VI.    CONCLUSION

The Court concludes that Plaintiffs have standing to bring their claims for declaratory and injunctive relief, sovereign immunity is waived under Tenn. Code Ann. § 1-3-121, and the issues presented do not come within the political questions doctrine and are justiciable.  The Court further concludes that Plaintiffs have shown a likelihood of success on the merits of their claims that the Governor's actions in calling the National Guard into the active service of the state to support the Memphis Safe Task Force violate the terms and conditions of Tennessee's Military Code, Tenn. Code Ann. §§58-1-106(a) and (c); that Plaintiffs have established they are suffering or will suffer irreparable harm in the absence of granting a temporary injunction; and that the balance of harms and public interest factors weigh in favor of granting temporary injunctive relief.  Thus, the Court concludes that Plaintiffs request for a temporary injunction should be GRANTED.

It is, accordingly, ORDERED that:

A.    Plaintiff's *Motion for Temporary Injunction* is GRANTED, and the Court temporarily ENJOINS and RESTRAINS Defendants Governor Bill Lee and Major General Warner Ross, III from implementing and continuing the activation and deployment of Tennessee National Guard personnel in accordance with Section 3 of the President's September 15, 2025 Memorandum and the Secretary of War's September 23, 2025 Letter to Governor Lee to provide law enforcement support and assistance to the Memphis Safe Task Force under "Title 32 status."

B.    This temporary injunction shall become effective upon Plaintiffs posting an injunction bond in the amount of $50,000 under Tenn. R. Civ. P. 65.05.

C.       This temporary injunction shall remain in force and effect until modified or dissolved on motion or until a permanent injunction is granted or denied, as provided under Tenn. R. Civ. P. 65.05(5).

D.       The Court further GRANTS a STAY of the effectiveness of the temporary injunction pending Defendants' filing of an immediate application for permission to appeal, provided Defendants' file such application within 5 business days after the injunction is issued and effective upon Plaintiffs' posting the injunction bond.  If no application for permission to appeal appeal is timely filed, the stay granted by this injunction order will be lifted and the injunction will become immediately effective.

E.       All other issues are reserved.

IT IS SO ORDERED.

s/Patricia Head Moskal
_____
PATRICIA HEAD MOSKAL
CHANCELLOR, PART I


ISSUED this the ____ day of _____, 2025 at _____ o'clock ___m.


MARIA M. SALAS, Clerk and Master



By:_____
       Deputy Clerk and Master

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing is being forwarded by U.S. Mail, first-class, postage pre-paid, with a courtesy copy by email, to counsel or parties listed below:

William J. Harbison III, Attorney at Law
Robert D. Boon, II, Attorney at Law
Micah N. Bradley, Attorney at Law
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
jharbison@srvhlaw.com
jboon@srvhlaw.com
mbradley@srvhlaw.com

Cody N. Brandon, Deputy Attorney General
Zachary R. Clark, *Pro Hac Vice Attorney*
Gary R. Dunn, *Pro Hac Vice Attorney*
Constitutional Defense Division
OFFICE OF THE TENNESSEE ATTORNEY
GENERAL
P.O. Box 20207
Nashville, TN 37202-0207
Cody.Brandon@ag.tn.gov
Zachary.Clark@ag.tn.gov
Gary.Dunn@ag.tn.gov

Brian D. Netter, *Pro Hac Vice Attorney*
Yenisey Rodriguez, *Pro Hac Vice Pending*
William B. Bardwell, *Pro Hac Vice Attorney*
Joshua M. Salzman, *Pro Hac Vice Attorney*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
bnetter@democracyforward.org
yenisey.rodriguez@democracyforward.org
wbardwell@democracyforward.org
jsalzman@democracyforward.org

David M. Rudolph, Sr. Asst. Atty. General
OFFICE OF THE TENNESSEE ATTORNEY
GENERAL
40 South Main Street, Suite 1014
Memphis, TN 38103
david.rudolph@ag.tn.gov

*Attorneys for State Defendants*

Benjamin Farley, *Pro Hac Vice Attorney*
Marlene Berroa Rodriguez, *Pro Hac Vice Atty.*
Efren C. Olivares, *Pro Hac Vice Attorney*
THE NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
farley@nilc.org
berroa@nilc.org
olivares@nilc.org

*Attorneys for Plaintiffs*

_Maria M. Salas_
MMS ~~Deputy~~ **Clerk & Master**

11/17/25
**Date**