# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

                          Plaintiff,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

                        Defendants.

Case No. 25-cv-3005 (JMC)

## MEMORANDUM OPINION

Since August 11, 2025, over 2,000 members of the National Guard have been deployed to the District of Columbia. While in the District, these units have provided support to local and federal law enforcement agencies. Guard units have patrolled on the National Mall, in Metro Transit stations, and across D.C. neighborhoods. The Guard's operations in D.C. have been coordinated by the Joint Task Force District of Columbia (JTF-DC), which oversees units from D.C.'s own National Guard (DCNG) and from other states, including South Carolina, West Virginia, Mississippi, Louisiana, Tennessee, Ohio, Georgia, Alabama, and South Dakota. At this point, National Guard units are expected to remain in the District through February 28, 2026.

The District of Columbia (Plaintiff) filed this suit, alleging that the National Guard deployment violated the Administrative Procedure Act (APA), the District of Columbia Home Rule Act, the Emergency Management Assistance Compact (EMAC), the Posse Comitatus Act (PCA), and the Constitution. The complaint named three categories of Defendants: (1) President Donald J. Trump, (2) the United States Department of Defense, Secretary of Defense Peter B. Hegseth, the United States Army, and Secretary of the Army Daniel P. Driscoll (collectively, DOD Defendants), and (3) the Department of Justice, Attorney General Pamela J. Bondi, the U.S.

Marshals Service, and Director of the Marshals Service Gadyaces S. Serralta (collectively, DOJ Defendants).[1] Plaintiff then moved for a preliminary injunction and to stay agency action, seeking to enjoin or stay the deployment of the National Guard in the District for the duration of this litigation. Defendants oppose the motion and have also moved to dismiss Plaintiff's suit.

The record in this case, including many of the amicus briefs filed, makes clear that there are strong views on both sides about whether these deployments represent good policy. But the Court is only tasked with deciding whether Defendants' actions are lawful. In this opinion, the Court addresses two of the District's statutory arguments under the APA and finds that it is likely to succeed on the merits of both. First, the DOD Defendants have exceeded the bounds of their authority under Title 49 of the D.C. Code, and thus acted contrary to law, in deploying the DCNG for non-military, crime-deterrence missions in the absence of a request from the city's civil authorities. Second, these Defendants lack statutory authority under 32 U.S.C. § 502 to support their request for assistance from out-of-state National Guards and their actions in calling those Guards to the District. The Court finds that the District's exercise of sovereign powers within its jurisdiction is irreparably harmed by Defendants' actions in deploying the Guards, and that the balance of equities and public interest weigh in the District's favor. As such, the Court will **GRANT** the District's motion for preliminary relief and partially **DENY** Defendants' motion to dismiss on those claims. The Court finds, however, that the public interest weighs in favor of an administrative stay in this case, and that a stay is needed to permit orderly proceedings on appeal. Accordingly, the Court will **STAY** its order for 21 days, until December 11, 2025.[2]

---

[1] The individual Defendants are sued in their official capacities.

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.    BACKGROUND

The Court begins by providing some background on the legal structures governing the National Guard, the District of Columbia, and the DCNG in particular. The Court then discusses some factual background on the deployment of the National Guard forces in the District since August 2025 and provides a brief overview of the procedural history of this case.

### A.  The National Guard

The modern National Guard descends from the state militias of the colonial era recognized and protected by the Constitution. *See* U.S. Const. art. I, § 8, cl. 15 (providing Congress with the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"); *id*. cl. 16 (giving Congress the power to organize, arm, and discipline the militia, and to govern "such Part of them as may be employed in the service of the United States," while reserving other powers to the states). "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States."[3] *Perpich v. Dep't of Def*., 496 U.S. 334, 345 (1990). National Guard units retain their state character "unless and until ordered to active duty in the Army." *Id*. The President is the Commander in Chief of "the Militia of the several States, when called into the actual Service of the United States"—i.e., when the National Guard is called into federal service. U.S. Const. art. II, § 2, cl. 1.

---

[3] It has been observed that "[i]n many senses, the National Guard is a constitutional anomaly. It simultaneously serves two sovereigns. On the one hand, it serves as an organized version of the militia intended by the framers to be in control of the states in times of peace. As such, it is constantly available to serve state governments in the event of natural disasters (such as floods or tornadoes) or public disturbances (such as riots or strikes), and always ready to be called upon by Congress to serve the federal government in times of war or national emergency. On the other hand, it is the federal reserve of first resort, a very important component of the armed forces of the United States, capable of being ordered onto active duty upon federal command." Peter A. Fish, *The Constitution and the Training of National Guardsmen: Can State Governors Prevent Uncle Sam from Sending the Guard to Central America?*, 4 J.L. & Pol. 597, 636 (1988).

The National Guard can operate in three statuses: state active duty, federal active duty under Title 10 of the U.S. Code, and full-time National Guard duty under Title 32 of the U.S. Code. When a member of the National Guard is operating under state active duty, they act "under state control for state purposes" and "at state expense." *Stirling v. Minasian*, 955 F.3d 795, 798 (9th Cir. 2020). In contrast, federal active duty pursuant to Title 10 refers to duty that the National Guard undertakes "in the active military service of the United States." 10 U.S.C. § 101(d)(1). The President can call up the National Guard for federal active duty—known as federalizing the Guard—under limited circumstances, including when there is an insurrection, invasion, or rebellion, or if the President is unable to execute the laws of the United States with regular forces. *See* 10 U.S.C. §§ 251–53; *id.* § 12406. When federalized, the National Guard is subject to the restrictions of the Posse Comitatus Act, barring it from conducting domestic law enforcement. 18 U.S.C. § 1385 (prohibiting the Army and the Air Force from being used "as a posse comitatus or otherwise to execute the laws"); *see also Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019) ("Federal service for purposes of the Posse Comitatus Act refers to standing active duty forces organized under Title 10 of the U.S. Code.").

In this case, all of the National Guard units at issue, from D.C. and out of state, are operating pursuant to the third status—a hybrid state/federal status under Title 32 also referred to as "[f]ull-time National Guard duty." 32 U.S.C. § 101(19). Title 32 authorizes "members [to] provide military support as state National Guard members under state control" while also being "in the service of the federal government and funded by the federal government." *Stirling*, 955 F.3d at 798. In other words, Title 32 covers those activities performed by state National Guard units when they remain under the control of their own state governors and generals but receive federal funding to assist with a federal mission. Duties under Title 32 are defined as "training or

4

other duty" performed by a member of the National Guard under sections 316, 502, 503, 504, or 505 of Title 32 "for which the member is entitled to pay from the United States." 32 U.S.C. § 101(19). Relevant here, section 502(f) authorizes a member of the state National Guard to "be ordered to perform training or other duty," including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f).

When Title 10's predicates are satisfied—such as in the case of a rebellion—the President can order federalized National Guard units into any state across the country, regardless of which states the troops originate from. *See* 10 U.S.C. § 12406 (allowing the President to call into federal service the National Guard units of "any State" and to deploy those units "as he considers necessary"). Accordingly, in commanding the federalized National Guard, the President does not need the permission of the sending or receiving state governors to act. But under both state active duty and Title 32 statuses, the states can deploy their National Guards to assist each other only by mutual agreement or through the Emergency Management Assistance Compact (EMAC). Pub. L. No. 104–321, § 1, 110 Stat. 3877 (1996). The EMAC provides for "[m]utual assistance between the states" in managing any "emergency disaster" declared by the receiving state governor, including assistance through "use of the states' National Guard forces." *Id.* As explained on the EMAC website, state active duty and Title 32 are two forms of "duty statuses," but "[d]uty statuses are not a mechanism for a deployment outside of the home state." *Duty Status*, EMAC, https://perma.cc/J6F7-D5CW. Instead, the EMAC "serves as th[e] mechanism" for those out-of-state-deployments and "provides [legal] protections . . . for the deploying forces." *Id*.

**B.  The District of Columbia and its National Guard**

This case also implicates the unique constitutional position of the District of Columbia. Pursuant to the District Clause of the Constitution, Congress has the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of the Government of the United States." U.S. Const. art. I § 8, cl. 17. In 1889, Congress passed an act establishing the governance of the D.C. militia, which is retained in substantial form by Title 49 of the D.C. Code. The statute provides that "[t]he President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia." D.C. Code § 49-409. Title 49 also explicitly states that the President can call out the DCNG as he deems necessary (1) when there is a "tumult, riot, mob," or other coordinated criminal or violent activity in the District, and (2) the Mayor, the U.S. Marshal, or the National Capital Service Director "call[s] on the [President] to aid them in suppressing such violence and enforcing the laws." *Id.* § 49-103. In 1969, the President delegated this authority over the DCNG to the Secretary of Defense. *Supervision and Control of the National Guard of the District of Columbia*, Exec. Order No. 11485, § 1, 34 Fed. Reg. 15411 (Oct. 1, 1969) (establishing that the Secretary of Defense is authorized to "supervise, administer[,] and control" the DCNG "while in militia status" and that the Commanding General of the DCNG "shall report" to the Secretary of Defense). The Secretary of Defense is empowered to "command the military operations, including training, parades and other duty" of the DCNG and, "subject to the direction of the President," can deploy the DCNG "to aid the civil authorities of the District." *Id.*

In 1973, in response to "calls for local self-government," Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, more commonly known as the Home Rule Act. *Marijuana Pol'y Proj. v. United States*, 304 F.3d 82, 83 (D.C. Cir. 2002) (citing

Pub. L. No. 93-198, 87 Stat. 774 (1973)); *see* D.C. Code § 1-201.02(a) (stating that Congress's intent was to "grant to the inhabitants of the District . . . powers of local self-government"). In doing so, Congress delegated its police powers over the District to the local District government, headed by a mayor. Under D.C. law, "[i]t shall be the duty of the Mayor" to "preserve the public peace," "prevent crime and arrest offenders," and "enforce and obey all laws."[4] D.C. Code § 5-101.03(1), (2), (10); *see id.* § 1-204.22 ("The Mayor shall be responsible for the proper execution of all laws relating to the District."). The Home Rule Act specified, however, that "[n]othing in this chapter shall be construed as vesting in the District government any greater authority over . . . the National Guard of the District of Columbia . . . than was vested in the Commissioner prior to January 2, 1975."[5] *Id.* § 1-206.02(b).

In 2002, in the aftermath of the terrorist attacks on September 11th, 2001, the District of Columbia passed legislation joining the EMAC and authorizing the Mayor to "execute, on behalf of the District of Columbia," the provisions of the compact. D.C. Law 14-194, § 603, 49 D.C. Reg. 5306 (codified at D.C. Code § 7-2332). As adopted by the District, the EMAC can be utilized to seek assistance from other states only after "the Mayor of the District of Columbia" makes "a declaration of a state of emergency or disaster." *Id.* (Article IV of the EMAC).

---

[4] In some instances, the District's power may be shared with federal power. For example, Defendants have noted that some federal entities—including the U.S. Marshals and the U.S. Park Police—play key roles in law enforcement in the District. ECF 35-1 at 18; D.C. Code § 5-201 (addressing the powers and duties of the Park Police); *id.* §§ 23-501, 23-581 (providing certain federal law enforcement officers with the powers to make arrests in the District).

[5] From 1874 to 1967, D.C.'s government was comprised of a three-member commission appointed by the President. Joseph V. Jaroscak & Ben Leubsdorf, Cong. Rsch. Serv., IF12577, Governing the District of Columbia: Overview and Timeline 2 (2024). In 1967, President Lyndon B. Johnson reorganized the District government and established a nine-member council and a mayor-commissioner appointed by the President. *Id.* Since the enactment of the Home Rule Act in 1973, D.C. has been led by an elected mayor and council. *Id.* Section § 1-206.02 of the D.C. Code thus establishes that the elected Mayor, after the passage of the Home Rule Act, does not wield any greater authority over the National Guard than that exercised by the appointed mayor-commissioner prior to 1975.

**C.  August 2025 Mobilization of National Guard in the District**

On August 11, President Trump issued a Presidential Memorandum ordering the deployment of the DCNG and out-of-state National Guards to combat crime in the District:

> Mobilizing the District of Columbia National Guard. Pursuant to my authority under the Constitution and laws of the United States and the District of Columbia, I direct the Secretary of Defense to mobilize the District of Columbia National Guard and order members to active service, in such numbers as he deems necessary, to address the epidemic of crime in our Nation's capital. The mobilization and duration of duty shall remain in effect until I determine that conditions of law and order have been restored in the District of Columbia. Further, I direct the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission.

Presidential Memorandum, *Restoring Law and Order in the District of Columbia*, § 2 (Aug. 11, 2025) [hereinafter August 11 Presidential Memorandum], https://perma.cc/WM9U-RHTE.

The Secretary of the Army and the Commanding General of the DCNG implemented the President's directive. First, the Secretary of the Army approved the DCNG to "provide critical support to law enforcement efforts in the District of Columbia." ECF 70-1 at 135. The Commanding General then issued DCNG Permanent Order 25-223. Under that Order, members of the DCNG were ordered to "protect federal property and functions in the District of Columbia and to support federal and District law enforcement." *Id.* at 137. The Order cites 32 U.S.C. § 502 and D.C. Code §§ 49-101, 49-102, and 49-107 as support for the Commanding General's authority to direct such actions.

Defendants also executed Memorandums of Understanding (MOUs) between the DCNG and various "Supporting States," establishing the terms under which those states would send their National Guard units to the District. According to documents produced by Defendants in discovery, the DCNG executed MOUs with state National Guard units from Louisiana,

Mississippi, Ohio, Tennessee, West Virginia, Georgia, Alabama, and South Dakota.[6] ECF 70-1 at 13–16, 17–20, 21–24, 25–28, 29–32, 33–36, 37–40, 41–44. The MOUs' stated purpose is to "support . . . Operation Make DC Safe and Beautiful," including by facilitating "cooperation and unity of effort" between the DCNG, U.S. Marshals Service, U.S. Park Police, and Metropolitan Police Department (MPD). *Id*. at 13. Under the agreements, each governor "retain[s] the authority to decline missions that will compromise his or her ability to respond to emergency requirements." *Id*. The MOUs also provide that "[s]ending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment," and that the parties to the MOUs "will perform duties under 32 U.S.C. § 502(f)." *Id*. at 13–14. The MOUs also list the activities the out-of-state National Guard units may assist in, including "national monument security, area beautification, traffic control points, and law enforcement patrols." *Id*. at 13.

The Parties broadly agree that, since being deployed in August, the National Guard has been operating throughout the District as part of "presence patrol[s]" and "high visibility missions" to deter crime.[7] ECF 83-1 at 10–11; ECF 35-1 at 23 (National Guard units in the District support

---

[6] Defendants represent in their briefing that JTF-DC consists of personnel from "South Carolina, West Virginia, Mississippi, Louisiana, Tennessee, and Ohio." ECF 35-1 at 22. Defendants have subsequently produced documents, however, referencing the involvement of National Guard units from Georgia, Alabama, and South Dakota. *See, e.g.*, ECF 83-1 at 84–85 (referencing the "TF Bulldawg (GANG)" and "TF Yellow Hammer (ALNG)"); ECF 70-1 at 41–44 (MOU between the DCNG and South Dakota). And it does not appear that Defendants have produced a MOU for South Carolina. The Court understands that operational changes may have occurred since the initial briefing was filed in this case and that the states whose units are deployed within the District at any given moment may continue to shift. The Court's opinion and order applies to all out-of-state National Guard units operating in the District pursuant to 32 U.S.C. § 502(f).

[7] In their briefing, the Parties extensively dispute whether the activities the National Guard units are undertaking in the District qualify as "law enforcement" activities. *See* ECF 35-1 at 34 (Defendants denying that the DCNG or out-of-state National Guard are "making arrests or engaging in direct law enforcement activity"); ECF 3-1 at 45 (Plaintiff arguing that the National Guard troops have been deputized as U.S. Marshals and given the authority to conduct law enforcement). Defendants characterize the missions as crime deterrence and passive patrolling, while Plaintiff argues

the MPD and federal law enforcement by "acting as a presence to deter crime, report crimes they witness, and assist law enforcement in support missions"). For example, the National Guard has patrolled Metro stations and busy public spaces like the H Street Corridor, Gallery Place, and Dupont Circle. *See, e.g.*, ECF 83-1 at 10–11. The Guard has also taken over patrolling some parks, freeing up the Park Police to assist the MPD in other activities. ECF 35-1 at 23–24.

And these deployments will continue for a while. On September 3, the Secretary of the Army initially extended the mobilizations of both out-of-state National Guard units and the DCNG through November 30. Secretary of the Army Daniel Driscoll, *Memorandum for Interim Commanding General, DCNG, Re: Extension of 11 August 2025, Mobilization of D.C. National Guard – JTF-DC* (Sept. 3, 2025), ECF 3-2 at 138, ("In alignment with the Presidential memorandum issued [on August 11, 2025], I am extending this mobilization through 30 November 2025, to continue supporting the President's ongoing efforts to restore law and order in the District of Columbia."). On October 31, Defendants filed a notice informing the Court that the DCNG's mission has again been extended through February 28, 2026, and that the Commanding General of the DCNG will implement guidance to effectuate this directive. ECF 81 at 1. Indeed, shortly after the August 11 Presidential Memorandum, the President issued Executive Order No. 14339 concerning "Additional Measures to Address the Crime Emergency in the District of Columbia." 90 Fed. Reg. 42121 (Aug. 25, 2025). That Order directed the Secretary of Defense to "begin training, manning, hiring, and equipping a specialized unit within the District of Columbia National Guard, subject to activation under Title 32 . . . , that is dedicated to ensuring public safety and order in the Nation's capital," *id.* § 2(d)(i), which could be read to suggest that the use of the

---

that the National Guard units are displacing local law enforcement in everyday policing. Whether these activities constitute "law enforcement" is not relevant to the claims that the Court addresses in this opinion. The Court will address any legal questions about the scope of the Guard's activities in the District as necessary in future decisions.

DCNG for crime deterrence and public safety missions in the District may become longstanding, if not permanent.

### D. Procedural History

The District filed its complaint on September 4, 2025, alleging four causes of action. ECF 1. The complaint challenges (1) the National Guard's deployment as contrary to law under the APA, citing violations of the Home Rule Act, the EMAC, Title 32 of the U.S. Code, the Posse Comitatus Act, and the Constitution. *Id.* ¶¶ 139–58. Plaintiff also alleges that Defendants' actions are (2) arbitrary and capricious under the APA, (3) violate the Separation of Powers, the Take Care Clause, and the District Clause of the Constitution, and (4) are ultra vires. *Id.* ¶¶ 159–85. A few days later, on September 9, Plaintiff filed its motion for a preliminary injunction and a section 705 stay, asking this Court to enjoin the deployment of National Guard troops and stay agency action pending the resolution of this litigation. ECF 3.

On the same day, Plaintiff filed a motion to expedite discovery in support of the preliminary relief motion, seeking information about the extent of federal command and control over the National Guard troops and the scope of activities in which they were engaged. ECF 4. On September 16, Defendants moved to dismiss the case. ECF 35. After holding a hearing on the District's motion for expedited discovery, the Court authorized the District to serve revised, limited discovery requests on September 19. Sept. 18, 2025 Min. Entry; ECF 43; ECF 44. The Parties completed initial discovery and supplemental briefing based on those discovery productions on October 22. ECF 51. On October 24, the Parties appeared for a hearing before the Court on the District's motion for preliminary relief and Defendants' motion to dismiss.

In this opinion, the Court addresses only Plaintiff's APA contrary to law claims regarding the Home Rule Act, the EMAC, and Title 32 against the DOD Defendants, granting Plaintiff's

motion for preliminary relief and denying Defendants' motion to dismiss as to these claims. The Court makes no ruling as to whether the District would also be entitled to preliminary relief on any of its remaining claims, and will resolve Defendants' motion to dismiss those claims separately.

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party moving for a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without preliminary injunctive relief, (3) that the balance of equities tips in its favor, and (4) that an injunction serves the public interest. *Id*. at 20; *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The third and fourth prongs—the balance of equities and the public interest—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Under the [APA], a court may set aside an agency's final decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). In APA cases, the Court can grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 or "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing the issuance of a preliminary injunction govern the issuance of relief under section 705. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

III.     ANALYSIS

Plaintiff seeks to enjoin the DCNG and out-of-state National Guards' deployments in the District as authorized by the DOD Defendants. The Court grants Plaintiff's motion because the DOD Defendants' actions are likely contrary to law under the APA. First, the Court finds that the District has standing to bring its statutory claims and can challenge the DOD Defendants' actions under the APA. Turning to the merits, the Court finds that Defendants lack authority under D.C. law to support their deployment of the DCNG and have exceeded the bounds of their statutory authority under 32 U.S.C. § 502(f) in requesting the deployment of out-of-state National Guards. Finally, the Court concludes that Plaintiff is suffering an irreparable harm to its sovereign powers under the Home Rule Act, which are being usurped by Defendants' unlawful actions. Because the balance of the equities and the public interest also weigh in Plaintiff's favor, the Court grants Plaintiff's motion in relevant part.[8]

### A.  Likelihood of Success on the Merits

#### 1.  Standing

To start, the Court must assure itself of its jurisdiction and confirm that the District has standing to bring its challenges. As noted above, the Court evaluates only two of Plaintiff's claims here: that the DOD Defendants have exceeded their authority (1) under Title 49 of the D.C. Code

---

[8] Defendants also ask the Court to waive the requirement under Local Civil Rule 7(n) to file a certified list of an administrative record simultaneously with the filing of their motion to dismiss. ECF 35-1 at 26 n.10. The administrative record is not necessary for the Court to resolve Plaintiff's preliminary relief motion or Defendants' motion to dismiss on the claims analyzed in this opinion. The issues analyzed here only concern issues of statutory interpretation and the Court is not passing on Plaintiff's arbitrary and capricious claims. Accordingly, the Court will waive Local Civil Rule 7(n) pending the resolution of any appeal of this opinion and order. *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018) (granting Defendants' motion to waive compliance with Local Civil Rule 7(n) because "the Court need not consider the administrative record in evaluating the motions before it"). The Court finds that waiver is additionally justified by the fact that the District does not oppose and instead stated that it views expedited discovery as an alternative to the production of the administrative record in this case. ECF 4 at 9; *see also AAR Airlift Grp., Inc. v. U.S. Transp. Command*, 161 F. Supp. 3d 37, 41 n.1 (D.D.C. 2015) (finding that an administrative record is not necessary when the "documents that would comprise" a substantial portion of the record were already produced as exhibits).

in deploying the DCNG and (2) under 32 U.S.C. § 502(f) in requesting the assistance of the out-of-state National Guard units. The Court finds that the District has standing to bring both claims.

The "'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Relevant to the claims the Court resolves in this opinion, the Parties dispute whether the District has suffered any injury from the National Guard units' presence in the District. The District contends that Defendants' deployment of the DCNG and out-of-state National Guard units has caused it many injuries, including the sovereign injury of being "depriv[ed] . . . of the core rights of self-government afforded in the Home Rule Act" and being "divested . . . of its authority under the Assistance Compact."[9] ECF 3-1 at 50. For their part, Defendants question whether the District can establish an injury to its sovereignty when the District is not a state, but a "statutory creation [of Congress] with a set of delegated authorities."[10] ECF 35-1 at 47. But Defendants acknowledge that the District may have standing to sue based upon injuries to "statutory right[s] Congress has granted to the District Government specifically." ECF 35-1 at 47 ("Plaintiff perhaps has standing to

---

[9] Plaintiff also argues that Defendants are "undermining the District's own law enforcement work," creating the risk of "serious public safety harms," and causing the District to lose out on substantial tax revenues from tourism and entertainment. ECF 3-1 at 51–53. Defendants respond that the District's asserted law enforcement harms are self-inflicted, based on actions voluntarily taken by the MPD, and that its public safety and economic harms are hypothetical. ECF 35-1 at 50–52. The Court finds that the injuries to the District's self-rule are sufficient to establish standing in this case and declines to address the other potential asserted bases for standing in this opinion. The Court notes, however, that another district court has found that such harms may be too speculative to establish a concrete injury. *See Newsom v. Trump*, No. 25-cv-4870, 2025 WL 2501619, at *15 (N.D. Cal. Sept. 2, 2025) ("Plaintiffs' generalized references to 'tensions,' 'chaos,' and 'fear' are intangible harms that are not concrete enough to establish Article III standing."); *see id.* at *14 ("[I]t is not apparent on this factual record which of these economic harms are traceable to . . . the presence of . . . troops.").

[10] Defendants argue that Plaintiff has no standing to challenge the out-of-state deployment "on the grounds that the federal government is unlawfully commanding the day-to-day operations of state National Guard members," accusing the District of seeking to vindicate rights belonging to the sending states' governors. ECF 68 at 18 (arguing that the District lacks standing to "assert an injury on behalf of another State or its Governor"). The Court is not addressing the District's claim about federal command and control under section 502(f) in this opinion so leaves that question for another day.

vindicate the specific rights that they say (incorrectly) the Mayor has under D.C. law and the EMAC.").

The Court finds that the District can establish standing based on injuries to its sovereign power to govern itself and to the statutory rights afforded to it under the D.C. Code and the EMAC for two reasons. First, the District is injured by Defendants' deployment of the DCNG and out-of-state National Guards because Defendants' actions usurp the District's rights to self-governance. Under the District Clause of the Constitution, "Congress may . . . exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005). Under the Home Rule Act, Congress delegated its exclusive authority over the District to the District government and its local elected representatives. *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953) (noting that "there is no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power," subject to constitutional limits and Congress's power to revoke the authority granted). The District may not be a sovereign like a state is, but it can nevertheless exercise delegated sovereign *powers* and is therefore injured by being unlawfully deprived of those powers. *Compare Sovereign*, Black's Law Dictionary (12th ed. 2024) (a "state vested with independent and supreme authority"), *with Sovereign Power*, Black's Law Dictionary (12th ed. 2024) ("The power to make and enforce laws."); *see New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021) (finding that New Jersey could establish standing based on harm to an authority delegated to it by the EPA).

Under D.C. law, the District has a right to govern itself and to determine how to enforce laws in the District. D.C. Code § 1-204.22 ("The Mayor shall be responsible for the proper execution of all laws relating to the District."); *see id.* § 5-101.03(1), (2), (10) (noting that "[i]t

shall be the duty of the Mayor" to "preserve the public peace," "prevent crime and arrest offenders," and "enforce and obey all laws"). The District has asserted an injury sufficient for standing purposes by alleging that Defendants have, without statutory authority, reallocated decisions about preventing and deterring crime from the District's local government authorities to other actors, including DCNG and out-of-state commanders.[11] *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011) (finding that a federal action that "hinders a state's exercise of th[e] sovereign power . . . arguably inflicts an injury sufficient to provide . . . standing to challenge" that action). The District is also harmed when Defendants undermine its right to determine when to call for out-of-state assistance under the EMAC, including when Defendants call for the deployment of out-of-state units to the District without a declaration of emergency by the Mayor. *See* D.C. Code § 7-2332.

Second, the District suffers a distinct injury from the presence of out-of-state National Guard units—an injury to its constitutional status as a federal district free from state interference. The Constitution placed the District exclusively under Congress's authority to prevent individual states from exerting any influence over the nation's capital. *See* U.S. Const. art. I § 8, cl. 17 (providing Congress with "exclusive" power to govern "such District . . . as may . . . become the Seat of the Government of the United States"); *Thompson*, 346 U.S. at 109 (finding that the word "exclusive" in the District Clause was used to "eliminate any possibility" that Congress's power over the District had "to be concurrent with that of the ceding states"); *see also* The Federalist No. 43 (recognizing that the District was designed to be "protect[ed]" from the "awe or influence" of

---

[11] At the hearing on the preliminary relief motion, Defendants raised an additional theory that the District does not have standing to challenge the Guard's actions on federal property. Hr'g Tr. 83:1–3. Defendants have never argued that the deployment of the DCNG or out-of-state National Guards has been limited to federal property and the record suggests otherwise. *See, e.g.*, ECF 83-1 at 10–11 (describing National Guards' operational locations around the District, including Gallery Place, 14th Street, and various "designated Metro Stations"). The District's self-rule injury is based on Defendants' asserted and exercised powers of deployment—i.e., the underlying *orders*—not the day-to-day locations to which the forces are deployed, which, in any case, include municipal property throughout the District.

16

other states). When improperly deployed in the District, out-of-state National Guard units violate the District's right to be free from state influence by forcing the D.C. government to share power with state governors commanding Guard units. *See id*. Further, the District's right to be free from out-of-state influence is also intertwined with its right to self-rule. The District's home rule rights would be meaningless if, for example, Virginia's National Guard could patrol the District at will and the District could not seek any remedy to prevent that from happening. *See* D.C. Code § 1-201.02(a) (stating that Congress's intent is to "grant to the inhabitants of the District . . . powers of local self-government"); 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 433 (Jonathan Elliot ed., 2d ed., Philadelphia, J.B. Lippincott 1901) (recognizing the need for "the general government [to] be guarded from the undue influence of particular states").

At its core, Congress has given the District rights to govern itself. Those rights are infringed upon when Defendants approve, in excess of their statutory authority, the deployment of National Guard troops to the District. Any incursion on the District's exercise of its sovereign power would cause Article III injury, but the Court observes that the scope of the infringement here is no small matter. The deployments at issue entail the day-to-day presence of more than 2,000 National Guard troops, about two-thirds the size of the MPD, on the streets of the District. Hr'g Tr. 33:5–10. And there is also the risk that this incursion may become permanent, or at least enduring, given the creation of a DCNG unit specifically established to conduct law enforcement in the District. Exec. Order No. 14339, § 2(d)(i) (ordering the establishment of a specialized unit "that is dedicated to ensuring public safety and order in the Nation's capital"). Faced with these major intrusions into local governance, the Court finds that the District has standing to challenge Defendants' actions.

*See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (permitting states to sue when they have "suffered injury to their sovereign power to enforce state law").[12]

### 2.  APA Review

Addressing another threshold inquiry, the Court determines that it can review the DOD Defendants' challenged actions under the APA. It is well established that this Court cannot review the President's actions under the APA because the President is not an "agency." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). In this case, the President issued the initial directive asking the Secretary of Defense to mobilize the DCNG and to coordinate with state governors on soliciting the support of the out-of-state National Guard. August 11 Presidential Memorandum. While the District cannot seek APA review of the President's memorandum, it can seek APA review of the agency orders implementing the presidential directive.[13] *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (holding "that the Secretary's regulations . . . based on the President's Executive Order" were subject to "judicial review under the APA, even if the validity of the Order were thereby drawn into question").

In this case, the DOD Defendants, including the Secretary of Defense and other subordinate actors, carried out and completed the decisionmaking process that brought the DCNG and out-of-state National Guard units to D.C. and those actions are reviewable. *See Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (observing that "*Franklin* is limited to those cases

---

[12] Defendants also make passing arguments that the District is not injured because the Mayor has cooperated with the National Guard deployment and has not joined this suit. The District disputes that argument, but in any event, it is not relevant to any of the legal questions before the Court. It is well-established that the D.C. Attorney General can sue on the District's behalf, which it has done here. D.C. Code § 1-301.81 (describing the Attorney General's litigating powers on behalf of the District).

[13] Plaintiff also challenges other agency actions implementing the deployment of the National Guard in the District, such as their deputation by the U.S. Marshals Service. Because those actions are not relevant to the claims that the Court addresses in this opinion, the Court does not analyze them at this time. As a result, the Court need not enjoin the DOJ Defendants at this time because their challenged actions are not relevant to the statutory interpretation questions addressed in this opinion.

in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties"). For the DCNG, both the Secretary of the Army and the Commanding General of the DCNG took action to implement the presidential directive. *See* ECF 70-1 at 135 (the Secretary of the Army "approv[ing] the use of the DCNG to provide critical support to law enforcement efforts in the District"); DCNG Permanent Order 25-223 (Aug. 11, 2025), *id*. at 137 (ordering members of the DCNG to "protect federal property and functions in the District of Columbia and to support federal and District law enforcement"). The Secretary of the Army issued the memorandum extending the DCNG's mobilization through November 30, 2025, *id*. at 99, and the Commanding General of the DCNG was charged with implementing the further extension of the deployment through February 28, 2026, ECF 81 at 1. And for the out-of-state National Guards, the District can challenge the MOUs executed and signed between the DCNG and the states under the APA. *See, e.g.*, ECF 70-1 at 13–16 (MOU between the DCNG and Louisiana for Operation Make D.C. Safe and Beautiful).[14]

  As such, the Court concludes that it can review the DOD Defendants' actions under the APA and assess whether they are contrary to law. In the following analysis, the Court nevertheless often refers to the President's actions or legal authorities as a shorthand for the legal bases for the DOD Defendants' actions. In deploying the DCNG and requesting the assistance of out-of-state National Guard units, the DOD Defendants rely on the President's authorities and are limited by the bounds of the President's powers. Accordingly, the Court turns to assessing the scope of

---

[14] Defendants only argue that other agency actions—the deputations of the Guard members and the memorandum authorizing them to carry service weapons—are not final within the meaning of the APA. ECF 35-1 at 43. Defendants have not argued that any of the orders or memoranda executed to authorize the DCNG's or out-of-state Guards' deployments are not final agency action. Any such argument would now be forfeited. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief."). Additionally, the orders and memoranda discussed in this paragraph are clearly agency actions that impose "legal consequences" and determine "rights or obligations" because they determine whether the National Guard members have legal authorization to operate in the District. *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Defendants' asserted authority to deploy the DCNG under Title 49 of the D.C. Code and Article II of the Constitution. Next, the Court evaluates whether Defendants have exceeded the scope of their authority under 32 U.S.C. § 502(f) by requesting that out-of-state National Guards undertake missions in the District.

### 3. The D.C. National Guard

The President can exercise command over the DCNG in two distinct capacities. Pursuant to an act of Congress, the President is the commander in chief of the DCNG when it is operating in militia status. D.C. Code § 49-409. The President can also federalize the DCNG under Title 10 of the U.S. Code and act in his capacity as commander in chief of the armed forces. The Parties agree that the DCNG is currently operating under Title 32 status—in a state-commanded, federally funded mission with the President acting in a position analogous to a state governor. *See* ECF 3-1 at 38; ECF 35-1 at 12. In his role as state commander in chief, the President has mobilized the DCNG to "address the epidemic of crime in our Nation's capital." August 11 Presidential Memorandum.

Defendants identify three sources of authority for the President to wield the DCNG in this manner. First, Defendants argue that because the President is commander in chief of the DCNG, he does not need separate statutory authority to deploy it. *See* ECF 35-1 at 28. Next, they rely on D.C. Code § 49-102, which states that the Commanding General "may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties" as he deems necessary. They argue that that the phrase "other duties" encompasses supporting law enforcement and deterring crime when read in the context of section 49-404, which they say allows the DCNG to "aid the civil authorities in the execution of the laws." D.C. Code § 49-404. Finally, Defendants

suggest that the President has inherent Article II authority "to use troops for the protection of federal property and federal functions" and to enforce federal law. ECF 35-1 at 40.

The Court finds no authority in Title 49 of the D.C. Code that supports the President's ability to call out the DCNG to patrol the District under these circumstances. Section 49-409, which states that the President is the commander in chief of the DCNG, is only a designation of command; separate provisions of the D.C. Code define when and how that command can be exercised. Section 49-102, in turn, is best read as a limited authority over drills, inspections, escorts, parades, and other similar duties related to discrete military exercises. And the President's ability to order the DCNG to "aid the civil authorities in the execution of the laws" is limited precisely to those instances in which the relevant civil authorities *request* the President's aid. D.C. Code §§ 49-103, 49-404. Additionally, while Defendants mention in passing that the President can rely on his Article II powers in the absence of statutory authorization, his command over the DCNG in militia status is bounded by Congress's power to govern the District and its military forces. As such, the Court finds that the President has no free-floating Article II power to deploy the DCNG for the deterrence of crime. Historical practice confirms this understanding of the President's authority. The Court concludes that the District has shown a likelihood of success on the merits of its claim against the deployment of the DCNG.

### a. Title 49 of the D.C. Code Does Not Allow the President to Deploy the DCNG in the Circumstances Present Here.

The District Clause of the Constitution endows Congress with sole authority to legislate over the District. U.S. Const. art. I, § 8, cl. 17 (granting Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District"). In 1889, Congress first passed the statute that forms the basis for Title 49 of the D.C. Code—the statutory provisions that govern the DCNG. Act of March 1, 1889, ch. 328, § 45, 25 Stat. 772, 778. The Parties agree that, under Title 49, "the

President stands in a relation to the D.C. National Guard that is similar to the relation obtaining between the Governors of the several States and their respective State National Guard units." ECF 35-1 at 27 (quoting *Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 94 (1989) [hereinafter 1989 OLC Opinion]); ECF 57 at 17 (discussing how the D.C. militia code was "patterned after" state statutes delineating governors' powers over their state militias). Notably, state statutes do not simply provide that the governor is the commander in chief of the state militia and leave other powers—such as the power to enforce the laws—implicit within that authority. Instead, such statutes spell out the specific instances in which the governor can call up the National Guard for state active duty. *See infra* Section III.A.3.a.i. The Parties point to two provisions of the D.C. Code that set forth the President's authority to call upon the DCNG: the "other duties" language in section 49-102 and the power "to aid" civil authorities in section 49-103. D.C. Code §§ 49-102, 49-103.

These two provisions of Title 49—sections 102 and 103—reflect well-established categories of powers in state law governing militias. Section 49-102 embodies one type of authority regarding the state commander's power to order the militia to engage in discrete military exercises. As discussed below, the Court finds that the phrase "other duties" in that section refers to other military duties that are similar in nature to drills, inspections, parades, or escorts and excludes activities outside of military exercises, such as patrolling a city to deter crime. Section 49-103 exemplifies another category of statutory authority that enables state governors to use the National Guard in the event of riots, insurrections, or similar crises. In the case of the DCNG, such authority is only available to the President when the relevant civil authorities request aid. D.C. Code. §§ 49-404, 49-103; *OLC Memorandum concerning the amenability of members of the National Guard of the District of Columbia to courts-martial or other disciplinary action for*

*failure to participate in formations ordered pursuant to Section 44 of the Act of March 1, 1889* at 2–3 (Aug. 9, 1963) [hereinafter August 1963 OLC Opinion], *available at* https://perma.cc/CEY4-TY8J (contrasting the "drill- and training-type activities" of section 49-102 with "aid-to-civil-authorities-type activities expressly covered by" section 49-103). Finding no support for Defendants' actions in Title 49, the Court concludes that the DOD Defendants have likely exceeded the bounds of their statutory authority.

### i. "Commander in Chief" in Section 49-409

First, Defendants argue that, because the President is commander in chief of the DCNG, "he does not need specific statutory authority to deploy it." ECF 35-1 at 28; *see* D.C. Code § 49-409 ("The President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia."). Defendants ask the Court to read section 49-409 as an affirmative grant of commander in chief power, permitting the President to deploy the DCNG at will. The Parties agree, however, that the D.C. Code's provisions governing the DCNG are broadly modeled after state militia codes and the President is "functionally serving in the role of a Governor of a state." ECF 35-1 at 29; ECF 57 at 17. And a state statute's identification of a governor as commander in chief of a state national guard does not, merely by that designation, describe the contours of the governor's power. A brief survey of state law demonstrates that state constitutions and statutes often have separate provisions (1) designating the governor as commander in chief and (2) listing the situations in which the governor can deploy the state militia. The designation provision in these statutes does not independently confer authority to call up the National Guard for whatever reason a governor sees fit. Similarly, the President, like state governors, is only permitted to call up the DCNG through the exercise of a specific power outlined in state law.

23

Other state code provisions can provide a helpful comparison to the relevant D.C. statutes here. Consider, for example, the structure of Alabama's state laws governing its National Guard. First, Alabama Code § 31-2-51 designates the governor of Alabama as the "Commander in Chief" of the state's military forces. Another section—section § 31-2-52—then lists the powers and duties the governor shall have as commander in chief:

> (b) The Governor, as Commander in Chief, shall have the power in case of war, invasion, insurrection, riot, tumult, breach of peace, natural disaster, or imminent danger thereof, to call or order all or any portion or class of the armed forces of the state into the active military or naval service[.]
> . . .
> (c) The Governor may authorize all or any part of the National Guard or Naval Militia to participate in any drill, parade, review, or other public exercise, or to engage in service for escort duty . . . of the state.
> . . .
> (e) The Governor, as Commander in Chief, is authorized to call out all or any such portion of the National Guard as he may deem advisable, upon his determination that a state of emergency exists.

*Id*. Subsection (b) provides the Alabama Governor with power to act in cases of war, invasion, insurrection, riot, and other circumstances broadly corresponding with D.C. Code § 49-103.[15]

---

[15] While the Alabama statute does not reference "civil authorities," many other state law provisions addressing such exigent situations reference a request from a civil authority or the governor's ability to "aid" civil authorities. *See* S.C. Code Ann. § 25-1-1840 ("In the event of (a) war, insurrection, rebellion, invasion, tumult, riot or a mob, (b) a body of men acting together by force with intent to commit a felony, to offer violence to persons or property or by force and violence to break and resist the laws of this State or of the United States, (c) in case of the imminent danger of the occurrence of any of such events or (d) in the event of public disaster the Governor may order the National Guard of South Carolina or any part thereof into the active service of the State and cause them to perform such duty as he shall deem proper. The Governor may also upon the written request of the mayor of a city or the sheriff of a county within which a large public assemblage is to occur order out the National Guard or any part thereof to preserve order and keep people within bounds at such assemblage."); Miss. Code Ann. § 33-7-301 ("Whenever any circuit judge of a county, sheriff, or mayor of a municipality . . . shall apprehend the outbreak of insurrection, riot, breach of the peace, or combination to oppose the enforcement of the law by force or violence . . . or in the event of disaster or other grave emergency, it shall forthwith become the duty of the circuit judge, sheriff or mayor, when it appears that such unlawful combination or disaster has progressed beyond the control of the civil authorities, to notify the Governor, and the Governor may then, in his discretion, if he deems the apprehension well-founded or the disaster or emergency of sufficient magnitude, order into the active service of the state, for such period, to such extent, and in such manner as he may deem necessary, all or any part of the organized militia."); 20 Ill. Comp. Stat. Ann. 1805/83 ("Whenever there is a tumult, riot, mob or body of persons acting together by force with attempt to commit a felony, or to offer violence to persons or property, or by force or violence to break or resist the laws of the State, or when such tumult, riot or mob is threatened it shall be deemed that a time of public disorder and danger then exists, and it shall be the duty of the Governor thereupon to order such military force as he may deem necessary to aid the civil authorities in suppressing

Subsection (c) gives the Governor authority over "any drill, parade, review, or other public exercise," with language that parallels D.C. Code § 49-102.[16] The Alabama statute identifies the governor as the "Commander in Chief" of the state National Guard in three separate instances across two sections. But that designation as commander in chief does not confer boundless discretion—instead, the statute goes on to list specific enumerated powers that the governor can wield. State constitutional provisions dating to the 1800s operate through a similar structure. *See, e.g.*, Ill. Const. art. XII, § 4 ("The Governor is commander-in-chief of the organized militia . . . . He may call them out to enforce the laws, suppress insurrection or repel invasion."); Mich. Const. art. V, § 12 ("The governor shall be commander-in-chief of the armed forces and may call them out to execute the laws, suppress insurrection and repel invasion.").[17]

Defendants read section 49-409 as providing a grant of authority to the President to deploy the DCNG as he sees fit. ECF 35-1 at 29 ("[T]he President, as Commander in Chief and

---

such violence and executing the law."); Kan. Stat. Ann. § 48-238 ("It shall be the duty of the governor, and the governor is hereby authorized and required, in case of war, invasion, insurrection, or breaches of the peace, or imminent danger thereof, or any forcible obstruction to the execution of the laws, or reasonable apprehension thereof, to call upon the national guard to defend the state or aid the civil authorities to enforce the laws thereof."); Mich. Comp. Laws § 32.551 (noting that the governor "may order to active state service any members of the Michigan National Guard in case of riot, tumult, breach of the peace, or resistance of process, or for service in aid of civil authority, whether state or federal, or in time of actual or imminent public danger, disaster, crisis, catastrophe, or other public emergency within this state or to respond to acts or threats of terrorism or to safeguard military or other vital resources of this state or of the United States").

[16] *See also* Neb. Rev. Stat. § 55-113 ("Each organization shall assemble for drill and instruction, and participate in encampments, maneuvers and other exercises at such periods as may be prescribed by the Governor."); Colo. Rev. Stat. Ann. § 28-3-902 ("The governor may, in his or her discretion, order such organizations as he or she may deem proper to parade for purposes of drill, review, or escort duty and prescribe all regulations and requirements therefor.").

[17] These state constitutional provisions are examples of language in effect at the time of Congress's passage of the 1889 D.C. militia act. *See* Frederic J. Stimson, American Statute Law § 298 (1886) (identifying provisions among state constitutions that empowered the governor to "call out the militia . . . to execute the laws"). In Michigan and Illinois, this language has been part of the state constitutions since 1850 and 1870 respectively. *Michigan Constitution, Art V § 12*, Michigan Constitutional Archive, Makinac Center Legal Foundation, https://perma.cc/MFF5-4SQ9 (noting that the Michigan Constitution of 1850 included a provision stating that "[t]he Governor shall be Commander-in-Chief of the military and naval forces, and may call out such forces to execute the laws, to suppress insurrections and to repel invasions"); Ill. Const. 1870, art. V, § 14 ("The Governor shall be commander-in-chief of the military and naval forces of the State . . . and may call out the same to execute the laws, suppress insurrection, and repel invasion.").

functionally serving in the role of a Governor of a state, [can] independently determine that mobilization of the [DCNG] is necessary."). But the Court cannot accept that interpretation. State governors do not derive their authority to call out state National Guards from their status as commanders in chief alone—they are empowered and restrained by separate language in their states' legal frameworks.[18] *See supra* notes 15–17 (listing the specific powers that state governors have to aid civil authorities or order drills). D.C. law is no different. And under D.C. law, the relevant powers are identified in sections 49-102 and 49-103, allowing the President and his subordinates to prescribe drills or aid the civil authorities in the execution of the laws. The Court next evaluates those statutory provisions and, finding that those statutes do not authorize the DCNG's activities, concludes that the DCNG is likely operating contrary to law.

### ii.   "Prescribing Drills" in Section 49-102

First, the Court interprets the scope of two words that Defendants rely on—the phrase "other duties" in D.C. Code § 49-102. Section 49-102 is entitled "Prescribing drills" and states, in relevant part:

> The Commanding General shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard, and may order out any portion of the National Guard for such drills, inspections, parades, escort, *or other duties*, as he may deem proper.

*Id.* (emphasis added).

Applying the principle of *noscitur a sociis*—"a word is known by the company it keeps"— the Court examines the phrase "other duties" in light of the terms that precede it. *Yates v. United States*, 574 U.S. 528, 543–44 (2015). A "drill" is the "act or exercise of training soldiers in the

---

[18] A Tennessee state court recently reached the same conclusion, finding that the Tennessee governor's status as commander in chief did not authorize his deployment of the Tennessee National Guard to address "law enforcement concern[s]." *See Harris v. Lee*, No. 25-1461-I, slip op. at 28–31 (Tenn. Ch. Ct. Nov. 17, 2025) (finding that the Tennessee governor's exercise of power over the Tennessee National Guard likely exceeded his powers under Tenn. Code Ann. § 58-1-106).

military art." *Drill*, Webster's Complete Dictionary of the English Language 413 (1886); *Drill*, Dictionary of the English Language 447 (1888) ("The instruction of officers and soldiers in the exercise of the firelock, and in the first principles of field movements."). An "inspection" refers to the "act of inspecting," which means "view[ing] and examin[ing] officially" of "troops, arms, goods offered for sale, [or] work performed." *Inspection*, Webster's Complete Dictionary 699; *Inspect*, Webster's Complete Dictionary 699. An "escort" is a "body of persons, giving attendance for the sake of affording safety" or "a guard." *Escort*, Webster's Complete Dictionary 464; *Escort*, Dictionary of the English Language 501 ("A convoy; a guard from place to place; a company of armed men attending on a person as a guard or a distinction."). Finally, to "parade" means to "assemble and be marshaled in military order" or "to go about in military procession." *Parade*, Webster's Complete Dictionary 946.

Under the canon of *ejusdem generis*, the Supreme Court has repeatedly counseled that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to those specific items that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024). As the preceding definitions make clear, drills, inspections, escorts, and parades are all types of military exercises. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (citing founding-era sources which indicate that the militias were "able bodied men . . . required by law to attend military exercises on certain days"); *Presser v. People of State of Ill.*, 116 U.S. 252, 253, 262 (1886) (evaluating a provision of the Illinois Military Code that forbade unauthorized bodies of men other than the regular volunteer militia from engaging in military duties including "drill[ing] or parad[ing] with arms"); *id.* at 263 (noting duties of the Illinois militia which included engaging in "inspections, parades, and encampments"); *id.* at 267 (referencing the "organization, drilling, and parading of military bodies and associations"). The "other duties" permitted by

27

statute, then, must encompass only those duties that relate to discrete military exercises ordered by the commanders of the DCNG. To read the statute otherwise would lead to improbable results— Congress is unlikely to have listed a set of activities within the sphere of military exercises if "other duties" was meant to sweep in all law enforcement-related activities in the District. *See Yates*, 574 U.S. at 543 (applying *noscitur a sociis* to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress"); *Fischer*, 603 U.S. at 487 ("Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it."). The second sentence of section 49-102 confirms the necessity of applying the *noscitur a sociis* and *ejusdem generis* canons here. Section 49-102 also allows "[t]he commanding officer of any regiment, battalion or company" to "assemble his command, or any part thereof, in the evening for drill, instruction, *or other business*, as he may deem expedient." D.C. Code § 49-102 (emphasis added). Such a provision cannot plausibly be read to allow the subordinate military officials of the DCNG to conduct any business they would like, including general policing in the District. Reading the two sentences together, section 49-102 naturally refers to orders from DCNG commanders to their units for duties related to military exercises—an inspection of the troops, for example, or a training drill.

Defendants respond that the terms "escorts" and "inspections" include "core police and law enforcement duties." ECF 35-1 at 40. While claiming that the National Guard units in the District are not engaged in law enforcement activities (a position that Plaintiff hotly contests), Defendants argue that if section 49-102 includes law enforcement powers, it must also provide sufficient authority to authorize the DCNG's passive, crime-deterrence activities. Hr'g Tr. 54:3–13 ("These Guardsmen are not doing law enforcement, but surely the lesser is included in the greater here."). In the alternative, Defendants argue that, even if section 49-102 cannot be read to include law

enforcement powers and is only "read by reference to the items that precede it," "the Guard's duties—principally acting as a deterrence force—are not different in kind from the preceding items." ECF 68 at 13.

The Court first turns to Defendants' argument that section 49-102 includes a general law enforcement power over the District and rejects it. Even if the plain meaning of the terms "escorts" and "inspections" could encompass such duties—a position for which Defendants have provided no authority—Defendants have not demonstrated that the best reading of those terms in the context of a militia statute for "[p]rescribing drills" includes such activities.[19] Defendants hinge their reading of section 49-102 not on the statutory text, but on opinions from the Department of Justice's Office of Legal Counsel (OLC), which have interpreted section 49-102 to be "broad enough to include law enforcement activities." 1989 OLC Opinion at 93. In July 1963, the OLC opined that the language of section 49-102 can "be construed as authorizing the commanding general to use the National Guard to support activities of the civilian police force during any massive demonstration or parade in the District." *Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, Re: Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia* at 1–2 (July 30, 1963) [hereinafter July 1963 OLC Opinion], *available at* https://perma.cc/2VWF-BA8F. The opinion adopts an expansive view of the President's powers under section 49-102, stating:

---

[19] In modern parlance, the term "escort" is often used in the context of convoys of vehicles "traveling together for safety" or for safe passage. *See Convoy*, Black's Law Dictionary (12th ed. 2024) (a "group of vehicles or vessels traveling together for safety, esp. with armed escorts"); *Safe Conduct*, Black's Law Dictionary (12th ed. 2024) (referencing "safe conduct[] . . . with or without an escort"). In the context of the statute, the term is best read to encompass only military escorts or convoys. Defendants offer no reason to think that the term should be read out of alignment with the statute to encompass all police escorts in the District. Similarly, while the term "inspection" can refer to a wide range of activities—home inspections, for example—the context of the statute dictates that it refers to military activities such as inspections of the troops.

> Since the President performs the same function with respect to the District of
> Columbia National Guard as the Governors of the several States serve with respect
> to their respective State organizations, and since the Congress has vested the
> President with comparable authority in the appointment and removal of the
> commanding general of the District of Columbia organization, it would certainly
> not seem inappropriate for the President to request or urge the commanding general
> to use the National Guard in support of activities of the District of Columbia police
> whenever he feels that the welfare, safety, or interest of the public would be served
> thereby.

*Id.* at 3.

The Court recognizes the Executive Branch's interpretation of section 49-102, but the OLC

Opinions do not bear the weight Defendants place on them.[20] First, OLC's position on this issue

is far from definitive. The July 1963 OLC Opinion states that "*it would certainly not seem*

*inappropriate* for the President to *request or urge* the commanding general to use the National

Guard" to undertake these activities. *Id.* (emphasis added). The Opinion itself appears to express

hesitance about whether the President could mandate the Commanding General of the DCNG to

take such actions and does not cite any authority for the President's power to do so. For example,

it does not explain how a general power to call out the DCNG to protect the "welfare, safety, or

interest of the public" is rooted in the text of section 49-102. Absent such an analysis, the Opinion's

interpretation of "other duties" has no clear limiting principle. The Department of Justice appeared

to recognize this issue and equivocated on their view of the statute two weeks later. In an August

1963 opinion, the OLC recognized that the term "other duties" could "be construed by courts *in*

*pari materia* with the other terms used in that section which relate primarily to drill- and training-

type activities." August 1963 OLC Opinion at 2–3.

Second, as discussed previously, the July 1963 OLC Opinion appears to overread the extent

to which state governors have the authority to use their National Guard units to support the public

---

[20] As the D.C. Circuit has noted, "OLC's views are not binding" but courts may "look to them for their persuasive
value." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 689 (D.C. Cir. 2023).

welfare. *See supra* Section III.A.3.a.i. As discussed above, state governors are often limited in the situations that they can call upon their National Guards. The July 1963 OLC Opinion conflates two, separate categories of state governors' powers over their National Guard units—(1) the authority to order drills, parades, and other similar military duties, and (2) the authority to quell insurrections, riots, and mobs, or otherwise intervene in emergencies for the public welfare. The Opinion reads the latter power—an exigency-based authority—into section 49-102. But section 49-102 covers only the former—orders by commanding officials relating to military exercises.

Finally, Defendants argue that, even if the phrase "other duties" in section 49-102 is "read by reference to the items that precede it," the DCNG's current activities in the District "are not different in kind from the preceding items." ECF 68 at 13. But Defendants' reading ignores that the plain meaning of the terms "drill," "inspection," "escort," and "parade" all refer to discrete military exercises. *See supra* 26–27 (defining those terms). While the Guard's conduct may be superficially similar when acting in different capacities—the Guard can walk through Union Station in a military procession or as part of a crime-deterring force—the nature of the activity authorized is distinct. Section 49-102 confers authority on the Commanding General to issue orders related to activities performed by the DCNG in its capacity as a military unit. The partial delegation of that authority to subordinate officials demonstrates that section 49-102 only covers conduct that can be authorized within that command structure. Defendants seek to use section 49-102 as a basis for the DCNG to interact with members of the public outside of any military exercise to patrol and to deter crime. Such an authority lies outside of the best reading of the statute.

### iii.  "To Aid the Civil Authorities" in Sections 49-103 and 49-404

Defendants also argue that section 49-102 must be understood in the context of section 49-404 and thus the "other duties" permissibly ordered by the Commanding General can include

activities "to aid the civil authorities in the execution of the laws," which is what Defendants contend the DCNG is doing here by supporting local law enforcement. ECF 68 at 14 (arguing that section 49-102 "does not stand alone"); D.C. Code § 49-404 ("The enrolled militia shall not be subject to any duty except when called into the service of the United States, or to aid the civil authorities in the execution of the laws or suppression of riots.").

The Court finds no such expansive power in section 49-404 permitting Defendants to unilaterally call upon the DCNG to assist the District with crime control. First, section 49-404 is a prohibition, not a grant of power. It provides that the DCNG "*shall not* be subject to any duty except" when federalized or in aid of the civil authorities in the execution of the laws or suppressing riots.[21] *Id.* (emphasis added). Even if that language could be read as a grant of authority to "aid" the civil authorities in execution of the laws, such language is best read as hinging upon a *request* by a civil authority under section 49-103. Section 49-103 states, in relevant part:

> When there is in the District of Columbia a tumult, riot, mob, or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws, or when such tumult, riot, or mob is threatened, it shall be lawful for the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, *to call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws*; the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same.

D.C. Code § 49-103 (emphasis added). Sections 49-103 and 49-404 mirror each other in referencing when the DCNG is called on "to aid" civil authorities in "enforcing the laws." *Id.*; *id.* § 49-404 ("to aid the civil authorities in the execution of the laws"). The phrase "to aid" is best

---

[21] A similar provision in South Carolina state law is also clearly a prohibition, not a grant of affirmative authority. *See* S.C. Code Ann. § 25-1-1820 ("The National Guard shall not be subject to active duty other than training duty, except (a) in case of war, (b) in event or danger of invasion by a foreign nation, (c) there is a rebellion or danger of rebellion against the authority of the government of the United States, (d) the President issues orders to execute the laws of the United States, (e) for preventing, repelling or suppressing invasion, insurrection or riot, (f) for aiding civil officers in the execution of the laws.").

read as "to help," "to assist," or "[t]o support, either by furnishing strength or means to effect a purpose." *Aid*, Webster's Complete Dictionary 32. Section 49-404 prohibits the imposition of any "duty" on the DCNG except for in certain circumstances, one of which is when they are called on "to aid" the civil authorities, and section 49-103 delineates when and how the DCNG can be called on to give such "aid." Neither section 49-103 nor 49-404 endow the President or the Commanding General with additional authority of their own to execute the laws.

That structure reflects the choice Congress made when it enacted the first version of Title 49. At the time of the 1889 act, nearly two dozen state constitutions allowed governors to call out the National Guard "to execute the laws," but Congress chose instead to only allow the President "to aid the civil authorities." Frederic J. Stimson, American Statute Law § 298 (1886); *see supra* Section III.A.3.a.i (describing state constitutions that allow governors to call upon the National Guard "to enforce" or "execute" the laws); *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law."). Congress was aware of the other state laws in place at the time of its passage of the 1889 act, yet intentionally adopted a narrower phrase. *See* July 1963 OLC Opinion at 2 ("[T]he legislative history of [the 1889] Act indicates that it was patterned after a number of State statutes in effect at the time of its enactment."); H.R. Rep. No. 50-809, at 1–2 (1888) (stating that the 1889 act "contains only the usual and necessary provisions that are included in the militia codes of nearly all the States").[22] The Court must give meaning to the words Congress chose, which limit the DCNG's duties to "aid[ing]" the civil authorities in the execution of the

---

[22] Because the legislative history demonstrates that Congress was aware of contemporary state militia statutes, the Court finds it a reasonable inference that Congress was also aware of contemporary state constitution provisions governing the militia. *See* Stimson, American Statute Law § 298. Congress was thus likely aware that it had the option to adopt phrases such as to "execute" or "enforce" the laws but chose a different formulation.

laws. D.C. Code § 49-404.[23] This understanding of "aid" to civil authorities is also reflected in other state laws today, which use the phrase to refer to more limited instances in which a county or municipality can no longer enforce the laws and requests the governor's aid. *See, e.g.*, Ariz. Rev. Stat. § 26-172(C) ("The civil authorities of a county or municipality requiring aid of the national guard to quell any riot, insurrection or other civil disturbance shall submit to the governor a written request for aid."); *see supra* note 15 (collecting state statutes referencing aid to civil authorities).

Defendants also argue that because the District government now has no greater authority over the DCNG than was vested in the District commissioners prior to 1975, the Mayor cannot veto the President's use of the DCNG. *See* D.C. Code § 1-206.02(b). But section 45 of the 1889 act stated that "it shall be lawful for the commissioners of the District of Columbia . . . to call on the commander-in-chief to aid them in suppressing such violence and enforcing the laws." Act of March 1, 1889, ch. 328, § 45, 25 Stat. at 778. The Mayor and the commissioners, then, both needed to call upon the President before the DCNG could be deployed for the enforcement of the laws and the Mayor is allocated no greater authority than was available to the commissioners prior to 1975.

Finally, Defendants suggest that section 49-103 is merely a mechanism by which the Mayor can "request" assistance from the President, but "does not divest the President of his authority to call out the D.C. National Guard." ECF 35-1 at 28. Relatedly, they argue that the use of the DCNG as a "federal entity" cannot be "condition[ed]" on the "consent of a local official." *Id.* at 29. But, as the Court has already recognized, it is more accurate to say that the D.C. Code

---

[23] Defendants also cite Executive Order 11485 to argue that the President has affirmative power to engage in law enforcement, which he delegated to the Secretary of Defense. ECF 35-1 at 29. But the Executive Order merely states that the Secretary may order out the National Guard to "aid the civil authorities of the District," which is entirely consistent with the Court's reading of section 49-103. Exec. Order No. 11485, § 1, 34 Fed. Reg. at 15411. The Executive Order also cannot give the Secretary of Defense authority that the President does not have by statute.

does not provide authority for the President to call out the DCNG at will. Rather, section 49-103 provides a limited exception to that general lack of authority, giving the President power to mobilize the DCNG only when specific predicates are met.[24] Historical practice, in fact, demonstrates that Presidents have relied on a request by a civil authority before deploying the DCNG, as outlined by section 49-103. During the Know-Nothing Riots of 1857, for example, President James Buchanan ordered a Marine detachment into the District to restore peace at the request of the mayor. Lawrence Kapp et al., Cong. Rsch. Serv., R46886, Use of Militia, National Guard, or Federal Armed Forces within the District of Columbia Prior to 2020 at 5 (2021) [hereinafter Kapp et al., Use of Militia]. In 1932, the then-board of commissioners of the District "requested military support from President Herbert Hoover" in response to a march of 10,000 to 20,000 World War I veterans on the District. *Id*. at 9. President Hoover explicitly declined to "proclaim a state of insurrection or to declare martial law" but approved "the use of federal armed forces to assist the police operations in a supporting role." *Id*. On April 5, 1968, the day after Reverend Dr. Martin Luther King., Jr.'s assassination, the mayor-commissioner at the time "requested federal troops to assist civil authorities in their response to riots in the district." *Id*. at 13. That same day, President Lyndon B. Johnson issued Executive Order 11403 ordering the Secretary of Defense to assume authority over the DCNG, giving the Secretary the power to federalize the DCNG and to take control over the DCNG in its militia status. *Id*. at 13–14. Soon thereafter, the Secretary federalized the DCNG, without using the delegated state militia authority. *Id*. at 14.

---

[24] In the absence of a request by the civil authorities, the President remains free to federalize the DCNG and to exercise his power as commander in chief of the armed forces. Lawrence Kapp et al., Cong. Rsch. Serv., IF11768, National Guard Civil Support in the District of Columbia 2 (2021) [hereinafter Kapp et al., National Guard Civil Support] (noting that Title 10 "authorize[s] the President to deploy the military to address significant civil unrest under certain conditions").

More recently, during the 2020 Black Lives Matter protests, the two U.S. Marshals in D.C. requested that the President activate DCNG troops.[25] U.S. Dep't of Just., Office of the Inspector Gen., *A Review of the Department of Justice's Response to Protest Activity and Civil Unrest in Washington, D.C. in Late May and Early June 2020*, No. 24-085 at 73–74 (July 2024) [hereinafter OIG Report]. After being activated, members of the DCNG assisted with the clearing of protests, including in and around Lafayette Park. *Id*. at 6, 95, 98. And on December 31, 2020, in advance of planned demonstrations at the U.S. Capitol on January 5 and 6, 2021, D.C. Mayor Muriel Bowser sent a letter to the Commanding General of the DCNG requesting support. Letter from Mayor Muriel Bowser, to Major General William J. Walker, Commanding General of the D.C. National Guard (Dec. 31, 2020), https://perma.cc/WS9T-G5GQ. In the midst of exigent circumstances, both local civil authorities and the Executive Branch have appeared to operate under the assumption that the President can call out the DCNG after receiving a request from the Mayor or the U.S. Marshals. *See* OIG Report at 74 (noting that "OLC, in consultation with DOD, continued to examine the use of § 49-103 to request assistance from the DCNG on June 1" and "OLC attorneys debated internally the practical mechanics of making such a request"); *id*. at 73 n.92 (noting that the D.C. government had requested DCNG assistance before June 1 but asked for a "limited number of DCNG troops to help the MPD with traffic control" and "explicitly stated that troops would not be involved in law enforcement-related activities").[26] The history of such

---

[25] There are two U.S. Marshals in the District—one for the federal district court and one for the Superior Court—and they are both appointed by the President. 28 U.S.C. § 561(c) ("The President shall appoint, by and with the advice and consent of the Senate, a United States marshal for each judicial district of the United States and for the Superior Court of the District of Columbia.").

[26] In other historical instances, the President did not rely on a request by the Mayor or the U.S. Marshals, but it is unclear whether the DCNG was federalized or deployed in state militia status at the time. Kapp et al., Use of Militia at 8–9, 11–13 (describing the deployment of civil and military personnel to address 1919 and 1967 riots and demonstrations in the District).

requests in the midst of active emergencies suggests that the relevant players have understood that section 49-103 imposes requirements for the deployment of the DCNG, consistent with the Court's interpretation of the statute.

### b. The President's Article II Powers Must Be Exercised in Conformity with Congress's Power to Govern the District.

On a single page of their opening brief, Defendants also contend that, separate from any statutory powers, the President has inherent Article II powers to utilize the DCNG (1) to enforce the D.C. Code as federal law and (2) to "use troops for the protection of federal property and federal functions." ECF 35-1 at 40; *see also* ECF 68 at 13 ("The D.C. Code is itself federal law and the President is Commander in Chief of the D.C. National Guard, a federal entity. The President does not need express statutory authority to enforce federal law using federal forces at his command."). The Court rejects Defendants' fly-by assertion of constitutional power, finding that such a broad reading of the President's Article II authority would erase Congress's role in governing the District and its National Guard.

First, Defendants rely on a footnote in the 1989 OLC Opinion to argue that the President has inherent constitutional authority to use the DCNG to carry out federal law in the District. 1989 OLC Opinion at 93 n.6.[27] The 1989 Opinion analyzed the question of whether the DCNG, in its militia status, could be used to support local drug enforcement efforts. The Opinion suggested, without deciding, that such activities could be permitted, not only under section 49-102, but alternatively "on the basis of the President's inherent constitutional authority to use any forces at

---

[27] The footnote reads in full:

> Although there is adequate statutory authority in this case, and we therefore need not reach the question, since the President is Commander-in-Chief of the District of Columbia National Guard in its militia status (D.C. Code § [4]9-[4]09), and since the D.C. Code is federal law, this use of the National Guard might also be supported on the basis of the President's inherent constitutional authority to use any forces at his command to carry out the laws. *See In Re Neagle*, 135 U.S 1 (1890).

his command to carry out the laws." *Id.* Defendants also cite the OLC Opinion that considered whether the President could deploy the DCNG in the face of the Mayday Demonstrations, which threatened to block traffic in the District and prevent federal employees from reaching their workplaces. *Authority to Use Troops to Prevent Interference with Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions,* 1 Op. O.L.C. Supp. 343, 343–44 (1971) [hereinafter Mayday OLC Opinion] (noting that "this authority rests on inherent power, rather than specific statutes"). Because it is the President's "constitutional duty to protect this functioning," the Opinion reasoned, the President could call upon the DCNG as part of his "inherent powers to use troops to protect federal property and functions as a necessary adjunct of his constitutional duties under Article II, Section 3 of the Constitution."[28] *Id.* at 344. In the current case, the August 11 Presidential Memorandum draws on the logic of the Mayday OLC Opinion when it states that the DCNG's deployment serves to ensure that "the Federal Government can properly function, without fear of being subjected to violent, menacing street crime." August 11 Presidential Memorandum § 1. Additionally, the memorandum provides that it is the President's duty to "Federal workers to secure the safety and the peaceful functioning of our Nation, the Federal Government, and our city." *Id.*

---

[28] Both OLC opinions rely on *In re Neagle*, in which the Supreme Court determined that the use of troops would be permissible in the protection of essential public functions like the flow of interstate mail and the safeguarding of public land. 135 U.S. 1, 65 (1890). The Mayday OLC Opinion also cites *In re Debs*, which reiterates the power to "use . . . force on the part of the executive authorities" if there is an obstruction to interstate commerce. 158 U.S. 564, 582 (1895) ("The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the nation, and all its militia, are at the service of the nation, to compel obedience to its laws."). As another district court addressing similar issues recently noted, *Neagle* and *Debs* must be read in their context—the first arose from "well-documented threats against a sitting Supreme Court Justice," and the second "involved a massive strike that effectively halted mail delivery across the country." *Newsom*, 2025 WL 2501619, at *23. The Court similarly declines to stretch those cases, "made in response to historic threats," to now "grant the President a perpetual, atextual right to defy Congress if he determines it necessary to protect federal property, personnel, or functions." *Id.*

While the President certainly may have some Article II powers to protect federal functioning and property, including in the District, such powers cannot justify the deployment of the DCNG in this case. As Commander in Chief of the DCNG, the President must exercise his powers in a manner that is consistent with Congress's power over the governance of the District. When the DCNG is in state militia status, the President is exercising delegated authority from Congress's exclusive constitutional power over the District. *See* U.S. Const. art. I, § 8, cl. 17 (granting Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District"). Congress, too, has authority to legislate for the protection and regulation of federal property. *Id*. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting . . . Property belonging to the United States."). The D.C. Code states that the D.C. Council has no authority to pass laws that "concern[] the functions or property of the United States." D.C. Code § 1-206.02(a)(3). That reserved power, carved out from the Home Rule Act, remains with Congress. Pub. L. No. 93-198, § 602(A), 87 Stat. 774.

In passing Title 49, Congress has specified the instances in which the President is allowed to deploy the DCNG to protect federal functioning in the District. In section 49-103, for example, Congress has recognized that there are instances in which federal property or functioning may need to be protected by forces stronger than those the civil authorities can call upon and carved out limited instances for the President to intervene. *See* D.C. Code § 49-103. The President cannot now assert an Article II power that operates as if in an "open field"; instead, he must wield any Article II powers he has in a manner that co-exists with the statutory scheme set up by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 639 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional

powers minus any constitutional powers of Congress over the matter."). Like in *Youngstown*, Defendants' assertion of executive power here would leave Congress powerless to exercise its authority under the District Clause. Stretched to an extreme, a freestanding Article II power to protect the functioning of the federal government or enforce the D.C. Code would allow the President day-to-day control over the functioning of the entire District. But such power would run headlong into the Constitution's allocation of the governance of the District to Congress. Here, Congress has drawn a line between what remains in the President's power and what is carved out for D.C.'s home rule. For the DCNG's state militia operations, that line is embodied in Title 49.

Finally, in examining the historical record, the Court finds that, even when faced with mass protests or demonstrations, the President has either federalized the National Guard or responded to a call from a civil authority, drawing upon powers based in statute. Just over five years ago, the President did not invoke any inherent Article II power over federal property to clear Lafayette Park—a park operated by the National Park Service directly in front of the White House. Instead, the President waited for requests made by the U.S. Marshals before deploying the DCNG, pursuant to D.C. Code § 49-103. *See* OIG Report at 73–74. The Court finds the historical practice of Presidents—the Lafayette Park example and others cited above—to be persuasive evidence of the Executive Branch's historical understanding of its Article II powers over the DCNG: as powers that must be exercised consistent with Congress's direction in Title 49.

*    *    *

In sum, the DOD Defendants rely on three separate provisions of the D.C. Code to support the deployment of the DCNG in this case: (1) the "other duties" language in section 49-102, (2) the "aid" to civil authorities language in sections 49-404 and 49-103, and (3) the President's status as the Commander in Chief of the DCNG under section 49-409. None of these statutory bases

40

support the deployment of the DCNG in the District for crime deterrence purposes. Nor does the President have an Article II power that can override Congress's statutory scheme governing the District. Accordingly, the Court finds no statutory authority supporting the DOD Defendants' actions and that the District is likely to succeed on the merits of its claim.

### 4.  Out-of-State National Guard Units

The DCNG only forms part of the current National Guard deployment in the District. Over 1,000 out-of-state National Guard members are also deployed in the District in reliance on the President's authority under 32 U.S.C. § 502(f). ECF 3-1 at 38 ("The out-of-state National Guard units called into the District are all in state militia status under Title 32."); ECF 35-1 at 35 ("The parties all agree that out-of-District National Guard units are all operating in Title 32 status."). Within the context and structure of Title 32, the Court finds that section 502(f) cannot bear the expansive interpretation that Defendants attribute to it and that Plaintiff is also likely to succeed on the merits of this claim.

Title 32 of the U.S. Code outlines a hybrid federal-state status for the National Guard. Under Title 32, guard members "fall under the command and control of their state or territory governor, but their duty is federally funded and regulated." *National Guard Duty Statuses*, National Guard Bureau, https://perma.cc/V9C4-GMTA. Under section 502(f), a member of the National Guard may "be ordered to perform training or other duty" in "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(2)(A). Defendants adopt a reading of section 502 that allows state National Guard units to support any "operation[] or mission[]" requested by the President and consented to by the state governor. Hr'g Tr. 63:14–16 ("Congress has used broad language, but it has to be . . . support of operations or missions undertaken by the member's unit at the request of the President

41

or Secretary of Defense."). The District, on the other hand, argues that Title 32 contains no authority to justify what Defendants have done here—entering Memorandums of Understanding with the states and calling those out-of-state units to D.C. The District reads section 502(f) to empower the federal government to fund and support activities that state National Guard units have authority to undertake under state law, but does not provide authorization for state National Guard units to fulfill any and all federally requested missions. *See* Hr'g Tr. 20:18–22.

The Court concludes that section 502(f)(2)(A) is best understood to encompass operations or missions requested by the President that are authorized under state law. Accordingly, the Court finds that section 502 cannot support the out-of-state National Guards' operations in the District because there is no state-law basis for those Guards to travel to the District and the EMAC has not been invoked as the mechanism for their deployment. As a result, the Court finds that the DOD Defendants' actions are likely to have exceeded the scope of section 502.[29]

---

[29] The Parties also dispute the extent to which the federal government is improperly exercising "command and control" over the out-of-state units in Title 32 status. ECF 3-1 at 36; ECF 35-1 at 35. The District argues that both the Constitution and federal law bar the federal government from exercising day-to-day control over state National Guard units in state militia status. ECF 3-1 at 37. Discovery has shown that the out-of-state units are operating under the day-to-day instructions of the DCNG and the JTF-DC. It is unclear in this situation, given the DCNG's unique structure, whether the out-of-state units are operating under *federal* command and control or under the DCNG's operational control pursuant to its authority as a receiving jurisdiction. If the out-of-state units were properly operating in D.C. under Title 32 and the EMAC, the DCNG would be in the position of the state receiving assistance. Under Article IV of the EMAC, "[e]mergency forces will continue under the command and control of their regular leaders, but the organizational units will come under the operational control of the emergency services authorities of the state receiving assistance." Pub. L. No. 104-321, 110 Stat. at 3879. Under the EMAC, sending states have signed up to delegate, by default, a portion of their day-to-day operational control to the receiving state in service of the efficiency of emergency management. If the out-of-state units were properly in the District pursuant to state mutual assistance authority under the EMAC, it would not be improper for the DCNG to issue day-to-day operational orders to the out-of-state National Guards and such orders would not violate prohibitions that the out-of-state National Guards remain under state command. Given the lack of briefing on this unique jurisdictional line in the context of the District—where state command is federal command—the Court declines to address this question in this opinion. This separate question is not necessary to decide whether the out-of-state units are properly in the District pursuant to Title 32.

42

### a.  Section 502(f) is Best Read as a Limited Grant of Authority for Federal Requests for Missions That are Permitted Under State Law.

Under section 502(f), state National Guard units can "perform training or other duty" in "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f). Defendants argue that the plain text of section 502(f) lends itself to capacious interpretation, authorizing support of any "operations" or "missions" requested by the President. *See, e.g.*, *Operation*, Webster's II Dictionary 499 (3rd ed. 2005) (defining "operation" as a "military action or campaign"); *Operation*, Merriam-Webster's Collegiate Dictionary 869 (11th ed. 2003) (a "military action, mission, or maneuver including its planning and execution"). Defendants argue, in essence, that Title 32 allows the President to call up the state National Guards for any federal mission, at any time, for any purpose. ECF 35-1 at 33 ("[N]othing in Section 502(f) limits the types of missions that the President and Secretary of Defense can request."). The only check, in their view, is that the President must receive the consent of the state governor whose National Guard unit is being deployed. *See* Hr'g Tr. 63:18–24. Section 502(f)'s intended scope, however, is narrower and focused on providing federal support for operational missions that the relevant National Guard unit already had authority to undertake under state law. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute."); *Maracich v. Spears*, 570 U.S. 48, 65 (2013) ("It is necessary and required that an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning.").

To start, consider the historical backdrop of Title 32. In 1903, Congress created what has now become Title 32 by providing for a federally funded, state-controlled training status for the

National Guard. *See* An Act to Promote the Efficiency of the Militia, and for Other Purposes, ch. 196, § 14, 32 Stat. 775, 777 (1903) (providing federal funds for "field or camp service for instruction" of the organized militia). Section 502 sits within Chapter 5 of Title 32, which is entitled "Training." Title 32 establishes the scope of permitted activities under "full-time National Guard duty," which is defined as "training or other duty . . . performed by a member of the [National Guard] . . . in the member's status as a member of the National Guard of a State or territory, the Commonwealth of Puerto Rico, or the District of Columbia under section 316, 502, 503, 504, or 505 of this Title." 32 U.S.C. § 101(19); *see also* 10 U.S.C. § 101(d)(5). Section 316 allows the President to detail officers of the Army National Guard "to duty as instructors at rifle ranges." 32 U.S.C. § 316. Sections 503, 504, and 505 permit the National Guard to, with authorization of the Secretary of the Army or of the Air Force, (1) participate in "encampments, maneuvers, outdoor target practice, or other exercises for field or coast-defense instruction," *id*. § 503(a)(1); (2) "attend schools conducted by the Army or the Air Force," *id*. § 504(a)(1); or (3) be attached to a branch of the Army or Air Force for "routine practical instruction." *Id*. § 505. Subsections 502(a)–(e), too, discuss training; 502(a), for example, permits the federal government to order state National Guard units to conduct a certain number of days of training per year. *Id*. § 502(a). The theme is clear: Chapter 5 of Title 32 provides authorities for state National Guard activities related to training and interoperability between the National Guard, the Army, and the Air Force. Christopher R. Brown, *Been There, Doing That in a Title 32 Status: The National Guard Now Authorized to Perform Its 400-Year-Old Domestic Mission in Title 32 Status*, 2008-MAY Army Law 23, 29 (2008) ("It is in Title 32 status that the National Guard generally 'trains' rather than 'operates' because training to perform the dual mission . . . is the primary task of Army National Guard units in peacetime.").

Although Section 502 was originally narrowly focused on training, it has been expanded over the years to cover federal support of state operational missions. In 1964, Congress amended section 502 by adding subsection (f), creating section 502(f)'s "other duty" status:

> (f) Under regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may—
>> (1) without his consent, but with the pay and allowances provided by law; or
>> (2) with his consent, either with or without pay and allowances;
> be ordered to perform *training or other duty* in addition to that prescribed under subsection (a). Duty without pay shall be considered for all purposes as if it were duty with pay.

Act of Oct. 3, 1964, Pub. L. No. 88-621, § 1(1), 78 Stat. 999 (emphasis added). Relying on the grant of authority that permitted "other dut[ies]" in addition to training, the federal government could now ask state National Guard units to perform "specific, statutorily authorized operational missions . . . under state control." Brown, *supra*, at 30. Section 502(f)'s "other duty" status was invoked to "provide federal pay and benefits to the National Guard personnel who provided security at many of the nation's airports after September 11, 2001, and who participated in disaster relief operations in response to hurricanes Katrina and Rita in 2005." Jennifer K. Elsea, Cong. Rsch. Serv., LSB10121, The President's Authority to Use the National Guard or the Armed Forces to Secure the Border 2 (June 15, 2023).

Also in the aftermath of the September 11th attacks, Congress "significantly increased the authority for the Federal Government to fund these National Guard domestic operations in Title 32 status." Brown, *supra*, at 23. First, in 2002, Congress provided authority for National Guard units serving under section 502(f) to perform "duties in support of emergency preparedness" or to "respond to any emergency" involving weapons of mass destruction or terrorist attacks. *See* Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 514, 116 Stat. 2458, 2539 (2002) (amending 10 U.S.C. § 12310(c)(1)(A) & (B)). Second, in 2004, Congress

passed Chapter 9 of Title 32, authorizing the Secretary of Defense to provide funds to state governors to employ state National Guard units to "conduct homeland defense activities that the Secretary determines to be necessary and appropriate for participation by the National Guard units or members." 32 U.S.C. § 902; *id*. § 904(a) (providing that "[a]ll duty performed under this chapter shall be considered to be full-time National Guard duty under section 502(f) of this title"). Under such a scheme, "the states benefit from . . . cost sharing" and "are not required to reimburse the federal government for the use of federal equipment." Brown, *supra*, at 34.

After the passage of Chapter 9, various state governors unsuccessfully attempted to use the new homeland defense authorities but were stymied by the cumbersome requirements for receiving federal assistance. Brown, *supra*, at 31–32. In response to "confusion and frustration regarding the apparent nonuse of" Chapter 9, *id*. at 32, Congress amended section 502 in 2006 by adding section 502(f)(2), further expanding state National Guards' ability to undertake operations with federal support. John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 525(c), 120 Stat. 2083, 2195 (2006). The newly added section reads:

> (2) The training or duty ordered to be performed under paragraph (1) may include the following:
>
> > (A) *Support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense.*
> >
> > (B) Support of training operations and training missions assigned in whole or in part to the National Guard by the Secretary concerned, but only to the extent that such training missions and training operations--
> >
> > > (i) are performed in the United States or the Commonwealth of Puerto Rico or possessions of the United States; and
> > >
> > > (ii) are only to instruct active duty military, foreign military (under the same authorities and restrictions applicable to active duty troops), Department of Defense contractor personnel, or Department of Defense civilian employees.

32 U.S.C. § 502(f)(2) (emphasis added).

46

In light of the amendment history of section 502, section 502(f)(2)(A) is best read to permit federal support of federally-requested state National Guard missions. In other words, the President or Secretary of Defense can request—and use federal funds to support—state-authorized National Guard activities that the President or Secretary believes would serve a national purpose. Such a reading conforms with the prior understanding of section 502(f)'s "other duty" status, which was not seen as an independent grant of authority for new federal missions. Instead, missions undertaken in section 502(f)'s "other duty" status referred to missions authorized by state governors that were eligible for federal support. *See* 32 U.S.C. § 112(a) ("The Secretary of Defense may provide funds to the Governor of a State who submits to the Secretary a State drug interdiction and counter-drug activities plan."); *id.* § 112(c)(5) (allowing state National Guard units in Title 32 status to participate in drug interdiction activities when "the use of the National Guard of the State for the activities proposed under the plan is authorized by, and is consistent with, State law"); *id.* § 902 ("The Secretary of Defense may provide funds to a Governor to employ National Guard units or members to conduct homeland defense activities that the Secretary determines to be necessary and appropriate."). Section 902, for example, does not provide that the Secretary of Defense can call up the state National Guard units for "homeland defense activities" directly ordered by the Secretary. *Id.* § 902. Instead, the section states that the Secretary of Defense "may provide funds to a Governor to employ National Guard units" to conduct homeland defense activities. *Id.* The power to deploy the National Guard comes from the governor's authorities under state law; the Secretary can then decide which activities are necessary and appropriate to fund for homeland defense purposes under Title 32. As is the case here, the state governor retains control and can accept or decline the mission. But to accept the mission, the state governor must exercise

47

authorities *that already exist* under state law. The governor is granted no new authority under section 502(f).

Looking to state law, the out-of-state National Guard units would only have authorization to operate in the District if (1) the District had statutory authority to undertake the requested activities, and (2) had properly requested other states' assistance under the EMAC. D.C. Code § 7-2332; Pub. L. No. 104-321, § 1, 110 Stat. at 3877. First, under the EMAC, the sending states' emergency forces are afforded "the same powers, . . . duties, rights, and privileges as are afforded forces of the state in which they are performing emergency services." D.C. Code § 7-2332 (Article IV, Limitations). If the DCNG does not have the authority to conduct general crime deterrence in the District itself, it also cannot invite out-of-state National Guard units to do so. Second, as previously explained, "[d]uty statuses" like Title 32 "are not a mechanism for a deployment outside of the home state." *Duty Status*, EMAC, https://perma.cc/J6F7-D5CW. Instead, the EMAC "serves as th[e] mechanism" for those out-of-state-deployments and "provides [legal] protections . . . for the deploying forces." *Id.* ("[T]he EMAC mission is needed as the deployment mechanism."). The District has not made any requests to other states for assistance through the EMAC and has not invoked a deployment mechanism for those out-of-state units to come to the District.

Defendants argue that the EMAC can never be used to accept National Guard members into the District from other states, and that D.C. Code § 7-2332 only codifies the "terms of the EMAC that *apply* to D.C.," excluding the "National Guard terms." ECF 35-1 at 30. Defendants also argue that even if such authority did exist, the President, not the Mayor, would exercise it on the District's behalf. *Id.* at 31. But Defendants' reading finds no support in the text of D.C. Code § 7-2332, which does not carve out the National Guard in any provision. Instead, the statute codifies the EMAC and states that emergency forces will only be activated "subsequent to a

declaration of a state of emergency or disaster by . . . the Mayor of the District of Columbia." D.C. Code § 7-2332 (Article IV of the EMAC).[30] And while Defendants correctly observe that the Mayor cannot deploy the DCNG to other states, the District government is permitted to "receive other State[s'] resources" under the compact, including their National Guard units operating under state control. Off. of the Gen. Counsel, Nat'l Guard Bureau, Dep't of Defense, Domestic Operations Law and Policy 75 (3d ed. 2024) [hereinafter Domestic Operations Law and Policy Manual]. In other words, a civilian official in the District government, "acting on behalf of the Mayor," can "request[] other [state active duty] forces to augment DCNG." *Id.*

The historical practice surrounding inaugurations supports the reading that interstate deployments rely upon authority otherwise granted under state law and contradicts Defendants' view of the District's role in the compact. When the DCNG is called upon to support law enforcement at inaugurations and "anticipates the exercise of [law enforcement]-like functions," the Mayor designates members of the DCNG as special police officers under D.C. Code § 5-129.03. Domestic Operations Law and Policy Manual at 74 (noting that D.C. Code § 5-129.03 permits the Mayor to appoint "special privates without pay" for days of "public election, ceremony, or celebration"). Title 32 orders issued to the DCNG and to out-of-state National Guard units then permit those forces to exercise "authority to act under . . . Title 5 of the D.C. Code." *Id.* This practice confirms an understanding that D.C. law—authority provided by the Mayor under Title 5—forms the legal basis for out-of-state National Guards to support D.C. law enforcement.

---

[30] Defendants again rely on D.C. Code § 1-206.02(b) to argue that the Mayor does not have the authority to obtain out-of-District assistance under the EMAC because the District does not have any greater authority over the National Guard under Home Rule than it did before 1975. ECF 35-1 at 31. Such an argument is not persuasive, however, when a separate provision of the D.C. Code gives the Mayor power to submit requests under the compact. D.C. Code § 7-2332 ("The Mayor is hereby authorized to execute, on behalf of the District of Columbia, the Emergency Management Assistance Compact."). In submitting requests through the EMAC, the Mayor is not commanding or controlling the DCNG—i.e., not directly exercising authority "over" the DCNG—but exercising a different authority to call for out-of-state assistance.

In short, Title 32 is a collection of federal statutes that define the federal government's involvement with state National Guard units, but its provisions do not change the scope of state command. As discussed in Section III.A.3, the DCNG has no state-law authority for the activities it is currently conducting and could not invite other states to assist it in those actions under the EMAC. Additionally, the District made no request through the EMAC here. As a result, no authority exists for the out-of-state National Guard units to operate in the District and Plaintiff is likely to succeed on the merits of its APA contrary to law claim.

### b. Defendants' Counter-Arguments Lead to Implausible Results, Upending the Fundamental Division of Power Between State and Federal Control over the National Guard.

Defendants, on the other hand, read section 502(f)(2)(A) as allowing the President to request any mission or operation from state National Guard units, including missions for which the President cannot utilize the federalized National Guard. Such a reading cannot be right. First, Defendants do not explain why Congress would bury such an expansive authority—in their view, a more flexible version of Title 10—in a subsection of a statute in a chapter focused on training. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (describing the principle that Congress does not "hide elephants in mouseholes"). Second, Defendants cannot articulate why this single amendment to Title 32 should be read to create operational authorization for the underlying activities, when other Title 32 provisions are structurally designed to rely on governors' powers under state law. *See* 32 U.S.C. § 112(c)(5) (allowing state National Guard units in Title 32 status to participate in drug interdiction activities when "the use of the National Guard of the State for the activities proposed under the plan is authorized by . . . State law"); *id.* § 906 ("A Governor of a State may request funding assistance for the homeland defense activities of the National Guard of that State from the Secretary of Defense."). Another amendment passed in the same package as

50

the updated section 502(f) demonstrates that Congress did not view the addition of section 502(f)(2)(A) as altering the fundamental scheme of Title 32. The bill also added to an existing statute to permit members "serving on full-time National Guard duty under section 502(f)" to assist in emergency preparedness or help respond to emergencies involving a "natural or manmade disaster in the United States." Pub. L. No. 109-364, § 527, 120 Stat. at 2196 (modifying 10 U.S.C. § 12310(c)). Defendants offer no explanation as to why Congress would establish such a specific emergency provision if it thought that section 502(f)(2)(A) already empowered the National Guard to undertake any mission the President requested.

At argument, Defendants cited past instances of the deployment of the National Guard under Title 32 as support for its broad interpretation of the statute, noting that Presidents have previously utilized the provision to undertake border patrol missions. Hr'g Tr. 53:2–22 (citing other 502(f) missions as "helpful data points"). But those historical examples confirm, rather than undermine, the principle that missions under section 502(f)(2)(A) must be authorized by state law, rather than presidential request. Defendants cite two border-control missions—Operation Jump Start and Operation Phalanx—performed by state National Guard units beginning in 2006 and 2010 respectively. Under Operation Jump Start, more than 6,000 Guardsmen from states across the country were called to the border, while Operation Phalanx involved about 1,200 Guardsmen from the border states. Luis Martinez, *Pentagon Has Few Details About Guard Deployment to Border*, ABC News (April 5, 2018), https://perma.cc/A5TB-N5FD. For Operation Jump Start, the governors of Arizona, California, New Mexico, and Texas "officially requested" federal support in managing the crisis at the border and executed a memorandum of agreement to request out-of-state assistance. Major Jonathan E. Marang, *Operation Jump Start*, Marine Corps Gazette 80 (Nov. 2018), https://perma.cc/64MN-TPJZ. In these operations, "National Guard personnel involved in

activities on the border [were] under the command and control of the governors of the southwest border states and . . . received federal funding in Title 32 status." U.S. Gov't Accountability Off., GAO-12-657T, Border Security: Observations on Costs, Benefits, and Challenges of a Department of Defense Role in Helping to Secure the Southwest Land Border 7 (2012).

The authority for these operations, then, came not from the President's request that such operations take place, but from the requesting states. Arizona, California, New Mexico, and Texas asserted their authority to deploy their own National Guards to assist with emergencies at the border.[31] *See, e.g.*, Ariz. Rev. Stat. § 26-172(A) ("When the governor proclaims an emergency . . . the governor may mobilize all or any part of the national guard or the unorganized militia into service of the state."); Cal. Mil. & Vet. Code § 146(a) (noting that the governor can call the California National Guard into state active service in case of "emergency, or imminent danger thereof, or resistance to the laws of this state or the United States"). Title 32 was invoked to support, not authorize, such operations. In fact, one Congressional Research Service report describing those operations noted that "[a]lthough National Guard members did not engage in direct law enforcement activities during these two border security operations, it is possible that *states* might consider giving them that authority in future operations." Elsea, *supra*, at 2 (emphasis added). The reliance on state authority is also consistent with the National Guard's own interpretations of Title 32. Nat'l Guard Bureau, Nat'l Guard Reg. 500-5, Nat'l Guard Domestic Law Enforcement Support & Mission Assurance Operations § 4–2(a) (Aug. 18, 2010) ("The National Guard normally serves on state active duty or Title 32 status when providing support during these operations, and is under the command of the state's Governor, in accordance with

---

[31] It is also notable that the National Guard units were not serving in a "direct law enforcement role" by enforcing federal law at the border, but instead assisting with engineering, aviation, entry identification teams, and other forms of logistical and administrative support. Elsea, *supra,* at 1–2.

state law."); *id.* § 4-2(b) ("Governors may authorize the use of the National Guard to assist civil authorities and support law enforcement activities according to state law or the state constitution.").

Finally, since the Founding, governing law has recognized that the militia operates as both a federal and state organization, but that different rules apply to its different statuses. The Militia Clause mandates that Congress shall have the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States." U.S. Const. art. I, § 8, cl. 16. In other words, when the militia is in state status, Congress can provide resources for "organizing, arming, and disciplining" them, but can only "govern[] such Part of them as may be employed" in federalized service. *Id.* And the Constitution reserves to the states the powers to appoint officers and "the Authority of training the Militia according to the discipline prescribed by Congress." *Id.*

This bedrock division between two separate statuses for operating the National Guard— under state active duty or as part of the federal armed forces—has not been erased by section 502(f) of Title 32. Congress and the states have crafted an intricate framework governing the National Guard in its different roles, with specific checks imposed, and the Court will not read section 502(f) to render these checks superfluous. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("When there are two acts upon the same subject, the rule is to give effect to both if possible.").

And these checks on federal power have endured for good reason. The President wields a powerful tool under Title 10 and the Insurrection Act. *See* 10 U.S.C. §§ 251–53, 12406. Under those statutes, the President can call up the National Guard of any state, without its governor's

consent, and deploy it to any other state. *See id*. That expansive Title 10 authority, however, is limited by equally strong restraints. The President is only allowed to federalize the National Guard during an insurrection, invasion, rebellion, or when regular forces cannot suffice to execute the laws. *Id*. Courts have recently upheld limits on the President's power to federalize the National Guard when those conditions are not met. *See Illinois v. Trump*, 155 F.4th 929, 938–39 (7th Cir. 2025) (concluding that the federal government was unlikely to succeed on its argument that it had met the prerequisites for federalizing the National Guard under 10 U.S.C. § 12406). Additionally, the federalized National Guard is considered part of the federal armed forces and subject to the Posse Comitatus Act's prohibition on the use of armed forces in domestic law enforcement. *See* 18 U.S.C. § 1385 (barring "any part of the Army" or the Air Force from being used to "execute the laws"). Defendants' reading of section 502(f) would obviate the need to satisfy the predicates found in Title 10 and the Insurrection Act and provide an escape hatch from the PCA, allocating power to the President without any corresponding checks.[32]

State active duty status, on the other hand, has traditionally come with its own benefits and limitations. The National Guard is not subject to the PCA when operating under state active duty, permitting those units to engage in a wider array of activities. *Mueller*, 943 F.3d at 837 (holding that the PCA "only bars the Army and Air Force from domestic law enforcement"). In fact, many states explicitly allow their governors to call on the Guard to "execute the laws." *See, e.g.*, Miss. Code § 33-3-1 ("The Governor shall be Commander in Chief of the militia . . . and shall have

---

[32] Defendants argue that deployments of the state National Guard under section 502(f) are still constrained by the need to receive the sending state governor's consent. Hr'g Tr. 63:25–64:4 (arguing that "while 502(f) is written broadly," any missions authorized under the statute would need approval from "high-level" state and federal authorities, who "have to come to some agreement on the necessity of th[e] project"). Such an argument, however, does not respond to two of the key issues raised by their interpretation: (1) that reading section 502(f) broadly would allow the President to avoid the strictures of the Posse Comitatus Act, and (2) that permitting such missions would risk trampling on the sovereignty of the receiving states, who are not required to consent to the section 502(f) missions under Defendants' interpretation.

power to call forth the militia to execute the laws."). But state governors are not generally authorized to act outside of their own state's borders or to respond to crises outside of their jurisdictions. Congress and the states have developed the EMAC as a mechanism that permits states to send their National Guards to assist other states in times of crisis. *See* Pub. L. No. 104-321, 110 Stat. at 3878–79 (Articles II and III of the EMAC, describing general implementation and party state responsibilities); *id.* at 3877 (stating that the purpose of the compact is to "provide for mutual assistance between the states . . . in managing any emergency disaster," including "community disorders"). The EMAC, however, requires the consent of both the sending and receiving states, while Defendants' interpretation of section 502(f) would allow the President to ignore the receiving states' voices entirely.

As currently designed, Title 10, the EMAC, and the PCA function as interlocking pieces of a comprehensive scheme, placing limits on the use of the National Guard under both its federal and state statuses. For example, the EMAC carefully carves out the President's activities under Title 10 from its scope. Pub. L. No. 104-321, 110 Stat. at 3882 (Article XIII of the EMAC, stating that nothing in the compact "shall authorize or permit the use of military force by the National Guard of a state at any place outside that state in any emergency for which the President is authorized by law" to federalize the National Guard). The compact also does not permit the use of the state National Guards for law enforcement in the absence of express authorization. *Id.* (prohibiting the use of National Guard units under the EMAC "for any purpose for which the use of the Army or the Air Force would in the absence of express statutory authorization be prohibited under" the PCA). Defendants, on the other hand, read 32 U.S.C. § 502(f) to erase all boundaries between the state and federal National Guards and the respective limits on their use. *Contra Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (stating that courts' construction of terms "must,

to the extent possible, ensure that the statutory scheme is coherent and consistent"). Under their interpretation of Title 32, the President could send a non-federalized National Guard unit to another state, against the receiving state's will, to conduct any operation or mission the President directs. As the Seventh Circuit has recently noted, such an interpretation would raise serious constitutional questions implicating the Tenth Amendment's protections of state sovereignty. *See Illinois*, 155 F.4th at 940 (finding "an incursion on Illinois's sovereignty" when National Guard members from Texas are deployed to Illinois "over the state's objection"). The Court declines to adopt an interpretation of section 502(f) that would raise such serious constitutional questions.[33] *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (noting that when "choosing between competing plausible interpretations of a statutory text," courts can "rest[] on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

After delineating the specific powers and statutory schemes governing the state and federal National Guards in Title 10, the PCA, and the EMAC, Congress has not eviscerated those limits by amending section 502. As a result, the Court rejects Defendants' interpretation and finds that the out-of-state National Guards are likely operating in the District in a manner contrary to law. Under section 502(f), state law defines the permissible use of the National Guard under state control—i.e., which missions the governors can order their units to conduct. Here, the state governors whose units are currently operating in the District lack authority to order these missions because the District has not properly sought their aid under D.C. law and the EMAC.

---

[33] Defendants argue that the Court cannot consider any state sovereignty issues raised by their interpretation because the Plaintiff in this case is not a state. But Defendants have not articulated how their interpretation of section 502(f) would apply differently to states, as opposed to the District. *See Clark*, 543 U.S. at 382 (declining to adopt an interpretative approach in which a statute's meaning would be "subject to change depending on the presence or absence of constitutional concerns in each individual case").

\*    \*    \*

In sum, the Court concludes that the District is likely to succeed on the merits of its statutory arguments against Defendants' deployments of both the DCNG and the out-of-state National Guards. The Court now moves to analyzing the remaining preliminary injunction and stay factors: irreparable harm, balance of the equities, and the public interest.

## B. Remaining Preliminary Injunction and Stay Factors

The Court finds that the District has demonstrated irreparable harm from Defendants' infringements on its ability to exercise sovereign powers within its jurisdiction. The balance of the equities and the public interest also favor preliminary relief here.

### 1. Irreparable Harm

To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The Court finds that the District has demonstrated irreparable harm from the DOD Defendants' actions deploying the National Guard and usurping the District's rights to home rule.

Defendants do not contest that sovereign injuries to states constitute irreparable harm. *See Kentucky v. EPA*, Nos. 23-3126, 23-3225, 2023 WL 11871967, at \*4 (6th Cir. July 25, 2023) ("[I]nvasions of state sovereignty likely cannot be economically quantified, and thus cannot be monetarily redressed, and as such constitute irreparable harm."); *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) ("[A] stay is necessary to prevent the irreparable harm to state sovereignty."). Instead, Defendants argue that the District cannot assert a sovereign injury because

the District government is a "statutory creation," exercising "a limited set of delegated authorities." ECF 35-1 at 48–49.

As discussed above in Section III.A.1, however, the Court finds that the District can assert injuries to the exercise of the sovereign powers that Congress has delegated to it. Under D.C. law, the powers to "preserve the public peace," "prevent crime and arrest offenders," and "enforce and obey all laws" are reserved to the local elected representatives of the District. D.C. Code § 5-101.03(1), (2), (10); *see id.* § 1-204.22 ("The Mayor shall be responsible for the proper execution of all laws relating to the District."). The deployments of the DCNG and the out-of-state National Guards have infringed upon the District's right to govern itself and to make its own decisions on key elements of home rule, including how to best deter crime and when to call for emergency assistance from other states. *See supra* Section III.A.1; *Harris v. Lee*, No. 25-1461-I, slip op. at 32 (Tenn. Ch. Ct. Nov. 17, 2025) (finding irreparable harm where Memphis mayor and county officials were "deprived . . . of the ability to exercise their authority, rights, and duties as current elected public officials under Tennessee law"). Those injuries are concrete, immediate, and irreparable. Defendants have not suggested, for example, how after-the-fact relief could rectify these intrusions, and the Court can think of none. *Cf. Ctr. for Biological Diversity v. Regan*, No. 21-cv-119, 2024 WL 1740078, at *5 (D.D.C. Apr. 23, 2024) (refusing to find irreparable harm because Florida "remain[ed] free to enforce state law and to exercise its traditional sovereign authority").[34] Defendants have improperly reallocated the exercise of the District's sovereign

---

[34] Defendants' arguments that the National Guard is helping the District by supporting law enforcement agencies is not responsive to the self-government injury the District has asserted. ECF 35-1 at 48. Additionally, while it is true that Congress has given some law enforcement powers in the District to other actors, including the President's emergency powers over the MPD, those limited powers are carved out from the District's sphere of home rule. *See* D.C. Code § 1-207.40. Defendants' exercise of their powers over the DCNG would similarly not injure the District if Defendants were exercising their powers within the bounds authorized by D.C. law.

Defendants have also suggested that the District's delay in filing this lawsuit undermines its claim of irreparable harm. ECF 35-1 at 53 (noting that the District "waited nearly a month to even seek an injunction"). But

powers to the commanders of the DCNG and the out-of-state Guard units and such harm, if it proceeds during the course of this litigation, could not be remediated. The Court finds that the irreparable harm factor supports the granting of preliminary relief in this case.

### 2. Balance of the Equities and Public Interest

The balance of the equities and the public interest also tip in the District's favor. These factors "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). Defendants argue that granting an injunction in this case would impinge on the President's "longstanding and express authority as Commander in Chief" of the DCNG and "second guess" the President's judgment on crime rates in the District. ECF 35-1 at 52. Defendants also ask the Court to weigh the benefits they say the deployment is delivering to "residents, federal employees, and visitors," such as a reduction in violent crime. *Id*. at 53. The Court recognizes, as the Ninth and Seventh Circuits have, that the federal government has a strong interest in the protection of federal functions and property—in this case, through the deterrence of crime in the District. *See Illinois*, 155 F.4th at 940; *Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025). But the District and the public have countervailing interests to not be subject to the presence of National Guard units who have exceeded the bounds of their lawful authority. That is because "[t]here is generally no public interest in the perpetuation of unlawful agency action," but "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice or reads

---

the District's sovereign powers injury is ongoing for the duration of the improper deployments. The Court also finds that the District's delay is explained by uncertainty over the factual circumstances surrounding the initial deployment, including its need for discovery from Defendants. *Cf. Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (finding that an "unexcused delay" in seeking injunctive relief may imply a lack of irreparable harm).

a statute as required."). Because of the District's strong public interest in enforcing "its duly enacted law," *Hansen v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024), and its "high likelihood of success on the merits," *Newby*, 838 F.3d at 12, the Court concludes that a "preliminary injunction would serve the public interest." *Id.*

### C.  Stay Pending Appeal

Based on the analysis above, the Court finds that all four preliminary injunction factors weigh in the District's favor and will grant the District's motion for preliminary relief. The Court now considers Defendants' final argument, requesting that the Court administratively stay its order pending appeal. Hr'g Tr. 86:24–87:3. The Court finds that, under these circumstances, an administrative stay is necessary to permit orderly proceedings on appeal. Accordingly, the Court will stay its order granting preliminary relief for 21 days, until December 11, 2025.

"A stay pending appeal is an extraordinary remedy." *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). The Court must consider four factors before granting a stay motion: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434. While the Court again finds Defendants' arguments unpersuasive on the merits, the Court concludes that the public interest weighs in favor of granting Defendants a brief administrative stay. *See Marin Audubon Soc'y v. Fed. Aviation Admin.*, 129 F.4th 869, 871–72 (D.C. Cir. 2025) (as part of the consideration of the equities and the public interest, courts can evaluate "the practical effects" on the parties, including the need to avoid "substantial disruption"). As discussed throughout this opinion, over 2,000 members of the National Guard are currently deployed in the

District, including over 1,000 members from states outside the District. To prevent potential disruption to the functioning of the District and the National Guard during the appeals process, the Court will administratively stay its decision, "freez[ing] legal proceedings" to provide the D.C. Circuit time to rule on Defendants' request for relief. *See United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay) (describing courts' practice of issuing administrative stays "to permit time for briefing and deliberation"). The District has also indicated that it "does not oppose" a "time-limited administrative stay to permit orderly resolution of any request for emergency relief." ECF 57 at 51 n.22. The Court will thus stay its order for 21 days in order to "build in a grace period" and avoid "disruptive consequences" to the public. *Marin Audubon Soc'y*, 129 F.4th at 872.

*    *    *

For the foregoing reasons, Plaintiff's motion for preliminary relief, ECF 3, is **GRANTED** against the DOD Defendants. Defendants' motion to dismiss, ECF 35, is **DENIED in part** on those same claims. A separate order accompanies this memorandum opinion. The Court's order is administratively **STAYED** for 21 days, until December 11, 2025.

   **SO ORDERED.**

               _____
               JIA M. COBB
               United States District Judge

Date: November 20, 2025